POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUKE ROTTMAN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> E.L.F. BEAUTY, INC., TARANG P. AMIN, and MANDY J. FIELDS, <br><br> Defendants. | Case No. <br><br> <u>CLASS ACTION</u> <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Luke Rottman ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding e.l.f. Beauty, Inc. ("Elf" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff

believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Elf securities between November 1, 2023 and November 19, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Elf, together with its subsidiaries, provides cosmetic and skin care products under the e.l.f. Cosmetics, e.l.f. Skin, Well People, Naturium, and Keys Soulcare brand names.  The Company employs an "omni-channel distribution strategy" and sells its products with retailers in the U.S., as well as internationally.  Elf also sells its products online through its own direct e-commerce channels, as well as through other e-commerce websites.  According to the Company's "value proposition," "[e]ach of [its] brands has accessible pricing relative to its competitive set and furthers [the Company's] mission of making the best of beauty accessible to every eye, lip, face and skin concern. As an example, e.l.f. Cosmetics' average product price point is approximately $6, as compared to other leading mass cosmetics brands which have average product price points over $9 and prestige cosmetics brands which have average product price points over $20, according to Nielsen."

3.      The Company purports to have developed a "scalable, asset-light supply chain centered on the combination of speed to market, high-quality and low costs."  Substantially all of the Company's products are sourced and manufactured in China through "close collaboration

with a network of third-party manufacturers." Elf has also touted that it has "ample manufacturing capacity as well as redundant capabilities in the event that one or more suppliers cannot meet [its] needs" and that its "broad supply base gives [it] the ability to fulfill [its] product requirements and remain cost competitive."

4.      As a retail company, effective inventory management is critical to Elf's financial performance. Specifically, the Company derives revenue from "sales of [its] beauty products, net of provisions for sales discounts and allowances, product returns, markdowns and price adjustments." Accordingly, Elf's profitability depends, in large part, on ensuring that it maintains a volume of inventory that will allow the Company to effectively sell its products at a level that will meet customer demand. Conversely, Elf maintaining a level of inventory that is excessive relative to customer demand will result in the Company holding products that cannot be effectively sold and must therefore be written down or sold at a loss, thereby negatively impacting its profitability.

5.      As its investors would eventually learn, Elf's inventory management was woefully ineffective. In fiscal Q2 2024, the Company began identifying growth concerns when inventory levels rose as a consequence of flagging sales. However, Elf concealed this issue from investors. Instead, the Company described itself at all relevant times as one of a "rarified group of high-growth companies" with "strong relationships with [its] retail customers such as Target, Walmart, Ulta Beauty and other leading retailers that have enabled [it] to expand distribution both domestically and internationally" and consistently maintained that "the combination of its value proposition, innovation engine, ability to attract and engage consumers, and its world-class team's ability to execute with speed, has positioned the Company well to navigate the competitive beauty market."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

6.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) contrary to its representations to investors, the Company was experiencing rising inventory levels as a consequence of flagging sales; (ii) Elf falsely attributed the rising inventory levels to, among other things, changes in its sourcing practices; (iii) to maintain investor confidence, Elf reported inflated revenue, profits, and inventory over several quarters; (iv) accordingly. the Company's business and/or financial prospects were overstated; (v) all of the foregoing, once revealed, would likely have a material negative impact on the Company; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

7.      On November 20, 2024, Muddy Waters Research ("Muddy Waters") published a report entitled "e.l.f. Beauty, Inc. A Revenue and Inventory Mystery" (the "Muddy Waters Report"), alleging that Elf had "materially overstated revenue over the past three quarters," and that in "Q2 FY24, ELF management realized its growth narrative was in trouble as its inventory built.  It appears that ELF then began reporting inflated revenue and profits.  Its reported inventory also appears materially inflated as a result - i.e., to account for cash that has not really come in." Further, Muddy Waters accused the Company of concealing its inventory challenges from investors by falsely attributing its rising inventory levels to supposed changes in its sourcing practices rather than the true cause—insufficient sales.

