# Exhibit 1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

_____

## FORM 10-K
_____

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended March 31, 2024**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____
**Commission File Number 001-37873**

_____

# e.l.f. Beauty, Inc.
*(Exact name of registrant as specified in its charter)*

_____

| **Delaware** | **46-4464131** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

**570 10th Street**

**Oakland, CA 94607**

(Address of principal executive offices) (Zip code)

_____

**(510) 778-7787**

(Registrant's telephone number, including area code)

_____

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.01 par value | ELF | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

_____

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☒  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.  Yes ☐  No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).  Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicated by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

As of September 30, 2023, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of the voting and non-voting stock held by non-affiliates of the registrant was approximately $4.2 billion.

The number of shares of registrant's common stock outstanding as of May 16, 2024 was 55,939,080 shares.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's Definitive Proxy Statement relating to the registrant's 2024 annual meeting of stockholders are incorporated by reference into Part III of this Annual Report on Form 10-K. Such Definitive Proxy Statement will be filed with the Securities and Exchange Commission within 120 days of the registrant's fiscal year ended March 31, 2024.

**e.l.f. Beauty, Inc.**
**Table of Contents**

| | | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 2 |
| Item 1A. | Risk factors | 11 |
| Item 1B. | Unresolved staff comments | 40 |
| Item 1C. | Cybersecurity | 40 |
| Item 2. | Properties | 41 |
| Item 3. | Legal proceedings | 41 |
| Item 4. | Mine safety disclosures | 41 |
| | | |
| **PART II** | | |
| Item 5. | Market for registrant's common equity, related stockholder matters and issuer purchases of equity securities | 42 |
| Item 6. | [Reserved] | 44 |
| Item 7. | Management's discussion and analysis of financial condition and results of operations | 45 |
| Item 7A. | Quantitative and qualitative disclosures about market risk | 53 |
| Item 8. | Financial statements and supplementary data | 55 |
| Item 9. | Changes in and disagreements with accountants on accounting and financial disclosure | 55 |
| Item 9A. | Controls and procedures | 55 |
| Item 9B. | Other information | 57 |
| Item 9C. | Disclosure regarding foreign jurisdictions that prevent inspections | 58 |
| | | |
| **PART III** | | |
| Item 10. | Directors, executive officers and corporate governance | 59 |
| Item 11. | Executive compensation | 59 |
| Item 12. | Security ownership of certain beneficial owners and management and related stockholder matters | 59 |
| Item 13. | Certain relationships and related transactions, and director independence | 59 |
| Item 14. | Principal accounting fees and services | 59 |
| | | |
| **PART IV** | | |
| Item 15. | Exhibits, financial statement schedules | 60 |
| Item 16. | Form 10-K summary | 63 |
| | Signatures | 65 |

**CAUTIONARY NOTE ABOUT FORWARD-LOOKING STATEMENTS**

*This Annual Report on Form 10-K ("Annual Report") contains forward-looking statements within the meaning of the federal securities laws concerning our business, operations and financial performance and condition, as well as our plans, objectives and expectations for our business operations and financial performance and condition. Any statements contained herein that are not statements of historical facts may be deemed to be forward-looking statements. In some cases, you can identify forward-looking statements by terminology such as "aim," "anticipate," "assume," "believe," "contemplate," "continue," "could," "due," "estimate," "expect," "goal," "intend," "may," "objective," "plan," "predict," "potential," "positioned," "seek," "should," "target," "will," "would" and other similar expressions that are predictions of or indicate future events and future trends, or the negative of these terms or other comparable terminology. These forward-looking statements are based on management's current expectations, estimates, forecasts and projections about our business and the industry in which we operate and management's beliefs and assumptions and are not guarantees of future performance or development and involve known and unknown risks, uncertainties and other factors that are in some cases beyond our control. Although we believe that the expectations reflected in the forward-looking statements contained herein are reasonable, our actual results and the timing of selected events may differ materially. Factors that may cause actual results to differ materially from current expectations include, among other things, those listed under Part I, Item 1A. "Risk factors" and elsewhere in this Annual Report. Potential investors are urged to consider these factors carefully in evaluating the forward-looking statements. These forward-looking statements speak only as of the date of this Annual Report. Except as required by law, we assume no obligation to update or revise these forward-looking statements for any reason, even if new information becomes available in the future.*

**SUMMARY OF MATERIAL RISKS ASSOCIATED WITH OUR BUSINESS**

The principal risks and uncertainties affecting our business include the following:

- The beauty industry is highly competitive, and if we are unable to compete effectively our results will suffer.

- Our new product introductions may not be as successful as we anticipate.

- Any damage to our reputation or brands may materially and adversely affect our business, financial condition and results of operations.

- Our success depends, in part, on the quality, performance and safety of our products.

- We may not be able to successfully implement our growth strategy.

- Our growth and profitability are dependent on a number of factors, and our historical growth may not be indicative of our future growth.

- We may be unable to continue to grow our business effectively or efficiently, which would harm our business, financial condition and results of operations.

- Acquisitions or investments, such as our acquisition of Naturium LLC, could disrupt our business and harm our financial condition.

- A disruption in our operations, including a disruption in the supply chain for our products, could materially and adversely affect our business.

- We rely on a number of third-party suppliers, manufacturers, distributors and other vendors, and they may not continue to produce products or provide services that are consistent with our standards or applicable regulatory requirements, which could harm our brands, cause consumer dissatisfaction, and require us to find alternative suppliers of our products or services.

- Adverse economic conditions in the United States or any of the other countries in which we conduct significant business could negatively affect our business, financial condition and results of operations.

1

- We depend on a limited number of retailers for a large portion of our net sales, and the loss of one or more of these retailers, or business challenges at one or more of these retailers, could adversely affect our results of operations.

- We have significant operations in China, which exposes us to risks inherent in doing business in that country.

- We are subject to international business uncertainties.

- If we are unable to protect our intellectual property, the value of our brands and other intangible assets may be diminished, and our business may be adversely affected.

- Our success depends on our ability to operate our business without infringing, misappropriating or otherwise violating the trademarks, patents, copyrights and other proprietary rights of third parties.

The summary risk factors described above should be read together with the text of the full risk factors below in the section titled "Risk factors" and the other information set forth in this Annual Report, including our consolidated financial statements and the related notes, as well as in other documents that we file with the US Securities and Exchange Commission (the "SEC"). The risks summarized above or described in the section titled "Risk factors" are not the only risks that we face. Additional risks and uncertainties not precisely known to us or that we currently deem to be immaterial may also materially adversely affect our business, financial condition, results of operations, and future growth prospects.

## PART I

### Item 1. Business.

### Overview

e.l.f. Beauty, Inc. ("e.l.f. Beauty" and together with our subsidiaries, the "Company," or "we") is a multi-brand beauty company that offers inclusive, accessible, clean, vegan and cruelty free cosmetics and skin care products.

- ***Our Vision***. To be a different kind of beauty company by building brands that disrupt industry norms, shape culture and connect communities through positivity, inclusivity and accessibility.

- ***Our Mission***. We make the best of beauty accessible to every eye, lip, face and skin concern.

- ***Our Purpose***. We stand with every eye, lip, face and paw.

### Our Brands

Our family of brands includes e.l.f. Cosmetics, e.l.f. SKIN, Naturium, Well People and Keys Soulcare. Our brands are available online and across leading beauty, mass-market and specialty retailers. We have strong relationships with our retail customers such as Target, Walmart, Ulta Beauty and other leading retailers that have enabled us to expand distribution both domestically and internationally.

2

| | |
|---|---|
| **e.l.f. Cosmetics** | Since 2004, e.l.f. Cosmetics has made the best of beauty accessible to every eye, lip and face. We make premium-quality, prestige-inspired cosmetics at an extraordinary value. We offer a range of products that are clean, vegan, cruelty free and manufactured in a Fair Trade Certified™ facility. As one of the first digital disruptors, e.l.f. continues to attract a highly engaged audience, leveraging social and digital platforms to connect with our community. |
| **e.l.f. SKIN** | Win in skin the clean + kind way with e.l.f. SKIN. We create targeted, ingredient-focused, dermatologist-developed formulas for every eye, lip, face and skin concern. Our ambition is to make skin care accessible to all with innovative, efficacious formulas at get-real prices. We offer a range of products that are clean, vegan, cruelty free and manufactured in a Fair Trade Certified™ facility. |
| **Naturium** | Driven by the belief that skin care should be and can be high performance, skin compatible and affordable, Naturium was born. Naturium unlocks the benefits of natural botanicals and powerful actives with innovative technology by formulating skin care formulas that work. |
| **Well People** | Since 2008, Well People has raised the standard for plant-powered, high-performance beauty. A clean beauty pioneer with approximately 100 EWG VERIFIED™ products, Well People was founded so that all people can be well people with dermatologist-developed, "clean" and planet minded products. |
| **Keys Soulcare** | Inspired by Alicia Keys' personal skin care and self-discovery journey, Keys Soulcare combines skin-nourishing offerings with soul-nurturing rituals to care for the whole self. Developed by board-certified dermatologist Dr. Renée Snyder, our premium-quality skin care formulas are also clean, cruelty free and manufactured in a Fair Trade Certified™ facility. |

**Our Products and Strategy**

We believe our ability to deliver cruelty free, clean, vegan and premium-quality products at accessible prices with broad appeal differentiates us in the beauty industry. We believe the combination of our value proposition, powerhouse innovation, disruptive marketing engine and our world-class team's ability to execute with quality and speed has positioned us well to navigate the competitive beauty market. Our strategy is underpinned by four key pillars:

• *Value Proposition*. Each of our brands has accessible pricing relative to its competitive set and furthers our mission of making the best of beauty accessible to every eye, lip, face and skin concern. As an example, e.l.f. Cosmetics' average product price point is approximately $6, as compared to other leading mass cosmetics brands which have average product price points over $9 and prestige cosmetics brands which have average product price points over $20, according to Nielsen.

• *Powerhouse Innovation*. We believe innovation is key to our success and we were named to Fast Company's list of "The World's Most Innovative Companies of 2023." We believe we are a leader in the beauty industry in speed and first-to-mass product introductions.

Our flagship e.l.f. Cosmetics brand is known for its "holy grail" innovation: beauty products that deliver premium quality at extraordinary prices with broad appeal. As consumers are increasingly savvy and knowledgeable about trends in the prestige market, they look for ways to get the best of beauty at an accessible price. Examples of our "holy grails" include the e.l.f. Cosmetics Power Grip Primer at $10 versus a prestige item at $38, the e.l.f. Cosmetics Halo Glow Liquid Filter at $14 versus a prestige item at $49, and the e.l.f. SKIN Holy Hydration! Makeup Melting Cleansing Balm at $11 versus a prestige item at $38.

• *Disruptive Marketing Engine*. We believe that our brand awareness is relatively low in comparison to legacy mass beauty brands. This represents an opportunity for us, and we have a multi-faceted strategy to build brand awareness, affinity and loyalty. We seek to attract and engage consumers primarily through digital and social media, as compared to legacy beauty brands that engage consumers primarily through traditional media such as magazines, newspapers and television. We attract and engage existing and new consumers through buzz-worthy activations, unexpected creativity and unique collaborations. Total expenses for marketing and digital in the fiscal year ended March 31, 2024 were $256.0 million, approximately 25% of our net sales.

• *Unique One-Team Culture*. Our talented employees are at the core of our business strategy. Our commitment to our people and our High Performance Team ("HPT") culture is evident in our 91% employee engagement score and recognition by U.S. News & World Report on its annual list of the "2023-2024 Best Companies to Work For."

With regards to compensation, we take a unique "one-team" approach. All full-time employees receive a base salary, are bonus eligible under the same bonus plan tied to our financial performance and receive an equity award in e.l.f. Beauty stock. We believe we are one of the few public consumer companies that grants equity on an annual basis to every employee—strongly aligning our team with the long-term interests of our stockholders. We believe this approach, which applies across all employee levels and geographies, is unique in the beauty industry and contributes to our success in hiring and retaining top talent and driving business results.

**Markets and Competition**

We operate across beauty categories including eye, lip and face makeup, beauty tools and accessories, and skin care products. Color cosmetics and skin care products are broadly sold through food, drug and mass channels, as well as through department stores, online and in specialty channels.

The beauty industry is relatively concentrated, with a significant portion of retail sales in the United States generated by brands owned by a few large multinational companies, such as L'Oréal, Estee Lauder, Coty, Unilever, LVMH, Shiseido, Beiersdorf and Procter & Gamble. These large multinational companies typically own multiple brands. In addition to the traditional brands against which we compete, small independent companies continue to enter the market with new brands and customized product offerings.

**Distribution**

We employ an omni-channel distribution strategy and sell our products with retailers in the United States, as well as internationally. We also sell our products online through our own direct e-commerce channels, as well as through other e-commerce websites. Our main channels of distribution are described below.

- *Domestic retailers*. We sell our products in the United States primarily in the mass, drug store, food and specialty retail channels.

- *e-commerce.* e-commerce is an important component of our engagement and innovation model. Our roots as an e-commerce company and our digital engagement model drive conversion on our e-commerce websites and our mobile applications, where we sell our full product offerings. Our products are also available at other e-commerce sites, such as Amazon, making our products widely accessible to our consumers.

- *International retailers.* Our products are also sold in international markets, primarily in the United Kingdom (the "UK") and Canada.

In the fiscal year ended March 31, 2024, national and international retailers comprised 84% of our net sales. The remaining 16% came from e-commerce channels.

The United States accounted for 85% of our net sales in the fiscal year ended March 31, 2024. The remaining 15% was attributable to international markets.

**Customers**

We have strong relationships with our retail customers such as Target, Walmart, Ulta Beauty and other leading retailers that have enabled us to expand distribution both domestically and internationally.

Our largest three customers, Target, Walmart and Ulta Beauty, accounted for 25%, 17% and 16%, respectively, of our net sales in the fiscal year ended March 31, 2024. No other individual customer accounted for 10% or more of our net sales in the fiscal year ended March 31, 2024. We expect that Target, Walmart and Ulta Beauty, along with a small number of other customers will, in the aggregate, continue to account for a large portion of our net sales in the future.

As is customary in the industry, none of our customers are under any obligation to continue purchasing products from us in the future.

For more information regarding customer concentration, see Part II, Item 7 "Management's discussion and analysis of financial condition and results of operations" of this report under the heading "Overview."

**Supply Chain**

We have developed a scalable, asset-light supply chain centered on the combination of speed to market, high-quality and low costs. Substantially all of our products are sourced and manufactured in China through close collaboration with a network of third-party manufacturers. We have ample manufacturing capacity as well as redundant capabilities in the event that one or more suppliers cannot meet our needs. Our broad supply base gives us the ability to fulfill our product requirements and remain cost competitive.

We work closely with our suppliers on new product innovation and quality. Our China-based sourcing, quality and innovation teams work with their US-based counterparts to deliver ongoing product quality, innovation and cost savings. We are not overly dependent on any single raw material. The raw materials used in our products are broadly available and have regular quality testing for ingredient integrity.

Our distribution centers are operated by leading third-party logistics providers. Our distribution center in California mainly serves our national retail customers, while our distribution centers in Utah, Ohio and Georgia serve our e-commerce consumers. For our international operations, we utilize third-party logistics providers in the UK, Germany and Canada to distribute to certain international customers and distributors. We have invested capital in picking, packaging, scanning and conveying technology to more fully automate our processes.

**Employees and Human Capital Management**

As of March 31, 2024, we had 475 full-time employees (377 in the United States, the UK and Canada, and 98 in China).

*Social Impact and Commitments*

Our Impact Report sets out our social and environmental goals and strategy across three pillars - Encourage Self Expression, Empower Others and Embody Our Ethics. Details can be found in our Impact Report on our website (https://www.elfbeauty.com/social-impact/). The information on, or that can be accessed through, our website, including our Impact Report and related materials, is not incorporated by reference into this Annual Report or any other filings we make with the SEC.

We are committed to:

• *Encourage Self Expression*. We celebrate diversity and make the best of beauty accessible.

• *Empower Others*. We provide equal opportunities for growth and success.

• *Embody Our Ethics*. We strive to do the right thing for all people, the planet and our furry friends.

*Encourage Self Expression: Promoting a Culture of Diversity, Equity and Inclusion*

We are deeply committed to diversity, equity and inclusion ("DEI") as exemplified by the diversity of both our Board of Directors and our employee base. We are proud to be one of only four public companies in the United States with a Board of Directors that is at least two-thirds women and at least one-third diverse (out of over 4,200 public companies). We're also proud that our employee base, which is 75% women, over 40% diverse and over 65% millennial and Gen Z, is representative of the young, diverse communities we serve.

We are committed to enabling the appropriate levels of diversity – including but not limited to gender, race, sexual orientation, national origin, ability and age – to be represented across our entire team. We promote DEI at all levels of our workforce, and our senior leadership team owns and is responsible for our DEI initiatives and programs.

The following table provides certain statistics of our team as of March 31, 2024:

| | Board of Directors | Executive Team[1] | Directors and Above[2] | All Employees[2] |
|---|---|---|---|---|
| **Gender** | | | | |
| Female | 67% | 57% | 72% | 75% |
| Male | 33% | 43% | 28% | 25% |
| **Age** | | | | |
| Gen Z and Millennial | —% | —% | 44% | 67% |
| All Other | 100% | 100% | 56% | 33% |
| **Race / Ethnicity** | | | | |
| Black or African American | 11% | 14% | 1% | 4% |
| Hispanic or LatinX | —% | —% | 11% | 16% |
| Asian | 22% | 29% | 16% | 17% |
| Native American | —% | —% | 1% | —% |
| Two or More Races | —% | —% | 4% | 5% |
| White | 67% | 57% | 67% | 57% |

[1]    Executive Team includes our Executive Officers and the Vice President, General Manager of our China operations.

[2]    Employee demographic figures based on our full-time employees as of March 31, 2024. Race/ethnicity percentages exclude our employees outside of the United States.

Note: We are an equal opportunity employer and do not use race, ethnicity, gender or any other protected criteria as a factor in any employment decisions, such as hiring, promotions or compensation.

***Empower Others: Supporting the Full Potential of Our Employees***

Our talented employees are at the core of our business strategy. We place a high priority on attracting, recruiting, developing and retaining diverse global talent. Our continued investments in our people and culture have positioned us as an employer of choice both in the beauty industry and our local communities. In FY 2024, we were recognized on U.S. News & World Report's annual list of the "2023-2024 Best Companies to Work For."

We are keenly interested in our employees' well-being, development and overall satisfaction. Engagement is a key factor we look to because it measures our team's connection and commitment to both e.l.f. Beauty and our vision, mission and values. In FY 2024, we conducted our third annual engagement survey of all employees. All employees are offered the opportunity to participate, and 86% submitted a response. Our employee engagement results this year hit record highs relative to prior surveys and to consumer industry benchmarks. Our overall engagement score was 91% —19% above the industry benchmark and 2% above our survey administered the previous year.

Our benefits and programs are designed to support the total well-being and promote the full potential of our employees. With regards to compensation, we take a unique "one-team" approach. All full-time employees receive a base salary, are bonus eligible under the same bonus plan tied to our financial performance and receive an equity award in e.l.f. Beauty stock. We believe this approach – which applies across all employee levels and geographies – is unique in the beauty industry and contributes to our success in hiring and retaining top talent and driving business results.

In the United States, where over 70% of our workforce is located, the benefits for our full-time employees include, among other things:

• Financial benefits, including competitive compensation as well as retirement savings plans and commuter benefits;

• Healthcare benefits including flexible spending accounts, disability and life insurance - all of which begin on day 1 of employment;

• Family support and flexibility benefits, including up to 20 weeks of gender-neutral parental leave, as well as fertility and adoption support;

- Wellness and time off programs, including an employee assistance program, access to wellness coaches and flexible time off;

- Community impact programs, including employee donation matching programs and paid time off for volunteering; and

- Education and career development programs, including tuition reimbursement, High Performance Teamwork ("HPT") coaching, as well as ongoing learning and training opportunities.

Outside of the United States, we provide similarly competitive benefit packages to those offered to our United States employees and tailored to market-specific practices.

**Embody Our Ethics: Doing the Right Thing for All People, the Planet and Our Furry Friends**

<u>All People</u>

We proudly support human rights and individual expression and freedom. As such, we treat all employees with respect, regardless of age, gender, ethnicity, religion, abilities or sexual orientation. We also expect our suppliers and partners to observe these principles when providing products and services to us.

We are proud to be the first company in the beauty industry to have a third-party manufacturing facility Fair Trade Certified™. A Fair Trade Certified™ seal on a product signifies that it was made according to rigorous fair trade standards that promote sustainable livelihoods and safe working conditions for factory employees, protection of the environment and transparent supply chains. Our first third-party manufacturing facility in China was Fair Trade Certified™ in August 2022, and we have since expanded this program to certify additional facilities. To achieve certification, facilities are required to pass thorough audits and demonstrate adherence to over 100 compliance criteria that cover social responsibility, environmental responsibility, empowerment and economic development. Facilities must pass a re-certification annually, which includes plans for continuous improvement. Each time a consumer buys one of our Fair Trade Certified™ products, e.l.f. Beauty makes a contribution to the facility workers who made the product for use in improving their communities.

<u>The Planet</u>

We are focused on reducing our environmental impact while providing our consumers with premium-quality beauty products. Product packaging represents a meaningful portion of our environmental footprint, driving our continued focus to further reduce this impact. Our packaging sustainability strategy is grounded in three principles:

- *Packaging footprint reduction.* We are proud to have eliminated over 2.5 million pounds of excess packaging since the inception of "Project Unicorn." Project Unicorn was launched in 2019 to elevate e.l.f. Cosmetics' product assortment, presentation, and navigation on-shelf, and resulted in a significant streamlining in our product packaging footprint. This was achieved by removing secondary cartons, vacuum formed trays and paper insert cards, slimming down secondary packaging, and designing a patented approach to display product on shelf. In 2023, we established a new goal seeking to achieve a 20% reduction in packaging intensity by the end of our fiscal year ending March 31, 2030, and we are actively pursuing projects to lightweight our packaging.

- *Sustainably sourced packaging.* Our initial focus is the use of Forest Stewardship Council ("FSC")-certified paper for our products that use paper cartons. FSC certification is a globally recognized standard that promotes products that come from responsibly managed forests that provide environmental, social and economic benefits. We have set a goal for 100% of our paper cartons and 100% of our wood brush handles to be FSC-certified across all of our brands by the end of our fiscal year ending March 31, 2025.

- *Recyclability and recycled content.* We have projects underway to increase the percentage of our packaging that is recyclable, refillable, reusable or made from recycled materials.

We are also working to reduce our carbon footprint. In our fiscal year ended March 31, 2022, we publicly disclosed our greenhouse gas (GHG) emissions of our offices, distribution centers and value chain. We have made meaningful progress since then. We have already met our science-based target for a 42% reduction in our Scope 1 and 2 emissions by 2030 (from a 2022 base year) through the Science Based Targets initiative. We also identified and began acting on key focus areas to reduce our carbon footprint. As we progress this work, we plan to evaluate science-based targets for our Scope 3 emissions. As part of

7

Table of Contents

our transparency and reporting efforts, we made our first annual disclosure through CDP's Climate Change questionnaire in July 2023.

*Our Furry Friends*

We are proud to be a 100% cruelty free company. We do not conduct or tolerate any tests on animals, nor do we use any ingredients that are tested on animals in any of our products. We are double certified as "cruelty free" across our e.l.f. Cosmetics, e.l.f. SKIN, Well People and Keys Soulcare brands. Each of these brands is certified by People for the Ethical Treatment of Animals ("PETA") as "Global Animal Test-Free," a credential given to companies and brands who have verified that their own facilities and their suppliers do not conduct, commission, pay for, or allow any tests on animals for their ingredients or finished products. In addition, each of the aforementioned brands is certified by the Leaping Bunny Program. Companies with this credential certify that no animal testing was conducted on materials or formulations at any stages of product development, in addition to recommitting to the program annually and being open to third-party audits.

**Seasonality**

Our results of operations are subject to seasonal fluctuations, with net sales in the third and fourth fiscal quarters typically being higher than in the first and second fiscal quarters. The higher net sales in our third and fourth fiscal quarters are largely attributable to the increased levels of purchasing by retailers for the holiday season and customer shelf reset activity, respectively. Lower holiday season purchases or shifts in customer shelf reset activity could have a disproportionate effect on our results of operations for the entire fiscal year. To support anticipated higher sales during the third and fourth fiscal quarters, we make investments in working capital to ensure inventory levels can support demand. Fluctuations throughout the year are also driven by the timing of product restocking or rearrangement by our major retail customers as well as expansion into new retail customers. Because a limited number of our retail customers account for a large percentage of our net sales, a change in the order pattern of one or more of our large retail customers could cause a significant fluctuation of our quarterly results or impact our liquidity.

**Trademarks and Other Intellectual Property**

We believe that our intellectual property has substantial value and has contributed significantly to the success of our business. Our primary trademarks include "e.l.f.," "e.l.f. eyes lips face," "e.l.f. SKIN," "Well People," "Naturium" and "Keys Soulcare," all of which are registered or have registrations pending with the US Patent and Trademark Office for our goods and services of primary interest. These trademarks are also registered or have registrations pending in various foreign countries in which we operate. We also have other trademark registrations and pending trademark applications for product names and tag lines. Our trademarks are valuable assets that reinforce the distinctiveness of our brands and our consumers' perception of our products. In addition to trademark protection, we own US Design Patents covering packaging, make-up tools and brush handle shapes and we own numerous domain names, including the domain names of our e-commerce websites. We also rely on and use commercially reasonable measures to protect our unpatented proprietary technology, which includes our expertise and product formulations, continuing innovation and other know-how to develop and maintain our competitive position.

**Government Regulation**

We and our products are subject to various federal, state and international laws and regulations, including regulation in the United States by the US Food and Drug Administration (the "FDA"), the Consumer Product Safety Commission (the "CPSC"), the Federal Trade Commission (the "FTC"), and regulations outside of the United States by Health Canada and the European Commission, among others. These laws and regulations principally relate to the ingredients, proper labeling, advertising, packaging, marketing, manufacture, safety, shipment and disposal of our products. Further, as the vast majority of our products are imported from overseas manufacturers, we are subject to Customs Border Patrol clearance regulations prior to goods being released into the United States market.

In the United States, the Federal Food, Drug and Cosmetic Act (the "FDCA"), defines cosmetics as articles or components of articles intended for application to the human body to cleanse, beautify, promote attractiveness, or alter the appearance, with the exception of soap. The labeling of cosmetic products is subject to the requirements of the FDCA, the Fair Packaging and Labeling Act, the Poison Prevention Packaging Act and other FDA regulations.

Cosmetics are not subject to pre-market approval by the FDA; however, certain ingredients, such as color additives, must be pre-approved for the specific intended use of the product and are subject to certain restrictions on their use. If a company has not adequately substantiated the safety of its products or ingredients by, for example, performing appropriate toxicological tests or relying on already available toxicological test data, then a specific warning label is required. The FDA may, by regulation, require other warning statements on certain cosmetic products for specified hazards associated with such products. FDA regulations also prohibit or otherwise restrict the use of certain types of ingredients in cosmetic products.

In addition, the FDA requires that cosmetic labeling and claims be truthful and not misleading. Moreover, cosmetics may not be marketed or labeled for their use in treating, preventing, mitigating, or curing disease or other conditions or in affecting the structure or function of the body, as such claims would render the products to be a drug and subject to regulation as a drug. The FDA has issued warning letters to cosmetic companies alleging improper drug claims regarding their cosmetic products. In addition to FDA requirements, the FTC as well as state consumer protection laws and regulations can subject a cosmetics company to a range of requirements and theories of liability, including similar standards regarding false and misleading product claims, under which FTC or state enforcement or class-action lawsuits may be brought.

In the United States, the FDA has not promulgated regulations establishing mandatory Good Manufacturing Practices ("GMPs") for cosmetics. However, the FDA's draft guidance on cosmetic GMPs, most recently updated in June 2013, provides recommendations related to process documentation, recordkeeping, building and facility design, equipment maintenance and personnel, and compliance with these recommendations can reduce the risk that FDA finds such products have been rendered adulterated or misbranded in violation of applicable law. The FDA also recommends that manufacturers maintain product complaint and recall files and voluntarily report adverse events to the FDA.

The FDA monitors compliance of cosmetic products through market surveillance and inspection of cosmetic manufacturers and distributors to ensure that the products are not manufactured under unsanitary conditions, or labeled in a false or misleading manner. Inspections also may arise from consumer or competitor complaints filed with the FDA. In the event the FDA identifies unsanitary conditions, false or misleading labeling, or any other violation of FDA regulation, FDA may request or a manufacturer may independently decide to conduct a recall or market withdrawal of products. In addition, under the Modernization of Cosmetic Regulation Act of 2022 ("MoCRA"), manufacturers of cosmetic products will become subject to more onerous FDA obligations once implemented via regulation, including adverse event reporting and record retention requirements, safety substantiation requirements, facility registration requirements, product listing requirements, mandatory GMP requirements and labeling requirements for certain products. Under MoCRA, the FDA was also granted new enforcement authorities over cosmetics, such as the ability to initiate mandatory recalls and to obtain access certain product records.

In addition to our cosmetic products, we also market certain non-prescription drug products, including certain products that are intended to treat acne or be used as sunscreens, which are regulated as over-the-counter ("OTC") drug products by the FDA. Certain OTC drug products are subject to regulation pursuant to the FDA's "monographs," which provide rules applicable to each therapeutic category of non-prescription drug, and establishes conditions, such as active ingredients, uses (indications), doses, labeling, and testing procedures, under which an OTC drug within that particular category may be generally recognized as a safe and effective ("GRASE"), and therefore can be marketed without obtaining pre-market approval of an new drug application ("NDA") or abbreviated new drug application ("ANDA"). To be legally marketed, among other things, OTC drug products marketed under an OTC monograph must be manufactured in compliance with the FDA's GMP requirements for drug products, and the failure to maintain compliance with these requirements could lead to FDA enforcement action. Moreover, a failure to comply with the OTC monograph requirements could lead the FDA to determine that the drug is not GRASE, and thus is a "new drug" requiring approval in accordance with the NDA or ANDA processes, or to make changes to its manufacturing processes or product formulations or labels.

Moreover, the FTC regulates and can bring enforcement action against cosmetic companies for deceptive advertising and lack of adequate scientific substantiation for claims. The FTC requires that companies have a reasonable basis to support marketing claims. What constitutes a reasonable basis can vary depending on the strength or type of claim made, or the market in which the claim is made, but objective evidence substantiating the claim is generally required.

In the E.U., the sale of cosmetic products is regulated under the E.U. Cosmetics Regulation (EC) No 1223/2009 setting out the general regulatory framework for finished cosmetic products placed on the E.U. market. The overarching requirement is that a cosmetic product made available on the E.U. market must be safe for human health when used under normal or reasonably foreseeable conditions of use, taking account, in particular, of the following: (a) presentation including conformity with Directive 87/357/EEC regarding health and safety of consumers; (b) labelling; (c) instructions for use and disposal; and (d) any other indication or information provided by the responsible person.

9

Generally, there is no requirement for pre-market approval of cosmetic products in the E.U. However, centralized notification of all cosmetic products placed on the E.U. market is required. Manufacturers are required to notify their products via the E.U. cosmetic products notification portal. Manufacturers are responsible for safety of their marketed finished cosmetic products, and must ensure that they undergo an appropriate scientific safety assessment before cosmetic products are sold. A special database with information on cosmetic substances and ingredients, known as CosIng, enables easy access to data on cosmetic ingredients, including legal requirements and restrictions. We rely on expert consultants for our E.U. product registrations and review of our labelling for compliance with E.U. regulation.

The E.U. Cosmetics Regulation requires the manufacture of cosmetic products to comply with GMPs, which is presumed where the manufacture is in accordance with the relevant harmonized standards. In addition, in the labelling, making available on the market and advertising of cosmetic products, text, names, trademarks, pictures and figurative or other signs must not be used to imply that these products have characteristics or functions they do not have; any product claims in labelling must be capable of being substantiated.

We are also subject to a number of federal, state and international laws and regulations that affect companies conducting business on the Internet, including regulations related to consumer protection, the promotion and sale of merchandise, privacy, use and protection of consumer and employee personal information and data (including the collection of data from minors), behavioral tracking, and advertising and marketing activities (including sweepstakes, contests and giveaways).

**Expenditures for Environmental Compliance**

We are subject to numerous foreign, federal, provincial, state, municipal and local environmental, health and safety laws and regulations relating to, among other matters, safe working conditions, product stewardship and environmental protection, including those relating to emissions to the air, discharges to land and surface waters, generation, handling, storage, transportation, treatment and disposal of hazardous substances and waste materials, and the registration and evaluation of chemicals. We maintain policies and procedures to monitor and control environmental, health and safety risks, and to monitor compliance with applicable environmental, health and safety requirements. Compliance with such laws and regulations pertaining to the discharge of materials into the environment, or otherwise relating to the protection of the environment, has not had a material effect upon our capital expenditures, earnings or competitive position.

**Segments**

We operate our business as a single operating and reportable segment. For more information regarding segment reporting, see Note 2 Summary of significant accounting policies to our consolidated financial statements in Part IV, Item 15. "Exhibits, financial statement schedules" under the heading "Segment reporting."

**Geographic Information**

For information regarding the geographic source of our net sales and the location of our long-lived assets, see Note 2 Summary of significant accounting policies to our consolidated financial statements in Part IV, Item 15. "Exhibits, financial statement schedules" under the heading "Segment reporting." For information regarding the risks related to our non-US operations, see Part I, Item 1A "Risk factors."

**Corporate Information**

e.l.f. Beauty was formed as a Delaware corporation on December 20, 2013 under the name J.A. Cosmetics Holdings, Inc. and we changed our name to e.l.f. Beauty, Inc. in April 2016. We completed the initial public offering of our common stock in September 2016. Our common stock is currently listed on the New York Stock Exchange ("NYSE") under the symbol "ELF." Our principal executive offices are located at 570 10th Street, Oakland, California 94607. Our telephone number is (510) 778-7787 and our investor relations website can be found at www.elfbeauty.com. e.l.f. Beauty operates through its principal subsidiaries, e.l.f. Cosmetics, Inc., which conducts business under the names "e.l.f. Cosmetics" or "e.l.f.," "e.l.f. SKIN," and "Keys Soulcare," Well People, Inc., which conducts business under the name "Well People," and Naturium LLC, which conducts business under the name "Naturium."

**Available Information**

We make available on or through our website, www.elfbeauty.com, certain reports and amendments to those reports that we file with, or furnish to, the SEC in accordance with the Securities Exchange Act of 1934, as amended (the "Exchange Act"). These include our Annual Reports on Form 10-K, our Quarterly Reports on Form 10-Q and our Current Reports on Form 8-K, and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act. We make this information available on or through our website free of charge as soon as reasonably practicable after we electronically file the information with, or furnish it to, the SEC. The information on, or that can be accessed through, our website is not incorporated by reference into this Annual Report or any other filings we make with the SEC.

**Item 1A. Risk factors.**

Certain risks may have a material and/or adverse effect on our business, financial condition and results of operations. These risks include those described below and may include additional risks and uncertainties not presently known to us or that we currently deem immaterial. These risks should be read in conjunction with the other information in this Annual Report, including our consolidated financial statements and related notes thereto and "Management's discussion and analysis of financial condition and results of operations" in Part II, Item 7 of this Annual Report.

**Risk factors related to the beauty industry**

***The beauty industry is highly competitive, and if we are unable to compete effectively our results will suffer.***

We face vigorous competition from companies throughout the world, including large multinational consumer products companies that have many beauty brands under ownership and independent beauty and skincare brands, including those that may target the latest trends or specific distribution channels. Competition in the beauty industry is based on the introduction of new products, pricing of products, quality of products and packaging, brand awareness, perceived value and quality, innovation, in-store presence and visibility, promotional activities, advertising, editorials, e-commerce and mobile-commerce initiatives and other activities. We must compete with a high volume of new product introductions and existing products by diverse companies across several different distribution channels.

Many multinational consumer companies have greater financial, technical or marketing resources, longer operating histories, greater brand recognition or larger customer bases than we do and may be able to respond more effectively to changing business and economic conditions than we can. Many of these competitors' products are sold in a wider selection or greater number of retail stores and possess a larger presence in these stores, typically having significantly more inline shelf space than we do. Given the finite space allocated to beauty products by retail stores, our ability to grow the number of retail stores in which our products are sold and expand our space allocation once in these retail stores may require the removal or reduction of the shelf space of these competitors. We may be unsuccessful in our growth strategy in the event retailers do not reallocate shelf space from our competitors to us. Increasing shelf space allocated to our products may be especially challenging in instances when a retailer has its own brand. In addition, our competitors may attempt to gain market share by offering products at prices at or below the prices at which our products are typically offered, including through the use of large percentage discounts and "buy one and get one free" offers. Competitive pricing may require us to reduce our prices, which would decrease our profitability or result in lost sales. Our competitors, many of whom have greater resources than we do, may be better able to withstand these price reductions and lost sales.

It is difficult for us to predict the timing and scale of our competitors' activities in these areas or whether new competitors will emerge in the beauty industry. In recent years, numerous online, "indie," celebrity and influencer-backed beauty companies have emerged and garnered significant followings. In addition, further technological breakthroughs, including new and enhanced technologies which increase competition in the online retail market, new product offerings by competitors and the strength and success of our competitors' marketing programs may impede our growth and the implementation of our business strategy.

Our ability to compete also depends on the continued strength of our brands and products, the success of our marketing, innovation and execution strategies, the continued diversity of our product offerings, the successful management of new product introductions and innovations, strong operational execution, including in order fulfillment, our ability to adapt to changes in technology, including the successful utilization of data analytics, artificial intelligence ("AI") and machine learning, and our success in entering new markets and expanding our business in existing geographies. If we are unable to continue to compete effectively, it could have a material adverse effect on our business, financial condition and results of operations.

***Our new product introductions may not be as successful as we anticipate.***

The beauty industry is driven in part by fashion and beauty trends, which may shift quickly. Our continued success depends on our ability to anticipate, gauge and react in a timely and cost-effective manner to changes in consumer preferences for beauty products, consumer attitudes toward our industry and brands and where and how consumers shop for those products. We must continually work to develop, produce and market new products, maintain and enhance the recognition of our brands, maintain a favorable mix of products and develop our approach as to how and where we market and sell our products.

We have a process for the development, evaluation and validation of our new product concepts. Nonetheless, each new product launch involves risks, as well as the possibility of unexpected consequences. For example, the acceptance of new product launches and sales to our retail customers may not be as high as we anticipate, due to lack of acceptance of the products themselves or their price, or limited effectiveness of our marketing strategies.

In addition, our ability to launch new products may be limited by delays or difficulties affecting the ability of our suppliers or manufacturers to timely manufacture, distribute and ship new products or displays for new products. Sales of new products may be affected by inventory management by our retail customers, and we may experience product shortages or limitations in retail display space by our retail customers. We may also experience a decrease in sales of certain existing products as a result of newly-launched products, the impact of which could be exacerbated by shelf space limitations or any shelf space loss. Any of these occurrences could delay or impede our ability to achieve our sales objectives, which could have a material adverse effect on our business, financial condition and results of operations.

As part of our ongoing business strategy, we expect that we will need to continue to introduce new products in the color cosmetics and skincare categories, while also expanding our product launches into adjacent categories in which we may have little to no operating experience. The success of product launches in adjacent product categories could be hampered by our relative inexperience operating in such categories, the strength of our competitors or any of the other risks referred to above. Furthermore, any expansion into new product categories may prove to be an operational and financial constraint which inhibits our ability to successfully accomplish such expansion. Our inability to introduce successful products in our traditional categories or in adjacent categories could limit our future growth and have a material adverse effect on our business, financial condition and results of operations.

***Any damage to our reputation or brands may materially and adversely affect our business, financial condition and results of operations.***

We believe that developing and maintaining our brands is critical and that our financial success is directly dependent on consumer perception of our brands. Furthermore, the importance of brand recognition may become even greater as competitors offer more products similar to ours.

We have relatively low brand awareness among consumers when compared to legacy beauty brands, and maintaining and enhancing the recognition and reputation of our brands is critical to our business and future growth. Many factors, some of which are beyond our control, are important to maintaining our reputation and brands. These factors include our ability to comply with ethical, social, product, labor and environmental standards. Any actual or perceived failure in compliance with such standards could damage our reputation and brands.

The growth of our brands depends largely on our ability to provide a high-quality consumer experience, which in turn depends on our ability to bring innovative products to the market at competitive prices that respond to consumer demands and preferences. Additional factors affecting our consumer experience include our ability to provide appealing store sets in retail stores, the maintenance and stocking of those sets by our retail customers, the overall shopping experience provided by our retail customers, a reliable and user-friendly website interface and mobile applications for our consumers to browse and purchase products on our e-commerce websites and mobile applications. If we are unable to preserve our reputation, enhance our brand recognition or increase positive awareness of our products and in-store and Internet platforms, it may be difficult for us to maintain and grow our consumer base, and our business, financial condition and results of operations may be materially and adversely affected.

The success of our brands may also suffer if our marketing plans or product initiatives do not have the desired impact on our brands' image or our ability to attract consumers. Further, our brand value could diminish significantly due to a number of factors, including consumer perception that we have acted in an irresponsible manner, adverse publicity about our products, our failure to maintain the quality of our products, product contamination, the failure of our products to deliver consistently positive consumer experiences, or our products becoming unavailable to consumers.

***Our success depends, in part, on the quality, performance and safety of our products.***

Any loss of confidence on the part of consumers in the ingredients used in our products, whether related to product contamination or product safety or quality failures, actual or perceived, or inclusion of prohibited ingredients, could tarnish the image of our brands and could cause consumers to choose other products. Allegations of contamination or other adverse effects on product safety or suitability for use by a particular consumer, even if untrue, may require us to expend significant time and resources responding to such allegations and could, from time to time, result in a recall of a product from any or all of the markets in which the affected product was distributed. Any such issues or recalls could negatively affect our profitability and image of our brands.

If our products are found to be, or perceived to be, defective or unsafe, or if they otherwise fail to meet our consumers' expectations, our relationships with consumers could suffer, the appeal of our brands could be diminished, we may need to recall some of our products and/or become subject to regulatory action, and we could lose sales or market share or become subject to boycotts or liability claims. In addition, safety or other defects in our competitors' products could reduce consumer demand for our own products if consumers view them to be similar. Any of these outcomes could result in a material adverse effect on our business, financial condition and results of operations.

**Risk factors related to our growth and profitability**

***We may not be able to successfully implement our growth strategy.***

Our future growth, profitability and cash flows depend upon our ability to successfully implement our business strategy, which, in turn, is dependent upon a number of key initiatives, including our ability to:

- build demand in our brands;

- invest in digital capabilities;

- lead innovation by providing prestige quality products at an extraordinary value;

- drive productivity and space expansion with our retailers;

- deliver profitable growth; and

- pursue strategic extensions that can leverage our strengths and bring new capabilities.

There can be no assurance that we can successfully achieve any or all of the above initiatives in the manner or time period that we expect. Further, achieving these objectives will require investments which may result in short-term cost increases with net sales materializing on a longer-term horizon and, therefore, may be dilutive to our earnings. We cannot provide any assurance that we will realize, in full or in part, the anticipated benefits we expect our strategy will achieve. The failure to realize those benefits could have a material adverse effect on our business, financial condition and results of operations.

***Our growth and profitability are dependent on a number of factors, and our historical growth may not be indicative of our future growth.***

Our historical growth may not be indicative of our future performance as we may not be successful in executing our growth strategy, and, even if we achieve our strategic imperatives, we may not be able to sustain profitability. In future periods, our revenue could decline, or grow more slowly than we expect. We also may incur significant losses in the future for a number of reasons, including the following risks and the other risks described in this report, and we may encounter unforeseen expenses, difficulties, complications, delays and other unknown factors:

- we may lose one or more significant retail customers, or sales of our products through these retail customers may decrease;

- the ability of our third-party suppliers and manufacturers to produce our products and of our distributors to distribute our products could be disrupted;

13

- because substantially all of our products are sourced and manufactured in China, our operations are susceptible to risks inherent in doing business there;

- our products may be the subject of regulatory actions, including, but not limited to, actions by the FDA, the FTC and the CPSC in the United States;

- we may be unable to introduce new products that appeal to consumers or otherwise successfully compete with our competitors in the beauty industry;

- we may be unsuccessful in enhancing the recognition and reputation of our brands, and our brands may be damaged as a result of, among other reasons, our failure, or alleged failure, to comply with applicable ethical, social, product, labor or environmental standards;

- we may experience service interruptions, data corruption, cyber-based attacks or network security breaches which result in the disruption of our operating systems or the loss of confidential information of our consumers;

- we may be unable to retain key members of our senior management team or attract and retain other qualified personnel; and

- we may be affected by any adverse economic conditions in the United States or internationally.

***We may be unable to continue to grow our business effectively or efficiently, which would harm our business, financial condition and results of operations.***

Since our formation, we have experienced significant growth in our business, customer base, employee headcount and operations, and we expect to continue to grow our business. Growing our business has placed, and we expect that it will continue to place, strain on our management team, personnel, financial and information systems, supply chain and distribution capacity and other resources. To manage our growth effectively, we must continue to enhance our operational, financial and management systems, including our warehouse management and inventory control; maintain and improve our internal controls and disclosure controls and procedures; maintain and improve our information technology systems and procedures; and expand, train and manage our employee base while maintaining close coordination among our executive, accounting, finance, legal, human resources, marketing, regulatory, sales and operations functions.

We may not be able to continue to effectively manage our expansion in any one or more of these areas, and any failure to do so could significantly harm our business, financial condition and results of operations. Growing our business may make it difficult for us to adequately predict the expenditures we will need to make in the future. If we do not make the necessary overhead expenditures to accommodate our future growth, we may not be successful in executing our growth strategy, and our results of operations would suffer.

***Acquisitions or investments, such as our acquisition of Naturium, could disrupt our business and harm our financial condition.***

We frequently review acquisition and strategic investment opportunities that would expand our current product offerings, our distribution channels, increase the size and geographic scope of our operations or otherwise offer growth and operating efficiency opportunities. There can be no assurance that we will be able to identify suitable candidates or consummate these transactions on favorable terms. The process of integrating an acquired business, product or technology can create unforeseen operating difficulties, expenditures and other challenges such as:

- potentially increased regulatory and compliance requirements;

- implementation or remediation of controls, procedures and policies at the acquired business;

- diversion of management time and focus from operation of our then-existing business to acquisition integration challenges;

- coordination of product, sales, marketing and program and systems management functions;

- transition of the users and customers of the acquired business, product, or technology onto our system;

14

- retention of employees from the acquired business;

- integration of employees from the acquired business into our organization;

- integration of the acquired business' accounting, information management, human resources and other administrative systems and operations into our systems and operations;

- liability for activities of the acquired business, product or technology prior to the acquisition, including violations of law, commercial disputes and tax and other known and unknown liabilities; and

- litigation or other claims in connection with the acquired business, product or technology, including claims brought by terminated employees, customers, former stockholders or other third parties.

If we are unable to address these difficulties and challenges or other problems encountered in connection with any acquisition or investment, we might not realize the anticipated benefits of that acquisition or investment, and we might incur unanticipated liabilities or otherwise suffer harm to our business generally. For example, if the integration of Naturium's business with our business is more difficult, costly or time-consuming than expected, we may not fully realize the expected benefits of our acquisition of Naturium, which may adversely affect our business, financial condition and results of operations. See also "Risk factors related to our acquisition of Naturium."

To the extent that we pay the consideration for any acquisitions or investments in cash, it reduces the amount of cash available to us for other purposes. Acquisitions or investments can also result in dilutive issuances of our equity securities or the incurrence of debt, contingent liabilities, amortization expenses, increased interest expenses or impairment charges against goodwill on our consolidated balance sheet, any of which could have a material adverse effect on our business, financial condition and results of operations. For example, in connection with our acquisition of Naturium, we paid total consideration of approximately $333 million using an incremental term loan under our existing credit facility, borrowings on our existing revolving facility, cash on the balance sheet and approximately $58 million of our stock.

**Risk factors related to our acquisition of Naturium**

***We have made certain assumptions relating to our acquisition of Naturium that may prove to be materially inaccurate.***

We have made certain assumptions relating to our acquisition of Naturium that may prove to be inaccurate, including as the result of the failure to realize the expected benefits of the acquisition, failure to realize expected revenue growth rates and higher than expected operating, transaction and integration costs, as well as general economic and business conditions that adversely affect Naturium. If the assumptions are incorrect, our business, financial condition and results of operations may be materially adversely affected.

***Naturium may have liabilities that are not known to us.***

Naturium may have liabilities that we failed, or were unable, to discover in the course of performing our due diligence investigations in connection with our acquisition of Naturium. We may learn additional information about Naturium that materially and adversely affects us and Naturium, such as unknown or contingent liabilities and liabilities related to compliance with applicable laws. Moreover, Naturium may be subject to audits, reviews, inquiries, investigations and claims of non-compliance and litigation by federal and state regulatory agencies which could result in liabilities or other sanctions. Any such liabilities or sanctions, individually or in the aggregate, could have an adverse effect on our business, financial condition and results of operations.

***Raw material sources for Naturium could be interrupted from time to time and, if interrupted, there is no guarantee that the supply of materials could be resumed within a reasonable time frame and at an acceptable cost or at all.***

Naturium relies on certain third-party suppliers for raw materials necessary to produce Naturium products, and we intend to continue to rely on these third parties. There are a limited number of suppliers of raw materials used to produce Naturium products, and there may be a need to assess alternate suppliers to prevent a possible disruption of the availability of those raw materials. We cannot be sure that these suppliers will remain in business, or that they will not be purchased by one of our competitors or another company that is not interested in continuing to provide raw materials for our intended purpose. In addition, the lead time needed to establish a relationship with a new supplier can be lengthy, and we may experience delays in meeting demand in the event a new supplier must be used. The time and effort to qualify a new supplier could result in

15

additional costs, diversion of resources or reduced manufacturing yields, any of which would negatively impact our operating results. Any significant delay in the supply of the raw materials needed to produce Naturium products could considerably delay product manufacturing and distribution, which would impair our ability to generate revenues from the sale of Naturium products and could ultimately adversely affect our business, financial condition and results of operations.

**Risk factors related to our business operations and macroeconomic conditions**

*A disruption in our operations, including a disruption in the supply chains for our products, could materially and adversely affect our business.*

As a company engaged in distribution on a global scale, our operations, including those of our third-party manufacturers, suppliers, brokers and delivery service providers, are subject to the risks inherent in such activities, including industrial accidents, environmental events, strikes and other labor disputes, disruptions or delays in shipments, disruptions in information systems, product quality control, safety, licensing requirements and other regulatory issues, as well as natural disasters, pandemics (such as the coronavirus pandemic), border disputes, international conflict (such as the ongoing military conflict in Ukraine and the Middle East), acts of terrorism and other external factors over which we and our third-party manufacturers, suppliers, brokers and delivery service providers have no control. The loss of, or damage to, the manufacturing facilities or distribution centers of our third-party manufacturers, suppliers, brokers and delivery service providers could materially and adversely affect our business, financial condition and results of operations.

We depend heavily on ocean container delivery, as well as fast boats, rail and air freight, to receive shipments of our products from our third-party manufacturers located in China and contracted third-party delivery service providers to deliver our products to our distribution facilities and logistics providers, and from there to our retail customers. Further, we rely on postal and parcel carriers for the delivery of products sold directly to consumers through our e-commerce websites and mobile applications. Interruptions, to or failures in, these delivery services could prevent the timely or successful delivery of our products. These interruptions or failures may be due to unforeseen events that are beyond our control or the control of our third-party delivery service providers, such as port congestion, container shortages, inclement weather, natural disasters, international conflict, labor unrest or other transportation disruptions. In addition, port congestion, container shortages, inclement weather, natural disasters, international conflict, labor unrest or other transportation disruptions may increase the costs to supply or transport our products or the components of our products. If our products are not delivered on time or are delivered in a damaged state, retail customers and consumers may refuse to accept our products and have less confidence in our services. In addition, a vessel and container shortage globally could delay future inventory receipts and, in turn, could delay deliveries to our retailer customers and availability of products in our direct-to-consumer e-commerce channel. Such potential delays, additional transportation expenses and shipping disruptions could negatively impact our results of operations through higher inventory costs and reduced sales. Furthermore, the delivery personnel of contracted third-party delivery service providers act on our behalf and interact with our consumers personally. Any failure to provide high-quality delivery services to our consumers may negatively affect the shopping experience of our consumers, damage our reputation and cause us to lose consumers.

Our ability to meet the needs of our consumers and retail customers depends on the proper operation of our distribution facilities, where most of our inventory that is not in transit is housed. Although we currently insure our inventory, our insurance coverage may not be sufficient to cover the full extent of any loss or damage to our inventory or distribution facilities, and any loss, damage or disruption of the facilities, or loss or damage of the inventory stored there, could materially and adversely affect our business, financial condition and results of operations.

*Our success depends, in part, on our retention of key members of our senior management team and ability to attract and retain qualified personnel.*

Our success depends, in part, on our ability to attract and retain key employees, including our executive officers, senior management team and operations, finance, sales and marketing personnel. The labor markets in the United States and China, where most of our employees are located, are hyper competitive, and attracting and retaining top talent requires significant organizational costs and attention. We are a relatively small company that relies on a few key employees, any one of whom would be difficult to replace, and because we are a small company, we believe that the loss of key employees may be more disruptive to us than it would be to a larger company. Our success also depends, in part, on our continuing ability to identify, hire, train and retain other highly qualified personnel. In addition, we may be unable to effectively plan for the succession of senior management, including our Chief Executive Officer. The loss of key personnel or the failure to attract and retain qualified personnel may have a material adverse effect on our business, financial condition and results of operations.

16

***We rely on a number of third-party suppliers, manufacturers, distributors and other vendors, and they may not continue to produce products or provide services that are consistent with our standards or applicable regulatory requirements, which could harm our brands, cause consumer dissatisfaction, and require us to find alternative suppliers of our products or services.***

We use multiple third-party suppliers and manufacturers, primarily based in China, to source and manufacture substantially all of our products. We engage our third-party suppliers and manufacturers on a purchase order basis and are not party to long-term contracts with any of them. The ability of these third parties to supply and manufacture our products may be affected by competing orders placed by other persons and the demands of those persons. Further, we are subject to risks associated with disruptions or delays in shipments whether due to port congestion, container shortages, labor disputes, product regulations and/or inspections or other factors, natural disasters or health pandemics, or other transportation disruptions. If we experience significant increases in demand or need to replace a significant number of existing suppliers or manufacturers, there can be no assurance that additional supply and manufacturing capacity will be available when required on terms that are acceptable to us, or at all, or that any supplier or manufacturer will allocate sufficient capacity to us in order to meet our requirements.

In addition, quality control problems, such as the use of ingredients and delivery of products that do not meet our quality control standards and specifications or comply with applicable laws or regulations could harm our business. These quality control problems could result in regulatory action, such as restrictions on importation, products of inferior quality or product stock outages or shortages, harming our sales and creating inventory write-downs for unusable products.

We have also outsourced significant portions of our distribution process, as well as certain technology-related functions, to third-party service providers. Specifically, we rely on third-party distributors to sell our products in a number of foreign countries, our warehouses and distribution facilities are managed and staffed by third-party service providers, we are dependent on a single third-party vendor for credit card processing, and we utilize a third-party hosting and networking provider to host our e-commerce websites and mobile applications. The failure of one or more of these entities to provide the expected services on a timely basis, or at all, or at the prices we expect, or the costs and disruption incurred in changing these outsourced functions to being performed under our management and direct control or that of a third-party, may have a material adverse effect on our business, financial condition and results of operations. We are not party to long-term contracts with some of our distributors, and upon expiration of these existing agreements, we may not be able to renegotiate the terms on a commercially reasonable basis, or at all.

Further, our third-party manufacturers, suppliers and distributors may:

- have economic or business interests or goals that are inconsistent with ours;

- take actions contrary to our instructions, requests, policies or objectives;

- be unable or unwilling to fulfill their obligations under relevant purchase orders, including obligations to meet our production deadlines, quality standards, pricing guidelines and product specifications, or to comply with applicable regulations, including those regarding the safety and quality of products and ingredients and good manufacturing practices;

- have financial difficulties;

- encounter raw material or labor shortages;

- encounter increases in raw material or labor costs which may affect our procurement costs;

- disclose our confidential information or intellectual property to competitors or third parties;

- engage in activities or employment practices that may harm our reputation; and

- work with, be acquired by, or come under control of, our competitors.

The occurrence of any of these events, alone or together, could have a material adverse effect on our business, financial condition and results of operations. In addition, such problems may require us to find new third-party suppliers,

17

manufacturers or distributors, and there can be no assurance that we would be successful in finding third-party suppliers, manufacturers or distributors meeting our standards of innovation and quality.

The management and oversight of the engagement and activities of our third-party suppliers, manufacturers and distributors requires substantial time, effort and expense of our employees, and we may be unable to successfully manage and oversee the activities of our third-party manufacturers, suppliers and distributors. If we experience any supply chain disruptions caused by our manufacturing process or by our inability to locate suitable third-party manufacturers or suppliers, or if our manufacturers or raw material suppliers experience problems with product quality or disruptions or delays in the manufacturing process or delivery of the finished products or the raw materials or components used to make such products, our business, financial condition and results of operations could be materially and adversely affected.

***If we fail to manage our inventory effectively, our results of operations, financial condition and liquidity may be materially and adversely affected.***

Our business requires us to manage a large volume of inventory effectively. We depend on our forecasts to estimate demand for and popularity of various products to make purchasing decisions and to manage our inventory of stock-keeping units. Demand for products, however, can change significantly between the time inventory or components are ordered and the date of sale. Demand may be affected by seasonality, new product launches, rapid changes in product cycles and pricing, product defects, promotions, changes in consumer spending patterns, changes in consumer tastes with respect to our products and other factors, and our consumers may not purchase products in the quantities that we expect. It may be difficult to accurately forecast demand and determine appropriate levels of product or components. We generally do not have the right to return unsold products to our suppliers. If we fail to manage our inventory effectively or negotiate favorable credit terms with third-party suppliers, we may be subject to a heightened risk of inventory obsolescence, a decline in inventory values, and significant inventory write-downs or write-offs. In addition, if we are required to lower sale prices in order to reduce inventory level or to pay higher prices to our suppliers, our profit margins might be negatively affected. Any of the above may materially and adversely affect our business, financial condition and results of operations. See also "*Risk factors related to our retail customers, consumers and the seasonality of our business—Our quarterly results of operations fluctuate due to seasonality, order patterns from key retail customers and other factors, and we may not have sufficient liquidity to meet our seasonal working capital requirements.*"

***Public health crises could adversely affect our business, financial condition and results of operations.***

The COVID-19 pandemic and government and private sector responsive measures taken to contain or mitigate the effects of the pandemic, as well as related changes in consumer shopping behaviors, adversely affected our business, financial condition and results of operations. The emergence of another pandemic, epidemic or infectious disease outbreak could have a similar effect. The potential impacts of such public health crises include, but are not limited to:

- the possibility of closures, reduced operating hours and/or decreased retail traffic for our retail customers, resulting in a decrease in sales of our products;

- disruption to our distribution centers and our third-party suppliers and manufacturers, including the effects of facility closures as a result of disease outbreaks or other illnesses, or measures taken by federal, state or local governments to reduce its spread, reductions in operations hours, labor shortages and real-time changes in operating procedures, including for additional cleaning and disinfection procedures; and

- significant disruption of global financial markets, which could have a negative impact on our ability to access capital in the future.

The COVID-19 pandemic contributed significantly to global supply chain constraints, with restrictions and limitations on related activities causing disruption and delay. These disruptions and delays strained domestic and international supply chains, resulting in port congestion, transportation delays as well as labor and container shortages, and affected the flow or availability of certain products.

The emergence of another pandemic, epidemic or infectious disease outbreak, and any required or voluntary actions to help limit the spread of illness, could impact our ability to carry out our business and may materially adversely impact global economic conditions, our business, financial condition and results of operations. There is a risk that our suppliers and distribution centers may become less productive or encounter disruptions as a result of the emergence and spread of another

disease, and/or these facilities may no longer be allowed to operate based on directives from public health officials or government authorities in the United States, China or other jurisdictions. Such events could materially increase our costs, negatively impact our sales and damage our results of operations and liquidity, possibly to a significant degree.

The full extent of the impact of a pandemic, such as the COVID-19 pandemic, an epidemic or an infectious disease outbreak on our business, financial condition and results of operations will depend on future developments that are highly uncertain and unpredictable, including the timing, acceptance and efficacy of vaccinations and possible achievement of herd immunity in various locations, the occurrence of virus mutations and variants, infection rates increasing or returning in various geographic areas, actions by government authorities to contain outbreaks or treat their impact, and any related impact on capital and financial markets and consumer behavior, including the impacts of any recession or inflationary pressures, all of which may vary across regions.

***Adverse economic conditions in the United States or any of the other countries in which we conduct significant business could negatively affect our business, financial condition and results of operations.***

Many of our products may be considered discretionary items for consumers. Consumer spending on beauty products is influenced by general economic conditions and the availability of discretionary income. Adverse economic conditions in the United States, the UK, Canada, China or any of the other countries in which we conduct significant business, such as the current inflationary economic environment, rising interest rates, financial distress caused by recent or potential bank failures and the associated banking crisis, an economic recession, depression or downturn, a tightening of the credit markets, high energy prices or higher unemployment levels, may lead to decreased consumer spending, reduced credit availability and a decline in consumer confidence and demand, each of which poses a risk to our business. For example, US and global markets have been experiencing volatility and disruption due to interest rate and inflation increases, such as higher inflation rates in the United States, which have remained above the Federal Reserve's inflation target, as well as the continued escalation of geopolitical tensions, including those as a result of the conflicts between Russia and Ukraine and in the Middle East. We have experienced and continue to experience inflationary pressures in certain areas of our business. Although our business has not yet been materially negatively impacted by such inflationary pressures, we cannot be certain that neither we nor our consumers will be materially impacted by continued pressures. As global economic conditions continue to be volatile and economic uncertainty remains, trends in consumer discretionary spending also remain unpredictable and subject to reductions due to credit constraints and uncertainties about the future. A decrease in consumer spending or in retailer and consumer confidence and demand for our products could have a significant negative impact on our net sales and profitability, including our operating margins and return on invested capital. These economic conditions could cause some of our retail customers or suppliers to experience cash flow or credit problems and impair their financial condition, which could disrupt our business and adversely affect product orders, payment patterns and default rates and increase our bad debt expense.

***Volatility in the financial markets could have a material adverse effect on our business, financial condition and results of operations.***

While we currently generate cash flows from our ongoing operations and have had access to credit markets through our various financing activities, credit markets may experience significant disruptions. Deterioration in global financial markets, rising interest rates and concerns over potential recessions could make future financing difficult or more expensive. If any financial institution party to our credit facilities or other financing arrangements were to declare bankruptcy or become insolvent, they may be unable to perform under their agreements with us. This could leave us with reduced borrowing capacity, which could have a material adverse effect on our business, financial condition and results of operations.

We regularly maintain cash balances at third-party financial institutions in excess of the Federal Deposit Insurance Corporation (the "FDIC") insurance limit. In 2023, the FDIC took control and was appointed receiver of Silicon Valley Bank ("SVB"), Signature Bank and First Republic Bank, after each bank was unable to continue its operations. Although the Company did not have any cash or cash equivalent balances on deposit with SVB, Signature Bank or First Republic Bank and, therefore, did not experience any direct risk of loss, we are unable to predict the extent or nature of the impacts of the failures of these banks and related circumstances at this time. Similarly, we cannot predict the impact that the high market volatility and instability of the banking sector more broadly could have on economic activity and our business in particular. The failure of other banks and financial institutions and measures taken, or not taken, by governments, businesses and other organizations in response to these events could adversely impact our business, financial condition and results of operations.

If the financial institutions with which we do business enter receivership or become insolvent in the future, there is no guarantee that the Department of the Treasury, the Federal Reserve and the FDIC will intercede to provide us and other

19

depositors with access to balances in excess of the $250,000 FDIC insurance limit or that we would be able to: (i) access our existing cash, cash equivalents and investments; (ii) maintain any required letters of credit or other credit support arrangements; or (iii) adequately fund our business for a prolonged period of time or at all. Any of such events could have a material adverse effect on our current or projected business operations and results of operations and financial condition. In addition, if any parties with which we conduct business are unable to access funds pursuant to such instruments or lending arrangements with such a financial institution, such parties' ability to continue to fund their business and perform their obligations to us could be adversely affected, which, in turn, could have a material adverse effect on our business, financial condition and results of operations.

**Risk factors related to our financial condition**

***Our indebtedness may have a material adverse effect on our business, financial condition and results of operations.***

As of March 31, 2024, we had a total of $262.9 million of indebtedness, consisting of amounts outstanding under our credit facilities and finance lease obligations, and a total availability of $10.5 million under our Amended Revolving Credit Facility (as defined in Part II, Item 7 "Management's discussion and analysis of financial condition and results of operations" under the heading "Description of indebtedness"). Our primary cash needs are for working capital, fixturing, retail product displays and digital investments. Cash needs typically vary depending on strategic initiatives selected for the fiscal year, including investments in infrastructure, digital capabilities expansion within or to additional retailer store locations, and acquisitions. On August 28, 2023, we entered into the Second Amendment to the Amended and Restated Credit Agreement, pursuant to which we borrowed an incremental term loan in a principal amount equal to $115.0 million (the "Incremental Term Loan"), together with available cash from our balance sheet and additional borrowings under our Amended Revolving Credit Facility, to consummate and pay related fees and expenses in connection with our acquisition of Naturium.

Our indebtedness could have significant consequences, including:

- requiring a substantial portion of our cash flows to be dedicated to debt service payments instead of funding growth, working capital, capital expenditures, investments or other cash requirements;

- reducing our flexibility to adjust to changing business conditions or obtain additional financing;

- exposing us to the risk of increased interest rates as our borrowings are at variable rates;

- making it more difficult for us to make payments on our indebtedness;

- subjecting us to restrictive covenants that may limit our flexibility in operating our business, including our ability to take certain actions with respect to indebtedness, liens, sales of assets, consolidations and mergers, affiliate transactions, dividends and other distributions and changes of control;

- subjecting us to maintenance covenants which require us to maintain specific financial ratios; and

- limiting our ability to obtain additional financing for working capital, capital expenditures, debt service requirements and general corporate or other purposes.

***If our cash from operations is not sufficient to meet our current or future operating needs, expenditures and debt service obligations, our business, financial condition and results of operations may be materially and adversely affected.***

We may require additional cash resources due to changed business conditions or other future developments, including any marketing initiatives, investments or additional acquisitions we may decide to pursue. To the extent we are unable to generate sufficient cash flow, we may be forced to cancel, reduce or delay these activities. Alternatively, if our sources of funding are insufficient to satisfy our cash requirements, we may seek to obtain an additional credit facility or sell equity or debt securities. The sale of equity securities would result in dilution of our existing stockholders. The incurrence of additional indebtedness would result in increased debt service obligations and operating and financing covenants that could restrict our operations.

Our ability to generate cash to meet our operating needs, expenditures and debt service obligations will depend on our future performance and financial condition, which will be affected by financial, business, economic, legislative, regulatory and other

20

factors, including potential changes in costs, pricing, the success of product innovation and marketing, competitive pressure and consumer preferences. If our cash flows and capital resources are insufficient to fund our debt service obligations and other cash needs, we could face substantial liquidity problems and could be forced to reduce or delay investments and capital expenditures or to dispose of material assets or operations, seek additional debt or equity capital or restructure or refinance our indebtedness. Our credit facilities may restrict our ability to take these actions, and we may not be able to affect any such alternative measures on commercially reasonable terms, or at all. If we cannot make scheduled payments on our debt, the lenders under the Amended Credit Agreement (as defined in Part II, Item 7 "Management's discussion and analysis of financial condition and results of operations" under the heading "Description of indebtedness") can terminate their commitments to loan money under the Amended Revolving Credit Facility, and our lenders under the Amended Credit Agreement can declare all outstanding principal and interest to be due and payable and foreclose against the assets securing their borrowings, and we could be forced into bankruptcy or liquidation.

Furthermore, it is uncertain whether financing will be available in amounts or on terms acceptable to us, if at all, which could materially and adversely affect our business, financial condition and results of operations.

***Changes in tax law, in our tax rates or in exposure to additional income tax liabilities or assessments could materially and adversely affect our business, financial condition and results of operations.***

We are subject to the income tax laws of the United States and several international jurisdictions. Changes in law and policy relating to taxes, including changes in administrative interpretations and legal precedence, could materially and adversely affect our business, financial condition and results of operations.

In addition, as we continue to expand our business internationally, the application and implementation of existing, new or future international laws could materially and adversely affect our business, financial condition and results of operations. Current economic and political conditions make tax rules in any jurisdiction, including those in which we operate, subject to significant change.

***Fluctuations in currency exchange rates may negatively affect our financial condition and results of operations.***

Exchange rate fluctuations may affect the costs that we incur in our operations. The main currencies to which we are exposed are the Euro, British pound, Chinese Renminbi ("RMB"), and Canadian dollar. The exchange rates between these currencies and the US dollar in recent years have fluctuated significantly and may continue to do so in the future. A depreciation of these currencies against the US dollar will decrease the US dollar equivalent of the amounts derived from foreign operations reported in our consolidated financial statements, and an appreciation of these currencies will result in a corresponding increase in such amounts. The cost of certain items, such as raw materials, manufacturing, employee compensation and benefits and transportation and freight, required by our operations may be affected by changes in the value of the relevant currencies.

To the extent that we are required to pay for goods or services in foreign currencies, the appreciation of such currencies against the US dollar will tend to negatively affect our business. There can be no assurance that foreign currency fluctuations will not have a material adverse effect on our business, financial condition and results of operations.

**Risk factors related to our retail customers, consumers and the seasonality of our business**

***We depend on a limited number of retailers for a large portion of our net sales, and the loss of one or more of these retailers, or business challenges at one or more of these retailers, could adversely affect our results of operations.***

A limited number of our retail customers account for a large percentage of our net sales. We expect a small number of retailers will, in the aggregate, continue to account for the majority of our net sales for foreseeable future periods. Any changes in the policies or our ability to meet the demands of our retail customers relating to service levels, inventory de-stocking, pricing and promotional strategies or limitations on access to display space could have a material adverse effect on our business, financial condition and results of operations.

As is typical in our industry, our business with retailers is based primarily upon discrete sales orders, and we do not have contracts requiring retailers to make firm purchases from us. Accordingly, retailers could reduce their purchasing levels or cease buying products from us at any time and for any reason. If we lose a significant retail customer or if sales of our

21

products to a significant retailer materially decrease, it could have a material adverse effect on our business, financial condition and results of operations.

Because a high percentage of our sales are made through our retail customers, our results are subject to risks relating to the general business performance of our key retail customers. Factors that adversely affect our retail customers' businesses may also have a material adverse effect on our business, financial condition and results of operations. These factors may include:

- any reduction in consumer traffic and demand at our retail customers as a result of economic downturns, pandemics or other health crises, changes in consumer preferences or reputational damage as a result of, among other developments, data privacy breaches, regulatory investigations or employee misconduct;

- any credit risks associated with the financial condition of our retail customers;

- the effect of consolidation or weakness in the retail industry or at certain retail customers, including store closures and the resulting uncertainty; and

- inventory reduction initiatives and other factors affecting retail customer buying patterns, including any reduction in retail space committed to beauty products and retailer practices used to control inventory shrinkage.

***Our quarterly results of operations fluctuate due to seasonality, order patterns from key retail customers and other factors, and we may not have sufficient liquidity to meet our seasonal working capital requirements.***

Our results of operations are subject to seasonal fluctuations, with net sales in the third and fourth fiscal quarters typically being higher than in the first and second fiscal quarters. The higher net sales in our third and fourth fiscal quarters are largely attributable to the increased levels of purchasing by retailers for the holiday season and customer shelf reset activity, respectively. Adverse events that occur during either the third or fourth fiscal quarter could have a disproportionate effect on our results of operations for the entire fiscal year. To support anticipated higher sales during the third and fourth fiscal quarters, we make investments in working capital to ensure inventory levels can support demand.

Fluctuations throughout the year are also driven by the timing of product restocking or rearrangement by our major customers as well as our expansion into new customers. Because a limited number of our retail customers account for a large percentage of our net sales, a change in the order pattern of one or more of our large retail customers could cause a significant fluctuation of our quarterly results or reduce our liquidity.

Furthermore, product orders from our large retail customers may vary over time due to changes in their inventory or out-of-stock policies. If we were to experience a significant shortfall in sales or profitability, we may not have sufficient liquidity to fund our business. As a result of quarterly fluctuations caused by these and other factors, comparisons of our operating results across different fiscal quarters may not be accurate indicators of our future performance. Any quarterly fluctuations that we report in the future may differ from the expectations of market analysts and investors, which could cause the price of our common stock to fluctuate significantly.

**Risk factors related to information technology and cybersecurity**

***We are increasingly dependent on information technology, and if we are unable to protect against service interruptions, data corruption, cyber-based attacks or network security breaches, our operations could be disrupted.***

We rely on information technology networks and systems to market and sell our products, to process electronic and financial information, to assist with sales tracking and reporting, to manage a variety of business processes and activities and to comply with regulatory, legal and tax requirements. We are increasingly dependent on a variety of secure information systems to effectively process retail customer orders and fulfill consumer orders from our e-commerce business. We depend on our information technology infrastructure for digital marketing activities and for electronic communications among our personnel, retail customers, consumers, manufacturers and suppliers around the world. These information technology systems, some of which are managed by third parties, may be susceptible to damage, disruptions or shutdowns due to failures during the process of upgrading or replacing software, databases or components, power outages, hardware failures, computer viruses, telecommunication failures, user errors, catastrophic events, malicious uses of AI and other data security and privacy threats. If our information technology systems suffer damage, disruption or shutdown, we may incur substantial cost in repairing or replacing these systems, and if we do not effectively resolve the issues in a timely manner, our business, financial condition

22

and results of operations may be materially and adversely affected, and we could experience delays in reporting our financial results.

Data security and privacy threats are accelerating in frequency and magnitude, are becoming increasingly difficult to detect, and come from a variety of sources, including traditional computer "hackers," threat actors, "hacktivists," personnel (such as through malfeasance, human error, theft or misuse), organized criminal threat actors, sophisticated nation states and nation-state supported actors. Some threat actors now engage and are expected to continue to engage in cyberattacks, including, without limitation, nation-state actors for geopolitical reasons and in conjunction with military conflicts and defense activities. During times of war and other major conflicts, we and the third parties upon which we rely may be vulnerable to a heightened risk of these attacks, including retaliatory cyberattacks that could materially disrupt our systems and operations.

The tools and techniques used by threat actors to attack or access systems and data are constantly evolving and may not be recognized until or after being launched against a target. These tools can, in some cases, circumvent security controls, evade detection and remove forensic evidence. We may be unable to anticipate, detect, prevent, remediate or recover from future cybersecurity incidents, including attacks to our information systems and data. As new and improved technologies and methodologies become available to threat actors (for example, AI), increased risks and currently unknown vulnerabilities could result in significant future expenditures related to our information systems, technology infrastructure and operations. Any material disruption of our systems, or the systems of our third-party service providers, could disrupt our ability to track, record and analyze the products that we sell and could negatively impact our operations, our reputation, shipment of goods, ability to process financial information and transactions and our ability to receive and process retail customer and e-commerce orders or engage in normal business activities.

Any adverse impact to the availability, integrity or confidentiality of our information technology systems and data could, among other things: result in unauthorized access, disclosure, loss or misuse of our intellectual property, proprietary information, or employee, customer or supplier data; attract substantial media attention; damage our relationships with our customers, employees, and partners; cause a loss of confidence in us or cause us to violate applicable privacy laws and obligations; expose us to costly government investigations and enforcement actions or private litigation (such as class actions) and financial liability (possibly beyond our insurance coverage); increase the costs we incur to protect against or remediate cybersecurity incidents and vulnerabilities; result in additional costs and operational activities to comply with consumer protection and data privacy laws and obligations; and/or disrupt our operations and distract our management and other key personnel from performing their primary operational duties, any of which could adversely affect our reputation, competitiveness, business, results of operations and financial condition. Any of the foregoing can be exacerbated by a delay or failure to detect and respond to a cybersecurity incident or the full extent of such incident.

Our e-commerce operations are important to our business. Our e-commerce websites and mobile applications serve as an extension of our marketing strategies by introducing potential new consumers to our brand, product offerings and enhanced content. Due to the importance of our e-commerce operations, we are vulnerable to website downtime and other technical failures. Our failure to successfully respond to these risks in a timely manner could reduce e-commerce sales and damage our brands' reputation.

The risks described here are heightened due to the increase in remote working and the challenges associated with managing remote computing assets and security vulnerabilities that are present in many non-corporate and home networks. A portion of our personnel is currently working under our hybrid model of three days in the office and two days remote, while others work remote entirely. It is possible with this model that the execution of our business plans and operations could be negatively impacted. Additionally, if a natural disaster, power outage, connectivity issue, or other event occurs that impacts our employees' ability to work remotely, it may be difficult or, in certain cases, impossible, for us to continue our business for a substantial period of time. The increase in remote working may also result in heightened consumer privacy, IT security and fraud concerns, potentially disrupting our operations.

***We must continue to maintain and make requisite or critical upgrades to our information technology systems, and our failure to do so could have a material adverse effect on our business, financial condition and results of operations.***

We conduct periodic penetration testing and vulnerability assessments to identify and address potential security weaknesses in our systems and third-party vendor environments to support expected future growth. As such, we will continue to invest in and implement modifications and upgrades to our information technology systems and procedures, including replacing legacy systems with successor systems, making changes to legacy systems or acquiring new systems with new functionality, hiring employees with information technology expertise and building new policies, procedures, training programs and monitoring

23

tools. We are currently undertaking various technology upgrades and enhancements to support our business growth, including an implementation of SAP software to upgrade our platforms and systems worldwide. These types of activities subject us to inherent costs and risks associated with replacing and changing these systems, including impairment of our ability to leverage our e-commerce channels, fulfill customer orders, potential disruption of our internal control structure, substantial capital expenditures, additional administration and operating expenses, acquisition and retention of sufficiently skilled personnel to implement and operate the new systems, demands on management time and other risks and costs of delays or difficulties in transitioning to or integrating new systems into our current systems.

The implementation of new information technology systems, such as our implementation of SAP software, or any modification of our key information systems may not result in productivity improvements at a level that outweighs the costs of implementation, or at all. In addition, difficulties with implementing new technology systems, delays in our timeline for planned improvements, significant system failures, or our inability to successfully modify our information systems to respond to changes in our business needs may cause disruptions in our business operations and have a material adverse effect on our business, financial condition and results of operations.

***If we fail to adopt new technologies or adapt our e-commerce websites and systems to changing consumer requirements or emerging industry standards, our business may be materially and adversely affected.***

To remain competitive, we must continue to enhance and improve the responsiveness, functionality and features of our information technology, including our e-commerce websites and mobile applications. Our competitors are continually innovating and introducing new products to increase their consumer base and enhance user experience. As a result, in order to attract and retain consumers and compete against our competitors, we must continue to invest resources to enhance our information technology and improve our existing products and services for our consumers. The Internet and the online retail industry are characterized by rapid technological evolution, changes in consumer requirements and preferences, frequent introductions of new products and services embodying new technologies and the emergence of new industry standards and practices, any of which could render our existing technologies and systems obsolete. Our success will depend, in part, on our ability to identify, develop, acquire or license leading technologies useful in our business, and respond to technological advances and emerging industry standards and practices in a cost-effective and timely way. The development of our e-commerce websites, mobile applications and other proprietary technology entails significant technical and business risks. There can be no assurance that we will be able to properly implement or use new technologies effectively or adapt our e-commerce websites, mobile applications and systems to meet consumer requirements or emerging industry standards. If we are unable to adapt in a cost-effective and timely manner in response to changing market conditions or consumer requirements, whether for technical, legal, financial or other reasons, our business, financial condition and results of operations may be materially and adversely affected.

***We use AI in our business, and challenges with properly managing its use could result in harm to our brand, reputation, business or customers, and adversely affect our results of operations.***

We are implementing the use of AI solutions, including machine learning and generative AI tools that collect, aggregate, and analyze data to assist in the development of our products and in the use of internal tools that support our business. These applications may become increasingly important in our operations over time. This emerging technology presents a number of risks inherent in its use. AI algorithms are based on machine learning and predictive analytics, which can create accuracy issues, unintended biases, and discriminatory outcomes that could harm our brand, reputation, business, or customers. Additionally, no assurance can be made that the usage of AI will assist us in being more efficient. Further, dependence on AI without adequate safeguards to make certain business decisions may introduce additional operational vulnerabilities by producing inaccurate outcomes, recommendations, or other suggestions based on flaws in the underlying data or other unintended results. Our competitors or other third parties may incorporate AI into their business, services, and products more rapidly or more successfully than us, which could hinder our ability to compete effectively and adversely affect our results of operations. Implementing the use of AI successfully, ethically and as intended, will require significant resources. In addition, the use of AI may increase cybersecurity and data privacy risks, such as intended, unintended, or inadvertent transmission of proprietary or sensitive information. The technologies underlying AI and their use cases are rapidly developing, and it is not possible to predict all of the legal, operational or technological risks related to the use of AI. While new AI initiatives, laws, and regulations are emerging and evolving, what they ultimately will look like remains uncertain, and our obligation to comply with them could entail significant costs, negatively affect our business, or limit our ability to incorporate certain AI capabilities into our business.

24

Table of Contents

***Failure to protect sensitive information of our consumers and information technology systems against security breaches could damage our reputation and brand and substantially harm our business, financial condition and results of operations.***

We collect, maintain, transmit, store and otherwise process data about our consumers, suppliers, prospective and current employees, and others, including personal data, financial information, including consumer payment information, as well as other confidential and proprietary information important to our business. We also employ third-party service providers that collect, store, process and transmit personal data, and confidential, proprietary and financial information on our behalf.

We have in place technical and organizational measures designed to maintain the security and safety of critical proprietary, personal, employee, customer and financial data. However, despite these efforts, advances in technology, the pernicious ingenuity of criminals, new exposures via cryptography, acts or omissions by our employees, contractors or service providers or other events or developments could result in a compromise or breach in the security of confidential or personal data. We and our service providers may not be able to prevent third parties, including criminals, competitors or others, from breaking into or altering our systems, disrupting business operations or communications infrastructure through denial-of-service attacks, attempting to gain access to our systems, information or monetary funds through phishing or social engineering campaigns, installing viruses or malicious software on our e-commerce websites or mobile applications or devices used by our employees or contractors, or carrying out other activity intended to disrupt our systems or gain access to confidential or sensitive information in our or our service providers' systems. Further, there can also be no assurance that our cybersecurity risk management program and processes, including our policies, controls or procedures, will be fully implemented, complied with or effective in protecting our information technology systems and data.

We are not aware of any cybersecurity incidents that have had a material impact on our operations or financial results, but we have been subject to attacks (e.g., phishing, denial of service) in the past and cannot guarantee that our security measures will be sufficient to prevent a material breach or compromise in the future.

Furthermore, such third parties may engage in various other illegal activities using such information, including credit card fraud or identity theft, which may cause additional harm to us, our consumers and our brands. We also may be vulnerable to error or malfeasance by our own employees or other insiders. Third parties may attempt to fraudulently induce our or our service providers' employees to misdirect funds or to disclose information in order to gain access to personal data we maintain about our consumers or website users. In addition, we have limited control or influence over the security policies or measures adopted by third-party providers of online payment services through which some of our consumers may elect to make payment for purchases at our e-commerce websites and mobile applications. Contracted third-party delivery service providers may also violate their confidentiality or data processing obligations and disclose or use information about our consumers inadvertently or illegally.

If a material security breach were to occur, our reputation and brands could be damaged, and we could be required to expend significant capital and other resources to alleviate problems caused by such breaches including exposure of litigation or regulatory action and a risk of loss and possible liability. Actual or anticipated attacks may cause us to incur increasing costs, including costs to deploy additional personnel and protection technologies, train employees and engage third-party experts and consultants. In addition, any party who is able to illicitly obtain a subscriber's password could access the subscriber's financial, transaction or personal information. Any compromise or breach of our security measures, or those of our third-party service providers, may violate applicable privacy, data security, financial, cyber and other laws and cause significant legal and financial exposure, adverse publicity and a loss of confidence in our security measures, all of which could have a material adverse effect on our business, financial condition and results of operations. We may be subject to post-breach review of the adequacy of our privacy and security controls by regulators and other third parties, which could result in post-breach regulatory investigation, fines and consumer litigation as well as regulatory oversight, at significant expense and risking reputational harm.

Furthermore, we are subject to diverse laws and regulations in the United States, the European Union (the "EU"), and other international jurisdictions that require notification to affected individuals in the event of a breach involving personal information. These required notifications can be time-consuming and costly. Furthermore, failure to comply with these laws and regulations could subject us to regulatory scrutiny and additional liability. Although we maintain relevant insurance, we cannot be certain that our insurance coverage will be adequate for all breach related liabilities, that insurance will continue to be available to us on economically reasonable terms, or at all, or that the insurer will not deny coverage as to any future claim. The successful assertion of one or more large claims against us that exceed available insurance coverage, or the occurrence of changes in our insurance policies, including premium increases or the imposition of large deductible or co-insurance requirements, could adversely affect our reputation, business, financial condition and results of operations. We

25

may need to devote significant resources to protect against security breaches or to address problems caused by breaches, diverting resources from the growth and expansion of our business.

***Payment methods used on our e-commerce websites subject us to third-party payment processing-related risks.***

We accept payments from our consumers using a variety of methods, including online payments with credit cards and debit cards issued by major banks, payments made with gift cards processed by third-party providers and payment through third-party online payment platforms such as PayPal, Afterpay and Apple Pay. We also rely on third parties to provide payment processing services. For certain payment methods, including credit and debit cards, we pay interchange and other fees, which may increase over time and raise our operating costs and lower our profit margins. We may also be subject to fraud and other illegal activities in connection with the various payment methods we offer, including online payment options and gift cards. Transactions on our e-commerce websites and mobile applications are card-not-present transactions, so they present a greater risk of fraud. Criminals are using increasingly sophisticated methods to engage in illegal activities such as unauthorized use of credit or debit cards and bank account information. Requirements relating to consumer authentication and fraud detection with respect to online sales are complex. We may ultimately be held liable for the unauthorized use of a cardholder's card number in an illegal activity and be required by card issuers to pay charge-back fees. Charge-backs result not only in our loss of fees earned with respect to the payment, but also leave us liable for the underlying money transfer amount. If our charge-back rate becomes excessive, card associations also may require us to pay fines or refuse to process our transactions. In addition, we may be subject to additional fraud risk if third-party service providers or our employees fraudulently use consumer information for their own gain or facilitate the fraudulent use of such information. Overall, we may have little recourse if we process a criminally fraudulent transaction.

We are subject to payment card association operating rules, certification requirements and various rules, regulations and requirements governing electronic funds transfers, which could change or be reinterpreted to make it difficult or impossible for us to comply. As our business changes, we may also be subject to different rules under existing standards, which may require new assessments that involve costs above what we currently pay for compliance. If we fail to comply with the rules or requirements of any provider of a payment method we accept, or if the volume of fraud in our transactions limits or terminates our rights to use payment methods we currently accept, or if a data breach occurs relating to our payment systems, among other things, we may be subject to fines and higher transaction fees and lose our ability to accept credit and debit card payments from our consumers, process electronic funds transfers or facilitate other types of online payments, and our reputation and our business, financial condition and results of operations could be materially and adversely affected.

**Risk factors related to conducting business internationally**

***We have significant operations in China, which exposes us to risks inherent in doing business in that country.***

We currently source and manufacture a substantial number of our products from third-party suppliers and manufacturers in China. As of March 31, 2024, we had 98 employees in China. With the rapid development of the Chinese economy, the cost of labor has increased and may continue to increase in the future. Our results of operations will be materially and adversely affected if our labor costs, or the labor costs of our suppliers and manufacturers, increase significantly. In addition, we and our manufacturers and suppliers may not be able to find a sufficient number of qualified workers due to the intensely competitive and fluid market for skilled labor in China. Furthermore, pursuant to Chinese labor laws, employers in China are subject to various requirements when signing labor contracts, paying remuneration, determining the term of employees' probation and unilaterally terminating labor contracts. These labor laws and related regulations impose liabilities on employers and may significantly increase the costs of workforce reductions. If we decide to change or reduce our workforce, these labor laws could limit or restrict our ability to make such changes in a timely, favorable and effective manner. Any of these events may materially and adversely affect our business, financial condition and results of operations.

Operating in China exposes us to political, legal and economic risks. In particular, the political, legal and economic climate in China, both nationally and regionally, is fluid and unpredictable. Our ability to operate in China may be adversely affected by changes in the United States and Chinese laws and regulations such as those related to, among other things, taxation, import and export tariffs, environmental regulations, land use rights, intellectual property, currency controls, network security, employee benefits, privacy, hygiene supervision and other matters. For example, in December 2021, the US Congress enacted the Uyghur Forced Labor Prevention Act in an effort to prevent what it views as forced labor and human rights abuses in the Xinjiang Uyghur Autonomous Region ("XUAR"). If it is determined that our third-party suppliers and manufacturers mine, produce or manufacture our products wholly or in part from the XUAR, then we could be prohibited from importing such products into the United States. In addition, we may not obtain or retain the requisite legal permits to continue to operate in

26

Table of Contents

China, and costs or operational limitations may be imposed in connection with obtaining and complying with such permits. In addition, Chinese trade regulations are in a state of flux, and we may become subject to other forms of taxation, tariffs and duties in China. Furthermore, the third parties we rely on in China may disclose our confidential information or intellectual property to competitors or third parties, which could result in the illegal distribution and sale of counterfeit versions of our products. If any of these events occur, our business, financial condition and results of operations could be materially and adversely affected.

***We are subject to international business uncertainties.***

We sell many of our products to customers located outside the United States. In addition, substantially all of our third-party suppliers and manufacturers are located in China and certain other foreign countries. We intend to continue to sell to customers outside the United States and maintain our relationships in China and other foreign countries where we have suppliers and manufacturers. Further, we recently opened an office in the UK and hired a team of employees to support our international expansion, and we are establishing additional relationships in other countries to grow our operations. The substantial up-front investment required, the lack of consumer awareness of our products in jurisdictions outside of the United States, differences in consumer preferences and trends between the United States and other jurisdictions, the risk of inadequate intellectual property protections and differences in packaging, labeling and related laws, rules and regulations are all substantial matters that need to be evaluated prior to doing business in new territories. We cannot be assured that our international efforts will be successful.

International sales and increased international operations may be subject to risks such as:

- difficulties in staffing and managing foreign operations;

- burdens of complying with a wide variety of laws and regulations, including more stringent regulations relating to data privacy and security, particularly in the UK and the EU;

- adverse tax effects and foreign exchange controls making it difficult to repatriate earnings and cash;

- political and economic instability;

- terrorist activities and natural disasters;

- trade restrictions;

- disruptions or delays in shipments whether due to port congestion, container shortages, labor disputes, product regulations and/or inspections or other factors, natural disasters or health pandemics, or other transportation disruptions;

- differing employment practices and laws and labor disruptions;

- the imposition of government controls;

- an inability to use or to obtain adequate intellectual property protection for our key brands and products;

- tariffs and customs duties and the classifications of our goods by applicable governmental bodies;

- a legal system subject to undue influence or corruption;

- a business culture in which illegal sales practices may be prevalent;

- logistics and sourcing; and

- military conflicts.

The occurrence of any of these risks could negatively affect our international business and consequently our overall business, financial condition and results of operations.

In addition, the ultimate effects of the UK's withdrawal from the EU ("Brexit") are still difficult to predict as there remains considerable uncertainty around the impact of post-Brexit regulations as the various agencies interpret the regulations and develop enforcement practices. Changes related to Brexit could subject us to heightened risks in that region, including disruptions to trade and free movement of goods, services and people to and from the UK, disruptions to our employees in the UK and the workforce of our business partners, increased foreign exchange volatility with respect to the British pound and additional legal, political and economic uncertainty. Furthermore, Brexit could also result in similar referenda or votes in other European countries in which we do business or look to expand operations. If these actions impacting our international distribution and sales channels result in increased costs for us or our international partners, such changes could result in higher costs to us, adversely affecting our operations, particularly as we expand our international presence in the UK and Europe.

**Risk factors related to evolving laws and regulations and compliance with laws and regulations**

*New laws, regulations, enforcement trends or changes in existing regulations governing the introduction, marketing and sale of our products to consumers could harm our business.*

There has been an increase in regulatory activity and activism in the United States and abroad, and the regulatory landscape is becoming more complex with increasingly strict requirements. If this trend continues, we may find it necessary to alter some of the ways we have traditionally manufactured and marketed our products in order to stay in compliance with a changing regulatory landscape, and this could add to the costs of our operations and have an adverse impact on our business. To the extent federal, state, local or foreign regulatory changes regarding consumer protection, or the ingredients, claims or safety of our products occur in the future, they could require us to reformulate or discontinue certain of our products, revise the product packaging or labeling, or adjust operations and systems, any of which could result in, among other things, increased costs, delays in product launches, product returns or recalls and lower net sales, and therefore could have a material adverse effect on our business, financial condition and results of operations. Noncompliance with applicable regulations could result in enforcement action by the FDA or other regulatory authorities within or outside the United States, including but not limited to product seizures, injunctions, product recalls and criminal or civil monetary penalties, all of which could have a material adverse effect on our business, financial condition and results of operations.

In the United States, with the exception of color additives, the FDA does not currently require pre-market approval for products intended to be sold as cosmetics. However, the FDA may in the future require pre-market authorization for certain cosmetic products, establishments or manufacturing facilities. Moreover, such products could also be regulated as both drugs and cosmetics simultaneously, as the categories are not mutually exclusive. The statutory and regulatory requirements applicable to drugs are extensive and require significant resources and time to ensure compliance. For example, if any of our products intended to be sold as cosmetics were to be regulated as drugs, we might be required to conduct, among other things, clinical trials to demonstrate the safety and efficacy of these products. We may not have sufficient resources to conduct any required clinical trials or to ensure compliance with the manufacturing requirements applicable to drugs. If the FDA determines that any of our products intended to be sold as cosmetics should be classified and regulated as drug products and we are unable to comply with applicable drug requirements, we may be unable to continue to market those products. Any inquiry into the regulatory status of our cosmetics and any related interruption in the marketing and sale of these products could damage our reputation and image in the marketplace.

In recent years, the FDA has issued warning letters to several cosmetic companies alleging improper claims regarding their cosmetic products. If the FDA determines that we have disseminated inappropriate drug claims for our products intended to be sold as cosmetics, we could receive a warning or untitled letter, be required to modify our product claims or take other actions to satisfy the FDA. In addition, plaintiffs' lawyers have filed class action lawsuits against cosmetic companies after receipt of these types of FDA warning letters. There can be no assurance that we will not be subject to state and federal government actions or class action lawsuits, which could harm our business, financial condition and results of operations.

Additional state and federal requirements may be imposed on consumer products as well as cosmetics, cosmetic ingredients, or the labeling and packaging of products intended for use as cosmetics. For example, on December 29, 2022, Congress enacted the MoCRA. MoCRA created new compliance requirements for manufacturers of cosmetic products in the United States and also significantly expanded the FDA's authority to oversee and regulate cosmetics. Under MoCRA, companies must comply with new requirements for cosmetics, such as new labeling requirements for certain products, safety substantiation, facility registration, product listing, adverse event reporting, good manufacturing practice requirements and mandatory recalls. In addition, MoCRA provided FDA with new enforcement authorities over cosmetics, such as the ability to initiate mandatory recalls and to obtain access certain product records. Many of the requirements were scheduled to become

28

applicable on December 29, 2023, with some of the requirements, such as those relating to labeling, scheduled to become applicable later in 2024 and 2025; however, on November 8, 2023, the FDA advised that it does not intend to enforce the requirements related to cosmetic product facility registration and cosmetic product listing until July 1, 2024 to provide regulated industry additional time to comply with the requirements.

In either case, although the FDA is required under MoCRA to propose mandatory GMPs for cosmetics by July 1, 2024, and although parties that operate facilities engaged in the manufacturing or processing of cosmetic products are required to register such facilities and submit product listing information to FDA by the same deadline, the FDA has yet to propose implementing regulations for MoCRA. As such, we are unable to ascertain at this time the full impact that complying with MoCRA will have on our business. Compliance with the new requirements may further increase the cost of manufacturing certain of our products and could have a material adverse effect on our business, financial condition and results of operations.

We also sell a number of products as over-the-counter ("OTC") drug products, which are subject to the FDA OTC drug regulatory requirements because they are intended to be used as sunscreen or to treat acne. The FDA regulates the formulation, manufacturing, packaging and labeling of OTC drug products. Our sunscreen and acne drug products are regulated pursuant to FDA OTC drug monographs that specify acceptable active drug ingredients and acceptable product claims that are generally recognized as safe and effective for particular uses. If any of these products that are marketed as OTC drugs are not in compliance with the applicable FDA monograph, we may be required to reformulate the product, stop making claims relating to such product or stop selling the product until we are able to obtain costly and time-consuming FDA approvals. We are also required to submit adverse event reports to the FDA for our OTC drug products, and failure to comply with this requirement may subject us to FDA regulatory action.

We also sell a number of consumer products, which are subject to regulation by the CPSC in the United States under the provisions of the Consumer Product Safety Act, as amended by the Consumer Product Safety Improvement Act of 2008. These statutes and the related regulations ban from the market consumer products that fail to comply with applicable product safety laws, regulations and standards. The CPSC has the authority to require the recall, repair, replacement or refund of any such banned products or products that otherwise create a substantial risk of injury and may seek penalties for regulatory noncompliance under certain circumstances. The CPSC also requires manufacturers of consumer products to report certain types of information to the CPSC regarding products that fail to comply with applicable regulations. Certain state laws also address the safety of consumer products, and mandate reporting requirements, and noncompliance may result in penalties or other regulatory action.

Our products are also subject to state laws and regulations, such as the California Safe Drinking Water and Toxic Enforcement Act, also known as "Prop 65," and various state PFAS regulations, and failure to comply with such laws may also result in lawsuits and regulatory enforcement that could have a material adverse effect on our business, financial condition and results of operations. We are, and may in the future be, involved in litigation related to such state laws and regulations.

***Our facilities and those of our third-party manufacturers are subject to regulation under the FDCA and FDA implementing regulations.***

Our facilities and those of our third-party manufacturers are subject to regulation under the FDCA and FDA implementing regulations. The FDA may inspect all of our facilities and those of our third-party manufacturers periodically to determine if we and our third-party manufacturers are complying with provisions of the FDCA and FDA regulations. In addition, third-party manufacturer's facilities for manufacturing OTC drug products must comply with the FDA's current GMP ("cGMP") requirements for drug products that require us and our manufacturers to maintain, among other things, good manufacturing processes, including stringent vendor qualifications, ingredient identification, manufacturing controls and record keeping.

Our operations could be harmed if regulatory authorities make determinations that we, or our vendors, are not in compliance with these regulations. If the FDA finds a violation of cGMPs, it may enjoin our manufacturer's operations, seize product, restrict importation of goods, and impose administrative, civil or criminal penalties. If we or our third-party manufacturers fail to comply with applicable regulatory requirements, we could be required to take costly corrective actions, including suspending manufacturing operations, changing product formulations, suspending sales, or initiating product recalls. In addition, compliance with these regulations has increased and may further increase the cost of manufacturing certain of our products as we work with our vendors to ensure they are qualified and in compliance. For example, under MoCRA, manufacturers of cosmetic products in the United States will become subject to mandatory GMP requirements. Although the FDA has yet to establish or implement regulations for such GMP requirements, third-party manufacturers of our cosmetic products may be slow or unable to adapt to these forthcoming regulations, which may require us to find alternative suppliers

29

for our products. Any of these outcomes could have a material adverse effect on our business, financial condition and results of operations.

***Government regulations and private party actions relating to the marketing and advertising of our products and services may restrict, inhibit or delay our ability to sell our products and harm our business, financial condition and results of operations.***

Government authorities regulate advertising and product claims regarding the performance and benefits of our products. These regulatory authorities typically require a reasonable basis to support any marketing claims. What constitutes a reasonable basis for substantiation can vary widely from market to market, and there is no assurance that the efforts that we undertake to support our claims will be deemed adequate for any particular product or claim. A significant area of risk for such activities relates to improper or unsubstantiated claims about our products and their use or safety. If we are unable to show adequate substantiation for our product claims, or our promotional materials make claims that exceed the scope of allowed claims for the classification of the specific product, whether cosmetics, OTC drug products or other consumer products that we offer, the FDA, the FTC or other regulatory authorities could take enforcement action or impose penalties, such as monetary consumer redress, requiring us to revise our marketing materials, amend our claims or stop selling certain products, all of which could harm our business, financial condition and results of operations. Any regulatory action or penalty could lead to private party actions, or private parties could seek to challenge our claims even in the absence of formal regulatory actions which could harm our business, financial condition and results of operations.

***Our business is subject to complex and evolving US and foreign laws and regulations regarding privacy and data protection. Many of these laws and regulations are subject to change and uncertain interpretation, and could result in claims, changes to our business practices, monetary penalties, increased costs of operations or otherwise harm our business, financial condition and results of operations.***

We are subject to a variety of laws and regulations in the United States and abroad regarding privacy and data protection, some of which can be enforced by private parties or government entities and some of which provide for significant penalties for non-compliance. Such laws and regulations restrict how personal information is collected, processed, stored, used and disclosed, as well as set standards for its security, implement notice requirements regarding privacy practices, and provide individuals with certain rights regarding the use, disclosure, and sale of their protected personal information.

For example, the California Consumer Privacy Act (the "CCPA") requires certain disclosures to California residents regarding a business's data processing activities, affords California consumers rights with respect to their personal information (including the rights related to access to and deletion of personal information, and the right to opt out of certain disclosures of their personal information), and establishes significant penalties for noncompliance. The California Privacy Rights Act (the "CPRA"), which took effect on January 1, 2023, significantly expands the CCPA, including by introducing additional obligations such as data minimization and retention requirements, granting additional rights to California residents such as correction of personal information and additional opt-out rights, and creating a new regulatory authority, the California Privacy Protection Agency, to implement and enforce the law. Comprehensive privacy legislation imposing similar obligations have been passed in several states and took effect in Virginia, Colorado, Connecticut and Utah in 2023. Following this trend, several other states have enacted or are considering enacting data protection legislation that may impose significant obligations and restrictions. Additionally, there is discussion in Congress of a new comprehensive federal data protection law. The enactment of such laws could create conflicting requirements, compliance with which could result in additional compliance costs. The effects of these laws are potentially significant and may require us to modify our data collection or processing practices and policies and to incur substantial costs and expenses in an effort to comply, and increase our potential exposure to regulatory enforcement and/or litigation.

In addition, the UK General Data Protection Regulation and Data Protection Act 2018 (collectively, the "UK GDPR") and the EU's General Data Protection Regulation (the "EU GDPR") (the EU GDPR and UK GDPR together referred to as the "GDPR") impose comprehensive data privacy compliance obligations in relation to the collection, processing, sharing, disclosure, transfer and other use of data relating to an identifiable living individual, including a principle of accountability and the obligation to demonstrate compliance through policies, procedures, training and audits. Failure to comply with the UK GDPR or the GDPR could result in penalties for noncompliance of up to the greater of GBP 17.5 million/EUR 20 million (as applicable) or 4% of our global annual turnover, and companies can be fined under each of these regimes independently with respect to the same violation. In addition to fines, a violation of the UK GDPR or the GDPR may result in regulatory investigations, reputational damage, orders to cease/change data processing activities, enforcement notices, assessment notices (for a compulsory audit) and/or civil claims (including class actions).

30

Table of Contents

We are also subject, under the GDPR, to restrictions on cross-border transfers of personal data out of the European Economic Area (the "EEA") where recent legal developments have created complexity and uncertainty regarding transfers of personal data outside the EEA and the UK, including to the United States. We rely on the standard contractual clauses ("SCCs") to transfer data outside of the EEA/ UK in some situations; however, the Court of Justice of the European Union ("CJEU") has stated that reliance on the SCCs alone may not be sufficient. On October 7, 2022, President Biden signed an Executive Order on 'Enhancing Safeguards for United States Intelligence Activities' which introduced new redress mechanisms and binding safeguards to address some of the concerns raised by the CJEU. We expect the existing legal complexity and uncertainty regarding international personal data transfers to continue. Some European regulators have prevented companies from transferring personal data out of the EEA for allegedly violating the EU GDPR's cross—border transfer rules. As supervisory authorities issue further guidance on personal data export mechanisms, including circumstances where the SCCs cannot be used, and/or continue to take enforcement action, we could suffer additional costs, complaints and/or regulatory investigations or fines, and/or if we are otherwise unable to transfer personal data between and among countries and regions in which we operate, it could affect the manner in which we provide our services, the geographical location or segregation of our relevant systems and operations, and could adversely affect our financial results.

Data privacy continues to remain a matter of interest to lawmakers and regulators. In the United States, a number of privacy-related proposals (including proposed comprehensive privacy legislation) are pending before federal and state legislative and regulatory bodies and additional laws and regulations have been passed but are not yet effective, all of which could significantly affect our business. The same may be true outside the United States, where various jurisdictions have enacted or are considering comprehensive data protection legislation. Additionally, at the federal level in the United States, various bills have been introduced to enact comprehensive federal privacy legislation, though to date none of these efforts have been successful. If comprehensive privacy legislation is enacted at the federal level in the United States, this could lead to additional costs and increase our overall risk exposure.

We are also subject to evolving privacy laws on cookies, tracking technologies and e-marketing. Regulation of cookies and similar technologies may lead to broader restrictions on our marketing and personalization activities and may negatively impact our efforts to understand consumers' Internet usage, online shopping and other relevant online behaviors, as well as the effectiveness of our marketing and our business generally. Such regulations, including uncertainties about how well the advertising technology ecosystem can adapt to legal changes around the use of tracking technologies, may have a negative effect on businesses, including ours, that collect and use online usage information for consumer acquisition and marketing. We may also be subject to fines and penalties for non-compliance with any such laws and regulations. The decline of cookies or other online tracking technologies as a means to identify and target potential purchasers may increase the cost of operating our business and lead to a decline in revenues. In addition, legal uncertainties about the legality of cookies and other tracking technologies may increase regulatory scrutiny and increase potential civil liability under data protection or consumer protection laws.

Compliance with existing, forthcoming, and proposed privacy and data protection laws and regulations can be costly and can delay or impede our ability to market and sell our products, impede our ability to conduct business through websites and mobile applications we and our partners may operate, require us to modify or amend our information practices and policies, change and limit the way we use consumer information in operating our business, cause us to have difficulty maintaining a single operating model, result in negative publicity, increase our operating costs, require significant management time and attention, or subject us to inquiries or investigations, claims or other remedies, including significant fines and penalties, or demands that we modify or cease existing business practices. In addition, if our privacy or data security measures fail to comply with applicable current or future laws and regulations, we may be subject to litigation, regulatory investigations, enforcement notices requiring us to change the way we use personal data or our marketing practices, fines or other liabilities, as well as negative publicity and a potential loss of business. We may also face civil claims including representative actions and other class action type litigation (where individuals have suffered harm), potentially amounting to significant compensation or damages liabilities, as well as associated costs, and diversion of internal resources. Any of the foregoing could have a material adverse effect on our business, financial condition and results of operations.

***Failure to comply with the US Foreign Corrupt Practices Act, other applicable anti-corruption and anti-bribery laws, and applicable trade control laws could subject us to penalties and other adverse consequences.***

We currently source and manufacture a substantial number of our products from third-party suppliers and manufacturers located outside of the United States, and we have an office in China from which we manage our international supply chain. We sell our products in countries outside of the United States, including through distributors. Our operations are subject to the US Foreign Corrupt Practices Act (the "FCPA"), as well as the anti-corruption and anti-bribery laws in the countries where

31

we do business. The FCPA prohibits covered parties from offering, promising, authorizing or giving anything of value, directly or indirectly, to a "foreign government official" with the intent of improperly influencing the official's act or decision, inducing the official to act or refrain from acting in violation of lawful duty, or obtaining or retaining an improper business advantage. The FCPA also requires publicly traded companies to maintain records that accurately and fairly represent their transactions, and to have an adequate system of internal accounting controls. In addition, other applicable anti-corruption laws prohibit bribery of domestic government officials, and some laws that may apply to our operations prohibit commercial bribery, including giving or receiving improper payments to or from non-government parties, as well as so-called "facilitation" payments. In addition, we are subject to United States and other applicable trade control regulations that restrict with whom we may transact business, including the trade sanctions enforced by the US Treasury, Office of Foreign Assets Control.

While we have implemented policies, internal controls and other measures reasonably designed to promote compliance with applicable anti-corruption and anti-bribery laws and regulations, and certain safeguards designed to ensure compliance with US trade control laws, our employees or agents may engage in improper conduct for which we might be held responsible. Any violations of these anti-corruption or trade controls laws, or even allegations of such violations, can lead to an investigation and/or enforcement action, which could disrupt our operations, involve significant management distraction, and lead to significant costs and expenses, including legal fees. If we, or our employees or agents acting on our behalf, are found to have engaged in practices that violate these laws and regulations, we could suffer severe fines and penalties, profit disgorgement, injunctions on future conduct, securities litigation, bans on transacting government business, delisting from securities exchanges and other consequences that may have a material adverse effect on our business, financial condition and results of operations. In addition, our brands and reputation, our sales activities or our stock price could be adversely affected if we become the subject of any negative publicity related to actual or potential violations of anti-corruption, anti-bribery or trade control laws and regulations.

***Government regulation of the Internet and e-commerce is evolving, and unfavorable changes or failure by us to comply with these regulations could substantially harm our business, financial condition and results of operations.***

We are subject to general business regulations and laws as well as regulations and laws specifically governing the Internet and e-commerce. Existing and future regulations and laws could impede the growth of the Internet, e-commerce or mobile commerce. These regulations and laws may involve taxes, tariffs, privacy and data security, anti-spam, content protection, electronic contracts and communications, consumer protection, social media marketing, third-party cookies, web beacons and similar technology for online behavioral advertising and gift cards. It is not clear how existing laws governing issues such as property ownership, sales taxes and other taxes and consumer privacy apply to the Internet as the vast majority of these laws were adopted prior to the advent of the Internet and do not contemplate or address the unique issues raised by the Internet or e-commerce. It is possible that general business regulations and laws, or those specifically governing the Internet or e-commerce, may be interpreted and applied in a manner that is inconsistent from one jurisdiction to another and may conflict with other rules or our practices. We cannot be sure that our practices have complied, comply or will comply fully with all such laws and regulations. Any failure, or perceived failure, by us to comply with any of these laws or regulations could result in damage to our reputation, a loss in business and proceedings or actions against us by governmental entities or others. Any such proceeding or action could hurt our reputation, force us to spend significant amounts in defense of these proceedings, distract our management, increase our costs of doing business and decrease the use of our sites by consumers and suppliers and may result in the imposition of monetary liability. We may also be contractually liable to indemnify and hold harmless third parties from the costs or consequences of non-compliance with any such laws or regulations. In addition, it is possible that governments of one or more countries may seek to censor content available on our sites or may even attempt to completely block access to our sites. Adverse legal or regulatory developments could substantially harm our business. In particular, in the event that we are restricted, in whole or in part, from operating in one or more countries, our ability to retain or increase our consumer base may be adversely affected, and we may not be able to maintain or grow our net sales and expand our business as anticipated.

**Risk factors related to legal and regulatory proceedings**

***We are involved, and may become involved in the future, in disputes and other legal or regulatory proceedings that, if adversely decided or settled, could materially and adversely affect our business, financial condition and results of operations.***

We are, and may in the future become, party to litigation, regulatory proceedings or other disputes. In general, claims made by or against us in disputes and other legal or regulatory proceedings can be expensive and time consuming to bring or defend against, requiring us to expend significant resources and divert the efforts and attention of our management and other

personnel from our business operations. These potential claims include, but are not limited to, personal injury claims, class action lawsuits, intellectual property claims, privacy claims, employment litigation and regulatory investigations and causes of action relating to the advertising and promotional claims about our products. Any adverse determination against us in these proceedings, or even the allegations contained in the claims, regardless of whether they are ultimately found to be without merit, may also result in settlements, injunctions or damages that could have a material adverse effect on our business, financial condition and results of operations.

***We may be required to recall products and may face product liability claims, either of which could result in unexpected costs and damage our reputation.***

We sell products for human use. Our products intended for use as cosmetics or skin care are not generally subject to pre-market approval or registration processes, so we cannot rely upon a government safety panel to qualify or approve our products for use. A product may be safe for the general population when used as directed but could cause an adverse reaction for a person who has a health condition or allergies, or who is taking a prescription medication. While we include what we believe are adequate instructions and warnings and we have historically had low numbers of reported adverse reactions, previously unknown adverse reactions could occur. If we discover that any of our products are causing adverse reactions, we could suffer adverse publicity or regulatory/government sanctions.

Potential product liability risks may arise from the testing, manufacture and sale of our products, including that the products fail to meet quality or manufacturing specifications, contain contaminants, include inadequate instructions as to their proper use, include inadequate warnings concerning side effects and interactions with other substances or for persons with health conditions or allergies, or cause adverse reactions or side effects. Product liability claims could increase our costs, and adversely affect our business, financial condition and results of operations. As we continue to offer an increasing number of new products, our product liability risk may increase. It may be necessary for us to recall products that do not meet approved specifications or because of the side effects resulting from the use of our products, which would result in adverse publicity, potentially significant costs in connection with the recall and could have a material adverse effect on our business, financial condition and results of operations.

In addition, plaintiffs in the past have received substantial damage awards from other cosmetic and drug companies based upon claims for injuries allegedly caused by the use of their products. Although we currently maintain general liability insurance, any claims brought against us may be subject to policy exclusions or exceed our existing or future insurance policy coverage or limits. Any judgment against us that is not covered or in excess of our policy coverage or limits would have to be paid from our cash reserves, which would reduce our capital resources. In addition, we may be required to pay higher premiums and accept higher deductibles in order to secure adequate insurance coverage in the future. Further, we may not have sufficient capital resources to pay a judgment, in which case our creditors could levy against our assets. Any product liability claim or series of claims brought against us could harm our business significantly, particularly if a claim were to result in adverse publicity or damage awards outside or in excess of our insurance policy limits.

**Risk factors related to intellectual property**

***If we are unable to protect our intellectual property, the value of our brands and other intangible assets may be diminished, and our business may be adversely affected.***

We rely on trademark, copyright, trade secret, patent and other laws protecting proprietary rights, nondisclosure and confidentiality agreements and other practices, to protect our brands and proprietary information, technologies and processes. Our primary trademarks include "e.l.f.," "e.l.f. SKIN," "Naturium," "e.l.f. eyes lips face," "Well People," and "Keys Soulcare," all of which are registered or have registrations pending in the United States and in many other countries or registries. Our trademarks are valuable assets that support our brands and consumers' perception of our products.

Although we have existing and pending trademark registrations for our brands in the United States and in many of the foreign countries in which we operate, we may not be successful in asserting trademark or trade name protection in all jurisdictions. We also have not applied for trademark protection in all relevant foreign jurisdictions and cannot assure you that our pending trademark applications will be approved. Third parties may also attempt to register our trademarks abroad in jurisdictions where we have not yet applied for trademark protection, oppose our trademark applications domestically or abroad, or otherwise challenge our use of the trademarks. In the event that our trademarks are successfully challenged, we could be forced to rebrand our products in some parts of the world, which could result in the loss of brand recognition and could require us to devote resources to advertising and marketing new brands.

33

We have limited patent protection, which limits our ability to protect our products from competition. We primarily rely on know-how to protect our products. It is possible that others will independently develop the same or similar know-how, which may allow them to sell products similar to ours. If others obtain access to our know-how, our confidentiality agreements may not effectively prevent disclosure of our proprietary information, technologies and processes and may not provide an adequate remedy in the event of unauthorized use of such information, which could harm our competitive position. Furthermore, advances in AI technology may generate intellectual property developments, which existing intellectual property laws may not adequately protect and which may also give rise to a proliferation of infringement which we may not be able to address effectively.

The efforts we have taken to protect our proprietary rights may not be sufficient or effective. In addition, effective trademark, copyright, patent and trade secret protection may be unavailable or limited for certain of our intellectual property in some foreign countries. Other parties may infringe our intellectual property rights and may dilute our brands in the marketplace. We may need to engage in litigation or other activities to enforce our intellectual property rights, to protect our trade secrets or to determine the validity and scope of proprietary rights of others. Any such activities could require us to expend significant resources and divert the efforts and attention of our management and other personnel from our business operations. If we fail to protect our intellectual property or other proprietary rights, our business, financial condition and results of operations may be materially and adversely affected.

***Our success depends on our ability to operate our business without infringing, misappropriating or otherwise violating the trademarks, patents, copyrights and other proprietary rights of third parties.***

Our commercial success depends in part on our ability to operate without infringing, misappropriating or otherwise violating the trademarks, patents, copyrights, trade secrets and other proprietary rights of others. We cannot be certain that the conduct of our business does not and will not infringe, misappropriate or otherwise violate such rights. From time to time we receive allegations of intellectual property infringement and third parties have filed claims against us with allegations of intellectual property infringement. We are, and may in the future be, subject to third-party claims of intellectual property infringement. In addition, third parties may involve us in intellectual property disputes as part of a business model or strategy to gain competitive advantage.

As we gain greater visibility and market exposure as a public company and otherwise, we also face a greater risk of being the subject of such claims and litigation. For these and other reasons, third parties may allege that our products or activities infringe, misappropriate, dilute or otherwise violate their trademark, patent, copyright or other proprietary rights. Defending against allegations and litigation could be expensive, occupy significant amounts of time, divert management's attention from other business concerns and have an adverse impact on our ability to bring products to market. In addition, if we are found to infringe, misappropriate, dilute or otherwise violate third-party trademark, patent, copyright or other proprietary rights, our ability to use brands to the fullest extent we plan may be limited, we may need to obtain a license, which may not be available on commercially reasonable terms, or at all, or we may need to redesign or rebrand our marketing strategies or products, which may not be possible.

We may also be required to pay substantial damages or be subject to an order prohibiting us and our retail customers from importing or selling certain products or engaging in certain activities. Our inability to operate our business without infringing, misappropriating or otherwise violating the trademarks, patents, copyrights and proprietary rights of others could have a material adverse effect on our business, financial condition and results of operations.

**Risk factors related to marketing activities**

***Use of social media may materially and adversely affect our reputation or subject us to fines or other penalties, and any failure in our marketing efforts through our social media presence could materially and adversely affect our business, financial condition and results of operations.***

We rely to a large extent on our online presence to reach consumers, and we offer consumers the opportunity to rate and comment on our products on our e-commerce websites and mobile applications. Negative commentary or false statements regarding us or our products may be posted on our e-commerce websites, mobile applications, or social media platforms and may be harmful to our reputation or business. Our target consumers often value readily available information and may act on such information without further investigation and without regard to its accuracy. The harm may be immediate without affording us an opportunity for redress or correction. In addition, we may face claims relating to information that is published or made available through the interactive features of our e-commerce websites and mobile applications. For example, we

34

may receive third-party complaints that the comments or other content posted by users on our platforms infringe third-party intellectual property rights or otherwise infringe the legal rights of others. While the Communications Decency Act and Digital Millennium Copyright Act generally protect online service providers from claims of copyright infringement or other legal liability for the self-directed activities of its users, if it were determined that we did not meet the relevant safe harbor requirements under either law, we could be exposed to claims related to advertising practices, defamation, intellectual property rights, rights of publicity and privacy, and personal injury torts. We could incur significant costs investigating and defending such claims and, if we are found liable, significant damages. If any of these events occur, our business, financial condition and results of operations could be materially and adversely affected.

We also use third-party social media platforms as marketing tools. For example, we maintain Snapchat, Facebook, TikTok, X (formerly Twitter), Roblox, Twitch, Pinterest, Instagram and YouTube accounts. As e-commerce and social media platforms continue to rapidly evolve, we must continue to maintain a presence on these platforms and establish presences on new or emerging popular social media platforms. If we are unable to cost-effectively use social media platforms as marketing tools, our ability to acquire new consumers and our financial condition may suffer. Generally, the opportunities in and sophistication of newer advertising channels are relatively undeveloped and unproven, and there can be no assurance that we will be able to continue to appropriately manage and fine-tune our marketing efforts in response to these and other trends in the advertising industry. Furthermore, these newer advertising channels often change rapidly and can be subject to disruptions for reasons beyond our control. For example, lawmakers in the United States, Europe and Canada have recently escalated efforts to restrict access to TikTok. On April 24, 2024, President Biden signed a bill to force a sale of TikTok by its Chinese owner, ByteDance, or institute a first-of-its-kind ban on the app in the United States. Individual states, governmental bodies and institutions have also voiced concerns that TikTok poses a national security threat and have pursued similar prohibitions. As laws and regulations rapidly evolve to govern the use of these platforms and devices, the failure by us, our employees or third parties acting at our direction to abide by applicable laws and regulations in the use of these platforms and devices could subject us to regulatory investigations, class action lawsuits, liability, fines or other penalties and have a material adverse effect on our business, financial condition and result of operations. Any failure to successfully manage our marketing efforts on, or disruptions to, social media channels that we have come to depend on for marketing could materially adversely affect our business, financial condition and results of operations.

In addition, an increase in the use of social media for product promotion and marketing may cause an increase in the burden on us to monitor compliance of such materials and increase the risk that such materials could contain problematic product or marketing claims in violation of applicable regulations.

***Use of influencers may materially and adversely affect our reputation and business.***

We rely in part upon social media influencers to market our brands and are unable to fully control their efforts. Influencers with whom we maintain a relationship could engage in behavior or use their platforms to communicate directly with our consumers and retail customers in a manner that reflects poorly on our brand, and these communications may be attributed to us or otherwise adversely affect us. Furthermore, negative commentary regarding us or our products or influencers may also be posted on social media platforms and may be adverse to our reputation or business. The immediacy of social media precludes us from having real-time control over postings made regarding us via social media, whether matters of fact or opinion. Information distributed via social media could result in immediate unfavorable publicity we may not be able to reverse. It is not possible to prevent such behavior, and the precautions we take to prevent or detect this activity may not be effective. This unfavorable publicity could result in damage to our reputation and therefore have a material adverse effect on our business, financial condition, operating results and prospects.

***Our business relies heavily on email and other messaging services, and any restrictions on the sending of emails or messages or an inability to timely deliver such communications could materially adversely affect our net revenue and business.***

Our business is highly dependent upon email and other messaging services for promoting our brands, products and e-commerce platforms. We provide emails, text messages and "push" communications to inform consumers of new products, shipping specials and other promotions. We believe these messages are an important part of our consumer experience. If we are unable to successfully deliver emails or other messages to our subscribers, or if subscribers decline to open or read our messages, our business, financial condition and results of operations may be materially adversely affected. Changes in how web and mail services block, organize and prioritize email may reduce the number of subscribers who receive or open our emails. For example, Google's Gmail service has a feature that organizes incoming emails into categories (for example, primary, social and promotions).

Such categorization or similar inbox organizational features may result in our emails being delivered in a less prominent location in a subscriber's inbox or viewed as "spam" by our subscribers and may reduce the likelihood of that subscriber reading our emails. Actions by third parties to block, impose restrictions on or charge for the delivery of emails or other messages could also adversely impact our business. From time to time, Internet service providers or other third parties may block bulk email transmissions or otherwise experience technical difficulties that result in our inability to successfully deliver emails or other messages to consumers.

Changes in the laws or regulations that limit our ability to send such communications or impose additional requirements upon us in connection with sending such communications would also materially adversely impact our business. For example, electronic marketing and privacy requirements in the EU and the UK are highly restrictive and differ greatly from those in the United States, which could cause fewer of individuals in the EU or the UK to subscribe to our marketing messages and drive up our costs and risk of regulatory oversight and fines if we are found to be non-compliant.

Our use of email and other messaging services to send communications to consumers may also result in legal claims against us, which may cause us increased expenses, and if successful might result in fines and orders with costly reporting and compliance obligations or might limit or prohibit our ability to send emails or other messages. We also rely on social networking messaging services to send communications and to encourage consumers to send communications. Changes to the terms of these social networking services to limit promotional communications, any restrictions that would limit our ability or our consumers' ability to send communications through their services, disruptions or downtime experienced by these social networking services or decline in the use of or engagement with social networking services by consumers could materially and adversely affect our business, financial condition and results of operations.

**Risk factors relating to our stockholders and ownership of our common stock**

***Our business could be negatively impacted by corporate citizenship and sustainability matters.***

There is an increased focus from certain investors, customers, consumers, employees, and other stakeholders concerning corporate citizenship and sustainability matters. From time to time, we may announce certain initiatives, including goals, regarding our focus areas, which include environmental matters, packaging, responsible sourcing and social investments. We could fail, or be perceived to fail, in our achievement of such initiatives or goals, or we could fail in accurately reporting our progress on such initiatives and goals. In addition, we could be criticized for the scope of such initiatives or goals or perceived as not acting responsibly in connection with these matters. Any such matters, or related corporate citizenship and sustainability matters, could have a material adverse effect on our business, financial condition and results of operations.

In addition, a variety of organizations measure the performance of companies on environmental, social, and governance ("ESG") topics, and the results of these assessments are widely publicized. Investment in funds that specialize in companies that perform well in such assessments are increasingly popular, and major institutional investors have publicly emphasized the importance of such ESG measures to their investment decisions. Topics taken into account in such assessments include, among others, the company's efforts and impacts on climate change and human rights, ethics and compliance with law, and the role of the company's board of directors in supervising various sustainability issues.

Furthermore, ESG-related legislation and regulation is being implemented across the world, including in the United States, and any such legislation or regulation may impose additional compliance burdens on us and on third parties in our value chain, which could potentially result in increased administrative costs, decreased demand in the marketplace for our products, and/or increased costs for our supplies and products. For example, in March 2024, the SEC adopted final rules to require public companies to disclose certain climate-related information. The final SEC rules, to the extent they are implemented, will require us to disclose, among other things, material climate-related risks, activities to mitigate or adapt to such risks, information about our board of directors' oversight of climate-related risks and management's role in managing material climate-related risks, and information on any climate-related targets or goals that are material to our business, results of operations or financial condition. We are assessing our obligations under these new regulations but expect that our efforts to comply will require significant expenditures, which will then increase our operating expenses. On March 21, 2024, the U.S. Court of Appeals for the Eighth Circuit was selected as the court to hear challenges against the SEC over its final climate disclosure rules. On April 4, 2024, the SEC announced that it would voluntarily stay its final climate disclosure rules pending judicial review.

We take into consideration the expected impact of ESG matters on the sustainability of our business over time and the potential impact of our business on society and the environment. However, in light of investors' increased focus on ESG

matters, and in light of increased and evolving legislation and regulation regarding ESG matters, there can be no certainty that we will manage such issues successfully, or that we will successfully meet our customers' or society's expectations as to our proper role. If we fail to meet the ESG values, standards and metrics that we set for ourselves, or our articulated purposes to offer inclusive, accessible, clean, vegan and cruelty free cosmetics and skin care products, or fail to align to regulatory or market expectations or standards regarding such matters, we may experience negative publicity and a loss of customers as a result, which will adversely affect our business, financial condition, and results of operations.

***Actions of activist stockholders could be costly and time-consuming, divert management's attention and resources, and have an adverse effect on our business.***

While we value open dialogue and input from our stockholders, activist stockholders could take actions that could be costly and time-consuming to us, disrupt our operations, and divert the attention of our board of directors, management, and employees, such as public proposals and requests for potential nominations of candidates for election to our board of directors, requests to pursue a strategic combination or other transaction, or other special requests. As a result, we have retained, and may in the future retain additional services of various professionals to advise us in these matters, including legal, financial and communications advisers, the costs of which may negatively impact our future financial results. In addition, perceived uncertainties as to our future direction, strategy, or leadership created as a consequence of activist stockholder initiatives may result in the loss of potential business opportunities, harm our ability to attract new or retain existing investors, customers, directors, employees or other partners, and cause our stock price to experience periods of volatility or stagnation.

***Because we have no current plans to pay cash dividends on our common stock, stockholders may not receive any return on investment unless they sell our common stock for a price greater than that which they paid for it.***

We have no current plans to pay cash dividends on our common stock. The declaration, amount and payment of any future dividends will be at the sole discretion of our board of directors. Our board of directors may take into account general and economic conditions, our financial condition and results of operations, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions and implications on the payment of dividends by us to our stockholders or by our subsidiaries to us, including restrictions under the Amended Credit Agreement and other indebtedness we may incur, and such other factors as our board of directors may deem relevant.

***Stockholders may be diluted by the future issuance of additional common stock in connection with our incentive plans, acquisitions or otherwise.***

We had approximately 194.1 million shares of common stock authorized but unissued and 55.9 million shares of common stock outstanding as of May 16, 2024. Our amended and restated certificate of incorporation authorizes us to issue these shares of common stock and stock options exercisable for common stock (and other equity awards) for the consideration and on the terms and conditions established by our board of directors in its sole discretion, whether in connection with acquisitions or otherwise. Any common stock that we issue, including under our existing equity incentive plans or any additional equity incentive plans that we may adopt in the future, would dilute the percentage ownership held by existing investors. In connection with our acquisition of Naturium, we issued 577,659 shares of the Company's common stock, with a fair market value of $57.8 million as of the date of the Acquisition.

***Anti-takeover provisions in our organizational documents and Delaware law might discourage or delay acquisition attempts for us that stockholders might consider favorable.***

Our amended and restated certificate of incorporation and amended and restated bylaws contain provisions that may make the acquisition of our company more difficult without the approval of our board of directors. Among other things:

- although we do not have a stockholder rights plan, these provisions allow us to authorize the issuance of undesignated preferred stock in connection with a stockholder rights plan or otherwise, the terms of which may be established and the shares of which may be issued without stockholder approval, and which may include super voting, special approval, dividend or other rights or preferences superior to the rights of the holders of common stock;

- these provisions provide for a classified board of directors with staggered three-year terms;

37

- these provisions require advance notice for nominations of directors by stockholders and for stockholders to include matters to be considered at our annual meetings;

- these provisions prohibit stockholder action by written consent;

- these provisions provide for the removal of directors only for cause and only upon affirmative vote of holders of at least 75% of the shares of common stock entitled to vote generally in the election of directors; and

- these provisions require the amendment of certain provisions only by the affirmative vote of at least 75% of the shares of common stock entitled to vote generally in the election of directors.

Further, as a Delaware corporation, we are also subject to provisions of Delaware law, which may impair a takeover attempt that our stockholders may find beneficial. These anti-takeover provisions and other provisions under Delaware law could discourage, delay or prevent a transaction involving a change in control of our company, including actions that our stockholders may deem advantageous, or negatively affect the trading price of our common stock. These provisions could also discourage proxy contests and make it more difficult for other stockholders to elect directors of their choosing and to cause us to take other corporate actions they may desire.

***Our board of directors is authorized to issue and designate shares of our preferred stock in additional series without stockholder approval.***

Our amended and restated certificate of incorporation authorizes our board of directors, without the approval of our stockholders, to issue up to 30 million shares of our preferred stock, subject to limitations prescribed by applicable law, rules and regulations and the provisions of our amended and restated certificate of incorporation, as shares of preferred stock in series, to establish from time to time the number of shares to be included in each such series and to fix the designation, powers, preferences and rights of the shares of each such series and the qualifications, limitations or restrictions thereof. The powers, preferences and rights of these additional series of preferred stock may be senior to or on parity with our common stock, which may reduce its value.

***Our amended and restated certificate of incorporation and amended and restated bylaws provide that the Court of Chancery of the State of Delaware will be the exclusive forum for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or employees.***

Our amended and restated certificate of incorporation and amended and restated bylaws provide that the Court of Chancery of the State of Delaware is the exclusive forum for any derivative action or proceeding brought on our behalf, any action asserting a breach of fiduciary duty, any action asserting a claim against us arising pursuant to the Delaware General Corporation Law, our amended and restated certificate of incorporation or our amended and restated bylaws, or any action asserting a claim against us that is governed by the internal affairs doctrine. This provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or our directors, officers or other employees, which may discourage such lawsuits against us and our directors, officers and other employees. Alternatively, if a court were to find this provision in our amended and restated certificate of incorporation and amended and restated bylaws to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could adversely affect our business, financial condition and results of operations.

**General risk factors**

***An active trading market for our common stock may not be sustained, and the market price of shares of our common stock may be volatile, which could cause the value of your investment to decline.***

Although our common stock is listed on the NYSE, there can be no assurances that an active trading market for our common stock will be sustained. In the absence of an active trading market for our common stock, stockholders may not be able to sell their common stock at the time or price they would like to sell.

Even if an active trading market is sustained, the market price of our common stock may be highly volatile and could be subject to wide fluctuations. Securities markets often experience significant price and volume fluctuations. This market volatility, as well as general economic, market or political conditions, could reduce the market price of shares of our common

stock in spite of our operating performance. In addition, our results of operations could be below the expectations of public market analysts and investors due to a number of potential factors, including variations in our quarterly results of operations, additions or departures of key management personnel, changes in consumer preferences or beauty trends, announcements of new products or significant price reductions by our competitors, failure to meet analysts' earnings estimates, publication of research reports about our industry, litigation and government investigations, changes or proposed changes in laws or regulations or differing interpretations or enforcement thereof affecting our business, adverse market reaction to any indebtedness we may incur or securities we may issue in the future, changes in market valuations of similar companies or speculation in the press or investment community, announcements by our competitors of significant contracts, acquisitions, dispositions, strategic partnerships, joint ventures or capital commitments, adverse publicity about our industry, the level of success of releases of new products and in response the market price of shares of our common stock could decrease significantly.

In addition, in May 2019, we announced that our board of directors authorized a share repurchase program allowing us to repurchase up to $25.0 million of our outstanding shares of common stock ("Share Repurchase Program"), of which approximately $17.1 million remains available for future share repurchases as of March 31, 2024. Purchases under the Share Repurchase Program may be made from time to time in the open market, in privately negotiated transactions or otherwise. The timing and amount of any repurchases pursuant to the Share Repurchase Program will be determined based on market conditions, share price and other factors. The Share Repurchase Program may be suspended or discontinued at any time and there is no guarantee that any shares will be purchased under the Share Repurchase Program.

In the past, following periods of volatility in the overall market and the market price of a company's securities, securities class action litigation has often been instituted against these companies. This litigation, if instituted against us, could result in substantial costs and a diversion of our management's attention and resources.

***Future sales, or the perception of future sales, by us or our stockholders in the public market could cause the market price for our common stock to decline.***

The sale of substantial amounts of shares of our common stock in the public market, or the perception that such sales could occur could harm the prevailing market price of shares of our common stock. These sales, or the possibility that these sales may occur, also might make it more difficult for us to sell equity securities in the future at a time and at a price that we deem appropriate.

In addition, all the shares of common stock subject to stock options and restricted stock units and shares of restricted stock awards outstanding and reserved under our 2014 Equity Incentive Plan, our 2016 Equity Incentive Award Plan and our 2016 Employee Stock Purchase Plan have been registered on Form S-8 under the Securities Act and such shares, once the underlying equity award vests, will be eligible for sale in the public markets, subject to Rule 144 limitations applicable to affiliates. We intend to file one or more registration statements on Form S-8 to cover additional shares of our common stock or securities convertible into or exchangeable for shares of our common stock pursuant to automatic increases in the number of shares reserved under our 2016 Equity Incentive Award Plan and our 2016 Employee Stock Purchase Plan. Accordingly, shares registered under these registration statements on Form S-8 will be available for sale in the open market.

As restrictions on resale end, the market price of shares of our common stock could drop significantly if the holders of these restricted shares sell them or are perceived by the market as intending to sell them. These factors could also make it more difficult for us to raise additional funds through future offerings of shares of our common stock or other securities.

***If securities analysts do not publish research or publish inaccurate or unfavorable research about our business, our stock price and trading volume could decline.***

The trading market for our common stock depends in part on the research and reports that securities or industry analysts publish about us or our business. If one or more of the analysts who cover us downgrade our stock or publish inaccurate or unfavorable research about our business, our stock price would likely decline. If one or more of these analysts cease coverage of our company or fail to publish reports on us regularly, demand for our stock could decrease, which might cause our stock price and trading volume to decline.

**Item 1B. Unresolved staff comments.**

None.

**Item 1C. Cybersecurity**

*Cybersecurity Risk Management and Strategy*

We have developed and implemented a cybersecurity risk management program intended to protect the confidentiality, integrity, and availability of our critical systems and information.

Our cybersecurity program was developed by integrating a range of relevant concepts and controls derived from established security frameworks. These include the National Institute of Standards and Technology Cybersecurity Framework, the Committee of Sponsoring Organizations of the Treadway Commission and related SOC 2 Control Objectives, as well as the Payment Card Industry Data Security Standard. It is important to note that while these frameworks guide our cybersecurity strategies and help us identify, access, and manage cybersecurity risks relevant to our business, this does not imply certification or that we meet or comply with any specific technical standards, specifications or requirements.

Our cybersecurity risk management program is integrated into our overall enterprise risk management program, and shares common methodologies, reporting channels and governance processes that apply across the enterprise risk management program to other legal, compliance, strategic, operational, and financial risk areas.

Key elements of our cybersecurity risk management program include, but are not limited to, the following:

a.  risk assessments designed to help identify material cybersecurity risks to our critical systems, information, products, services, and our broader enterprise IT environment;

b.  a security team principally responsible for managing (1) our cybersecurity risk assessment processes, (2) our security controls, and (3) our response to cybersecurity incidents;

c.  the use of external service providers, where appropriate, to assess, test or otherwise assist with aspects of our security processes;

d.  cybersecurity awareness training of our employees;

e.  a cybersecurity incident response plan that includes procedures for responding to cybersecurity incidents; and

f.  a third-party risk management process for service providers based on our assessment of their criticality to our operations and respective risk profile.

We have not identified any cybersecurity threats that have materially affected or are reasonably likely to materially affect us, including our operations, business strategy, results of operations, or financial condition. We face risks from cybersecurity threats that, if realized, are reasonably likely to materially affect us, including our operations, business strategy, results of operations, or financial condition. See "Risk factors related to information technology and cybersecurity" included as part of Item 1A. Risk Factors of this Annual Report on Form 10-K, which disclosures are incorporated by reference herein.

*Cybersecurity Governance*

Our Board considers cybersecurity risk and other information technology risks as part of its risk oversight function. The full Board oversees management's implementation of our cybersecurity risk management program.

The Board receives periodic reports from management on our cybersecurity risks and our cyber risk management program. Board members receive presentations on cybersecurity topics from our Chief Digital Officer ("CDO") as part of the Board's continuing education on topics that impact public companies. In addition, management is prepared to update the Board, as it deems appropriate, regarding cybersecurity incidents it considers to be significant or potentially significant.

Our CDO has primary responsibility for, and works collaboratively across the Company to implement, our cybersecurity risk management program designed to protect our information systems from cybersecurity threats and to respond to any

cybersecurity incidents in accordance with our incident response plans. Our CDO leads a team, including a number of cybersecurity professionals, that is responsible for implementing and maintaining centralized cybersecurity and data protection practices in close coordination with senior leadership and other teams across the Company. In addition to our extensive in-house cybersecurity capabilities, at times we also engage consultants, auditors, or other third parties to assist with assessing, identifying, and managing cybersecurity risks. Our CDO leads the core elements of e.l.f. Beauty's IT and digital functions, including IT infrastructure, systems and security, digital experience and operations, and consumer technology. Our CDO has served in various roles in information technology and information security for over 25 years, and her background includes completing the Harvard Cybersecurity program and active involvement in the Silicon Valley Consortium, focusing on security and technological advancements in cybersecurity and data privacy. As a thought leader in the intersection of artificial intelligence and cybersecurity, her expertise aligns with the critical needs of the constantly changing cybersecurity landscape and managing digital risk. Working with our CDO in implementing our cybersecurity risk management program, our Chief Information Security Officer and our Associate Director, IT Infrastructure & Security, collectively have more than 30 years of experience in information technology and extensive education and industry experience managing cybersecurity risks, developing and implementing cybersecurity policies, and responding to cybersecurity incidents.

Our management team takes steps to stay informed about and monitors efforts to prevent, detect, mitigate, and remediate cybersecurity risks and incidents through various means, which may include briefings from internal security personnel; threat intelligence and other information obtained from governmental, public or private sources, including external consultants engaged by us; and alerts and reports produced by security tools deployed in our IT environment.

**Item 2. Properties.**

Our principal executive offices are located in Oakland, California. We also occupy offices and distribution centers in the United States and abroad, as indicated below.

| Location/Facility | Leased/Owned | Use |
|---|---|---|
| Oakland, California | Leased | Corporate headquarters |
| New York, New York | Leased | Corporate offices |
| Los Angeles, California | Leased | Corporate offices |
| Fairfield, New Jersey | Leased | Corporate offices |
| London, UK | Leased | Corporate offices |
| Shanghai, China | Leased | Corporate offices |
| Ontario, California | Leased | Distribution |

Our properties total an aggregate of approximately 57,018 square feet of commercial space and approximately 465,219 square feet of commercial space for our distribution centers.

All of our properties are leased. The leases expire at various times through 2033, subject to renewal options. We consider our properties to be generally in good condition and believe that our existing facilities are adequate to support our existing operations.

We also use distribution centers that are operated by third-parties and located in West Chester Township, Ohio, West Jordan, Utah, Fairburn, Georgia, Vernon, California, Fairfield, New Jersey, Gosport Hants, England, Rodgau, Germany and Ontario, Canada.

**Item 3. Legal proceedings.**

We are from time to time subject to, and are presently involved in, litigation and other proceedings. We believe that there are no pending lawsuits or claims that, individually or in the aggregate, may have a material adverse effect on our business, financial condition or results of operations.

**Item 4. Mine safety disclosures.**

Not applicable.

41

**PART II**

**Item 5. Market for registrant's common equity, related stockholder matters and issuer purchases of equity securities.**

**Market information for common stock.**

Our common stock began trading on the NYSE under the symbol "ELF" on September 22, 2016. Prior to that date, there was no public trading market for our common stock. On May 16, 2024, the closing price for our common stock as reported by the NYSE was $162.26.

**Holders of record**

As of May 16, 2024, the approximate number of common stockholders of record was 25. This number does not include beneficial owners whose shares are held by nominees in street name.

**Dividends**

There were no dividends declared or paid during the fiscal year ended March 31, 2024. Since our initial public offering on September 22, 2016, we have never declared or paid cash dividends on our capital stock. We intend to retain all available funds and future earnings, if any, to fund expansion of our business and we do not anticipate paying any cash dividends in the foreseeable future. In addition, the Amended Credit Agreement limits our ability to pay dividends to our stockholders.

Any future determination related to dividend policy will be made at the discretion of our board of directors and will depend on a number of factors, including future earnings, capital requirements, financial conditions, future prospects, contractual restrictions and covenants and other factors that our board of directors may deem relevant.

**Stock performance graph**

*The following performance graph and related information shall not be deemed "soliciting material" or to be "filed" with the SEC, nor shall such information be incorporated by reference into any future filing under the Securities Act of 1933 or the Exchange Act, each as amended, whether made before or after the date hereof and irrespective of any general incorporation language in any such filing, or otherwise subject to the liabilities under the Securities Act of 1933 or Exchange Act, each as amended, except to the extent that we specifically incorporate it by reference into such filing.*

The following graph compares the total cumulative stockholder return on our common stock with the S&P 500 Stock Index and the S&P Consumer Discretionary Index for the 5-year period covering March 31, 2019, through March 31, 2024. The graph assumes an investment of $100 made at the closing of trading on March 31, 2019 in (i) our common stock, (ii) the stocks comprising the S&P 500 Index and (iii) the stocks comprising the S&P 500 Consumer Discretionary Index. All values assume reinvestment of the full amount of all dividends. The performance shown on the graph below is not intended to forecast or be indicative of possible future performance of our common stock.

42



## Total Cumulative Stockholder Return

| $100 investment in stock or index | 3/31/19 | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 | 9/30/20 |
|---|---|---|---|---|---|---|---|
| e.l.f. Beauty, Inc. (ELF) | $100.00 | $133.02 | $165.19 | $152.17 | $92.83 | $179.91 | $173.30 |
| S&P 500 Index (GSPC) | $100.00 | $103.79 | $105.02 | $113.98 | $91.19 | $109.38 | $118.65 |
| S&P 500 Consumer Discretionary Index (S5COND) | $100.00 | $105.28 | $105.82 | $110.55 | $89.23 | $118.54 | $136.40 |

| $100 investment in stock or index | 12/31/20 | 3/31/21 | 6/30/21 | 9/30/21 | 12/31/21 | 3/31/22 | 6/30/22 |
|---|---|---|---|---|---|---|---|
| e.l.f. Beauty, Inc. (ELF) | $237.64 | $253.11 | $256.04 | $274.06 | $313.30 | $243.68 | $289.43 |
| S&P 500 Index (GSPC) | $132.52 | $140.17 | $151.62 | $151.97 | $168.15 | $159.84 | $133.55 |
| S&P 500 Consumer Discretionary Index (S5COND) | $147.37 | $151.95 | $162.50 | $162.51 | $183.37 | $166.82 | $123.18 |

| $100 investment in stock or index | 9/30/22 | 12/31/22 | 3/31/23 | 6/30/23 | 9/30/23 | 12/31/23 | 3/31/24 |
|---|---|---|---|---|---|---|---|
| e.l.f. Beauty, Inc. (ELF) | $354.91 | $521.70 | $776.89 | $1,077.64 | $1,036.13 | $1,361.70 | $1,849.34 |
| S&P 500 Index (GSPC) | $126.50 | $135.46 | $144.98 | $157.01 | $151.29 | $168.28 | $185.38 |
| S&P 500 Consumer Discretionary Index (S5COND) | $128.55 | $115.47 | $134.09 | $153.64 | $146.26 | $164.43 | $172.62 |

**Recent sales of unregistered securities**

None.

**Purchases of equity securities by the issuer and affiliated purchasers**

In May 2019, we announced that our board of directors authorized the Share Repurchase Program, which authorizes us to repurchase up to $25.0 million of our outstanding shares of common stock. The Share Repurchase Program remains in effect through the earlier of (i) the date that $25.0 million of our outstanding common stock has been purchased under the Share Repurchase Program or (ii) the date that our board of directors cancels the Share Repurchase Program.

On April 30, 2021, the Company amended and restated its prior credit agreement. Subject to certain exceptions, the covenants in the Amended Credit Agreement require the Company to be in compliance with certain leverage ratios to make repurchases under the Share Repurchase Program.

We did not repurchase any shares during the fiscal year ended March 31, 2024, including pursuant to the Share Repurchase Program. A total of $17.1 million remains available for purchase under the Share Repurchase Program as of March 31, 2024.

**Item 6. [Reserved]**

44

**Item 7. Management's discussion and analysis of financial condition and results of operations.**

*You should read the following discussion and analysis of our financial condition and results of operations in conjunction with our consolidated financial statements and related notes thereto included elsewhere in this Annual Report.*

### Overview and Business Trends

e.l.f. Beauty, Inc., a Delaware corporation ("e.l.f. Beauty" and together with its subsidiaries, the "Company," or "we"), is a multi-brand beauty company that offers inclusive, accessible, clean, vegan and cruelty free cosmetics and skin care products. Our mission is to make the best of beauty accessible to every eye, lip, face and skin concern.

We believe our ability to deliver cruelty free, clean, vegan and premium-quality products at accessible prices with broad appeal differentiates us in the beauty industry. We believe the combination of our value proposition, innovation engine, ability to attract and engage consumers, and our world-class team's ability to execute with speed has positioned us well to navigate the competitive beauty market.

Our family of brands includes e.l.f. Cosmetics, e.l.f. SKIN, Naturium, Well People and Keys Soulcare. Our brands are available online and across leading beauty, mass-market, and specialty retailers. We have strong relationships with our retail customers such as Target, Walmart, Ulta Beauty and other leading retailers that have enabled us to expand distribution both domestically and internationally.

For additional information regarding our business, see Part I, Item 1, "Business."

### Our Acquisition of Naturium

On October 4, 2023, we consummated our acquisition of Naturium LLC, a Delaware limited liability company ("Naturium"), and TCB-N Prelude Blocker Corp., a Delaware corporation ("Blocker"), pursuant to a Securities Purchase Agreement, dated August 28, 2023 (the "Purchase Agreement"), by and among the Company, e.l.f. Cosmetics, Inc., Naturium, Blocker and various sellers. Pursuant to the Purchase Agreement, we acquired all rights, title and interest in and to the outstanding equity securities of Naturium and Blocker for a purchase price of $333.0 million paid in cash and shares of our common stock (the "Acquisition"). See Note 4, "Acquisition," in our consolidated financial statements for further details.

**Components of our results of operations and trends affecting our business**

### Net sales

We develop, market and sell beauty products under the e.l.f. Cosmetics, e.l.f. SKIN, Naturium, Well People and Keys Soulcare brands. Our net sales are derived from sales of these beauty products, net of provisions for sales discounts and allowances, product returns, markdowns and price adjustments.

Year over year changes in net sales is driven by a number of factors, including beauty category performance, levels of consumer spending, and our ability to drive awareness of and demand for our products. Within our existing retailer accounts, we are able to drive growth by increasing sales per linear foot supported by marketing investments and continued innovation, as well as through expanding space and door penetration. We seek to continue to grow through improved sales per linear foot in our existing space, expanded space allocation with our current retail accounts, as well as adding new retail customers.

Our business faces challenges and uncertainties, including our ability to introduce new products that will appeal to a broad consumer base, our ability to service demand, the ability of our major retail customers to drive traffic and keep products in stock, our ability to continue to grow our customer base and competitive threats from other beauty companies.

Our largest three customers, Target, Walmart and Ulta Beauty, accounted for 25%, 17% and 16%, respectively, of our net sales in the fiscal year ended March 31, 2024. No other individual customer accounted for 10% or more of our net sales in the fiscal year ended March 31, 2024. National and international retailers comprised 84% of our net sales. The remaining 16% came from e-commerce channels in the fiscal year ended March 31, 2024.

The primary market for our products is in the United States, which accounted for 85% of our net sales in the fiscal year ended March 31, 2024. The remaining 15% was attributable to international markets, primarily the UK and Canada.

### Gross profit

Gross profit is our net sales less cost of sales. Cost of sales includes the aggregate costs to procure our products, including the amounts invoiced by our third-party contract manufacturers for finished goods as well as costs related to transportation to our distribution center, customs and duties. Cost of sales also includes the effect of changes in the balance of reserves for excess and obsolete inventory. Gross margin measures our gross profit as a percentage of net sales.

We have an extensive network of third-party manufacturers from whom we purchase substantially all of our finished goods. We have worked to evolve our supply chain to increase capacity and technical capabilities while maintaining or reducing overall costs as a percentage of sales.

Historically, we have improved our gross margin largely through changes in our product mix, pricing, and cost reductions in our supply chain. Other drivers of changes in gross margin, which could have a positive or negative impact, include fluctuations in foreign exchange rates, certain costs related to space expansion and retailer activity, changes in customer mix, and changes in the balance of reserves for excess and obsolete inventory, among other things.

### Selling, general and administrative expenses

Our selling, general and administrative ("SG&A") expenses primarily consist of marketing and digital expenses, personnel-related costs, including salaries, bonuses, benefits and stock-based compensation, warehousing and distribution costs, costs related to merchandising, depreciation of property and equipment, amortization of retail product displays and amortization related to intangible assets and cloud computing costs. See "Critical accounting policies and estimates — stock-based compensation" below for more detail regarding stock-based compensation.

### Interest expense, net

Interest expense primarily consists of cash interest and fees on our outstanding indebtedness. See "Financial condition, liquidity and capital resources" below and a description of our indebtedness in Note 9 to the Notes to consolidated financial statements in Part IV, Item 15 "Exhibits, financial statement schedules."

### Other income (expense), net

We are exposed to periodic currency fluctuations given our purchasing and selling activities in various countries. Other income (expense), net is primarily related to foreign exchange rate movements.

### Income tax provision

The provision for income taxes represents federal, foreign, state and local income taxes. The effective rate differs from statutory rates due to the effect of state and local income taxes and certain permanent tax adjustments. Our effective tax rate will change from period to period based on recurring and nonrecurring factors including, but not limited to, the geographical mix of earnings, enacted tax legislation, state and local income taxes, tax audit settlements, the interaction of various tax strategies and the impact of permanent tax adjustments, such as those related to stock-based compensation.

### Net income

Our net income for future periods will be affected by the various factors described above.

**Results of operations**

The following table sets forth our consolidated statements of operations data in dollars and as a percentage of net sales for the periods presented.

| | Fiscal year ended March 31, | | |
| --- | --- | --- | --- |
| | 2024 | 2023 | 2022 |
| Net sales | $ 1,023,932 | $ 578,844 | $ 392,155 |
| Cost of sales | 299,836 | 188,448 | 140,423 |
| Gross profit | 724,096 | 390,396 | 251,732 |
| Selling, general and administrative expenses | 574,418 | 322,253 | 221,912 |
| Restructuring expense | — | — | 50 |
| Operating income | 149,678 | 68,143 | 29,770 |
| Other income (expense), net | 1,210 | (1,875) | (1,438) |
| Impairment of equity investment | (2,875) | — | — |
| Interest expense, net | (7,023) | (2,018) | (2,441) |
| Loss on extinguishment of debt | — | (176) | (460) |
| Income before provision for income taxes | 140,990 | 64,074 | 25,431 |
| Income tax provision | (13,327) | (2,544) | (3,661) |
| Net income | $ 127,663 | $ 61,530 | $ 21,770 |

| | Fiscal year ended March 31, | | |
| --- | --- | --- | --- |
| (percentage of net sales) | 2024 | 2023 | 2022 |
| Net sales | 100 % | 100 % | 100 % |
| Cost of sales | 29 % | 33 % | 36 % |
| Gross profit | 71 % | 67 % | 64 % |
| Selling, general and administrative expenses | 56 % | 56 % | 57 % |
| Operating income | 15 % | 12 % | 8 % |
| Other income (expense), net | — % | — % | — % |
| Impairment of equity investment | — % | — % | — % |
| Interest expense, net | (1)% | — % | (1)% |
| Loss on extinguishment of debt | — % | — % | — % |
| Income before provision for income taxes | 14 % | 11 % | 6 % |
| Income tax provision | (1)% | — % | (1)% |
| Net income | 12 % | 11 % | 6 % |

*Comparison of the fiscal year ended March 31, 2024 to the fiscal year ended March 31, 2023*

*Net sales*

Net sales increased $445.1 million, or 77%, to $1,023.9 million in the fiscal year ended March 31, 2024, from $578.8 million in the fiscal year ended March 31, 2023. The increase was driven by strength across our retailer and e-commerce channels. Net sales increased $353.5 million, or 69%, in our retailer channels and $91.6 million, or 132%, in our e-commerce channels. From a price and volume perspective, a higher volume of units sold drove $320.4 million of the increase in net sales. A higher average item price and mix within retailer and e-commerce orders drove the remaining $124.7 million increase in net sales as compared to the fiscal year ended March 31, 2023.

47

*Gross profit*

Gross profit increased $333.7 million, or 85%, to $724.1 million in the fiscal year ended March 31, 2024, compared to $390.4 million in the fiscal year ended March 31, 2023. Higher unit volume drove $216.1 million of the increase in gross profit, with the remaining increase of $117.6 million driven by higher average item price and mix. Gross margin increased from 67% in the fiscal year ended March 31, 2023 to 71% in the fiscal year ended March 31, 2024. The increase in gross margin rate was primarily driven by favorable foreign exchange impacts, cost savings and mix, improved transportation costs, inventory adjustments, and international price increases, partially offset by costs related to retailer activity.

*Selling, general and administrative expenses*

SG&A expenses were $574.4 million in the fiscal year ended March 31, 2024, an increase of $252.2 million, or 78%, from $322.3 million in the fiscal year ended March 31, 2023. SG&A expenses as a percentage of net sales was 56% for each of the fiscal years ended March 31, 2024 and March 31, 2023. The increase on a dollar basis was primarily related to increased marketing and digital spend of $130.0 million, increased compensation and benefits expense of $32.9 million, increased operations costs of $26.4 million, increased retail fixturing and visual merchandising costs of $21.1 million, increased depreciation and amortization of $12.2 million and increased professional fees of $11.5 million.

*Other income (expense), net*

Other income (expense), net was $1.2 million of income in the fiscal year ended March 31, 2024, as compared to $1.9 million of expense in the fiscal year ended March 31, 2023. The year-over-year variance is primarily due to an increase in unrealized gain in the fiscal year ended March 31, 2024 attributable to favorable foreign currency rate fluctuation.

*Impairment of equity investment*

Impairment of equity investment was $2.9 million in the fiscal year ended March 31, 2024. See Note 3, "Investments," in our consolidated financial statements for further details.

*Interest expense, net*

Interest expense increased $5.0 million, or 248%, to $7.0 million in the fiscal year ended March 31, 2024, as compared to $2.0 million in the fiscal year ended March 31, 2023. The increase was primarily due to additional borrowings for the fiscal year ended March 31, 2024 as well as higher interest costs, partially offset by increased interest earned on our cash balances. See Note 9, "Debt," in our consolidated financial statements for further details on our debt.

*Income tax provision*

The provision for income taxes was $13.3 million, or an effective rate of 9% for the twelve months ended March 31, 2024, as compared to a provision of $2.5 million, or an effective rate of 4% for the twelve months ended March 31, 2023. The change in the provision was primarily driven by an increase in income before taxes of $76.9 million, partially offset by an increase in discrete tax benefits of $14.4 million, primarily related to stock-based compensation.

**Comparison of the fiscal year ended March 31, 2023 to the fiscal year ended March 31, 2022**

*Net sales*

Net sales increased $186.6 million, or 48%, to $578.8 million in the fiscal year ended March 31, 2023, from $392.2 million in the fiscal year ended March 31, 2022. The increase was driven by strength across our retailer and e-commerce channels. Net sales increased $158.0 million, or 45%, in our retailer channels and $28.6 million, or 71%, in our e-commerce channels. From a price and volume perspective, a higher volume of units sold drove $97.7 million of the increase in net sales. A higher average item price and mix within retailer and e-commerce orders drove the remaining $88.9 million increase in net sales as compared to the fiscal year ended March 31, 2022.

*Gross profit*

Gross profit increased $138.7 million, or 55%, to $390.4 million in the fiscal year ended March 31, 2023, compared to $251.7 million in the fiscal year ended March 31, 2022. Higher average item price and mix accounted for approximately $75.9 million of the increase to gross profit, with the remaining $62.8 million driven by volume. Gross margin increased from 64% in the fiscal year ended March 31, 2022 to 67% in the fiscal year ended March 31, 2023. The increase in gross margin rate was primarily driven by pricing, cost savings and product mix, partially offset by inventory adjustments.

*Selling, general and administrative expenses*

SG&A expenses were $322.3 million in the fiscal year ended March 31, 2023, an increase of $100.4 million, or 45%, from $221.9 million in the fiscal year ended March 31, 2022. SG&A expenses as a percentage of net sales decreased to 56% for the fiscal year ended March 31, 2023 from 57% in the fiscal year ended March 31, 2022. The increase on a dollar basis was primarily related to increased marketing and digital spend of $62.8 million, increased compensation and benefits expense of $19.4 million, increased operations costs of $9.6 million, and increased retail fixturing and visual merchandising costs of $5.6 million.

*Other income (expense), net*

Other income (expense), net was $1.9 million of expense in the fiscal year ended March 31, 2023, as compared to $1.4 million of expense in the fiscal year ended March 31, 2022. The change was primarily related to unfavorable foreign exchange rate movements, impacting cash and receivables, driving an unrealized loss in the period.

*Interest expense, net*

Interest expense decreased $0.4 million, or 17%, to $2.0 million in the fiscal year ended March 31, 2023, as compared to $2.4 million in the fiscal year ended March 31, 2022. This decrease was due to increased interest earned on our cash balances and a lower average loan balance, offsetting higher interest rates.

*Income tax provision*

The provision for income taxes was $2.5 million, or an effective rate of 4% for the twelve months ended March 31, 2023, as compared to a provision of $3.7 million, or an effective rate of 14% for the twelve months ended March 31, 2022. The change in the provision was primarily driven by an increase in discrete tax benefit of $12.7 million, primarily related to stock based compensation. The discrete benefit was partially offset by additional income taxes related to the increase in income before taxes of $38.6 million.

**Financial condition, liquidity and capital resources**

***Overview***

As of March 31, 2024, we had $108.2 million of cash and cash equivalents. In addition, as of March 31, 2024, we had borrowing capacity of $10.5 million under the Amended Revolving Credit Facility.

Our primary cash needs are for working capital, fixturing, retail product displays and digital investment. Cash needs typically vary depending on strategic initiatives selected for the fiscal year, including investments in infrastructure, digital capabilities and expansion within or to additional retailer store locations. We expect to fund ongoing cash needs from existing cash and cash equivalents, cash generated from operations and, if necessary, draws on our Amended Revolving Credit Facility.

Our primary working capital requirements are for product and product-related costs, payroll, rent, distribution costs and marketing. Fluctuations in working capital are primarily driven by the timing of when a retailer rearranges or restocks its products, expansion of space within our existing retailer base, expansion to new retailers, and the general seasonality of our business. As of March 31, 2024, we had working capital, excluding cash, of $69.8 million, compared to $74.6 million as of March 31, 2023. Working capital, excluding cash and debt, was $170.1 million and $80.1 million as of March 31, 2024 and March 31, 2023, respectively.

We believe that our operating cash flow, cash on hand and available financing under the Amended Revolving Credit Facility will be adequate to meet our planned operating, investing and financing needs for the next twelve months. The unused balance of the Amended Revolving Credit Facility as of March 31, 2024 was $10.5 million. If necessary, we can borrow funds under the Amended Revolving Credit Facility to finance our liquidity requirements, subject to customary borrowing conditions. To the extent additional funds are necessary to meet our long-term liquidity needs as we continue to execute our business strategy, we anticipate that they will be obtained through the incurrence of additional indebtedness, additional equity financings or a combination of these potential sources of funds; however, such financing may not be available on favorable terms, or at all.

Our ability to meet our operating, investing and financing needs depends to a significant extent on our future financial performance, which will be subject in part to general economic, competitive, financial, regulatory and other factors that are

beyond our control, including those described elsewhere in Part I, Item 1A "Risk factors". In addition to these general economic and industry factors, the principal factors in determining whether our cash flows will be sufficient to meet our liquidity requirements will rely on our ability to provide innovative products to our consumers, manage production and our supply chain.

***Cash flows***

| | Fiscal year ended March 31, | | |
|---|---|---|---|
| (in thousands) | 2024 | 2023 | 2022 |
| Net cash provided by (used in): | | | |
| Operating activities | $ 71,154 | $ 101,883 | $ 19,513 |
| Investing activities | (284,660) | (1,723) | (4,818) |
| Financing activities | 200,945 | (22,735) | (29,110) |

*Cash provided by operating activities*

For the fiscal year ended March 31, 2024, net cash provided by operating activities was $71.2 million. This included net income, before deducting depreciation, amortization and other non-cash items of $205.5 million, partially offset by an increase in net working capital of $123.8 million and payment of acquisition-related seller expenses of $10.5 million in connection with the Acquisition. The increase in net working capital was primarily driven by a $93.9 million increase in inventory. The increase was reflective of building inventory to support net sales growth, as well as $10.0 million related to Naturium inventory, and $7.8 million related to a change in certain vendor arrangements where we now take ownership of inventory at shipment from China versus when it enters our U.S. distribution center. Additional changes in working capital include a $49.6 million increase in accounts receivable, a $55.2 million increase in prepaid and other assets, and a $6.3 million decrease in other liabilities, partially offset by an $81.2 million increase of accounts payable and accrued expenses.

For the fiscal year ended March 31, 2023, net cash provided by operating activities was $101.9 million. This included net income, before deducting depreciation, amortization and other non-cash items, of $107.1 million and an increase in net working capital of $5.2 million. The change in net working capital was driven by a $22.4 million increase in accounts receivable, a $24.6 million increase in prepaid and other assets, and a $4.4 million decrease of other liabilities partially offset by a $43.0 million increase of accounts payable and accrued expenses, and a $3.2 million decrease in inventory.

For the fiscal year ended March 31, 2022, net cash provided by operating activities was $19.5 million. This included net income, before deducting depreciation, amortization and other non-cash items, of $66.2 million and an increase in net working capital of $46.7 million. The change in net working capital was driven by a $5.6 million increase in accounts receivable, a $27.7 million increase in inventory, a $10.6 million increase in prepaid and other assets and a $4.4 million decrease of other liabilities, partially offset by a $1.5 million increase of accounts payable and accrued expenses.

*Cash used in investing activities*

For the fiscal year ended March 31, 2024, net cash used in investing activities was $284.7 million. This includes $275.0 million paid for the Acquisition, net of cash acquired, capital expenditures related to fixturing, equipment and software of $8.7 million, and contributions to other investment of $1.0 million.

For the fiscal years ended March 31, 2023 and March 31, 2022, net cash used in investing activities was $1.7 million and $4.8 million, respectively, which was primarily driven by capital expenditures related to fixturing, equipment and software.

*Cash provided by (used in) financing activities*

For the fiscal year ended March 31, 2024, net cash provided by financing activities was $200.9 million and was primarily driven by proceeds from the Amended Term Loan Facility of $115.0 million and Amended Revolving Credit Facility of $89.5 million and cash received from the exercise of stock options of $5.6 million. This was partially offset by repayment on the Amended Term Loan Facility of $7.9 million and payment of debt issuance costs of $0.7 million associated with the Second Amendment.

For the fiscal year ended March 31, 2023, net cash used in financing activities was $22.7 million, primarily driven by prepayment on the Amended Term Loan Facility of $25.0 million and quarterly debt payments, partially offset by cash received from the exercise of stock options to purchase common stock.

For the fiscal year ended March 31, 2022, net cash used in financing activities was $29.1 million, driven by $54.5 million of repayment of the revolving line of credit and the term loan facility, offset by $25.6 million of cash received from net of proceeds from the Amended Revolving Credit Facility and the Amended Term Loan Facility.

**Description of indebtedness**

*Amended Credit Agreement*

On April 30, 2021, we amended and restated our prior credit agreement (as further amended, supplemented or modified from time to time, the "Amended Credit Agreement") and refinanced all loans under the prior credit agreement. The Amended Credit Agreement has a five year term and consists of a revolving credit facility (the "Amended Revolving Credit Facility") and a term loan facility (the "Amended Term Loan Facility").

All amounts under the Amended Revolving Credit Facility are available for draw until the maturity date on April 30, 2026. The Amended Revolving Credit Facility is collateralized by substantially all of our assets and requires payment of an unused fee ranging from 0.10% to 0.30% (based on our consolidated total net leverage ratio (as defined in the Amended Credit Agreement)) times the average daily amount of unutilized commitments under the Amended Revolving Credit Facility. The Amended Revolving Credit Facility also provides for sub-facilities in the form of a $7 million letter of credit and a $5 million swing line loan; however, all amounts drawn under the Amended Revolving Credit Facility cannot exceed $100 million. The unused balance of the Amended Revolving Credit Facility as of March 31, 2024 was $10.5 million.

Prior to the Second Amendment (as defined below), both the Amended Revolving Credit Facility and the Amended Term Loan Facility bore interest, at the borrowers' option, at either (i) a rate per annum equal to an adjusted LIBOR rate determined by reference to the cost of funds for the US dollar deposits for the applicable interest period (subject to a minimum floor of 0%) plus an applicable margin ranging from 1.25% to 2.125% based on our consolidated total net leverage ratio or (ii) a floating base rate plus an applicable margin ranging from 0.25% to 1.125% based on our consolidated total net leverage ratio. On March 29, 2023, we amended the Amended Credit Agreement to transition the benchmark from LIBOR to an adjusted Secured Overnight Financing Rate ("SOFR") (which is equal to the applicable SOFR plus 0.10%) (such transaction, the "First Amendment"). In connection with the First Amendment, all outstanding LIBOR loans were converted to SOFR loans. The annual interest rate for SOFR borrowings will be equal to term SOFR, subject to a floor of 0%, plus a margin ranging from 1.25% to 2.125%.

The interest rate as of March 31, 2024 for the Amended Revolving Credit Facility and the Amended Term Loan Facility was approximately 6.7%.

*Second Amended Credit Agreement*

On August 28, 2023, we entered into the Second Amendment to the Amended Credit Agreement (the "Second Amendment"). Pursuant to the Second Amendment, we may borrow incremental term loans in a principal amount equal to $115.0 million under the Amended Credit Agreement (the "Incremental Term Loan"). The Incremental Term Loan will bear interest at a rate per annum equal to, at our election, adjusted term SOFR or an alternate base rate as set forth in the Second Amendment, plus an interest rate margin, to be based on consolidated total net leverage ratio levels, ranging from, (i) in the case of SOFR loans, 1.50% to 2.375%; provided that if SOFR is less than 0.00%, such rate shall be deemed to be 0.00%, and (ii) in the case of alternate base rate loans, 0.50% to 1.375%; provided that if the alternate base rate is less than 1.00%, such rate shall be deemed to be 1.00%. The Incremental Term Loan amortizes at 5.00% per annum payable in equal quarterly installments of 1.25% per annum, commencing with the fiscal quarter ended on December 31, 2023. We used the Incremental Term Loan together with cash from our balance sheet and additional borrowings under our Amended Revolving Credit Facility to consummate the Acquisition and to pay related fees and expenses in connection with the Naturium acquisition and Second Amendment.

The interest rate as of March 31, 2024 for the Incremental Term Loan was approximately 6.9%.

The Amended Credit Agreement contains a number of covenants that, among other things and subject to certain exceptions, restrict our ability to pay dividends and distributions or repurchase our capital stock, incur additional indebtedness, create liens on assets, engage in mergers or consolidations and sell or otherwise dispose of assets. The Amended Credit Agreement

51

also includes reporting, financial and maintenance covenants that require us to, among other things, comply with certain consolidated total net leverage ratios and consolidated fixed charge coverage ratios. As of March 31, 2024, we were in compliance with all financial covenants under the Amended Credit Agreement.

**Off-balance sheet arrangements**

We are not party to any off-balance sheet arrangements.

**Critical accounting policies and estimates**

Our consolidated financial statements included elsewhere in this Annual Report have been prepared in accordance with US generally accepted accounting principles. The preparation of our financial statements requires us to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses. We base our estimates on historical experience and on various other assumptions that we believe are reasonable under the circumstances. Actual results may differ from these estimates under different assumptions or conditions. While our significant accounting policies are more fully described in the Note 2 to consolidated financial statements in Part IV, Item 15. "Exhibits, financial statement schedules," we believe that the following accounting policies and estimates are critical to our business operations and understanding of our financial results.

*Revenue recognition*

We recognize revenue when control of promised goods or services is transferred to a customer in an amount that reflects the consideration that we expect to receive in exchange for those goods or services. Control of the substantial majority of the products that we sell is transferred at a point in time. Factors that determine the specific point in time a customer obtains control and a performance obligation is satisfied are when we have a present right to payment for the goods, whether the customer has physical possession and title to the goods, and whether significant risks and rewards of ownership have transferred. Delivery is typically considered to have occurred at the time the title and risk of loss passes to the customer.

In the normal course of business, we offer various incentives to customers such as sales discounts, markdown support and other incentives and allowances, which give rise to variable consideration. The amount of variable consideration is estimated at the time of sale based on either the expected value method or the most likely amount, depending on the nature of the variability. We regularly review and revise, when deemed necessary, our estimates of variable consideration based on both customer-specific expectations as well as historical rates of realization. A provision for customer incentives and allowances is included on the consolidated balance sheet, net against accounts receivable.

*Business Combinations*

We allocate the purchase price of a business acquisition to the assets acquired and liabilities assumed based upon their estimated fair values at the business combination date. The excess of purchase price over the fair value of assets acquired and liabilities assumed is recorded as goodwill. Determining fair value of identifiable assets, particularly intangibles, and liabilities acquired also requires us to make estimates, which are based on all available information and in some cases assumptions with respect to the timing and amount of future revenues and expenses associated with an asset. Unanticipated events or circumstances may occur that could affect the accuracy of our fair value estimates, and under different assumptions, the resulting valuations could be materially different, which could impact the operating results we report.

*Impairment of long-lived assets, including goodwill and intangible assets*

We assess potential impairments to our long-lived assets, which include property and equipment, retail product displays, and amortizable intangible assets, whenever events or circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of an asset is measured by a comparison of the carrying amount of an asset group to the estimated undiscounted future cash flows expected to be generated by the asset. If the carrying amount of the asset group exceeds its estimated undiscounted future cash flows, an impairment charge is recognized as the amount by which the carrying amount of the asset exceeds the fair value of the asset. There were no impairment charges recorded on long-lived assets during the fiscal years ended March 31, 2024, March 31, 2023 or March 31, 2022.

We evaluate our indefinite-lived intangible asset to determine whether current events and circumstances continue to support an indefinite useful life. In addition, our indefinite-lived intangible asset is tested for impairment annually. The indefinite-lived intangible asset impairment test consists of a comparison of the fair value of each asset with its carrying value, with any

excess of carrying value over fair value being recognized as an impairment loss. We are also permitted to make a qualitative assessment of whether it is more likely than not that an indefinite-lived intangible asset's fair value is less than its carrying value prior to applying the quantitative assessment. If based on our qualitative assessment it is more likely than not that the carrying value of the asset is less than its fair value, then a quantitative assessment may be required.

The goodwill impairment test consists of a comparison of each reporting unit's fair value to its carrying value. The fair value of a reporting unit is an estimate of the amount for which the unit as a whole could be sold in a current transaction between willing parties. If the carrying value of a reporting unit exceeds its fair value, goodwill is written down to its implied fair value. We are also permitted to make a qualitative assessment of whether it is more likely than not that the fair value of a reporting unit is less than its carrying value prior to applying the quantitative assessment. If based on our qualitative assessment it is more likely than not that the carrying value of the reporting unit is less than its fair value, then a quantitative assessment may be required. We have identified a single reporting unit for purposes of impairment testing.

We have selected October 1 as the date on which to perform our annual impairment tests. We also test for impairment whenever events or circumstances indicate that the fair value of goodwill or indefinite-lived intangible assets has been impaired. No impairment of goodwill or our indefinite-lived intangible asset was recorded during the fiscal years ended March 31, 2024, March 31, 2023 or March 31, 2022.

### Stock based compensation

We have several stock award plans, which are described in detail in Note 13 to consolidated financial statements in Part IV, Item 15. "Exhibits, financial statement schedules." We account for stock based compensation under ASC 718, "Compensation-Stock Compensation." We recognize expense over the requisite service period of the award, net of an estimate for the impact of award forfeitures.

We have no current plans to pay a regular dividend.

### New accounting pronouncements

See Note 2, Summary of significant accounting policies to the Notes to consolidated financial statements in Part IV, Item 15. "Exhibits, Financial Statement Schedules" for information regarding new accounting pronouncements.

We comply with any new or revised accounting standards on the relevant dates on which adoption of such standards is required for publicly traded companies that are not emerging growth companies.

**Item 7A. Quantitative and qualitative disclosures about market risk.**

We are exposed to certain market risks arising from transactions in the normal course of our business. Such risk is principally associated with interest rates and foreign exchange.

### Interest rate risk

We had cash and cash equivalents of $108.2 million and $120.8 million as of March 31, 2024 and March 31, 2023, respectively. Our cash and cash equivalents consist of cash and money market funds, which are highly liquid and, as such, are not sensitive to interest rate risk.

We are exposed to changes in interest rates because the indebtedness incurred under the Amended Credit Agreement is variable rate debt. Interest rate changes generally do not affect the market value of our Amended Credit Facility; however, they do affect the amount of our interest payments. A hypothetical 1% increase or decrease of interest rates would result in a decrease or increase, respectively, in interest expense on an annualized basis of approximately $2.6 million as of March 31, 2024.

### Foreign exchange risk

We are exposed to foreign exchange risk as we sell product into the UK, Europe, Canada and other smaller international markets. We also have exposure to the Chinese Renminbi as we source nearly all our products from China. We do not have an active hedging program.

Foreign currency transaction exposure from a 10% movement of currency exchange rates would have a material impact on our reported cost of sales and net income. Based on a hypothetical 10% adverse movement in RMB as compared to the US dollar, our cost of sales and net income would be adversely affected by approximately $32.0 million for the fiscal year ended March 31, 2024.

54

**Item 8. Financial statements and supplementary data.**

The following consolidated financial statements are incorporated by reference herein:

**e.l.f. Beauty, Inc. and subsidiaries**
**Index to consolidated financial statements**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 68 |
| Consolidated Balance Sheets | 71 |
| Consolidated Statements of Operations | 72 |
| Consolidated Statements of Comprehensive Income | 73 |
| Consolidated Statements of Stockholders' Equity | 74 |
| Consolidated Statements of Cash Flows | 75 |
| Notes to Consolidated Financial Statements | 77 |

**Item 9. Changes in and disagreements with accountants on accounting and financial disclosure.**

None.

**Item 9A. Controls and procedures.**

*Evaluation of Disclosure Controls and Procedures*

As of March 31, 2024, our management conducted an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2024, our disclosure controls and procedures were effective to provide reasonable assurance that the information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and that such information is accumulated and communicated to the officers who certify our financial reports and to the members of the Company's senior management and board of directors as appropriate to allow timely decisions regarding required disclosure.

*Management's Annual Report on Internal Control over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in the Exchange Act. Internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements prepared for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.

On October 4, 2023, we completed the Naturium Acquisition and are currently integrating Naturium into our operations, compliance programs and internal control processes. SEC rules and regulations allow companies to exclude acquisitions from the assessment of internal control over financial reporting during the first year following an acquisition while integrating the acquired company. We have elected to exclude the acquired operations of Naturium from our assessment of the Company's internal control over financial reporting as of March 31, 2024. Total assets and revenues of the acquired entity that were excluded from our assessment of internal control over financial reporting constitute in aggregate of approximately 4% and 5% of the consolidated total assets and revenues, respectively, as of and for the fiscal year ended March 31, 2024. The assessment of internal control over financial reporting of the acquired business will be included in our fiscal year 2025 evaluation.

Under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, our management conducted an evaluation of the effectiveness of our internal control over financial reporting based upon the framework in "Internal Control - Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on that evaluation, management concluded that our internal control over financial reporting was effective as of March 31, 2024.

Deloitte & Touche LLP, an independent registered public accounting firm, was retained to audit our Consolidated Financial Statements and the effectiveness of our internal control over financial reporting. They have issued an attestation report on

Table of Contents

our internal control over financial reporting as of March 31, 2024, which is included herein.

***Changes in Internal Control over Financial Reporting***

There were no changes to our internal control over financial reporting that occurred during the quarter ended March 31, 2024 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

***Section 302 and 906 Certification***

The required certification of our Chief Executive Officer and Chief Financial Officer under Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 are included as exhibits to this Annual Report (See Exhibits 31 and 32 under Part IV, Item 15. "Exhibits, Financial Statement Schedules").

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the stockholders and the Board of Directors of e.l.f. Beauty, Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited the internal control over financial reporting of e.l.f. Beauty, Inc. and subsidiaries (the "Company") as of March 31, 2024, based on criteria established in *Internal Control—Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of March 31, 2024, based on criteria established in *Internal Control—Integrated Framework (2013)* issued by COSO.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated financial statements as of and for the year ended March 31, 2024, of the Company and our report dated May 23, 2024, expressed an unqualified opinion on those financial statements.

As described in Management's report on Internal Control over Financial Reporting, management excluded from its assessment the internal control over financial reporting of the acquired operations of Naturium LLC, which constitutes 4% and 5% of consolidated total assets and revenues, respectively, as of and for the fiscal year ended March 31, 2024. Accordingly, our audit did not include the internal control over financial reporting of the acquired operations of Naturium LLC.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Deloitte & Touche LLP

San Francisco, California
May 23, 2024

**Item 9B. Other information.**

**Rule 10b5-1 Trading Plans**

During the three months ended March 31, 2024, no director or officer of the Company adopted, terminated or modified a "Rule 10b5-1 trading arrangement" or "non-Rule 10b5-1 trading arrangement," as each term is defined in Item 408(a) of Regulation S-K.

**Item 9C. Disclosure regarding foreign jurisdictions that prevent inspections.**

Not applicable.

**PART III**

**Item 10. Directors, executive officers and corporate governance.**

The information required by this Part III, Item 10 is incorporated by reference to the Definitive Proxy Statement (the "Proxy Statement") for our 2024 annual meeting of stockholders ("2024 Annual Meeting of Stockholders"), which will be filed with the SEC no later than 120 days after March 31, 2024.

**Item 11. Executive compensation.**

The information required by this Part III, Item 11 is incorporated by reference to the Proxy Statement for our 2024 Annual Meeting of Stockholders, which will be filed with the SEC no later than 120 days after March 31, 2024.

**Item 12. Security ownership of certain beneficial owners and management and related stockholder matters.**

The information required by this Part III, Item 12 is incorporated by reference to the Proxy Statement for our 2024 Annual Meeting of Stockholders, which will be filed with the SEC no later than 120 days after March 31, 2024.

**Item 13. Certain relationships and related transactions, and director independence.**

The information required by this Part III, Item 13 is incorporated by reference to the Proxy Statement for our 2024 Annual Meeting of Stockholders, which will be filed with the SEC no later than 120 days after March 31, 2024.

**Item 14. Principal accountant fees and services.**

The information required by this Part III, Item 14 is incorporated by reference to the Proxy Statement for our 2024 Annual Meeting of Stockholders, which will be filed with the SEC no later than 120 days after March 31, 2024.

**PART IV**

**Item 15. Exhibits, financial statement schedules.**

(a) The following documents are filed as part of this Annual Report:

1.    Consolidated financial statements:

Reference is made to the Index to Consolidated Financial Statements on page 67 hereof, which is incorporated by reference herein.

2.    Financial statement schedules:

All schedules are omitted because the required information is either not present, not present in material amounts or presented within our consolidated financial statements and notes thereto beginning on page 71 hereof and are incorporated herein by reference.

3.    Exhibits

| Exhibit Number | Exhibit Description | Filed Herewith | Form | Incorporated by Reference Exhibit Number | File Number | Filing Date |
|---|---|---|---|---|---|---|
| 2.1 | Securities Purchase Agreement by and among Naturium LLC, TCB-N Prelude Blocker Corp., The Center Brands LLC, Elaine J. Balady, TCB Prelude Holdings, LLC, e.l.f. Cosmetics, Inc., e.l.f. Beauty, Inc. and The Center Brands LLC (as Representative), dated August 28, 2023. | | S-3ASR | 2.1 | 333-274869 | 10/5/2023 |
| 3.1 | Amended and Restated Certificate of Incorporation of e.l.f. Beauty, Inc. | | 8-K | 3.1 | 001-37873 | 9/27/2016 |
| 3.2 | Amended and Restated Bylaws of e.l.f. Beauty, Inc. | | 8-K | 3.2 | 001-37873 | 9/27/2016 |
| 4.1 | Reference is made to Exhibits 3.1 and 3.2. | | | | | |
| 4.2 | Form of Common Stock Certificate. | | S-1/A | 4.4 | 333-213333 | 9/12/2016 |
| 4.3 | Description of Capital Stock | | 10-K | 4.4 | 001-37873 | 5/27/2021 |
| 10.1 (a) | Standard Multi-Tenant Office Lease, dated as of March 31, 2014, by and between 1007 Clay Street Properties LLC and e.l.f. Cosmetics, Inc. (formerly known as J.A. Cosmetics US, Inc.). | | S-1 | 10.1 | 333-213333 | 8/26/2016 |
| 10.1 (b) | Addendum to Standard Multi-Tenant Office Lease, dated as of March 31, 2014, by and between 1007 Clay Street Properties LLC and e.l.f. Cosmetics, Inc. (formerly known as J.A. Cosmetics US, Inc.). | | S-1 | 10.2 | 333-213333 | 8/26/2016 |
| 10.1 (c) | Standard Multi-Tenant Office Lease, dated as of October 5, 2015, by and between 1007 Clay Street Properties LLC and e.l.f. Cosmetics, Inc. (formerly known as J.A. Cosmetics US, Inc.). | | S-1 | 10.3 | 333-213333 | 8/26/2016 |
| 10.1 (d) | Addendum to Standard Multi-Tenant Office Lease, dated as of October 22, 2015, by and between 1007 Clay Street Properties LLC and e.l.f. Cosmetics, Inc. (formerly known as J.A. Cosmetics US, Inc.). | | S-1 | 10.4 | 333-213333 | 8/26/2016 |
| 10.1 (e) | Amended and Restated Lease Agreement, dated June 19, 2019, by and between e.l.f. Cosmetics, Inc. and Redwood Property Investors III, LLC (as successor to 1007 Clay Street Properties) | | 10-Q | 10.1 | 001-37873 | 8/8/2019 |

60

| Exhibit Number | Exhibit Description | Filed Herewith | Form | Incorporated by Reference Exhibit Number | File Number | Filing Date |
|---|---|---|---|---|---|---|
| 10.2(a) | Standard Industrial/Commercial Multi-Tenant Lease, dated as of December 9, 2015, by and between Jurupa Gateway LLC and e.l.f. Cosmetics, Inc. (formerly known as J.A. Cosmetics US, Inc.). | | S-1 | 10.5 | 333-213333 | 8/26/2016 |
| 10.2(b) | First Amendment to Lease, dated August 24, 2020, by and between Jurupa Gateway LLC and e.l.f. Cosmetics, Inc. | | 10-Q | 10.1 | 001-37873 | 2/4/2021 |
| 10.3 (a) | Senior Secured Credit Agreement, dated as of December 23, 2016, by and among e.l.f. Beauty, Inc., as parent guarantor, e.l.f. Cosmetics, Inc., J.A. 139 Fulton Street Corp., J.A. 741 Retail Corp., J.A. Cosmetics Retail, Inc., J.A. RF, LLC and J.A. Cherry Hill, LLC, each as a borrower, and Bank of Montreal, as the administrative agent, swingline lender and l/c issuer. | | 8-K | 10.1 | 001-37873 | 12/28/2016 |
| 10.3 (b) | First Amendment to Credit Agreement, dated as of August 25, 2017, by and among e.l.f. Beauty, Inc., as parent guarantor, e.l.f. Cosmetics, Inc., J.A. 139 Fulton Street Corp., J.A. 741 Retail Corp., J.A. Cosmetics Retail, Inc., J.A. RF, LLC and J.A. Cherry Hill, LLC, each as a borrower, Bank of Montreal, as the administrative agent, swingline lender and l/c issuer, and the lenders from time to time party thereto. | | 8-K | 10.1 | 001-37873 | 8/28/2017 |
| 10.3 (c) | Second Amendment to Credit Agreement, dated as of December 7, 2018, by and among e.l.f. Beauty, Inc., as parent guarantor, e.l.f. Cosmetics, Inc., J.A. 139 Fulton Street Corp., J.A. 741 Retail Corp., J.A. Cosmetics Retail, Inc., J.A. RF, LLC and J.A. Cherry Hill, LLC, each as a borrower, Bank of Montreal, as the administrative agent, swingline lender and l/c issuer, and the lenders from time to time party thereto. | | 10-K | 10.8(b) | 001-37873 | 5/28/2020 |
| 10.3(d) | Third Amendment to Credit Agreement, dated as of April 8, 2020, by and among e.l.f. Beauty, Inc., as parent guarantor, e.l.f. Cosmetics, Inc., W3ll People, Inc., J.A. RF, LLC, each as a borrower, Bank of Montreal, as the administrative agent, swingline lender and l/c issuer, and the lenders from time to time party thereto. | | 8-K | 10.1 | 001-37873 | 4/9/2020 |
| 10.4(a) | Amended and Restated Credit Agreement, dated April 30, 2021, by and among the Company as parent guarantor, e.l.f. Cosmetics, Inc., W3LL People, Inc. and J.A. RF, LLC, each as a borrower, Bank of Montreal, as the administrative agent, swingline lender and l/c issuer, U.S. Bank, as syndication agent and a joint lead arranger, BMO Capital Markets Corp., as a joint lead arranger and bookrunner, and the lenders from time to time party thereto. | | 8-K | 10.1 | 001-37873 | 5/4/2021 |
| 10.4(b) | FIRST AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT | | 10-K | 10.4(b) | 001-37873 | 5/25/2023 |
| 10.4(c) | Second Amendment to Amended and Restated Credit Agreement, dated August 28, 2023, by and among the Company as parent guarantor, e.l.f. Cosmetics, Inc., W3LL People, Inc. and J.A. RF, LLC, each as a borrower, Bank of Montreal, as the administrative agent, swingline lender and l/c issuer, U.S. Bank, as syndication agent and a joint lead arranger, BMO Capital Markets Corp., as a joint lead arranger and bookrunner, and the lenders from time to time party thereto. | | 10-Q | 10.1 | 001-37873 | 11/2/2023 |

Table of Contents

| Exhibit Number | Exhibit Description | Filed Herewith | Form | Incorporated by Reference | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | Exhibit Number | File Number | Filing Date |
| 10.5 (a)# | 2014 Equity Incentive Plan of e.l.f. Beauty, Inc. | | S-1 | 10.12 | 333-213333 | 8/26/2016 |
| 10.5 (b)# | Amendment to 2014 Equity Incentive Plan of e.l.f. Beauty, Inc., dated as of March 15, 2017. | | 10-K | 10.7(b) | 001-37873 | 3/15/2017 |
| 10.5 (c)# | Forms of stock option award agreements used under the 2014 Equity Incentive Plan of e.l.f. Beauty, Inc. | | S-1 | 10.13 | 333-213333 | 8/26/2016 |
| 10.6 (a)# | 2016 Equity Incentive Award Plan of e.l.f. Beauty, Inc. | | S-1/A | 10.16 | 333-213333 | 9/12/2016 |
| 10.6 (b)# | Amendment to the e.l.f. Beauty, Inc. 2016 Equity Incentive Award Plan | | 8-K | 10.2 | 001-37873 | 7/2/2020 |
| 10.6 (c)# | Form of Stock Option Grant Notice under the 2016 Equity Incentive Award Plan of e.l.f. Beauty, Inc. | | S-1/A | 10.17 | 333-213333 | 9/12/2016 |
| 10.6 (d)# | Form of Restricted Stock Unit Award Grant Notice under the 2016 Equity Incentive Award Plan of e.l.f. Beauty, Inc. | | S-1/A | 10.27 | 333-213333 | 9/12/2016 |
| 10.6 (e)# | Form of Restricted Stock Award Grant Notice under the 2016 Equity Incentive Award Plan of e.l.f. Beauty, Inc. (Executives). | | 10-K | 10.12(d) | 001-37873 | 3/15/2017 |
| 10.6 (f)# | Form of Restricted Stock Award Grant Notice under the 2016 Equity Incentive Award Plan of e.l.f. Beauty, Inc. (Chief Executive Officer). | | 10-K | 10.12(e) | 001-37873 | 3/15/2017 |
| 10.6 (g)# | Form of Performance Stock Award Grant Notice under the 2016 Equity Incentive Award Plan of e.l.f. Beauty, Inc. (Executives). | | 10-K | 10.1 | 001-37873 | 5/27/2021 |
| 10.6 (h)# | Form of Performance Stock Award Grant Notice under the 2016 Equity Incentive Award Plan of e.l.f. Beauty, Inc. (Chief Executive Officer). | | 10-K | 10.2 | 001-37873 | 5/27/2021 |
| 10.7# | 2016 Employee Stock Purchase Plan of e.l.f. Beauty, Inc. | | S-1/A | 10.18 | 333-213333 | 9/12/2016 |
| 10.8# | Amended and Restated Employment Agreement, dated as of February 26, 2019, between Tarang Amin, e.l.f. Cosmetics, Inc. and e.l.f. Beauty, Inc. | | 10-K | 10.16 | 001-37873 | 2/28/2019 |
| 10.9# | Amended and Restated Employment Agreement, dated as of February 26, 2019, between Scott Milsten, e.l.f. Cosmetics, Inc. and e.l.f. Beauty, Inc. | | 10-K | 10.17 | 001-37873 | 2/28/2019 |
| 10.10# | Employment Agreement, dated as of February 1, 2019, between Kory Marchisotto, e.l.f. Cosmetics, Inc. and e.l.f. Beauty, Inc. | | 10-Q | 10.1 | 001-37873 | 5/9/2019 |
| 10.11# | Employment Agreement, dated as of March 15, 2019, between Mandy Fields, e.l.f. Cosmetics, Inc. and e.l.f. Beauty, Inc. | | 8-K | 10.1 | 001-37873 | 3/21/2019 |
| 10.12# | Employment Agreement, dated as of November 25, 2019, between Josh Franks, e.l.f. Cosmetics, Inc. and e.l.f. Beauty, Inc. | | 10-Q | 10.1 | 001-37873 | 2/6/2020 |
| 10.13# | Employment Agreement, dated as of April 20, 2022 between Jennie Laar, e.l.f. Cosmetics, Inc. and e.l.f. Beauty, Inc. | | 10-K | 10.13 | 001-37873 | 5/25/2023 |
| 10.14# | Form of Indemnification Agreement for directors and officers of e.l.f. Beauty, Inc. | | S-1 | 10.25 | 333-213333 | 8/26/2016 |

| Exhibit Number | Exhibit Description | Filed Herewith | Form | Exhibit Number | File Number | Filing Date |
|---|---|---|---|---|---|---|
| | | | | **Incorporated by Reference** | | |
| 10.15# | Amended and Restated Non-Employee Director Compensation Program of e.l.f. Beauty, Inc. | | 10-Q | 10.1 | 001-37873 | 11/7/2019 |
| 10.16# | Cooperation Agreement, dated as of July 1, 2020, by and between e.l.f. Beauty, Inc., Marathon Partners Equity Management, LLC, Marathon Partners L.P., Marathon Focus Fund L.P., Marathon Partners LUX Fund, L.P., Cibelli Research & Management, LLC and Mario Cibelli. | | 8-K | 10.1 | 001-37873 | 7/2/2020 |
| 10.17 | List of Significant Subsidiaries of e.l.f. Beauty, Inc. | X | | | | |
| 19.1 | e.l.f. Beauty, Inc. Amended and Restated Insider Trading Compliance Program | X | | | | |
| 23.1 | Consent of Independent Registered Public Accounting Firm. | X | | | | |
| 24.1 | Power of Attorney. Reference is made to the signature page to this Annual Report on Form 10-K. | X | | | | |
| 31.1 | Certification of the Chief Executive Officer, pursuant to Section 302 of the Sarbanes-Oxley Act. | X | | | | |
| 31.2 | Certification of the Chief Financial Officer, pursuant to Section 302 of the Sarbanes-Oxley Act. | X | | | | |
| 32.1* | Certification of the Chief Executive Officer and Chief Financial Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act. | X | | | | |
| 97.1 | Amended and Restated Compensation Recovery Policy | X | | | | |
| 97.2 | Policy for Recovery of Erroneously Awarded Compensation | X | | | | |
| 101.INS | XBRL Instance Document - Instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. | X | | | | |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document. | X | | | | |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document. | X | | | | |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document. | X | | | | |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document. | X | | | | |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document. | X | | | | |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101). | X | | | | |

\#    Indicates management contract or compensatory plan

\*    This certification is deemed furnished, and not filed, with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of e.l.f. Beauty, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, whether made before or after the date of this Annual Report on Form 10-K, irrespective of any general incorporation language contained in such filing.

**Item 16. Form 10-K Summary.**

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

None.

64

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

e.l.f. Beauty, Inc.

| May 23, 2024 | By: | /s/ Tarang P. Amin |
|---|---|---|
| Date | | Tarang P. Amin |
| | | Chief Executive Officer |
| | | (Principal Executive Officer) |

| May 23, 2024 | By: | /s/ Mandy Fields |
|---|---|---|
| Date | | Mandy Fields |
| | | Chief Financial Officer |
| | | (Principal Financial and Accounting Officer) |

65

Table of Contents

POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below hereby constitutes and appoints Tarang P. Amin, Mandy Fields and Scott K. Milsten and each of them acting individually, as his or her true and lawful attorneys-in-fact and agents, each with full power of substitution, for him or her in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K and to file the same, with all exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, with full power of each to act alone, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully for all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or his or their substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, each of the undersigned has executed this Power of Attorney as of the date indicated opposite his or her name.

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Annual Report on Form 10-K has been signed below by the following persons in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Tarang P. Amin<br>**Tarang P. Amin** | Chairman, Chief Executive Officer and Director<br>(Principal Executive Officer) | May 23, 2024 |
| /s/ Mandy Fields<br>**Mandy Fields** | Senior Vice President and Chief Financial Officer<br>(Principal Financial and Accounting Officer) | May 23, 2024 |
| /s/ Lori A. Keith<br>**Lori A. Keith** | Director | May 23, 2024 |
| /s/ Lauren Cooks Levitan<br>**Lauren Cooks Levitan** | Director | May 23, 2024 |
| /s/ Kenny Mitchell<br>**Kenny Mitchell** | Director | May 23, 2024 |
| /s/ Tiffany Daniele<br>**Tiffany Daniele** | Director | May 23, 2024 |
| /s/ Gayle Tait<br>**Gayle Tait** | Director | May 23, 2024 |
| /s/ Beth M. Pritchard<br>**Beth M. Pritchard** | Director | May 23, 2024 |
| /s/ Maureen C. Watson<br>**Maureen C. Watson** | Director | May 23, 2024 |
| /s/ Richard G. Wolford<br>**Richard G. Wolford** | Director | May 23, 2024 |

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | |
|---|---|
| Report of independent registered public accounting firm (Deloitte & Touche LLP, San Francisco, CA, Auditor Firm ID:34) | 68 |
| Consolidated balance sheets as of March 31, 2024 and March 31, 2023 | 71 |
| Consolidated statements of operations for the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022 | 72 |
| Consolidated statements of comprehensive income for the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022 | 73 |
| Consolidated statements of stockholders' equity for the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022 | 74 |
| Consolidated statements of cash flows for the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022 | 75 |
| Notes to consolidated financial statements | 77 |

67

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the stockholders and the Board of Directors of e.l.f. Beauty, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of e.l.f. Beauty, Inc. and subsidiaries (the "Company") as of March 31, 2024 and 2023, the related consolidated statements of operations and comprehensive income, stockholders' equity, and cash flows, for each of the three years in the period ended March 31, 2024, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of March 31, 2024 and 2023, and the results of its operations and its cash flows for each of the three years in the period ended March 31, 2024, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of March 31, 2024, based on criteria established in *Internal Control—Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated May 23, 2024, expressed an unqualified opinion on the Company's internal control over financial reporting.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current-period audit of the financial statements that were communicated or required to be communicated to the audit committee and that (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

**Provision for Certain Customer Incentives and Allowances — Refer to Note 2 to the financial statements**

*Critical Audit Matter Description*

The Company offers various incentives to customers such as sales discounts, markdown support and other incentives and allowances, which give rise to variable consideration. The amount of variable consideration is estimated at the time of sale based on either the expected amount or the most likely amount, depending on the nature of the variability. The Company regularly reviews and revises, when deemed necessary, its estimates of variable consideration based on both customer-specific expectations as well as historical rates of realization. A provision for customer incentives and allowances is included on the consolidated balance sheet, net against accounts receivable.

Auditing the Company's provision for certain customer incentives and allowances was complex and judgmental as the provision for customer incentives and allowances is determined based on significant management estimates. Changes in

68

Table of Contents

these estimates can have a material impact on the amounts and timing of revenue recognized. Additionally, given the subjectivity of estimating the provision for certain customer incentives and allowances, performing audit procedures to evaluate whether the provision for certain customer incentives and allowances is appropriately recorded required a high degree of auditor judgment.

*How the Critical Audit Matter Was Addressed in the Audit*

Our audit procedures related to the Company's provision for certain customer incentives and allowances included the following, among others:

- We obtained an understanding, evaluated the design and implementation, and tested the operating effectiveness of controls over the Company's provision for customer incentives and allowances, including controls over management's review of the significant assumptions, such as the historical rate of customer deductions and management's review of the completeness and accuracy of the data used.

- We tested customer deduction data underlying the estimate to validate the nature, timing, and amount of deductions taken.

- We evaluated the Company's historical ability to accurately estimate its provision by performing a retrospective analysis on the prior period reserve, based on current period deductions.

- We evaluated period-over-period comparisons of the Company's provision for customer incentives and allowances and deductions claimed by customers by allowance type to identify unusual trends.

- We evaluated management's methodologies and tested the significant assumptions of customer-specific expectations and historic rates of realization, which were used by the Company to calculate the provision for customer incentives and allowances and verified they were consistent with the terms of underlying customer agreements, historical data patterns, and estimated future trends.

**Acquisition – Assumptions related to the valuation of certain acquired intangible assets — Refer to Note 2 and Note 4 to the financial statements**

*Critical Audit Matter Description*

The Company completed the acquisition of Naturium LLC ("Naturium") on October 4, 2023. The Company accounted for the transaction under the acquisition method of accounting for business combinations. Accordingly, the purchase price was allocated to the assets acquired and liabilities assumed based on their respective fair values, including intangible assets. Intangible assets acquired primarily related to trademarks and a key customer relationship. Management estimated the fair value of the intangible assets using valuation techniques which includes the use of a discounted cash flow model and the relief from royalty method. The fair value determination of the intangible assets required management to make significant estimates and assumptions, including future expected revenue, royalty rates, as well as discount rates.

We identified the fair value of acquired intangible assets from the Naturium acquisition as a critical audit matter because of the significant business assumptions and estimates used in the valuation of acquired entity intangible assets that possess higher degrees of complexity and sensitivity to the valuation. This required a high degree of auditor judgment and an increased extent of effort, including the need to involve our internal fair value specialists, when performing audit procedures to evaluate the reasonableness of management's assumptions. The significant assumptions and estimates used to estimate the fair value of Naturium's intangible assets relate primarily to the forecasted revenue growth rate, royalty rate and the discount rate applied to those future cash flows.

*How the Critical Audit Matter Was Addressed in the Audit*

Our audit procedures related to the fair value of the acquired intangible assets, specifically as they relate to significant assumptions and estimates including forecasted revenue growth rate, royalty rate, and discount rate included the following, among others:

69

- We tested the design and implementation and tested the operating effectiveness of internal controls over the valuation and accounting for the acquired intangible assets, including management's controls related to the forecasted revenue growth rate, royalty rate, and other assumptions used in the valuation models.

- We assessed the reasonableness of management's forecast of future revenues by comparing the projected growth rates to historical company data, and industry projections.

- We evaluated whether the estimated future revenues were consistent with evidence obtained in other areas of the audit.

- With the assistance of our fair value specialists, we evaluated the reasonableness of the (1) valuation methodology, (2) discount rate applied to future cash flows, and (3) royalty rate by:

  ◦ Assessing the reasonableness of valuation methodology utilized for the different valuation models.

  ◦ Testing the source information underlying the determination of the discount rate and royalty rate and testing the mathematical accuracy of the calculations.

  ◦ Developing a range of independent estimates and comparing those to the discount rate and royalty rate selected by management.

/s/ Deloitte & Touche LLP

San Francisco, California
May 23, 2024

We have served as the Company's auditor since 2014.

70

**e.l.f. Beauty, Inc. and subsidiaries**
**Consolidated balance sheets**
**(in thousands, except share and per share data)**

| | | March 31, 2024 | | March 31, 2023 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 108,183 | $ | 120,778 |
| Accounts receivable, net | | 123,797 | | 67,928 |
| Inventory, net | | 191,489 | | 81,323 |
| Prepaid expenses and other current assets | | 53,608 | | 33,296 |
| Total current assets | | 477,077 | | 303,325 |
| Property and equipment, net | | 13,974 | | 7,874 |
| Intangible assets, net | | 225,094 | | 78,041 |
| Goodwill | | 340,600 | | 171,620 |
| Other assets | | 72,502 | | 34,741 |
| Total assets | $ | 1,129,247 | $ | 595,601 |
| | | | | |
| **Liabilities and stockholders' equity** | | | | |
| Current liabilities: | | | | |
| Current portion of long-term debt and finance lease obligations | $ | 100,307 | $ | 5,575 |
| Accounts payable | | 81,075 | | 31,427 |
| Accrued expenses and other current liabilities | | 117,733 | | 70,974 |
| Total current liabilities | | 299,115 | | 107,976 |
| Long-term debt and finance lease obligations | | 161,819 | | 60,881 |
| Deferred tax liabilities | | 3,666 | | 3,742 |
| Long-term operating lease obligations | | 21,459 | | 11,201 |
| Other long-term liabilities | | 616 | | 784 |
| Total liabilities | | 486,675 | | 184,584 |
| | | | | |
| Commitments and contingencies (Note 10) | | | | |
| | | | | |
| Stockholders' equity: | | | | |
| Common stock, par value of $0.01 per share; 250,000,000 shares authorized as of March 31, 2024 and March 31, 2023; 55,583,660 and 53,770,482 shares issued and outstanding as of March 31, 2024 and March 31, 2023, respectively | | 555 | | 535 |
| Additional paid-in capital | | 936,403 | | 832,481 |
| Accumulated other comprehensive loss | | (50) | | — |
| Accumulated deficit | | (294,336) | | (421,999) |
| Total stockholders' equity | | 642,572 | | 411,017 |
| Total liabilities and stockholders' equity | $ | 1,129,247 | $ | 595,601 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

**e.l.f. Beauty, Inc. and subsidiaries**
**Consolidated statements of operations**
**(in thousands, except share and per share data)**

| | | Fiscal year ended March 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2024 | | 2023 | | 2022 |
| Net sales | $ | 1,023,932 | $ | 578,844 | $ | 392,155 |
| Cost of sales | | 299,836 | | 188,448 | | 140,423 |
| Gross profit | | 724,096 | | 390,396 | | 251,732 |
| Selling, general and administrative expenses | | 574,418 | | 322,253 | | 221,912 |
| Restructuring expense | | — | | — | | 50 |
| Operating income | | 149,678 | | 68,143 | | 29,770 |
| Other income (expense), net | | 1,210 | | (1,875) | | (1,438) |
| Impairment of equity investment | | (2,875) | | — | | — |
| Interest expense, net | | (7,023) | | (2,018) | | (2,441) |
| Loss on extinguishment of debt | | — | | (176) | | (460) |
| Income before provision for income taxes | | 140,990 | | 64,074 | | 25,431 |
| Income tax provision | | (13,327) | | (2,544) | | (3,661) |
| Net income | $ | 127,663 | $ | 61,530 | $ | 21,770 |
| Net income per share: | | | | | | |
| Basic | $ | 2.33 | $ | 1.17 | $ | 0.43 |
| Diluted | $ | 2.21 | $ | 1.11 | $ | 0.41 |
| Weighted average shares outstanding: | | | | | | |
| Basic | | 54,747,930 | | 52,474,811 | | 50,940,808 |
| Diluted | | 57,788,454 | | 55,337,554 | | 53,654,303 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

**e.l.f. Beauty, Inc. and subsidiaries**
**Consolidated statements of comprehensive income**
**(in thousands)**

| | | Fiscal year ended March 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | **2024** | | **2023** | | **2022** | |
| Net income | $ | 127,663 | $ | 61,530 | $ | 21,770 |
| Other comprehensive loss, net of tax | | | | | | |
| Foreign currency translation adjustment | | (50) | | — | | — |
| Other comprehensive loss, net of tax | | (50) | | — | | — |
| Comprehensive income | $ | 127,613 | $ | 61,530 | $ | 21,770 |

The accompanying notes are an integral part of these consolidated financial statements.

73

**e.l.f. Beauty, Inc. and subsidiaries**
**Consolidated statements of stockholders' equity**
**(in thousands, except share data)**

| | Common stock | | Additional paid-in capital | Accumulated other comprehensive loss | Accumulated deficit | Total stockholders' equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| **Balance as of March 31, 2021** | 50,400,510 | $ 504 | $ 774,441 | $ — | $ (505,299) | $ 269,646 |
| Net income | — | — | — | — | 21,770 | 21,770 |
| Stock based compensation | — | — | 19,336 | — | — | 19,336 |
| Exercise of stock options and vesting of restricted stock | 1,123,797 | 11 | 1,666 | — | — | 1,677 |
| **Balance as of March 31, 2022** | 51,524,307 | 515 | 795,443 | — | (483,529) | 312,429 |
| Net income | — | — | — | — | 61,530 | 61,530 |
| Stock based compensation | — | — | 29,005 | — | — | 29,005 |
| Exercise of stock options and vesting of restricted stock | 2,047,270 | 20 | 8,033 | — | — | 8,053 |
| **Balance as of March 31, 2023** | 53,571,577 | 535 | 832,481 | — | (421,999) | 411,017 |
| Net income | — | — | — | — | 127,663 | 127,663 |
| Stock based compensation | — | — | 40,609 | — | — | 40,609 |
| Exercise of stock options and vesting of restricted stock | 1,359,300 | 14 | 5,547 | — | — | 5,561 |
| Issuance of common stock as consideration for Acquisition | 577,659 | 6 | 57,766 | — | — | 57,772 |
| Foreign currency translation adjustment | — | — | — | (50) | — | (50) |
| **Balance as of March 31, 2024** | 55,508,536 | $ 555 | $ 936,403 | $ (50) | $ (294,336) | $ 642,572 |

The accompanying notes are an integral part of these consolidated financial statements.

74

**e.l.f. Beauty, Inc. and subsidiaries**
**Consolidated statements of cash flows**
**(in thousands)**

| | Fiscal year ended March 31, | | |
| --- | --- | --- | --- |
| | **2024** | **2023** | **2022** |
| **Cash flows from operating activities:** | | | |
| Net income | $ 127,663 | $ 61,530 | $ 21,770 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 35,913 | 22,164 | 27,083 |
| Restructuring expense | — | — | 50 |
| Stock based compensation expense | 40,625 | 29,117 | 19,646 |
| Amortization of debt issuance costs and discount on debt | 430 | 346 | 394 |
| Deferred income taxes | (3,276) | (6,401) | (3,701) |
| Impairment of equity investment | 2,875 | — | — |
| Acquisition-related seller expenses | (10,549) | — | — |
| Loss on extinguishment of debt | — | 176 | 460 |
| Other, net | 1,227 | 179 | 496 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | (49,598) | (22,432) | (5,597) |
| Inventory | (93,930) | 3,174 | (27,655) |
| Prepaid expenses and other assets | (55,182) | (24,553) | (10,555) |
| Accounts payable and accrued expenses | 81,215 | 42,995 | 1,498 |
| Other liabilities | (6,259) | (4,412) | (4,376) |
| Net cash provided by operating activities | 71,154 | 101,883 | 19,513 |
| | | | |
| **Cash flows from investing activities:** | | | |
| Acquisition, net of cash acquired | (274,973) | — | — |
| Purchase of property and equipment | (8,659) | (1,723) | (4,818) |
| Investment contributions | (1,028) | — | — |
| Net cash used in investing activities | (284,660) | (1,723) | (4,818) |
| | | | |
| **Cash flows from financing activities:** | | | |
| Proceeds from revolving line of credit | 89,500 | — | 26,480 |
| Repayment of revolving line of credit | — | — | (26,480) |
| Proceeds from long-term debt | 115,000 | — | 25,581 |
| Repayment of long-term debt | (7,875) | (30,000) | (54,525) |
| Debt issuance costs paid | (665) | — | (1,064) |
| Cash received from issuance of common stock | 5,561 | 8,053 | 1,677 |
| Other, net | (576) | (788) | (779) |
| Net cash provided by (used in) financing activities | 200,945 | (22,735) | (29,110) |
| | | | |
| Effect of exchange rate changes on cash and cash equivalents | (34) | — | — |
| | | | |
| Net (decrease) increase in cash and cash equivalents | (12,595) | 77,425 | (14,415) |
| Cash and cash equivalents - beginning of period | 120,778 | 43,353 | 57,768 |
| Cash and cash equivalents - end of period | $ 108,183 | $ 120,778 | $ 43,353 |

| | | Fiscal year ended March 31, | | |
|---|---|---|---|---|
| | | 2024 | 2023 | 2022 |
| **Supplemental disclosure of cash flow information:** | | | | |
| Cash paid for interest | $ | 11,265 | $ 3,546 | $ 1,762 |
| Cash paid for income taxes, net of refunds | | 12,396 | 13,369 | 7,573 |
| Cash paid for interest on finance leases | | 6 | 32 | 63 |
| **Supplemental disclosure of noncash investing and financing activities:** | | | | |
| Issuance of common stock as consideration for acquisition | $ | 57,772 | $ — | $ — |
| Property and equipment purchases included in accounts payable and accrued expenses | | 1,632 | 335 | 390 |

The accompanying notes are an integral part of these consolidated financial statements.

76

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

**Note 1—Nature of operations**

e.l.f. Beauty, Inc., a Delaware corporation ("e.l.f. Beauty" and together with its subsidiaries, the "Company"), is a multi-brand beauty company that offers inclusive, accessible, clean, vegan and cruelty free cosmetics and skin care products. The Company's mission is to make the best of beauty accessible to every eye, lip, face and skin concern.

e.l.f. Beauty believes its ability to deliver cruelty free, clean, vegan and premium-quality products at accessible prices with broad appeal differentiates it in the beauty industry. e.l.f. Beauty believes the combination of its value proposition, innovation engine, ability to attract and engage consumers, and its world-class team's ability to execute with speed, has positioned the Company well to navigate the competitive beauty market.

The Company's family of brands includes e.l.f. Cosmetics, e.l.f. SKIN, Naturium, Well People and Keys Soulcare. The Company's brands are available online and across leading beauty, mass-market and specialty retailers. The Company has strong relationships with its retail customers such as Target, Walmart, Ulta Beauty and other leading retailers that have enabled the Company to expand distribution both domestically and internationally.

**Note 2—Summary of significant accounting policies**

*Basis of presentation*

The consolidated financial statements and related notes have been prepared in accordance with US generally accepted accounting principles ("US GAAP") and all intercompany balances and transactions have been eliminated in consolidation.

*Use of estimates*

The preparation of financial statements in conformity with US GAAP requires management make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and reported amounts of revenues and expenses during the reporting period. Actual results could differ from these estimates.

*Cash and cash equivalents*

Cash and cash equivalents include all cash balances and highly liquid investments purchased with maturities of three months or less.

*Accounts receivable*

Trade receivables consist of uncollateralized, non-interest bearing customer obligations from transactions with the Company's customers, reduced by an allowance for doubtful accounts for estimated losses resulting from the inability of customers to make payments. The allowance is based on the evaluation and aging of past due balances, specific exposures, historical trends and economic conditions.

The Company maintains allowances for doubtful accounts for uncollectible accounts receivable. Management estimates anticipated losses from doubtful accounts based on days past due, collection history and the financial health of customers. The Company writes off accounts receivable against the allowance when a balance is determined to be uncollectible. Recoveries of receivables previously written off are recorded when received. The Company recorded an allowance for doubtful accounts of $1.2 million and $0.1 million as of March 31, 2024 and March 31, 2023, respectively. The Company recorded a reserve for sales adjustments of $38.7 million and $23.5 million as of March 31, 2024 and March 31, 2023, respectively, which is also presented as a reduction to accounts receivable. The Company grants credit terms in the normal course of business to its customers. Trade credit is extended based upon an evaluation of each customer's ability to perform its payment obligations.

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

*Concentrations of credit risk*

Financial instruments, which potentially subject the Company to concentrations of credit risk, consist principally of cash and cash equivalents including money market funds. Although the Company deposits its cash with creditworthy financial institutions, its deposits, at times, may exceed federally insured limits. To date, the Company has not experienced any losses on its cash deposits. The Company performs credit evaluations of its customers and the risk with respect to trade receivables is further mitigated by the short duration of customer payment terms and the pedigree of the customer base.

During the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022, the following customers individually accounted for greater than 10% of the Company's net sales as disclosed below:

| | Fiscal year ended March 31, | | |
| --- | --- | --- | --- |
| | 2024 | 2023 | 2022 |
| Target | 25 % | 25 % | 23 % |
| Walmart | 17 % | 20 % | 26 % |
| Ulta Beauty | 16 % | 15 % | 12 % |

Customers that individually accounted for greater than 10% of the Company's accounts receivable at the end of the periods as of March 31, 2024 and March 31, 2023, respectively, are as presented:

| | March 31, 2024 | March 31, 2023 |
| --- | --- | --- |
| Target | 28 % | 32 % |
| Walmart | 20 % | 26 % |
| Ulta Beauty | 12 % | * |

* Customer comprised less than 10% of accounts receivable at the end of the period indicated.

*Inventory*

Inventory, consisting principally of finished goods, is stated at the lower of cost and net realizable value. Cost is principally determined by the first-in, first-out method. The Company also records a reserve for excess and obsolete inventory, which represents the excess of the cost of the inventory over its estimated market value. This reserve is based upon an assessment of historical trends, current market conditions and forecasted product demand. The Company recorded an adjustment for excess and obsolete inventory, which is presented as a reduction to inventory of $10.6 million and $6.6 million as of March 31, 2024 and March 31, 2023, respectively.

*Property and equipment and other assets*

Property and equipment is stated at cost and is depreciated on a straight-line basis over the estimated useful lives of the assets. Leasehold improvements are amortized on a straight-line basis over the shorter of the lease term or the useful lives of the assets. Repairs and maintenance expenditures are expensed as incurred.

Useful lives by major asset class are as follows:

| | Estimated useful lives |
| --- | --- |
| Machinery, equipment and software | 2 - 5 years |
| Leasehold improvements | up to 5 years |
| Furniture and fixtures | 3 - 5 years |
| Store fixtures | 1 - 3 years |

As of March 31, 2024 and March 31, 2023, included in other assets are retail product displays, net, of $41.1 million and $15.7 million, respectively, that are generally amortized over a period of three years. Amortization expense for retail product

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

displays was $11.4 million, $5.2 million and $5.9 million for the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022, respectively.

The Company evaluates events and changes in circumstances that could indicate carrying amounts of long-lived assets, including property and equipment, may not be recoverable. When such events or changes in circumstances occur, the Company assesses the recoverability of long-lived assets by determining whether or not the carrying value of such assets will be recovered through undiscounted future cash flows derived from their use and eventual disposition. For purposes of this assessment, long-lived assets are grouped with other assets and liabilities at the lowest level for which identifiable cash flows are largely independent of the cash flows of other assets and liabilities. The Company's long-lived assets are grouped on an entity-wide basis. This is due, in part, to the integrated nature of the Company's various distribution channels and the extent of shared costs across those channels. If the sum of the undiscounted future cash flows is less than the carrying amount of an asset, the Company records an impairment loss for the amount by which the carrying amount of the assets exceeds its fair value. There were no impairment charges recorded on long-lived assets during the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022, respectively.

*Goodwill and intangible assets*

Goodwill represents the excess of the purchase price for an acquisition over the fair value of the net assets acquired. In addition, the Company has acquired finite-lived intangible assets and an indefinite-lived intangible asset.

Goodwill is not amortized but rather is reviewed annually for impairment, at the reporting unit level, or when there is evidence that events or changes in circumstances indicate that the Company's carrying amount may not be recovered. When testing goodwill for impairment, the Company first performs an assessment of qualitative factors. If qualitative factors indicate that it is more likely than not that the fair value of the relevant reporting unit is less than its carrying amount, the Company tests goodwill for impairment at the reporting unit level using a two-step approach. In step one, the Company determines if the fair value of the reporting unit exceeds the unit's carrying value. If step one indicates that the fair value of the reporting unit is less than its carrying value, the Company performs step two, determining the fair value of goodwill and, if the carrying value of goodwill exceeds its implied fair value, an impairment charge is recorded. The Company has identified a single reporting unit for purposes of impairment testing due, in part, to the integrated nature of the Company's various distribution channels and the extent of shared costs across those channels.

Indefinite-lived intangible assets are not amortized but rather are tested for impairment annually and impairment is recognized if the carrying amount exceeds the fair value of the intangible asset. The Company evaluates its indefinite-lived intangible asset to determine whether current events and circumstances continue to support an indefinite useful life. Amortization of intangible assets with finite useful lives is computed on a straight-line basis over periods of 3 years to 15 years. The determination of the estimated period of benefit is dependent upon the use and underlying characteristics of the intangible asset. The Company evaluates the recoverability of its intangible assets subject to amortization when facts and circumstances indicate that the carrying value of the asset may not be recoverable. If the carrying value of an intangible asset is not recoverable, impairment loss is measured as the amount by which the carrying value exceeds its estimated fair value. There were no impairment charges recorded on goodwill or indefinite-lived intangible assets during the fiscal years ended March 31, 2024, March 31, 2023 or March 31, 2022.

*Debt issuance costs*

Debt issuance costs and lender fees were incurred for arranging the credit facilities from various financial institutions. For credit facilities consisting of both term and revolving debt, such costs are allocated to each sub-facility based upon the total borrowing capacity. For term debt, issuance costs are presented within the related long-term debt liability on the consolidated balance sheet and lender fees are presented as a direct deduction from the carrying amount. Both debt issuance costs and lender fees are amortized over the term of the related debt using the effective interest rate method. For revolving debt, issuance costs and lender fees are presented as a noncurrent asset and amortized over the term of the related debt on a straight-line basis.

Table of Contents

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

*Fair value of financial instruments*

The carrying amounts of cash and cash equivalents, accounts receivable and accounts payable and accrued expenses approximate their fair values due to the short-term nature of these items. The carrying amounts of bank debt approximate their fair values as the stated interest rates approximate market rates currently available to the Company for loans with similar terms. See Note 8 Fair value of financial instruments to consolidated financial statements in Part IV, Item 15."Exhibits, financial statement schedules."

*Segment reporting*

Operating segments are components of an enterprise for which separate financial information is available that is evaluated by the chief operating decision maker in deciding how to allocate resources and in assessing performance. Utilizing these criteria, the Company manages its business on the basis of one operating segment and one reportable segment. It is impracticable for the Company to provide revenue by product line.

During the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022, net sales in the United States and International were as follows (in thousands):

|  | Fiscal year ended March 31, | | |
|  | 2024 | 2023 | 2022 |
|---|---|---|---|
| United States | $ 868,076 | $ 506,759 | $ 347,484 |
| International | 155,856 | 72,085 | 44,671 |
| Total net sales | $ 1,023,932 | $ 578,844 | $ 392,155 |

As of March 31, 2024 and March 31, 2023, the Company had property and equipment in the United States and International as follows (in thousands):

|  | March 31, 2024 | March 31, 2023 |
|---|---|---|
| United States | $ 10,936 | $ 7,606 |
| International | 3,038 | 268 |
| Total property and equipment, net | $ 13,974 | $ 7,874 |

*Business combinations*

The purchase price of a business acquisition is allocated to the assets acquired and liabilities assumed based upon their estimated fair values at the business combination date. The excess of purchase price over the fair value of assets acquired and liabilities assumed is recorded as goodwill. Determining fair value of identifiable assets, particularly intangibles, and liabilities acquired also requires the Company to make estimates, which are based on all available information and in some cases assumptions with respect to the timing and amount of future revenues and expenses associated with an asset. Unanticipated events or circumstances may occur that could affect the accuracy of the Company's fair value estimates, and under different assumptions, the resulting valuations could be materially different.

Costs that are incurred to complete the business combination, such as legal and other professional fees, are not considered as a part of consideration transferred and are charged to selling, general and administrative expense as they are incurred.

*Revenue recognition*

Revenue is recognized when control of promised goods or services is transferred to a customer in an amount that reflects the consideration that the Company expects to receive in exchange for those goods or services.

For the Company's retail customer transactions, a contract exists when a written purchase order is received. For the Company's direct-to-consumer transactions, a contract exists when an order is placed online. Control transfers at the time of shipment or the time of delivery, depending upon the specific terms of the customer arrangement. Nearly all of the Company's transactions with its customers and consumers include a single performance obligation delivered at a point in time.

Table of Contents

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

The transaction price can include both fixed and variable consideration. In most cases, it is entirely comprised of variable consideration with the variability driven by expected sales discounts, markdown support and other incentives and allowances offered to customers. These incentives may be explicit or implied by the Company's historical business practices. Generally, these commitments represent cash consideration paid to a customer and do not constitute a promised good or service.

The amount of variable consideration is estimated at the time of sale based on either the expected amount or the most likely amount, depending on the nature of the variability. The Company regularly reviews and revises, when deemed necessary, its estimates of variable consideration, based on both customer-specific expectations as well as historical rates of realization. A provision for customer incentives and allowances is included on the consolidated balance sheet, net against accounts receivable.

_Disaggregated revenue_

The Company distributes product both through national and international retailers as well as direct-to-consumers through its e-commerce channels. The marketing and consumer engagement benefits that the direct channels provide are integral to the Company's brand and product development strategy and drive sales across channels. As such, the Company views its two primary distribution channels as components of one integrated business, as opposed to discrete revenue streams.

The Company sells a variety of beauty products but does not consider them to be meaningfully different revenue streams given similarities in the nature of the products, the target consumer and the innovation and distribution processes. See _Segment Reporting_ section above for the table providing disaggregated revenue from contracts with customers by geographical market, as the nature, amount, timing and uncertainty of revenue and cash flows can differ between domestic and international customers.

_Contract assets and liabilities_

The Company extends credit to its retail customers based upon an evaluation of their credit quality. The majority of retail customers obtain payment terms of approximately 30 days and a contract asset is recognized for the related accounts receivable. Additionally, shipping terms can vary, giving rise to contract liabilities for contracts where payment has been received in advance of delivery. The contract liability balance can vary significantly depending on the timing of when an order is placed and when shipment or delivery occurs.

As of March 31, 2024, other than accounts receivable, the Company had no material contract assets, contract liabilities or deferred contract costs recorded on its consolidated balance sheet.

_Practical expedients_

The Company elected to record revenue net of taxes collected from customers and exclude the amounts from the transaction price. The Company includes in revenue any taxes assessed on the Company's total gross receipts for which it has the primary responsibility to pay the tax.

The Company elected not to disclose revenues related to remaining performance obligations for partially completed or unfulfilled contracts that are expected to be fulfilled within one year as such amounts were insignificant.

81

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

A reconciliation of the beginning and ending amounts of the reserve for sales adjustments for the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022 is as follows (in thousands):

| | | |
|---|---|---:|
| Balance as of March 31, 2021 | $ | 11,913 |
| Charges | | 48,862 |
| Deductions | | (44,465) |
| Balance as of March 31, 2022 | | 16,310 |
| Charges | | 66,302 |
| Deductions | | (59,092) |
| Balance as of March 31, 2023 | | 23,520 |
| Charges | | 122,228 |
| Deductions | | (107,088) |
| Balance as of March 31, 2024 | $ | 38,660 |

In the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022, the Company recorded $3.4 million, $1.6 million and $0.7 million, respectively, of reimbursed shipping expenses from customers within revenues. The shipping and handling costs associated with product distribution were $57.1 million, $36.9 million and $28.0 million, in the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022, respectively, and are included in selling, general and administrative expenses in the consolidated statements of operations.

***Income taxes***

Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. Valuation allowances are recorded to reduce deferred tax assets when it is more likely than not that a tax benefit will not be realized.

Future income tax benefits are recognized to the extent that realization of such benefits is more likely than not. The Company recognizes interest and penalties, if any, related to unrecognized tax benefits in its income tax provision.

***Leases***

The Company has entered into operating lease agreements for office space, warehouse and equipment and software. Lease assets and liabilities are recognized at the present value of the minimum rental payments (excluding executory costs) and expected payment under any residual value guarantee at the lease commencement date. The Company uses its incremental borrowing rate to determine the present value of lease payments.

Non-lease components primarily include payments for maintenance and utilities. The Company accounts for the non-lease components in a contract (e.g., common area maintenance) as part of the lease component by electing practical expedient for all leases of commercial office and warehouse space, as the non-lease components are not a significant portion of the total consideration in those agreements. The Company's lease terms include periods under options to extend or terminate the lease when it is reasonably certain that the Company will exercise that option.

Operating lease assets and liabilities are included on the Company's consolidated balance sheet. The current portion of the Company's operating lease liabilities is included in accrued expenses and other current liabilities and the long-term portion is included in long-term operating lease liabilities. Finance lease assets are included in other assets. Finance lease liabilities are included in long-term debt and finance lease obligations. Operating lease expense is recognized on a straight-line basis over the lease term.

Table of Contents

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

*Foreign currency*

The functional currency of most of the Company's foreign subsidiaries as of March 31, 2024 is the US dollar. During the current reporting period, the Company reassessed its functional currency and determined that the functional currency for one of its foreign subsidiaries changed from the US dollar to GBP. The change in functional currency is accounted for prospectively from October 1, 2023. Prior to the change, the functional currency of all of the Company's foreign subsidiaries is the US dollar. Transactions denominated in currencies other than the functional currency are recorded at exchange rates in effect on the date of the transaction. At the end of each reporting period, monetary assets and liabilities are remeasured to the functional currency using exchange rates in effect at the balance sheet date. Non-monetary assets and liabilities are remeasured at historical exchange rates. Unrealized foreign exchange gains and losses due to re-measurement of monetary assets and liabilities denominated in non-functional currencies as well as transaction gains or losses that arise from exchange rate fluctuations on transactions denominated in a currency other than the functional currency are included in other income (expense), net in the consolidated statements of operations.

The financial statements of the non-US dollar functional currency subsidiary are translated into US dollars using period-end rates of exchange for assets and liabilities, historical rates of exchange for equity and average rates of exchange for revenue and expenses. Translation gains (losses) are recorded in accumulated other comprehensive income (loss) as a component of stockholders' equity.

*Stock based compensation*

The Company has several stock award plans, which are described in detail in Note 13. The Company accounts for stock based compensation under ASC 718, "Compensation-Stock Compensation." The Company recognizes expense over the requisite service period of the award, net of an estimate for the impact of award forfeitures.

*Advertising costs*

Advertising costs are expensed as incurred or distributed. Advertising costs are included in selling, general and administrative expenses in the accompanying consolidated statements of operations and amounted to approximately $209.2 million, $96.7 million and $41.0 million in the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022, respectively.

*Net income per share*

Basic net income per share is computed using net income available to common stockholders divided by the weighted-average number of common shares outstanding during the period. Diluted net income per share reflects the dilutive effects of stock options and restricted stock outstanding during the period, to the extent such securities would not be anti-dilutive and is determined using the treasury stock method.

*Recent accounting pronouncements*

No new accounting pronouncements issued but not yet adopted are expected to have a material impact on the Company's consolidated financial statements.

**Note 3—Investments**

The Company has certain investments included in other assets on its consolidated balance sheets. The Company has elected the measurement alternative for equity investments that do not have readily determinable fair values. The Company recorded an impairment charge on one of its investments of $2.9 million as a separate line under other expense, net during the fiscal year ended March 31, 2024, as an identified event or change in circumstances resulted in an indicator of impairment. The Company did not record an impairment charge on its investment during the fiscal years ended March 31, 2023 and March 31, 2022, respectively, as any identified events or changes in circumstances did not result in an indicator of impairment during those periods. Further, there were no observable price changes in orderly transactions for the identical or a similar investment of the same issuer during the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022, respectively.

Table of Contents

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

**Note 4 —Acquisition**

On October 4, 2023, the Company, through its wholly owned subsidiary, e.l.f. Cosmetics, Inc., completed its acquisition of Naturium LLC ("Naturium") (including the indirect acquisition of equity interests in Naturium through the purchase of TCB-N Prelude Blocker Corp., a holding company) (the "Acquisition"), which furthered the Company's mission to make the best of beauty accessible to every eye, lip, face and skin concern. Naturium is a skin care company that provides clinically effective products at an affordable price. The Company directly and indirectly acquired all rights, title and interest in and to the outstanding equity securities of Naturium for a purchase price of $333.0 million in a combination of cash and Company stock.

The following table summarizes the fair market value of the consideration transferred and how the Company calculates the goodwill resulting from the acquisition (in thousands):

| | | | |
|---|---|---|---|
| Cash consideration | $ | | 275,266 |
| Equity consideration (common stock issued)[1] | | | 57,772 |
| Total consideration transferred | | | 333,038 |
| Less: Net assets acquired | | | |
| Net assets acquired, excluding liability assumed for acquisition-related seller expenses | $ | 174,608 | |
| Liability assumed for acquisition-related seller expenses[2] | | (10,549) | |
| Net assets acquired | | | (164,059) |
| Goodwill | $ | | 168,979 |

[1] The fair market value of the $57.8 million common stock issued (equivalent to 577,659 shares of common stock) was determined on the basis of the opening market price of the Company's stock of $100.01 per share on the acquisition date.

[2] In connection with the Acquisition, the Company paid Naturium's acquisition-related expenses of $10.5 million recognized as an assumed liability at the acquisition date.

The Company incurred and expensed acquisition transaction costs of $3.4 million during the fiscal year ended March 31, 2024, which are included as a component of selling, general and administrative expenses in the consolidated statements of operations.

The Acquisition has been accounted for as a business combination under the acquisition method and, accordingly, the total purchase price is allocated to the tangible and intangible assets acquired and the liabilities assumed based on their respective fair values on the acquisition date. The purchase price allocation, deferred tax calculations and residual goodwill are preliminary and pending finalization. Naturium's results of operations have been included in the Company's consolidated financial statements from the date of acquisition.

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

The following table presents the preliminary purchase price allocation recorded in the Company's condensed consolidated balance sheet on the acquisition date (in thousands):

| | | |
|---|---|---:|
| Cash | $ | 293 |
| Accounts receivable | | 7,388 |
| Inventory | | 16,236 |
| Prepaid expenses and other current assets | | 1,899 |
| Property and equipment | | — |
| Goodwill[1] | | 168,979 |
| Intangible assets | | 162,100 |
| Total assets acquired | | 356,895 |
| Accounts payable | | (15,897) |
| Accrued expenses and other current liabilities | | (6,025) |
| Net deferred tax liability | | (1,935) |
| Total liabilities assumed | | (23,857) |
| Total purchase price | $ | 333,038 |

[1] The goodwill represents the excess value over both tangible and intangible assets acquired and liabilities assumed. The goodwill recognized in this transaction is primarily attributable to the Company's expectation that Naturium can continue to expand distribution and deliver new skin care products. A substantial amount of the goodwill is expected to be deductible for tax purposes.

The Company made certain measurement period adjustments in the fourth quarter of fiscal 2024 resulting in an increase to goodwill of $0.4 million. None of the adjustments were individually material. There was no income statement impact on comparable prior periods presented as a result of these adjustments.

*Intangible assets*

The estimated fair values (all considered level 3 measurements) of the identifiable intangible assets acquired, their estimated useful lives and fair value methodology are as follows:

| | Fair Value (in thousands) | Estimated Useful Life (in years) | Fair Value Methodology |
|---|---:|:---:|:---:|
| Customer relationships – retailers | $ 20,000 | 10 | Excess earnings method |
| Customer relationships – e-commerce | 17,600 | 3 | Excess earnings method and with and without method |
| Trademarks | 124,500 | 15 | Relief from Royalty method |
| Total identified intangible assets | $ 162,100 | | |

*Certain financial information (unaudited)*

The amounts of Naturium's net sales included in the Company's condensed consolidated financial statements from the date of acquisition and the net sales of the combined companies on an unaudited pro forma basis, had the acquisition date been April 1, 2022, are as follows (in thousands):

| | Amount |
|---|---:|
| Actual Naturium net sales from October 4, 2023 to March 31, 2024 | $ 53,421 |
| Supplemental pro forma combined net sales for the fiscal year ended March 31, 2024 | 1,065,726 |
| Supplemental pro forma combined net sales for the fiscal year ended March 31, 2023 | 628,751 |

Table of Contents

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

The unaudited pro forma financial information shown in the table above are presented for informational purposes only and are not indicative of the results of operations that would have been achieved if the acquisition had taken place at April 1, 2022 (the beginning of the comparable prior annual reporting period).

The pro forma earnings of the combined companies are not presented as the effects of the Acquisition in earnings are not material in relation to the overall consolidated financial statements.

**Note 5—Goodwill and other intangible assets**

Information regarding the Company's goodwill and intangible assets as of March 31, 2024 is as follows (in thousands):

| | Estimated useful life | Gross carrying amount | Accumulated amortization | Net carrying amount |
|---|---|---|---|---|
| Customer relationships – retailers | 10 years | $ 97,600 | $ (73,393) | $ 24,207 |
| Customer relationships – e-commerce | 3 years | 21,540 | (6,874) | 14,666 |
| Trademarks | 10 to 15 years | 128,000 | (5,579) | 122,421 |
| Total finite-lived intangibles | | 247,140 | (85,846) | 161,294 |
| Trademarks | Indefinite | 63,800 | — | 63,800 |
| Goodwill | | 340,600 | — | 340,600 |
| Total goodwill and other intangibles | | $ 651,540 | $ (85,846) | $ 565,694 |

Information regarding the Company's goodwill and intangible assets as of March 31, 2023 is as follows (in thousands):

| | Estimated useful life | Gross carrying amount | Accumulated amortization | Net carrying amount |
|---|---|---|---|---|
| Customer relationships – retailers | 10 years | $ 77,600 | $ (65,780) | $ 11,820 |
| Customer relationships – e-commerce | 3 years | 3,940 | (3,940) | — |
| Trademarks | 10 years | 3,500 | (1,079) | 2,421 |
| Total finite-lived intangibles | | 85,040 | (70,799) | 14,241 |
| Trademarks | Indefinite | 63,800 | — | 63,800 |
| Goodwill | | 171,620 | — | 171,620 |
| Total goodwill and other intangibles | | $ 320,460 | $ (70,799) | $ 249,661 |

The Company has not recognized any impairment charges on its goodwill or intangible assets. Amortization expense on finite-lived intangible assets was $15.0 million for the fiscal year ended March 31, 2024, and $8.1 million for each of the fiscal years ended March 31, 2023 and March 31, 2022.

The estimated future amortization expense related to the finite-lived intangible assets, assuming no impairment as of March 31, 2024, is as follows (in thousands):

| Year ending March 31, | |
|---|---|
| 2025 | $ 17,397 |
| 2026 | 17,397 |
| 2027 | 14,463 |
| 2028 | 11,530 |
| 2029 | 11,530 |
| Thereafter | 88,977 |
| Total | $ 161,294 |

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

### Note 6—Property and equipment

Property and equipment as of March 31, 2024 and March 31, 2023 consists of the following (in thousands):

|  | March 31, 2024 | March 31, 2023 |
|---|---|---|
| Machinery, equipment and software | $ 20,222 | $ 15,148 |
| Leasehold improvements | 6,982 | 4,677 |
| Furniture and fixtures | 1,542 | 1,263 |
| Store fixtures | 10,157 | 10,782 |
| Property and equipment, gross | 38,903 | 31,870 |
| Less: Accumulated depreciation and amortization | (24,929) | (23,996) |
| Property and equipment, net | $ 13,974 | $ 7,874 |

Depreciation and amortization expense on property and equipment was $3.5 million, $4.3 million and $7.9 million during the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022, respectively.

### Note 7—Accrued expenses and other current liabilities

Accrued expenses and other current liabilities as of March 31, 2024 and March 31, 2023 consists of the following (in thousands):

|  | March 31, 2024 | March 31, 2023 |
|---|---|---|
| Accrued expenses | $ 37,782 | $ 22,726 |
| Accrued inventory | 16,478 | 1,330 |
| Accrued marketing | 29,282 | 23,761 |
| Current portion of operating lease liabilities | 7,016 | 4,510 |
| Accrued compensation | 17,423 | 13,098 |
| Taxes payable | 5,814 | 2,851 |
| Other current liabilities | 3,938 | 2,698 |
| Accrued expenses and other current liabilities | $ 117,733 | $ 70,974 |

### Note 8—Fair value of financial instruments

The fair value of financial instruments are categorized based upon the level of judgment associated with the inputs used to measure their fair values. Fair value is measured using inputs from the three levels of the fair value hierarchy, which are described as follows:

**Level 1**—Quoted prices in active markets for identical assets or liabilities

**Level 2**—Quoted prices for similar assets and liabilities in active markets or inputs that are observable

**Level 3**—Inputs that are unobservable (for example, cash flow modeling inputs based on management's assumptions)

The assets' or liabilities' fair value measurement level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement. The following table sets forth the fair value of the Company's financial liabilities by level within the fair value hierarchy as of March 31, 2024 (in thousands):

|  |  | Fair value measurements using | | |
|---|---|---|---|---|
|  | Fair value | Level 1 | Level 2 | Level 3 |
| **Financial liabilities:** |  |  |  |  |
| Long-term debt, including current portion [1] | $ 262,932 | $ — | $ 262,932 | $ — |
| Total financial liabilities | $ 262,932 | $ — | $ 262,932 | $ — |

---

[1] Of this amount, $100.3 million is classified as current. The gross carrying amounts of the Company's bank debt, before reduction of the debt issuance costs, approximate their fair values as the stated rates approximate market rates for loans with

87

Table of Contents

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

similar terms.

The following table sets forth the fair value of the Company's financial liabilities by level within the fair value hierarchy as of March 31, 2023 (in thousands):

| | Fair value | | Fair value measurements using | | | | | |
| | | | Level 1 | | Level 2 | | Level 3 | |
|---|---|---|---|---|---|---|---|---|
| **Financial liabilities:** | | | | | | | | |
| Long-term debt, including current portion [1] | $ | 66,883 | $ | — | $ | 66,883 | $ | — |
| Total financial liabilities | $ | 66,883 | $ | — | $ | 66,883 | $ | — |

[1] Of this amount, $5.6 million is classified as current. The gross carrying amounts of the Company's bank debt, before reduction of the debt issuance costs, approximate their fair values as the stated rates approximate market rates for loans with similar terms.

The Company did not transfer any assets measured at fair value on a recurring basis to or from Level 1 or Level 2 for any of the periods presented.

**Note 9—Debt**

The Company's outstanding debt as of March 31, 2024 and March 31, 2023 consists of the following (in thousands):

| | | March 31, 2024 | | March 31, 2023 |
|---|---|---|---|---|
| Debt: | | | | |
| Revolving line of credit[1] | $ | 89,500 | $ | — |
| Term loan[1] | $ | 173,375 | $ | 66,250 |
| Finance lease obligations | | 57 | | 633 |
| Total debt | | 262,932 | | 66,883 |
| Less: debt issuance costs | | (806) | | (427) |
| Total debt, net of issuance costs | | 262,126 | | 66,456 |
| Less: current portion | | (100,307) | | (5,575) |
| Long-term portion of debt | $ | 161,819 | $ | 60,881 |

[1] See further discussion below. As of March 31, 2024, the Company was in compliance with all applicable financial covenants under the Amended Credit Agreement.

***Amended Credit Agreement***

On April 30, 2021, the Company amended and restated its prior credit agreement (as further amended, supplemented or modified from time to time, the "Amended Credit Agreement") and refinanced all loans under the prior credit agreement. The Amended Credit Agreement has a five year term and consists of (i) a $100 million revolving credit facility (the "Amended Revolving Credit Facility") and (ii) a $100 million term loan facility (the "Amended Term Loan Facility").

All amounts under the Amended Revolving Credit Facility are available for draw until the maturity date on April 30, 2026. The Amended Revolving Credit Facility is collateralized by substantially all of the Company's assets and requires payment of an unused fee ranging from 0.10% to 0.30% (based on the Company's consolidated total net leverage ratio (as defined in the Amended Credit Agreement)) times the average daily amount of unutilized commitments under the Amended Revolving Credit Facility. The Amended Revolving Credit Facility also provides for sub-facilities in the form of a $7 million letter of credit and a $5 million swing line loan; however, all amounts drawn under the Amended Revolving Credit Facility cannot exceed $100 million. The unused balance of the Amended Revolving Credit Facility as of March 31, 2024 was $10.5 million.

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

Prior to the Second Amendment (as defined below), both the Amended Revolving Credit Facility and the Amended Term Loan Facility bore interest, at the borrowers' option, at either (i) a rate per annum equal to an adjusted LIBOR rate determined by reference to the cost of funds for the United States US dollar deposits for the applicable interest period (subject to a minimum floor of 0%) plus an applicable margin ranging from 1.25% to 2.125% based on our consolidated total net leverage ratio (the "Applicable Margin") or (ii) a floating base rate plus an applicable margin ranging from 0.25% to 1.125% based on our consolidated total net leverage ratio. On March 29, 2023, the Company amended the Amended Credit Agreement to transition the benchmark from LIBOR to an adjusted Secured Overnight Financing Rate ("SOFR") (which is equal to the applicable SOFR plus 0.10%) (such transaction, the "First Amendment"). In connection with the First Amendment, all outstanding LIBOR loans were converted to SOFR loans. The annual interest rate for SOFR borrowings will be equal to term SOFR, subject to a floor of 0%, plus a margin ranging from 1.25% to 2.125%.

The interest rate as of March 31, 2024 for the Amended Revolving Credit Facility and the Amended Term Loan Facility was approximately 6.7%.

In accordance with ASC 470, Debt, the amendment to the Company's prior credit agreement was accounted for as both a debt modification and partial debt extinguishment, which resulted in the recognition of a loss on extinguishment of debt of $0.5 million for the fiscal year ended March 31, 2022. The Company incurred and capitalized $1.1 million of new debt issuance costs related to the amendment.

In the fiscal year ended March 31, 2023, the Company recognized a loss on extinguishment of debt of approximately $0.2 million, primarily related to the partial prepayment of term loan borrowings in the amount of $25.0 million.

### *Second Amended Credit Agreement*

On August 28, 2023, the Company entered into the Second Amendment to the Amended and Restated Credit Agreement (the "Second Amendment"). Pursuant to the Second Amendment, the Company may borrow incremental term loans in a principal amount equal to $115.0 million under the Amended Credit Agreement (the "Incremental Term Loan"). The Incremental Term Loan will bear interest at a rate per annum equal to, at the Company's election, adjusted term SOFR or an alternate base rate as set forth in the Second Amendment, plus an interest rate margin, to be based on consolidated total net leverage ratio levels, ranging from, (i) in the case of SOFR loans, 1.50% to 2.375%; provided that if SOFR is less than 0.00%, such rate shall be deemed to be 0.00%, and (ii) in the case of alternate base rate loans, 0.50% to 1.375%; provided that if the alternate base rate is less than 1.00%, such rate shall be deemed to be 1.00%. The Incremental Term Loan amortizes at 5.00% per annum payable in equal quarterly installments of 1.25% per annum, commencing with the fiscal quarter ended on December 31, 2023. The Company used the Incremental Term Loan together with cash from its balance sheet and additional borrowings under its Amended Revolving Credit Facility to consummate the Acquisition (as defined in Note 4 hereto) and to pay related fees and expenses in connection with the Acquisition and Second Amendment.

The interest rate as of March 31, 2024 for the Incremental Term Loan was approximately 6.9%.

The Amended Credit Agreement contains a number of covenants that, among other things and subject to certain exceptions, restrict the Company's ability to pay dividends and distributions or repurchase capital stock, incur additional indebtedness, create liens on assets, engage in mergers or consolidations and sell or otherwise dispose of assets. The Amended Credit Agreement also includes reporting, financial and maintenance covenants that require the Company to, among other things, comply with certain consolidated total net leverage ratios and consolidated fixed charge coverage ratios.

Aggregate future minimum principal payments are as follows (in thousands):

| Year ending March 31, | | Term Loan |
|---|---|---|
| 2025 | $ | 100,250 |
| 2026 | | 10,750 |
| 2027 | | 151,875 |
| Total | $ | 262,875 |

89

Table of Contents

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

**Interest expense, net**

The components of interest expense, net are as follows (in thousands):

|  | | Fiscal year ended March 31, | | | | |
|  | | 2024 | | 2023 | | 2022 |
|---|---|---|---|---|---|---|
| Interest on term loan debt | $ | 8,294 | $ | 3,450 | $ | 1,708 |
| Amortization of debt issuance costs | | 430 | | 346 | | 331 |
| Interest on revolving line of credit | | 3,106 | | 163 | | 342 |
| Interest on finance leases | | 10 | | 31 | | 63 |
| Interest income | | (4,817) | | (1,972) | | (3) |
| Interest expense, net | $ | 7,023 | $ | 2,018 | $ | 2,441 |

**Note 10—Commitments and contingencies**

**Legal Contingencies**

From time to time, the Company is involved in legal proceedings, claims, and litigation arising in the ordinary course of business. The Company is not currently a party to any matters that management expects will have a material adverse effect on the Company's consolidated financial position, results of operations or cash flows.

**Note 11—Income taxes**

The components of income (loss) before the provision for income taxes are as follows (in thousands):

|  | | Fiscal year ended March 31, | | | | |
|  | | 2024 | | 2023 | | 2022 |
|---|---|---|---|---|---|---|
| Domestic | $ | 142,507 | $ | 64,850 | $ | 26,286 |
| Foreign | | (1,517) | | (776) | | (855) |
| Total | $ | 140,990 | $ | 64,074 | $ | 25,431 |

The components of the benefit (provision) for income taxes are as follows (in thousands):

|  | | Fiscal year ended March 31, | | | | |
|  | | 2024 | | 2023 | | 2022 |
|---|---|---|---|---|---|---|
| Current: | | | | | | |
| US federal | $ | (12,505) | $ | (7,065) | $ | (5,637) |
| State | | (4,078) | | (1,854) | | (1,715) |
| Foreign | | (20) | | (26) | | (10) |
| Total current | | (16,603) | | (8,945) | | (7,362) |
| Deferred: | | | | | | |
| US federal | | 2,130 | | 5,035 | | 3,146 |
| State | | 746 | | 816 | | 738 |
| Foreign | | 400 | | 550 | | (183) |
| Total deferred | | 3,276 | | 6,401 | | 3,701 |
| Total (provision) benefit for income taxes | $ | (13,327) | $ | (2,544) | $ | (3,661) |

90

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

The following table presents a reconciliation of the federal statutory rate to the Company's effective tax rate:

| | Fiscal year ended March 31, | | |
| --- | --- | --- | --- |
| | **2024** | **2023** | **2022** |
| Federal statutory rate | 21.0 % | 21.0 % | 21.0 % |
| State tax, net of federal benefit | 1.8 % | 1.0 % | 2.6 % |
| State tax deferred rate change, net of federal benefit | — % | — % | (0.1)% |
| Nondeductible business expenses | 0.4 % | 0.6 % | 0.4 % |
| Nondeductible employee compensation | 4.3 % | 2.5 % | 1.1 % |
| Provision-to-return adjustment | (0.2)% | (0.1)% | (0.3)% |
| Uncertain tax positions | — % | — % | 0.1 % |
| Stock based compensation | (18.4)% | (20.3)% | (12.0)% |
| Change in valuation allowance | 0.4 % | (0.6)% | 1.5 % |
| Others | 0.2 % | (0.1)% | 0.1 % |
| Effective tax rate | 9.5 % | 4.0 % | 14.4 % |

The components of net deferred taxes arising from temporary differences are as follows (in thousands):

| | March 31, 2024 | March 31, 2023 |
| --- | --- | --- |
| Deferred tax assets: | | |
| Compensation | $ 222 | $ 354 |
| Inventory and receivables | 13,465 | 9,976 |
| Accrued expenses | 3,782 | 2,734 |
| Stock compensation | 7,349 | 8,247 |
| Net operating losses | 1,188 | 571 |
| Right of use liability | 5,026 | 3,782 |
| Capitalized research and development | 2,051 | 858 |
| Other | 1,792 | 774 |
| Gross deferred tax assets | 34,875 | 27,296 |
| Valuation allowance | (744) | — |
| Net deferred tax assets | 34,131 | 27,296 |
| Deferred tax liabilities: | | |
| Goodwill | 3,546 | 5,180 |
| Fixed assets and internally developed software | 5,746 | 2,451 |
| Intangible assets | 21,326 | 19,107 |
| Right of use asset | 4,801 | 3,359 |
| Other | 557 | 378 |
| Deferred tax liabilities | 35,976 | 30,475 |
| Net deferred tax liabilities | $ 1,845 | $ 3,179 |

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

The deferred tax assets and liabilities are reported in the accompanying balance sheets as follows (in thousands):

|  | March 31, 2024 | March 31, 2023 |
|---|---|---|
| Deferred tax assets | $ 1,821 | $ 563 |
| Deferred tax liabilities | 3,666 | 3,742 |
| Net deferred tax liabilities | $ 1,845 | $ 3,179 |

The valuation allowance was $0.7 million and zero as of March 31, 2024 and March 31, 2023, respectively, primarily relating to an investment impairment for which we do not believe a tax benefit is more likely than not to be realized.

As of March 31, 2024, the Company had gross federal, state and foreign net operating loss carryforwards of zero, $0.9 million and $4.6 million, respectively. The state net operating loss carryforwards can either be carried forward 20 years or indefinitely. The state net operating loss carryforwards will begin to expire in 2038. The foreign net operating loss carryforwards can either be carried forward 5 years or indefinitely and will begin to expire in 2027.

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows (in thousands):

|  | Fiscal year ended March 31, | | |
|---|---|---|---|
|  | 2024 | 2023 | 2022 |
| Balance at beginning of year | $ 442 | $ 466 | $ 458 |
| Increases for prior year tax positions | — | — | — |
| Increases for current year tax positions | 108 | 92 | 75 |
| Decreases for prior year tax positions | (19) | (10) | (6) |
| Decreases due to settlements | — | — | (61) |
| Decreases due to statutes lapsing | (98) | (106) | — |
| Balance at end of year | $ 433 | $ 442 | $ 466 |

If all of the Company's unrecognized tax benefits as of March 31, 2024, March 31, 2023 and March 31, 2022 were recognized, $0.4 million, $0.4 million and $0.5 million, respectively, of unrecognized tax benefits, would impact the effective tax rate. The Company believes it is reasonably possible that $40 thousand of unrecognized tax benefits may reverse in the next twelve months.

The Company recognizes interest and penalties accrued related to unrecognized tax benefits in the provision for income taxes. The Company's liability for unrecognized tax benefits is recorded within other long-term liabilities on the consolidated balance sheet. The Company had $0.2 million and $0.2 million of accrued gross interest and penalties as of March 31, 2024 and March 31, 2023, respectively. The Company recognized net interest and penalties (benefit)/expense of $(21) thousand, $34 thousand and $27 thousand for the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022, respectively.

The Company files income tax returns in the US federal jurisdiction and various state and foreign jurisdictions. As of March 31, 2024, with few exceptions, the Company or its subsidiaries are no longer subject to examination prior to tax fiscal year ended March 31, 2020.

The Organization for Economic Co-operation and Development has a framework to implement a global minimum corporate tax of 15% for companies with global revenues and profits above certain thresholds (referred to as "Pillar 2"), with certain aspects of Pillar 2 effective January 1, 2024 and other aspects effective January 1, 2025. While it is uncertain whether the U.S. will enact legislation to adopt Pillar 2, certain countries in which the Company operates have adopted the legislation, and other countries are in the process of introducing legislation to implement Pillar 2. The Company is continuing to evaluate and monitor but does not expect for Pillar 2 to have a material impact on the effective tax rate or the consolidated financial statements.

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

**Note 12—Preferred stock**

The Company has authorized 30,000,000 shares of preferred stock for issuance with a par value of $0.01 per share. There were no shares of preferred stock outstanding as of March 31, 2024 or March 31, 2023.

**Note 13—Stock based compensation**

*Stock plans*

The Company grants stock based awards under its 2016 Equity Incentive Award Plan (as amended) (the "2016 Plan"), which replaced its 2014 Equity Incentive Plan (the "2014 Plan") and became effective immediately prior to the effectiveness of the Company's registration statement on Form S-1 in September 2016. No grants have been made under the 2014 Plan since the Company's initial public offering and no further awards will be granted thereunder. Any awards outstanding under the 2014 Plan that are forfeited or lapse unexercised will be added to the shares reserved and available for grant under the 2016 Plan. The 2016 Plan permits the grant of incentive stock options, non-statutory stock options, restricted stock and other stock- or cash-based awards to employees, officers, directors, advisors and consultants. The 2016 Plan allows for option grants of the Company's common stock based on service, performance and market conditions.

During the fiscal year ended March 31, 2024, no stock options were issued. As of March 31, 2024, a total of 17,697,556 shares have been authorized for issuance under the 2016 Plan, and 8,618,008 remain available for grant. As of March 31, 2024, there were 64,525 options and awards outstanding under the 2014 Plan that, if forfeited, would increase the number of shares authorized for grant under the 2016 Plan.

*Service-based vesting stock options*

The following table summarizes the activity for options that vest solely based upon the satisfaction of a service condition as follows:

| | Options outstanding | Weighted-average exercise price | Weighted-average remaining contractual life (in years) | Aggregate intrinsic values (in thousands) [1] |
|---|---|---|---|---|
| Balance as of March 31, 2021 | 1,640,981 | 14.86 | | |
| Exercised | (93,282) | 11.19 | | |
| Canceled or forfeited | (4,200) | 26.63 | | |
| Balance as of March 31, 2022 | 1,543,499 | 15.05 | 5.1 | $ 16,686 |
| Exercised | (519,009) | 12.82 | | |
| Balance as of March 31, 2023 | 1,024,490 | $ 16.17 | 4.1 | $ 67,796 |
| Exercised | (347,590) | 14.47 | | |
| Canceled or forfeited | (2,900) | 26.84 | | |
| Balance as of March 31, 2024 | 674,000 | $ 17.01 | 3.3 | $ 120,660 |
| | | | | |
| Exercisable, March 31, 2024 | 650,000 | $ 17.07 | 3.2 | $ 116,326 |

(1) The aggregate intrinsic value is calculated as the difference between the exercise price of the underlying awards and the Company's closing stock price of $196.03, as reported on the New York Stock Exchange on March 28, 2024.

Additional information relating to service-based options is as follows (in thousands):

| | Fiscal year ended March 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Stock based compensation expense | $ 147 | $ 344 | $ 924 |
| Intrinsic value of options exercised | 45,542 | 18,015 | 1,695 |

As of March 31, 2024, there was $0.1 million of total unrecognized compensation cost related to service-based stock options, which is expected to be recognized over the remaining weighted-average vesting period of 1.5 years.

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

No service-based stock options were granted during the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022.

The determination of the fair value of stock options on the date of grant using a Black-Scholes option-pricing model is affected by the fair value of the underlying common stock, as well as assumptions regarding a number of variables that are complex, subjective and generally require significant judgment. The assumptions used in the Black-Scholes option-pricing model to calculate the fair value of stock options were:

*Fair value of common stock*

The fair value of shares of common stock underlying stock options is based on the closing stock price as quoted on the New York Stock Exchange on the date of grant.

*Expected term*

The expected term of the options represents the period of time that the options are expected to be outstanding. Options granted have a maximum contractual life of 10 years. Prior to the Company's initial public offering of its common stock in September 2016, the Company estimated the expected term of the option based on the estimated timing of potential liquidity events. For grants upon or after the initial public offering, the Company estimated the expected term based upon the simplified method described in Staff Accounting Bulletin No. 107, as the Company did not have sufficient historical exercise data to provide a reasonable basis upon which to estimate expected term due to the limited period of time its equity shares had been publicly traded.

*Expected volatility*

As the Company did not have sufficient trading history for its common stock, the expected stock price volatility for the common stock was estimated by taking the average historic price volatility for industry peers based on daily price observations over a period equivalent to the expected term of the stock option grants. Industry peers consist of several public companies within the same industry, which are of similar size, complexity and stage of development. The Company intends to continue to consistently apply this process using the same or similar public companies until a sufficient amount of historical information regarding the volatility of its own share price becomes available, or unless circumstances change such that the identified companies are no longer similar to the Company, in which case, more suitable companies whose share prices are publicly available would be used in the calculation.

*Risk-free interest rate*

The risk-free interest rate was based on the US Treasury rate, with maturities similar to the expected term of the options.

*Expected dividend yield*

The Company does not anticipate paying any dividends in the foreseeable future. As such, the Company uses an expected dividend yield of zero.

94

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

*Performance-based and market-based vesting stock options*

The following table summarizes the activity for options that vest based upon the satisfaction of performance or market conditions as follows:

| | Options outstanding | Weighted-average exercise price | Weighted-average remaining contractual life (in years) | Aggregate intrinsic values (in thousands) [1] |
|---|---|---|---|---|
| Balance as of March 31, 2021 | 1,108,592 | 8.72 | | |
| Exercised | (104,265) | 2.24 | | |
| Balance as of March 31, 2022 | 1,004,327 | 9.40 | 3.0 $ | 16,809 |
| Exercised | (460,787) | 2.73 | | |
| Canceled or forfeited | (25,800) | 26.84 | | |
| Balance as of March 31, 2023 | 517,740 | 14.46 | 2.4 $ | 35,151 |
| Exercised | (256,440) | 1.84 | | |
| Balance as of March 31, 2024 | 261,300 | 26.84 | 2.9 $ | 44,209 |
| | | | | |
| Exercisable, March 31, 2024 | 261,300 | 26.84 | 2.9 $ | 44,209 |

[1] The aggregate intrinsic value is calculated as the difference between the exercise price of the underlying awards and the Company's closing stock price of $196.03, as reported on the New York Stock Exchange on March 28, 2024.

As of March 31, 2024, there was no further unrecognized compensation cost related to performance-based and market-based vesting stock options.

Additional information relating to options that vest based upon the satisfaction of performance or market conditions is as follows (in thousands):

| | Fiscal year ended March 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Intrinsic value of options exercised | $ 27,718 | $ 23,860 | $ 2,921 |

*Restricted stock awards and restricted stock units*

The following table summarizes the activities for restricted stock awards ("RSAs") and restricted stock units ("RSUs"), including performance-based RSUs, as follows:

| | Shares of restricted stock outstanding | Weighted-average grant date fair value |
|---|---|---|
| Balance as of March 31, 2021 | 2,289,615 | 14.67 |
| Granted | 1,103,890 | 27.62 |
| Vested | (926,250) | 14.50 |
| Canceled or forfeited | (191,513) | 16.67 |
| Balance as of March 31, 2022 | 2,275,742 | 20.85 |
| Granted | 1,180,167 | 28.59 |
| Vested | (1,066,516) | 18.88 |
| Canceled or forfeited | (260,620) | 22.24 |
| Balance as of March 31, 2023 | 2,128,773 | 25.94 |
| Granted | 526,280 | 111.41 |
| Vested | (649,592) | 24.57 |
| Canceled or forfeited | (62,594) | 51.75 |
| Balance as of March 31, 2024 | 1,942,867 | 48.67 |

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

The Company has historically granted both service based and performance-based RSUs to its executive officers. Service based RSUs vest over time based on continued employment of the participant. The performance-based RSUs vest based upon the achievement of certain performance goals and continued employment of the participant through the determination date of the achievement of the respective performance goals. Service based RSU awards are also granted annually to every Company employee, and vest over time based on continued employment of the participant.

As of March 31, 2024, there were 75,124 unvested shares subject to RSAs outstanding. Additional information relating to RSAs and RSUs (including performance-based RSUs), is as follows (in thousands):

| | Fiscal year ended March 31, | | |
| --- | --- | --- | --- |
| | 2024 | 2023 | 2022 |
| Stock based compensation expense: | | | |
| Cost of sales | $ 16 | $ 112 | $ 311 |
| Selling, general and administrative expense | 40,462 | 28,661 | 18,411 |
| Total | $ 40,478 | $ 28,773 | $ 18,722 |
| | | | |
| Intrinsic value of restricted stock released | $ 73,124 | $ 47,713 | $ 25,621 |

As of March 31, 2024, there was $78.1 million of total unrecognized compensation cost related to unvested RSAs and RSUs (including performance-based RSUs), which is expected to be recognized over the remaining weighted-average vesting period of 1.7 years.

**Note 14—Repurchase of common stock**

On May 8, 2019, the Company announced that its board of directors authorized a share repurchase program to acquire up to $25.0 million of the Company's common stock (the "Share Repurchase Program"). Purchases under the Share Repurchase Program may be made from time to time through a variety of methods, which may include open market purchases, privately negotiated transactions, block trades, accelerated share repurchase transactions, or by any combination of such methods. The timing and amount of any repurchases pursuant to the Share Repurchase Program will be determined based on market conditions, share price and other factors. The Share Repurchase Program does not have an expiration date, does not require the Company to repurchase any specific number of shares of its common stock, and may be modified, suspended or terminated at any time without notice. There is no guarantee that any additional shares will be purchased under the Share Repurchase Program and such shares are intended to be retired after purchase.

The covenants in the Amended Credit Agreement require the Company to be in compliance with certain leverage ratios to make repurchases under the Share Repurchase Program.

The Company did not repurchase any shares during the three and twelve months ended March 31, 2024. A total of $17.1 million remains available for purchase under the Share Repurchase Program as of March 31, 2024.

**Note 15—Employee benefit plan**

The Company maintains a defined contribution 401(k) profit-sharing plan (the "401(k) Plan") for eligible employees. Participants may make voluntary contributions up to the maximum amount allowable by law. The Company may make contributions to the 401(k) Plan on a discretionary basis which vest to the participants 100%. The Company made matching contributions of $0.7 million, $0.5 million and $0.4 million to the 401(k) Plan during the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022, respectively.

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

**Note 16—Net income per share**

The following is a reconciliation of the numerator and denominator in the basic and diluted net income per common share computations (in thousands, except share and per share data):

| | Fiscal year ended March 31, | | |
| --- | --- | --- | --- |
| | 2024 | 2023 | 2022 |
| **Numerator:** | | | |
| Net income | $ 127,663 | $ 61,530 | $ 21,770 |
| | | | |
| **Denominator:** | | | |
| Weighted average common shares outstanding — basic | 54,747,930 | 52,474,811 | 50,940,808 |
| Dilutive common equivalent shares from equity awards | 3,040,524 | 2,862,743 | 2,713,495 |
| Weighted average common shares outstanding —diluted | 57,788,454 | 55,337,554 | 53,654,303 |
| | | | |
| **Net income per share:** | | | |
| Basic | $ 2.33 | $ 1.17 | $ 0.43 |
| Diluted | $ 2.21 | $ 1.11 | $ 0.41 |
| | | | |
| Weighted average anti-dilutive shares from outstanding equity awards excluded from diluted earnings per share | 44,772 | 194,289 | 20,314 |

**Note 17—Leases**

The Company leases warehouses, distribution centers, office space and equipment. The majority of the Company's leases include one or more options to renew, with renewal terms that can extend the lease term for up to five years. The exercise of lease renewal options is at the Company's sole discretion and such renewal options are included in the lease term if they are reasonably certain to be exercised. Certain leases also include options to purchase the leased asset. The Company's lease agreements do not contain any material residual value guarantees or material restrictive covenants. Most of the Company's equipment leases are finance leases of assets used to operate its distribution center in Ontario, California.

Significant judgment is required to determine whether commercial contracts contain a lease for purposes of ASC 842. The Company uses its incremental borrowing rate to determine the present value of lease payments.

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

Supplemental balance sheet information related to leases as of March 31, 2024 and March 31, 2023 is as follows (in thousands):

|  | Classification | March 31, 2024 | March 31, 2023 |
|---|---|---|---|
| **Assets** | | | |
| Operating lease assets | Other assets | $ 27,415 | $ 14,071 |
| Finance lease assets [a] | Other assets | — | 245 |
| Total leased assets | | $ 27,415 | $ 14,316 |
| **Liabilities** | | | |
| Current | | | |
| Operating | Accrued expenses and other current liabilities | $ 7,016 | $ 4,510 |
| Finance | Current portion of long-term debt and finance lease obligations | 57 | 575 |
| Noncurrent | | | |
| Operating | Long-term operating lease obligations | 21,459 | 11,201 |
| Finance | Long-term debt and finance lease obligations | — | 58 |
| Total lease liabilities | | $ 28,532 | $ 16,344 |

_____
[a] Finance leases are recorded net of accumulated amortization of $1.5 million and $3.4 million as of March 31, 2024 and March 31, 2023, respectively.

For the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022, the components of operating and finance lease costs were as follows (in thousands):

|  | Classification | Fiscal year ended March 31, | | |
|---|---|---|---|---|
|  |  | 2024 | 2023 | 2022 |
| Operating lease cost | Selling, general and administrative ("SG&A") expenses | $ 7,341 | $ 4,638 | $ 4,686 |
| Finance lease cost | | | | |
| Amortization of leased assets | SG&A expenses | 210 | 420 | 436 |
| Interest on lease liabilities | Interest expense, net | 10 | 31 | 63 |
| Total lease cost | | $ 7,561 | $ 5,089 | $ 5,185 |

As of March 31, 2024, the aggregate future minimum lease payments under non-cancellable leases are as follows (in thousands):

| Year ending March 31, | Operating leases | Finance leases | Total |
|---|---|---|---|
| 2025 | $ 8,332 | $ 57 | $ 8,389 |
| 2026 | 8,898 | — | 8,898 |
| 2027 | 5,537 | — | 5,537 |
| 2028 | 2,419 | — | 2,419 |
| 2029 | 1,956 | — | 1,956 |
| Thereafter | 5,417 | — | 5,417 |
| Total lease payments | 32,559 | 57 | 32,616 |
| Less: Interest | 4,084 | — | 4,084 |
| Present value of lease liabilities | $ 28,475 | $ 57 | $ 28,532 |

Table of Contents

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to consolidated financial statements**

As of March 31, 2024 and March 31, 2023, the weighted average remaining lease term (in years) and discount rate were as follows:

|  | March 31, 2024 | March 31, 2023 |
|---|---|---|
| Weighted-average remaining lease term |  |  |
| Operating leases | 4.8 years | 4.6 years |
| Finance leases | 0.2 years | 0.9 years |
| Weighted-average discount rate |  |  |
| Operating leases | 5.1 % | 2.6 % |
| Finance leases | 1.6 % | 2.6 % |

Operating cash outflows from operating leases for the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022 were $6.0 million, $4.9 million and $5.1 million, respectively.

**Note 18—Quarterly financial summary (unaudited)**

Unaudited quarterly results for the last three years were as follows (in thousands, except per share data):

| 2024 | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| Net sales | $ 216,339 | $ 215,507 | $ 270,943 | $ 321,143 |
| Gross profit | 152,572 | 152,365 | 191,957 | 227,202 |
| Net income | 52,977 | 33,271 | 26,888 | 14,527 |
| Net income per share: |  |  |  |  |
| Basic | 0.98 | 0.61 | 0.49 | $ 0.26 |
| Diluted | $ 0.93 | $ 0.58 | $ 0.46 | $ 0.25 |

| 2023 | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| Net sales | $ 122,601 | $ 122,349 | $ 146,537 | 187,357 |
| Gross profit | 82,985 | 79,560 | 98,725 | 129,126 |
| Net income | 14,469 | 11,710 | 19,105 | 16,246 |
| Net income per share: |  |  |  |  |
| Basic | 0.28 | 0.22 | 0.36 | $ 0.31 |
| Diluted | $ 0.27 | $ 0.21 | $ 0.34 | $ 0.29 |

| 2022 | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| Net sales | $ 97,047 | $ 91,855 | $ 98,118 | $ 105,135 |
| Gross profit | 61,906 | 57,985 | 64,341 | 67,500 |
| Net income | 8,276 | 5,724 | 6,214 | 1,556 |
| Net income per share: |  |  |  |  |
| Basic | 0.16 | 0.11 | 0.12 | 0.03 |
| Diluted | $ 0.15 | $ 0.11 | $ 0.12 | $ 0.03 |

**Exhibit 10.17**

**List of Significant Subsidiaries of**
**e.l.f. Beauty, Inc.**

| Subsidiary | Jurisdiction of Incorporation or Organization |
|---|---|
| e.l.f. Cosmetics, Inc. | Delaware |
| W3LL People, Inc. (a wholly owned subsidiary of e.l.f. Cosmetics, Inc.) | Delaware |
| | |
| Naturium Holdings, Inc. (a wholly owned subsidiary of e.l.f. Cosmetics, Inc.) | Delaware |
| Naturium LLC (a wholly owned subsidiary of Naturium Holdings, Inc.) | Delaware |
| e.l.f. Beauty UK Limited (a wholly owned subsidiary of e.l.f. Cosmetics, Inc.) | England and Wales |
| J.A. China Holdings, LLC (a wholly owned subsidiary of e.l.f. Cosmetics, Inc.) | Delaware |
| | |
| e.l.f. (Shanghai) Trading Co., Ltd. (a wholly owned subsidiary of J.A. China Holdings, LLC) | People's Republic of China – Wholly Foreign-Owned Enterprise |

**e.l.f. Beauty, Inc.**

**Amended and Restated Insider Trading Compliance Program**

This Amended and Restated Insider Trading Compliance Program (the "***Program***") consists of six sections:

- Section I provides an overview;

- Section II sets forth e.l.f. Beauty, Inc.'s policies prohibiting insider trading;

- Section III explains insider trading;

- Section IV consists of various procedures which have been put in place by e.l.f. Beauty, Inc. to prevent insider trading, including the prohibition of short sales, publicly traded options and hedging transactions and the prohibition of margin purchases and pledging of Company securities by officers and directors;

- Section V explains Rule 10b5-1 trading plans and provides information regarding Section 16 and Rule 144; and

- Section VI refers to the execution and return of a compliance certificate.

## I.  Summary

Preventing insider trading is necessary to comply with securities law and to preserve the reputation and integrity of e.l.f. Beauty, Inc. and its subsidiaries (together, the "***Company***") as well as that of all persons affiliated with the Company. "***Insider trading***" occurs when any person purchases or sells a security while in possession of inside information relating to the security. As explained in Section III below, "***inside information***" is information which is considered to be both "material" and "non-public." Insider trading is a crime, and the penalties for violating the law include imprisonment, disgorgement of profits, civil fines, and criminal fines for individuals and entities. Insider trading is also prohibited by this Program and could result in serious sanctions, including dismissal.

This Program applies to all officers, directors and employees of the Company and extends to all activities within and outside an individual's duties at the Company. This Program also applies to family members of the Company's officers, directors and employees, as well as other members of such individuals' households and entities (including trusts, partnerships and corporations) controlled by any individual subject to this Program. References to officers, directors and employees below include the family members, other household members and controlled entities of such officers, directors and employees.

Questions regarding this Program should be directed to the Company's General Counsel or Chief Financial Officer.

1

## II.    Policies Prohibiting Insider Trading

No officer, director or employee shall purchase or sell any type of security while in possession of material non-public information relating to the security or the issuer of such security in breach of a duty of trust or confidence, whether the issuer of such security is the Company or any other company.

No officer, director or employee shall directly or indirectly tip or otherwise provide material non-public information to anyone while in possession of such information. In addition, material non-public information should not be communicated to anyone outside the Company under any circumstances (absent prior approval from the Company's General Counsel or Chief Financial Officer and execution of an appropriate confidentiality agreement), or to anyone within the Company other than on a need-to-know basis.

## III.    Explanation of Insider Trading

As noted above, "***insider trading***" refers to the purchase or sale of a security while in possession of "material" "non-public" information relating to the security. "***Securities***" include not only stocks, bonds, notes and debentures, but also stock options, warrants and similar instruments. "Purchase" and "sale" are defined broadly under the federal securities law. "***Purchase***" includes not only the actual purchase of a security, but any contract to purchase or otherwise acquire a security. "***Sale***" includes not only the actual sale of a security, but any contract to sell or otherwise dispose of a security. These definitions extend to a broad range of transactions including conventional cash-for-stock transactions, conversions, the grant and exercise of stock options, and acquisitions and exercises of warrants or puts, calls or other options related to a security. It is generally understood that insider trading includes the following:

- Trading by insiders while in possession of material non-public information;

- Trading by persons other than insiders while in possession of material non-public information where the information either was given in breach of an insider's fiduciary duty to keep it confidential or was misappropriated; or

- Communicating or tipping material non-public information to others, including recommending the purchase or sale of a security while in possession of such information.

### A.    What Facts are Material?

The materiality of a fact depends upon the circumstances. A fact is considered "material" if there is a substantial likelihood that a reasonable investor would consider it important in making a decision to buy, sell or hold a security or if the fact is likely to have a significant effect on the market price of the security. Material information can be positive or negative and can relate to virtually any aspect of a company's business or to any type of security, debt or equity.

Examples of material information include (but are not limited to) information about corporate earnings, earnings forecasts, possible acquisitions or dispositions, major new products or product developments, significant product delays, defects, recalls or discontinuations, significant changes in raw material costs, significant developments regarding contract manufacturers, important business developments such as major contract awards or cancellations, senior-level management or control changes, significant financing developments including pending public sales or offerings of debt or equity

2

securities, defaults on borrowings, bankruptcies, cybersecurity or data security incidents, significant asset write-offs and significant litigation developments. Moreover, material information does not have to be related to a company's business. For example, the contents of a forthcoming newspaper column that is expected to affect the market price of a security can be material.

A good general rule of thumb: **When in doubt, do not trade.**

B.    What is Non-Public?

Information is "***non-public***" if it is not available to the general public. In order for information to be considered public, it must be widely disseminated in a manner making it generally available to investors through such media as <u>Dow Jones</u>, <u>Business Wire</u>, <u>PR Newswire</u>, <u>Reuters Economic Services</u>, <u>The Wall Street Journal</u>, <u>Associated Press</u> or <u>United Press International</u>. The circulation of rumors, even if accurate and reported in the media, does not constitute effective public dissemination.

In addition, even after a public announcement, a reasonable period of time must lapse in order for the market to react to the information. Generally, one should allow approximately 48 hours following publication as a reasonable waiting period before such information is deemed to be public.

C.    Who is an Insider?

"***Insiders***" include officers, directors and employees of a company and anyone else who has material inside information about a company, such as representatives of independent auditors and outside counsel who have access to such information. Insiders have independent fiduciary duties to the company and its stockholders not to trade on material non-public information relating to the company's securities. All officers, directors and employees of the Company should consider themselves insiders with respect to material non-public information about the Company's business, activities and securities. Officers, directors and employees may not trade the Company's securities while in possession of material non-public information relating to the Company nor tip (or communicate to anyone within the Company except on a need-to-know basis) such information to others.

The policies and prohibitions contained in this Program will continue to apply to the officer, director or employee after the termination of his or her employment or service with the Company for so long as he or she is in possession of material non-public information about the Company.

D.    Trading by Persons Other than Insiders

Insiders may be liable for communicating or tipping material non-public information to a third party (a "***tippee***"), and insider trading violations are not limited to trading or tipping by insiders. Persons other than insiders also can be liable for insider trading, including tippees who trade on material non-public information tipped to them or individuals who trade on material non-public information which has been misappropriated.

Tippees inherit an insider's duties and are liable for trading on material non-public information illegally tipped to them by an insider. Similarly, just as insiders are liable for the insider trading of their tippees, so are tippees who pass the information along to others who trade. In other words, a tippee's liability for insider trading is no different from that of an insider. Tippees can obtain material non-public information by receiving overt tips from others or through, among other things, conversations at social, business or other gatherings.

3

E.    Penalties for Engaging in Insider Trading

Penalties for trading on or tipping material non-public information can extend significantly beyond any profits made or losses avoided, both for individuals engaging in such unlawful conduct and their employers. The Securities and Exchange Commission (the "**SEC**") and the Department of Justice have made the civil and criminal prosecution of insider trading violations a top priority. Enforcement remedies available to the government or private plaintiffs under the federal securities laws include:

- SEC administrative sanctions;

- Securities industry self-regulatory organization sanctions;

- Civil injunctions;

- Damage awards to private plaintiffs;

- Disgorgement of all profits;

- Civil fines for the violator;

- Civil fines for the employer or other controlling person of a violator (i.e., where the violator is an employee or other controlled person);

- Criminal fines for individual or entity violators; and

- Jail sentences.

In addition, insider trading could result in serious sanctions by the Company, including dismissal. Insider trading violations are not limited to violations of the federal securities laws. Other federal and state civil or criminal laws, such as the laws prohibiting mail and wire fraud and the Racketeer Influenced and Corrupt Organizations Act (RICO), also may be violated upon the occurrence of insider trading.

F.    Size of Transaction and Reason for Transaction Do Not Matter

The size of the transaction or the amount of profit received does not have to be significant to result in prosecution. The SEC has the ability to monitor even the smallest trades, and the SEC performs routine market surveillance. Brokers or dealers are required by law to inform the SEC of any possible violations by people who may have material non-public information. The SEC aggressively investigates even small insider trading violations.

G.    Examples of Insider Trading

Examples of insider trading cases include actions brought against corporate officers, directors and employees who traded a company's securities after learning of significant confidential corporate developments; friends, business associates, family members and other tippees of such officers, directors and employees who traded the securities after receiving such information; government employees who learned of such information in the course of their employment; and other persons who misappropriated, and took advantage of, confidential information from their employers.

The following are illustrations of insider trading violations. These illustrations are hypothetical and, consequently, not intended to reflect on the actual activities or business of the Company or any other entity.

Trading by Insider

An officer of X Corporation learns that earnings to be reported by X Corporation will increase dramatically. Prior to the public announcement of such earnings, the officer purchases X Corporation's stock. The officer, an insider, is liable for all profits as well as penalties of up to three times the amount of all profits. The officer also is subject to, among other things, criminal prosecution, including up to $5,000,000 in additional fines and 20 years in jail. Depending upon the circumstances, X Corporation and the individual to whom the officer reports also could be liable as controlling persons.

Trading by Tippee

An officer of X Corporation tells a friend that X Corporation is about to publicly announce that it has concluded an agreement for a major acquisition. This tip causes the friend to purchase X Corporation's stock in advance of the announcement. Regardless of whether the officer knew that his or her friend would purchase X Corporation's stock based on the material non-public information provided, the officer is jointly liable with his friend for all of the friend's profits and each is liable for all penalties of up to three times the amount of the friend's profits. In addition, the officer and his friend are subject to, among other things, criminal prosecution, as described above.

H.    Prohibition of Records Falsifications and False Statements

Section 13(b)(2) of the Securities Exchange Act of 1934, as amended (the "*1934 Act*"), requires companies subject to the 1934 Act to maintain proper internal books and records and to devise and maintain an adequate system of internal accounting controls. The SEC has supplemented the statutory requirements by adopting rules that prohibit (1) any person from falsifying records or accounts subject to the above requirements and (2) officers or directors from making any materially false, misleading or incomplete statement to any accountant in connection with any audit or filing with the SEC. These provisions reflect the SEC's intent to discourage officers, directors and other persons with access to the Company's books and records from taking action that might result in the communication of materially misleading financial information to the investing public.

5

**IV.    Procedures Preventing Insider Trading; Prohibition of Short Sales, Publicly Traded Options and Hedging Transactions; Prohibition of Margin Purchases and Pledging of Company Securities by Officers and Directors**

We have established the following procedures, and will maintain and enforce them, to prevent insider trading. Every officer, director and employee is required to follow these procedures.

A.    Identifying Material Non-public Information

Prior to directly or indirectly trading any security of the Company, every officer, director and employee listed on Schedule I is required to obtain the approval of the Company's General Counsel or Chief Financial Officer (as part of the pre-clearance procedure discussed below in Section D), who will make a determination whether the Company and/or such officer, director or employee is in possession of material non-public information relating to such security. In making such assessment, the explanations of "material" and "non-public" information set forth above should be of assistance. If the Company's General Counsel or Chief Financial Officer determines that the Company and/or such officer, director or employee is in possession of material non-public information, there may be no trading of such security.

B.    Information Relating to the Company

1.    Access to Information

Access to material non-public information about the Company, including the Company's business, earnings or prospects, should be limited to officers, directors and employees of the Company on a need-to-know basis. In addition, such information should not be communicated to anyone outside the Company under any circumstances (absent prior approval by the Company's Chief Executive Officer, General Counsel or Chief Financial Officer and execution of an appropriate confidentiality agreement) or to anyone within the Company on an other than need-to-know basis.

In communicating material non-public information to employees of the Company, all officers, directors and employees must take care to emphasize the need for confidential treatment of such information and adherence to the Company's policies with regard to confidential information.

2.    Inquiries From Third Parties

Inquiries from third parties, such as industry analysts or members of the media, about the Company should be directed to the Company's Chief Executive Officer, General Counsel or Chief Financial Officer.

C.    Limitations on Access to the Company Information

The following procedures are designed to maintain confidentiality with respect to the Company's business operations and activities.

1.    All officers, directors and employees should take all steps and precautions necessary to restrict access to, and secure, material non-public information by, among other things:

•    Maintaining the confidentiality of Company related transactions;

6

- Conducting their business and social activities so as not to risk inadvertent disclosure of confidential information. Review of confidential documents in public places should be avoided, and only if absolutely necessary conducted so as to prevent access by unauthorized persons;

- Restricting access to documents and files (including computer files) containing material non-public information to individuals on a need-to-know basis (including maintaining control over the distribution of documents and drafts of documents);

- Promptly removing and cleaning up all confidential documents and other materials from conference rooms following the conclusion of any meetings;

- Disposing of all confidential documents and other papers after there is no longer any business or other legal reason to keep through shredders when appropriate;

- Restricting access to areas likely to contain confidential documents or material non-public information; and

- Avoiding the discussion of material non-public information in places where the information could be overheard by others such as in elevators, restrooms, hallways, restaurants, airplanes or taxicabs.

2. Personnel involved with material non-public information, to the extent feasible, should conduct their business and activities in areas separate from other Company activities.

7

D.    Quarterly Black-out Periods

Neither the Company nor any of its officers, directors or employees listed on Schedule I may purchase or sell any securities of the Company during the period beginning 21 days before the end of any fiscal quarter of the Company and ending two full trading days after the public release of earnings data for such fiscal quarter, except for:

(a)    the exercise of stock options or other equity awards or the surrender of shares to the Company in payment of the exercise price or in satisfaction of any tax withholding obligations in a manner permitted by the applicable equity award agreement, or vesting of equity-based awards, in each case, that do not involve a market sale or the sale to a third party of Company securities (a "broker's cashless exercise" of a Company stock option *does* involve the sale of Company common stock and therefore would not qualify under this exception);

(b)    purchases of the Company's securities from the Company, sale of the Company's securities to the Company, or the granting of stock awards by the Company;

(c)    *bona fide* gifts of the Company's securities, unless the individual making the gift knows, or is reckless in not knowing, the recipient intends to sell the securities while the donor is in possession of material nonpublic information about the Company; and

(d)    subject to Section V.B below, purchases or sales of Company securities made pursuant to any binding contract, specific instruction or written plan entered into while the purchaser or seller, as applicable, was unaware of any material non-public information and which contract, instruction or plan (I) meets all requirements of the affirmative defense provided by Rule 10b5-1, (ii) was pre-cleared in advance pursuant to this Program, and (iii) has not been amended or modified in any respect after such initial pre-clearance without such amendment or modification being pre-cleared in advance pursuant to this Program.

For the purposes of this Program, a "trading day" shall mean a day on which national stock exchanges are open for trading.

E.    Pre-Clearance of Trades by Officers, Directors and Certain Employees; Event-Specific Trading Restrictions

To provide assistance in preventing inadvertent violations of applicable securities laws and to avoid the appearance of impropriety in connection with the purchase and sale of the Company securities:

•    Pre-clearance of Transactions by Officers, Directors and Employees Listed on Schedule I. All transactions in Company securities (including, without limitation, acquisitions and dispositions of Company securities and the sale of Company common stock issued upon exercise of stock options) by officers, directors and employees listed on Schedule I *must* be pre-cleared by the Company's General Counsel or Chief Financial Officer.

•    Event-Specific Trading Restrictions. In addition, from time to time, the Company, through the Board of Directors, the Company's disclosure committee, the Chief Financial Officer or General Counsel, may recommend that officers, directors, employees or others suspend trading in our securities because of developments that have not yet been disclosed to the public.

8

The foregoing restrictions shall not apply to (a) the exercise of stock options that does not involve the sale to a third party of Company securities (a "broker's cashless exercise" of a Company stock option *does* involve the sale of Company common stock and therefore would not qualify under this exception), including the exercise of a tax withholding right pursuant to which an option holder has elected to have the Company withhold shares subject to an option to satisfy tax withholding requirements, (b) the granting of stock awards by the Company, (c) the vesting, receipt or purchase of shares in settlement of any restricted stock or restricted stock unit agreement (but not the sale of any such shares), including the payment of any associated taxes through the surrender or sale of shares received from such stock award (or the right to receive such shares), and (d) subject to Section V.B below, purchases or sales of Company securities made pursuant to any binding contract, specific instruction or written plan entered into while the purchaser or seller, as applicable, was unaware of any material non-public information and which contract, instruction or plan (i) meets all requirements of the affirmative defense provided by Rule 10b5-1, (ii) was pre-cleared in advance pursuant to this Program, and (iii) has not been amended or modified in any respect after such initial pre-clearance without such amendment or modification being pre-cleared in advance pursuant to this Program.

When a request for pre-clearance is made, the requestor should carefully consider whether he or she may be aware of any material non-public information about the Company and must certify that he or she is not aware of material non-public information about the Company. If the requestor is an officer or director of the Company, the requestor should also indicate whether he or she has effected any non-exempt "opposite-way" transactions within the past six months, and should be prepared to report the proposed transaction in an appropriate Section 16 filing (i.e., Form 4). If the requestor is subject to Rule 144, the requestor should also be prepared to comply with SEC Rule 144 and file a Form 144, if necessary, at the time of any sale. See Section V below for more information regarding Section 16 and Rule 144.

Subject to the exceptions noted above, all those affected should not trade in our securities while the suspension is in effect and should not disclose to others that we have suspended trading. Also, please consult the "Insider Trading Reminders" attached to this Program as "Attachment A."

      F.    <u>Prohibition of Short Sales, Publicly Traded Options and Hedging Transactions; Prohibition of Margin Purchases and Pledging of Company Securities by Officers and Directors</u>

      1.    <u>Short Sales</u>

Short sales of the Company's securities evidence an expectation on the part of the seller that the securities will decline in value, and therefore signal to the market that the seller has no confidence in the Company or its short-term prospects. In addition, short sales may reduce the seller's incentive to improve the Company's performance. For these reasons, short sales of the Company's securities are prohibited by this Program. In addition, Section 16(c) of the 1934 Act absolutely prohibits insiders from making short sales of the Company's securities (*i.e.*, sales of shares which the insider does not own at the time of sale, or sales of Company securities against which the insider does not deliver the shares within 20 days after the sale).

      2.    <u>Publicly Traded Options</u>

A transaction in options is, in effect, a bet on the short-term movement of the Company's securities and therefore creates the appearance that an officer, director or employee is trading based on

9

inside information. Transactions in options also may focus an officer's, director's or employee's attention on short-term performance at the expense of the Company's long-term objectives. Accordingly, transactions in puts, calls or other derivative securities involving the Company's securities, on an exchange or in any other organized market, are prohibited by this Program.

3.    Hedging Transactions

Certain forms of hedging or monetization transactions, such as zero-cost collars and forward sale contracts, allow an officer, director or employee to lock in much of the value of his or her stock holdings, often in exchange for all or part of the potential for upside appreciation in the stock. These transactions allow such officer, director or employee to continue to own the covered securities, but without the full risks and rewards of ownership. When that occurs, the officer, director or employee may no longer have the same objectives as the Company's other stockholders. Therefore, such transactions involving the Company's securities are prohibited by this Program.

4.    Purchases of the Company's Securities on Margin; Pledging the Company's Securities to Secure Margin or Other Loans

The Company does not permit officers and directors to purchase the Company's securities on margin or to pledge the Company's securities as collateral to secure loans. This prohibition means, among other things, that officers and directors cannot hold the Company's securities in a "margin account" (which would allow them to borrow against their holdings to buy securities).

Nothing in this Program is intended to limit the ability of an investment fund, venture capital partnership or other similar entity with which a director is affiliated to distribute Company securities to its partners, members, or other similar persons. It is the responsibility of each affected director and the affiliated entity, in consultation with their own counsel (as appropriate), to determine the timing of any distributions, based on all relevant facts and circumstances, and applicable securities laws.

## V.    Rule 10b5-1 Trading Plans; Section 16 and Rule 144

A.    Rule 10b5-1 Trading Plans

Rule 10b5-1 trading plans are designed to protect directors, officers and employees from insider trading liability under Rule 10b5-1 for transactions under a previously established contract, plan or instruction to trade the Company's securities (a "***Trading Plan***") entered into in good faith and in accordance with the terms of Rule 10b5-1 and all applicable state laws and shall be exempt from the trading restrictions set forth in the Program. The initiation of, and any modification to, any such Trading Plan will be deemed to be a transaction in the Company's securities, and such initiation or modification is subject to all limitations and prohibitions of transactions involving the Company's securities. Each such Trading Plan, and any modification thereof, shall be submitted to and pre-approved by the Company's General Counsel, Chief Financial Officer or such other person as the Company's board of directors may designate from time to time (the "***Authorizing Officer***"), who may impose such conditions on the implementation and operation of the Trading Plan as the Authorizing Officer deems necessary or advisable. However, compliance of the Trading Plan to the terms of Rule 10b5-1 and the execution of transactions pursuant to the Trading Plan are the sole responsibility of the person initiating the Trading Plan, not the Company or the Authorizing Officer.

10

Rule 10b5-1 presents an opportunity for insiders to establish arrangements to sell (or purchase) Company securities without the restrictions of windows and black-out periods even when there is undisclosed material information. A Trading Plan may also help reduce negative publicity that may result when key executives sell the Company's securities. Rule 10b5-1 only provides an "affirmative defense" in the event there is an insider-trading lawsuit. It does not prevent someone from bringing a lawsuit.

A director, officer or employee may enter into a Trading Plan only when he or she is not in possession of material non-public information, and only during a trading window period outside of the black-out period. Although transactions effected under a Trading Plan will not require further pre-clearance at the time of the trade, any transaction (including the quantity and price) made pursuant to a Trading Plan of a Section 16 reporting person must be reported to the Company promptly on the day of each trade to permit the Company's filing coordinator to assist in the preparation and filing of a required Form 4.

The Company reserves the right from time to time to suspend, discontinue or otherwise prohibit any transaction in Company securities, even pursuant to a previously approved Trading Plan, if the Authorizing Officer or the board of directors, in his, her or its discretion, determines that such suspension, discontinuation or other prohibition is in the best interests of the Company. Any Trading Plan submitted for approval hereunder should explicitly acknowledge the Company's right to prohibit transactions in Company securities. Failure to discontinue purchases and sales as directed is a violation of the terms of this Section V and will result in a loss of the Trading Plan exemption set forth in this Section V.

In addition, the Company reserves the right to publicly disclose, announce, or respond to inquiries from the media regarding the adoption, amendment, termination, or revocation of a Trading Plan and non-Rule 10b5-1 trading arrangements, or the execution of transactions made under a Trading Plan.

*Timing.* Officers, directors and employees may adopt Trading Plans with brokers that outline a pre-set plan for trading of the Company's securities, including the exercise of stock options. Trading Plans are to be implemented only during open window periods and when the individual is not aware of any material non-public information.

Rule 10b5–1(c)(1) provides an affirmative defense to Section 10(b) and Rule 10b–5 liability, and an individual's purchase or sale of securities will not be "on the basis of" material non-public information, if a person satisfies the following conditions:

- First, before becoming aware of the information, the individual in good faith enters into a binding contract to purchase or sell the securities, provides instructions to another person to purchase or sell the securities or adopts a written plan for trading the securities (i.e., the Trading Plan).

- Second, the Trading Plan must:

  - specify the amount of securities to be purchased or sold, the price at which the securities are to be purchased or sold and the date on which the securities are to be purchased or sold; or

  - include a written formula or computer algorithm for determining the amount of securities to be purchased or sold and the price at which and date on which the securities are to be purchased or sold; and

11

- prohibit the individual from exercising any subsequent influence over the purchase or sale of the Company's securities under the Trading Plan in question.

- Third, the purchase or sale must occur pursuant to the Trading Plan and the individual must not enter into a corresponding hedging transaction or alter or deviate from the Trading Plan.

- Fourth, directors and officers subject to the reporting requirements of Section 16 of the 1934 Act ("***Section 16 Officer***") must include a representation in their Trading Plan certifying that at the time of the adoption of a new or modified Trading Plan: (1) they are not aware of material nonpublic information about the Company or its securities and (2) they are adopting the Trading Plan in good faith and not as part of a plan or scheme to evade the prohibitions of Rule 10b-5.

- Finally, the individual must act in good faith with respect to the Trading Plan.

*Cooling-Off Period*. Trades pursuant to a Trading Plan for Section 16 Officers and directors may not occur until the later of: (i) 90 days following the Trading Plan adoption or modification or (ii) two (2) business days following the disclosure of the Company's financial results in a Form 10-Q or Form 10-K for the fiscal quarter in which the Trading Plan was adopted or modified (but, in any event, this required cooling-off period is subject to a maximum of 120 days after adoption or modification). For all other employees and any other persons, other than the Company, trades pursuant to a Trading Plan may not occur until 30 days following the Trading Plan adoption or modification.

*Limitations on the Number of Plans that May Be Adopted*. An individual may not rely on the affirmative defense provided by Rule 10b5-1 for (i) overlapping Trading Plans for open market purchases or sales of any class of securities of the Company or (ii) more than one single-trade Trading Plan during any consecutive 12-month period. The limitation on overlapping Trading Plans does **not** apply to: (i) Trading Plans that authorize qualified sell-to-cover transactions (i.e., "the plan authorizes an agent to sell only such securities as are necessary to satisfy tax withholding obligations incident to the vesting of a compensatory award"), which exception does not apply to sales incident to the exercise of stock options, and the individual does not otherwise control the timing of the sales; (ii) a series of separate Trading Plans with different broker-dealers or other agents acting on behalf of the person (other than the Company) to execute trades of securities held in separate accounts, provided that the contracts with each broker-dealer or other agent, when taken together as a whole, meet all of the applicable conditions of and remain collectively subject to Rule 10b5-1(c)(1); or (iii) two separate Rule 10b5-1 plans maintained at the same time, so long as trading under the later-commencing plan is not authorized to begin until after all trades under the earlier-commencing plan are completed or expire without execution.[1]

  1. Revocation/Amendments to Trading Plans

Revocation or amendment of Trading Plans should occur only in unusual circumstances.

Effectiveness of any revocation of a Trading Plan will be subject to the prior review and approval of the Authorizing Officer. Subject to the prior review and approval of the Authorizing Officer, a person acting in good faith may amend a prior Trading Plan so long as such amendments are made outside of a

---

[1] If the earlier-commencing plan is terminated prior to its expiration date, then the cooling-off period for the later-commencing plan will be deemed to commence as of the date of the termination of the earlier-commencing plan.

12

quarterly trading black-out period and at a time when the Trading Plan participant does not possess material non-public information. Trading Plan amendments that change the amount, price or timing of the purchase or sale of the securities underlying the Trading Plan will trigger a new cooling-off period as set forth in Section V.A. above for newly adopted Trading Plans.

You should note that revocation or amendment of a Trading Plan can result in the loss of an affirmative defense for past or future transactions under a Trading Plan. You should consult with your own legal counsel before deciding to revoke or amend a Trading Plan.

Under certain circumstances, a Trading Plan *must* be revoked. This includes circumstances such as the announcement of a merger or the occurrence of an event that would cause the transaction either to violate the law or to have an adverse effect on the Company. The Authorizing Officer or administrator of the Company's stock plans is authorized to notify the broker in such circumstances, thereby insulating the insider in the event of revocation.

2.    Discretionary Plans

Discretionary Trading Plans, where the discretion or control over trading is transferred to a broker, are permitted if pre-approved by the Authorizing Officer.

The Authorizing Officer must pre-approve any Trading Plan, arrangement or trading instructions, etc., involving potential sales or purchases of the Company's securities or stock option exercises, including but not limited to, blind trusts or limit orders. The actual transactions effected pursuant to a pre-approved Trading Plan will not be subject to further pre-clearance for transactions in the Company's securities once the Trading Plan or other arrangement has been pre-approved.

3.    Rule 144 and Section 16 Reporting (if Required)

An SEC Form 144 will be filled out and filed by the individual/brokerage firm in accordance with the existing rules regarding Form 144 filings. A footnote at the bottom of the Form 144 should indicate that the trades "are in accordance with a Trading Plan that complies with Rule 10b5-1 and expires ____." For Section 16 reporting persons, Forms 4 should be filed before the end of the second business day following the date that the broker, dealer or plan administrator informs the individual that a transaction was executed, provided that the date of such notification is not later than the third business day following the trade date. A similar footnote should be placed at the bottom of the Form 4 as outlined above. For more information about Rule 144 and Section 16, see Sections V.B and C below.

4.    Stock Options

Cash exercise of stock options currently can be executed at any time. "Same day sales" exercises of stock options are subject to trading windows. However, the Company will permit same day sales under Trading Plans. If a broker is required to execute a same day sale in accordance with a Trading Plan, then the Company must have exercise forms attached to the Trading Plan that are signed, undated and with the number of shares to be exercised left blank. Once a broker determines that the time is right to exercise the stock option and dispose of the shares in accordance with the Trading Plan, the broker will notify the Company in writing and the administrator of the Company's stock plans will fill in the number of shares and the date of exercise on the previously signed exercise form. The insider should not be involved with this part of the exercise.

13

5.   Trades Outside of a Trading Plan

Subject to compliance with the Program, during an open window, trades which differ from Trading Plan instructions that are already in place are allowed as long as the Trading Plan continues to be followed and the shares subject to any existing Trading Plan are not traded outside of such plan.

**Trading Plans do not exempt individuals from complying with the Section 16 six-month short-swing profit rules or from liability under Section 16.**

6.   Public Announcements and Required Disclosures

The Company may make a public announcement that Trading Plans are being implemented in accordance with Rule 10b5-1. It will consider in each case whether a public announcement of a particular Trading Plan should be made. It may also make public announcements or respond to inquiries from the media as transactions are made under a Trading Plan.

Pursuant to new Item 408(a) of Regulation S-K under the 1934 Act ("***Regulation S-K***"), the Company will be required to make quarterly disclosures regarding the adoption, modification, and termination of Trading Plans and certain other written trading arrangements by directors and Section 16 Officers for the trading of its securities and the material terms of each arrangement (other than pricing terms), such as the name and title of the director or officer, date of adoption or termination of the trading arrangement, duration of the trading arrangement, and aggregate number of securities to be purchased or sold. Additionally, pursuant to new Item 408(b) of Regulation S-K, the Company must (i) disclose annually, in Form 10-K and proxy and information statements on Schedule 14A and Schedule 14C that it has adopted the A&R Insider Trading Compliance Program; and (ii) file a copy of the A&R Insider Trading Compliance Program as an exhibit to Form 10-K.

7.   Short Sales, Publicly Traded Options and Hedging Transactions are Prohibited

As discussed above, short sales, publicly traded options and hedging transactions are prohibited by this Program. This prohibition also applies to any transaction under a Trading Plan.

8.   Purchases of the Company's Securities on Margin; Pledging the Company's Securities to Secure Margin or Other Loans

As discussed above, the Company does not permit officers and directors to purchase the Company's securities on margin or to pledge the Company's securities as collateral to secure loans. This prohibition also applies to any transaction under a Trading Plan.

B.   Section 16 (Applicable to Officers, Directors and 10% Stockholders)

1.   Reporting Obligations Under Section 16(a): SEC Forms 3, 4 and 5

Section 16(a) of the 1934 Act generally requires all Section 16 Officers, directors and 10% stockholders ("***Section 16 Insiders***") within 10 days after the insider becomes an officer, director or 10% stockholder, to file with the SEC an "Initial Statement of Beneficial Ownership of Securities" on SEC Form 3 listing the amount of the Company's common stock, stock options and warrants which the Section 16 Insider beneficially owns. Following the initial filing on Form 3, every change in the beneficial

14

ownership of the Company's common stock, stock options and warrants, including as a result of a disposition of equity securities by gift, must be reported on an SEC Form 4 within two business days after the date on which such change occurs or in certain cases on SEC Form 5 within 45 days after fiscal year end. A Form 4 must be filed even if, as a result of balancing transactions, there has been no net change in holdings. The two-day Form 4 deadline begins to run from the trade date rather than the settlement date (or for gifts, the date of the gift).

In certain situations, purchases or sales of Company securities made within six months *prior* to the filing of a Form 3 must be reported on a Form 4. Similarly, certain purchases or sales of Company securities made within six months *after* a Section 16 Officer or director ceases to be a Section 16 Insider must be reported on a Form 4.

The Legal Department office will oversee the preparation of the Section 16 forms (unless you have indicated that you prefer to prepare and file your own Forms 4). **For your personal transactions, and due to the two-business day electronic filing requirement, it is essential that you pre-clear any proposed transactions by the General Counsel or Chief Financial Officer, work directly with the E\*TRADE executive services team in order to execute any trade by contacting Cory Maughan at cory.maughan@etrade.com or execsrvcs@etrade.com, provide all information necessary for SEC reporting, respond promptly to the Legal Department's office, and otherwise assist in completing the required forms, if you wish to obtain approval of and to proceed with any proposed transaction.**

While the Company is offering its assistance to its Section 16 filers to help them comply with the Section 16 rules, you should recognize that it remains *your* obligation to see that your filings are accurate and made on time, and that you have no Section 16(b) trading liability. The Company cannot assume any legal responsibility in this regard. Under the law, if a filing is missed, you are personally responsible, notwithstanding that the Company has undertaken to prepare a required form. Please do not hesitate to call the General Counsel if you have any questions about any proposed transaction or about the Section 16 reporting requirements generally.

2.  Recovery of Profits Under Section 16(b)

For the purpose of preventing the unfair use of information which may have been obtained by a Section 16 Insider, any profits realized by any officer, director or 10% stockholder from any "purchase" and "sale" of Company securities during a six-month period, so called "short-swing profits," may be recovered by the Company. When such a purchase and sale occurs, good faith is no defense. The Section 16 Insider is liable even if compelled to sell for personal reasons, and even if the sale takes place after full disclosure and without the use of any inside information.

The liability of a Section 16 Insider under Section 16(b) of the 1934 Act is only to the Company itself. The Company, however, cannot waive its right to short swing profits, and any Company stockholder can bring suit in the name of the Company. Reports of ownership filed with the SEC on Form 3, Form 4 or Form 5 pursuant to Section 16(a) (discussed above) are readily available to the public, and certain attorneys carefully monitor these reports for potential Section 16(b) violations. In addition, liabilities under Section 16(b) may require separate disclosure in the Company's annual report on Form 10-K or its proxy statement for its annual meeting of stockholders. No suit may be brought more than two years after the date the profit was realized. However, if the Section 16 Insider fails to file a report of the transaction under Section 16(a), as required, the two-year limitation period does not begin to run until after the transactions giving rise to the profit have been disclosed. Failure to report transactions and late filing of reports require separate disclosure in the Company's proxy statements.

15

3.    Short Sales Prohibited under Section 16(c)

Section 16(c) of the 1934 Act prohibits Section 16 Insiders absolutely from making short sales of the Company's securities, i.e., sales of shares which the Section 16 Insider does not own at the time of the sale or sales of securities against which the Section 16 Insider does not deliver the shares within 20 days after the sale. Under certain circumstances, the purchase or sale of put or call options, or the writing of such options, can result in a violation of Section 16(c). Section 16 Insiders violating Section 16(c) face criminal liability.

The Company's General Counsel should be consulted if you have any questions regarding reporting obligations, short-swing profits or short sales under Section 16.

C.    Rule 144 (Applicable to Officers, Directors and 10% Stockholders)

Rule 144 imposes a series of restrictions upon the sale of Company common stock by affiliates (generally, directors, officers and 10% stockholders of the Company). These restrictions may be summarized as follows:

- *Current Public Information*. The Company must have filed all SEC-required reports during the last 12 months.

- *Volume Limitations*. Total sales of Company common stock by a covered individual for any three-month period may not exceed the *greater* of: (i) 1% of the total number of outstanding shares of Company common stock, as reflected in the most recent report or statement published by the Company, or (ii) the average weekly reported volume of such shares traded during the four calendar weeks preceding the filing of the requisite Form 144.

- *Method of Sale*. The shares must be sold either in a "broker's transaction" or in a transaction directly with a "market maker." A "broker's transaction" is one in which the broker does no more than execute the sale order and receive the usual and customary commission. Neither the broker nor the selling person can solicit or arrange for the sale order. In addition, the selling person or Board member must not pay any fee or commission other than to the broker. A "market maker" includes a specialist permitted to act as a dealer, a dealer acting in the position of a block positioner, and a dealer who holds himself out as being willing to buy and sell Company common stock for his own account on a regular and continuous basis.

- *Notice of Proposed Sale*. A notice of the sale (a Form 144) must be filed with the SEC at the time of the sale. Brokers generally have internal procedures for executing sales under Rule 144 and will assist you in completing the Form 144 and in complying with the other requirements of Rule 144.

16

If you are subject to Rule 144, you must instruct your broker who handles trades in Company securities to follow the brokerage firm's Rule 144 compliance procedures in connection with all trades.

## VI.   Execution and Return of Certification of Compliance

After reading this Program, all officers, directors and employees should execute and return, as indicated in the form, the Certification of Compliance form attached as "Attachment B."

Dated Effective: February 27, 2023

17

**<u>Schedule I</u>\***

*See attached.*

**Insider Trading Reminders**

Before engaging in any transaction in the Company securities, please read the following:

Both the federal securities laws and the Company's policy prohibit transactions in the Company's securities at a time when you may be in possession of material information about the Company which has not been publicly disclosed. This also applies to members of your household as well as all others whose transactions may be attributable to you, including entities controlled by you.

Material information, in short, is any information which could affect the price of the securities. Either positive or negative information may be material. Once a public announcement has been made, you should wait until the information has been made available to the public for at least 48 hours before engaging in any transaction.

**Neither the Company nor any of its officers, directors or employees listed on <u>Schedule I</u> attached to the Amended and Restated Insider Trading Compliance Program may trade in any securities of the Company during the period beginning 21 days before the end of any fiscal quarter of the Company and ending two full trading days after the public release of earnings data for such fiscal quarter,** except for:

(a) the exercise of stock options or other equity awards or the surrender of shares to the Company in payment of the exercise price or in satisfaction of any tax withholding obligations in a manner permitted by the applicable equity award agreement, or vesting of equity-based awards, in each case, that do not involve a market sale or the sale to a third party of Company securities (a "broker's cashless exercise" of a Company stock option *does* involve the sale of Company common stock and therefore would not qualify under this exception);

(b) purchases of the Company's securities from the Company, sale of the Company's securities to the Company, or the granting of stock awards by the Company;

(c) *bona fide* gifts of the Company's securities, unless the individual making the gift knows, or is reckless in not knowing, the recipient intends to sell the securities while the donor is in possession of material nonpublic information about the Company; and

(d) subject to Section V.B of the Company's Amended and Restated Insider Trading Compliance Program, purchases or sales of Company securities made pursuant to any binding contract, specific instruction or written plan entered into while the purchaser or seller, as applicable, was unaware of any material non-public information and which contract, instruction or plan (i) meets all requirements of the affirmative defense provided by Rule 10b5-1 promulgated under the Securities Exchange Act of 1934, as amended, (ii) was pre-cleared in advance pursuant to the Company's Amended and Restated Insider Trading Compliance Program, and (iii) has not been amended or modified in any respect after such initial pre-clearance without such amendment or modification being pre-cleared in advance pursuant to the Company's Amended and Restated Insider Trading Compliance Program.

For further information and guidance, please refer to our Amended and Restated Insider Trading Compliance Program and do not hesitate to contact the Company's General Counsel or Chief Financial Officer.

Attachment A

**IMPORTANT: All transactions in the Company's securities by officers, directors and employees listed on <u>Schedule I</u> attached to the Amended and Restated Insider Trading Compliance Program must be pre-cleared by contacting the Company's General Counsel or Chief Financial Officer, subject to those certain exceptions specified in Section 4.E of the Company's Amended and Restated Insider Trading Compliance Program.**

Attachment A

**e.l.f. Beauty, Inc.**

**Certification of Compliance**

I have received, read and understand the e.l.f. Beauty, Inc. Amended and Restated Insider Trading Compliance Program and undertake, as a condition to my present and continued employment (or, if I am not an employee, affiliation with) e.l.f. Beauty, Inc., to comply fully with the policies and procedures contained therein.

_____    _____
Signature       Date

_____
Print Name & Title

**Please return this Certificate of Compliance to Hillary Lyon at the corporate offices at 570 10th Street, Oakland, CA 94607, or by email at <u>hlyon@elfbeauty.com</u>.**

Attachment B

**Exhibit 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Registration Statement Nos. 333-213818, 333-216718, 333-223383, 333-230027, 333-238909, 333-256631, 333-265255, and 333-272234 on Form S-8 and Registration Statement No. 333-274869 on Form S-3 of our reports dated May 23, 2024, relating to the financial statements of e.l.f. Beauty, Inc. and the effectiveness of e.l.f. Beauty, Inc.'s internal control over financial reporting appearing in this Annual Report on Form 10-K for the year ended March 31, 2024.


/s/ *DELOITTE & TOUCHE LLP*


San Francisco, CA
May 23, 2024

**Exhibit 31.1**

**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER**
**PURSUANT TO**
**SECURITIES EXCHANGE ACT RULES 13A-14(A) AND 15D-14(A)**
**AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Tarang P. Amin, certify that:

1.    I have reviewed this Annual Report on Form 10-K of e.l.f. Beauty, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 23, 2024

/s/ Tarang P. Amin
Tarang P. Amin
Chief Executive Officer
*(Principal Executive Officer)*

**Exhibit 31.2**

**CERTIFICATION OF THE CHIEF FINANCIAL OFFICER**
**PURSUANT TO**
**SECURITIES EXCHANGE ACT RULES 13A-14(A) AND 15D-14(A)**
**AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Mandy Fields, certify that:

1.    I have reviewed this Annual Report on Form 10-K of e.l.f. Beauty, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 23, 2024

/s/ Mandy Fields
Mandy Fields
Chief Financial Officer
*(Principal Financial Officer and Accounting Officer)*

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of e.l.f. Beauty, Inc. (the "Company") on Form 10-K for the fiscal year ended March 31, 2024, as filed with the Securities and Exchange Commission (the "Report"), Tarang P. Amin, Chief Executive Officer of the Company, and Mandy Fields, Chief Financial Officer of the Company, do each hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

- The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

- The information in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: May 23, 2024

/s/ Tarang P. Amin
_____
Tarang P. Amin
Chief Executive Officer
*(Principal Executive Officer)*

/s/ Mandy Fields
_____
Mandy Fields
Chief Financial Officer
*(Principal Financial Officer and Accounting Officer)*

**Exhibit 97.1**

**E.L.F. BEAUTY, INC.**

**AMENDED AND RESTATED COMPENSATION RECOVERY POLICY**

This Amended and Restated Compensation Recovery Policy (the "***Policy***") is intended to maintain a culture of focused, diligent and responsible management that discourages conduct detrimental to the growth of e.l.f. Beauty, Inc. and its subsidiaries (together, the "***Company***"). Accordingly, as set forth in this Policy, it may be appropriate for the Company to recover annual or long-term incentive compensation of its Executive Officers (as defined below) and key employees, to the extent permitted by governing laws, in the event that they engage in conduct that is detrimental to the Company. This Policy amends, restates and supersedes the Compensation Recovery Policy adopted by the Company as of February 18, 2021, and shall be effective as of November 16, 2023 (the "***Effective Date***").

1.      Applicability. This Policy applies to all "executive officers" as defined under the Securities Exchange Act of 1934, as amended (the "***Executive Officers***") of the Company and such other key employees of the Company who may from time to time be determined to be deemed subject to the Policy by the Administrator (collectively the "***Covered Employees***").

2.      Administration of the Policy.

(a)      Authority. The Policy will be administered by the Compensation Committee of the Board of Directors unless the Board of Directors determines to administer the Policy itself (the Compensation Committee or the Board of Directors, as applicable, in its role administering the Policy is the "***Administrator***"). The Administrator shall have full and final authority to make all determinations under this Policy, including without limitation whether the Policy applies and if so, the amount of compensation to be repaid or forfeited by the Covered Employee, and to adopt such rules for the administration, interpretation and application of this Policy as are consistent therewith and to interpret, amend or revoke any such rules. All determinations and decisions made by the Administrator pursuant to the provisions of this Policy shall be final, conclusive and binding on all persons, including the Company, its affiliates, its shareholders and employees. The Administrator may delegate ministerial administrative duties to one or more officers or employees of the Company.

(b)      Liability. No member of the Administrator shall be personally liable for any action or determination made in good faith with respect to this Policy or to any settlement of any dispute between a Covered Employee and the Company. The Administrator shall be entitled to rely upon the advice or opinions of any attorneys, consultants, accountants, appraisers, brokers or other persons with respect to all matters concerning this Policy.

3.      Recoverable Events, Recoverable Amounts and Policy Coverage.

(a)      Recoverable Events. The following shall constitute "***Recoverable Events***" for purposes of this Policy:

(i)      The material misstatement of financial calculations or information or if events come to light after the award or payout of Incentive Compensation (as defined below) that disclose a material misstatement that would have significantly reduced the amount of the Incentive Compensation if known at the time of the award or payout.

(ii)      The Covered Employee's engagement in fraudulent, willful or negligent misconduct that results in the Company being required to prepare an accounting restatement due to its material noncompliance with any financial reporting requirement under United States securities laws.

(b)      Recoverable Amounts.

(i)      In the event that a Recoverable Event described in Section 3(a)(i) occurs, the Administrator may, in its sole discretion, seek to recover from any Covered Employee the amount of Incentive Compensation granted, earned, vested or paid to such Covered Employee if and to the extent the amount of the Incentive Compensation was calculated based on the achievement of certain financial results that were subsequently revised due

to the Recoverable Event, and the amount of the Incentive Compensation that would have been granted, earned, vested or paid to such Covered Employee had the financial results been properly reported would have been lower than the amount actually paid (such amount, the "***Overage Amount***"). The Overage Amount shall not exceed the differential between the amount of Incentive Compensation paid to such Covered Employee in connection with the Recoverable Event and the amount of Incentive Compensation that would have been paid to such Covered Employee had the Recoverable Event not occurred.

(ii)     In the event that a Recoverable Event described in Section 3(a)(ii) occurs, the Administrator may, in its sole discretion, seek to recover from any Covered Employee any Incentive Compensation partially or fully earned or paid in connection with or after the Recoverable Event to the extent the Administrator determines that such Incentive Compensation would not have been earned or paid had the Board or the Administrator been aware of the Recoverable Event at the time the amount of Incentive Compensation was determined.

(c)     <u>Coverage</u>. "***Incentive Compensation***" means any bonus, incentive payment, or other cash compensation or equity-based award granted, earned and/or received by such Covered Employee from the Company on or after the Effective Date (but shall not include a Covered Employee's wages or base salary); provided, however, with respect to Recoverable Events described in Section 3(a)(ii), this Policy shall apply solely to Incentive Compensation granted, earned and/or received during the three completed fiscal years immediately preceding the date on which the Company is required to prepare a restatement in connection with such a Recoverable Event or on which such a Recoverable Event occurs, as applicable.

4.     <u>Determinations in Discretion of the Administrator</u>.

(a)     The Administrator shall determine in its sole and absolute discretion the amount of any recoverable amount (subject to the limitations set forth in this Policy), whether or not a Recoverable Event has occurred and whether or not to take any action upon discovery of a Recoverable Event.

(b)     The Administrator shall have full discretion to decline to seek recovery under this Policy to the extent permitted by applicable law. In exercising its discretion, the Administrator may, to the extent permitted by applicable law, consider (i) the likelihood of success in achieving the recovery, given the anticipated cost and management effort required, (ii) whether the assertion of a claim for recovery may prejudice the interests of the Company, including in any related proceeding or investigation, (iii) any pending legal proceeding relating to the underlying cause(s) of the clawback, (iv) the degree of harm suffered by the Company, (v) the Covered Employee's responsibility for the harm and his or her state of mind relative to the acts or decisions giving rise to the harm, (vi) the extent to which the Covered Employee was acting in accordance with Company policies, procedures and processes, (vii) the extent to which others were responsible for the acts or decisions giving rise to the harm, (viii) the position and responsibilities of the Covered Employee relative to the magnitude of harm suffered by the Company, (ix) the long-term value of the Covered Employee to the Company and (x) such other factors as the Administrator deems to be appropriate.

(c)     Notwithstanding the foregoing, unless otherwise prohibited by the applicable law, to the extent this Policy provides for recovery of Incentive Compensation already recovered by the Company pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 or Section 10D of the Exchange Act and Rule 10D-1 promulgated thereunder or any other clawback, recoupment, forfeiture or similar policies or provisions of the Company or its affiliates (including the Company's Policy for Recovery of Erroneously Awarded Compensation and any such policies or provisions of such effect contained in any employment agreement, bonus plan, incentive plan, equity-based plan or award agreement thereunder or similar plan, program or agreement of the Company or an affiliate or required under applicable law) (the "***Other Recovery Arrangements***"), the amount of Incentive Compensation already recovered by the Company from the recipient of such Incentive Compensation shall be credited to the amount of Incentive Compensation required to be recovered pursuant to this Policy from such person. Except as otherwise determined by the Administrator, the adoption of this Policy does not limit, and is intended to apply in addition to, any Other Recovery Arrangements maintained by the Company.

(d)     Except to the extent otherwise required by applicable law, any clawback under this Policy may, in the discretion of the Administrator, be effectuated through the reduction, forfeiture or cancellation of awards, the return of paid-out cash or exercised or released shares, adjustments to future incentive compensation opportunities or in such other manner as the Administrator in its discretion determine to be appropriate.

(e)      Any clawback under this Policy shall not limit or prohibit any disciplinary actions the Company may take against the Covered Employee, including termination of employment. Any right to indemnification by the Company that a Covered Employee may have shall be waived with respect to any repayment made by such Covered Employee pursuant to this Policy.

5.      <u>Employee Right to be Heard</u>. Before the Administrator determines to seek recovery pursuant to this Policy, the Covered Employee will be provided written notice and the opportunity to be heard at a meeting of the Administrator (which may be in-person or telephonic, as determined in the discretion of the Administrator).

6.      <u>Amendment, Modification and Termination</u>. This Policy may at any time or from time to time be amended, modified or terminated by the Administrator.

Case 5:25-cv-02316-EKL    Document 59-1    Filed 09/05/25    Page 133 of 137

**Exhibit 97.2**

**E.L.F. BEAUTY, INC.**

**POLICY FOR RECOVERY OF ERRONEOUSLY AWARDED COMPENSATION**

e.l.f. Beauty, Inc. (the "***Company***") has adopted this Policy for Recovery of Erroneously Awarded Compensation (the "***Policy***"), effective as of October 2, 2023 (the "***Effective Date***").

1.    <u>Applicability</u>. This Policy shall apply to current and former Officers of the Company. Each Officer shall be required to sign an acknowledgment pursuant to which such Officer will agree to be bound by the terms of, and comply with, this Policy; however, any Officer's failure to sign any such acknowledgment shall not negate the application of this Policy to the Officer.

2.    <u>Compensation Subject to Policy</u>. This Policy shall apply to Incentive-Based Compensation received on or after the Effective Date. For purposes of this Policy, the date on which Incentive-Based Compensation is "received" shall be determined under the Applicable Rules, which generally provide that Incentive-Based Compensation is "received" in the Company's fiscal period during which the relevant Financial Reporting Measure is attained or satisfied, without regard to whether the grant, vesting or payment of the Incentive-Based Compensation occurs after the end of that period.

3.    <u>Recovery of Compensation</u>. In the event that the Company is required to prepare a Restatement, the Company shall recover, reasonably promptly, the portion of any Incentive-Based Compensation that is Erroneously Awarded Compensation, unless the Committee has determined that recovery would be Impracticable. Recovery shall be required in accordance with the preceding sentence regardless of whether the applicable Officer engaged in misconduct or otherwise caused or contributed to the requirement for the Restatement and regardless of whether or when restated financial statements are filed by the Company. For clarity, the recovery of Erroneously Awarded Compensation under this Policy will not give rise to any person's right to voluntarily terminate employment for "good reason," or due to a "constructive termination" (or any similar term of like effect) under any plan, program or policy of or agreement with the Company or any of its affiliates.

4.    <u>Manner of Recovery; Limitation on Duplicative Recovery</u>. The Committee shall, in its sole discretion, determine the manner of recovery of any Erroneously Awarded Compensation, which may include, without limitation, reduction or cancellation by the Company or an affiliate of the Company of Incentive-Based Compensation or Erroneously Awarded Compensation, reimbursement or repayment by any person subject to this Policy of the Erroneously Awarded Compensation, and, to the extent permitted by law, an offset of the Erroneously Awarded Compensation against other compensation payable by the Company or an affiliate of the Company to such person. Notwithstanding the foregoing, unless otherwise prohibited by the Applicable Rules, to the extent this Policy provides for recovery of Erroneously Awarded Compensation already recovered by the Company pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 or Other Recovery Arrangements, the amount of Erroneously Awarded Compensation already recovered by the Company from the recipient of such Erroneously Awarded Compensation may be credited to the amount of Erroneously Awarded Compensation required to be recovered pursuant to this Policy from such person.

5.    <u>Administration</u>. This Policy shall be administered, interpreted and construed by the Committee, which is authorized to make all determinations necessary, appropriate or advisable for such purpose. The Board of Directors of the Company (the "***Board***") may re-vest in itself the authority to administer, interpret and construe this Policy in accordance with applicable law, and in such event references herein to the "Committee" shall be deemed to be references to the Board. Subject to any permitted review by the applicable national securities exchange or association pursuant to the Applicable Rules, all determinations and decisions made by the Committee pursuant to the provisions of this Policy shall be final, conclusive and binding on all persons, including the Company and its affiliates, equityholders and employees. The Committee may delegate administrative duties with respect to this Policy to one or more directors or employees of the Company, as permitted under applicable law, including any Applicable Rules.

6.    <u>Interpretation.</u> This Policy will be interpreted and applied in a manner that is consistent with the requirements of the Applicable Rules, and to the extent this Policy is inconsistent with such Applicable Rules, it shall be deemed amended to the minimum extent necessary to ensure compliance therewith.

1

7.    No Indemnification; No Liability. The Company shall not indemnify or insure any person against the loss of any Erroneously Awarded Compensation pursuant to this Policy, nor shall the Company directly or indirectly pay or reimburse any person for any premiums for third-party insurance policies that such person may elect to purchase to fund such person's potential obligations under this Policy. None of the Company, an affiliate of the Company or any member of the Committee or the Board shall have any liability to any person as a result of actions taken under this Policy.

8.    Application; Enforceability. Except as otherwise determined by the Committee or the Board, the adoption of this Policy does not limit, and is intended to apply in addition to, any other clawback, recoupment, forfeiture or similar policies or provisions of the Company or its affiliates, including any such policies or provisions of such effect contained in any employment agreement, bonus plan, incentive plan, equity-based plan or award agreement thereunder or similar plan, program or agreement of the Company or an affiliate or required under applicable law (the "***Other Recovery Arrangements***"). The remedy specified in this Policy shall not be exclusive and shall be in addition to every other right or remedy at law or in equity that may be available to the Company or an affiliate of the Company.

9.    Severability. The provisions in this Policy are intended to be applied to the fullest extent of the law; provided, however, to the extent that any provision of this Policy is found to be unenforceable or invalid under any applicable law, such provision will be applied to the maximum extent permitted, and shall automatically be deemed amended in a manner consistent with its objectives to the extent necessary to conform to any limitations required under applicable law.

10.    Amendment and Termination. The Board or the Committee may amend, modify or terminate this Policy in whole or in part at any time and from time to time in its sole discretion. This Policy will terminate automatically when the Company does not have a class of securities listed on a national securities exchange or association.

11.    Definitions

"***Applicable Rules***" means Section 10D of the Exchange Act, Rule 10D-1 promulgated thereunder, the listing rules of the national securities exchange or association on which the Company's securities are listed, and any applicable rules, standards or other guidance adopted by the Securities and Exchange Commission or any national securities exchange or association on which the Company's securities are listed.

"***Committee***" means the committee of the Board responsible for executive compensation decisions comprised solely of independent directors (as determined under the Applicable Rules), or in the absence of such a committee, a majority of the independent directors serving on the Board.

"***Erroneously Awarded Compensation***" means the amount of Incentive-Based Compensation received by a current or former Officer that exceeds the amount of Incentive-Based Compensation that would have been received by such current or former Officer based on a restated Financial Reporting Measure, as determined on a pre-tax basis in accordance with the Applicable Rules.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended.

"***Financial Reporting Measure***" means any measure determined and presented in accordance with the accounting principles used in preparing the Company's financial statements, and any measures derived wholly or in part from such measures, including GAAP, IFRS and non-GAAP/IFRS financial measures, as well as stock or share price and total equityholder return.

"***GAAP***" means United States generally accepted accounting principles.

"***IFRS***" means international financial reporting standards as adopted by the International Accounting Standards Board.

"***Impracticable***" means (a) the direct costs paid to third parties to assist in enforcing recovery would exceed the Erroneously Awarded Compensation; provided that the Company (i) has made reasonable attempts to recover the Erroneously Awarded Compensation, (ii) documented such attempt(s), and (iii) provided such

2

documentation to the relevant listing exchange or association, (b) to the extent permitted by the Applicable Rules, the recovery would violate the Company's home country laws pursuant to an opinion of home country counsel; provided that the Company has (i) obtained an opinion of home country counsel, acceptable to the relevant listing exchange or association, that recovery would result in such violation, and (ii) provided such opinion to the relevant listing exchange or association, or (c) recovery would likely cause an otherwise tax-qualified retirement plan, under which benefits are broadly available to employees of the Company, to fail to meet the requirements of 26 U.S.C. 401(a)(13) or 26 U.S.C. 411(a) and the regulations thereunder.

"***Incentive-Based Compensation***" means, with respect to a Restatement, any compensation that is granted, earned, or vested based wholly or in part upon the attainment of one or more Financial Reporting Measures and received by a person: (a) after beginning service as an Officer; (b) who served as an Officer at any time during the performance period for that compensation; (c) while the issuer has a class of its securities listed on a national securities exchange or association; and (d) during the applicable Three-Year Period.

"***Officer***" means each person who serves as an executive officer of the Company, as defined in Rule 10D-1(d) under the Exchange Act.

"***Restatement***" means an accounting restatement to correct the Company's material noncompliance with any financial reporting requirement under securities laws, including restatements that correct an error in previously issued financial statements (a) that is material to the previously issued financial statements or (b) that would result in a material misstatement if the error were corrected in the current period or left uncorrected in the current period.

"***Three-Year Period***" means, with respect to a Restatement, the three completed fiscal years immediately preceding the date that the Board, a committee of the Board, or the officer or officers of the Company authorized to take such action if Board action is not required, concludes, or reasonably should have concluded, that the Company is required to prepare such Restatement, or, if earlier, the date on which a court, regulator or other legally authorized body directs the Company to prepare such Restatement. The "Three-Year Period" also includes any transition period (that results from a change in the Company's fiscal year) within or immediately following the three completed fiscal years identified in the preceding sentence. However, a transition period between the last day of the Company's previous fiscal year end and the first day of its new fiscal year that comprises a period of nine to 12 months shall be deemed a completed fiscal year.

3

**E.L.F. BEAUTY, INC.**

**POLICY FOR RECOVERY OF ERRONEOUSLY AWARDED COMPENSATION**

**ACKNOWLEDGMENT AGREEMENT**

In consideration of, and as a condition to, the receipt of future cash and equity incentive compensation from e.l.f. Beauty, Inc. (the "***Company***"), the executive officer executive this Acknowledgment Agreement ("***Executive***") and the Company are entering into this Acknowledgment Agreement.

1. Executive agrees that compensation received by Executive may be subject to reduction, cancellation, forfeiture and/or recoupment to the extent necessary to comply with (a) the Policy for Recovery of Erroneously Awarded Compensation adopted by the Compensation Committee of the Board of Directors of the Company (as amended from time to time, the "***Policy***") , and (b) any Other Recovery Arrangements (as defined in the Policy), including the Company's Amended and Restated Compensation Recovery Policy. Executive acknowledges that Executive has received and has had an opportunity to review the Policy and any Other Recovery Arrangements applicable to Executive.

2. Executive acknowledges and agrees to the terms of the Policy and any Other Recovery Arrangements, including that any compensation received by Executive shall be subject to and conditioned upon the provisions of the Policy and any Other Recovery Arrangements applicable to Executive.

3. Executive further acknowledges and agrees that Executive is not entitled to indemnification in connection with any enforcement of the Policy or any Other Recovery Arrangements applicable to Executive and expressly waives any rights to such indemnification under the Company's organizational documents or otherwise.

4. Executive agrees to take all actions requested by the Company in order to enable or facilitate the enforcement of the Policy and any Other Recovery Arrangements applicable to Executive (including, without limitation, any reduction, cancellation, forfeiture or recoupment of any compensation that Executive has received or to which Executive may become entitled).

5. To the extent any recovery right under the Policy and any Other Recovery Arrangements applicable to Executive conflicts with any other contractual rights Executive may have with the Company or any affiliate, Executive understands that the terms of the Policy and the Other Recovery Arrangements shall supersede any such contractual rights. Executive agrees that no recovery of compensation under the Policy and the Other Recovery Arrangements will be an event that triggers or contributes to any right of Executive to resign for "good reason" or "constructive termination" (or similar term) under any agreement with the Company or any affiliate.

*Signature Page Follows*

EXECUTIVE

---

(Signature)

---

(Print Name)

---

(Title)


---

(Date)


E.L.F. BEAUTY, INC.


By: _____
Name: Scott Milsten
Title: SVP and General Counsel


*Signature Page to Acknowledgment Agreement*
*Policy for Recovery of Erroneously Awarded Compensation*