8.      On this news, Elf's stock price fell $2.71 per share, or 2.23%, to close at $119.00 per share on November 20, 2024.

9.      Elf's share price continued to fall.  After the Class Period ended, on February 6, 2025, Elf released its fiscal Q3 2024 results and provided its fiscal 2025 outlook.  Specifically, Elf revealed that it expected full-year fiscal 2025 net sales growth to be 27%-28%, down from

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the previous guidance of 28-30%, and also revised its adjusted EBITDA guidance to $289-293 million, down from $304-308 million, resulting in part from the updated sales outlook and a $7 million foreign currency loss.  Further, the Company stated that it anticipated net sales growth was lowered to -1% to +2%, with management explaining that this reflected prudence amid softer consumption trends, challenging category conditions, and slower-than-expected new product performance.

10.    On March 5, 2025—*i.e.*, the last trading session before the filing of this Complaint—Elf's stock price closed at $64.67 per share, representing a total decline of $57.04 per share, or nearly 47%, since the truth about the Company's inventory management and revenue first came to light.

11.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Elf is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' activities took place within this District.

15.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.     Plaintiff, as set forth in the attached Certification, acquired Elf securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.     Defendant Elf is a Delaware corporation with principal executive offices located at 570 10th Street, Oakland, California 94607.  The Company's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "ELF."

18.     Defendant Tarang P. Amin ("Amin") has served as Elf's Chief Executive Officer at all relevant times.

19.     Defendant Mandy J. Fields ("Fields") has served as Elf's Chief Financial Officer at all relevant times.

20.     Defendants Amin and Fields are collectively referred to herein as the "Individual Defendants."

21.     The Individual Defendants possessed the power and authority to control the contents of Elf's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Elf's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Elf, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed

6

from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

22.    Elf and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

23.    Elf, together with its subsidiaries, provides cosmetic and skin care products under the e.l.f. Cosmetics, e.l.f. Skin, Well People, Naturium, and Keys Soulcare brand names worldwide.  The Company uses multiple third-party suppliers, primarily based in China, to source all of its products.  Elf has historically designated these products as Company inventory upon their physical delivery to its U.S. distribution center in Ontario, California.

24.    As a retail company, effective inventory management is critical to Elf's financial performance.  Specifically, the Company derives revenue from "sales of [its] beauty products, net of provisions for sales discounts and allowances, product returns, markdowns and price adjustments."  Accordingly, Elf's profitability depends, in large part, on ensuring that it maintains a volume of inventory that will allow the Company to effectively sell its products at a level that will meet customer demand.  Conversely, Elf maintaining a level of inventory that is excessive relative to customer demand will result in the Company holding products that cannot be effectively sold and must therefore be written down or sold at a loss, thereby negatively impacting its profitability.

### Materially False and Misleading Statements Issued During the Class Period

25.    The Class Period begins on November 1, 2023, when Elf issued a press release announcing the Company's fiscal Q2 2024 results.  The press release stated, in relevant part:

7

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

"We continue to deliver exceptional, consistent, category-leading sales growth," said [Defendant] Amin[.] "In Q2, *we grew net sales by 76% and category share by 330 basis points, marking our 19th consecutive quarter of growth in each. As we look ahead, the significant whitespace we see across color cosmetics, skin care and international gives us confidence that we are in the early innings of unlocking the full potential we see for e.l.f. Beauty*."

**Three Months Ended September 30, 2023 Results**

For the three months ended **September 30, 2023**, compared to the three months ended September 30, 2022:

- **Net sales** increased 76% to $215.5 million, primarily driven by strength in both retailer and e-commerce channels.[1]

26.     That same day, Elf hosted an earnings call with investors and analysts to discuss the Company's fiscal Q2 2024 results (the "Q2 2024 Earnings Call").  During the scripted portion of the Q2 2024 Earnings Call, Defendant Amin stated, in relevant part:

In Q2, we grew net sales by 76%, increased gross margin by 570 basis points and delivered $60 million in adjusted EBITDA, up 122% versus prior year.

Q2 marked our 19th consecutive quarter of net sales growth, putting e.l.f. Beauty in a select group of consistent, high-growth consumer companies. We're 1 of only 5 public consumer companies out of 274 that has grown for 19 straight quarters and average at least 20% sales growth per quarter.

***

Our fifth strategic imperative is to **deliver profitable growth**. Since 2019, we've been focused on the flywheel of investing behind our high ROI marketing and digital initiatives to drive top line growth, while also expanding our adjusted EBITDA margin. **We again delivered on this winning formula in Q2 with both strong top line growth and adjusted EBITDA margin expansion. Supported by a combination of our strong sales growth, gross margin expansion and leverage in our non-marketing [selling, general, and administrative] expenses**.

27.     Also during the scripted portion of the Q2 2024 Earnings Call, Defendant Fields stated, in relevant part:

Moving to the balance sheet and cash flow. Our balance sheet remains strong, and we believe positions us well to execute our long-term growth plans. **Our ending**

---

[1] All emphases included herein are added unless otherwise indicated.

*inventory balance was $147 million, in line with our expectations and up from $81 million a year ago. The difference is a combination of 2 things. As we said last quarter, we plan to build back our inventory levels through fiscal '24 to support the strong consumer demand we're seeing.*

*In addition, approximately $37 million of the increase is the result of taking ownership of inventory from China when it ships versus when it enters our distribution center here in the U.S. We ended the quarter with approximately $168 million in cash on hand compared to a cash balance of $85 million a year ago.* I'm also pleased with the approximately $27 million in free cash flow we generated in Q2. We ended the quarter with a net cash position and less than 1x leverage in terms of total debt to adjusted EBITDA.

\*\*\*

Turning to gross margin. In fiscal '24, we now expect our consolidated gross margin to be up approximately 225 basis points year-over-year as compared to our expectation for up 150 basis points previously. The improved outlook is largely a result of our outperformance in Q2, aided by lower inventory adjustments in the quarter and favorable mix. In terms of the key puts and takes for the rest of the year, we continue to expect gross margin to benefit from lower transportation costs, favorable FX rates, margin accretive mix and cost savings, which are expected to more than offset costs related to retailer activity and space expansion.

\*\*\*

We are quite pleased to be again in this position to meaningfully raise both our net sales growth and profitability outlook. In summary, we delivered a phenomenal second quarter. Our disciplined execution behind our 5 strategic imperatives has driven category-leading results over the last 19 quarters. The significant white space we see across color cosmetics, skin care and internationally, gives us confidence that we are still in the early innings of unlocking the full potential behind our brands.

28.     On November 2, 2023, Elf filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended September 30, 2023 (the "Q2 2024 10-Q").  In providing an overview of the Company, the Q2 2024 10-Q stated, in relevant part:

The Company believes its ability to deliver cruelty-free, clean, vegan and premium-quality products at accessible prices with broad appeal differentiates it in the beauty industry. ***The Company believes the combination of its value proposition, innovation engine, ability to attract and engage consumers, and its world-class team's ability to execute with speed, has positioned the Company well to navigate the competitive beauty market***.

9

The Company's family of brands includes e.l.f. Cosmetics, e.l.f. SKIN, Well People and Keys Soulcare. The Company's brands are available online and across leading beauty, mass-market and specialty retailers. The Company has strong relationships with its retail customers such as Target, Walmart, Ulta Beauty and other leading retailers that have enabled the Company to expand distribution both domestically and internationally.

29.      Appended to the Q2 2024 10-Q as an exhibit was a signed certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, attesting that "[t]he information in the [Q2 2024 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

30.      On February 6, 2024, Elf issued a press release announcing the Company's fiscal Q3 2024 results.  The press release stated, in relevant part:

> "Our vision is to create a different kind of beauty company and you can see that in the ***exceptional, consistent, category-leading growth we've delivered," said [Defendant] Amin[.] "In Q3, we grew net sales by 85% and market share by 305 basis points, marking our 20th consecutive quarter of growth in each***. I'm extremely proud of our team and the progress we continue to make across color cosmetics, skin care and internationally."
>
> **Three Months Ended December 31, 2023 Results**
>
> For the three months ended **December 31, 2023**, compared to the three months ended December 31, 2022:
>
> - **Net sales** increased 85% to $270.9 million, primarily driven by strength in both retailer and e-commerce channels.

31.      That same day, Elf hosted an earnings call with investors and analysts to discuss the Company's fiscal Q3 2024 results (the "Q3 2024 Earnings Call").  During the scripted portion of the Q3 2024 Earnings Call, Defendant Amin stated, in relevant part:

> In Q3, we grew net sales by 85%, increased gross margin by nearly 350 basis points, and delivered $59 million in adjusted EBITDA, up 61% versus prior year. Our vision is to create a different kind of beauty company by building brands that disrupt norms, shape culture, and connect communities through positivity, inclusivity, and accessibility.
>
> We've executed against this vision and delivered exceptional, consistent category leading growth. Q3 marked our 20th consecutive quarter of net sales growth,

putting e.l.f. Beauty in a rarefied group of consistent, high growth consumer companies. We're one of only five public consumer companies out of 274, that has grown for 20 straight quarters and averaged at least 20% sales growth per quarter.

\*\*\*

In summary, as we enter our 20th year as a company, we continue to deliver exceptional results. What gives me confidence for the future is a significant white space we see in color cosmetics, skin care, and international. We continue to believe we are still in the early innings of unlocking the full potential for our brands.

32.    Also during the scripted portion of the Q3 2024 Earnings Call, Defendant Fields stated, in relevant part:

> ***Our balance sheet remains strong and we believe positions us well to execute our long-term growth plans. We ended the quarter with approximately $72 million in cash on hand compared to a cash balance of $87 million a year ago. Our ending inventory balance was $205 million in-line with our expectations and up from $81 million a year ago***. The difference is primarily a combination of three things.
>
> First, as we said last quarter, ***we continued to build back our inventory levels through fiscal '24 to support strong consumer demand***.
>
> Second, approximately 28 million of the increase is the result of taking ownership of inventory from China when it ships versus when it enters our distribution center here in the U.S.
>
> Lastly, our consolidated results include Naturium for the first time, which added approximately $25 million of inventory. ***We believe we have the appropriate levels of inventory across the business to service our customers and support the demand we're seeing***.
>
> \*\*\*
>
> In summary, our third quarter results underscore our ability to drive exceptional, consistent, category leading growth. We have a significant white space opportunity in front of us as we continue our vision of creating a different kind of beauty company, one, that is purpose led and results driven.

33.    On February 7, 2024, Elf filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended December 31, 2023 (the "Q3 2024 10-Q"). The Q3 2024 10-Q contained a substantively similar description of the Company as discussed, *supra* in ¶ 28.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

34.     Appended to the Q3 2024 10-Q as an exhibit was a signed certification pursuant to SOX by the Individual Defendants, attesting that "[t]he information in the [Q3 2024 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

35.     On May 22, 2024, Elf issued a press release announcing the Company's fiscal Q4 and full year 2024 results. The press release stated, in relevant part:

> "Fiscal 2024 marked our strongest year of net sales growth on record, ***a continuation of the exceptional, consistent, category-leading growth we've delivered,"* said [Defendant] Amin[.] *"In Q4, we grew net sales by 71% and expanded our market share by 325 basis points, marking our 21st consecutive quarter of net sales and market share growth***. As we look ahead, we believe we are still in the early innings of unlocking the full potential we see for e.l.f. Beauty across cosmetics, skin care and international markets."

> **Fourth Quarter Fiscal 2024 Review**

> For the three months ended March 31, 2024, compared to the three months ended March 31, 2023:

> - **Net sales** increased 71% to $321.1 million, primarily driven by strength across our retailer and e-commerce channels.

36.     That same day, Elf hosted an earnings call with investors and analysts to discuss the Company's fiscal Q4 2024 results (the "Q4 2024 Earnings Call"). During the scripted portion of the Q4 2024 Earnings Call, Defendant Amin stated, in relevant part:

> In fiscal '24, we grew net sales by 77%, increased gross margin by approximately 330 basis points, grew adjusted EBITDA by 101%, and increased market share of 305 basis points, well above our original expectations.

> ***

> Q4 marked our 21st consecutive quarter of both net sales growth and market share gains, putting e.l.f. Beauty in a rarified group of high-growth companies. We are one of only five public consumer companies out of 274 that has grown for 21 straight quarters and average at least 20% sales growth per quarter.

> In Q4, we grew net sales by 71%, increased gross margin by approximately 180 basis points and grew adjusted EBITDA 93%.

\*\*\*

Our value proposition, powerhouse innovation and disruptive marketing engine has allowed us to drive exceptional consistent category-leading growth. And with the significant white space we see in color cosmetics, skin care and international, we believe we're in the early innings of unlocking the full potential for our brands.

37.    Also during the scripted portion of the Q4 2024 Earnings Call, Defendant Fields stated, in relevant part:

Our balance sheet remains strong, and we believe positions us well to execute our long-term growth plans. We ended the quarter with $108 million in cash on hand compared to a cash balance of $121 million a year ago.

Our ending inventory balance was $191 million, in line with our expectations and up from $81 million a year ago. The difference is primarily a combination of three things. ***First, as we've said the past few quarters, we continue to build back our inventory levels to support strong consumer demand***.

Second, our consolidated results now include Naturium, which added approximately $26 million of inventory; lastly, an additional $8 million of the increase is the result of taking ownership of inventory from China when it ships versus when it enters our distribution center here in the U.S.

Our liquidity position remains strong. We ended the quarter with less than 1x leverage in terms of net debt-to-adjusted EBITDA.

\*\*\*

In Q1, we expect our net sales growth to come in well ahead of our 20% to 22% annual growth, reflecting the ongoing strong consumption trends we are seeing and the incremental contribution from the acquisition of Naturium.

38.    On May 23, 2024, Elf filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the fiscal quarter and year ended March 31, 2024 (the "2024 10-K"). The 2024 10-K contained a substantively similar description of the Company as discussed, *supra*, in ¶ 28.

39.    Appended to the 2024 10-K as an exhibit was a signed certification pursuant to SOX by the Individual Defendants, attesting that "[t]he information in the [2024 10-K] fairly

presents, in all material respects, the financial condition and results of operations of the Company."

40.    On August 8, 2024, Elf issued a press release announcing the Company's fiscal Q1 2025 results.  The press release stated, in relevant part:

> ***"We are off to a strong start this fiscal year, delivering 50% net sales growth and 260 basis points of market share gains in Q1," said [Defendant] Amin[.] "This marked our 22nd consecutive quarter of both net sales growth and market share gains--putting e.l.f. Beauty in a rarified group of high growth consumer companies**. We continue to make progress across color cosmetics, skin care and international and believe our unique areas of advantage will fuel our ability to win in fiscal 2025 and beyond."*

**Three Months Ended June 30, 2024 Results**

For the three months ended June 30, 2024, compared to the three months ended June 30, 2023:

- **Net sales** increased 50% to $324.5 million, primarily driven by strength in both retailer and e-commerce channels.

41.    That same day, Elf hosted an earnings call with investors and analysts to discuss the Company's fiscal Q1 2025 results (the "Q1 2025 Earnings Call").  During the scripted portion of the Q1 2025 Earnings Call, Defendant Amin stated, in relevant part:

> In Q1 we grew net sales 50% increased gross margin by approximately 80 basis points and delivered $77 million in adjusted EBITDA. Q1 marked our 22nd consecutive quarter of both net sales growth and market share gains, putting off beauty in a verified growth of high growth companies. We are one of only five public consumer companies out of 274 that has grown for 22 straight quarters and averaged at least 20% sales growth per quarter. We've continued to prioritize three areas with significant runway for growth.

42.    Also during the scripted portion of the Q1 2025 Earnings Call, Defendant Fields stated, in relevant part:

> Our balance sheet remains strong and we believe positions us well to execute our long-term growth plans. We ended the quarter with $109 million in cash on hand, compared to a cash balance of $143 million a year ago. Our ending inventory balance was $200 million in line with our expectations and up from $98 million a year ago.

The difference is primarily a combination of three things. First, as we've said in the past few quarters, we continue to build back our inventory levels to support strong consumer demand. Second, our consolidated results now include Naturium, which added approximately $26 million of inventory.

Lastly, an additional $23 million of the increase is the result of taking ownership of inventory from China when it ships versus when it enters our distribution center here in the U.S. Our liquidity position remained strong. We ended the quarter with less than one times leverage in terms of net debt to adjusted EBITDA. We expect our cash priorities for the year to remain on investing behind our growth initiatives and supporting our strategic extensions.

43.    On August 9, 2024, Elf filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended June 30, 2024 (the "Q1 2025 10-Q").  The Q1 2025 10-Q contained a substantively similar description of the Company as discussed, *supra* in ¶ 28.

44.    Appended to the Q1 2025 10-Q as an exhibit was a signed certification pursuant to SOX by the Individual Defendants, attesting that "[t]he information in the [Q1 2025 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

45.    On November 6, 2024, Elf issued a press release announcing the Company's fiscal Q2 2025 results.  The press release stated, in relevant part:

> "***Q2 marked another quarter of consistent, category-leading growth. In Q2, we delivered 40% net sales growth, fueled by 195 basis points of market share gains in the U.S. and 91% net sales growth internationally***," said [Defendant] Amin[.] "***This was our 23rd consecutive quarter of both net sales growth and market share gains***. We continue to make progress across color cosmetics, skin care and international and believe our unique areas of advantage will fuel our ability to win in fiscal 2025 and beyond."

**Three Months Ended September 30, 2024 Results**

For the three months ended **September 30, 2024**, compared to the three months ended September 30, 2023:

- **Net sales** increased 40% to $301.1 million, primarily driven by strength in both our retailer and e-commerce channels, in the U.S. and internationally.

15

46.     That same day, Elf hosted an earnings call with investors and analysts to discuss the Company's fiscal Q2 2025 results (the "Q2 2025 Earnings Call").  During the scripted portion of the Q2 2025 Earnings Call, Defendant Amin stated, in relevant part:

> Q2 marked yet another quarter of consistent category leading growth. In Q2, we grew net sales 40%, delivered $69 million in adjusted EBITDA, and increased our U.S. market share by 195 basis points. Q2 marked our 23rd consecutive quarter of both net sales growth and market share gains, putting e.l.f. Beauty in a rarefied group of high growth companies. We are one of only six public consumer companies out of 546 that has grown for 23 straight quarters and average at least 20% sales growth per quarter. e.l.f. is the only brand of the nearly 1,000 cosmetics brands tracked by Nielsen to gain share for 23 consecutive quarters.
>
> Our net sales growth of 40% in Q2 came in above our outlook with stronger than expected growth across international retailers and digital commerce helping to offset U.S. tracked channel trends that were slightly below our expectations. Our international net sales grew 91% in Q2, fueled by growth in our existing markets as well as expansion into new markets. International drove 21% of our net sales in Q2, up from 16% a year ago. We continue to see significant runway for growth in our largest existing markets. e.l.f. outpaced category growth by more than 20 times in Canada and more than 7 times in the UK, fueling share gains in each.

47.     Also during the scripted portion of the Q2 2025 Earnings Call, Defendant Fields stated, in relevant part:

> Moving to the balance sheet and cash flow, our balance sheet remains strong and we believe positions us well to execute our long-term growth plans. We ended the quarter with $97 million in cash on hand compared to a cash balance of $108 million at the end of fiscal 2024. Our ending inventory balance was $239 million in line with our expectations and up from $147 million a year ago. Consistent with the last few quarters, the increase was driven by timing of when we take ownership of inventory from China, the addition of NATURIUM and supporting the demand we're seeing.
>
> Our liquidity position remains strong. We ended the quarter with less than 1 times leverage in terms of net debt to adjusted EBITDA. We expect our cash priorities for the year to remain on investing behind our growth initiatives and supporting strategic extensions. The specific growth initiatives we're focused on this year include investing in our people and infrastructure, our ERP transition to SAP, as well as increased distribution capacity to support strong global consumer demand.
>
> ***
>
> Now, let's turn to our raised outlook for fiscal 2025. We are pleased to be in a position to raise our outlook across both the top and bottom line. *For the full year,*

*we now expect net sales growth of approximately 28% to 30%, up from 25% to 27% previously. Our raised outlook reflects the outperformance in Q2 relative to our expectations, pipeline related to the space gains we talked about with Target, Dollar General, and Walgreens as well as ongoing international momentum.*

48.    On November 7, 2024, Elf filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the fiscal quarter ended September 30, 2024 (the "Q2 2025 10-Q"). The Q2 2025 10-Q contained a substantively similar description of the Company as discussed, *supra* in ¶ 28.

49.    Appended to the Q2 2025 10-Q as an exhibit was a signed certification pursuant to SOX by the Individual Defendants, attesting that "[t]he information in the [Q2 2025 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

50.    The statements referenced in ¶¶ 25-49 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) contrary to its representations to investors, the Company was experiencing rising inventory levels as a consequence of flagging sales; (ii) Elf falsely attributed the rising inventory levels to, among other things, changes in its sourcing practices; (iii) to maintain investor confidence, Elf reported inflated revenue, profits, and inventory over several quarters; (iv) accordingly. the Company's business and/or financial prospects were overstated; (v) all of the foregoing, once revealed, would likely have a material negative impact on the Company; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

51.    On November 20, 2024, Muddy Waters published a report entitled "e.l.f. Beauty, Inc. A Revenue and Inventory Mystery". The Muddy Waters Report accused Elf of overstating

its revenue by approximately $135 million to $190 million over several quarters.  Citing, *inter alia*, a review of Elf's inventory accounts and import data, as well as discussions with "a former China-side manager and three of ELF's largest suppliers," the report alleges that Elf began reporting inflated revenue, profits, and inventory in fiscal Q2 2024 after management identified growth concerns related to rising inventory levels caused by flagging sales.

52.    In concluding that Elf had massively overstated its revenue, the Muddy Waters Report began by reviewing the correlation between (1) Elf's imports of products to the U.S. from China, the source of roughly 80% of Elf's products, and (2) the Company's U.S. sales, observing that historically, "there was almost a 1:1 relationship between growth in imports and e.l.f. product U.S. sales".  Given the historical correlation, then, "tracking U.S. imports should be the best data to understand end demand in the U.S.".



53.    Then, in the second quarter of fiscal year 2024, Elf "announced that a recent change to its sourcing practices was responsible for the sudden appearance of an additional $36.9 million in inventory."  Elf claimed that, while it had historically designated product as inventory only after its physical delivery to the Company's warehouse in Ontario, California, "it had just

begun taking ownership of the product on the China side," which supposedly caused a sharp increase in Elf's reported product inventory.  In other words, Elf attributed the $36.9 million spike in its reported inventory to the inclusion of product while it was "on the water"—*i.e.*, in transit between China and California—which purportedly represented a change from the Company's prior practice.

54.     However, discussions with Elf's employees and suppliers in China significantly undermined Elf's explanation for the additional $36.9 million in inventory.  Significantly, "a former China-side manager and three of ELF's largest suppliers" indicated that Elf's "longstanding general practice was to take title to goods on the China side[.]"  Accordingly, the Company's increase in inventory instead appeared to be "due to insufficient sales—not a change in buying practices"—an indication that Elf had also been misleading its auditor.

55.     Considering the timing of Elf's order placement ("at least 90 days in advance") and its reported imports, which peaked in the third quarter of 2024 before falling sharply, Muddy Waters concluded that Elf must have "greatly reduced its planned purchased by the time of its Q2 FY24 call on November 1, 2023".  Nevertheless, Elf raised its guidance not only on that call, but on the next three quarterly earnings calls as well, even as its imports from China were plummeting.



CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

56.     In sum, after considering (i) the historical correlation between its imports and U.S. sales; (ii) Elf's dubious claims about a purported change to its inventory reporting practices; and (iii) Elf's recurring claims about growing its inventory levels even as the Company's imports were falling—as well as thoroughly evaluating and rejecting several alternative explanations for the apparent disconnect—Muddy Waters concluded that Elf had materially overstated revenue for the past three quarters by as much as $190 million, while inflating its inventory.

57.     Following publication of the Muddy Waters Report, Elf's stock price fell $2.71 per share, or 2.23%, to close at $119.00 per share on November 20, 2024.

### Post-Class Period Developments

58.     On November 21, 2024, Elf issued a statement categorically denying the allegations in the Muddy Waters Report, which it accused of relying on incomplete data and flawed assumptions, omitting critical context, and presenting speculation as fact."

59.     Nevertheless, Elf's subsequent financial reporting hardly disproved the Muddy Waters Report's conclusions.  On February 6, 2025, Elf released its fiscal Q3 2025 results and provided fiscal 2025 outlook.  With Defendant Fields citing "softer than expected trends in January," Elf's results represented a sharp departure from the preceding five quarters, as the Company reported softer consumption trends driven by, among other things, "consumers stocking up in a highly promotional December and lower social conversation around beauty" and slower than anticipated new product launches.

60.     On this news, Elf's stock price fell $17.36 per share, or 19.62%, to close at $71.13 per share on February 7, 2025.

61.     Elf's shares have continued to trade at significantly lower prices since the publication of the Muddy Waters Report.  On March 5, 2025—*i.e.*, the last trading session before the filing of this Complaint—Elf's stock price closed at $64.67 per share, representing a total

decline of $57.04 per share, or nearly 47%, since the truth about the Company's inventory management and revenue first came to light.

62.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**SCIENTER ALLEGATIONS**

63.    During the Class Period, Defendants had both the motive and opportunity to commit fraud.  For example, during the Class Period, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for Elf securities, the Individual Defendants enriched themselves by millions of dollars by engaging in insider sales of the Company's shares while those shares traded at artificially high prices.  Specifically, during the Class Period, Defendant Amin sold at least 435,574 shares of Elf stock for total proceeds of at least $68.7 million and Defendant Fields sold at least 28,168 shares of Elf stock for total proceeds of at least nearly $5 million.

64.    Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

65.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Elf securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein,

the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

66.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Elf securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Elf or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

67.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

68.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

69.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Elf;

- whether the Individual Defendants caused Elf to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Elf securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

70.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

71.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Elf securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Elf securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

72.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

73.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

74.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

75.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

76.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Elf securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Elf securities and options at artificially inflated prices.  In furtherance of this unlawful

1

2

scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

77.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Elf securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Elf's finances and business prospects.

78.      By virtue of their positions at Elf, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

79.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Elf, the Individual Defendants had knowledge of the details of Elf's internal affairs.

80.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual

25

Defendants were able to and did, directly or indirectly, control the content of the statements of Elf.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Elf's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Elf securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Elf's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Elf securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

81.     During the Class Period, Elf securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Elf securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Elf securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Elf securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

82.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

83.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

84.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

85.    During the Class Period, the Individual Defendants participated in the operation and management of Elf, and conducted and participated, directly and indirectly, in the conduct of Elf's business affairs.   Because of their senior positions, they knew the adverse non-public information about Elf's misstatement of income and expenses and false financial statements.

86.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Elf's financial condition and results of operations, and to correct promptly any public statements issued by Elf which had become materially false or misleading.

87.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Elf disseminated in the marketplace during the Class Period concerning Elf's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Elf to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Elf within the meaning of Section

20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Elf securities.

88.    Each of the Individual Defendants, therefore, acted as a controlling person of Elf. By reason of their senior management positions and/or being directors of Elf, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Elf to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Elf and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

89.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Elf.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Dated: March 6, 2025

Respectfully submitted,

POMERANTZ LLP

*/s/ Jennifer Pafiti*

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

THE SCHALL FIRM
Brian Schall
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
brian@schallfirm.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS