**Exhibit 22**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, DC 20549**

_____

## FORM 10-Q

_____

**(Mark One)**

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Quarterly Period Ended June 30, 2024**

**or**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Transition Period from _____ to _____**

**Commission File Number: 001-37873**

_____

# e.l.f. Beauty, Inc.

(Exact name of registrant as specified in its charter)

_____

| **Delaware** | | **46-4464131** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | | (I.R.S. Employer Identification No.) |

**570 10th Street**

**Oakland,  CA  94607**

(Address of principal executive offices)(Zip code)

_____

**(510) 778-7787**

(Registrant's telephone number, including area code)

_____

Securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.01 per share | ELF | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   ☒ Yes   ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   ☒ Yes   ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☒ | | Accelerated filer | ☐ |
| Non- accelerated filer | ☐ | | Smaller reporting company | ☐ |
| | | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   ☐ Yes  ☒ No

The number of shares of the registrant's common stock, par value $0.01 per share, outstanding as of August 1, 2024 was 56,388,228 shares.

## CAUTIONARY NOTE ABOUT FORWARD-LOOKING STATEMENTS

*This Quarterly Report on Form 10-Q (this "Quarterly Report") contains forward-looking statements within the meaning of the federal securities laws concerning our business, operations and financial performance and condition, as well as our plans, objectives and expectations for our business operations and financial performance and condition. Any statements contained herein that are not statements of historical facts may be deemed to be forward-looking statements. In some cases, you can identify forward-looking statements by terminology such as "aim," "anticipate," "assume," "believe," "contemplate," "continue," "could," "due," "estimate," "expect," "goal," "intend," "may," "objective," "plan," "predict," "potential," "positioned," "seek," "should," "target," "will," "would" and other similar expressions that are predictions of or indicate future events and future trends, or the negative of these terms or other comparable terminology. These forward-looking statements are based on management's current expectations, estimates, forecasts and projections about our business and the industry in which we operate and management's beliefs and assumptions and are not guarantees of future performance or development and involve known and unknown risks, uncertainties and other factors that are in some cases beyond our control. Although we believe that the expectations reflected in the forward-looking statements contained herein are reasonable, our actual results and the timing of selected events may differ materially. Factors that may cause actual results to differ materially from current expectations include, among other things, those listed under "Risk factors" in Part II, Item 1A of this Quarterly Report and elsewhere in this Quarterly Report. Potential investors are urged to consider these factors carefully in evaluating the forward-looking statements. These forward-looking statements speak only as of the date of this Quarterly Report. Except as required by law, we assume no obligation to update or revise these forward-looking statements for any reason, even if new information becomes available in the future.*

## SUMMARY OF MATERIAL RISKS ASSOCIATED WITH OUR BUSINESS

The principal risks and uncertainties affecting our business include the following:

- The beauty industry is highly competitive, and if we are unable to compete effectively our results will suffer.

- Our new product introductions may not be as successful as we anticipate.

- Any damage to our reputation or brands may materially and adversely affect our business, financial condition and results of operations.

- Our success depends, in part, on the quality, performance and safety of our products.

- We may not be able to successfully implement our growth strategy.

- Our growth and profitability are dependent on a number of factors, and our historical growth may not be indicative of our future growth.

- We may be unable to continue to grow our business effectively or efficiently, which would harm our business, financial condition and results of operations.

- Acquisitions or investments, such as our acquisition of Naturium LLC, could disrupt our business and harm our financial condition.

- A disruption in our operations, including a disruption in the supply chain for our products, could materially and adversely affect our business.

- We rely on a number of third-party suppliers, manufacturers, distributors and other vendors, and they may not continue to produce products or provide services that are consistent with our standards or applicable regulatory requirements, which could harm our brands, cause consumer dissatisfaction, and require us to find alternative suppliers of our products or services.

- Adverse economic conditions in the United States or any of the other countries in which we conduct significant business could negatively affect our business, financial condition and results of operations.

- We depend on a limited number of retailers for a large portion of our net sales, and the loss of one or more of these retailers, or business challenges at one or more of these retailers, could adversely affect our results of operations.

- We have significant operations in China, which exposes us to risks inherent in doing business in that country.

- We are subject to international business uncertainties.

- If we are unable to protect our intellectual property, the value of our brands and other intangible assets may be diminished, and our business may be adversely affected.

- Our success depends on our ability to operate our business without infringing, misappropriating or otherwise violating the trademarks, patents, copyrights and other proprietary rights of third parties.

The summary risk factors described above should be read together with the text of the full risk factors below in the section titled "Risk factors" and the other information set forth in this Quarterly Report, including our unaudited condensed consolidated financial statements and the related notes, as well as in other documents that we file with the U.S. Securities and Exchange Commission (the "SEC"). The risks summarized above or described in the section titled "Risk factors" are not the only risks that we face. Additional risks and uncertainties not precisely known to us or that we currently deem to be immaterial may also materially adversely affect our business, financial condition, results of operations and future growth prospects.

**e.l.f. Beauty, Inc.**

**Table of Contents**

| | |
|---|---|
| **PART I. FINANCIAL INFORMATION** | 5 |
| Item 1. Financial statements (unaudited) | 5 |
|     Condensed consolidated balance sheets | 5 |
|     Condensed consolidated statements of operations | 6 |
|     Condensed consolidated statements of comprehensive income | 7 |
|     Condensed consolidated statements of stockholders' equity | 8 |
|     Condensed consolidated statements of cash flows | 9 |
|     Notes to condensed consolidated financial statements (unaudited) | 10 |
| Item 2. Management's discussion and analysis of financial condition and results of operations | 21 |
| Item 3. Quantitative and qualitative disclosures about market risk | 26 |
| Item 4. Controls and procedures | 26 |
| **PART II. OTHER INFORMATION** | 27 |
| Item 1. Legal proceedings | 27 |
| Item 1A. Risk factors | 27 |
| Item 2. Unregistered sales of equity securities and use of proceeds | 55 |
| Item 3. Defaults upon senior securities | 56 |
| Item 4. Mine safety disclosures | 56 |
| Item 5. Other information | 56 |
| Item 6. Exhibits | 57 |
| **SIGNATURES** | 58 |

Table of Contents

**PART I. FINANCIAL INFORMATION**

**Item 1. Financial statements (unaudited)**

**e.l.f. Beauty, Inc. and subsidiaries**
**Condensed consolidated balance sheets**
**(unaudited)**
**(in thousands, except share and per share data)**

| | June 30, 2024 | March 31, 2024 | June 30, 2023 |
|---|---|---|---|
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 109,034 | $ 108,183 | $ 142,549 |
| Accounts receivable, net | 155,701 | 123,797 | 90,531 |
| Inventory, net | 199,563 | 191,489 | 98,053 |
| Prepaid expenses and other current assets | 66,162 | 53,608 | 39,276 |
| Total current assets | 530,460 | 477,077 | 370,409 |
| Property and equipment, net | 14,040 | 13,974 | 7,581 |
| Intangible assets, net | 220,745 | 225,094 | 76,013 |
| Goodwill | 340,600 | 340,600 | 171,620 |
| Other assets | 98,987 | 72,502 | 32,258 |
| Total assets | $ 1,204,832 | $ 1,129,247 | $ 657,881 |
| | | | |
| **Liabilities and stockholders' equity** | | | |
| Current liabilities: | | | |
| Current portion of long-term debt and finance lease obligations | $ 102,938 | $ 100,307 | $ 5,431 |
| Accounts payable | 79,989 | 81,075 | 53,237 |
| Accrued expenses and other current liabilities | 116,878 | 117,733 | 51,037 |
| Total current liabilities | 299,805 | 299,115 | 109,705 |
| Long-term debt and finance lease obligations | 159,234 | 161,819 | 59,612 |
| Deferred tax liabilities | 7,910 | 3,666 | 5,855 |
| Long-term operating lease obligations | 33,637 | 21,459 | 10,137 |
| Other long-term liabilities | 656 | 616 | 870 |
| Total liabilities | 501,242 | 486,675 | 186,179 |
| | | | |
| Commitments and contingencies (Note 7) | | | |
| | | | |
| Stockholders' equity: | | | |
| Common stock, par value of $0.01 per share; 250,000,000 shares authorized as of June 30, 2024, March 31, 2024 and June 30, 2023; 56,387,461, 55,583,660 and 54,417,579 shares issued and outstanding as of June 30, 2024, March 31, 2024 and June 30, 2023, respectively | 563 | 555 | 543 |
| Additional paid-in capital | 949,817 | 936,403 | 840,181 |
| Accumulated other comprehensive loss | (9) | (50) | — |
| Accumulated deficit | (246,781) | (294,336) | (369,022) |
| Total stockholders' equity | 703,590 | 642,572 | 471,702 |
| Total liabilities and stockholders' equity | $ 1,204,832 | $ 1,129,247 | $ 657,881 |

*The accompanying notes are an integral part of these condensed consolidated financial statements.*

**e.l.f. Beauty, Inc. and subsidiaries**
**Condensed consolidated statements of operations**
**(unaudited)**
**(in thousands, except share and per share data)**

| | Three months ended June 30, | |
| --- | --- | --- |
| | **2024** | **2023** |
| Net sales | $ 324,477 | $ 216,339 |
| Cost of sales | 93,194 | 63,767 |
| Gross profit | 231,283 | 152,572 |
| Selling, general and administrative expenses | 180,575 | 91,939 |
| Operating income | 50,708 | 60,633 |
| Other income, net | 187 | 399 |
| Impairment of equity investment | — | (1,720) |
| Interest (expense) income, net | (3,665) | 341 |
| Income before provision for income taxes | 47,230 | 59,653 |
| Income tax benefit (provision) | 325 | (6,676) |
| Net income | $ 47,555 | $ 52,977 |
| | | |
| Net income per share: | | |
| Basic | $ 0.85 | $ 0.98 |
| Diluted | $ 0.81 | $ 0.93 |
| Weighted average shares outstanding: | | |
| Basic | 55,973,914 | 53,938,136 |
| Diluted | 58,551,423 | 57,175,870 |

*The accompanying notes are an integral part of these condensed consolidated financial statements.*

6

Table of Contents

**e.l.f. Beauty, Inc. and subsidiaries**
**Condensed consolidated statements of comprehensive income**
**(unaudited)**
**(in thousands)**

|  | Three months ended June 30, | |
|  | 2024 | 2023 |
|---|---|---|
| Net income | $ 47,555 | $ 52,977 |
| Other comprehensive income, net of tax | | |
| Foreign currency translation adjustment | 41 | — |
| Other comprehensive income, net of tax | 41 | — |
| Comprehensive income | $ 47,596 | $ 52,977 |

*The accompanying notes are an integral part of these condensed consolidated financial statements.*

7

**e.l.f. Beauty, Inc. and subsidiaries**
**Condensed consolidated statements of stockholders' equity**
**(unaudited)**
**(in thousands, except share data)**

| | Common stock | | Additional paid-in capital | Accumulated other comprehensive loss | Accumulated deficit | Total stockholders' equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| **Balance as of March 31, 2024** | 55,508,536 | $ 555 | $ 936,403 | $ (50) | $ (294,336) | $ 642,572 |
| Net income | — | — | — | — | 47,555 | 47,555 |
| Stock-based compensation | — | — | 12,958 | — | — | 12,958 |
| Exercise of stock options and vesting of restricted stock | 878,925 | 8 | 456 | — | — | 464 |
| Foreign currency translation adjustment | — | — | — | 41 | — | 41 |
| **Balance as of June 30, 2024** | 56,387,461 | $ 563 | $ 949,817 | $ (9) | $ (246,781) | $ 703,590 |

| | Common stock | | Additional paid-in capital | Accumulated other comprehensive loss | Accumulated deficit | Total stockholders' equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| **Balance as of March 31, 2023** | 53,571,577 | $ 535 | $ 832,481 | $ — | $ (421,999) | $ 411,017 |
| Net income | — | — | — | — | 52,977 | 52,977 |
| Stock-based compensation | — | — | 7,223 | — | — | 7,223 |
| Exercise of stock options and vesting of restricted stock | 754,953 | 8 | 477 | — | — | 485 |
| **Balance as of June 30, 2023** | 54,326,530 | $ 543 | $ 840,181 | $ — | $ (369,022) | $ 471,702 |

*The accompanying notes are an integral part of these condensed consolidated financial statements.*

8

**e.l.f. Beauty, Inc. and subsidiaries**
**Condensed consolidated statements of cash flows**
**(unaudited)**
**(in thousands)**

| | Three months ended June 30, | |
| --- | --- | --- |
| | 2024 | 2023 |
| **Cash flows from operating activities:** | | |
| Net income | $ 47,555 | $ 52,977 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation, amortization and non-cash lease expense | 11,134 | 5,637 |
| Stock-based compensation expense | 12,964 | 7,200 |
| Amortization of debt issuance costs and discount on debt | 138 | 75 |
| Deferred income taxes | 5,108 | 2,113 |
| Impairment of equity investment | — | 1,720 |
| Other, net | (127) | 71 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (31,815) | (22,615) |
| Inventory | (8,074) | (16,729) |
| Prepaid expenses and other assets | (30,500) | (8,094) |
| Accounts payable and accrued expenses | (3,107) | 2,014 |
| Other liabilities | (1,995) | (1,015) |
| Net cash provided by operating activities | 1,281 | 23,354 |
| | | |
| **Cash flows from investing activities:** | | |
| Purchase of property and equipment | (786) | (616) |
| Other, net | (93) | — |
| Net cash used in investing activities | (879) | (616) |
| | | |
| **Cash flows from financing activities:** | | |
| Repayment of long-term debt | — | (1,250) |
| Cash received from issuance of common stock | 464 | 485 |
| Other, net | (56) | (202) |
| Net cash provided by (used in) financing activities | 408 | (967) |
| | | |
| Effect of exchange rate changes on cash and cash equivalents | 41 | — |
| | | |
| Net increase in cash and cash equivalents | 851 | 21,771 |
| Cash and cash equivalents - beginning of period | 108,183 | 120,778 |
| Cash and cash equivalents - end of period | $ 109,034 | $ 142,549 |

*The accompanying notes are an integral part of these condensed consolidated financial statements.*

9

Table of Contents

**e.l.f. Beauty, Inc. and subsidiaries**
**Notes to condensed consolidated financial statements (unaudited)**

**Note 1—Nature of operations**

e.l.f. Beauty, Inc., a Delaware corporation ("e.l.f. Beauty" and together with its subsidiaries, the "Company"), is a multi-brand beauty company that offers inclusive, accessible, clean, vegan and cruelty-free cosmetics and skin care products. The Company's mission is to make the best of beauty accessible to every eye, lip, face and skin concern.

The Company believes its ability to deliver cruelty-free, clean, vegan and premium-quality products at accessible prices with broad appeal differentiates it in the beauty industry. The Company believes the combination of its value proposition, innovation engine, ability to attract and engage consumers, and its world-class team's ability to execute with speed, has positioned the Company well to navigate the competitive beauty market.

The Company's family of brands includes e.l.f. Cosmetics, e.l.f. SKIN, Naturium, Well People and Keys Soulcare. The Company's brands are available online and across leading beauty, mass-market and specialty retailers. The Company has strong relationships with its retail customers such as Target, Walmart, Ulta Beauty and other leading retailers that have enabled the Company to expand distribution both domestically and internationally.

**Note 2—Summary of significant accounting policies**

*Basis of presentation*

The accompanying unaudited condensed consolidated financial statements and related notes have been prepared in accordance with U.S. generally accepted accounting principles ("U.S. GAAP") for interim financial information and pursuant to the rules and regulations of the Securities and Exchange Commission. Certain information and note disclosures normally included in the Company's annual financial statements prepared in accordance with U.S. GAAP have been condensed or omitted pursuant to such rules and regulations. In the opinion of the Company, these interim financial statements contain all adjustments, including normal recurring adjustments, necessary for a fair statement of its financial position as of June 30, 2024, March 31, 2024 and June 30, 2023, and its results of operations and stockholders' equity for the three months ended June 30, 2024 and June 30, 2023 and its cash flows for the three months ended June 30, 2024 and June 30, 2023. All intercompany balances and transactions have been eliminated in consolidation.

These unaudited condensed consolidated financial statements should be read in conjunction with the audited consolidated financial statements and related notes included in the Company's Annual Report on Form 10-K for the fiscal year ended March 31, 2024 (the "Annual Report"). Operating results for the interim periods are not necessarily indicative of the results that may be expected for the full year.

*Use of estimates*

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and reported amounts of revenues and expenses during the reporting period. Actual results could differ from these estimates.

*Segment reporting*

Operating segments are components of an enterprise for which separate financial information is available that is evaluated by the chief operating decision maker in deciding how to allocate resources and in assessing performance. Utilizing these criteria, the Company manages its business on the basis of one operating segment and one reportable segment. It is impracticable for the Company to provide revenue by product line.

*Significant accounting policies*

The Company made no material changes in the application of its significant accounting policies that were disclosed in Note 2, "Summary of significant accounting policies," to the audited consolidated financial statements as of and for the fiscal year ended March 31, 2024 included in the Annual Report.

***Business combinations***

The purchase price of a business acquisition is allocated to the assets acquired and liabilities assumed based upon their estimated fair values at the business combination date. The excess of purchase price over the fair value of assets acquired and liabilities assumed is recorded as goodwill. Determining fair value of identifiable assets, particularly intangibles, and liabilities acquired also requires the Company to make estimates, which are based on all available information and in some cases assumptions with respect to the timing and amount of future revenues and expenses associated with an asset. Unanticipated events or circumstances may occur that could affect the accuracy of the Company's fair value estimates, and under different assumptions, the resulting valuations could be materially different.

Costs that are incurred to complete the business combination, such as legal and other professional fees, are not considered as a part of consideration transferred and are charged to selling, general and administrative expense as they are incurred.

***Revenue recognition***

The Company distributes products both through national and international retailers, as well as direct-to-consumers through its e-commerce channel. The marketing and consumer engagement benefits that the direct-to-consumer channel provides are integral to the Company's brand and product development strategy and drive sales across channels. As such, the Company views its two primary distribution channels as components of one integrated business, as opposed to discrete revenue streams.

The Company sells a variety of beauty products but does not consider them to be meaningfully different revenue streams given similarities in the nature of the products, the target consumer and the innovation and distribution processes.

The following table provides disaggregated revenue from contracts with customers by geographical market, as the nature, amount, timing and uncertainty of revenue and cash flows can differ between domestic and international customers (in thousands).

| | Three months ended June 30, | | | |
|---|---|---|---|---|
| **Net sales by geographic region:** | **2024** | | **2023** | |
| United States | $ | 271,367 | $ | 188,595 |
| International | | 53,110 | | 27,744 |
| Total net sales | $ | 324,477 | $ | 216,339 |

As of June 30, 2024, other than accounts receivable, the Company had no material contract assets, contract liabilities or deferred contract costs recorded on its unaudited condensed consolidated balance sheet.

11

Table of Contents

*Recent accounting pronouncements*

<u>New accounting pronouncements issued but not yet adopted</u>

In November 2023, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2023-07, Segment Reporting – Improvements to Reportable Segment Disclosures (Topic 280). The standard expands reportable segment disclosure requirements, primarily through enhanced disclosures about significant segment expenses. In addition, ASU 2023-07 enhances interim disclosure requirements, clarifies circumstances in which an entity can disclose multiple segment measures of profit or loss, and contains other disclosure requirements. ASU 2023-07 is effective for the Company's annual period beginning April 1, 2024, and interim periods within fiscal years beginning April 1, 2025. Entities must adopt the changes to the segment reporting guidance on a retrospective basis. Early adoption is permitted. The Company expects ASU 2023-07 to only impact its disclosures with no impacts to the Company's results of operations, cash flows, and financial condition.

In December 2023, the FASB issued ASU 2023-09, Improvements to Income Tax Disclosures (Topic 740). The standard requires disaggregated information about a reporting entity's effective tax rate reconciliation as well as information on income taxes paid. The standard is intended to benefit investors by providing more detailed income tax disclosures that would be useful in making capital allocation decisions. The new requirements apply to all entities subject to income taxes and will be effective for the Company's annual periods beginning April 1, 2025. The guidance will be applied on a prospective basis with the option to apply the standard retrospectively and early adoption is permitted. The Company expects ASU 2023-09 to only impact its disclosures with no impacts to the Company's results of operations, cash flows, and financial condition.

**Note 3—Acquisition**

On October 4, 2023, the Company, through its wholly owned subsidiary, e.l.f. Cosmetics, Inc., completed its acquisition of Naturium LLC ("Naturium") (including the indirect acquisition of equity interests in Naturium through the purchase of TCB-N Prelude Blocker Corp., a holding company) (the "Acquisition"), which furthered the Company's mission to make the best of beauty accessible to every eye, lip, face and skin concern. Naturium is a skin care company that provides clinically effective products at an affordable price. The Company directly and indirectly acquired all rights, title and interest in and to the outstanding equity securities of Naturium for a purchase price of $333.0 million in a combination of cash and Company stock.

The following table summarizes the fair market value of the consideration transferred and how the Company calculates the goodwill resulting from the acquisition (in thousands):

| | | | |
|---|---|---|---|
| Cash consideration | | $ | 275,266 |
| Equity consideration (common stock issued)[1] | | | 57,772 |
| Total consideration transferred | | | 333,038 |
| Less: Net assets acquired | | | |
| Net assets acquired, excluding liability assumed for acquisition-related seller expenses | $ | 174,608 | |
| Liability assumed for acquisition-related seller expenses[2] | | (10,549) | |
| Net assets acquired | | | (164,059) |
| Goodwill | | $ | 168,979 |

[1] The fair market value of the $57.8 million common stock issued (equivalent to 577,659 shares of common stock) was determined on the basis of the opening market price of the Company's stock of $100.01 per share on the acquisition date.

[2] In connection with the Acquisition, the Company paid Naturium's acquisition-related expenses of $10.5 million recognized as an assumed liability at the acquisition date.

The Company incurred and expensed acquisition transaction costs of $0.4 million and zero during the three months ended June 30, 2024 and June 30, 2023, respectively, which are included as a component of selling, general and administrative expenses in the condensed consolidated statements of operations.

The Acquisition has been accounted for as a business combination under the acquisition method and, accordingly, the total purchase price is allocated to the tangible and intangible assets acquired and the liabilities assumed based on their respective fair values on the acquisition date. The purchase price allocation, deferred tax calculations and residual goodwill are

preliminary and pending finalization. Naturium's results of operations have been included in the Company's condensed consolidated financial statements from the date of acquisition.

The following table presents the preliminary purchase price allocation recorded in the Company's condensed consolidated balance sheet on the acquisition date (in thousands):

| | |
|---|---:|
| Cash | $ 293 |
| Accounts receivable | 7,388 |
| Inventory | 16,236 |
| Prepaid expenses and other current assets | 1,899 |
| Goodwill[1] | 168,979 |
| Intangible assets | 162,100 |
| Total assets acquired | 356,895 |
| Accounts payable | (15,897) |
| Accrued expenses and other current liabilities | (6,025) |
| Net deferred tax liability | (1,935) |
| Total liabilities assumed | (23,857) |
| Total purchase price | $ 333,038 |

[1] The goodwill represents the excess value over both tangible and intangible assets acquired and liabilities assumed. The goodwill recognized in this transaction is primarily attributable to the Company's expectation that Naturium can continue to expand distribution and deliver new skin care products. A substantial amount of the goodwill is expected to be deductible for tax purposes.

### Intangible assets

The estimated fair values (all considered level 3 measurements) of the identifiable intangible assets acquired, their estimated useful lives and fair value methodology are as follows:

| | Fair Value (in thousands) | Estimated Useful Life (in years) | Fair Value Methodology |
|---|---:|:---:|:---:|
| Customer relationships – retailers | $ 20,000 | 10 | Excess earnings method |
| Customer relationships – e-commerce | 17,600 | 3 | Excess earnings method and with and without method |
| Trademarks | 124,500 | 15 | Relief from Royalty method |
| Total identified intangible assets | $ 162,100 | | |

### Note 4—Goodwill and intangible assets

Information regarding the Company's goodwill and intangible assets as of June 30, 2024 is as follows (in thousands):

| | Estimated useful life | Gross carrying amount | Accumulated amortization | Net carrying amount |
|---|:---:|---:|---:|---:|
| Customer relationships – retailers | 10 years | $ 97,600 | $ (74,113) | $ 23,487 |
| Customer relationships – e-commerce | 3 years | 21,540 | (8,340) | 13,200 |
| Trademarks | 10 to 15 years | 128,000 | (7,742) | 120,258 |
| Total finite-lived intangibles | | 247,140 | (90,195) | 156,945 |
| Trademarks | Indefinite | 63,800 | — | 63,800 |
| Goodwill | | 340,600 | — | 340,600 |
| Total goodwill and other intangibles | | $ 651,540 | $ (90,195) | $ 561,345 |

13

Table of Contents

Information regarding the Company's goodwill and intangible assets as of March 31, 2024 is as follows (in thousands):

| | Estimated useful life | Gross carrying amount | Accumulated amortization | Net carrying amount |
|---|---|---|---|---|
| Customer relationships – retailers | 10 years | $ 97,600 | $ (73,393) | $ 24,207 |
| Customer relationships – e-commerce | 3 years | 21,540 | (6,874) | 14,666 |
| Trademarks | 10 to 15 years | 128,000 | (5,579) | 122,421 |
| Total finite-lived intangibles | | 247,140 | (85,846) | 161,294 |
| Trademarks | Indefinite | 63,800 | — | 63,800 |
| Goodwill | | 340,600 | — | 340,600 |
| Total goodwill and other intangibles | | $ 651,540 | $ (85,846) | $ 565,694 |

Information regarding the Company's goodwill and intangible assets as of June 30, 2023 is as follows (in thousands):

| | Estimated useful life | Gross carrying amount | Accumulated amortization | Net carrying amount |
|---|---|---|---|---|
| Customer relationships – retailers | 10 years | $ 77,600 | $ (67,720) | $ 9,880 |
| Customer relationships – e-commerce | 3 years | 3,940 | (3,940) | — |
| Trademarks | 10 years | 3,500 | (1,167) | 2,333 |
| Total finite-lived intangibles | | 85,040 | (72,827) | 12,213 |
| Trademarks | Indefinite | 63,800 | — | 63,800 |
| Goodwill | | 171,620 | — | 171,620 |
| Total goodwill and other intangibles | | $ 320,460 | $ (72,827) | $ 247,633 |

Amortization expenses on finite-lived intangible assets were $4.3 million and $2.0 million in the three months ended June 30, 2024 and June 30, 2023, respectively. Certain trademark assets have been classified as indefinite-lived intangible assets and accordingly, are not subject to amortization. There were no impairments of goodwill or intangible assets recorded in the three months ended June 30, 2024 and June 30, 2023.

The estimated future amortization expense related to finite-lived intangible assets, assuming no impairment as of June 30, 2024 is as follows (in thousands):

| | |
|---|---|
| Remainder of fiscal 2025 | $ 13,047 |
| 2026 | 17,397 |
| 2027 | 14,463 |
| 2028 | 11,530 |
| 2029 | 11,530 |
| Thereafter | 88,978 |
| Total | $ 156,945 |

14

Table of Contents

**Note 5—Accrued expenses and other current liabilities**

Accrued expenses and other current liabilities as of June 30, 2024, March 31, 2024 and June 30, 2023 consisted of the following (in thousands):

| | June 30, 2024 | March 31, 2024 | June 30, 2023 |
|---|---|---|---|
| Accrued expenses | $ 51,511 | $ 37,782 | $ 22,767 |
| Accrued inventory | 20,307 | 16,478 | 84 |
| Accrued marketing | 23,337 | 29,282 | 12,458 |
| Current portion of operating lease liabilities | 8,470 | 7,016 | 4,474 |
| Accrued compensation | 7,409 | 17,423 | 5,165 |
| Taxes payable | 3,065 | 5,814 | 3,594 |
| Other current liabilities | 2,779 | 3,938 | 2,495 |
| Accrued expenses and other current liabilities | $ 116,878 | $ 117,733 | $ 51,037 |

**Note 6—Debt**

The Company's outstanding debt as of June 30, 2024, March 31, 2024 and June 30, 2023 consisted of the following (in thousands):

| | June 30, 2024 | March 31, 2024 | June 30, 2023 |
|---|---|---|---|
| Revolving line of credit[1] | $ 89,500 | $ 89,500 | $ — |
| Term loan[1] | 173,375 | 173,375 | 65,000 |
| Finance lease obligations | — | 57 | 431 |
| Total debt[2] | 262,875 | 262,932 | 65,431 |
| Less: debt issuance costs | (703) | (806) | (388) |
| Total debt, net of issuance costs | 262,172 | 262,126 | 65,043 |
| Less: current portion | (102,938) | (100,307) | (5,431) |
| Long-term portion of debt | $ 159,234 | $ 161,819 | $ 59,612 |

[1] See further discussion below. As of June 30, 2024, the Company was in compliance with all applicable financial covenants under the Amended Credit Agreement (as defined below).

[2] The gross carrying amounts of the Company's long-term debt, before reduction of the debt issuance costs, and finance lease obligations approximate their fair values, based on Level 2 inputs (quoted prices for similar assets and liabilities in active markets or inputs that are observable), as the stated rates approximate market rates for loans with similar terms. The Company did not transfer any liabilities measured at fair value on a recurring basis to or from Level 2 for any of the periods presented.

*Amended Credit Agreement*

On April 30, 2021, the Company amended and restated its prior credit agreement (such amended and restated credit agreement, as further amended, supplemented or modified from time to time, the "Amended Credit Agreement") and refinanced all loans under the prior credit agreement. The Amended Credit Agreement has a five year term and consists of (i) a $100 million revolving credit facility (the "Amended Revolving Credit Facility") and (ii) a $100 million term loan facility (the "Amended Term Loan Facility").

Table of Contents

All amounts under the Amended Revolving Credit Facility are available for draw until the maturity date on April 30, 2026. The Amended Revolving Credit Facility is collateralized by substantially all of the Company's assets and requires payment of an unused fee ranging from 0.10% to 0.30% (based on the Company's consolidated total net leverage ratio (as defined in the Amended Credit Agreement)) times the average daily amount of unutilized commitments under the Amended Revolving Credit Facility. The Amended Revolving Credit Facility also provides for sub-facilities in the form of a $7 million letter of credit and a $5 million swing line loan; however, all amounts drawn under the Amended Revolving Credit Facility cannot exceed $100 million. The unused balance of the Amended Revolving Credit Facility as of June 30, 2024 was $10.5 million.

Prior to the Second Amendment (as defined below), both the Amended Revolving Credit Facility and the Amended Term Loan Facility bore interest, at the borrowers' option, at either (i) a rate per annum equal to an adjusted LIBOR rate determined by reference to the cost of funds for the United States ("US") dollar deposits for the applicable interest period (subject to a minimum floor of 0%) plus an applicable margin ranging from 1.25% to 2.125% based on our consolidated total net leverage ratio or (ii) a floating base rate plus an applicable margin ranging from 0.25% to 1.125% based on our consolidated total net leverage ratio. On March 29, 2023, the Company amended the Amended Credit Agreement to transition the benchmark from LIBOR to an adjusted Secured Overnight Financing Rate ("SOFR") (which is equal to the applicable SOFR plus 0.10%) (such transaction, the "First Amendment"). In connection with the First Amendment, all outstanding LIBOR loans were converted to SOFR loans. The annual interest rate for SOFR borrowings will be equal to term SOFR plus 0.10%, subject to a floor of 0%, plus a margin ranging from 1.25% to 2.125%.

The interest rate as of June 30, 2024 for the Amended Revolving Credit Facility and the Amended Term Loan Facility was approximately 6.7%.

### Second Amended Credit Agreement

On August 28, 2023, the Company entered into the Second Amendment to the Amended and Restated Credit Agreement (the "Second Amendment"). Pursuant to the Second Amendment, the Company may borrow incremental term loans in a principal amount equal to $115.0 million under the Amended Credit Agreement (the "Incremental Term Loan"). The Incremental Term Loan will bear interest at a rate per annum equal to, at the Company's election, adjusted term SOFR or an alternate base rate as set forth in the Second Amendment, plus an interest rate margin, to be based on consolidated total net leverage ratio levels, ranging from, (i) in the case of SOFR loans, 1.50% to 2.375%; provided that if SOFR is less than 0.00%, such rate shall be deemed to be 0.00%, and (ii) in the case of alternate base rate loans, 0.50% to 1.375%; provided that if the alternate base rate is less than 1.00%, such rate shall be deemed to be 1.00%. The Incremental Term Loan amortizes at 5.00% per annum payable in equal quarterly installments of 1.25% per annum, commencing with the fiscal quarter ending on December 31, 2023. The Company used the Incremental Term Loan together with cash from its balance sheet and additional borrowings under its Amended Revolving Credit Facility to consummate the Acquisition (as defined in Note 3 hereto) and to pay related fees and expenses in connection with the Acquisition and Second Amendment.

The interest rate as of June 30, 2024 for the Incremental Term Loan was approximately 6.9%.

The Amended Credit Agreement contains a number of covenants that, among other things and subject to certain exceptions, restrict the Company's ability to pay dividends and distributions or repurchase capital stock, incur additional indebtedness, create liens on assets, engage in mergers or consolidations and sell or otherwise dispose of assets. The Amended Credit Agreement also includes reporting, financial and maintenance covenants that require the Company to, among other things, comply with certain consolidated total net leverage ratios and consolidated fixed charge coverage ratios.

### Note 7—Commitments and contingencies

### Legal contingencies

The Company is from time to time subject to, and is currently involved in legal proceedings, claims and litigation arising in the ordinary course of business. The Company is not currently a party to any matters that management expects will have a material adverse effect on the Company's consolidated financial position, results of operations or cash flows.

Table of Contents

**Note 8—Income taxes**

The Company's quarterly tax provision is based upon an estimated annual effective tax rate as adjusted for any discrete items. The Company's income tax benefit for the three months ended June 30, 2024 was $0.3 million and the income tax provision for the three months ended June 30, 2023 was $6.7 million, with an effective tax rate of (0.7)% and 11.2% for the three months ended June 30, 2024 and June 30, 2023, respectively. The effective tax rate differs from the U.S. statutory tax rate primarily due to discrete tax benefit related to stock-based compensation.

**Note 9—Stock-based compensation**

Stock based compensation expense is recognized on a straight-line basis over the requisite service period. Total stock-based compensation is shown in the table below (in thousands):

|  | Three months ended June 30, | |
|  | 2024 | 2023 |
|---|---|---|
| Service-based vesting options | $ 19 | $ 46 |
| Restricted stock and RSUs | 12,945 | 7,154 |
| Total stock compensation expense | $ 12,964 | $ 7,200 |

As of June 30, 2024, there was $0.1 million and $123.4 million of total unrecognized stock-based compensation cost related to unvested service-based stock options and shares subject to RSAs and RSUs, respectively. The unrecognized stock-based compensation is expected to be recognized over the remaining weighted-average period of 1.3 years for service-based stock options and 2.0 years for shares subject to RSAs and RSUs, respectively.

**Note 10—Repurchase of common stock**

On May 8, 2019, the Company announced that its board of directors authorized a share repurchase program to acquire up to $25.0 million of the Company's common stock (the "Share Repurchase Program"). Purchases under the Share Repurchase Program may be made from time to time, in such amounts as management deems appropriate, through a variety of methods, which may include open market purchases, privately negotiated transactions, block trades, accelerated share repurchase transactions, or by any combination of such methods. The timing and amount of any repurchases pursuant to the Share Repurchase Program will be determined based on market conditions, share price and other factors. The Share Repurchase Program does not have an expiration date, does not require the Company to repurchase any specific number of shares of its common stock, and may be modified, suspended or terminated at any time without notice. There is no guarantee that any additional shares will be purchased under the Share Repurchase Program and such shares are intended to be retired after purchase.

The covenants in the Amended Credit Agreement require the Company to be in compliance with certain leverage ratios to make repurchases under the Share Repurchase Program.

The Company did not repurchase any shares during the three months ended June 30, 2024. A total of $17.1 million remains available for future share repurchases under the Share Repurchase Program as of June 30, 2024.

**Note 11—Net income per share**

The Company computes basic net income per share using the weighted-average number of shares of common stock outstanding. Diluted net income per share amounts are calculated using the treasury stock method for equity-based compensation awards. The following is a reconciliation of the numerator and denominator in the basic and diluted net income per common share computations (in thousands, except share and per share data):

| | Three months ended June 30, | |
| | 2024 | 2023 |
|---|---|---|
| **Numerator:** | | |
| Net income | $ 47,555 | $ 52,977 |
| | | |
| **Denominator:** | | |
| Weighted-average common shares outstanding – basic | 55,973,914 | 53,938,136 |
| Dilutive common equivalent shares from equity awards | 2,577,509 | 3,237,734 |
| Weighted-average common shares outstanding – diluted | 58,551,423 | 57,175,870 |
| | | |
| **Net income per share:** | | |
| Basic | $ 0.85 | $ 0.98 |
| Diluted | $ 0.81 | $ 0.93 |
| Weighted-average anti-dilutive shares from outstanding equity awards excluded from diluted earnings per share | 103,391 | 141,407 |

**Note 12—Leases**

The Company leases warehouses, distribution centers, office space and equipment. The majority of the Company's leases include one or more options to renew, with renewal terms that can extend the lease term for up to five years. The exercise of lease renewal options is at the Company's sole discretion and such renewal options are included in the lease term if they are reasonably certain to be exercised. Certain leases also include options to purchase the leased asset. The Company's lease agreements do not contain any material residual value guarantees or material restrictive covenants. Most of the Company's equipment leases are finance leases of assets used to operate its distribution center in Ontario, California.

Significant judgment is required to determine whether commercial contracts contain a lease for purposes of ASC 842. The Company uses its incremental borrowing rate to determine the present value of lease payments.

Supplemental balance sheet information related to leases as of June 30, 2024, March 31, 2024 and June 30, 2023 is as follows (in thousands):

| | Classification | June 30, 2024 | March 31, 2024 | June 30, 2023 |
|---|---|---|---|---|
| **Assets** | | | | |
| Operating lease assets | Other assets | $ 41,108 | $ 27,415 | $ 13,020 |
| Finance lease assets [a] | Other assets | — | — | 140 |
| Total leased assets | | $ 41,108 | $ 27,415 | $ 13,160 |
| **Liabilities** | | | | |
| Current | | | | |
| Operating | Accrued expenses and other current liabilities | $ 8,470 | $ 7,016 | $ 4,474 |
| Finance | Current portion of long-term debt and finance lease obligations | — | 57 | 431 |
| Noncurrent | | | | |
| Operating | Long-term operating lease obligations | 33,637 | 21,459 | 10,137 |
| Finance | Long-term debt and finance lease obligations | — | — | — |
| Total lease liabilities | | $ 42,107 | $ 28,532 | $ 15,042 |

_____

[a] Finance leases are recorded net of accumulated amortization of $1.5 million, $1.5 million and $3.5 million as of June 30, 2024, March 31, 2024 and June 30, 2023, respectively.

For the three months ended June 30, 2024 and June 30, 2023, the components of operating and finance lease costs were as follows (in thousands):

| | | Three months ended June 30, | |
|---|---|---|---|
| | Classification | 2024 | 2023 |
| Operating lease cost | Selling, general and administrative ("SG&A") expenses | $ 2,517 | $ 1,277 |
| Finance lease cost | | | |
| Amortization of leased assets | SG&A expenses | — | 105 |
| Interest on lease liabilities | Interest expense, net | — | 4 |
| Total lease cost | | $ 2,517 | $ 1,386 |

As of June 30, 2024, the aggregate future minimum lease payments under non-cancellable operating leases presented in accordance with ASC 842 are as follows (in thousands):

| | |
|---|---|
| Remainder of fiscal 2025 | $ 7,436 |
| 2026 | 6,031 |
| 2027 | 8,166 |
| 2028 | 5,300 |
| 2029 | 5,183 |
| Thereafter | 22,036 |
| Total lease payments | 54,152 |
| Less: Interest | 12,045 |
| Present value of lease liabilities | $ 42,107 |

As of June 30, 2024 and June 30, 2023, the weighted-average remaining lease term (in years) and discount rate were as follows:

| | June 30, 2024 | June 30, 2023 |
|---|---|---|
| Weighted-average remaining lease term | | |
| Operating leases | 6.2 years | 4.4 years |
| Finance leases | — | 0.7 years |
| Weighted-average discount rate | | |
| Operating leases | 5.8 % | 2.6 % |
| Finance leases | — % | 2.4 % |

Operating cash outflows from operating leases for the three months ended June 30, 2024 and June 30, 2023 were $2.4 million and $1.2 million, respectively.

20

**Item 2. Management's discussion and analysis of financial condition and results of operations.**

*Management's discussion and analysis of financial condition and results of operations ("MD&A") should be read together with the MD&A presented in the Annual Report on Form 10-K for the year ended March 31, 2024 (the "Annual Report") and the unaudited condensed consolidated financial statements and accompanying notes included in Part I, Item 1 of this Quarterly Report on Form 10-Q (this "Quarterly Report"), which include additional information about our accounting policies, practices and the transactions underlying our financial results.*

**Overview and Business Trends**

e.l.f. Beauty, Inc., a Delaware corporation ("e.l.f. Beauty" and together with its subsidiaries, the "Company," or "we"), is a multi-brand beauty company that offers inclusive, accessible, clean, vegan and cruelty free cosmetics and skin care products. Our mission is to make the best of beauty accessible to every eye, lip, face and skin concern.

We believe our ability to deliver cruelty free, clean, vegan and premium-quality products at accessible prices with broad appeal differentiates us in the beauty industry. We believe the combination of our value proposition, innovation engine, ability to attract and engage consumers, and our world-class team's ability to execute with speed has positioned us well to navigate the competitive beauty market.

Our family of brands includes e.l.f. Cosmetics, e.l.f. SKIN, Naturium, Well People and Keys Soulcare. Our brands are available online and across leading beauty, mass-market, and specialty retailers. We have strong relationships with our retail customers such as Target, Walmart, Ulta Beauty and other leading retailers that have enabled us to expand distribution both domestically and internationally.

**Seasonality**

Our results of operations are subject to seasonal fluctuations, with net sales in the third and fourth fiscal quarters typically being higher than in the first and second fiscal quarters. The higher net sales in our third and fourth fiscal quarters are largely attributable to the increased levels of purchasing by retailers for the holiday season and customer shelf reset activities, respectively. Lower inventory builds from our retailers in preparation for the holiday season or shifts in customer shelf reset activity could have a disproportionate effect on our results of operations for the entire fiscal year. To support anticipated higher sales during the third and fourth fiscal quarters, we make investments in working capital to ensure inventory levels can support demand. Fluctuations throughout the year are also driven by the timing of product restocking or rearrangement by our major retail customers as well as expansion into new retail customers. Because a limited number of our retail customers account for a large percentage of our net sales, a change in the order pattern of one or more of our large retail customers could cause a significant fluctuation of our quarterly results or impact our liquidity.

**Results of operations**

The following table sets forth our consolidated statements of operations data in dollars and as a percentage of net sales for the periods presented:

| | Three months ended June 30, | | | |
|---|---|---|---|---|
| **(in thousands)** | **2024** | | **2023** | |
| Net sales | $ | 324,477 | $ | 216,339 |
| Cost of sales | | 93,194 | | 63,767 |
| Gross profit | | 231,283 | | 152,572 |
| Selling, general and administrative expenses | | 180,575 | | 91,939 |
| Operating income | | 50,708 | | 60,633 |
| Other income, net | | 187 | | 399 |
| Impairment of equity investment | | — | | (1,720) |
| Interest (expense) income, net | | (3,665) | | 341 |
| Income before provision for income taxes | | 47,230 | | 59,653 |
| Income tax benefit (provision) | | 325 | | (6,676) |
| Net income | $ | 47,555 | $ | 52,977 |

21

| (percentage of net sales) | Three months ended June 30, | |
| --- | --- | --- |
| | 2024 | 2023 |
| Net sales | 100 % | 100 % |
| Cost of sales | 29 % | 29 % |
| Gross margin | 71 % | 71 % |
| Selling, general and administrative expenses | 56 % | 42 % |
| Operating income | 16 % | 28 % |
| Other income, net | — % | — % |
| Impairment of equity investment | — % | (1)% |
| Interest (expense) income, net | (1)% | — % |
| Income before provision for income taxes | 15 % | 28 % |
| Income tax benefit (provision) | — % | (3)% |
| Net income | 15 % | 24 % |

**Comparison of the three months ended June 30, 2024 to the three months ended June 30, 2023**

**Net sales**

Net sales increased $108.1 million, or 50%, to $324.5 million for the three months ended June 30, 2024, compared to $216.3 million for the three months ended June 30, 2023. The increase was driven primarily by strength in both our retailer and e-commerce channels. Net sales increased $81.0 million, or 43%, in our retailer channels and $27.2 million, or 105%, in our e-commerce channels. From a price and volume perspective, a higher volume of units sold drove $73.2 million of the increase in net sales. A higher average item price and mix within retailer and e-commerce orders drove the remaining $34.9 million increase in net sales as compared to the three months ended June 30, 2023.

**Gross profit**

Gross profit increased $78.7 million, or 52%, to $231.3 million for the three months ended June 30, 2024, compared to $152.6 million for the three months ended June 30, 2023. Higher unit volume drove $51.7 million of the increase in gross profit, with the remaining increase of $27.1 million driven by higher average item price and mix. Gross margin increased approximately 80 basis points to 71% when compared to the three months ended June 30, 2023. The increase in gross margin was primarily driven by favorable foreign exchange impacts, lower transportation costs, price increases in our international markets, cost savings and mix, partially offset by inventory adjustments.

**Selling, general and administrative expenses**

SG&A expenses were $180.6 million for the three months ended June 30, 2024, an increase of $88.6 million, or 96%, from $91.9 million for the three months ended June 30, 2023. SG&A expenses as a percentage of net sales increased to 56% for the three months ended June 30, 2024 from 42% for the three months ended June 30, 2023. The $88.6 million increase was primarily related to an increase in marketing and digital spend of $40.1 million, increased compensation and benefits expense of $15.1 million, increased operations costs of $10.7 million, increased retail fixturing and visual merchandising costs of $9.4 million, increased professional fees of $4.9 million and increased depreciation and amortization of $4.5 million.

**Other income, net**

Other income, net totaled $0.2 million for the three months ended June 30, 2024, as compared to $0.4 million for the three months ended June 30, 2023. The year-over-year variance is primarily due to an increase in foreign currency exchange losses in the period attributable to foreign currency rate fluctuation.

**Impairment of equity investment**

Impairment of equity investment was $1.7 million for the three months ended June 30, 2023. We elected the measurement alternative for equity investments that do not have readily determinable fair values. We recorded an impairment charge on one of our investments of $1.7 million during the three months ended June 30, 2023, as an identified event or change in circumstances resulted in an indicator of impairment. We did not record an impairment charge on our investment during the three months ended June 30, 2024 as any identified events or changes in circumstances did not result in an indicator of impairment during that period.

**Interest (expense) income, net**

Interest expense, net was $3.7 million for the three months ended June 30, 2024, as compared to interest income, net of $0.3 million for the three months ended June 30, 2023. The year-over-year variance was primarily due to additional borrowings as well as higher interest costs and lower interest earned on our cash balances. See Note 6, "Debt," in our unaudited condensed consolidated financial statements for further details on our debt.

**Income tax benefit (provision)**

The income tax benefit was $0.3 million, or an effective rate of (0.7)%, for the three months ended June 30, 2024, as compared to a provision of $6.7 million, or an effective rate of 11.2%, for the three months ended June 30, 2023. The change in the income tax benefit (provision) was primarily driven by a decrease in income before taxes of $12.4 million and an increase in discrete tax benefits of $3.6 million, primarily related to stock-based compensation.

**Financial condition, liquidity and capital resources**

*Overview*

As of June 30, 2024, we had $109.0 million of cash and cash equivalents. In addition, as of June 30, 2024, we had borrowing capacity of $10.5 million under our Amended Revolving Credit Facility.

Our primary cash needs are for working capital, fixturing, retail product displays and digital investments. Cash needs typically vary depending on strategic initiatives selected for the fiscal year, including investments in infrastructure, digital capabilities and expansion within or to additional retailer store locations. We expect to fund ongoing cash needs from existing cash and cash equivalents, cash generated from operations and, if necessary, draws on our Amended Revolving Credit Facility.

Our primary working capital requirements are for product and product-related costs, compensation and benefits, rent, distribution costs and marketing. Fluctuations in working capital are primarily driven by the timing of when a retailer rearranges or restocks its products, expansion of space within our existing retailer base, expansion to new retailers and the general seasonality of our business. As of June 30, 2024, we had working capital, excluding cash and cash equivalents, of $121.6 million, compared to $69.8 million as of March 31, 2024. Working capital, excluding cash and cash equivalents and debt, was $224.6 million and $170.1 million as of June 30, 2024 and March 31, 2024, respectively.

We believe that our operating cash flow, existing cash and cash equivalents and available financing under the Amended Revolving Credit Facility will be adequate to meet our planned operating, investing and financing needs for the next twelve months. The unused balance of the Amended Revolving Credit Facility as of June 30, 2024 was $10.5 million. If necessary, we can borrow funds under our Amended Revolving Credit Facility to finance our liquidity requirements, subject to customary borrowing conditions. To the extent additional funds are necessary to meet our long-term liquidity needs as we continue to execute our business strategy, we anticipate that they will be obtained through the incurrence of additional indebtedness, additional equity financings or a combination of these potential sources of funds; however, such financing may not be available on favorable terms, or at all.

Our ability to meet our operating, investing and financing needs depends to a significant extent on our future financial performance, which will be subject in part to general economic, competitive, financial, regulatory and other factors that are beyond our control, including those described elsewhere in Part II, Item 1A "Risk factors." In addition to these general economic and industry factors, the principal factors in determining whether our cash flows will be sufficient to meet our liquidity requirements will be based on our ability to provide innovative products to our customers, manage production and our supply chain.

*Cash flows*

| (in thousands) | Three months ended June 30, | | | |
| --- | --- | --- | --- | --- |
| | 2024 | | 2023 | |
| Net cash provided by (used in): | | | | |
| Operating activities | $ | 1,281 | $ | 23,354 |
| Investing activities | | (879) | | (616) |
| Financing activities | | 408 | | (967) |

*Cash provided by operating activities*

For the three months ended June 30, 2024, net cash provided by operating activities was $1.3 million. This included net income as adjusted for depreciation, amortization and other non-cash items of $76.8 million, partially offset by an increase in working capital of $75.5 million. The increase in working capital was primarily driven by a $31.8 million increase in accounts receivable, a $30.5 million increase in prepaid expense and other assets, a $8.1 million increase in inventory, a $3.1 million decrease in accounts payable and accrued expenses, and a $2.0 million decrease related to other liabilities.

For the three months ended June 30, 2023, net cash provided by operating activities was $23.4 million. This included net income as adjusted for depreciation, amortization and other non-cash items of $69.8 million, partially offset by an increase in working capital of $46.4 million. The increase in working capital was primarily driven by a $22.6 million increase in accounts receivable, a $16.7 million increase in inventory, an $8.1 million increase of prepaid expense and other assets, and a $1.0 million decrease related to other liabilities. This was partially offset by a $2.0 million increase in accounts payable and accrued expenses.

*Cash used in investing activities*

For the three months ended June 30, 2024, net cash used in investing activities was $0.9 million primarily consisting of capital expenditures related to fixturing, equipment and software.

For the three months ended June 30, 2023, net cash used in investing activities was $0.6 million consisting of capital expenditures related to fixturing, equipment and software.

*Cash provided by (used in) financing activities*

For the three months ended June 30, 2024, net cash provided by financing activities was $0.4 million primarily related to cash received from the exercise of stock options.

For the three months ended June 30, 2023, net cash used in financing activities was $1.0 million and was primarily driven by repayment on the Amended Term Loan Facility of $1.3 million, partially offset by cash received from the exercise of stock options.

**Description of indebtedness**

*Amended Credit Agreement*

On April 30, 2021, we amended and restated our prior credit agreement (as further amended, supplemented or modified from time to time, the "Amended Credit Agreement") and refinanced all loans under the prior credit agreement. The Amended Credit Agreement has a five year term and consists of revolving credit facility (the "Amended Revolving Credit Facility" and term loan facility (the "Amended Term Loan Facility").

All amounts under the Amended Revolving Credit Facility are available for draw until the maturity date on April 30, 2026. The Amended Revolving Credit Facility is collateralized by substantially all of our assets and requires payment of an unused fee ranging from 0.10% to 0.30% (based on our consolidated total net leverage ratio (as defined in the Amended Credit Agreement)) times the average daily amount of unutilized commitments under the Amended Revolving Credit Facility. The Amended Revolving Credit Facility also provides for sub-facilities in the form of a $7 million letter of credit and a $5 million swing line loan; however, all amounts drawn under the Amended Revolving Credit Facility cannot exceed $100 million. The unused balance of the Amended Revolving Credit Facility as of June 30, 2024 was $10.5 million.

24

Prior to the Second Amendment (as defined below), both the Amended Revolving Credit Facility and the Amended Term Loan Facility bear interest, at borrowers' option, at either (i) a rate per annum equal to an adjusted LIBOR rate determined by reference to the cost of funds for the US dollar deposits for the applicable interest period (subject to a minimum floor of 0%) plus an applicable margin ranging from 1.25% to 2.125% based on our consolidated total net leverage ratio or (ii) a floating base rate plus an applicable margin ranging from 0.25% to 1.125% based on our consolidated total net leverage ratio. On March 29, 2023, we amended the Amended Credit Agreement to transition the benchmark from LIBOR to an adjusted Secured Overnight Financing Rate ("SOFR") (which is equal to the applicable SOFR plus 0.10%) (such transaction, the "First Amendment"). In connection with the First Amendment, all outstanding LIBOR loans were converted to SOFR loans. The annual interest rate for SOFR borrowings will be equal to term SOFR, subject to a floor of 0%, plus a margin ranging from 1.25% to 2.125%.

The interest rate as of June 30, 2024 for the Amended Revolving Credit Facility and the Amended Term Loan Facility was approximately 6.7%.

### *Second Amended Credit Agreement*

On August 28, 2023, we entered into the Second Amendment to the Amended and Restated Credit Agreement (the "Second Amendment"). Pursuant to the Second Amendment, we may borrow incremental term loans in a principal amount equal to $115.0 million under the Amended Credit Agreement (the "Incremental Term Loan"). The Incremental Term Loan will bear interest at a rate per annum equal to, at our election, adjusted term SOFR or an alternate base rate as set forth in the Second Amendment, plus an interest rate margin, to be based on consolidated total net leverage ratio levels, ranging from, (i) in the case of SOFR loans, 1.50% to 2.375%; provided that if SOFR is less than 0.00%, such rate shall be deemed to be 0.00%, and (ii) in the case of alternate base rate loans, 0.50% to 1.375%; provided that if the alternate base rate is less than 1.00%, such rate shall be deemed to be 1.00%. The Incremental Term Loan amortizes at 5.00% per annum payable in equal quarterly installments of 1.25% per annum, commencing with the fiscal quarter ending on December 31, 2023. We used the Incremental Term Loan together with cash from our balance sheet and additional borrowings under our Amended Revolving Credit Facility to consummate the Acquisition and to pay related fees and expenses in connection with the Naturium acquisition and Second Amendment.

The interest rate as of June 30, 2024 for the Incremental Term Loan was approximately 6.9%.

The Amended Credit Agreement contains a number of covenants that, among other things and subject to certain exceptions, restrict our ability to pay dividends and distributions or repurchase our capital stock, incur additional indebtedness, create liens on assets, engage in mergers or consolidations and sell or otherwise dispose of assets. The Amended Credit Agreement also includes reporting, financial and maintenance covenants that require us to, among other things, comply with certain consolidated total net leverage ratios and consolidated fixed charge coverage ratios. As of June 30, 2024, we were in compliance with all financial covenants under the Amended Credit Agreement.

### Contractual obligations and commitments

There have been no material changes to our contractual obligations and commitments as included in the Annual Report.

### Off-balance sheet arrangements

We are not party to any off-balance sheet arrangements.

### Critical accounting policies and estimates

The MD&A is based upon our unaudited condensed consolidated financial statements, which have been prepared in accordance with U.S. generally accepted accounting principles. The preparation of these unaudited condensed consolidated financial statements required the use of estimates and judgments that affect the reported amounts of our assets, liabilities, revenues and expenses. Management bases estimates on historical experience and other assumptions it believes to be reasonable under the circumstances and evaluates these estimates on an on-going basis. Actual results may differ from these estimates. There have been no significant changes to the critical accounting policies and estimates included in the Annual Report.

**Recent accounting pronouncements**

Recent accounting pronouncements are disclosed in Note 2 to our unaudited condensed consolidated financial statements.

**Item 3. Quantitative and qualitative disclosures about market risk.**

There have been no material changes to our primary risk exposures or management of market risks from those disclosed in the Annual Report.

**Item 4. Controls and procedures.**

**Evaluation of disclosure controls and procedures over financial reporting**

As of June 30, 2024, our management conducted an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act"). Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of June 30, 2024, our disclosure controls and procedures were effective to provide reasonable assurance that the information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and that such information is accumulated and communicated to the officers who certify our financial reports and to the members of the Company's senior management and board of directors as appropriate to allow timely decisions regarding required disclosure.

**Changes in internal control over financial reporting**

We have assessed the impact on changes to our internal controls over financial reporting and concluded that there have been no changes to our internal control over financial reporting that occurred during the quarter ended June 30, 2024 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**PART II. OTHER INFORMATION**

**Item 1. Legal proceedings.**

We are from time to time subject to, and are presently involved in, legal proceedings, claims and litigation arising in the ordinary course of business. We are not currently a party to any matters that management expects will have a material adverse effect on our consolidated financial position, results of operations or cash flows.

**Item 1A. Risk factors.**

Certain risks may have a material and/or adverse effect on our business, financial condition and results of operations. These risks include those described below and may include additional risks and uncertainties not presently known to us or that we currently deem immaterial. These risks should be read in conjunction with the other information in this Quarterly Report, including our unaudited condensed consolidated financial statements and related notes thereto and "Management's discussion and analysis of financial condition and results of operations" in Part I, Item 2 of this Quarterly Report.

**Risk factors related to the beauty industry**

***The beauty industry is highly competitive, and if we are unable to compete effectively our results will suffer.***

We face vigorous competition from companies throughout the world, including large multinational consumer products companies that have many beauty brands under ownership and independent beauty and skin care brands, including those that may target the latest trends or specific distribution channels. Competition in the beauty industry is based on the introduction of new products, pricing of products, quality of products and packaging, brand awareness, perceived value and quality, innovation, in-store presence and visibility, promotional activities, advertising, editorials, e-commerce and mobile-commerce initiatives and other activities. We must compete with a high volume of new product introductions and existing products by diverse companies across several different distribution channels.

Many multinational consumer companies have greater financial, technical or marketing resources, longer operating histories, greater brand recognition or larger customer bases than we do and may be able to respond more effectively to changing business and economic conditions than we can. Many of these competitors' products are sold in a wider selection or greater number of retail stores and possess a larger presence in these stores, typically having significantly more inline shelf space than we do. Given the finite space allocated to beauty products by retail stores, our ability to grow the number of retail stores in which our products are sold and expand our space allocation once in these retail stores may require the removal or reduction of the shelf space of these competitors. We may be unsuccessful in our growth strategy in the event retailers do not reallocate shelf space from our competitors to us. Increasing shelf space allocated to our products may be especially challenging in instances when a retailer has its own brand. In addition, our competitors may attempt to gain market share by offering products at prices at or below the prices at which our products are typically offered, including through the use of large percentage discounts and "buy one and get one free" offers. Competitive pricing may require us to reduce our prices, which would decrease our profitability or result in lost sales. Our competitors, many of whom have greater resources than we do, may be better able to withstand these price reductions and lost sales.

It is difficult for us to predict the timing and scale of our competitors' activities in these areas or whether new competitors will emerge in the beauty industry. In recent years, numerous online, "indie," celebrity and influencer-backed beauty companies have emerged and garnered significant followings. In addition, further technological breakthroughs, including new and enhanced technologies which increase competition in the online retail market, new product offerings by competitors and the strength and success of our competitors' marketing programs may impede our growth and the implementation of our business strategy.

Our ability to compete also depends on the continued strength of our brands and products, the success of our marketing, innovation and execution strategies, the continued diversity of our product offerings, the successful management of new product introductions and innovations, strong operational execution, including in order fulfillment, our ability to adapt to changes in technology, including the successful utilization of data analytics, artificial intelligence ("AI") and machine learning, and our success in entering new markets and expanding our business in existing geographies. If we are unable to continue to compete effectively, it could have a material adverse effect on our business, financial condition and results of operations.

***Our new product introductions may not be as successful as we anticipate.***

The beauty industry is driven in part by fashion and beauty trends, which may shift quickly. Our continued success depends on our ability to anticipate, gauge and react in a timely and cost-effective manner to changes in consumer preferences for beauty products, consumer attitudes toward our industry and brands and where and how consumers shop for those products. We must continually work to develop, produce and market new products, maintain and enhance the recognition of our brands, maintain a favorable mix of products and develop our approach as to how and where we market and sell our products.

We have a process for the development, evaluation and validation of our new product concepts. Nonetheless, each new product launch involves risks, as well as the possibility of unexpected consequences. For example, the acceptance of new product launches and sales to our retail customers may not be as high as we anticipate due to lack of acceptance of the products themselves or their price or limited effectiveness of our marketing strategies. In addition, our ability to launch new products may be limited by delays or difficulties affecting the ability of our suppliers or manufacturers to timely manufacture, distribute and ship new products or displays for new products. Sales of new products may be affected by inventory management by our retail customers, and we may experience product shortages or limitations in retail display space by our retail customers. We may also experience a decrease in sales of certain existing products as a result of newly-launched products, the impact of which could be exacerbated by shelf space limitations or any shelf space loss. Any of these occurrences could delay or impede our ability to achieve our sales objectives, which could have a material adverse effect on our business, financial condition and results of operations.

As part of our ongoing business strategy, we expect that we will need to continue to introduce new products in the color cosmetics and skincare categories, while also expanding our product launches into adjacent categories in which we may have little to no operating experience. The success of product launches in adjacent product categories could be hampered by our relative inexperience operating in such categories, the strength of our competitors or any of the other risks referred to above. Furthermore, any expansion into new product categories may prove to be an operational and financial constraint which inhibits our ability to successfully accomplish such expansion. Our inability to introduce successful products in our traditional categories or in adjacent categories could limit our future growth and have a material adverse effect on our business, financial condition and results of operations.

***Any damage to our reputation or brands may materially and adversely affect our business, financial condition and results of operations.***

We believe that developing and maintaining our brands is critical and that our financial success is directly dependent on consumer perception of our brands. Furthermore, the importance of brand recognition may become even greater as competitors offer more products similar to ours.

We have relatively low brand awareness among consumers when compared to legacy beauty brands, and maintaining and enhancing the recognition and reputation of our brands is critical to our business and future growth. Many factors, some of which are beyond our control, are important to maintaining our reputation and brands. These factors include our ability to comply with ethical, social, product, labor and environmental standards. Any actual or perceived failure in compliance with such standards could damage our reputation and brands.

The growth of our brands depends largely on our ability to provide a high-quality consumer experience, which in turn depends on our ability to bring innovative products to the market at competitive prices that respond to consumer demands and preferences. Additional factors affecting our consumer experience include our ability to provide appealing store sets in retail stores, the maintenance and stocking of those sets by our retail customers, the overall shopping experience provided by our retail customers, a reliable and user-friendly website interface and mobile applications for our consumers to browse and purchase products on our e-commerce websites and mobile applications. If we are unable to preserve our reputation, enhance our brand recognition or increase positive awareness of our products and in-store and Internet platforms, it may be difficult for us to maintain and grow our consumer base, and our business, financial condition and results of operations may be materially and adversely affected.

The success of our brands may also suffer if our marketing plans or product initiatives do not have the desired impact on our brands' image or our ability to attract consumers. Further, our brand value could diminish significantly due to a number of factors, including consumer perception that we have acted in an irresponsible manner, adverse publicity about our products, our failure to maintain the quality of our products, product contamination, the failure of our products to deliver consistently positive consumer experiences, or our products becoming unavailable to consumers.

***Our success depends, in part, on the quality, performance and safety of our products.***

Any loss of confidence on the part of consumers in the ingredients used in our products, whether related to product contamination or product safety or quality failures, actual or perceived, or inclusion of prohibited ingredients, could tarnish the image of our brands and could cause consumers to choose other products. Allegations of contamination or other adverse effects on product safety or suitability for use by a particular consumer, even if untrue, may require us to expend significant time and resources responding to such allegations and could, from time to time, result in a recall of a product from any or all of the markets in which the affected product was distributed. Any such issues or recalls could negatively affect our profitability and image of our brands.

If our products are found to be, or perceived to be, defective or unsafe, or if they otherwise fail to meet our consumers' expectations, our relationships with consumers could suffer, the appeal of our brands could be diminished, we may need to recall some of our products and/or become subject to regulatory action, and we could lose sales or market share or become subject to boycotts or liability claims. In addition, safety or other defects in our competitors' products could reduce consumer demand for our own products if consumers view them to be similar. Any of these outcomes could result in a material adverse effect on our business, financial condition and results of operations.

**Risk factors related to our growth and profitability**

***We may not be able to successfully implement our growth strategy.***

Our future growth, profitability and cash flows depend upon our ability to successfully implement our business strategy, which, in turn, is dependent upon a number of key initiatives, including our ability to:

- build demand in our brands;

- invest in digital capabilities;

- lead innovation by providing prestige quality products at an extraordinary value;

- drive productivity and space expansion with our retailers;

- deliver profitable growth; and

- pursue strategic extensions that can leverage our strengths and bring new capabilities.

There can be no assurance that we can successfully achieve any or all of the above initiatives in the manner or time period that we expect. Further, achieving these objectives will require investments which may result in short-term cost increases with net sales materializing on a longer-term horizon and, therefore, may be dilutive to our earnings. We cannot provide any assurance that we will realize, in full or in part, the anticipated benefits we expect our strategy will achieve. The failure to realize those benefits could have a material adverse effect on our business, financial condition and results of operations.

***Our growth and profitability are dependent on a number of factors, and our historical growth may not be indicative of our future growth.***

Our historical growth may not be indicative of our future performance as we may not be successful in executing our growth strategy, and, even if we achieve our strategic imperatives, we may not be able to sustain profitability. In future periods, our revenue could decline or grow more slowly than we expect. We also may incur significant losses in the future for a number of reasons, including the following risks and the other risks described in this report, and we may encounter unforeseen expenses, difficulties, complications, delays and other unknown factors:

- we may lose one or more significant retail customers, or sales of our products through these retail customers may decrease;

- the ability of our third-party suppliers and manufacturers to produce our products and of our distributors to distribute our products could be disrupted;

- because substantially all of our products are sourced and manufactured in China, our operations are susceptible to risks inherent in doing business there;

Table of Contents

- our products may be the subject of regulatory actions, including, but not limited to, actions by the US Food and Drug Administration (the "FDA"), the Federal Trade Commission (the "FTC") and the Consumer Product Safety Commission (the "CPSC") in the United States and comparable foreign authorities outside the United States;

- we may be unable to introduce new products that appeal to consumers or otherwise successfully compete with our competitors in the beauty industry;

- we may be unsuccessful in enhancing the recognition and reputation of our brands, and our brands may be damaged as a result of, among other reasons, our failure, or alleged failure, to comply with applicable ethical, social, product, labor or environmental standards;

- we may experience service interruptions, data corruption, cyber-based attacks or network security breaches which result in the disruption of our operating systems or the loss of confidential information of our consumers;

- we may be unable to retain key members of our senior management team or attract and retain other qualified personnel; and

- we may be affected by any adverse economic conditions in the United States or internationally.

*We may be unable to continue to grow our business effectively or efficiently, which would harm our business, financial condition and results of operations.*

Since our formation, we have experienced significant growth in our business, customer base, employee headcount and operations, and we expect to continue to grow our business. Growing our business has placed, and we expect that it will continue to place, strain on our management team, personnel, financial and information systems, supply chain and distribution capacity and other resources. To manage our growth effectively, we must continue to enhance our operational, financial and management systems, including our warehouse management and inventory control; maintain and improve our internal controls and disclosure controls and procedures; maintain and improve our information technology systems and procedures; and expand, train and manage our employee base while maintaining close coordination among our executive, accounting, finance, legal, human resources, marketing, regulatory, sales and operations functions.

We may not be able to continue to effectively manage our expansion in any one or more of these areas, and any failure to do so could significantly harm our business, financial condition and results of operations. Growing our business may make it difficult for us to adequately predict the expenditures we will need to make in the future. If we do not make the necessary overhead expenditures to accommodate our future growth, we may not be successful in executing our growth strategy, and our results of operations would suffer.

*Acquisitions or investments, such as our acquisition of Naturium, could disrupt our business and harm our financial condition.*

We frequently review acquisition and strategic investment opportunities that would expand our current product offerings, our distribution channels, increase the size and geographic scope of our operations or otherwise offer growth and operating efficiency opportunities. There can be no assurance that we will be able to identify suitable candidates or consummate these transactions on favorable terms. The process of integrating an acquired business, product or technology can create unforeseen operating difficulties, expenditures and other challenges such as:

- potentially increased regulatory and compliance requirements;

- implementation or remediation of controls, procedures and policies at the acquired business;

- diversion of management time and focus from operation of our then-existing business to acquisition integration challenges;

- coordination of product, sales, marketing and program and systems management functions;

- transition of the users and customers of the acquired business, product, or technology onto our system;

- retention of employees from the acquired business;

Table of Contents

- integration of employees from the acquired business into our organization;

- integration of the acquired business' accounting, information management, human resources and other administrative systems and operations into our systems and operations;

- liability for activities of the acquired business, product or technology prior to the acquisition, including violations of law, commercial disputes and tax and other known and unknown liabilities; and

- litigation or other claims in connection with the acquired business, product or technology, including claims brought by terminated employees, customers, former stockholders or other third parties.

If we are unable to address these difficulties and challenges or other problems encountered in connection with any acquisition or investment, we might not realize the anticipated benefits of that acquisition or investment, and we might incur unanticipated liabilities or otherwise suffer harm to our business generally. For example, if the integration of Naturium's business with our business is more difficult, costly or time-consuming than expected, we may not fully realize the expected benefits of our acquisition of Naturium, which may adversely affect our business, financial condition and results of operations. See also "*Risk factors related to our acquisition of Naturium.*"

To the extent that we pay the consideration for any acquisitions or investments in cash, it reduces the amount of cash available to us for other purposes. Acquisitions or investments can also result in dilutive issuances of our equity securities or the incurrence of debt, contingent liabilities, amortization expenses, increased interest expenses or impairment charges against goodwill on our consolidated balance sheet, any of which could have a material adverse effect on our business, financial condition and results of operations. For example, in connection with our acquisition of Naturium, we paid total consideration of approximately $333.0 million using an incremental term loan under our existing credit facility, borrowings on our existing revolving facility, cash on the balance sheet and approximately $57.8 million of our stock.

**Risk factors related to our acquisition of Naturium**

***We have made certain assumptions relating to our acquisition of Naturium that may prove to be materially inaccurate.***

We have made certain assumptions relating to our acquisition of Naturium that may prove to be inaccurate, including as the result of the failure to realize the expected benefits of the acquisition, failure to realize expected revenue growth rates and higher than expected operating, transaction and integration costs, as well as general economic and business conditions that adversely affect Naturium. If the assumptions are incorrect, our business, financial condition and results of operations may be materially adversely affected.

***Naturium may have liabilities that are not known to us.***

Naturium may have liabilities that we failed, or were unable, to discover in the course of performing our due diligence investigations in connection with our acquisition of Naturium. We may learn additional information about Naturium that materially and adversely affects us and Naturium, such as unknown or contingent liabilities and liabilities related to compliance with applicable laws. Moreover, Naturium may be subject to audits, reviews, inquiries, investigations and claims of non-compliance and litigation by federal and state regulatory agencies which could result in liabilities or other sanctions. Any such liabilities or sanctions, individually or in the aggregate, could have an adverse effect on our business, financial condition and results of operations.

***Raw material sources for Naturium could be interrupted from time to time and, if interrupted, there is no guarantee that the supply of materials could be resumed within a reasonable time frame and at an acceptable cost or at all.***

Naturium relies on certain third-party suppliers for raw materials necessary to produce Naturium products, and we intend to continue to rely on these third parties. There are a limited number of suppliers of raw materials used to produce Naturium products, and there may be a need to assess alternate suppliers to prevent a possible disruption of the availability of those raw materials. We cannot be sure that these suppliers will remain in business, or that they will not be purchased by one of our competitors or another company that is not interested in continuing to provide raw materials for our intended purpose. In addition, the lead time needed to establish a relationship with a new supplier can be lengthy, and we may experience delays in meeting demand in the event a new supplier must be used. The time and effort to qualify a new supplier could result in additional costs, diversion of resources or reduced manufacturing yields, any of which would negatively impact our operating results. Any significant delay in the supply of the raw materials needed to produce Naturium products could considerably

Table of Contents

delay product manufacturing and distribution, which would impair our ability to generate revenues from the sale of Naturium products and could ultimately adversely affect our business, financial condition and results of operations.

**Risk factors related to our business operations and macroeconomic conditions**

*A disruption in our operations, including a disruption in the supply chains for our products, could materially and adversely affect our business.*

As a company engaged in distribution on a global scale, our operations, including those of our third-party manufacturers, suppliers, brokers and delivery service providers, are subject to the risks inherent in such activities, including industrial accidents, environmental events, strikes and other labor disputes, disruptions or delays in shipments, disruptions in information systems, product quality control, safety, licensing requirements and other regulatory issues, as well as natural disasters, pandemics (such as the coronavirus pandemic), border disputes, international conflict (such as the ongoing military conflict in Ukraine and the Middle East), acts of terrorism and other external factors over which we and our third-party manufacturers, suppliers, brokers and delivery service providers have no control. The loss of, or damage to, the manufacturing facilities or distribution centers of our third-party manufacturers, suppliers, brokers and delivery service providers could materially and adversely affect our business, financial condition and results of operations.

We depend heavily on ocean container delivery, as well as fast boats, rail and air freight, to receive shipments of our products from our third-party manufacturers located in China and contracted third-party delivery service providers to deliver our products to our distribution facilities and logistics providers, and from there to our retail customers. Further, we rely on postal and parcel carriers for the delivery of products sold directly to consumers through our e-commerce websites and mobile applications. Interruptions, to or failures in, these delivery services could prevent the timely or successful delivery of our products. These interruptions or failures may be due to unforeseen events that are beyond our control or the control of our third-party delivery service providers, such as port congestion, container shortages, inclement weather, natural disasters, international conflict, labor unrest or other transportation disruptions. In addition, port congestion, container shortages, inclement weather, natural disasters, international conflict, labor unrest or other transportation disruptions may increase the costs to supply or transport our products or the components of our products. For example, disruption in ocean transit through the Red Sea recently led to significant increases in ocean freight rates. If our products are not delivered on time or are delivered in a damaged state, retail customers and consumers may refuse to accept our products and have less confidence in our services. In addition, a vessel and container shortage globally could delay future inventory receipts and, in turn, could delay deliveries to our retailer customers and availability of products in our direct-to-consumer e-commerce channel. Such potential delays, additional transportation expenses and shipping disruptions could negatively impact our results of operations through higher inventory costs and reduced sales. Furthermore, the delivery personnel of contracted third-party delivery service providers act on our behalf and interact with our consumers personally. Any failure to provide high-quality delivery services to our consumers may negatively affect the shopping experience of our consumers, damage our reputation and cause us to lose consumers.

Our ability to meet the needs of our consumers and retail customers depends on the proper operation of our distribution facilities, where most of our inventory that is not in transit is housed. Although we currently insure our inventory, our insurance coverage may not be sufficient to cover the full extent of any loss or damage to our inventory or distribution facilities, and any loss, damage or disruption of the facilities, or loss or damage of the inventory stored there, could materially and adversely affect our business, financial condition and results of operations.

*Our success depends, in part, on our retention of key members of our senior management team and ability to attract and retain qualified personnel.*

Our success depends, in part, on our ability to attract and retain key employees, including our executive officers, senior management team and operations, finance, sales and marketing personnel. The labor markets in the United States, China and the United Kingdom (the "UK"), where most of our employees are located, are hyper competitive, and attracting and retaining top talent requires significant organizational costs and attention. We are a relatively small company that relies on a few key employees, any one of whom would be difficult to replace, and because we are a small company, we believe that the loss of key employees may be more disruptive to us than it would be to a larger company. Our success also depends, in part, on our continuing ability to identify, hire, train and retain other highly qualified personnel. In addition, we may be unable to effectively plan for the succession of senior management, including our Chief Executive Officer. The loss of key personnel or

32

the failure to attract and retain qualified personnel may have a material adverse effect on our business, financial condition and results of operations.

***We rely on a number of third-party suppliers, manufacturers, distributors and other vendors, and they may not continue to produce products or provide services that are consistent with our standards or applicable regulatory requirements, which could harm our brands, cause consumer dissatisfaction, and require us to find alternative suppliers of our products or services.***

We use multiple third-party suppliers and manufacturers, primarily based in China, to source and manufacture substantially all of our products. We engage our third-party suppliers and manufacturers on a purchase order basis and are not party to long-term contracts with any of them. The ability of these third parties to supply and manufacture our products may be affected by competing orders placed by other persons and the demands of those persons. Further, we are subject to risks associated with disruptions or delays in shipments whether due to port congestion, container shortages, labor disputes, product regulations and/or inspections or other factors, natural disasters or health pandemics, or other transportation disruptions. If we experience significant increases in demand or need to replace a significant number of existing suppliers or manufacturers, there can be no assurance that additional supply and manufacturing capacity will be available when required on terms that are acceptable to us, or at all, or that any supplier or manufacturer will allocate sufficient capacity to us in order to meet our requirements.

In addition, quality control problems, such as the use of ingredients and delivery of products that do not meet our quality control standards and specifications or comply with applicable laws or regulations could harm our business. These quality control problems could result in regulatory action, such as restrictions on importation, products of inferior quality or product stock outages or shortages, harming our sales and creating inventory write-downs for unusable products.

We have also outsourced significant portions of our distribution process, as well as certain technology-related functions, to third-party service providers. Specifically, we rely on third-party distributors to sell our products in a number of foreign countries, our warehouses and distribution facilities are managed and staffed by third-party service providers, we are dependent on a single third-party vendor for credit card processing, and we utilize a third-party hosting and networking provider to host our e-commerce websites and mobile applications. The failure of one or more of these entities to provide the expected services on a timely basis, or at all, or at the prices we expect, or the costs and disruption incurred in changing these outsourced functions to being performed under our management and direct control or that of a third-party, may have a material adverse effect on our business, financial condition and results of operations. We are not party to long-term contracts with some of our distributors, and upon expiration of these existing agreements, we may not be able to renegotiate the terms on a commercially reasonable basis, or at all.

Further, our third-party manufacturers, suppliers and distributors may:

• have economic or business interests or goals that are inconsistent with ours;

• take actions contrary to our instructions, requests, policies or objectives;

• be unable or unwilling to fulfill their obligations under relevant purchase orders, including obligations to meet our production deadlines, quality standards, pricing guidelines and product specifications, or to comply with applicable regulations, including those regarding the safety and quality of products and ingredients and good manufacturing practices;

• have financial difficulties;

• encounter raw material or labor shortages;

• encounter increases in raw material or labor costs which may affect our procurement costs;

• disclose our confidential information or intellectual property to competitors or third parties;

• engage in activities or employment practices that may harm our reputation; and

• work with, be acquired by, or come under control of, our competitors.

33

The occurrence of any of these events, alone or together, could have a material adverse effect on our business, financial condition and results of operations. In addition, such problems may require us to find new third-party suppliers, manufacturers or distributors, and there can be no assurance that we would be successful in finding third-party suppliers, manufacturers or distributors meeting our standards of innovation and quality.

The management and oversight of the engagement and activities of our third-party suppliers, manufacturers and distributors requires substantial time, effort and expense of our employees, and we may be unable to successfully manage and oversee the activities of our third-party manufacturers, suppliers and distributors. If we experience any supply chain disruptions caused by our manufacturing process or by our inability to locate suitable third-party manufacturers or suppliers, or if our manufacturers or raw material suppliers experience problems with product quality or disruptions or delays in the manufacturing process or delivery of the finished products or the raw materials or components used to make such products, our business, financial condition and results of operations could be materially and adversely affected.

*If we fail to manage our inventory effectively, our results of operations, financial condition and liquidity may be materially and adversely affected.*

Our business requires us to manage a large volume of inventory effectively. We depend on our forecasts to estimate demand for and popularity of various products to make purchasing decisions and to manage our inventory of stock-keeping units. Demand for products, however, can change significantly between the time inventory or components are ordered and the date of sale. Demand may be affected by seasonality, new product launches, rapid changes in product cycles and pricing, product defects, promotions, changes in consumer spending patterns, changes in consumer tastes with respect to our products and other factors, and our consumers may not purchase products in the quantities that we expect. It may be difficult to accurately forecast demand and determine appropriate levels of product or components. We generally do not have the right to return unsold products to our suppliers. If we fail to manage our inventory effectively or negotiate favorable credit terms with third-party suppliers, we may be subject to a heightened risk of inventory obsolescence, a decline in inventory values, and significant inventory write-downs or write-offs. In addition, if we are required to lower sale prices in order to reduce inventory level or to pay higher prices to our suppliers, our profit margins might be negatively affected. Any of the above may materially and adversely affect our business, financial condition and results of operations. See also "*Risk factors related to our retail customers, consumers and the seasonality of our business—Our quarterly results of operations fluctuate due to seasonality, order patterns from key retail customers and other factors, and we may not have sufficient liquidity to meet our seasonal working capital requirements.*"

*Public health crises could adversely affect our business, financial condition and results of operations.*

The COVID-19 pandemic and government and private sector responsive measures taken to contain or mitigate the effects of the pandemic, as well as related changes in consumer shopping behaviors, adversely affected our business, financial condition and results of operations. The emergence of another pandemic, epidemic or infectious disease outbreak could have a similar effect. The potential impacts of such public health crises include, but are not limited to:

- the possibility of closures, reduced operating hours and/or decreased retail traffic for our retail customers, resulting in a decrease in sales of our products;

- disruption to our distribution centers and our third-party suppliers and manufacturers, including the effects of facility closures as a result of disease outbreaks or other illnesses, or measures taken by federal, state or local governments to reduce its spread, reductions in operations hours, labor shortages and real-time changes in operating procedures, including for additional cleaning and disinfection procedures; and

- significant disruption of global financial markets, which could have a negative impact on our ability to access capital in the future.

The COVID-19 pandemic contributed significantly to global supply chain constraints, with restrictions and limitations on related activities causing disruption and delay. These disruptions and delays strained domestic and international supply chains, resulting in port congestion, transportation delays as well as labor and container shortages, and affected the flow or availability of certain products.

The emergence of another pandemic, epidemic or infectious disease outbreak, and any required or voluntary actions to help limit the spread of illness, could impact our ability to carry out our business and may materially adversely impact global economic conditions, our business, financial condition and results of operations. There is a risk that our suppliers and distribution centers may become less productive or encounter disruptions as a result of the emergence and spread of another

disease, and/or these facilities may no longer be allowed to operate based on directives from public health officials or government authorities in the United States, Canada, the UK, the European Union (the "EU"), China or other jurisdictions. Such events could materially increase our costs, negatively impact our sales and damage our results of operations and liquidity, possibly to a significant degree.

The full extent of the impact of a pandemic, such as the COVID-19 pandemic, an epidemic or an infectious disease outbreak on our business, financial condition and results of operations will depend on future developments that are highly uncertain and unpredictable, including the timing, acceptance and efficacy of vaccinations and possible achievement of herd immunity in various locations, the occurrence of virus mutations and variants, infection rates increasing or returning in various geographic areas, actions by government authorities to contain outbreaks or treat their impact, and any related impact on capital and financial markets and consumer behavior, including the impacts of any recession or inflationary pressures, all of which may vary across regions.

***Adverse economic conditions in the United States or any of the other countries in which we conduct significant business could negatively affect our business, financial condition and results of operations.***

Many of our products may be considered discretionary items for consumers. Consumer spending on beauty products is influenced by general economic conditions and the availability of discretionary income. Adverse economic conditions in the United States, Canada, the UK, the EU, China or any of the other jurisdictions in which we conduct significant business, such as the current inflationary economic environment, rising interest rates, financial distress caused by recent or potential bank failures and the associated banking crisis, an economic recession, depression or downturn, a tightening of the credit markets, high energy prices or higher unemployment levels, may lead to decreased consumer spending, reduced credit availability and a decline in consumer confidence and demand, each of which poses a risk to our business. For example, US and global markets have been experiencing volatility and disruption due to interest rate and inflation increases, such as higher inflation rates in the United States, which have remained above the Federal Reserve's inflation target, as well as the continued escalation of geopolitical tensions, including those as a result of the conflicts between Russia and Ukraine and in the Middle East. We have experienced and continue to experience inflationary pressures in certain areas of our business. Although our business has not yet been materially negatively impacted by such inflationary pressures, we cannot be certain that neither we nor our consumers will be materially impacted by continued pressures. In addition, the global macroeconomic environment has been negatively affected by, among other things, the upcoming US presidential election, increased US trade tariffs and trade disputes between the United States, China and other countries, the Houthi attacks on marine vessels in the Red Sea, political tensions between Taiwan and China, political demonstrations, and foreign governmental debt concerns which have caused, and are likely to continue to cause, uncertainty and instability in local economies and in global financial markets. As global economic conditions continue to be volatile and economic uncertainty remains, trends in consumer discretionary spending also remain unpredictable and subject to reductions due to credit constraints and uncertainties about the future. A decrease in consumer spending or in retailer and consumer confidence and demand for our products could have a significant negative impact on our net sales and profitability, including our operating margins and return on invested capital. These economic conditions could cause some of our retail customers or suppliers to experience cash flow or credit problems and impair their financial condition, which could disrupt our business and adversely affect product orders, payment patterns and default rates and increase our bad debt expense.

***Volatility in the financial markets could have a material adverse effect on our business, financial condition and results of operations.***

While we currently generate cash flows from our ongoing operations and have had access to credit markets through our various financing activities, credit markets may experience significant disruptions. Deterioration in global financial markets, rising interest rates and concerns over potential recessions could make future financing difficult or more expensive. If any financial institution party to our credit facilities or other financing arrangements were to declare bankruptcy or become insolvent, they may be unable to perform under their agreements with us. This could leave us with reduced borrowing capacity, which could have a material adverse effect on our business, financial condition and results of operations.

We regularly maintain cash balances at third-party financial institutions in excess of the Federal Deposit Insurance Corporation (the "FDIC") insurance limit. In 2023, the FDIC took control and was appointed receiver of Silicon Valley Bank ("SVB"), Signature Bank and First Republic Bank, after each bank was unable to continue its operations. Although the Company did not have any cash or cash equivalent balances on deposit with SVB, Signature Bank or First Republic Bank and, therefore, did not experience any direct risk of loss, we are unable to predict the extent or nature of the impacts of the failures of these banks and related circumstances at this time. Similarly, we cannot predict the impact that the high market volatility and instability of the banking sector more broadly could have on economic activity and our business in particular.

The failure of other banks and financial institutions and measures taken, or not taken, by governments, businesses and other organizations in response to these events could adversely impact our business, financial condition and results of operations.

If the financial institutions with which we do business enter receivership or become insolvent in the future, there is no guarantee that the Department of the Treasury, the Federal Reserve and the FDIC will intercede to provide us and other depositors with access to balances in excess of the $250,000 FDIC insurance limit or that we would be able to: (i) access our existing cash, cash equivalents and investments; (ii) maintain any required letters of credit or other credit support arrangements; or (iii) adequately fund our business for a prolonged period of time or at all. Any of such events could have a material adverse effect on our current or projected business operations and results of operations and financial condition. In addition, if any parties with which we conduct business are unable to access funds pursuant to such instruments or lending arrangements with such a financial institution, such parties' ability to continue to fund their business and perform their obligations to us could be adversely affected, which, in turn, could have a material adverse effect on our business, financial condition and results of operations.

**Risk factors related to our financial condition**

***Our indebtedness may have a material adverse effect on our business, financial condition and results of operations.***

As of June 30, 2024, we had a total of $262.9 million of indebtedness, consisting of amounts outstanding under our credit facilities and finance lease obligations, and a total availability of $10.5 million under our Amended Revolving Credit Facility (as defined in Part I, Item 2 "Management's discussion and analysis of financial condition and results of operations" under the heading "Description of indebtedness"). Our primary cash needs are for working capital, fixturing, retail product displays and digital investments. Cash needs typically vary depending on strategic initiatives selected for the fiscal year, including investments in infrastructure, digital capabilities expansion within or to additional retailer store locations, and acquisitions. On August 28, 2023, we entered into the Second Amendment to the Amended and Restated Credit Agreement, pursuant to which we borrowed an incremental term loan in a principal amount equal to $115.0 million (the "Incremental Term Loan"), together with available cash from our balance sheet and additional borrowings under our Amended Revolving Credit Facility, to consummate and pay related fees and expenses in connection with our acquisition of Naturium.

Our indebtedness could have significant consequences, including:

• requiring a substantial portion of our cash flows to be dedicated to debt service payments instead of funding growth, working capital, capital expenditures, investments or other cash requirements;

• reducing our flexibility to adjust to changing business conditions or obtain additional financing;

• exposing us to the risk of increased interest rates as our borrowings are at variable rates;

• making it more difficult for us to make payments on our indebtedness;

• subjecting us to restrictive covenants that may limit our flexibility in operating our business, including our ability to take certain actions with respect to indebtedness, liens, sales of assets, consolidations and mergers, affiliate transactions, dividends and other distributions and changes of control;

• subjecting us to maintenance covenants which require us to maintain specific financial ratios; and

• limiting our ability to obtain additional financing for working capital, capital expenditures, debt service requirements and general corporate or other purposes.

***If our cash from operations is not sufficient to meet our current or future operating needs, expenditures and debt service obligations, our business, financial condition and results of operations may be materially and adversely affected.***

We may require additional cash resources due to changed business conditions or other future developments, including any marketing initiatives, investments or additional acquisitions we may decide to pursue. To the extent we are unable to generate sufficient cash flow, we may be forced to cancel, reduce or delay these activities. Alternatively, if our sources of funding are insufficient to satisfy our cash requirements, we may seek to obtain an additional credit facility or sell equity or debt securities. The sale of equity securities would result in dilution of our existing stockholders. The incurrence of additional indebtedness would result in increased debt service obligations and operating and financing covenants that could restrict our operations.

36

Table of Contents

Our ability to generate cash to meet our operating needs, expenditures and debt service obligations will depend on our future performance and financial condition, which will be affected by financial, business, economic, legislative, regulatory and other factors, including potential changes in costs, pricing, the success of product innovation and marketing, competitive pressure and consumer preferences. If our cash flows and capital resources are insufficient to fund our debt service obligations and other cash needs, we could face substantial liquidity problems and could be forced to reduce or delay investments and capital expenditures or to dispose of material assets or operations, seek additional debt or equity capital or restructure or refinance our indebtedness. Our credit facilities may restrict our ability to take these actions, and we may not be able to affect any such alternative measures on commercially reasonable terms, or at all. If we cannot make scheduled payments on our debt, the lenders under the Amended Credit Agreement (as defined in Part I, Item 2 "Management's discussion and analysis of financial condition and results of operations" under the heading "Description of indebtedness") can terminate their commitments to loan money under the Amended Revolving Credit Facility, and our lenders under the Amended Credit Agreement can declare all outstanding principal and interest to be due and payable and foreclose against the assets securing their borrowings, and we could be forced into bankruptcy or liquidation.

Furthermore, it is uncertain whether financing will be available in amounts or on terms acceptable to us, if at all, which could materially and adversely affect our business, financial condition and results of operations.

***Changes in tax law, in our tax rates or in exposure to additional income tax liabilities or assessments could materially and adversely affect our business, financial condition and results of operations.***

We are subject to the income tax laws of the United States and several international jurisdictions. Changes in law and policy relating to taxes, including changes in administrative interpretations and legal precedence, could materially and adversely affect our business, financial condition and results of operations.

In addition, as we continue to expand our business internationally, the application and implementation of existing, new or future international laws could materially and adversely affect our business, financial condition and results of operations. Current economic and political conditions make tax rules in any jurisdiction, including those in which we operate, subject to significant change.

***Fluctuations in currency exchange rates may negatively affect our financial condition and results of operations.***

Exchange rate fluctuations may affect the costs that we incur in our operations. The main currencies to which we are exposed are the Euro, British pound, Chinese Renminbi and Canadian dollar. The exchange rates between these currencies and the US dollar in recent years have fluctuated significantly and may continue to do so in the future. A depreciation of these currencies against the US dollar will decrease the US dollar equivalent of the amounts derived from foreign operations reported in our consolidated financial statements, and an appreciation of these currencies will result in a corresponding increase in such amounts. The cost of certain items, such as raw materials, manufacturing, employee compensation and benefits and transportation and freight, required by our operations may be affected by changes in the value of the relevant currencies.

To the extent that we are required to pay for goods or services in foreign currencies, the appreciation of such currencies against the US dollar will tend to negatively affect our business. There can be no assurance that foreign currency fluctuations will not have a material adverse effect on our business, financial condition and results of operations.

**Risk factors related to our retail customers, consumers and the seasonality of our business**

***We depend on a limited number of retailers for a large portion of our net sales, and the loss of one or more of these retailers, or business challenges at one or more of these retailers, could adversely affect our results of operations.***

A limited number of our retail customers account for a large percentage of our net sales. We expect a small number of retailers will, in the aggregate, continue to account for the majority of our net sales for foreseeable future periods. Any changes in the policies or our ability to meet the demands of our retail customers relating to service levels, inventory de-stocking, pricing and promotional strategies or limitations on access to display space could have a material adverse effect on our business, financial condition and results of operations.

As is typical in our industry, our business with retailers is based primarily upon discrete sales orders, and we do not have contracts requiring retailers to make firm purchases from us. Accordingly, retailers could reduce their purchasing levels or cease buying products from us at any time and for any reason. If we lose a significant retail customer or if sales of our products to a significant retailer materially decrease, it could have a material adverse effect on our business, financial condition and results of operations.

Because a high percentage of our sales are made through our retail customers, our results are subject to risks relating to the general business performance of our key retail customers. Factors that adversely affect our retail customers' businesses may also have a material adverse effect on our business, financial condition and results of operations. These factors may include:

- any reduction in consumer traffic and demand at our retail customers as a result of economic downturns, pandemics or other health crises, changes in consumer preferences or reputational damage as a result of, among other developments, data privacy breaches, regulatory investigations or employee misconduct;

- any credit risks associated with the financial condition of our retail customers;

- the effect of consolidation or weakness in the retail industry or at certain retail customers, including store closures and the resulting uncertainty; and

- inventory reduction initiatives and other factors affecting retail customer buying patterns, including any reduction in retail space committed to beauty products and retailer practices used to control inventory shrinkage.

***Our quarterly results of operations fluctuate due to seasonality, order patterns from key retail customers and other factors, and we may not have sufficient liquidity to meet our seasonal working capital requirements.***

Our results of operations are subject to seasonal fluctuations, with net sales in the third and fourth fiscal quarters typically being higher than in the first and second fiscal quarters. The higher net sales in our third and fourth fiscal quarters are largely attributable to the increased levels of purchasing by retailers for the holiday season and customer shelf reset activity, respectively. Adverse events that occur during either the third or fourth fiscal quarter could have a disproportionate effect on our results of operations for the entire fiscal year. To support anticipated higher sales during the third and fourth fiscal quarters, we make investments in working capital to ensure inventory levels can support demand.

Fluctuations throughout the year are also driven by the timing of product restocking or rearrangement by our major customers as well as our expansion into new customers. Because a limited number of our retail customers account for a large percentage of our net sales, a change in the order pattern of one or more of our large retail customers could cause a significant fluctuation of our quarterly results or reduce our liquidity.

Furthermore, product orders from our large retail customers may vary over time due to changes in their inventory or out-of-stock policies. If we were to experience a significant shortfall in sales or profitability, we may not have sufficient liquidity to fund our business. As a result of quarterly fluctuations caused by these and other factors, comparisons of our operating results across different fiscal quarters may not be accurate indicators of our future performance. Any quarterly fluctuations that we report in the future may differ from the expectations of market analysts and investors, which could cause the price of our common stock to fluctuate significantly.

**Risk factors related to information technology and cybersecurity**

***We are increasingly dependent on information technology, and if we are unable to protect against service interruptions, data corruption, cyber-based attacks or network security breaches, our operations could be disrupted.***

We rely on information technology networks and systems to market and sell our products, to process electronic and financial information, to assist with sales tracking and reporting, to manage a variety of business processes and activities and to comply with regulatory, legal and tax requirements. We are increasingly dependent on a variety of secure information systems to effectively process retail customer orders and fulfill consumer orders from our e-commerce business. We depend on our information technology infrastructure for digital marketing activities and for electronic communications among our personnel, retail customers, consumers, manufacturers and suppliers around the world. These information technology systems, some of which are managed by third parties, may be susceptible to damage, disruptions or shutdowns due to failures during the process of upgrading or replacing software, databases or components, power outages, hardware failures, computer viruses, telecommunication failures, user errors, catastrophic events, malicious uses of AI and other data security and privacy threats, cyber and otherwise. If our information technology systems suffer damage, disruption or shutdown, we may incur substantial cost in repairing or replacing these systems, and if we do not effectively resolve the issues in a timely manner, our business, financial condition and results of operations may be materially and adversely affected, and we could experience delays in reporting our financial results. Moreover, third parties on which we rely for our distribution system and supply chain may be affected by such disruptions or failures, and we may incur substantial costs or delays if the issues are not resolved in a timely manner, which could materially and adversely affect our business, financial condition and results of operations.

Data security and privacy threats are accelerating in frequency and magnitude, are becoming increasingly difficult to detect and come from a variety of sources, including traditional computer "hackers," threat actors, "hacktivists," personnel (such as through malfeasance, human error, theft or misuse), organized criminal threat actors, sophisticated nation states and nation-state supported actors. Some threat actors now engage and are expected to continue to engage in cyberattacks, including without limitation nation-state actors for geopolitical reasons and in conjunction with military conflicts and defense activities. During times of war and other major conflicts, we and the third parties upon which we rely may be vulnerable to a heightened risk of these attacks, including retaliatory cyberattacks that could materially disrupt our systems and operations.

The tools and techniques used by threat actors to attack or access systems and data are constantly evolving and may not be recognized until or after being launched against a target. These tools can, in some cases, circumvent security controls, evade detection and remove forensic evidence. We may be unable to anticipate, detect, prevent, remediate or recover from future cybersecurity incidents, including attacks to our information systems and data. As new and improved technologies and methodologies become available to threat actors (for example, AI), increased risks and currently unknown vulnerabilities could result in significant future expenditures related to our information systems, technology infrastructure and operations. Any material disruption of our systems, or the systems of our third-party service providers, could disrupt our ability to track, record and analyze the products that we sell and could negatively impact our operations, our reputation, shipment of goods, ability to process financial information and transactions and our ability to receive and process retail customer and e-commerce orders or engage in normal business activities.

Any adverse impact to the availability, integrity or confidentiality of our information technology systems and data could, among other things: result in unauthorized access, disclosure, loss or misuse of our intellectual property, proprietary information, or employee, customer or supplier data; attract substantial media attention; damage our relationships with our customers, employees, and partners; cause a loss of confidence in us or cause us to violate applicable privacy laws and obligations; expose us to costly government investigations and enforcement actions or private litigation (such as class actions) and financial liability (possibly beyond our insurance coverage); increase the costs we incur to protect against or remediate cybersecurity incidents and vulnerabilities; result in additional costs and operational activities to comply with consumer protection and data privacy laws and obligations; and/or disrupt our operations and distract our management and other key personnel from performing their primary operational duties, any of which could adversely affect our reputation, competitiveness, business, results of operations and financial condition. Any of the foregoing can be exacerbated by a delay or failure to detect and respond to a cybersecurity incident or the full extent of such incident.

Our e-commerce operations are important to our business. Our e-commerce websites and mobile applications serve as an extension of our marketing strategies by introducing potential new consumers to our brand, product offerings and enhanced content. Due to the importance of our e-commerce operations, we are vulnerable to website downtime and other technical failures. Our failure to successfully respond to these risks in a timely manner could reduce e-commerce sales and damage our brands' reputation.

The risks described here are heightened due to the increase in remote working and the challenges associated with managing remote computing assets and security vulnerabilities that are present in many non-corporate and home networks. A portion of our personnel is currently working under our hybrid model of three days in the office and two days remote, while others work remote entirely. It is possible with this model that the execution of our business plans and operations could be negatively impacted. Additionally, if a natural disaster, power outage, connectivity issue, or other event occurs that impacts our employees' ability to work remotely, it may be difficult or, in certain cases, impossible, for us to continue our business for a substantial period of time. The increase in remote working may also result in heightened consumer privacy, IT security and fraud concerns, potentially disrupting our operations.

***We must continue to maintain and make requisite or critical upgrades to our information technology systems, and our failure to do so could have a material adverse effect on our business, financial condition and results of operations.***

We conduct periodic penetration testing and vulnerability assessments to identify and address potential security weaknesses in our systems and third-party vendor environments to support expected future growth. As such, we will continue to invest in and implement modifications and upgrades to our information technology systems and procedures, including replacing legacy systems with successor systems, making changes to legacy systems or acquiring new systems with new functionality, hiring employees with information technology expertise and building new policies, procedures, training programs and monitoring tools. We are currently undertaking various technology upgrades and enhancements to support our business growth, including an implementation of SAP software to upgrade our platforms and systems worldwide. These types of activities subject us to inherent costs and risks associated with replacing and changing these systems, including impairment of our ability to leverage our e-commerce channels, fulfill customer orders, potential disruption of our internal control structure, substantial capital expenditures, additional administration and operating expenses, acquisition and retention of sufficiently

skilled personnel to implement and operate the new systems, demands on management time and other risks and costs of delays or difficulties in transitioning to or integrating new systems into our current systems.

The implementation of new information technology systems, such as our implementation of SAP software, or any modification of our key information systems may not result in productivity improvements at a level that outweighs the costs of implementation, or at all. In addition, difficulties with implementing new technology systems, delays in our timeline for planned improvements, significant system failures, or our inability to successfully modify our information systems to respond to changes in our business needs may cause disruptions in our business operations and have a material adverse effect on our business, financial condition and results of operations.

***If we fail to adopt new technologies or adapt our e-commerce websites and systems to changing consumer requirements or emerging industry standards, our business may be materially and adversely affected.***

To remain competitive, we must continue to enhance and improve the responsiveness, functionality and features of our information technology, including our e-commerce websites and mobile applications. Our competitors are continually innovating and introducing new products to increase their consumer base and enhance user experience. As a result, in order to attract and retain consumers and compete against our competitors, we must continue to invest resources to enhance our information technology and improve our existing products and services for our consumers. The Internet and the online retail industry are characterized by rapid technological evolution, changes in consumer requirements and preferences, frequent introductions of new products and services embodying new technologies and the emergence of new industry standards and practices, any of which could render our existing technologies and systems obsolete. Our success will depend, in part, on our ability to identify, develop, acquire or license leading technologies useful in our business, and respond to technological advances and emerging industry standards and practices in a cost-effective and timely way. The development of our e-commerce websites, mobile applications and other proprietary technology entails significant technical and business risks. There can be no assurance that we will be able to properly implement or use new technologies effectively or adapt our e-commerce websites, mobile applications and systems to meet consumer requirements or emerging industry standards. If we are unable to adapt in a cost-effective and timely manner in response to changing market conditions or consumer requirements, whether for technical, legal, financial or other reasons, our business, financial condition and results of operations may be materially and adversely affected.

***We use AI in our business, and challenges with properly managing its use could result in harm to our brand, reputation, business or customers, and adversely affect our results of operations.***

We are implementing the use of AI solutions, including machine learning and generative AI tools that collect, aggregate, and analyze data to assist in the development of our products and in the use of internal tools that support our business. These applications may become increasingly important in our operations over time. This emerging technology presents a number of risks inherent in its use. AI algorithms are based on machine learning and predictive analytics, which can create accuracy issues, unintended biases, and discriminatory outcomes that could harm our brand, reputation, business, or customers. Additionally, no assurance can be made that the usage of AI will assist us in being more efficient. Further, dependence on AI without adequate safeguards to make certain business decisions may introduce additional operational vulnerabilities by producing inaccurate outcomes, recommendations, or other suggestions based on flaws in the underlying data or other unintended results. Our competitors or other third parties may incorporate AI into their business, services, and products more rapidly or more successfully than us, which could hinder our ability to compete effectively and adversely affect our results of operations. Implementing the use of AI successfully, ethically and as intended, will require significant resources. In addition, the use of AI may increase cybersecurity and data privacy risks, such as intended, unintended, or inadvertent transmission of proprietary or sensitive information. The technologies underlying AI and their use cases are rapidly developing, and it is not possible to predict all of the legal, operational or technological risks related to the use of AI. While new AI initiatives, laws, and regulations are emerging and evolving, what they ultimately will look like remains uncertain, and our obligation to comply with them could entail significant costs, negatively affect our business, or limit our ability to incorporate certain AI capabilities into our business.

***Failure to protect sensitive information of our consumers and information technology systems against security breaches could damage our reputation and brand and substantially harm our business, financial condition and results of operations.***

We collect, maintain, transmit, store and otherwise process data about our consumers, suppliers, prospective and current employees, and others, including personal data, financial information, including consumer payment information, as well as other confidential and proprietary information important to our business. We also employ third-party service providers that collect, store, process and transmit personal data, and confidential, proprietary and financial information on our behalf.

We have in place technical and organizational measures designed to maintain the security and safety of critical proprietary, personal, employee, customer and financial data. However, despite these efforts, advances in technology, the pernicious ingenuity of criminals, new exposures via cryptography, acts or omissions by our employees, contractors or service providers or other events or developments could result in a compromise or breach in the security of confidential or personal data. We and our service providers may not be able to prevent third parties, including criminals, competitors or others, from breaking into or altering our systems, disrupting business operations or communications infrastructure through denial-of-service attacks, attempting to gain access to our systems, information or monetary funds through phishing or social engineering campaigns, installing viruses or malicious software on our e-commerce websites or mobile applications or devices used by our employees or contractors, or carrying out other activity intended to disrupt our systems or gain access to confidential or sensitive information in our or our service providers' systems. Further, there can also be no assurance that our cybersecurity risk management program and processes, including our policies, controls or procedures, will be fully implemented, complied with or effective in protecting our information technology systems and data.

We are not aware of any cybersecurity incidents that have had a material impact on our operations or financial results, but we have been subject to attacks (e.g., phishing, denial of service) in the past and cannot guarantee that our security measures will be sufficient to prevent a material breach or compromise in the future.

Furthermore, such third parties may engage in various other illegal activities using such information, including credit card fraud or identity theft, which may cause additional harm to us, our consumers and our brands. We also may be vulnerable to error or malfeasance by our own employees or other insiders. Third parties may attempt to fraudulently induce our or our service providers' employees to misdirect funds or to disclose information in order to gain access to personal data we maintain about our consumers or website users. In addition, we have limited control or influence over the security policies or measures adopted by third-party providers of online payment services through which some of our consumers may elect to make payment for purchases at our e-commerce websites and mobile applications. Contracted third-party delivery service providers may also violate their confidentiality or data processing obligations and disclose or use information about our consumers inadvertently or illegally.

If a material security breach were to occur, our reputation and brands could be damaged, and we could be required to expend significant capital and other resources to alleviate problems caused by such breaches including exposure of litigation or regulatory action and a risk of loss and possible liability. Actual or anticipated attacks may cause us to incur increasing costs, including costs to deploy additional personnel and protection technologies, train employees and engage third-party experts and consultants. In addition, any party who is able to illicitly obtain a subscriber's password could access the subscriber's financial, transaction or personal information. Any compromise or breach of our security measures, or those of our third-party service providers, may violate applicable privacy, data security, financial, cyber and other laws and cause significant legal and financial exposure, adverse publicity and a loss of confidence in our security measures, all of which could have a material adverse effect on our business, financial condition and results of operations. We may be subject to post-breach review of the adequacy of our privacy and security controls by regulators and other third parties, which could result in post-breach regulatory investigation, fines and consumer litigation as well as regulatory oversight, at significant expense and risking reputational harm.

Furthermore, we are subject to diverse laws and regulations in the United States, the EU and other international jurisdictions that require notification to affected individuals in the event of a breach involving personal information. These required notifications can be time-consuming and costly. Furthermore, failure to comply with these laws and regulations could subject us to regulatory scrutiny and additional liability. Although we maintain relevant insurance, we cannot be certain that our insurance coverage will be adequate for all breach related liabilities, that insurance will continue to be available to us on economically reasonable terms, or at all, or that the insurer will not deny coverage as to any future claim. The successful assertion of one or more large claims against us that exceed available insurance coverage, or the occurrence of changes in our insurance policies, including premium increases or the imposition of large deductible or co-insurance requirements, could adversely affect our reputation, business, financial condition and results of operations. We may need to devote significant resources to protect against security breaches or to address problems caused by breaches, diverting resources from the growth and expansion of our business.

***Payment methods used on our e-commerce websites subject us to third-party payment processing-related risks.***

We accept payments from our consumers using a variety of methods, including online payments with credit cards and debit cards issued by major banks, payments made with gift cards processed by third-party providers and payment through third-party online payment platforms such as PayPal, Afterpay and Apple Pay. We also rely on third parties to provide payment processing services. For certain payment methods, including credit and debit cards, we pay interchange and other fees, which may increase over time and raise our operating costs and lower our profit margins. We may also be subject to fraud and other

illegal activities in connection with the various payment methods we offer, including online payment options and gift cards. Transactions on our e-commerce websites and mobile applications are card-not-present transactions, so they present a greater risk of fraud. Criminals are using increasingly sophisticated methods to engage in illegal activities such as unauthorized use of credit or debit cards and bank account information. Requirements relating to consumer authentication and fraud detection with respect to online sales are complex. We may ultimately be held liable for the unauthorized use of a cardholder's card number in an illegal activity and be required by card issuers to pay charge-back fees. Charge-backs result not only in our loss of fees earned with respect to the payment, but also leave us liable for the underlying money transfer amount. If our charge-back rate becomes excessive, card associations also may require us to pay fines or refuse to process our transactions. In addition, we may be subject to additional fraud risk if third-party service providers or our employees fraudulently use consumer information for their own gain or facilitate the fraudulent use of such information. Overall, we may have little recourse if we process a criminally fraudulent transaction.

We are subject to payment card association operating rules, certification requirements and various rules, regulations and requirements governing electronic funds transfers, which could change or be reinterpreted to make it difficult or impossible for us to comply. As our business changes, we may also be subject to different rules under existing standards, which may require new assessments that involve costs above what we currently pay for compliance. If we fail to comply with the rules or requirements of any provider of a payment method we accept, or if the volume of fraud in our transactions limits or terminates our rights to use payment methods we currently accept, or if a data breach occurs relating to our payment systems, among other things, we may be subject to fines and higher transaction fees and lose our ability to accept credit and debit card payments from our consumers, process electronic funds transfers or facilitate other types of online payments, and our reputation and our business, financial condition and results of operations could be materially and adversely affected.

**Risk factors related to conducting business internationally**

***We have significant operations in China, which exposes us to risks inherent in doing business in that country.***

We currently source and manufacture a substantial number of our products from third-party suppliers and manufacturers in China. As of June 30, 2024, we had 99 employees in China. With the rapid development of the Chinese economy, the cost of labor has increased and may continue to increase in the future. Our results of operations will be materially and adversely affected if our labor costs, or the labor costs of our suppliers and manufacturers, increase significantly. In addition, we and our manufacturers and suppliers may not be able to find a sufficient number of qualified workers due to the intensely competitive and fluid market for skilled labor in China. Furthermore, pursuant to Chinese labor laws, employers in China are subject to various requirements when signing labor contracts, paying remuneration, determining the term of employees' probation and unilaterally terminating labor contracts. These labor laws and related regulations impose liabilities on employers and may significantly increase the costs of workforce reductions. If we decide to change or reduce our workforce, these labor laws could limit or restrict our ability to make such changes in a timely, favorable and effective manner. Any of these events may materially and adversely affect our business, financial condition and results of operations.

Operating in China exposes us to political, legal and economic risks. In particular, the political, legal and economic climate in China, both nationally and regionally, is fluid and unpredictable. Our ability to operate in China may be adversely affected by changes in the United States and Chinese laws and regulations such as those related to, among other things, taxation, import and export tariffs, environmental regulations, land use rights, intellectual property, currency controls, network security, employee benefits, privacy, hygiene supervision and other matters. For example, in December 2021, the US Congress enacted the Uyghur Forced Labor Prevention Act in an effort to prevent what it views as forced labor and human rights abuses in the Xinjiang Uyghur Autonomous Region ("XUAR"). If it is determined that our third-party suppliers and manufacturers mine, produce or manufacture our products wholly or in part from the XUAR, then we could be prohibited from importing such products into the United States. In addition, we may not obtain or retain the requisite legal permits to continue to operate in China, and costs or operational limitations may be imposed in connection with obtaining and complying with such permits. In addition, Chinese trade regulations are in a state of flux, and we may become subject to other forms of taxation, tariffs and duties in China. Currently, considerable uncertainty surrounds the future trade relationship between the United States and China. The US government has implemented significant changes to US trade policy with respect to China since 2018, and there may be further changes made that could negatively affect our business if there is a change in administration as a result of the upcoming US presidential election. Furthermore, the third parties we rely on in China may disclose our confidential information or intellectual property to competitors or third parties, which could result in the illegal distribution and sale of counterfeit versions of our products. If any of these events occur, our business, financial condition and results of operations could be materially and adversely affected.

***We are subject to international business uncertainties.***

We sell many of our products to customers located outside the United States. In addition, substantially all of our third-party suppliers and manufacturers are located in China and certain other foreign countries. We intend to continue to sell to customers outside the United States and maintain our relationships in China and other foreign countries where we have suppliers and manufacturers. Further, we recently opened an office in the UK and hired a team of employees to support our international expansion, and we are establishing additional relationships in other countries to grow our operations. The substantial up-front investment required, the lack of consumer awareness of our products in jurisdictions outside of the United States, differences in consumer preferences and trends between the United States and other jurisdictions, the risk of inadequate intellectual property protections and differences in packaging, labeling and related laws, rules and regulations are all substantial matters that need to be evaluated prior to doing business in new territories. We cannot be assured that our international efforts will be successful.

International sales and increased international operations may be subject to risks such as:

*   changes in political, regulatory, legal or economic conditions, including as a result of the upcoming US presidential election;

*   difficulties in staffing and managing foreign operations;

*   burdens of complying with a wide variety of laws and regulations, including more stringent regulations relating to data privacy and security, particularly in the UK and the EU;

*   adverse tax effects and foreign exchange controls making it difficult to repatriate earnings and cash;

*   political and economic instability;

*   terrorist activities and natural disasters;

*   trade restrictions;

*   disruptions or delays in shipments whether due to port congestion, container shortages, changes in ocean freight rates or capacity, labor disputes, product regulations and/or inspections or other factors, natural disasters or health pandemics, or other transportation disruptions;

*   differing employment practices and laws and labor disruptions;

*   the imposition of government controls;

*   an inability to use or to obtain adequate intellectual property protection for our key brands and products;

*   tariffs and customs duties and the classifications of our goods by applicable governmental bodies;

*   a legal system subject to undue influence or corruption;

*   a business culture in which illegal sales practices may be prevalent;

*   logistics and sourcing; and

*   military conflicts.

The occurrence of any of these risks could negatively affect our international business and consequently our overall business, financial condition and results of operations.

In addition, the ultimate effects of the UK's withdrawal from the EU ("Brexit") are still difficult to predict as there remains considerable uncertainty around the impact of post-Brexit regulations as the various agencies interpret the regulations and develop enforcement practices. Changes related to Brexit could subject us to heightened risks in that region, including disruptions to trade and free movement of goods, services and people to and from the UK, disruptions to our employees in the UK and the workforce of our business partners, increased foreign exchange volatility with respect to the British pound and

additional legal, political and economic uncertainty. Furthermore, Brexit could also result in similar referenda or votes in other European countries in which we do business or look to expand operations. If these actions impacting our international distribution and sales channels result in increased costs for us or our international partners, such changes could result in higher costs to us, adversely affecting our operations, particularly as we expand our international presence in the UK and Europe.

**Risk factors related to evolving laws and regulations and compliance with laws and regulations**

***New laws, regulations, enforcement trends or changes in existing regulations governing the introduction, marketing and sale of our products to consumers could harm our business.***

There has been an increase in regulatory activity and activism in the United States and abroad, and the regulatory landscape is becoming more complex with increasingly strict requirements. If this trend continues, we may find it necessary to alter some of the ways we have traditionally manufactured and marketed our products in order to stay in compliance with a changing regulatory landscape, and this could add to the costs of our operations and have an adverse impact on our business. To the extent federal, state, local or foreign regulatory changes regarding consumer protection, or the ingredients, claims or safety of our products occur in the future, they could require us to reformulate or discontinue certain of our products, revise the product packaging or labeling, or adjust operations and systems, any of which could result in, among other things, increased costs, delays in product launches, product returns or recalls and lower net sales, and therefore could have a material adverse effect on our business, financial condition and results of operations. Noncompliance with applicable regulations could result in enforcement action by the FDA or other regulatory authorities within or outside the United States, including but not limited to product seizures, injunctions, product recalls and criminal or civil monetary penalties, all of which could have a material adverse effect on our business, financial condition and results of operations.

In the United States, with the exception of color additives, the FDA does not currently require pre-market approval for products intended to be sold as cosmetics. However, the FDA may in the future require pre-market authorization for certain cosmetic products, establishments or manufacturing facilities. Moreover, such products could also be regulated as both drugs and cosmetics simultaneously, as the categories are not mutually exclusive. The statutory and regulatory requirements applicable to drugs are extensive and require significant resources and time to ensure compliance. For example, if any of our products intended to be sold as cosmetics were to be regulated as drugs, we might be required to conduct, among other things, clinical trials to demonstrate the safety and efficacy of these products. We may not have sufficient resources to conduct any required clinical trials or to ensure compliance with the manufacturing requirements applicable to drugs. If the FDA determines that any of our products intended to be sold as cosmetics should be classified and regulated as drug products and we are unable to comply with applicable drug requirements, we may be unable to continue to market those products. Any inquiry into the regulatory status of our cosmetics and any related interruption in the marketing and sale of these products could damage our reputation and image in the marketplace.

In recent years, the FDA has issued warning letters to several cosmetic companies alleging improper claims regarding their cosmetic products. If the FDA determines that we have disseminated inappropriate drug claims for our products intended to be sold as cosmetics, we could receive a warning or untitled letter, be required to modify our product claims or take other actions to satisfy the FDA. In addition, plaintiffs' lawyers have filed class action lawsuits against cosmetic companies after receipt of these types of FDA warning letters. There can be no assurance that we will not be subject to state and federal government actions or class action lawsuits, which could harm our business, financial condition and results of operations.

Additional state and federal requirements may be imposed on consumer products as well as cosmetics, cosmetic ingredients, or the labeling and packaging of products intended for use as cosmetics. For example, on December 29, 2022, Congress enacted the Modernization of Cosmetics Regulation Act of 2022 ("MoCRA"). MoCRA created new compliance requirements for manufacturers of cosmetic products in the United States and also significantly expanded the FDA's authority to oversee and regulate cosmetics. Under MoCRA, companies must comply with new requirements for cosmetics, such as new labeling requirements for certain products, safety substantiation, facility registration, product listing, adverse event reporting, good manufacturing practice ("GMP") requirements and mandatory recalls. In addition, MoCRA provided FDA with new enforcement authorities over cosmetics, such as the ability to initiate mandatory recalls and to obtain access certain product records. Many of the requirements were originally scheduled to become applicable on December 29, 2023, with some of the requirements, such as those relating to labeling, scheduled to become applicable later in 2024 and 2025; however, on November 8, 2023, the FDA advised that it would not enforce the requirements related to cosmetic product facility registration and cosmetic product listing until July 1, 2024 to provide regulated industry additional time to comply with the requirements. Although we satisfied the requirements related to cosmetic product facility registration and cosmetic product listing by the July 1, 2024 deadline, the FDA has yet to propose implementing regulations for MoCRA. The FDA is currently slated to publish a notice of proposed rulemaking no later than December 29, 2024, and publish a final rule no later than

Table of Contents

December 29, 2025. As such, we are unable to ascertain at this time the full impact that complying with MoCRA will have on our business. Compliance with the new requirements may further increase the cost of manufacturing certain of our products and could have a material adverse effect on our business, financial condition and results of operations.

We also sell a number of products as over-the-counter ("OTC") drug products, which are subject to the FDA OTC drug regulatory requirements because they are intended to be used as sunscreen or to treat acne. The FDA regulates the formulation, manufacturing, packaging and labeling of OTC drug products. Our sunscreen and acne drug products are regulated pursuant to FDA OTC drug monographs that specify acceptable active drug ingredients and acceptable product claims that are generally recognized as safe and effective for particular uses. If any of these products that are marketed as OTC drugs are not in compliance with the applicable FDA monograph, we may be required to reformulate the product, stop making claims relating to such product or stop selling the product until we are able to obtain costly and time-consuming FDA approvals. We are also required to submit adverse event reports to the FDA for our OTC drug products, and failure to comply with this requirement may subject us to FDA regulatory action.

We also sell a number of consumer products, which are subject to regulation by the CPSC in the United States under the provisions of the Consumer Product Safety Act, as amended by the Consumer Product Safety Improvement Act of 2008. These statutes and the related regulations ban from the market consumer products that fail to comply with applicable product safety laws, regulations and standards. The CPSC has the authority to require the recall, repair, replacement or refund of any such banned products or products that otherwise create a substantial risk of injury and may seek penalties for regulatory noncompliance under certain circumstances. The CPSC also requires manufacturers of consumer products to report certain types of information to the CPSC regarding products that fail to comply with applicable regulations. Certain state laws also address the safety of consumer products, and mandate reporting requirements, and noncompliance may result in penalties or other regulatory action.

Our products are also subject to state laws and regulations, such as the California Safe Drinking Water and Toxic Enforcement Act, also known as "Prop 65," and various state PFAS regulations, and failure to comply with such laws may also result in lawsuits and regulatory enforcement that could have a material adverse effect on our business, financial condition and results of operations. We are, and may in the future be, involved in litigation related to such state laws and regulations.

***Our facilities and those of our third-party manufacturers are subject to regulation under the Federal Food, Drug and Cosmetic Act ("FDCA") and FDA implementing regulations.***

Our facilities and those of our third-party manufacturers are subject to regulation under the FDCA and FDA implementing regulations. The FDA may inspect all of our facilities and those of our third-party manufacturers periodically to determine if we and our third-party manufacturers are complying with provisions of the FDCA and FDA regulations. In addition, third-party manufacturer's facilities for manufacturing OTC drug products must comply with the FDA's current GMP ("cGMP") requirements for drug products that require us and our manufacturers to maintain, among other things, good manufacturing processes, including stringent vendor qualifications, ingredient identification, manufacturing controls and record keeping.

Our operations could be harmed if regulatory authorities make determinations that we, or our vendors, are not in compliance with these regulations. If the FDA finds a violation of cGMPs, it may enjoin our manufacturer's operations, seize product, restrict importation of goods, and impose administrative, civil or criminal penalties. If we or our third-party manufacturers fail to comply with applicable regulatory requirements, we could be required to take costly corrective actions, including suspending manufacturing operations, changing product formulations, suspending sales, or initiating product recalls. In addition, compliance with these regulations has increased and may further increase the cost of manufacturing certain of our products as we work with our vendors to ensure they are qualified and in compliance. For example, under MoCRA, manufacturers of cosmetic products in the United States will become subject to mandatory GMP requirements. Although the FDA has yet to establish or implement regulations for such GMP requirements, third-party manufacturers of our cosmetic products may be slow or unable to adapt to these forthcoming regulations, which may require us to find alternative suppliers for our products. Any of these outcomes could have a material adverse effect on our business, financial condition and results of operations.

***Government regulations and private party actions relating to the marketing and advertising of our products and services may restrict, inhibit or delay our ability to sell our products and harm our business, financial condition and results of operations.***

Government authorities regulate advertising and product claims regarding the performance and benefits of our products. These regulatory authorities typically require a reasonable basis to support any marketing claims. What constitutes a reasonable basis for substantiation can vary widely from market to market, and there is no assurance that the efforts that we

45

Table of Contents

undertake to support our claims will be deemed adequate for any particular product or claim. A significant area of risk for such activities relates to improper or unsubstantiated claims about our products and their use or safety. If we are unable to show adequate substantiation for our product claims, or our promotional materials make claims that exceed the scope of allowed claims for the classification of the specific product, whether cosmetics, OTC drug products or other consumer products that we offer, the FDA, the FTC or other regulatory authorities could take enforcement action or impose penalties, such as monetary consumer redress, requiring us to revise our marketing materials, amend our claims or stop selling certain products, all of which could harm our business, financial condition and results of operations. Any regulatory action or penalty could lead to private party actions, or private parties could seek to challenge our claims even in the absence of formal regulatory actions which could harm our business, financial condition and results of operations.

***Our business is subject to complex and evolving US and foreign laws and regulations regarding privacy and data protection. Many of these laws and regulations are subject to change and uncertain interpretation, and could result in claims, changes to our business practices, monetary penalties, increased costs of operations or otherwise harm our business, financial condition and results of operations.***

We are subject to a variety of laws and regulations in the United States and abroad regarding privacy and data protection, some of which can be enforced by private parties or government entities and some of which provide for significant penalties for non-compliance. Such laws and regulations restrict how personal information is collected, processed, stored, used and disclosed, as well as set standards for its security, implement notice requirements regarding privacy practices, and provide individuals with certain rights regarding the use, disclosure, and sale of their protected personal information.

For example, the California Consumer Privacy Act (the "CCPA") requires certain disclosures to California residents regarding a business's data processing activities, affords California consumers rights with respect to their personal information (including the rights related to access to and deletion of personal information, and the right to opt out of certain disclosures of their personal information), and establishes significant penalties for noncompliance. The California Privacy Rights Act (the "CPRA"), which took effect on January 1, 2023, significantly expands the CCPA, including by introducing additional obligations such as data minimization and retention requirements, granting additional rights to California residents such as correction of personal information and additional opt-out rights, and creating a new regulatory authority, the California Privacy Protection Agency, to implement and enforce the law. Comprehensive privacy legislation imposing similar obligations have been passed in several states and took effect in Virginia, Colorado, Connecticut and Utah in 2023. Following this trend, several other states have enacted or are considering enacting data protection legislation that may impose significant obligations and restrictions. Additionally, there is discussion in Congress of a new comprehensive federal data protection law. The enactment of such laws could create conflicting requirements, compliance with which could result in additional compliance costs. The effects of these laws are potentially significant and may require us to modify our data collection or processing practices and policies and to incur substantial costs and expenses in an effort to comply, and increase our potential exposure to regulatory enforcement and/or litigation.

In addition, the UK General Data Protection Regulation and Data Protection Act 2018 (collectively, the "UK GDPR") and the EU's General Data Protection Regulation (the "EU GDPR") (the EU GDPR and UK GDPR together referred to as the "GDPR") impose comprehensive data privacy compliance obligations in relation to the collection, processing, sharing, disclosure, transfer and other use of data relating to an identifiable living individual, including a principle of accountability and the obligation to demonstrate compliance through policies, procedures, training and audits. Failure to comply with the UK GDPR or the GDPR could result in penalties for noncompliance of up to the greater of GBP 17.5 million/EUR 20 million (as applicable) or 4% of our global annual turnover, and companies can be fined under each of these regimes independently with respect to the same violation. In addition to fines, a violation of the UK GDPR or the GDPR may result in regulatory investigations, reputational damage, orders to cease/change data processing activities, enforcement notices, assessment notices (for a compulsory audit) and/or civil claims (including class actions).

46

Table of Contents

We are also subject, under the GDPR, to restrictions on cross-border transfers of personal data out of the European Economic Area (the "EEA") where recent legal developments have created complexity and uncertainty regarding transfers of personal data outside the EEA and the UK, including to the United States. We rely on the standard contractual clauses ("SCCs") to transfer data outside of the EEA/ UK in some situations; however, the Court of Justice of the European Union ("CJEU") has stated that reliance on the SCCs alone may not be sufficient. On October 7, 2022, President Biden signed an Executive Order on 'Enhancing Safeguards for United States Intelligence Activities' which introduced new redress mechanisms and binding safeguards to address some of the concerns raised by the CJEU. We expect the existing legal complexity and uncertainty regarding international personal data transfers to continue. Some European regulators have prevented companies from transferring personal data out of the EEA for allegedly violating the EU GDPR's cross—border transfer rules. As supervisory authorities issue further guidance on personal data export mechanisms, including circumstances where the SCCs cannot be used, and/or continue to take enforcement action, we could suffer additional costs, complaints and/or regulatory investigations or fines, and/or if we are otherwise unable to transfer personal data between and among countries and regions in which we operate, it could affect the manner in which we provide our services, the geographical location or segregation of our relevant systems and operations, and could adversely affect our financial results.

Data privacy continues to remain a matter of interest to lawmakers and regulators. In the United States, a number of privacy-related proposals (including proposed comprehensive privacy legislation) are pending before federal and state legislative and regulatory bodies and additional laws and regulations have been passed but are not yet effective, all of which could significantly affect our business. The same may be true outside the United States, where various jurisdictions have enacted or are considering comprehensive data protection legislation. Additionally, at the federal level in the United States, various bills have been introduced to enact comprehensive federal privacy legislation, though to date none of these efforts have been successful. If comprehensive privacy legislation is enacted at the federal level in the United States, this could lead to additional costs and increase our overall risk exposure.

We are also subject to evolving privacy laws on cookies, tracking technologies and e-marketing. Regulation of cookies and similar technologies may lead to broader restrictions on our marketing and personalization activities and may negatively impact our efforts to understand consumers' Internet usage, online shopping and other relevant online behaviors, as well as the effectiveness of our marketing and our business generally. Such regulations, including uncertainties about how well the advertising technology ecosystem can adapt to legal changes around the use of tracking technologies, may have a negative effect on businesses, including ours, that collect and use online usage information for consumer acquisition and marketing. We may also be subject to fines and penalties for non-compliance with any such laws and regulations. The decline of cookies or other online tracking technologies as a means to identify and target potential purchasers may increase the cost of operating our business and lead to a decline in revenues. In addition, legal uncertainties about the legality of cookies and other tracking technologies may increase regulatory scrutiny and increase potential civil liability under data protection or consumer protection laws.

Compliance with existing, forthcoming, and proposed privacy and data protection laws and regulations can be costly and can delay or impede our ability to market and sell our products, impede our ability to conduct business through websites and mobile applications we and our partners may operate, require us to modify or amend our information practices and policies, change and limit the way we use consumer information in operating our business, cause us to have difficulty maintaining a single operating model, result in negative publicity, increase our operating costs, require significant management time and attention, or subject us to inquiries or investigations, claims or other remedies, including significant fines and penalties, or demands that we modify or cease existing business practices. In addition, if our privacy or data security measures fail to comply with applicable current or future laws and regulations, we may be subject to litigation, regulatory investigations, enforcement notices requiring us to change the way we use personal data or our marketing practices, fines or other liabilities, as well as negative publicity and a potential loss of business. We may also face civil claims including representative actions and other class action type litigation (where individuals have suffered harm), potentially amounting to significant compensation or damages liabilities, as well as associated costs, and diversion of internal resources. Any of the foregoing could have a material adverse effect on our business, financial condition and results of operations.

***Failure to comply with the US Foreign Corrupt Practices Act, other applicable anti-corruption and anti-bribery laws, and applicable trade control laws could subject us to penalties and other adverse consequences.***

We currently source and manufacture a substantial number of our products from third-party suppliers and manufacturers located outside of the United States, and we have an office in China from which we manage our international supply chain. We sell our products in countries outside of the United States, including through distributors. Our operations are subject to the US Foreign Corrupt Practices Act (the "FCPA"), as well as the anti-corruption and anti-bribery laws in the countries where we do business. The FCPA prohibits covered parties from offering, promising, authorizing or giving anything of value, directly or indirectly, to a "foreign government official" with the intent of improperly influencing the official's act or decision, inducing

the official to act or refrain from acting in violation of lawful duty, or obtaining or retaining an improper business advantage. The FCPA also requires publicly traded companies to maintain records that accurately and fairly represent their transactions, and to have an adequate system of internal accounting controls. In addition, other applicable anti-corruption laws prohibit bribery of domestic government officials, and some laws that may apply to our operations prohibit commercial bribery, including giving or receiving improper payments to or from non-government parties, as well as so-called "facilitation" payments. In addition, we are subject to United States and other applicable trade control regulations that restrict with whom we may transact business, including the trade sanctions enforced by the US Treasury, Office of Foreign Assets Control.

While we have implemented policies, internal controls and other measures reasonably designed to promote compliance with applicable anti-corruption and anti-bribery laws and regulations, and certain safeguards designed to ensure compliance with US trade control laws, our employees or agents may engage in improper conduct for which we might be held responsible. Any violations of these anti-corruption or trade controls laws, or even allegations of such violations, can lead to an investigation and/or enforcement action, which could disrupt our operations, involve significant management distraction, and lead to significant costs and expenses, including legal fees. If we, or our employees or agents acting on our behalf, are found to have engaged in practices that violate these laws and regulations, we could suffer severe fines and penalties, profit disgorgement, injunctions on future conduct, securities litigation, bans on transacting government business, delisting from securities exchanges and other consequences that may have a material adverse effect on our business, financial condition and results of operations. In addition, our brands and reputation, our sales activities or our stock price could be adversely affected if we become the subject of any negative publicity related to actual or potential violations of anti-corruption, anti-bribery or trade control laws and regulations.

*Government regulation of the Internet and e-commerce is evolving, and unfavorable changes or failure by us to comply with these regulations could substantially harm our business, financial condition and results of operations.*

We are subject to general business regulations and laws as well as regulations and laws specifically governing the Internet and e-commerce. Existing and future regulations and laws could impede the growth of the Internet, e-commerce or mobile commerce. These regulations and laws may involve taxes, tariffs, privacy and data security, anti-spam, content protection, electronic contracts and communications, consumer protection, social media marketing, third-party cookies, web beacons and similar technology for online behavioral advertising and gift cards. It is not clear how existing laws governing issues such as property ownership, sales taxes and other taxes and consumer privacy apply to the Internet as the vast majority of these laws were adopted prior to the advent of the Internet and do not contemplate or address the unique issues raised by the Internet or e-commerce. It is possible that general business regulations and laws, or those specifically governing the Internet or e-commerce, may be interpreted and applied in a manner that is inconsistent from one jurisdiction to another and may conflict with other rules or our practices. We cannot be sure that our practices have complied, comply or will comply fully with all such laws and regulations. Any failure, or perceived failure, by us to comply with any of these laws or regulations could result in damage to our reputation, a loss in business and proceedings or actions against us by governmental entities or others. Any such proceeding or action could hurt our reputation, force us to spend significant amounts in defense of these proceedings, distract our management, increase our costs of doing business and decrease the use of our sites by consumers and suppliers and may result in the imposition of monetary liability. We may also be contractually liable to indemnify and hold harmless third parties from the costs or consequences of non-compliance with any such laws or regulations. In addition, it is possible that governments of one or more countries may seek to censor content available on our sites or may even attempt to completely block access to our sites. Adverse legal or regulatory developments could substantially harm our business. In particular, in the event that we are restricted, in whole or in part, from operating in one or more countries, our ability to retain or increase our consumer base may be adversely affected, and we may not be able to maintain or grow our net sales and expand our business as anticipated.

**Risk factors related to legal and regulatory proceedings**

*We are involved, and may become involved in the future, in disputes and other legal or regulatory proceedings that, if adversely decided or settled, could materially and adversely affect our business, financial condition and results of operations.*

We are, and may in the future become, party to litigation, regulatory proceedings or other disputes. In general, claims made by or against us in disputes and other legal or regulatory proceedings can be expensive and time consuming to bring or defend against, requiring us to expend significant resources and divert the efforts and attention of our management and other personnel from our business operations. These potential claims include, but are not limited to, personal injury claims, class action lawsuits, intellectual property claims, privacy claims, employment litigation and regulatory investigations and causes of action relating to the advertising and promotional claims about our products. Any adverse determination against us in these proceedings, or even the allegations contained in the claims, regardless of whether they are ultimately found to be without

48

Table of Contents

merit, may also result in settlements, injunctions or damages that could have a material adverse effect on our business, financial condition and results of operations.

***We may be required to recall products and may face product liability claims, either of which could result in unexpected costs and damage our reputation.***

We sell products for human use. Our products intended for use as cosmetics or skin care are not generally subject to pre-market approval or registration processes, so we cannot rely upon a government safety panel to qualify or approve our products for use. A product may be safe for the general population when used as directed but could cause an adverse reaction for a person who has a health condition or allergies, or who is taking a prescription medication. While we include what we believe are adequate instructions and warnings and we have historically had low numbers of reported adverse reactions, previously unknown adverse reactions could occur. If we discover that any of our products are causing adverse reactions, we could suffer adverse publicity or regulatory/government sanctions.

Potential product liability risks may arise from the testing, manufacture and sale of our products, including that the products fail to meet quality or manufacturing specifications, contain contaminants, include inadequate instructions as to their proper use, include inadequate warnings concerning side effects and interactions with other substances or for persons with health conditions or allergies, or cause adverse reactions or side effects. Product liability claims could increase our costs, and adversely affect our business, financial condition and results of operations. As we continue to offer an increasing number of new products, our product liability risk may increase. It may be necessary for us to recall products that do not meet approved specifications or because of the side effects resulting from the use of our products, which would result in adverse publicity, potentially significant costs in connection with the recall and could have a material adverse effect on our business, financial condition and results of operations.

In addition, plaintiffs in the past have received substantial damage awards from other cosmetic and drug companies based upon claims for injuries allegedly caused by the use of their products. Although we currently maintain general liability insurance, any claims brought against us may be subject to policy exclusions or exceed our existing or future insurance policy coverage or limits. Any judgment against us that is not covered or in excess of our policy coverage or limits would have to be paid from our cash reserves, which would reduce our capital resources. In addition, we may be required to pay higher premiums and accept higher deductibles in order to secure adequate insurance coverage in the future. Further, we may not have sufficient capital resources to pay a judgment, in which case our creditors could levy against our assets. Any product liability claim or series of claims brought against us could harm our business significantly, particularly if a claim were to result in adverse publicity or damage awards outside or in excess of our insurance policy limits.

**Risk factors related to intellectual property**

***If we are unable to protect our intellectual property, the value of our brands and other intangible assets may be diminished, and our business may be adversely affected.***

We rely on trademark, copyright, trade secret, patent and other laws protecting proprietary rights, nondisclosure and confidentiality agreements and other practices, to protect our brands and proprietary information, technologies and processes. Our primary trademarks include "e.l.f.," "e.l.f. SKIN," "Naturium," "e.l.f. eyes lips face," "Well People," and "Keys Soulcare," all of which are registered or have registrations pending in the United States and in many other countries or registries. Our trademarks are valuable assets that support our brands and consumers' perception of our products.

Although we have existing and pending trademark registrations for our brands in the United States and in many of the foreign countries in which we operate, we may not be successful in asserting trademark or trade name protection in all jurisdictions. We also have not applied for trademark protection in all relevant foreign jurisdictions and cannot assure you that our pending trademark applications will be approved. Third parties may also attempt to register our trademarks abroad in jurisdictions where we have not yet applied for trademark protection, oppose our trademark applications domestically or abroad, or otherwise challenge our use of the trademarks. In the event that our trademarks are successfully challenged, we could be forced to rebrand our products in some parts of the world, which could result in the loss of brand recognition and could require us to devote resources to advertising and marketing new brands.

We have limited patent protection, which limits our ability to protect our products from competition. We primarily rely on know-how to protect our products. It is possible that others will independently develop the same or similar know-how, which may allow them to sell products similar to ours. If others obtain access to our know-how, our confidentiality agreements may not effectively prevent disclosure of our proprietary information, technologies and processes and may not provide an adequate remedy in the event of unauthorized use of such information, which could harm our competitive position.

49

Furthermore, advances in AI technology may generate intellectual property developments, which existing intellectual property laws may not adequately protect and which may also give rise to a proliferation of infringement which we may not be able to address effectively.

The efforts we have taken to protect our proprietary rights may not be sufficient or effective. In addition, effective trademark, copyright, patent and trade secret protection may be unavailable or limited for certain of our intellectual property in some foreign countries. Other parties may infringe our intellectual property rights and may dilute our brands in the marketplace. We may need to engage in litigation or other activities to enforce our intellectual property rights, to protect our trade secrets or to determine the validity and scope of proprietary rights of others. Any such activities could require us to expend significant resources and divert the efforts and attention of our management and other personnel from our business operations. If we fail to protect our intellectual property or other proprietary rights, our business, financial condition and results of operations may be materially and adversely affected.

***Our success depends on our ability to operate our business without infringing, misappropriating or otherwise violating the trademarks, patents, copyrights and other proprietary rights of third parties.***

Our commercial success depends in part on our ability to operate without infringing, misappropriating or otherwise violating the trademarks, patents, copyrights, trade secrets and other proprietary rights of others. We cannot be certain that the conduct of our business does not and will not infringe, misappropriate or otherwise violate such rights. From time to time we receive allegations of intellectual property infringement and third parties have filed claims against us with allegations of intellectual property infringement. We are, and may in the future be, subject to third-party claims of intellectual property infringement. In addition, third parties may involve us in intellectual property disputes as part of a business model or strategy to gain competitive advantage.

As we gain greater visibility and market exposure as a public company and otherwise, we also face a greater risk of being the subject of such claims and litigation. For these and other reasons, third parties may allege that our products or activities infringe, misappropriate, dilute or otherwise violate their trademark, patent, copyright or other proprietary rights. Defending against allegations and litigation could be expensive, occupy significant amounts of time, divert management's attention from other business concerns and have an adverse impact on our ability to bring products to market. In addition, if we are found to infringe, misappropriate, dilute or otherwise violate third-party trademark, patent, copyright or other proprietary rights, our ability to use brands to the fullest extent we plan may be limited, we may need to obtain a license, which may not be available on commercially reasonable terms, or at all, or we may need to redesign or rebrand our marketing strategies or products, which may not be possible.

We may also be required to pay substantial damages or be subject to an order prohibiting us and our retail customers from importing or selling certain products or engaging in certain activities. Our inability to operate our business without infringing, misappropriating or otherwise violating the trademarks, patents, copyrights and proprietary rights of others could have a material adverse effect on our business, financial condition and results of operations.

**Risk factors related to marketing activities**

***Use of social media may materially and adversely affect our reputation or subject us to fines or other penalties, and any failure in our marketing efforts through our social media presence could materially and adversely affect our business, financial condition and results of operations.***

We rely to a large extent on our online presence to reach consumers, and we offer consumers the opportunity to rate and comment on our products on our e-commerce websites and mobile applications. Negative commentary or false statements regarding us or our products may be posted on our e-commerce websites, mobile applications, or social media platforms and may be harmful to our reputation or business. Our target consumers often value readily available information and may act on such information without further investigation and without regard to its accuracy. The harm may be immediate without affording us an opportunity for redress or correction. In addition, we may face claims relating to information that is published or made available through the interactive features of our e-commerce websites and mobile applications. For example, we may receive third-party complaints that the comments or other content posted by users on our platforms infringe third-party intellectual property rights or otherwise infringe the legal rights of others. While the Communications Decency Act and Digital Millennium Copyright Act generally protect online service providers from claims of copyright infringement or other legal liability for the self-directed activities of its users, if it were determined that we did not meet the relevant safe harbor requirements under either law, we could be exposed to claims related to advertising practices, defamation, intellectual property rights, rights of publicity and privacy, and personal injury torts. We could incur significant costs investigating and

defending such claims and, if we are found liable, significant damages. If any of these events occur, our business, financial condition and results of operations could be materially and adversely affected.

We also use third-party social media platforms as marketing tools. For example, we maintain Snapchat, Facebook, TikTok, X (formerly Twitter), Roblox, Twitch, Pinterest, Instagram and YouTube accounts. As e-commerce and social media platforms continue to rapidly evolve, we must continue to maintain a presence on these platforms and establish presences on new or emerging popular social media platforms. If we are unable to cost-effectively use social media platforms as marketing tools, our ability to acquire new consumers and our financial condition may suffer. Generally, the opportunities in and sophistication of newer advertising channels are relatively undeveloped and unproven, and there can be no assurance that we will be able to continue to appropriately manage and fine-tune our marketing efforts in response to these and other trends in the advertising industry. Furthermore, these newer advertising channels often change rapidly and can be subject to disruptions for reasons beyond our control. For example, lawmakers in the United States, Europe and Canada have recently escalated efforts to restrict access to TikTok. On April 24, 2024, President Biden signed a bill to force a sale of TikTok by its Chinese owner, ByteDance, or institute a first-of-its-kind ban on the app in the United States. Individual states, governmental bodies and institutions have also voiced concerns that TikTok poses a national security threat and have pursued similar prohibitions. As laws and regulations rapidly evolve to govern the use of these platforms and devices, the failure by us, our employees or third parties acting at our direction to abide by applicable laws and regulations in the use of these platforms and devices could subject us to regulatory investigations, class action lawsuits, liability, fines or other penalties and have a material adverse effect on our business, financial condition and result of operations. Any failure to successfully manage our marketing efforts on, or disruptions to, social media channels that we have come to depend on for marketing could materially adversely affect our business, financial condition and results of operations.

In addition, an increase in the use of social media for product promotion and marketing may cause an increase in the burden on us to monitor compliance of such materials and increase the risk that such materials could contain problematic product or marketing claims in violation of applicable regulations.

### Use of influencers may materially and adversely affect our reputation and business.

We rely in part upon social media influencers to market our brands and are unable to fully control their efforts. Influencers with whom we maintain a relationship could engage in behavior or use their platforms to communicate directly with our consumers and retail customers in a manner that reflects poorly on our brand, and these communications may be attributed to us or otherwise adversely affect us. Furthermore, negative commentary regarding us or our products or influencers may also be posted on social media platforms and may be adverse to our reputation or business. The immediacy of social media precludes us from having real-time control over postings made regarding us via social media, whether matters of fact or opinion. Information distributed via social media could result in immediate unfavorable publicity we may not be able to reverse. It is not possible to prevent such behavior, and the precautions we take to prevent or detect this activity may not be effective. This unfavorable publicity could result in damage to our reputation and therefore have a material adverse effect on our business, financial condition, operating results and prospects.

### Our business relies heavily on email and other messaging services, and any restrictions on the sending of emails or messages or an inability to timely deliver such communications could materially adversely affect our net revenue and business.

Our business is highly dependent upon email and other messaging services for promoting our brands, products and e-commerce platforms. We provide emails, text messages and "push" communications to inform consumers of new products, shipping specials and other promotions. We believe these messages are an important part of our consumer experience. If we are unable to successfully deliver emails or other messages to our subscribers, or if subscribers decline to open or read our messages, our business, financial condition and results of operations may be materially adversely affected. Changes in how web and mail services block, organize and prioritize email may reduce the number of subscribers who receive or open our emails. For example, Google's Gmail service has a feature that organizes incoming emails into categories (for example, primary, social and promotions).

Such categorization or similar inbox organizational features may result in our emails being delivered in a less prominent location in a subscriber's inbox or viewed as "spam" by our subscribers and may reduce the likelihood of that subscriber reading our emails. Actions by third parties to block, impose restrictions on or charge for the delivery of emails or other messages could also adversely impact our business. From time to time, Internet service providers or other third parties may block bulk email transmissions or otherwise experience technical difficulties that result in our inability to successfully deliver emails or other messages to consumers.

Changes in the laws or regulations that limit our ability to send such communications or impose additional requirements upon us in connection with sending such communications would also materially adversely impact our business. For example, electronic marketing and privacy requirements in the EU and the UK are highly restrictive and differ greatly from those in the United States, which could cause fewer of individuals in the EU or the UK to subscribe to our marketing messages and drive up our costs and risk of regulatory oversight and fines if we are found to be non-compliant.

Our use of email and other messaging services to send communications to consumers may also result in legal claims against us, which may cause us increased expenses, and if successful might result in fines and orders with costly reporting and compliance obligations or might limit or prohibit our ability to send emails or other messages. We also rely on social networking messaging services to send communications and to encourage consumers to send communications. Changes to the terms of these social networking services to limit promotional communications, any restrictions that would limit our ability or our consumers' ability to send communications through their services, disruptions or downtime experienced by these social networking services or decline in the use of or engagement with social networking services by consumers could materially and adversely affect our business, financial condition and results of operations.

**Risk factors relating to our stockholders and ownership of our common stock**

***Our business could be negatively impacted by corporate citizenship and sustainability matters.***

There is an increased focus from certain investors, customers, consumers, employees, and other stakeholders concerning corporate citizenship and sustainability matters. From time to time, we may announce certain initiatives, including goals, regarding our focus areas, which include environmental matters, packaging, responsible sourcing and social investments. We could fail, or be perceived to fail, in our achievement of such initiatives or goals, or we could fail in accurately reporting our progress on such initiatives and goals. In addition, we could be criticized for the scope of such initiatives or goals or perceived as not acting responsibly in connection with these matters. Any such matters, or related corporate citizenship and sustainability matters, could have a material adverse effect on our business, financial condition and results of operations.

In addition, a variety of organizations measure the performance of companies on environmental, social, and governance ("ESG") topics, and the results of these assessments are widely publicized. Investment in funds that specialize in companies that perform well in such assessments are increasingly popular, and major institutional investors have publicly emphasized the importance of such ESG measures to their investment decisions. Topics taken into account in such assessments include, among others, the company's efforts and impacts on climate change and human rights, ethics and compliance with law, and the role of the company's board of directors in supervising various sustainability issues.

Furthermore, ESG-related legislation and regulation is being implemented across the world, including in the United States, and any such legislation or regulation may impose additional compliance burdens on us and on third parties in our value chain, which could potentially result in increased administrative costs, decreased demand in the marketplace for our products, and/or increased costs for our supplies and products. For example, in March 2024, the SEC adopted final rules to require public companies to disclose certain climate-related information. The final SEC rules, to the extent they are implemented, will require us to disclose, among other things, material climate-related risks, activities to mitigate or adapt to such risks, information about our board of directors' oversight of climate-related risks and management's role in managing material climate-related risks, and information on any climate-related targets or goals that are material to our business, results of operations or financial condition. We are assessing our obligations under these new regulations but expect that our efforts to comply will require significant expenditures, which will then increase our operating expenses. On March 21, 2024, the U.S. Court of Appeals for the Eighth Circuit was selected as the court to hear challenges against the SEC over its final climate disclosure rules. On April 4, 2024, the SEC announced that it would voluntarily stay its final climate disclosure rules pending judicial review.

We take into consideration the expected impact of ESG matters on the sustainability of our business over time and the potential impact of our business on society and the environment. However, in light of investors' increased focus on ESG matters, and in light of increased and evolving legislation and regulation regarding ESG matters, there can be no certainty that we will manage such issues successfully, or that we will successfully meet our customers' or society's expectations as to our proper role. If we fail to meet the ESG values, standards and metrics that we set for ourselves, or our articulated purposes to offer inclusive, accessible, clean, vegan and cruelty free cosmetics and skin care products, or fail to align to regulatory or market expectations or standards regarding such matters, we may experience negative publicity and a loss of customers as a result, which will adversely affect our business, financial condition, and results of operations.

***Actions of activist stockholders could be costly and time-consuming, divert management's attention and resources, and have an adverse effect on our business.***

While we value open dialogue and input from our stockholders, activist stockholders could take actions that could be costly and time-consuming to us, disrupt our operations, and divert the attention of our board of directors, management, and employees, such as public proposals and requests for potential nominations of candidates for election to our board of directors, requests to pursue a strategic combination or other transaction, or other special requests. As a result, we have retained, and may in the future retain additional services of various professionals to advise us in these matters, including legal, financial and communications advisers, the costs of which may negatively impact our future financial results. In addition, perceived uncertainties as to our future direction, strategy, or leadership created as a consequence of activist stockholder initiatives may result in the loss of potential business opportunities, harm our ability to attract new or retain existing investors, customers, directors, employees or other partners, and cause our stock price to experience periods of volatility or stagnation.

***Because we have no current plans to pay cash dividends on our common stock, stockholders may not receive any return on investment unless they sell our common stock for a price greater than that which they paid for it.***

We have no current plans to pay cash dividends on our common stock. The declaration, amount and payment of any future dividends will be at the sole discretion of our board of directors. Our board of directors may take into account general and economic conditions, our financial condition and results of operations, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions and implications on the payment of dividends by us to our stockholders or by our subsidiaries to us, including restrictions under the Amended Credit Agreement and other indebtedness we may incur, and such other factors as our board of directors may deem relevant.

***Stockholders may be diluted by the future issuance of additional common stock in connection with our incentive plans, acquisitions or otherwise.***

We had approximately 193.6 million shares of common stock authorized but unissued and 56.4 million shares of common stock outstanding as of August 1, 2024. Our amended and restated certificate of incorporation authorizes us to issue these shares of common stock and stock options exercisable for common stock (and other equity awards) for the consideration and on the terms and conditions established by our board of directors in its sole discretion, whether in connection with acquisitions or otherwise. Any common stock that we issue, including under our existing equity incentive plans or any additional equity incentive plans that we may adopt in the future, would dilute the percentage ownership held by existing investors. In connection with our acquisition of Naturium, we issued 577,659 shares of the Company's common stock, with a fair market value of $57.8 million as of the date of the Acquisition.

***Anti-takeover provisions in our organizational documents and Delaware law might discourage or delay acquisition attempts for us that stockholders might consider favorable.***

Our amended and restated certificate of incorporation and amended and restated bylaws contain provisions that may make the acquisition of our company more difficult without the approval of our board of directors. Among other things:

- although we do not have a stockholder rights plan, these provisions allow us to authorize the issuance of undesignated preferred stock in connection with a stockholder rights plan or otherwise, the terms of which may be established and the shares of which may be issued without stockholder approval, and which may include super voting, special approval, dividend or other rights or preferences superior to the rights of the holders of common stock;

- these provisions provide for a classified board of directors with staggered three-year terms;

- these provisions require advance notice for nominations of directors by stockholders and for stockholders to include matters to be considered at our annual meetings;

- these provisions prohibit stockholder action by written consent;

- these provisions provide for the removal of directors only for cause and only upon affirmative vote of holders of at least 75% of the shares of common stock entitled to vote generally in the election of directors; and

- these provisions require the amendment of certain provisions only by the affirmative vote of at least 75% of the shares of common stock entitled to vote generally in the election of directors.

Further, as a Delaware corporation, we are also subject to provisions of Delaware law, which may impair a takeover attempt that our stockholders may find beneficial. These anti-takeover provisions and other provisions under Delaware law could discourage, delay or prevent a transaction involving a change in control of our company, including actions that our stockholders may deem advantageous, or negatively affect the trading price of our common stock. These provisions could also discourage proxy contests and make it more difficult for other stockholders to elect directors of their choosing and to cause us to take other corporate actions they may desire.

***Our board of directors is authorized to issue and designate shares of our preferred stock in additional series without stockholder approval.***

Our amended and restated certificate of incorporation authorizes our board of directors, without the approval of our stockholders, to issue up to 30 million shares of our preferred stock, subject to limitations prescribed by applicable law, rules and regulations and the provisions of our amended and restated certificate of incorporation, as shares of preferred stock in series, to establish from time to time the number of shares to be included in each such series and to fix the designation, powers, preferences and rights of the shares of each such series and the qualifications, limitations or restrictions thereof. The powers, preferences and rights of these additional series of preferred stock may be senior to or on parity with our common stock, which may reduce its value.

***Our amended and restated certificate of incorporation and amended and restated bylaws provide that the Court of Chancery of the State of Delaware will be the exclusive forum for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or employees.***

Our amended and restated certificate of incorporation and amended and restated bylaws provide that the Court of Chancery of the State of Delaware is the exclusive forum for any derivative action or proceeding brought on our behalf, any action asserting a breach of fiduciary duty, any action asserting a claim against us arising pursuant to the Delaware General Corporation Law, our amended and restated certificate of incorporation or our amended and restated bylaws, or any action asserting a claim against us that is governed by the internal affairs doctrine. This provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or our directors, officers or other employees, which may discourage such lawsuits against us and our directors, officers and other employees. Alternatively, if a court were to find this provision in our amended and restated certificate of incorporation and amended and restated bylaws to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could adversely affect our business, financial condition and results of operations.

**General risk factors**

***An active trading market for our common stock may not be sustained, and the market price of shares of our common stock may be volatile, which could cause the value of your investment to decline.***

Although our common stock is listed on the NYSE, there can be no assurances that an active trading market for our common stock will be sustained. In the absence of an active trading market for our common stock, stockholders may not be able to sell their common stock at the time or price they would like to sell.

Even if an active trading market is sustained, the market price of our common stock may be highly volatile and could be subject to wide fluctuations. Securities markets often experience significant price and volume fluctuations. This market volatility, as well as general economic, market or political conditions, could reduce the market price of shares of our common stock in spite of our operating performance. In addition, our results of operations could be below the expectations of public market analysts and investors due to a number of potential factors, including variations in our quarterly results of operations, additions or departures of key management personnel, changes in consumer preferences or beauty trends, announcements of new products or significant price reductions by our competitors, failure to meet analysts' earnings estimates, publication of research reports about our industry, litigation and government investigations, changes or proposed changes in laws or regulations or differing interpretations or enforcement thereof affecting our business, adverse market reaction to any indebtedness we may incur or securities we may issue in the future, changes in market valuations of similar companies or speculation in the press or investment community, announcements by our competitors of significant contracts, acquisitions, dispositions, strategic partnerships, joint ventures or capital commitments, adverse publicity about our industry, the level of success of releases of new products and in response the market price of shares of our common stock could decrease significantly.

In addition, in May 2019, we announced that our board of directors authorized a share repurchase program allowing us to repurchase up to $25.0 million of our outstanding shares of common stock ("Share Repurchase Program"), of which approximately $17.1 million remains available for future share repurchases as of June 30, 2024. Purchases under the Share Repurchase Program may be made from time to time in the open market, in privately negotiated transactions or otherwise. The timing and amount of any repurchases pursuant to the Share Repurchase Program will be determined based on market conditions, share price and other factors. The Share Repurchase Program may be suspended or discontinued at any time and there is no guarantee that any shares will be purchased under the Share Repurchase Program.

In the past, following periods of volatility in the overall market and the market price of a company's securities, securities class action litigation has often been instituted against these companies. This litigation, if instituted against us, could result in substantial costs and a diversion of our management's attention and resources.

***Future sales, or the perception of future sales, by us or our stockholders in the public market could cause the market price for our common stock to decline.***

The sale of substantial amounts of shares of our common stock in the public market, or the perception that such sales could occur could harm the prevailing market price of shares of our common stock. These sales, or the possibility that these sales may occur, also might make it more difficult for us to sell equity securities in the future at a time and at a price that we deem appropriate.

In addition, all the shares of common stock subject to stock options and restricted stock units and shares of restricted stock awards outstanding and reserved under our 2014 Equity Incentive Plan, our 2016 Equity Incentive Award Plan and our 2016 Employee Stock Purchase Plan have been registered on Form S-8 under the Securities Act and such shares, once the underlying equity award vests, will be eligible for sale in the public markets, subject to Rule 144 limitations applicable to affiliates. We intend to file one or more registration statements on Form S-8 to cover additional shares of our common stock or securities convertible into or exchangeable for shares of our common stock pursuant to automatic increases in the number of shares reserved under our 2016 Equity Incentive Award Plan and our 2016 Employee Stock Purchase Plan. Accordingly, shares registered under these registration statements on Form S-8 will be available for sale in the open market.

As restrictions on resale end, the market price of shares of our common stock could drop significantly if the holders of these restricted shares sell them or are perceived by the market as intending to sell them. These factors could also make it more difficult for us to raise additional funds through future offerings of shares of our common stock or other securities.

***If securities analysts do not publish research or publish inaccurate or unfavorable research about our business, our stock price and trading volume could decline.***

The trading market for our common stock depends in part on the research and reports that securities or industry analysts publish about us or our business. If one or more of the analysts who cover us downgrade our stock or publish inaccurate or unfavorable research about our business, our stock price would likely decline. If one or more of these analysts cease coverage of our company or fail to publish reports on us regularly, demand for our stock could decrease, which might cause our stock price and trading volume to decline.

**Item 2. Unregistered sales of equity securities and use of proceeds.**

**Issuer Purchases of Equity Securities**

In May 2019, we announced that our board of directors authorized the Share Repurchase Program, which authorizes us to repurchase up to $25 million of our outstanding shares of common stock. The Share Repurchase Program remains in effect through the earlier of (i) the date that $25 million of our outstanding common stock has been purchased under the Share Repurchase Program or (ii) the date that our board of directors cancels the Share Repurchase Program.

Subject to certain exceptions, the covenants in the Amended Credit Agreement require us to be in compliance with certain leverage ratios to make repurchases under the Share Repurchase Program.

We did not repurchase any shares during the three months ended June 30, 2024, including pursuant to the Share Repurchase Program. A total of $17.1 million remains available for future share repurchases under the Share Repurchase Program as of June 30, 2024.

**Item 3. Defaults upon senior securities.**

None.

**Item 4. Mine safety disclosures.**

None.

**Item 5. Other information.**

**Rule 10b5-1 Trading Plans**

The following table sets forth the material terms of each Rule 10b5-1 trading plan that was adopted, modified or terminated by an officer or a director of the Company during the three months ended June 30, 2024.

| Officer/Director | Action | Date | Trading Arrangement | | Total Shares to be Sold | Expiration Date |
|---|---|---|---|---|---|---|
| | | | Rule 10b5-1* | Non-Rule 10b5-1** | | |
| Tarang Amin<br>*Chairman, Chief Executive Officer, and President* | Adopt | 5/29/2024 | X | | Up to 249,537 | 9/30/2025 |
| Mandy Fields<br>*SVP and Chief Financial Officer* | Modify[1] | 5/31/2024 | X | | Up to 83,962[2] | 8/22/2025 |
| Jennie Laar<br>*SVP and Chief Commercial Officer* | Adopt | 6/4/2024 | X | | Up to 46,889[2] | 8/29/2025 |
| Scott Milsten<br>*SVP, General Counsel and Chief People Officer* | Adopt | 6/6/2024 | X | | Up to 90,000 | 6/6/2025 |

* Intended to satisfy the affirmative defense of Rule 10b5-1(c).
** Not intended to satisfy the affirmative defense of Rule 10b5-1(c).

(1) Changed the amount of shares to be sold under the trading arrangement, the price limits for sales under the trading arrangement and the timing of sales under the trading arrangement originally adopted on November 14, 2022 and modified on May 30, 2023.

(2) The total shares to be sold cannot be determined at the date of this Quarterly Report as the planned sale amount for such officer is equal to a designated percentage of the net number of shares after a portion of the shares have been sold to cover withholding taxes from RSU vesting, as well as performance stock units that will only vest upon achievement of applicable performance targets and may not vest at all. The amount listed for such officer reflects the maximum number of shares available to be sold multiplied by the designated percentages set forth in each officer's respective 10b5-1 trading plan.

Table of Contents

**Item 6. Exhibits.**

| Exhibit Number | Exhibit Description | Filed Herewith | Incorporated by Reference | | | |
|---|---|---|---|---|---|---|
| | | | Form | Exhibit Number | File Number | Filing Date |
| 3.1 | Amended and Restated Certificate of Incorporation of e.l.f. Beauty, Inc. | | 8-K | 3.1 | 001-37873 | 9/27/2016 |
| 3.2 | Amended and Restated Bylaws of e.l.f. Beauty, Inc. | | 8-K | 3.2 | 001-37873 | 9/27/2016 |
| 31.1 | Certification of the Chief Executive Officer, pursuant to Section 302 of the Sarbanes-Oxley Act. | X | | | | |
| 10.1 | Extension of Lease to Amended and Restated Lease Agreement, dated June 25, 2024, by and between e.l.f. Cosmetics, Inc. and Redwood Property Investors III, LLC (as successor to 1007 Clay Street Properties) | X | | | | |
| 10.2 | Office Lease, dated as of May 29, 2024, by and between 601 City Center LLC and e.l.f. Cosmetics, Inc. | X | | | | |
| 10.3 | e.l.f. Beauty, Inc. Equity Award Retirement Policy | | 8-K | 10.1 | 001-37873 | 5/31/2024 |
| 31.1 | Certification of the Chief Executive Officer, pursuant to Section 302 of the Sarbanes-Oxley Act. | | | | | |
| 31.2 | Certification of the Chief Financial Officer, pursuant to Section 302 of the Sarbanes-Oxley Act. | X | | | | |
| 32.1* | Certification of the Chief Executive Officer and Chief Financial Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act. | X | | | | |
| 101.INS | XBRL Instance Document - Instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. | X | | | | |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document. | X | | | | |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document. | X | | | | |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document. | X | | | | |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document. | X | | | | |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document. | X | | | | |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101). | X | | | | |

\*    This certification is deemed furnished, and not filed, with the SEC and is not to be incorporated by reference into any filing of the Company under the Securities Act of 1933, as amended, or the Exchange Act, whether made before or after the date of this Quarterly Report, irrespective of any general incorporation language contained in such filing.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

e.l.f. Beauty, Inc.

| August 8, 2024 | | By: | /s/ Tarang P. Amin |
| --- | --- | --- | --- |
| Date | | | Tarang P. Amin |
| | | | Chief Executive Officer |
| | | | *(Principal Executive Officer)* |

| August 8, 2024 | | By: | /s/ Mandy Fields |
| --- | --- | --- | --- |
| Date | | | Mandy Fields |
| | | | Chief Financial Officer |
| | | | *(Principal Financial and Accounting Officer)* |

58


CALIFORNIA
ASSOCIATION
OF REALTORS®

# EXTENSION OF LEASE
**(C.A.R. Form EL, Revised 6/23)**

The following terms and conditions are hereby incorporated in and made a part of the Residential Lease or

☒ Other *Amended and Restated Lease Agreement*        ("Lease"),
dated   *June 19, 2019*   , on property known as   *570 10th St., Suite 300, 202 and 203*
*Oakland, CA 94607*   ("Premises"),

 in which   *e.l.f. Cosmetics, Inc.*   is referred to as ("Tenant")

 and   *Redwood Property Investors III, LLC*   is referred to as ("Housing Provider").

**Note to Housing Provider: If the Premises are subject to any rent increase cap under any state or local law, Housing Provider is strongly advised to seek counsel from a qualified California real estate lawyer, who is familiar with the law where the property is located, prior to using this form to modify any of the existing terms of the Lease.**

The terms of the tenancy are changed as follows. Unless otherwise provided, the change shall take effect on the date the Lease was scheduled to terminate.

1. **EXTENSION OF TERM:** The scheduled termination date is extended to   *July 31, 2025*   (Date).
2. **Rent shall be $** *90,107.64*   **per month.**
3. **Security deposit shall be increased by** $ _____
4. ☐ **Rent Cap and Just Cause Addendum (C.A.R. Form RCJC) is attached and incorporated into the Lease.**
5. **ADDITIONAL TERMS:** *This is a eight (8) month extension to the current lease. All other terms in the original    lease remain the same and in full force and effect.*

**By signing below, Tenant and Housing Provider acknowledge that each has read, understands, has received a copy of and agrees to the terms of this Extension of Lease.**

| | | | |
|---|---|---|---|
| Tenant | /s/ Scott Milsten | Date | 6/25/2024 |
| Tenant | *e.l.f. Cosmetics, Inc.* | | |
| | | | |
| Housing Provider | /s/ B Reid Settlemier | Date | 6/25/2024 |
| Housing Provider | *Redwood Property Investors III, LLC* | | |

© 2023, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOC/AT/ON OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**EL REVISED 6/23 (PAGE 1 OF 1)**

**EXTENSION OF LEASE (EL PAGE 1 OF 1)**

**601 CITY CENTER**
**OAKLAND, CALIFORNIA**


**OFFICE LEASE**


**601 CITY CENTER LLC**,
a Delaware limited liability company,
Landlord


and


**E.L.F. COSMETICS, INC.**,
a Delaware corporation,
Tenant


DATED AS OF: May 29, 2024


4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(i)

**TABLE OF CONTENTS**

**Page**

| | | |
|---|---|---|
| 1 | Premises | 1 |
| 2 | Certain Basic Lease Terms | 1 |
| 3 | Term; Delivery of Possession of Premises | 3 |
| 4 | Premises "As Is" | 3 |
| 5 | Monthly Rent | 4 |
| 6 | Intentionally Omitted | 5 |
| 7 | Additional Rent: Increases in Operating Expenses and Tax Expenses | 5 |
| 8 | Use of Premises; Compliance with Law | 12 |
| 9 | Alterations and Restoration | 16 |
| 10 | Repair | 19 |
| 11 | Abandonment | 20 |
| 12 | Liens | 20 |
| 13 | Assignment and Subletting | 21 |
| 14 | Indemnification of Landlord | 25 |
| 15 | Insurance | 26 |
| 16 | Mutual Waiver of Subrogation Rights | 28 |
| 17 | Utilities and Building Services | 28 |
| 18 | Personal Property and Other Taxes | 31 |
| 19 | Rules and Regulations | 32 |
| 20 | Surrender; Holding Over | 32 |
| 21 | Subordination and Attornment | 33 |
| 22 | Financing Condition | 34 |
| 23 | Entry by Landlord | 34 |
| 24 | Insolvency or Bankruptcy | 35 |
| 25 | Default and Remedies | 36 |
| 26 | Damage or Destruction | 39 |
| 27 | Eminent Domain | 40 |
| 28 | Landlord's Liability; Sale of Building | 41 |
| 29 | Estoppel Certificates | 42 |
| 30 | Right of Landlord to Perform | 42 |
| 31 | Late Charge; Late Payments | 43 |
| 32 | Attorneys' Fees; Waiver of Jury Trial | 43 |
| 33 | Waiver | 44 |
| 34 | Notices | 44 |
| 35 | Independent Covenants | 44 |
| 36 | Defined Terms and Marginal Headings | 44 |
| 37 | Time and Applicable Law | 45 |
| 38 | Successors | 45 |
| 39 | Entire Agreement; Modifications | 45 |
| 40 | Light and Air | 45 |
| 41 | Name of Building; Tenant's Trademarks | 45 |
| 42 | Severability | 46 |
| 43 | Authority | 46 |

| 44 | No Offer | 46 |
| 45 | Real Estate Brokers | 46 |
| 46 | Consents and Approvals | 46 |
| 47 | Reserved Rights | 47 |
| 48 | Financial Statements | 47 |
| 49 | Intentionally Omitted | 48 |
| 50 | Nondisclosure of Lease Terms | 48 |
| 51 | Hazardous Substance Disclosure | 48 |
| 52 | Signage Rights | 48 |
| 53 | Parking | 49 |
| 54 | Transportation Management | 51 |
| 55 | Renovation of the Real Property and Other Improvements | 51 |
| 56 | Waiver of Claims | 51 |
| 57 | Force Majeure | 51 |
| 58 | Quiet Enjoyment | 52 |
| 59 | No Discrimination | 52 |
| 60 | OFAC | 52 |
| 61 | CASp Inspection | 53 |
| 62 | Sustainability Practices | 53 |
| 63 | Renewal Options | 53 |
| 64 | Abatement of Rent and Termination Right When Tenant Is Prevented From Using Premises | 55 |

EXHIBITS:
A – Outline of Premises
B – Rules and Regulations
C – Form of Commencement Date Letter
D – Work Letter
E – Janitorial Specifications
F – Form of SNDA
G – Existing Exclusives

## LEASE

THIS LEASE is made as of the 29th day of May, 2024, between 601 CITY CENTER LLC, a Delaware limited liability company ("**Landlord**"), and E.L.F. COSMETICS, INC., a Delaware corporation ("**Tenant**").

1.        Premises. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, on the terms and conditions set forth herein, the space outlined on the attached Exhibit A (the "**Premises**"). The Premises are located on the floor(s) specified in Paragraph 2 below of the building (the "**Building**") located at 601 12th Street, Oakland, California, and known as 601 City Center. The Building, the underground parking (the "**Building Parking Garage**"), the outside plaza areas and the land upon which all of the foregoing are located (the "**Land**") and the improvements thereon are referred to herein collectively as the "**Real Property**."

Tenant's lease of the Premises shall include the right to use, in common with others and subject to the other provisions of this Lease, the public lobbies, entrances, stairs, elevators and other public portions of the Building, as well as the common areas of the other portions of the Real Property that are pertinent to Tenant's occupancy and use of the Premises (collectively, the "**Common Areas**"). Tenant shall comply with all recorded covenants, conditions and restrictions, if any, currently or hereinafter affecting the Real Property and agrees that this Lease shall be subject and subordinate thereto. All of the windows and outside walls of the Premises and any space in the Premises used for shafts, stacks, pipes, conduits, ducts, electrical equipment or other utilities or Building facilities are reserved solely to Landlord and Landlord shall have rights of access through the Premises for the purpose of operating, maintaining and repairing the same in accordance with Paragraph 24 of this Lease.

2.        Certain Basic Lease Terms. As used herein, the following terms shall have the meaning specified below:

a.        Floor(s) on which the Premises are located: Fourteenth (14th). The Premises are currently designated as Suite 1400, which designation may be subject to change by Landlord upon written notice to Tenant. Landlord and Tenant agree that for the purpose of this Lease, the Premises shall be deemed to contain 27,831 rentable square feet of space.

b.        Lease term: Ten (10) years and ten (10) months, commencing on the Commencement Date, and ending on the Expiration Date, as such terms are defined below. The "**Commencement Date**" means two hundred ten (210) days (the "**Buildout Period**") following the Delivery Date; however, if after the Delivery Date, an event of Force Majeure delays Tenant's construction of the Tenant Improvements (as such terms are defined below) and Tenant promptly notifies Landlord of the same in writing, the Buildout Period shall be extended on a day-for-day basis, not to exceed a total of ninety (90) days of extension. The "**Expiration Date**" means the date which is one hundred thirty (130) full calendar months following the Commencement Date. The "**Delivery Date**" means the date on which the following requirements are satisfied: (i) Tenant's receipt of this fully executed Lease; (ii) Landlord tenders possession of the Premises to Tenant in the condition described in Paragraph 4 below; and (iii) the SNDA Contingency (as defined in Paragraph 21 below) is satisfied (collectively, the "**Delivery Requirements**"). The Delivery Date is anticipated to occur on or about ten (10) days after the mutual execution and delivery of this Lease (the "**Anticipated Delivery Date**"). In no event shall the Delivery Date be deemed to occur prior to the Anticipated Delivery Date.

c.    Monthly Rent:

| Period | Monthly Rent |
| --- | --- |
| Lease Month 1 – 22 | $103,322.59 |
| Lease Month 23 – 34 | $106,430.38 |
| Lease Month 35 – 46 | $152,560.26 |
| Lease Month 47 – 58 | $157,137.07 |
| Lease Month 59 – 70 | $161,851.19 |
| Lease Month 71 – 82 | $166,706.72 |
| Lease Month 83 – 94 | $171,707.92 |
| Lease Month 95 – 106 | $176,859.16 |
| Lease Month 107 – 118 | $182,164.94 |
| Lease Month 119 – 130 | $187,629.88 |

d.    "**Lease Month 1**" shall commence on the Commencement Date and end on the last day of the first full calendar month thereafter, and each subsequent Lease Month shall be the calendar month commencing on the day after the expiration of the prior Lease Month.

e.    Notwithstanding the foregoing, so long as Tenant is not in monetary default or material non-monetary default under this Lease beyond applicable notice and cure periods, Monthly Rent for the Premises shall be abated during the period commencing on Lease Month 1 and ending on the expiration of Lease Month 10 (but excluding the remainder of the calendar month in which the Commencement Date occurs if the Commencement Date falls on other than the first day of such month) (the "**Abatement Period**"). During the Abatement Period, only Monthly Rent for the Premises shall be abated, and all other costs and charges specified in this Lease shall remain as due and payable pursuant to the provisions of this Lease. If at any time during the Abatement Period, Tenant is in monetary default or material non-monetary default under this Lease beyond applicable notice and cure periods, then the abatement of Monthly Rent shall cease until such default has been cured, at which point, the abatement of Monthly Rent shall re-commence, such that Tenant is entitled to the full ten (10) months of abatement, subject to the terms of this paragraph. Tenant acknowledges and agrees that the foregoing abatement of Monthly Rent has been granted to Tenant as additional consideration for entering into this Lease and for agreeing to pay the rent and performing the terms and conditions otherwise required under this Lease.

f.    Security Deposit: None.

g.    Tenant's Share: calculated based on a fraction, the numerator of which shall equal the gross leasable area of the Premises, and the denominator of which shall equal the gross leasable area of the Building, estimated to be 4.58%.

h.    Base Year: The calendar year 2025.

i.    Base Tax Year: Fiscal tax year from July 1, 2024 – June 30, 2025.

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt                                        (2)

       j.        Permitted Uses of Premises: Paragraph 8.a. below sets forth the permitted uses of the Premises.

       k.        Real estate broker(s): Jones Lang LaSalle, on behalf of Landlord, and Cushman & Wakefield, on behalf of Tenant ("**Tenant's Broker**").

3.        Term; Delivery of Possession of Premises.

       a.        Term. The term of this Lease shall commence on the Commencement Date (as defined in Paragraph 2.b.) and, unless sooner terminated pursuant to the terms hereof or at law, shall expire on the Expiration Date (as defined in Paragraph 2.b.). Upon either party's request after the Delivery Date and/or the Commencement Date, Landlord and Tenant shall execute a letter in substantially the form of Exhibit C attached hereto (the "**Commencement Date Memo**") confirming the Delivery Date, the Commencement Date and the Expiration Date. If the requesting party does not receive Landlord's or Tenant's countersignature to the Commencement Date Memo, as applicable, evidencing such party's agreement to the terms therein (or a written response setting forth such party's disagreement with the terms therein) within fifteen (15) days after the date of receipt of the Commencement Date Memo, and such failure continues for five (5) days after a second written request therefor, then such party will be deemed to have consented to the terms set forth therein.

       b.        Delivery of Possession. If Landlord, for any reason whatsoever, cannot deliver possession of the Premises to Tenant on or before the Anticipated Delivery Date, this Lease shall not be void or voidable, nor shall Landlord be liable to Tenant for any loss or damage resulting therefrom, but the Delivery Date shall be delayed until the date Landlord delivers possession of the Premises to Tenant in the condition required by this Lease and the Delivery Requirements are satisfied; provided, however, if the Delivery Date does not occur on or before the Anticipated Delivery Date as such date may be extended by Force Majeure (as defined below, which extension shall not exceed sixty (60) additional days) (such date, as so extended, the "**Credit Start Date**"), then, Tenant shall receive a rent credit equal to one (1) day of Monthly Rent for each day during the period which commences on the first day following the Credit Start Date and ends on the Delivery Date; and provided further that if the Delivery Date does not occur on or before November 1, 2024, without regard to delays caused by Force Majeure (such date, the "**Trigger Date**"), then Tenant may terminate this Lease upon written notice to Landlord given at any time after the Trigger Date until the Delivery Date occurs; however, Tenant's termination notice shall be void and of no force or effect if the Delivery Date shall occur within five (5) business days after Landlord's receipt of Tenant's termination notice. The foregoing right of Tenant to receive a credit against Monthly Rent and/or to terminate this Lease shall be Tenant's sole remedy for such delay in the Delivery Date. No delay in delivery of possession of the Premises shall operate to extend the term of this Lease or amend Tenant's obligations under this Lease.

4.        Premises "As Is". On the Delivery Date, Landlord shall cause the Premises to be in the condition described in Exhibit D-1 attached hereto. Except as expressly provided in this Lease, Tenant shall accept the Premises in their "as is" state and condition and Landlord shall have no obligation to make or, except as set forth in Exhibit D attached hereto, pay for any improvements or renovations in or to the Premises or to otherwise prepare the Premises for Tenant's occupancy . Notwithstanding the foregoing, in addition to the condition described in Exhibit D-1, Landlord shall deliver the Premises to Tenant in a broom clean condition, free from any other tenancies including, without limitation, free from any furniture, fixtures, equipment, inventory, or personal property of the existing tenant, with concrete

floors with no more than a 2.5 inch deviation from any given point within one hundred (100) feet and otherwise the concrete floors ready to receive carpeting.

a.        Landlord shall cause those portions of the Base Building (as defined below) systems located within and exclusively serving the Premises to be, as of the Delivery Date, in good working order and condition; provided, however, that the foregoing shall not imply any representation or warranty as to the useful life of such systems, nor shall the foregoing diminish Tenant's responsibility to perform any repairs, modifications or improvements to the same necessitated after the Delivery Date, as a result of Tenant's Alterations (as defined below). In addition, Landlord shall deliver the Premises to Tenant in compliance with all Applicable Laws as it relates to a "shell" condition space, with the exception of (i) any code compliance issues with respect to the restroom in the Premises and (ii) any related path of travel issues in connection with the restrooms, both of which exceptions shall be the responsibility of Tenant, if applicable. Landlord shall correct any latent defects in the Premises discovered by Tenant and reported to Landlord within one (1) year after the Delivery Date.

b.        Notwithstanding anything set forth herein to the contrary, if as the result of a pre-existing condition of the Building or a violation of Legal Requirements (including, without limitation, the applicable building code), Tenant is unable to obtain a building permit to commence its construction or a certificate of occupancy, then Landlord shall promptly, at Landlord's sole cost and expense, correct such condition or cure such violation to the extent such work is required as of the Delivery Date under Legal Requirements and relevant building codes that are applicable as of the Delivery Date. If Delivery Date has occurred, then the Buildout Period shall be extended by the number of days necessary for Landlord to correct such condition or cure such violation.

5.        <u>Monthly Rent</u>.

a.        Commencing as of the Commencement Date (but subject to the abatement of Monthly Rent provided for in Paragraph 2.c. above), and continuing thereafter on or before the first day of each calendar month during the term hereof, Tenant shall pay to Landlord, as monthly rent for the Premises, the Monthly Rent specified in Paragraph 2 above. If Tenant's obligation to pay Monthly Rent hereunder commences on a day other than the first day of a calendar month, or if the term of this Lease terminates on a day other than the last day of a calendar month, then the Monthly Rent payable for such partial month shall be appropriately prorated on the basis of a thirty (30)-day month. Monthly Rent and the Additional Rent specified in Paragraph 7 shall be paid by Tenant to Landlord, in advance, without deduction, offset, prior notice or demand except as expressly provided in this Lease, in immediately available funds of lawful money of the United States of America, or by good check as described below, to the lockbox location designated by Landlord, or to such other person or at such other place as Landlord may from time to time designate in writing. Payments made by check must be drawn either on a California financial institution or on a financial institution that is a member of the federal reserve system. Notwithstanding the foregoing, Tenant shall pay to Landlord together with Tenant's execution of this Lease an amount equal to the Monthly Rent payable under this Paragraph 5.a. for the first full calendar month of the Lease term after Tenant's obligation to pay Monthly Rent shall have commenced hereunder, which amount shall be applied to the Monthly Rent first due and payable hereunder.

b.        All amounts payable by Tenant to Landlord under this Lease, or otherwise payable in connection with Tenant's occupancy of the Premises, in addition to the Monthly Rent hereunder and Additional Rent under Paragraph 7, shall constitute rent owed by Tenant to Landlord hereunder.

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt                                        (4)

c.    Any rent not paid by Tenant to Landlord when due shall bear interest from the date due to the date of payment by Tenant at an annual rate of interest (the "**Interest Rate**") equal to the lesser of (i)  the rate publicly announced from time to time, by the largest (as measured by deposits) chartered bank operating in California, as its Prime Rate, Reference Rate or other similar benchmark, plus two percent (2%); or (ii) the maximum annual interest rate allowed by law on such due date for business loans (not primarily for personal, family or household purposes) not exempt from the usury law; provided that the first two (2) occurrences of such a delinquency in any calendar year shall cause the delinquent amount to bear interest only if Tenant fails to cure such delinquency within five (5) Business Days of written notice from Landlord thereof.

d.    No security or guaranty which may now or hereafter be furnished to Landlord for the payment of rent due hereunder or for the performance by Tenant of the other terms of this Lease shall in any way be a bar or defense to any of Landlord's remedies under this Lease or at law.

6.    Intentionally Omitted.

7.    Additional Rent: Increases in Operating Expenses and Tax Expenses.

a.    Operating Expenses. Tenant shall pay to Landlord, at the times hereinafter set forth, Tenant's Share, as specified in Paragraph 2.e. above, of any increase in the Operating Expenses (as defined below) incurred by Landlord in each calendar year subsequent to the Base Year specified in Paragraph 2.f. above, over the Operating Expenses incurred by Landlord during the Base Year. The amounts payable under this Paragraph 7.a. and Paragraph 7.b. below are termed "**Additional Rent**" herein. Monthly Rent and Additional Rent are sometimes herein collectively referred to as "**Rent**". Operating Expenses shall be calculated using generally accepted property management practices, consistently applied. Operating Expenses shall be limited to Landlord's substantiated costs for the items set forth in this Paragraph 7.a, except as expressly provided in Paragraph 7.c. below. Notwithstanding the foregoing, if Landlord does not carry any particular type of insurance during the calendar year attributable to the Base Year, but obtains any such insurance subsequent to the calendar year attributable to the Base Year, then the initial annual premium for such insurance shall not be included in Operating Expenses, and Operating Expenses in any given year subsequent to the first calendar year in which Landlord obtains such insurance shall include only the increases in the annual premium over the annual premium paid for such insurance for the first calendar year after the calendar year attributable to the Base Year in which Landlord carries the same. Similarly, if any insurance is included in the Base Year, but is subsequently removed from Operating Expenses due to a change in insurance requirements or in Landlord policy (for example, if Landlord maintains earthquake insurance coverage during the Base Year, but subsequently declines to carry such coverage), then the Base Year shall be retroactively adjusted to remove the amount which had been previously included for such insurance.

Notwithstanding the foregoing, if: (x) Landlord does not carry earthquake insurance during the calendar year attributable to the Base Year, but obtains earthquake insurance subsequent to the calendar year attributable to the Base Year, then the initial annual premium for the earthquake insurance shall not be included in Operating Expenses, and Operating Expenses in any given year subsequent to the first calendar year in which Landlord obtains earthquake insurance shall include only the increases in the annual premium over the annual premium paid for the earthquake insurance for the first calendar year after the calendar year attributable to the Base Year in which Landlord carries the same; and/or (y) any Substantial Item (defined below) of Operating Expenses is not included in the Base Year, but is included in Operating Expenses for a subsequent comparison year, then the Base Year shall be adjusted to include

the amount which would have been paid for such Substantial Item had such item been in effect in the Base Year. Similarly, if any Substantial Item of Operating Expenses or earthquake insurance is included in the Base Year, but is subsequently removed from Operating Expenses due to a change in insurance requirements or in Landlord policy (for example, if Landlord maintains earthquake insurance coverage during the Base Year, but subsequently declines to carry such coverage), then the Base Year shall be retroactively adjusted to remove the amount which had been previously included for such Substantial Item or earthquake insurance. As used herein, any item of Operating Expenses (other than earthquake insurance, which is addressed in clause (x) above) which, in the applicable year in which such item is either first included in Operating Expenses or first removed from Operating Expenses, is equal to or greater than One Hundred Thousand Dollars ($100,000.00), will be deemed a "**Substantial Item**".

The term "**Operating Expenses**" shall mean the total costs and expenses incurred by Landlord in connection with the management, operation, maintenance, repair and ownership of the Real Property, including, without limitation, the following costs: (1) salaries, wages, bonuses and other compensation (including hospitalization, medical, surgical, retirement plan, pension plan, union dues, life insurance, including group life insurance, welfare and other fringe benefits, and vacation, holidays and other paid absence benefits) relating to employees of Landlord or its agents engaged in the operation, repair, or maintenance of the Real Property; (2) payroll, social security, workers' compensation, unemployment and similar taxes with respect to such employees of Landlord or its agents, and the cost of providing disability or other benefits imposed by law or otherwise, with respect to such employees; (3) the cost of uniforms (including the cleaning, replacement and pressing thereof) provided to such employees; (4) premiums and other charges incurred by Landlord with respect to fire, other casualty, rent and liability insurance, any other insurance as is deemed necessary or advisable in the reasonable judgment of Landlord, or any insurance required by the holder of any Superior Interest (as defined in Paragraph 21 below), and, after the Base Year, costs of repairing an insured casualty to the extent of the deductible amount under the applicable insurance policy; (5) water charges and sewer rents or fees; (6) license, permit and inspection fees; (7) sales, use and excise taxes on goods and services purchased by Landlord in connection with the operation, maintenance or repair of the Real Property and Building systems and equipment; (8) telephone, telegraph, postage, stationery supplies and other expenses incurred in connection with the operation, maintenance, or repair of the Real Property; (9) management fees and expenses, not to exceed three percent (3%) of Landlord's gross receipts for the Building; (10) costs of repairs to and maintenance of the Real Property, including building systems and appurtenances thereto and normal repair and replacement of worn-out equipment, facilities and installations, but excluding the replacement of major building systems (except to the extent provided in (16) and (17) below); (11) fees and expenses for janitorial, window cleaning, guard, extermination, water treatment, rubbish removal, plumbing and other services and inspection or service contracts for elevator, electrical, mechanical, HVAC and other building equipment and systems or as may otherwise be necessary or proper for the operation, repair or maintenance of the Real Property; (12) costs of supplies, tools, materials, and equipment used in connection with the operation, maintenance or repair of the Real Property; (13) accounting, legal and other professional fees and expenses, subject to the limitations set forth herein; (14) fees and expenses for painting the exterior or the public or Common Areas of the Building and the cost of maintaining the sidewalks, landscaping and other Common Areas of the Real Property; (15) costs and expenses for electricity, chilled water, air conditioning, water for heating, gas, fuel, steam, heat, lights, power and other energy related utilities required in connection with the operation, maintenance and repair of the Real Property, including, without limitation, meters for measuring and monitoring such utilities; (16) the cost of any capital improvements made by Landlord to the Real Property or capital assets acquired by Landlord after the Base Year in order to comply with any and all present and future local, state or federal law, ordinance, rule, directive, order, guidelines, regulation, code or order of any

governmental entity or insurance requirement (collectively, "**Legal Requirement**") with which the Real Property was not required to comply during the Base Year, or to comply with or implement any amendment, recommendation or other change to the enactment or interpretation of any Legal Requirement from its enactment or interpretation during the Base Year; (17) the cost of any capital improvements made by Landlord to the Building or capital assets acquired by Landlord after the Base Year for (x) the protection of the health and safety of the occupants of the Real Property or (y) that are designed to reduce other Operating Expenses (including, without limitation, capital improvements intended to improve energy efficiency); (18) the cost of furniture, draperies, carpeting, landscaping and other customary and ordinary items of personal property (excluding paintings, sculptures and other works of art) provided by Landlord for use in Common Areas of the Building or the Real Property or in the Building office (to the extent that such Building office is dedicated to the operation and management of the Real Property); provided, however, that leasing or rental costs of a rotating or other art program for the Common Areas of the Building or the Real Property shall be included in Operating Expenses; (19) any expenses and costs resulting from substitution of work, labor, material or services in lieu of any of the above itemizations, or for any additional work, labor, services or material resulting from compliance with any Legal Requirement applicable to the Real Property or any parts thereof; (20) Building office rent or rental value; and (21) the cost of any capital improvements or other costs incurred in connection with the Real Property which are required in order for the Real Property, or any portion thereof, to obtain or maintain a certification under the U.S. Green Building Council's Leadership in Energy and Environmental Design ("**LEED**"), or other applicable certification agency in connection with Landlord's Sustainability Practices, including the costs of providing, installing, modifying and upgrading energy and water conservation equipment and systems and making alterations, replacements or additions to the Building intended to reduce Operating Expenses (provided the annual amortized costs does not exceed the actual cost savings realized and such savings do not redound primarily to the benefit of any particular tenant), utility consumption, and/or greenhouse gas emissions or otherwise improve the operation of the Building and the systems. If the Real Property is or becomes subject to any covenants, conditions or restrictions, reciprocal easement agreement, common area declaration or similar agreement, then Operating Expenses shall include all reasonable fees, costs or other expenses allocated to the Real Property under such agreement. With respect to the costs of items included in Operating Expenses under (16) and (17), and (21), such costs shall be amortized over a reasonable period, as determined by Landlord (provided that such period shall be within the range used to amortize such costs by landlords of Comparable Buildings (as defined below) in accordance with generally accepted property management practices), together with interest on the unamortized balance at a rate per annum equal to three (3) percentage points over the six-month United States Treasury bill rate in effect at the time such item is constructed or acquired, or at such higher rate as may have been paid by Landlord on funds borrowed for the purpose of constructing or acquiring such item, but in either case not more than the maximum rate permitted by law at the time such item is constructed or acquired.

Notwithstanding anything to the contrary in the definition of Operating Expenses set forth above, Operating Expenses shall not include the following: (i) depreciation on the Building or equipment or systems therein; (ii) debt service; (iii) rental under any ground or underlying lease; (iv) interest (except as expressly provided in this Paragraph 7.a.); (v) Tax Expenses (as defined in Paragraph 7.b. below); (vi) attorneys' fees and expenses incurred in connection with lease negotiations with prospective Building tenants or any costs (including in connection therewith all attorneys' fees and costs of settlement judgments and payments in lieu thereof) arising from claims, disputes or potential disputes in connection with potential or actual claims litigation or arbitrations pertaining to Landlord and/or the Building and/or the Real Property; (vii) the cost (including any amortization thereof) of any improvements or alterations which would be properly classified as capital expenditures according to

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt                                    (7)

generally accepted property management practices (except to the extent expressly included in Operating Expenses pursuant to this Paragraph 7.a.); (viii) the cost of decorating, improving for tenant occupancy, painting or redecorating portions of the Building to be demised to tenants (including any permit, license and inspection costs associated therewith); (ix) executive salaries; (x) advertising and promotional expenditures, and costs of signs in or on the Building identifying the owner of the Building or other tenants' signs; (xi) real estate broker's or other leasing commissions; (xii) rentals for items (except when needed in connection with normal repairs and maintenance of permanent systems) which if purchased, rather than rented, would constitute a Capital Item which is specifically excluded in Subsection (vii) above (excluding, however, equipment not affixed to the Building which is used in providing janitorial or similar services); (xiii) subject to the provisions of item (4) above, costs incurred by Landlord for the repair of damage to the Building, to the extent that Landlord is reimbursed by insurance proceeds, and costs of all capital repairs unless amortized as provided in the foregoing paragraph (regardless of whether such repairs are covered by insurance); (xiv) expenses in connection with services or other benefits which are not offered to Tenant or for which Tenant is charged for directly but which are provided to another tenant or occupant of the Building; (xv) costs incurred by Landlord due to the violation by Landlord or any tenant of the terms and conditions of any lease of space in the Building; (xvi) overhead and profit increments paid to subsidiaries or affiliates of Landlord for management or other services on or to the Building or for supplies or other materials to the extent that the cost of the services, supplies or materials materially exceed the amounts normally payable for similar goods and services under similar circumstances (taking into account the market factors in effect on the date any relevant contracts were negotiated) in Comparable Buildings; (xvii) Landlord's general corporate overhead and general and administrative expenses (which shall not be deemed to include a management fee); (xviii) any compensation paid to clerks, attendants or other persons in commercial concessions operated by Landlord or in the parking garage of the Building or wherever Tenant is granted its parking privileges and/or all fees paid to any parking facility operator (on or off-site); (provided, however, that if Landlord provides such parking to Tenant free of charge or at a reduced rate, to the extent that Tenant's Share of such expenses exceeds any amount paid by Tenant for such parking, these expenses may be included as a part of Operating Expenses); (xix) services and utilities provided, taxes attributable to, and costs incurred in connection with the operation of the retail and restaurant operations in the Building, if any, except to the extent the square footage of such operations are included in the rentable square feet of the Building and do not exceed the services, utility and tax costs which would have been incurred had the retail and/or restaurant space been used for general office purposes; (xx) costs incurred in connection with upgrading the Building to comply with disability, life, fire and safety codes, ordinances, statutes, or other laws in effect prior to the Delivery Date, including, without limitation, the ADA, including penalties or damages incurred due to such non-compliance; (xxi) tax penalties incurred as a result of Landlord's negligence, inability or unwillingness to make payments and/or to file any tax or informational returns when due; (xxii) the cost of any large-scale abatement, removal, or other remedial activities with respect to Hazardous Materials (as defined in Paragraph 8.c. below), provided, however, Operating Expenses may include the costs attributable to those actions taken by Landlord in connection with the ordinary operation and maintenance of the Building, including costs incurred in removing limited amounts of Hazardous Materials from the Building when such removal or spill is directly related to such ordinary maintenance and operation; (xxiii) costs arising from Landlord's charitable or political contributions; (xxiv) acquisition costs for sculpture, paintings or other objects of art; (xxv) costs associated with the operation of the business of the partnership or entity which constitutes Landlord as the same are distinguished from the costs of operation of the Building, including partnership accounting and legal matters, costs of defending any lawsuits with any mortgagee (except as the actions of Tenant may be in issue), costs of selling, syndicating, financing, mortgaging or hypothecating any of Landlord's interest in the Building, costs of any disputes between Landlord and its employees (if any) not engaged in Building operation, disputes of

Landlord with Building management, or outside fees paid in connection with disputes with other tenants; (xxvi) any entertainment, dining or travel expenses for any purpose and any flowers, gifts, balloons, etc. provided to any entity whatsoever, to include, but not limited to, Tenant, other tenants, employees, vendors, contractors, prospective tenants and agents; (xxvii) any "validated" parking for any entity; (xxvii) the cost of any magazine, newspaper, trade or other subscriptions; and (xxviii) "in-house" legal and/or accounting fees.

b.    <u>Tax Expenses</u>. Tenant shall pay to Landlord as Additional Rent under this Lease, at the times hereinafter set forth, Tenant's Share, as specified in Paragraph 2.e. above, of any increase in Tax Expenses incurred by Landlord during each calendar year subsequent to the Base Tax Year specified in Paragraph 2.f. above, over Tax Expenses incurred by Landlord during the Base Tax Year.

The term "**Tax Expenses**" shall mean all taxes, assessments (whether general or special), excises, transit charges, housing fund assessments or other housing charges, improvement districts, levies or fees, ordinary or extraordinary, unforeseen as well as foreseen, of any kind, which are assessed, levied, charged, confirmed or imposed (i) on the Real Property, on Landlord with respect to the Real Property, on the act of entering into leases of space in the Real Property, on the use or occupancy of the Real Property or any part thereof, (ii) with respect to services or utilities consumed in the use, occupancy or operation of the Real Property, or (iii) on any improvements, fixtures and equipment and other personal property of Landlord located in the Real Property and used in connection with the operation of the Real Property, and shall also include any other tax, fee or other excise, however described, which may be levied or assessed in lieu of, as a substitute (in whole or in part) for, or as an addition to, any other Tax Expense. Tax Expenses shall include reasonable attorneys' and professional fees, costs and disbursements incurred in connection with proceedings to contest, determine or reduce Tax Expenses. If it shall not be lawful for Tenant to reimburse Landlord for any increase in Tax Expenses as defined herein, the Monthly Rent payable to Landlord prior to the imposition of such increases in Tax Expenses shall be increased to net Landlord the same net Monthly Rent after imposition of such increases in Tax Expenses as would have been received by Landlord prior to the imposition of such increases in Tax Expenses.

Tax Expenses shall not include (x) income, franchise, transfer, inheritance or capital stock taxes, excess profits taxes, gift taxes, succession and estate taxes, unless, due to a change in the method of taxation, any of such taxes is levied or assessed against Landlord in lieu of, as a substitute (in whole or in part) for, or as an addition to, any other charge which would otherwise constitute a Tax Expense, (y) taxes and other amounts payable by Tenant pursuant to Paragraph 18 below or by another tenant of the Building pursuant to a similar provision in its lease, (z) any taxes that are measured by or reasonably attributable to the equipment, furniture, fixtures and other personal property of any other tenant of the Building; (xx) any taxes that are measured by or reasonably attributable to the cost or value of any leasehold improvements made in or to the premises of other tenants of the Building, to the extent the cost or value of such leasehold improvements exceeds the cost or value of Building's standard improvements; or (yy) any fine, penalty, cost or interest for any tax or assessment or part thereof, which Landlord failed to timely pay, except to the extent incurred as a result of Tenant's failure to timely pay Tenant's share of the Taxes.

The amount of Taxes included in the Base Year (the "**Base Taxes**") shall be the amount of Taxes incurred during the Base Year, exclusive of any Proposition 8 reduction of Taxes, as adopted by the voters of the State of California, attributable to the valuation of the Real Property and the Building (inclusive of tenant improvements). If, in any comparison year subsequent to the Base Year (the "**Adjustment Year**"), the amount of Taxes decreases below the amount of Base Taxes as a result of a

Proposition 8 reduction, then for purposes of all subsequent comparison years, including the comparison year in which such decrease in Taxes occurred, the Base Taxes shall be decreased by an amount equal to the decrease in Taxes in the Adjustment Year. Conversely, if the Taxes thereafter are increased during any comparison year subsequent to the Adjustment Year (the "**Readjustment Year**") as a result of Landlord's failure to secure a Proposition 8 reduction which is greater than or equal to the Proposition 8 reduction secured during the Adjustment Year, then for purposes of all subsequent comparison years, including the comparison year in which such increase in Taxes occurred, the Base Taxes shall be increased by an amount equal to the increase in Taxes during such Readjustment Year which resulted from Landlord's failure to secure a Proposition 8 reduction greater than or equal to the Proposition 8 reduction secured during the Adjustment Year.

        c.        <u>Adjustment for Occupancy Factor; Allocation of Operating Expenses and Tax Expenses</u>. Notwithstanding any other provision herein to the contrary, in the event the Building is not fully occupied during the Base Year or any calendar year during the term (including, without limitation, if any portion of the Building is unleased or is leased, but is not then being used by a tenant in the ordinary course of its business), an adjustment shall be made by Landlord in computing Operating Expenses for such year so that the Operating Expenses shall be computed for such year as though the Building had been fully occupied during such year. For purposes hereof, cost savings in components of Operating Expenses arising by reason of the cessation of use by tenants at the Building due to casualty, Force Majeure (as defined below), or other extraordinary circumstances are considered variable Operating Expenses that may be grossed up in Operating Expenses. If Operating Expenses for the Base Year includes amortized costs, or costs (including, but not limited to, costs of insurance, personnel, or increased or new services) relating to extraordinary circumstances, including, but not limited to changes in Legal Requirements, casualty or Force Majeure, then at such time as such costs are no longer applicable, the increased Operating Expenses attributable thereto shall be excluded from the Base Year, as applicable. In addition, if any particular work or service includable in Operating Expenses is not furnished to a tenant who has undertaken to perform such work or service itself, Operating Expenses shall be deemed to be increased by an amount equal to the additional Operating Expenses which would have been incurred if Landlord had furnished such work or service to such tenant. The parties agree that statements in this Lease to the effect that Landlord is to perform certain of its obligations hereunder at its own or sole cost and expense shall not be interpreted as excluding any cost from Operating Expenses or Tax Expenses if such cost is an Operating Expense or Tax Expense pursuant to the terms of this Lease. Landlord further agrees that since one of the purposes of Operating Expenses and the gross up provision is to allow Landlord to require Tenant to pay for the costs attributable to its Premises, Landlord agrees that Landlord shall make no profit from Landlord's collections of Operating Expenses. All assessments and premiums which are not specifically charged to Tenant because of what Tenant has done, which can be paid by Landlord in installments, shall be paid by Landlord in the maximum number of installments permitted by law and not included as Operating Expenses except in the year in which the assessment or premium installment is actually paid; provided, however, that if the prevailing practice in Comparable Buildings is to pay such assessments or premiums on an earlier basis, and Landlord pays on such basis, such assessments or premiums shall be included in Operating Expenses as paid by Landlord, but in no event shall Landlord include any accrued interest (resulting from such assessments or premiums) in its computation of Operating Expenses.

        Landlord shall have the right to equitably allocate some or all of Operating Expenses among particular classes or groups of tenants in the Building (for example, retail tenants) to reflect Landlord's good faith determination that measurably different amounts or types of services, work or benefits associated with Operating Expenses are being provided to or conferred upon such classes or

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(10)

groups. The allocations of Operating Expenses by Landlord under this grammatical paragraph are sometimes referred to herein as "**Cost Pools.**" If Cost Pools are created by Landlord under this grammatical paragraph, Tenant shall pay Tenant's Share of the Operating Expenses for each Cost Pool, to the extent applicable.

      d.    <u>Intention Regarding Expense Pass-Through</u>. It is the intention of Landlord and Tenant that the Monthly Rent paid to Landlord throughout the term of this Lease shall be absolutely net of all increases, respectively, in Tax Expenses and Operating Expenses over, respectively, Tax Expenses for the Base Tax Year and Operating Expenses for the Base Year, and the foregoing provisions of this Paragraph 7 are intended to so provide.

      e.    <u>Notice and Payment</u>. On or before the first day of each calendar year during the term hereof, and subsequent to the Base Year with respect to Operating Expenses and Tax Expenses, or as soon as practicable thereafter, Landlord shall give to Tenant notice of Landlord's estimate of the Additional Rent, if any, payable by Tenant pursuant to Paragraphs 7.a. and 7.b. for such calendar year subsequent to the Base Year. On or before the first day of each month during each such subsequent calendar year, Tenant shall pay to Landlord one-twelfth (1/12th) of the estimated Additional Rent; provided, however, that if Landlord's notice is not given prior to the first day of any calendar year Tenant shall continue to pay Additional Rent on the basis of the prior year's estimate until the month after Landlord's notice is given. If at any time it appears to Landlord that the Additional Rent payable under Paragraphs 7.a. and/or 7.b. will vary from Landlord's estimate by more than five percent (5%), Landlord may, by written notice to Tenant, revise its estimate for such year, and subsequent payments by Tenant for such year shall be based upon the revised estimate. On the first monthly payment date after any new estimate is delivered to Tenant, Tenant shall also pay any accrued cost increases, based on such new estimate. Each time Landlord provides Tenant with an actual and/or estimated statement of Operating Expenses, such statement shall be in reasonable detail consistent with Landlord's customary procedures showing the applicable expense for the applicable year and the year prior to the applicable year.

      f.    <u>Annual Accounting</u>. Within one hundred fifty (150) days after the close of each calendar year, and subsequent to the Base Year with respect to Operating Expenses and Tax Expenses, or as soon after such one hundred fifty (150) day period as practicable, Landlord shall deliver to Tenant a statement of the Additional Rent payable under Paragraphs 7.a. and 7.b. for such year and such statement shall be final and binding upon Landlord and Tenant, subject to Tenant's audit rights set forth in Paragraph 7.h. (except that the Tax Expenses and amounts payable to Landlord pursuant to Paragraph 18 below (if any) included in such statement may be modified by any subsequent adjustment or retroactive application of Tax Expenses affecting the calculation of such Tax Expenses). If the annual statement shows that Tenant's payments of Additional Rent for such calendar year pursuant to Paragraph 7.e. above or amounts payable to Landlord pursuant to Paragraph 18 below exceeded Tenant's obligations for the calendar year, Landlord shall credit the excess to the next succeeding installments of estimated Additional Rent or amounts payable pursuant to Paragraph 18 below, as applicable. If the annual statement shows that Tenant's payments of Additional Rent for such calendar year pursuant to Paragraph 7.e. above or amounts payable to Landlord pursuant to Paragraph 18 below for such calendar were less than Tenant's obligation for the calendar year, Tenant shall pay the deficiency to Landlord within thirty (30) days after delivery of such statement. Even though the Lease term has expired and Tenant has vacated the Premises, when the final determination is made regarding Additional Rent for the calendar year in which this Lease terminated, the foregoing procedure shall continue to apply, except that, (i) if Tenant overpaid Additional Rent for the calendar year in which the Lease term expired, Landlord shall promptly refund to Tenant the overpaid amount, and (ii) in no event shall Tenant be required to pay any additional amounts pursuant to

any such determination made more than eighteen (18) months after this Lease expires (provided that the foregoing waiver shall not apply with respect to, and Tenant shall remain responsible for, any Operating Expenses or Tax Expenses levied by any governmental authority or any public utility companies at any time following the expiration of the applicable calendar year which are attributable to such calendar year (provided that Landlord delivers to Tenant any such bill for such amounts within the later of (x) eighteen (18) months after the end of a calendar year and (y) three (3) months following Landlord's receipt of the bill therefor). Landlord shall be required to maintain records of all Operating Expenses and Tax Expenses for three-years following Landlord's delivery to Tenant of each statement setting forth Tenant's Share of Operating Expenses and Tax Expenses, which records shall be maintained in accordance with prudent real property management practices consistently applied.

g.    <u>Proration for Partial Lease Year</u>. If this Lease commences on a day other than the first day of a calendar year or terminates on a day other than the last day of a calendar year, the Additional Rent payable by Tenant pursuant to this Paragraph 7 applicable to the such partial calendar year shall be prorated on the basis that the number of days of such partial calendar year bears to three hundred sixty five (365).

h.    <u>Audit Rights</u>. If Tenant wishes to dispute an amount shown on the annual statement, Tenant shall give Landlord written notice of such dispute within one hundred eighty (180) days after Tenant's receipt of the annual statement. If Tenant does not give Landlord such notice within such time, Tenant shall have waived its right to dispute the annual statement. Promptly after the receipt of such written notice from Tenant, Landlord and Tenant shall endeavor in good faith to resolve such dispute. If such efforts do not succeed, Tenant shall have the right to cause a nationally recognized independent certified public accountant designated by Tenant, to be paid on an hourly and not a contingent fee basis, to audit the items questioned by Tenant in its original notice contesting the annual statement, provided that Tenant (i) notifies Landlord in writing of Tenant's intention to exercise such audit right within one hundred eighty (180) days after the relevant initial written notice from Tenant to Landlord with respect to such dispute, (ii) actually begins such audit within thirty (30) days after the notice from Tenant to Landlord advising Landlord that Tenant will require an audit (provided that such 30-day period within which the audit must be commenced shall be extended by the length of any delay in the commencement of the audit that is caused by Landlord) and (iii) diligently pursues such audit to completion as quickly as reasonably possible. Landlord agrees to make available to Tenant's auditors, at Landlord's office in the San Francisco Bay Area and/or at Landlord's office in the Building (at Landlord's sole option), the books and records relevant to the audit for review and copying, but such books and records may not be removed from Landlord's offices. Tenant shall bear all costs of such audit, including Landlord's actual, reasonable, out of pocket copying costs and personnel costs, if any, incurred in connection with such audit (provided that, prior to incurring any personnel costs in connection with any such audit, Landlord shall advise Tenant of Landlord's anticipated personnel costs so that Tenant may, at Tenant's option, modify Tenant's activities with regard to such audit in order to preclude the need for Landlord to incur such personnel costs), except that, if the audit (as conducted and certified by the auditor) shows an aggregate overstatement of Operating Expenses and/or Tax Expenses of five percent (5%) or more, and Landlord's auditors concur in such findings (or, in the absence of such concurrence, such overstatement is confirmed by a court of competent jurisdiction or such other dispute resolution mechanism as described below), then Landlord shall bear all costs of the audit. If the agreed or confirmed audit shows an underpayment of Operating Expenses and/or Tax Expenses by Tenant, Tenant shall pay to Landlord, within thirty (30) days after the audit is agreed to or confirmed, the amount owed to Landlord, and, if the agreed or confirmed audit shows an overpayment of Operating Expenses and/or Tax Expenses by Tenant, Landlord shall reimburse Tenant for such overpayment within thirty (30) days after the audit.

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(12)

If Landlord and/or Landlord's accountants reasonably and in good faith do not concur with the findings of Tenant's audit results and Landlord desires to contest such audit results, Landlord may do so by submitting the results of the audit within twenty (20) days of receipt of the results of the audit for expedited arbitration as follows: the dispute shall be resolved by a single arbitrator before the American Arbitration Association ("**AAA**") under the Commercial Arbitration Rules of the AAA modified as follows: (i) the total time from date of demand for arbitration to final award shall not exceed forty-five (45) days; (ii) all notices may be by telephone or other electronic communication with later confirmation in writing; (iii) the time, date, and place of the hearing shall be set by the arbitrator in his or her sole discretion, provided that there shall be at least ten (10) business days prior notice of the hearing; (iv) there shall be no post-hearing briefs; (v) there shall be no discovery except by order of the arbitrator; and (vi) the arbitrator shall issue his or her award within ten (10) business days after the close of the hearing. The arbitration shall be held in the county in which the Premises are located. The decision of the arbitrator shall be final and binding on the parties and judgment on the award rendered by the arbitrator may be entered in any court of competent jurisdiction. The fees and expenses of the arbitrator shall be shared by the parties in proportion to the degree by which each party calculation of the Operating Expenses and/or Taxes Expenses was incorrect, which proportion shall be determined by the auditor.

8.      Notwithstanding anything to the contrary set forth above, Tenant's audit rights under this Paragraph 7.h. shall be conditioned upon (i) Tenant having paid the total amounts billed by Landlord under this Paragraph 7 within the time stipulated in Paragraph 7.e. for payment (including, without limitation, the contested amounts) and (ii) Tenant executing, prior to the commencement of the audit, a confidentiality agreement in form and substance reasonably satisfactory to Landlord in which Tenant shall agree to keep confidential, and not disclose to any other party (other than Tenant's employees, agents, contractors and consultants), the results of any such audit or any action taken by Landlord in response thereto.

9.      <u>Use of Premises; Compliance with Law</u>.

a.      <u>Use of Premises</u>. The Premises shall be used solely for general and administrative office purposes for the business of Tenant and all supportive functions, including, without limitation, marketing, sales, and administration, and, ancillary to such use, for client and employee events, and for no other use or purpose (the "**Permitted Use**"), provided in no event may the use of the Premises include (1) a use which would materially increase the operating costs for the Building, the burden on the Building services, or the foot traffic, elevator usage or security concerns in the Building over and above the level of foot traffic or elevator usage which would exist if the subject portion of the Premises were used for customary general office and administrative purposes, except on an incidental and temporary basis, or (2) use as a school or training facility, an entertainment, sports or recreation facility, retail sales to the public, a personnel or employment agency, an office or facility of any governmental or quasi-governmental agency or authority, a place of public assembly (including, without limitation, a meeting center, theater or public forum), any use by or affiliation with a foreign government (including, without limitation, an embassy or consulate or similar office), or a facility for the provision of social, welfare or clinical health services or sleeping accommodations (whether temporary, daytime or overnight), or (3) a use which may conflict with any exclusive uses granted to other tenants of the Real Property as of the date of this Lease, or with the terms of any easement, covenant, condition or restriction or other agreement affecting the Real property. Landlord may grant exclusive uses to other tenants of the Building after the date of this Lease, but no such exclusive use shall preclude, restrict or limit Tenant's ability to utilize the Premises for the Permitted Use. As of the date of this Lease, the current exclusives in favor of other tenants at the Building are described on <u>Exhibit G</u> attached hereto.

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(13)

Tenant shall not do or suffer or permit anything to be done in or about the Premises or the Real Property, nor bring or keep anything therein, which would in any way subject Landlord, Landlord's agents or the holder of any Superior Interest (as defined in Paragraph 21) to any liability, increase the premium rate of or affect any fire, casualty, liability, rent or other insurance relating to the Real Property or any of the contents of the Building, or cause a cancellation of, or give rise to any defense by the insurer to any claim under, or conflict with, any policies for such insurance. Landlord represents and warrants that Tenant's mere operation for general office use in the ordinary course will not increase the premium rate, cause the cancellation of, or conflict with, any policies of insurance related to the Real Property or any of the contents of the Building. If any act or omission of Tenant results in any such increase in premium rates, Tenant shall pay to Landlord within thirty (30) days of Landlord's written demand the amount of such increase. Tenant shall not do or suffer or permit anything to be done in or about the Premises or the Real Property which will in any way unreasonably obstruct or unreasonably interfere with the rights of other tenants or occupants of the Real Property or injure or annoy them, or use or suffer or permit the Premises to be used for any immoral, unlawful or objectionable purpose, nor shall Tenant cause, maintain, suffer or permit any nuisance in, on or about the Premises or the Real Property. Without limiting the foregoing, no loudspeakers or other similar device which can be heard outside the Premises shall, without the prior written approval of Landlord, be used in or about the Premises. Tenant shall not commit or suffer to be committed any waste in, to or about the Premises. Landlord may from time to time conduct fire and life safety training for tenants of the Building, including evacuation drills and similar procedures. Tenant agrees to participate in such activities as reasonably requested by Landlord.

Tenant agrees not to employ any person, entity or contractor for any work in the Premises (including moving Tenant's equipment and furnishings in, out or around the Premises) whose presence may give rise to a labor or other disturbance in the Building and, if necessary to prevent such a disturbance in a particular situation, Landlord may require Tenant to employ union labor for the work.

b.      Compliance with Law. Tenant shall not do or permit anything to be done in or about the Premises which will in any way conflict with any Legal Requirement (as defined in Paragraph 7.a.(16) above) now in force or which may hereafter be enacted. Provided Landlord delivers the Premises and the elevator lobby on Tenant's floor to Tenant in compliance with all applicable Legal Requirements on the Delivery Date (as such Legal Requirements are interpreted and enforced given on the Delivery Date with the Premises being in the condition described on Exhibit D-1 attached hereto), Tenant, at its sole cost and expense, shall promptly comply with all such present and future Legal Requirements relating to the condition, use or occupancy of the Premises (including, without limitation, those regarding accessibility) (or applicable Legal Requirements to cease or reduce Tenant's business operations in or Tenant's use thereof), and shall perform all work to the Premises or other portions of the Real Property required to effect such compliance (or, at Landlord's election, Landlord may perform such work at Tenant's reasonable cost). Notwithstanding the foregoing, however, Tenant shall not be required to perform any structural changes to the Premises or other portions of the Real Property unless such changes are related to or affected or triggered by (i) Tenant's Alterations (as defined in Paragraph 9 below), (ii) Tenant's particular use of the Premises (as opposed to Tenant's use of the Premises for general office purposes in a normal and customary manner), (iii) Tenant's particular employees or employment practices, or (iv) the construction of the Tenant Improvements to the Premises, if any. Notwithstanding the foregoing, Tenant shall not be responsible to perform any structural changes to portions of the Real Property outside of the Premises to comply with Legal Requirements that are triggered by Tenant's use of the Premises or Tenant Improvements or Alterations to the extent such compliance is required due to the Premises or the Building having been non-compliant independent of Tenant's use of the Premises or Tenant's Alterations or Tenant Improvements. To the extent that the

Premises is located on any full floor(s) of the Building, Tenant's compliance obligations hereunder include the non-structural portions of any elevator lobbies on such full floor(s). The judgment of any court of competent jurisdiction or the admission of Tenant in an action against Tenant, whether or not Landlord is a party thereto, that Tenant has violated any Legal Requirement shall be conclusive of that fact as between Landlord and Tenant. Tenant shall immediately furnish Landlord with any notices received from any insurance company or governmental agency or inspection bureau regarding any unsafe or unlawful conditions within the Premises or the violation of any Legal Requirement. Upon Landlord's written request, Tenant shall deliver to Landlord, in form reasonably acceptable to Landlord, information relating to Tenant's electricity consumption at the Premises or any other non-confidential matter related to Tenant's occupancy to the extent such requested information is required in order for Landlord to comply with reporting requirements imposed upon Landlord by any federal, state or local law regarding energy use or any other matter or required in connection with Landlord's energy efficiency efforts. Tenant agrees to comply with, and cooperate (at no material additional cost or material inconvenience to Tenant) with Landlord's efforts to comply with all Legal Requirements concerning energy and water efficiency, green building certification, submetering, and/or carbon reduction, including, without limitation, occupant, water, energy, waste and transportation related laws and ordinances. Tenant shall also comply with any federal, state, or local laws applicable to the reduction of greenhouse gases or the use of sustainable materials, to the extent such laws are applicable to Tenant. Without limitation of the foregoing, Tenant shall be responsible for installing $CO_2$ sensors in all rooms of the Premises that have a design occupant density greater than or equal to 25 people per 1,000 square feet (40 square feet per person), provided that (x) if the total square footage of all dense space is less than 5% of total occupied square footage, the foregoing requirement shall be inapplicable and (y) rooms smaller than 150 square feet are also exempt from such requirement.

c.      During the Lease term, Landlord shall comply with all applicable Legal Requirements relating to the Common Areas and the Base Building (as defined below), provided that compliance with such Legal Requirements is not the responsibility of Tenant under this Lease, and provided further that Landlord's failure to comply therewith would prohibit Tenant from obtaining or maintaining a certificate of occupancy for the Premises, or would unreasonably affect the safety of Tenant's employees or create a significant health hazard for Tenant's employees, or would otherwise adversely affect Tenant's use of or access to the Premises. Landlord shall be permitted to include in Operating Expenses any costs or expenses incurred by Landlord under this subparagraph to the extent not prohibited by the terms of Paragraph 7.a. above, and subject to the terms of Paragraph 7.a. above. For purposes of the foregoing, "**Base Building**" means the structural portions of the Building (including, without limitation, the exterior walls, roof, foundation and core of the Building), the exterior of the Building and all Base Building systems, including, without limitation, elevator, plumbing, air conditioning, heating, electrical, security, life safety and power, except those special systems installed and exclusively serving specific tenants (including Tenant) and the portion of any other Building system within any specific tenant space which exclusively serves such tenant or is otherwise the responsibility of such tenant pursuant to its lease.

d.      <u>Hazardous Materials</u>. Tenant shall not cause or permit the storage, use, generation, release, handling or disposal (collectively, "**Handling**") of any Hazardous Materials (as defined below), in, on, or about the Premises or the Real Property by Tenant or any agents, employees, contractors, licensees, subtenants, customers, guests or invitees of Tenant (collectively with Tenant, "**Tenant Parties,**" and each individually, a "**Tenant Party**"), except that Tenant shall be permitted to use normal quantities of office supplies or products (such as copier fluids or cleaning supplies) customarily used in the conduct of general business office activities ("**Common Office Chemicals**"), provided that

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(15)

the Handling of such Common Office Chemicals shall comply at all times with all Legal Requirements, including Hazardous Materials Laws (as defined below). Notwithstanding anything to the contrary contained herein, however, in no event shall Tenant permit any usage of Common Office Chemicals in a manner that may cause the Premises or the Real Property to be contaminated by any Hazardous Materials or in violation of any Hazardous Materials Laws. Tenant shall promptly advise Landlord in writing of (a) any and all enforcement, cleanup, remedial, removal, or other governmental or regulatory actions instituted, completed, or threatened pursuant to any Hazardous Materials Laws relating to any Hazardous Materials affecting the Premises; and (b) all claims made or threatened by any third party against Tenant, Landlord, the Premises or the Real Property relating to damage, contribution, cost recovery, compensation, loss, or injury resulting from any Hazardous Materials on or about the Premises. Without Landlord's prior written consent, Tenant shall not take any remedial action or enter into any agreements or settlements in response to the presence of any Hazardous Materials in, on, or about the Premises. Tenant shall be solely responsible for and shall indemnify, defend and hold Landlord and all other Indemnitees (as defined in Paragraph 14.b. below), harmless from and against all Claims (as defined in Paragraph 14.b. below), arising out of or in connection with, or otherwise relating to (i) any Handling of Hazardous Materials by any Tenant Party or Tenant's breach of its obligations hereunder, or (ii) any removal, cleanup, or restoration work and materials necessary to return the Real Property or any other property of whatever nature located on the Real Property to their condition existing prior to the Handling of Hazardous Materials in, on or about the Premises by any Tenant Party. Tenant's obligations under this paragraph shall survive the expiration or other termination of this Lease. For purposes of this Lease, "**Hazardous Materials**" means any explosive, radioactive materials, hazardous wastes, or hazardous substances, including without limitation asbestos containing materials, PCB's, CFC's, or substances defined as "hazardous substances" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601-9657; the Hazardous Materials Transportation Act of 1975, 49 U.S.C. Section 1801-1812; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. Section 6901-6987; or any other Legal Requirement regulating, relating to, or imposing liability or standards of conduct concerning any such materials or substances now or at any time hereafter in effect (collectively, "**Hazardous Materials Laws**").

　　　　e.　　　Landlord represents and warrants to Tenant that, to the best of Landlord's knowledge (which, for purposes hereof, shall be limited to the actual knowledge of the Asset Manager and Property Manager of the Building, without inquiry), the Premises is presently in compliance with and, as of the Delivery Date, will be in compliance with, all applicable Hazardous Materials Laws. Landlord shall be responsible, at no cost to Tenant, for compliance with Hazardous Materials Laws arising out of or related to the environmental conditions existing at the Premises or the Real Property on or before the Delivery Date, or such earlier date on which Tenant is provided access to the Premises pursuant to Paragraph 3 above (collectively the "**Pre-Existing Conditions**") and for remediation of any conditions that may render the Premises unsafe for human occupation arising out of or related to the Pre-Existing Conditions or shall cause the party responsible for the remediation of any such Pre-Existing Conditions to remediate the same; provided that if Tenant or any Tenant Party exacerbates a Pre-Existing Condition prior to the Delivery Date, then Tenant shall be responsible for the cost of remedying such Pre-Existing Condition to the extent of such exacerbation. In addition, solely to the extent caused by Landlord, Landlord shall indemnify and defend and hold harmless Tenant against any and all losses and expenses incurred by Tenant as a result of any Pre-Existing Conditions; provided that such indemnity shall not apply to the extent that Tenant or any Tenant Party exacerbates any Pre-Existing Conditions prior to the Delivery Date.

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(16)

f.      Notwithstanding anything contained herein to the contrary, in the event any investigation, monitoring, clean-up, containment, removal, storage, or restoration work ("**Remedial Work**") is performed as a result of either (i) Pre-Existing Conditions or (ii) Hazardous Materials not caused or permitted by Tenant or its agents, employees or contractors, and such Remedial Work materially interferes with Tenant's construction of the Tenant Improvements, then Tenant's Buildout Period shall be extended day for day for the period during which such Remedial Work is performed).

g.      <u>Applicability of Paragraph</u>. The provisions of this Paragraph 8 are for the benefit of Tenant, Landlord, the holder of any Superior Interest (as defined in Paragraph 21 below), and the other Indemnitees only and are not nor shall they be construed to be for the benefit of any other tenant or occupant of the Building.

10.     <u>Alterations and Restoration</u>.

a.      Tenant shall not make or permit to be made any alterations, modifications, additions, decorations or improvements to the Premises, or any other work whatsoever that would directly or indirectly involve the penetration or removal (whether permanent or temporary) of, or require access through, in, under, or above any floor, wall or ceiling, or surface or covering thereof in the Premises (collectively, "**Alterations**"), except as expressly provided in this Paragraph 9. If Tenant desires any Alteration, Tenant must obtain Landlord's prior written approval of such Alteration, which shall not be unreasonably withheld, conditioned or delayed.

Notwithstanding the foregoing or anything to the contrary contained elsewhere in this Paragraph 9, Tenant shall have the right, without Landlord's consent, to make any Alteration that meets all of the following criteria (a "**Cosmetic Alteration**"): (i) Tenant provides Landlord with ten (10) days' advance written notice of the commencement of such Alteration, (ii) such Alteration does not adversely affect the Building's electrical, mechanical, life safety, plumbing, security, or HVAC systems or any other portion of the Base Building or any part of the Building other than the Premises, (iii) the work will not decrease the value of the Premises and uses only new materials comparable in quality to those being replaced and is performed in a workman-like manner and in accordance with all Legal Requirements, (iv) the work does not involve any Hazardous Materials, and (v) the cost of such Alteration, when aggregated with the cost of all other Cosmetic Alterations performed during the previous twelve (12) month period, does not exceed $150,000.00 in the aggregate as to all of the Premises. At the time Tenant notifies Landlord of any Cosmetic Alteration, Tenant shall give Landlord a copy of Tenant's plans for the work. If the Cosmetic Alteration is of such a nature that formal plans will not be prepared for the work, Tenant shall provide Landlord with a reasonably specific description of the work.

All Alterations shall be made at Tenant's sole cost and expense (including the expense of complying with all Legal Requirements related to Tenant's Alterations (subject to Paragraph 8.b.), including those regarding asbestos, if applicable, and any other work required to be performed in other areas within or outside the Premises by reason of the Alterations). Tenant shall either (i) arrange for Landlord to perform the work on terms and conditions acceptable to Landlord and Tenant, each in its sole discretion or (ii) bid the project out to general contractors approved by Landlord in writing in advance (which approval shall not be unreasonably withheld, conditioned, or delayed). Tenant shall have the right to select and use all of Tenant's own general contractors (subject to Landlord's approval as provided above), subcontractors, architects, engineers, project managers, and consultants. Tenant shall provide Landlord with a copy of the information submitted to bidders at such time as the bidders receive their copy. Regardless of the contractors who perform the work pursuant to the above, Tenant shall pay

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(17)

Landlord on demand prior to or during the course of such construction an amount (the "**Alteration Operations Fee**") equal to one percent (1%) of the total cost of the Alteration (and for purposes of calculating the Alteration Operations Fee, such cost shall include architectural and engineering fees, but shall not include permit fees) as compensation to Landlord for Landlord's internal review of Tenant's Plans and general oversight of the construction (which oversight shall be solely for the benefit of Landlord and shall in no event be a substitute for Tenant's obligation to retain such project management or other services as shall be necessary to ensure that the work is performed properly and in accordance with the requirements of this Lease). Landlord shall provide freight elevator operation at no additional charge to Tenant. Tenant shall reimburse Landlord for Landlord's reasonable out-of-pocket expenses for electrical energy consumed in connection with the work in excess of Normal Quantities, any additional security guard that is reasonably necessary to monitor Tenant's after-hours use of the freight elevator (as required in Paragraph 5.2 of <u>Exhibit D</u>), additional cleaning expenses, and the out-of-pocket fees and charges paid to third party architects, engineers and other consultants for review of the work and the plans and specifications with respect thereto. Upon the completion of an Alteration, Tenant shall notify Landlord in writing of the total cost of the Alteration.

All such work shall be performed diligently and in a first-class workmanlike manner and in accordance with plans and specifications approved by Landlord (to the extent Landlord's approval is required hereunder), shall be performed by a general contractor approved by Landlord, and shall comply with all Legal Requirements and Landlord's reasonable and non-discriminatory construction standards, procedures, conditions and requirements for the Building as in effect from time to time (including Landlord's reasonable and nondiscriminatory requirements relating to insurance and contractor qualifications), provided, however, in no event shall Tenant be required to obtain LEED certification for any of Tenant's Alterations. Any and all Alterations will be performed in accordance with Landlord's Sustainability Practices (as defined below), including, without limitation, any ENERGY STAR Tenant space criteria. To the extent applicable, and without limitation of the foregoing, Tenant shall cause a timely Notice of Completion to be recorded in the office of the Recorder of Alameda County in accordance with Section 8182 of the California Civil Code or any successor statute. Tenant shall deliver to Landlord, within ninety (90) days following the completion of the Alterations, a copy of as-built drawings of the Alterations, or, at Tenant's option, field-marked construction drawings. In no event shall Tenant employ any person, entity or contractor to perform work in the Premises whose presence may give rise to a labor or other disturbance in the Building. Default by Tenant in the payment of any sums agreed to be paid by Tenant for or in connection with an Alteration (regardless of whether such agreement is pursuant to this Paragraph 9 or separate instrument) shall entitle Landlord to all the same remedies as for non-payment of rent hereunder. Any Alterations, including, without limitation, moveable partitions that are affixed to the Premises (but excluding moveable, free standing partitions) and all carpeting, shall at once become part of the Building and the property of Landlord. Tenant shall give Landlord not less than ten (10) days prior written notice of the date the construction of the Alteration is to commence. Landlord may post and record an appropriate notice of non-responsibility with respect to any Alteration and Tenant shall maintain any such notices posted by Landlord in or on the Premises. In no event shall Tenant nor Tenant's contractor be required to pay a construction deposit of any kind or provide any completion bond, notwithstanding anything to the contrary in this Lease, the exhibits to this Lease, or any other document, including, without limitation, any tenant manual or any construction rules and regulations.

b.      Tenant shall not be required to remove any of its initial Tenant Improvements at the end of the Lease Term. At Landlord's sole election any or all Alterations (excluding the initial Tenant Improvements) made for or by Tenant shall be removed by Tenant from the Premises at the expiration or sooner termination of this Lease. Upon Tenant's express written request making specific reference to this

Paragraph 9.b., Landlord shall advise Tenant at the time of Landlord's approval of any Alteration requested by Tenant (or within ten (10) Business Days after receipt of Tenant's notice to Landlord with respect to those Alterations not requiring Landlord's approval, i.e. Cosmetic Alterations) whether Landlord will require the removal of the Alteration and restoration of the Premises to its previous condition, ordinary wear and tear excepted, at the expiration or sooner termination of this Lease. The removal of the Alterations and the restoration of the Premises shall be performed by a general contractor selected by Tenant and reasonably approved by Landlord, in which event Tenant shall pay the general contractor's fees and costs in connection with such work. Any separate work letter or other agreement which is hereafter entered into between Landlord and Tenant pertaining to Alterations shall be deemed to automatically incorporate the terms of this Lease without the necessity for further reference thereto.

c.    Tenant may, at its own expense, install its own security system (**"Tenant's Security System"**) in the Premises, subject to Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that in the event Tenant's Security System ties into the Building security system, Tenant shall coordinate the installation and operation of Tenant's Security System with Landlord to assure that Tenant's Security System is compatible with the Building security system and the systems and equipment of the Building and to the extent that Tenant's Security System is not compatible with the Building security system or the systems and equipment of the Building, Tenant shall not be entitled to install or operate it. Tenant shall be solely responsible, at Tenant's sole cost and expense, for the monitoring, operation and removal of Tenant's Security System. Tenant shall provide Landlord with any information reasonably required regarding Tenant's Security System in the event access to the Premises is necessary in an emergency. If required pursuant to Paragraph 9.b. above, upon the expiration or earlier termination of the Lease term, Tenant shall remove Tenant's Security System and repair all damage to the Building resulting from such removal, at Tenant's sole cost and expense.

d.    Subject to Landlord's prior consent of the plans therefor, which consent shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right to install a supplemental HVAC system (a **"Supplemental HVAC System"**) serving all or any portion of the Premises, provided that the cooling capacity of any Supplemental HVAC System shall not exceed the standards for the Building, as reasonably determined by Landlord. Any Supplemental HVAC system shall be installed pursuant to the terms of Paragraph 9 and shall be deemed an Alteration for purposes of this Lease (or, at Tenant's election, shall be installed in accordance with the terms of the Work Letter as a Tenant Improvement); provided, however, it shall be deemed reasonable for Landlord to withhold its approval to the extent any such installation would materially interfere with the occupancy of other tenants in the Building, or would materially interfere with, or materially increase the cost of, Landlord's maintenance or operation of the Building, unless Tenant agrees to pay for such increased costs and such installation would not result in Landlord being in breach or default under any other tenant's lease. Any Supplemental HVAC System installed by Tenant may utilize the Building's condenser water (provided that such supplemental HVAC system shall not exceed a capacity of twenty-one (21) tons), at Landlord's actual cost without markup. If Tenant connects into the Building's condenser water system pursuant to the terms of the foregoing sentence, then Landlord shall install a submetering device at Tenant's sole cost and expense, which shall measure the flow of condenser water to the Premises, and Tenant shall pay Landlord for Tenant's use of condenser water at Landlord's actual cost without markup. Tenant shall bear all costs of the equipment and installation. In connection with the foregoing, Landlord shall, at Tenant's sole cost and expense, separately meter the electricity utilized by any Supplemental HVAC System, and Tenant shall reimburse Landlord for the cost, at Landlord's actual cost without markup, of all electricity utilized by any Supplemental HVAC System in excess of Normal Quantities. Any reimbursements owing by

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(19)

Tenant to Landlord pursuant to this Paragraph 9.d. shall be payable by Tenant within thirty (30) days after Tenant's receipt of an invoice therefor.

       11.     <u>Repair</u>.

       a.     Tenant, at Tenant's sole cost and expense, shall keep the Premises and every interior, non-structural part thereof (including the interior walls and ceilings of the Premises, those portions of the Building systems located within and exclusively serving the Premises, and Tenant Improvements and Alterations, and including, without limitation, dishwashers, garbage disposals, and insta-hot dispensers) in good condition and repair; provided that Tenant shall not be responsible for repairs to the extent such repairs are (i) necessitated by the negligence or willful misconduct of Landlord or Landlord's agents, employees or contractors, or (ii) Landlord's obligations pursuant to Paragraph 10.b. below. Except as expressly provided in Paragraph 10.c. below, Tenant waives all rights to make repairs at the expense of Landlord as provided by any Legal Requirement now or hereafter in effect. It is specifically understood and agreed that, except as specifically set forth in this Lease, Landlord has no obligation and has made no promises to alter, remodel, improve, repair, decorate or paint the Premises or any part thereof, and that no representations respecting the condition of the Premises or the Building have been made by Landlord to Tenant. Tenant hereby waives the provisions of California Civil Code Sections 1932(1), 1941 and 1942 and of any similar Legal Requirement now or hereafter in effect. In completing repair and maintenance of the Premises, Tenant shall comply with Landlord's Sustainability Practices (as defined below), including any third-party rating system concerning the environmental compliance of the Building or the Premises, as the same may change from time to time.

       b.     Repairs to the Premises due to fire, earthquake, acts of God or the elements shall be governed by Paragraph 26 below, and repairs to the Premises due to a governmental taking shall be governed by Paragraph 27 below. Landlord shall (1) repair the Premises if they are damaged due to item (i) described in Paragraph 10.a. above (subject to Paragraph 16 below), and (2) repair and maintain in good condition consistent with other Comparable Buildings and repair the structural portions of the Building, including, without limitation, the foundation, floor/ceiling slabs, roof, curtain walls, exterior glass and mullions, columns, beams, shafts (including elevator shafts), stairs, parking garage, stairwells, escalators, elevator cabs, and all plazas, artwork, sculptures, common washrooms, mechanical, electrical and telephone closets, an all Common Areas and public areas, and all Building systems, including plumbing, heating, electrical, life safety and other systems installed or furnished by Landlord (other than the portions of those systems that are Tenant's responsibility to maintain and repair pursuant to Paragraph 10.a. above), provided that, if repairs under this item (2) are necessitated by the negligence or deliberate misconduct of Tenant or Tenant's agents, employees or contractors, then Tenant shall reimburse Landlord for the cost of such repair to the extent Landlord is not reimbursed therefor by insurance. Landlord shall in no event be obligated to repair any wear and tear to the Premises.

       c.     If Landlord fails to perform any of its repair and maintenance obligations within the Premises under this Lease and such failure materially adversely affects the use of or operation of business from the Premises or any part thereof, and if Landlord fails to cure or to commence the cure of such failure within a reasonable period of time after written notice (or oral notice in the event of an emergency), given the circumstances, after the receipt of such notice, but in any event not later than twenty (20) days after written notice from Tenant and thereafter diligently pursue such cure to completion, and such failure continues for five (5) days after Tenant's delivery of an additional written notice to Landlord specifying that Tenant intends to take such actions (provided, however, that neither of such notices shall be required in an event which poses an imminent threat of bodily injury) then Tenant

may proceed to take the actions required to cure such failure. If, however, Landlord delivers to Tenant, prior to the expiration of said five (5) day period, a written objection to the necessity or scope of Tenant's intended actions, setting forth in good faith and with reasonable particularity Landlord's reasons for its claim that such actions do not need to be taken by Landlord pursuant to this Lease, then Tenant shall not then be entitled to proceed hereunder until such matter is resolved by agreement, mediation, or a court of competent jurisdiction. Notwithstanding the foregoing, if any such repairs and/or maintenance are not wholly within the Premises or not in the elevator lobby on the floor on which the Premises is located (so long as Tenant leases the entirety of such floor), or will adversely affect in any way the Building's electrical, mechanical, life safety, plumbing, security, or HVAC systems or any structural components, any of the Common Areas, the exterior appearance of the Building, or any other tenant's leased space, Tenant shall not be permitted to perform the relevant repairs and/or maintenance. If such repairs and/or maintenance were required under the terms of this Lease to be performed by Landlord and are not performed by Landlord prior to the expiration of such five (5) day period provided above, then Tenant shall be entitled to reimbursement by Landlord of Tenant's actual, reasonable, and documented costs and expenses (plus ten percent (10%) of such costs and expenses) in performing such maintenance and/or repairs, within thirty (30) days after written demand by Tenant, together with reasonable supporting documentation. In the event that Landlord does not pay within thirty (30) days as provided herein, and such failure continues for an additional thirty (30) days after a second notice from Tenant (which notice must include in bold and capital letters the nature of the issue and proposed offset), then Tenant may deduct the same from Monthly Rent next coming due until such amount is fully recouped. Notwithstanding the foregoing, Tenant shall not be entitled to offset against Monthly Rent pursuant to this Paragraph 10.c., any amount that is the subject of a good faith dispute between Landlord and Tenant so long as Landlord has provided Tenant with written notice regarding such dispute prior to the expiration of the second thirty (30) day period described above in this Paragraph 10.c. If Tenant undertakes such repairs and/or maintenance pursuant to this paragraph, (i) Tenant shall only utilize the services of qualified, reputable and licensed contractors who normally and regularly perform similar work in Comparable Buildings (as defined below), and (ii) such undertaking shall not be deemed to have waived any rights or remedies Tenant may have against Landlord with respect to its to failure to perform any of its repair and maintenance obligations hereunder, set forth in this Lease, at law or in equity.

12.     <u>Abandonment</u>. Tenant shall not abandon the Premises or any part thereof at any time during the term hereof and cease paying Rent. Upon the expiration or earlier termination of this Lease, or if Tenant abandons or surrenders all or any part of the Premises and ceases paying Rent thereon or is dispossessed of the Premises by process of law, or otherwise, any movable furniture, equipment, trade fixtures, or other personal property belonging to Tenant and left on the Premises shall at the option of Landlord be deemed to be abandoned and, whether or not the property is deemed abandoned, Landlord shall have the right to remove such property from the Premises and charge Tenant for the removal and any restoration of the Premises as provided in Paragraph 9. Landlord may charge Tenant for the storage of Tenant's property left on the Premises at such rates as Landlord may from time to time reasonably determine, or, Landlord may, at its option, store Tenant's property in a public warehouse at Tenant's reasonable expense. Notwithstanding the foregoing, neither the provisions of this Paragraph 11 nor any other provision of this Lease shall impose upon Landlord any obligation to care for or preserve any of Tenant's property left upon the Premises, and Tenant hereby waives and releases Landlord from any claim or liability in connection with the removal of such property from the Premises and the storage thereof and specifically waives the provisions of California Civil Code Section 1542 with respect to such release. Landlord's action or inaction with regard to the provisions of this Paragraph 11 shall not be construed as a waiver of Landlord's right to require Tenant to remove its property, restore any damage to the Premises and the Building caused by such removal, and make any restoration required pursuant to

Paragraph 9 above. Nothing in the foregoing or elsewhere in this Lease shall be construed to require Tenant to occupy the Premises.

13.    Liens. Tenant shall not permit any mechanic's, materialman's or other liens arising out of work performed at the Premises by or on behalf of Tenant to be filed against the fee of the Real Property nor against Tenant's interest in the Premises. Landlord shall have the right to post and keep posted on the Premises any notices which it deems necessary for protection from such liens. If any such liens are filed, and such liens are not bonded over or discharged within fifteen (15) days after written notice to Tenant, then Landlord may, without waiving its rights based on such breach by Tenant and without releasing Tenant from any obligations hereunder, pay and satisfy the same and in such event the sums so reasonably paid by Landlord shall be due and payable by Tenant within thirty (30) days of Landlord's written demand, with interest from the date paid by Landlord through the date Tenant pays Landlord, at the Interest Rate. Tenant agrees to indemnify, defend and hold Landlord and the other Indemnitees (as defined in Paragraph 14.b. below) harmless from and against any Claims (as defined in Paragraph 14.b. below) for mechanics', materialmen's or other liens in connection with any Alterations, repairs or any work performed, materials furnished or obligations incurred by or for Tenant.

14.    Assignment and Subletting.

a.    Landlord's Consent. Landlord's and Tenant's agreement with regard to Tenant's right to transfer all or part of its interest in the Premises is as expressly set forth in this Paragraph 13. Tenant agrees that, except upon Landlord's prior written consent, which consent shall not (subject to Landlord's rights under Paragraph 13.d. below) be unreasonably withheld, conditioned or delayed, or as otherwise provided in Paragraph 13.h. below, neither this Lease nor all or any part of the leasehold interest created hereby shall, directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, be assigned, mortgaged, pledged, encumbered or otherwise transferred by Tenant or Tenant's legal representatives or successors in interest (collectively, an "**assignment**") and neither the Premises nor any part thereof shall be sublet or be used or occupied for any purpose by anyone other than Tenant (collectively, a "**sublease**"). Except for a transfer to an Affiliate pursuant to Paragraph 13.h. below, any assignment or subletting without Landlord's prior written consent shall, at Landlord's option, be void and shall constitute an Event of Default entitling Landlord to terminate this Lease and to exercise all other remedies available to Landlord under this Lease and at law.

The parties hereto agree and acknowledge that, among other circumstances for which Landlord may reasonably withhold its consent to an assignment or sublease, it shall be reasonable for Landlord to withhold its consent where: (i) the assignment or subletting would materially increase the operating costs for the Building or the burden on the Building services, elevator usage or security concerns in the Building, or create an increased probability of the comfort and/or safety of Landlord and other tenants in the Building being compromised or reduced, (ii) the space will be used for a school or training facility, an entertainment, sports or recreation facility, retail sales to the public (unless Tenant's permitted use is retail sales), a personnel or employment agency, an office or facility of any governmental or quasi-governmental agency or authority, a place of public assembly (including without limitation a meeting center, theater or public forum), any use by or affiliation with a foreign government (including without limitation an embassy or consulate or similar office), or a facility for the provision of social, welfare or clinical health services or sleeping accommodations (whether temporary, daytime or overnight) or for a co-working operation; (iii) the proposed assignee or subtenant (or any person which directly or indirectly controls, is controlled by, or is under common control with the proposed assignee or subtenant) is a current tenant of the Building or has negotiated with Landlord within the preceding one hundred

eighty (180) days (or is currently negotiating with Landlord) to lease space in the Real Property; however, Landlord must have reasonably equivalent space available for lease in the Building within reasonable proximity to the projected commencement date of the proposed sublease or assignment in order to withhold consent under clause (iii) of this subparagraph; (iv) Landlord reasonably disapproves of the proposed assignee's or subtenant's reputation or creditworthiness; (v) Landlord reasonably determines that the character of the business that would be conducted by the proposed assignee or subtenant at the Premises, or the manner of conducting such business, would be inconsistent with the character of the Building as a first-class office building; (vi) the proposed assignee or subtenant is an entity or related to an entity with whom Landlord or any affiliate of Landlord has had adverse dealings; (vii) the assignment or subletting may conflict with any exclusive uses granted to other tenants of the Real Property, or with the terms of any easement, covenant, condition or restriction, or other agreement affecting the Real Property; (viii) the assignment or subletting would involve a change in use from that expressly permitted under this Lease; (ix) Landlord determines that the proposed assignee may be unable to perform all of Tenant's obligations under this Lease or the proposed subtenant may be unable to perform all of its obligations under the proposed sublease or (x) as of the date Tenant requests Landlord's consent or as of the date Landlord responds thereto, a breach or default by Tenant under this Lease shall have occurred and be continuing beyond applicable notice and cure periods. Landlord's foregoing rights and options shall continue throughout the entire term of this Lease.

Except as provided in Paragraph 13.h. below, for purposes of this Paragraph 13, the following events shall be deemed an assignment or sublease, as appropriate: (i) the issuance of equity interests (whether stock, partnership interests or otherwise) in Tenant or any subtenant or assignee, or any entity controlling any of them, to any person or group of related persons, in a single transaction or a series of related or unrelated transactions, such that, following such issuance, such person or group shall have Control (as defined below) of Tenant or any subtenant or assignee; (ii) a transfer of Control of Tenant or any subtenant or assignee, or any entity controlling any of them, in a single transaction or a series of related or unrelated transactions (including, without limitation, by consolidation, merger, acquisition or reorganization), except that the transfer of outstanding capital stock or other listed equity interests by persons or parties other than "insiders" within the meaning of the Securities Exchange Act of 1934, as amended, through the "over-the-counter" market or any recognized national or international securities exchange, shall not be included in determining whether Control has been transferred; (iii) the sale, mortgage, hypothecation or pledge of an aggregate of fifty percent (50%) or more of the value of the unencumbered assets of Tenant within a twelve (12)-month period; (iv) a change or conversion in the form of entity of Tenant, any subtenant or assignee, or any entity controlling any of them, which has the effect of limiting the liability of any of the partners, members or other owners of such entity; or (v) the agreement by a third party to assume, take over, or reimburse Tenant for, any or all of Tenant's obligations under this Lease, in order to induce Tenant to lease space with such third party. "**Control**" shall mean direct or indirect ownership of fifty percent (50%) or more of all of the voting stock of a corporation or fifty percent (50%) or more of the legal or equitable interest in any other business entity, or the power to direct the operations of any entity (by equity ownership, contract or otherwise).

If this Lease is assigned, whether or not in violation of the terms of this Lease, Landlord may collect rent from the assignee. If the Premises or any part thereof is sublet, Landlord may, upon an Event of Default by Tenant hereunder, collect rent from the subtenant. In either event, Landlord may apply the amount collected from the assignee or subtenant to Tenant's monetary obligations hereunder.

The consent by Landlord to an assignment or subletting hereunder shall not relieve Tenant or any assignee or subtenant from the requirement of obtaining Landlord's express prior written

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(23)

consent to any other or further assignment or subletting. In no event shall any subtenant be permitted to assign its sublease or to further sublet all or any portion of its subleased premises without Landlord's prior written consent, which consent may be withheld by Landlord it its reasonable discretion. Neither an assignment or subletting nor the collection of rent by Landlord from any person other than Tenant, nor the application of any such rent as provided in this Paragraph 13.a. shall be deemed a waiver of any of the provisions of this Paragraph 13.a. or release Tenant from its obligation to comply with the provisions of this Lease and Tenant shall remain fully and primarily liable for all of Tenant's obligations under this Lease. If Landlord approves of an assignment or subletting hereunder and this Lease contains any renewal options, expansion options, rights of first refusal, rights of first negotiation or any other rights or options pertaining to additional space in the Building, such rights and/or options shall not run to the subtenant or assignee other than an Affiliate, it being agreed by the parties hereto that any such rights and options are personal to the Tenant originally named herein and or any Affiliate transferee and may not otherwise be transferred.

b.     Processing Expenses. Tenant shall pay to Landlord, as Landlord's cost of processing each proposed assignment or subletting, an amount equal to the sum of (i) Landlord's reasonable attorneys' and other professional fees (not to exceed an aggregate of $4,000.00 in connection with any one sublease or assignment request), plus (ii) the sum of One Thousand Dollars ($1,000.00) for the cost of Landlord's administrative, accounting and clerical time (collectively, "**Processing Costs**"). Notwithstanding anything to the contrary herein, Landlord shall not be required to process any request for Landlord's consent to an assignment or subletting until Tenant has paid to Landlord the amount of Landlord's estimate of the Processing Costs.

c.     Consideration to Landlord. In the event of any assignment or sublease, except for a transfer to an Affiliate, Landlord shall be entitled to receive, as additional rent hereunder, fifty percent (50%) of any consideration (including, without limitation, payment for leasehold improvements or personal property of Tenant in excess of the fair market value thereof) paid by the assignee or subtenant for the assignment or sublease and, in the case of a sublease, fifty percent (50%) of the excess of the amount of rent paid for the sublet space by the subtenant over the amount of Monthly Rent under Paragraph 5 above and Additional Rent under Paragraph 7 above attributable to the sublet space for the corresponding month, except that Tenant may recapture, on a straight line amortized basis over the term of the sublease or assignment, any brokerage commissions paid by Tenant in connection with the subletting or assignment (not to exceed commissions typically paid in the market at the time of such subletting or assignment), free rent periods with respect to such sublease or assignment, reasonable legal fees, and any improvement allowance paid by Tenant to the subtenant or assignee, the cost of any improvements made by Tenant for such subtenant or assignee (collectively the "**Assignment or Subletting Costs**"), provided that, as a condition to Tenant recapturing the Assignment or Subletting Costs, Tenant shall provide to Landlord, within ninety (90) days of Landlord's execution of Landlord's consent to the assignment or subletting, a detailed accounting of the Assignment or Subletting Costs and supporting documents, such as receipts and construction invoices. To effect the foregoing, Tenant shall deduct from the monthly amounts received by Tenant from the subtenant or assignee as rent or consideration, the Monthly Rent and Additional Rent payable by Tenant to Landlord for the subject space, and fifty percent (50%) of the then remaining sum shall be paid promptly to Landlord. Upon Landlord's request, Tenant shall assign to Landlord all amounts to be paid to Tenant by any such subtenant or assignee and that belong to Landlord and shall direct such subtenant or assignee to pay the same directly to Landlord. If there is more than one sublease under this Lease, the amounts (if any) to be paid by Tenant to Landlord pursuant to this Paragraph 13.c., shall be separately calculated for each sublease and amounts due Landlord with regard to any one sublease may not be offset against rental and

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(24)

other consideration pertaining to or due under any other sublease. Upon Landlord's request, Tenant shall provide Landlord with a detailed written statement of all sums payable by the assignee or subtenant to Tenant so that Landlord can determine the total sums, if any, due from Tenant to Landlord under this Paragraph 13.c.

        d.      <u>Procedures</u>. Except for a transfer to an Affiliate, if Tenant desires to assign this Lease or any interest therein or sublet all or part of the Premises, Tenant shall give Landlord written notice thereof and the terms proposed (the "**Sublease Notice**"), which Sublease Notice shall be accompanied by Tenant's proposed assignment or sublease agreement (in which the proposed assignee or subtenant shall be named, shall be executed by Tenant and the proposed assignee or subtenant, and which agreement shall otherwise meet the requirements of Paragraph 13.e. below), together with a current financial statement of such proposed assignee or subtenant and any other information reasonably requested by Landlord. Landlord shall have the prior right and option (to be exercised by written notice to Tenant given within thirty (30) days after receipt of Tenant's notice) (i) to terminate this Lease in its entirety (in the case of any proposed assignment) or as it pertains to the portion of the Premises so proposed by Tenant to be sublet (in the case of any proposed sublet); provided, however, that if the portion of the Premises proposed by Tenant to be sublet consists of space on more than one floor of the Building, Landlord may exercise (or not exercise) its termination option under this clause (i) separately as to the proposed sublet space on each such floor; and provided further, Tenant may nullify Landlord's termination election by withdrawing Tenant's Sublease Notice in writing within ten (10) business days after receipt of Landlord's termination notice; or (ii) to approve or reasonably disapprove the proposed assignment or sublease; provided that the foregoing shall not apply with respect to a sublease or assignment to an Affiliate (as defined below). If Landlord fails to exercise any such option to sublet or to terminate, this shall not be construed as or constitute a waiver of any of the provisions of Paragraphs 13.a., b., c. or d. herein. If Landlord exercises any option to terminate, any costs of demising the portion of the Premises affected by such termination shall be borne by Tenant. In addition, Landlord shall have no liability for any real estate brokerage commission(s) or with respect to any of the costs and expenses that Tenant may have incurred in connection with its proposed assignment or subletting, and Tenant agrees to indemnify, defend and hold Landlord and all other Indemnitees harmless from and against any and all Claims (as defined in Paragraph 14.b. below), including, without limitation, claims for commissions, arising from such proposed assignment or subletting. Landlord's foregoing rights and options shall continue throughout the entire term of this Lease.

        e.      <u>Documentation</u>. Except as provided in Paragraph 13.h., no permitted assignment or subletting by Tenant shall be effective until there has been delivered to Landlord a fully executed counterpart of the assignment or sublease which expressly provides that (i) the assignee or subtenant may not further assign this Lease or the sublease, as applicable, or sublet the Premises or any portion thereof, without Landlord's prior written consent (which shall not be unreasonably withheld, conditioned or delayed), (ii) the assignee or subtenant will comply with all of the provisions of this Lease, and Landlord may enforce the Lease provisions directly against such assignee or subtenant, (iii) in the case of an assignment, the assignee assumes all of Tenant's obligations under this Lease arising on or after the date of the assignment, and (iv) in the case of a sublease, the subtenant agrees to be and remain jointly and severally liable with Tenant for the payment of rent pertaining to the sublet space in the amount set forth in the sublease, and for the performance of all of the terms and provisions of this Lease applicable to the sublet space. In addition to the foregoing, no assignment or sublease by Tenant (other than an assignment or sublease pursuant to Paragraph 13.h) shall be effective until there has been delivered to Landlord a fully executed counterpart of Landlord's consent to assignment or consent to sublease form. The failure or refusal of a subtenant or assignee to execute any such instrument shall not release or discharge the

subtenant or assignee from its liability as set forth above. Notwithstanding the foregoing, however, no subtenant or assignee shall be permitted to occupy the Premises or any portion thereof unless and until such subtenant or assignee provides Landlord with certificates evidencing that such subtenant or assignee is carrying all insurance coverage required of such subtenant or assignee under this Lease.

f.    No Merger. Without limiting any of the provisions of this Paragraph 13, if Tenant has entered into any subleases of any portion of the Premises, the voluntary or other surrender of this Lease by Tenant, or a mutual cancellation by Landlord and Tenant, shall not work a merger, and shall, at the option of Landlord, terminate all or any existing subleases or subtenancies or, at the option of Landlord, operate as an assignment to Landlord of any or all such subleases or subtenancies. If Landlord does elect that such surrender or cancellation operate as an assignment of such subleases or subtenancies, Landlord shall in no way be liable for any previous act or omission by Tenant under the subleases or for the return of any deposit(s) under the subleases that have not been actually delivered to Landlord, nor shall Landlord be bound by any sublease modification(s) executed without Landlord's consent or for any advance rental payment by the subtenant in excess of one month's rent.

g.    Special Transfer Prohibitions. Notwithstanding anything set forth above to the contrary, Tenant may not sublet the Premises or assign this Lease (a) to any person or entity in which Landlord owns an interest, directly or indirectly (by applying constructive ownership rules set forth in Section 856(d)(5) of the Code (as defined in Paragraph 5.e. above); or (b) in any other manner which could cause any portion of the amounts received by Landlord pursuant to this Lease or any sublease to fail to qualify as "**rents from real property**" within the meaning of Sections 512(b)(3) or 856(d) of the Code, or which could cause any other income received by Landlord to fail to qualify as income described in Section 856(c)(2) of the Code.

h.    Affiliates. Notwithstanding anything to the contrary in Paragraphs 13.a. and 13.d., but subject to Paragraphs 13.b., 13.c., 13.e., 13.f. and 13.g., Tenant may assign this Lease or sublet the Premises or any portion thereof, without Landlord's consent, to (X) any partnership, corporation or other entity which controls, is controlled by, or is under common control with Tenant or Tenant's parent (control being defined for such purposes as ownership of at least 50% of the equity interests in, or the power to direct the management of, the relevant entity), or (Y) to any partnership, corporation or other entity resulting from a merger, reorganization, or consolidation with Tenant or Tenant's parent, or (Z) to any person or entity which acquires all or substantially all the assets of Tenant as a going concern (including by means of a purchase of all or substantially all of Tenant's stock) (collectively, an "**Affiliate**"), provided that (i) Landlord receives at least ten (10) days' prior written notice of the assignment or subletting, together with evidence that the requirements of this Paragraph 13.h. have been met (unless such prior notices is prohibited by Legal Requirements or a nondisclosure agreement, in which event Tenant shall provide notice within ten (10) business days after such assignment or subletting), (ii) the Affiliate's net worth is not less than Tenant's net worth as of the date of this Lease, (iii) the Permitted Use will not change, (iv) except in the case of an assignment where the assignor is dissolved as a matter of law following the series of transactions of which the assignment is a part (e.g. a merger) and where such assignor makes sufficient reserves for contingent liabilities (including its obligations under this Lease) as required by applicable law, the Affiliate remains an Affiliate for the duration of the subletting or the balance of the term in the event of an assignment, (v) the Affiliate assumes (in the event of an assignment) in writing all of Tenant's obligations under this Lease, and agrees (in the event of a sublease) that such subtenant will, at Landlord's election, attorn directly to Landlord in the event that this Lease is terminated for any reason, (vi) Landlord receives a fully executed copy of an assignment or sublease agreement between Tenant and the Affiliate, (vii) in the case of an assignment by

means of a purchase of all or substantially all of Tenant's stock, the essential purpose of such assignment is to transfer an active, ongoing business with substantial assets in addition to this Lease, and in the case of an assignment (by any means), or a sublease, the transaction is for legitimate business purposes unrelated to this Lease and the transaction is not a subterfuge by Tenant to avoid it obligations under this Lease or the restrictions on assignment and subletting contained herein, and (viii) in the case of a sublease,  the Affiliate executes and Tenant delivers to Landlord a fully executed counterpart of Landlord's waiver and acknowledgement form for an Affiliate sublease. An assignee of Tenant's interest under this Lease pursuant to this Paragraph 13.h. is referred to as an "**Affiliate Assignee**".

i.      Notwithstanding anything to the contrary in the Lease, the issuance of shares of stock of Tenant on a recognized public exchange or the public offering of Tenant's stock, or Tenant's parent company, no matter what the percentage, shall not constitute a sale, assignment, transfer or encumbrance of this Lease or any interest in it or the Premises nor a subletting of the Premises or any part of the Premises, and Tenant shall not be required to obtain Landlord's consent in any such event.

15.     Indemnification of Landlord.

a.      Landlord and the holders of any Superior Interests (as defined in Paragraph 21 below) shall not be liable to Tenant and Tenant hereby waives all claims against such parties for any loss, injury or other damage to property in or about the Premises or the Real Property from any cause whatsoever, including without limitation, water leakage of any character from the roof, walls, basement, fire sprinklers, appliances, air conditioning, plumbing or other portion of the Premises or the Real Property, or gas, fire, explosion, falling plaster, steam, electricity, or any malfunction within the Premises or the Real Property, or acts of other tenants of the Building; provided, however, that, subject to Paragraph 16 below and to the provisions of Paragraph 28 below regarding exculpation of Landlord from Special Claims, the foregoing waiver shall be inapplicable to any loss, injury or damage resulting directly from Landlord's gross negligence or willful misconduct.

b.      Tenant shall hold Landlord and the holders of any Superior Interest, and the constituent shareholders, partners or other owners thereof, and all of their agents, contractors, servants, officers, directors, employees and licensees (collectively with Landlord, the "**Landlord Indemnitees**") harmless from and indemnify the Landlord Indemnitees against any and all claims, liabilities, damages, costs and expenses, including reasonable attorneys' fees and costs incurred in defending against the same (collectively, "**Claims**"), to the extent arising from (a) the negligent acts or omissions or willful misconduct of Tenant or any other Tenant Parties (as defined in Paragraph 8.c. above) in, on or about the Real Property, or (b) any construction or other work undertaken by or on behalf of Tenant in, on or about the Premises, whether prior to or during the term of this Lease, or (c) any accident, injury or damage, howsoever and by whomsoever caused, to any person or property, occurring in, on or about the Premises; except to the extent such Claims are caused directly by the negligence or willful misconduct of Landlord, its agents, employees, contractors or authorized representatives. In case any action or proceeding be brought against any of the Indemnitees by reason of any such Claim, Tenant, upon notice from Landlord, covenants to resist and defend at Tenant's sole expense such action or proceeding by counsel reasonably satisfactory to Landlord (provided, however, counsel appointed by Tenant's insurer shall be deemed reasonably satisfactory to Landlord).

c.      Landlord shall hold Tenant harmless from and indemnify Tenant against any Claim incurred in connection with or arising from any injury, illness, or death to any person or damage to any property to the extent such injury, illness, death or damage is caused by the negligence or willful

misconduct of Landlord or its agents, contractors or employees. In case any action or proceeding be brought against Tenant by reason of any such Claim, Landlord, upon notice from Tenant, covenants to resist and defend at Landlord's sole expense such action or proceeding by counsel reasonably satisfactory to Tenant (provided, however, counsel appointed by Landlord's insurer shall be deemed reasonably satisfactory to Tenant). Notwithstanding anything to the contrary set forth in this Paragraph 14.c. or elsewhere in this Lease, in no event shall Landlord be liable for any consequential or remote damages, or, except as expressly provided in Paragraph 28, for loss of or damage to artwork, currency, jewelry, bullion, securities or other property in the Premises, not in the nature of ordinary fixtures, furnishings, equipment and other property used in general business office activities and functions. Landlord's indemnification obligations under this Paragraph  are subject to the provisions of Paragraph 16 below.

d.        The provisions of Paragraph 14.b. and 14.c. shall survive the expiration or earlier termination of this Lease with respect to any injury, illness, death or damage occurring prior to such expiration or termination.

16.      <u>Insurance</u>.

a.        <u>Tenant's Insurance; Coverage Amounts</u>. Tenant shall, at Tenant's expense, maintain during the term of this Lease (and, if Tenant occupies or conducts activities in or about the Premises prior to or after the term hereof, then also during such pre-term or post-term period): (i) commercial general liability insurance including contractual liability coverage, with minimum coverages of Five Million Dollars ($5,000,000.00) per occurrence combined single limit for bodily injury and property damage, Five Million Dollars ($5,000,000.00) for products-completed operations coverage, Five Hundred Thousand Dollars ($500,000.00) damage to rented premises (each occurrence), Five Million Dollars ($5,000,000.00) for personal and advertising injury, with a Six Million Dollars ($6,000,000.00) general aggregate limit, for injuries to, or illness or death of, persons and damage to property occurring in or about the Premises or otherwise resulting from Tenant's operations in the Building, provided that the foregoing coverage amounts may be provided through any combination of primary and umbrella/excess coverage policies; (ii) property insurance protecting Tenant against loss or damage by fire and such other risks as are insurable under then-available standard forms of "special form" (previously known as "all risk") insurance policies (excluding earthquake and flood but including water damage and earthquake sprinkler leakage), covering Tenant's personal property and trade fixtures in or about the Premises or the Real Property, and any above Building standard Alterations installed in the Premises by or at the request of Tenant (including those installed by Landlord at Tenant's request, whether prior or subsequent to the commencement of the Lease term), for the full replacement value thereof without deduction for depreciation; (iii) workers' compensation insurance in statutory limits, with employer's liability in the amount, if any, required by law but in no event less than $500,000 per occurrence; (iv) at least four months' coverage for loss of business income and continuing expenses, providing protection against any peril included within the classification "special form" insurance, excluding earthquake and flood but including water damage and earthquake sprinkler leakage; and (v) if Tenant operates owned, leased or non-owned vehicles on the Real Property, comprehensive automobile liability insurance with a minimum coverage of Two Million Dollars ($2,000,000.00) per occurrence, combined single limit; provided that the foregoing coverage amount may be provided through any combination of primary and umbrella/excess coverage policies. In no event shall any insurance maintained by Tenant hereunder or required to be maintained by Tenant hereunder be deemed to limit or satisfy Tenant's indemnification or other obligations or liability under this Lease. Landlord reserves the right, not more frequently than once every five (5) years, to increase the foregoing amount of liability coverage as Landlord reasonably determines is required to adequately protect Landlord and the other

parties designated by Landlord from the matters insured thereby, but in no event shall such increased amount of insurance be in excess of that requirement by landlords of Comparable Buildings or in excess of the amount of liability coverage then required by Landlord for new tenants occupying similar space in the Building (provided, however, that Landlord makes no representation that the limits of liability required hereunder from time to time shall be adequate to protect Tenant), and to require that Tenant cause any of its contractors, vendors, movers or other parties conducting activities in or about or occupying the Premises to obtain and maintain insurance as reasonably determined by Landlord and as to which Landlord and such other parties designated by Landlord shall be additional insureds.

b.      Policy Form. Each insurance policy required pursuant to Paragraph 15.a. above shall be issued by an insurance company authorized to do business in the State of California and be rated by AM Best not lower than A- VIII. Tenant shall provide Landlord with not less than thirty (30) days' prior written notice if an insurance policy obtained by Tenant hereunder is materially changed, cancelled or will be allowed to lapse, and not less than ten (10) days' prior written notice for such event if due to non-payment of premium. If any of the above policies are subject to deductibles then such deductibles shall be commercially reasonable. The liability policies and any umbrella/excess coverage policies carried pursuant to clauses (i) and (v) of Paragraph 15.a. above shall (i) name Landlord and all the other Indemnitees and any other parties designated by Landlord as additional insureds and (ii) provide that the policy and the coverage provided shall be primary and noncontributory with respect to polices carried by Landlord and provide a severability of interests clause. The property insurance policy carried under item (ii) of Paragraph 15.a. above shall include all waiver of subrogation rights endorsements necessary to affect the provisions of Paragraph 16 below. A certificate evidencing each insurance policy required of Tenant pursuant to this Paragraph 15 shall be delivered to Landlord by Tenant on or before the effective date of such policy and thereafter Tenant shall deliver to Landlord renewal certificates at least five (5) days prior to the expiration dates of expiring policies. If Tenant fails to procure such insurance or to deliver such certificates and such failure continues for ten (10) Business Days after written notice from Landlord, then Landlord may, at its option, procure the same for Tenant's account, and Landlord's reasonable out-of-pocket cost thereof shall be paid to Landlord by Tenant within thirty (30) days of Landlord's written demand.

c.      No Implication. Nothing in this Paragraph 15 shall be construed as creating or implying the existence of (i) any ownership by Tenant of any fixtures, additions, Alterations, or improvements in or to the Premises or (ii) any right on Tenant's part to make any addition, Alteration or improvement in or to the Premises.

d.      Landlord's Insurance. Landlord shall procure and maintain in effect throughout the Lease term, commercial general liability insurance, property insurance and/or such other types of insurance as are normally carried by reasonably prudent owners of Comparable Buildings. Such coverages shall be in such amounts, from such companies and on such other terms and conditions as Landlord may from time to time reasonably determine, provided at a minimum Landlord shall procure and maintain the following insurance: (i) special causes of loss (also known as "all risk") property insurance, with such coverage and in such amounts that are consistent with the amounts of property insurance customarily carried by owners of Comparable Buildings, but in no event less than one hundred percent (100%) of the insurable replacement cost covering the Building; and (ii) commercial general liability insurance for the Building, with such coverage and in such amounts that are consistent with the amounts of liability customarily carried owners of Comparable Buildings, but in no event less than a per occurrence limit of $5,000,000 and aggregate limit of $6,000,000 (such insurance shall be primary with respect to Common Areas).

17.    <u>Mutual Waiver of Subrogation Rights</u>. Each party hereto hereby releases the other respective party and, in the case of Tenant as the releasing party, the other Indemnitees, and the respective partners, shareholders, agents, employees, officers, directors and authorized representatives of such released party, from any claims such releasing party may have for damage to the Building, the Premises or any of such releasing party's fixtures, personal property, improvements and alterations in or about the Premises, the Building or the Real Property that is caused by or results from risks insured against under any "special form" insurance policies actually carried by such releasing party or deemed to be carried by such releasing party; provided, however, that such waiver shall be limited to the extent of the net insurance proceeds payable by the relevant insurance company with respect to such loss or damage (or in the case of deemed coverage, the net proceeds that would have been payable). For purposes of this Paragraph 16, Tenant shall be deemed to be carrying any of the insurance policies required pursuant to Paragraph 15 but not actually carried by Tenant, and Landlord shall be deemed to carry standard fire and extended coverage policies on the Real Property. Each party hereto shall cause each such fire and extended coverage insurance policy obtained by it to provide that the insurance company waives all rights of recovery by way of subrogation against the other respective party and the other released parties in connection with any matter covered by such policy.

18.    <u>Utilities and Building Services</u>.

a.    <u>Basic Services</u>. As used in this Lease, "**Business Days**" shall mean Monday through Friday, excluding public holidays. As part of Operating Expenses, Landlord shall furnish the following utilities and services ("**Basic Services**") for the Premises: (i) twenty-four (24) hours a day, seven (7) days per week, every day of the year, Landlord shall provide (x) Normal Quantities (as defined below) of electricity to the Premises, (y) tepid water for the restroom(s) in the Premises and in the public areas serving the Premises and for use (in customary amounts) in any plumbing fixtures located in the pantry/kitchen in the Premises, and (z) elevator service to the floor(s) of the Premises by non-attended automatic elevators for general office pedestrian usage; and (ii) janitorial services for the Common Areas of the Real Property and exterior window washing as reasonably determined by Landlord (but no less frequently than as provided in Paragraph 17.g. below), substantially consistent with the specifications attached hereto as <u>Exhibit E</u>; and (iii) during the hours ("**Building Hours**") of 8 A.M. to 6 P.M. on Business Days, heat and air conditioning ("**HVAC**") reasonably required in Landlord's judgment for the comfortable office use and occupancy of the Premises for ordinary general office purposes, provided that, if Tenant desires to receive HVAC during Building Hours on Saturday, Tenant shall comply with the Building's procedures in place from time to time for obtaining HVAC during such hours.

b.    Tenant may use the above services in excess of that provided in Basic Services, including additional hours ("**Excess Services**"), which shall include, without limitation, Building chilled, heated or condenser water and after hour HVAC, provided that the Excess Services desired by Tenant are reasonably available to Landlord and to the Premises (it being understood that in no event shall Landlord be obligated to make available to the Premises more than the pro rata share of the capacity of any Excess Service available to the Building or the applicable floor of the Building, as the case may be), and provided further that Tenant complies with the procedures established by Landlord from time to time for requesting and paying for such Excess Services and with all other provisions of this Paragraph 17. Landlord reserves the right to install, at Landlord's sole cost and expense, in the Premises or the Real Property water meters (including, without limitation, any additional wiring, conduit or panel required therefor) to measure the water consumed by Tenant or to cause the usage to be measured by other reasonable methods (e.g., by temporary "check" meters or by survey). Landlord shall also furnish janitorial services to the Premises in accordance with Paragraph 17.g. below.

c.    If Tenant requires HVAC during non-Business Hours for any portion of the Premises, Tenant shall notify Landlord thereof in accordance with Landlord's standard procedures for requesting after hour HVAC use.

d.    Notwithstanding the above, (subject to any temporary shutdown for repairs, for security purposes, for compliance with any legal restrictions, or Force Majeure, or other causes beyond the reasonable control of Landlord) (A) Tenant shall have access to the Premises 24 hours a day, each day of the Lease term, (B) subject to the above provisions of this Paragraph 17.a. regarding availability of Excess Services and Paragraph 17.b. below regarding Tenant's payment for Excess Services, the heat and air conditioning services described in item (iii) of the first grammatical paragraph of this Paragraph 17.a. shall be available to the Premises 24 hours a day, each day of the Lease term.

e.    <u>Payment for Utilities and Services</u>. The cost of Basic Services shall be included in Operating Expenses. In addition, Tenant shall pay to Landlord upon demand (i) the cost, at Landlord's prevailing rate, of any Excess Services used by Tenant (which as of the date hereof is $150.00 per hour per floor with respect to HVAC Excess Services), (ii) intentionally omitted, and (iii) Landlord's reasonable, out of pocket cost of installing, operating, maintaining or repairing any Temperature Balance Equipment (as defined in Paragraph 17.d. below) for the Premises and/or any equipment required in connection with any Excess Services requested by Tenant. Landlord's failure to bill Tenant for any of the foregoing shall not waive Landlord's right to bill Tenant for the same at a later time, but in no event after the later of (x) eighteen (18) months after the end of a calendar year or (y) three (3) months following Landlord's receipt of the bill therefor). Tenant shall bear the cost of replacement of lamps, starters and ballasts for non-Building standard lighting fixtures within the Premises.

f.    <u>Utility Connections</u>. As part of Basic Services, Landlord shall provide to the Premises, electricity for overhead lighting, in Normal Quantities. Tenant shall not connect or use any apparatus or device in the Premises which would exceed the capacity of the existing panel or transformer serving the Premises as described in <u>Exhibit D-1</u>. Tenant shall not connect with electric current (except through existing outlets in the Premises or such additional outlets as may be installed in the Premises as part of initial improvements or Alterations approved by Landlord), or water pipes, any apparatus or device for the purpose of using electrical current or water. Tenant shall not be charged for excess electrical consumption (except for HVAC during non-Business Hours) until total consumption exceeds, on a connected load basis, 6 watts per rentable square foot multiplied by the rentable area of the Premises ("**Normal Quantities**") on an annualized basis, excluding HVAC provided as part of Basic Services.

Landlord will not permit additional coring or channeling of the floor of the Premises in order to install new electric outlets in the Premises unless Landlord is satisfied, on the basis of such information to be supplied by Tenant at Tenant's expense, that coring and/or channeling of the floor in order to install such additional outlets will not weaken the structure of the floor.

g.    <u>Temperature Balance</u>. If the temperature otherwise maintained in any portion of the Premises by the heating, air conditioning or ventilation system is affected as a result of (i) the type or quantity of any lights, machines or equipment (including without limitation typical office equipment) used by Tenant in the Premises, (ii) the occupancy of such portion of the Premises by more than one person per one hundred thirty (130) square feet of rentable area therein (however, Tenant acknowledges that a density of one person per one hundred thirty (130) square feet of rentable area is in excess of the Building standard and that Landlord shall have no responsibility for any heating or cooling issues in the Premises to the extent caused by such increased density of the Premises), (iii) an electrical load for

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(31)

lighting or power in excess of the limits specified in Paragraph 17.c. above, or (iv) any rearrangement of partitioning or other improvements, then at Tenant's sole cost, Landlord may install any equipment, or modify any existing equipment (including the standard air conditioning equipment) Landlord deems necessary to restore the temperature balance (such new equipment or modifications to existing equipment termed herein "**Temperature Balance Equipment**"). Tenant agrees to keep closed, when necessary, draperies and/or window treatments which, because of the sun's position, must be closed to provide for the efficient operation of the air conditioning system, and Tenant agrees to cooperate with Landlord and to abide by the regulations and requirements which Landlord may prescribe for the proper functioning and protection of the heating, ventilating and air conditioning system. Landlord makes no representation to Tenant regarding the adequacy or fitness of the heating, air conditioning or ventilation equipment in the Building to maintain temperatures that may be required for, or because of, any computer or communications rooms, machine rooms, conference rooms or other areas of high concentration of personnel or electrical usage, or any other uses other than or in excess of the fractional horsepower normally required for office equipment, and Landlord shall have no liability for loss or damage suffered by Tenant or others in connection therewith.

h.      Interruption of Services. Landlord's obligation to provide utilities and services for the Premises are subject to the Rules and Regulations of the Building, applicable Legal Requirements (including the rules or actions of the public utility company furnishing the utility or service), and shutdowns for maintenance and repairs, for security purposes, or due to Force Majeure or other causes beyond the control of Landlord. In the event of an interruption in, or failure or inability to provide any service or utility for the Premises for any reason, such interruption, failure or inability shall not impose upon Landlord any liability whatsoever, including, but not limited to, liability for consequential damages or loss of business by Tenant, or, except as expressly provided in this Lease, entitle Tenant to any abatement or offset of Monthly Rent, Additional Rent or any other amounts due from Tenant under this Lease, entitle either party to terminate this Lease, or excuse Tenant's obligations under Paragraph 8. Tenant hereby waives the provisions of California Civil Code Section 1932(1) or any other applicable existing or future Legal Requirement permitting the termination of this Lease due to such interruption, failure or inability.

i.      Governmental Controls. In the event any governmental authority having jurisdiction over the Real Property or the Building promulgates or revises any Legal Requirement or building, fire or other code or imposes mandatory or voluntary controls or guidelines on Landlord or the Real Property or the Building relating to the use or conservation of energy or utilities or the reduction of automobile or other emissions (collectively, "**Controls**") or in the event Landlord is required or elects to make alterations to the Real Property or the Building in order to comply with such mandatory or voluntary Controls, Landlord may, in its reasonable discretion, comply with such Controls or make such alterations to the Real Property or the Building related thereto, subject to the express limitations set forth in this Lease. Provided Landlord complies with the express terms of this Lease, such compliance and the making of such alterations shall not impose upon Landlord any liability whatsoever, including, but not limited to, liability for consequential damages or loss of business by Tenant.

Without limitation of any provision of Paragraph 8.b. above (entitled "Compliance with Law"), provided such information is maintained by Tenant in the ordinary course of Tenant's business, Tenant shall, upon Landlord's written request, deliver to Landlord information relating to the Premises that is necessary for the Building to earn and maintain performance certifications (including, without limitation, ENERGY STAR and LEED certification), which information shall be in sufficient detail for the Building to comply with the applicable certification criteria and/or requirements, including, without

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(32)

limitation, those applicable to data centers and to any other particular use that is subject to special certification criteria and/or requirements, but shall not be required to contain any confidential information of Tenant. Upon written request by Tenant, Landlord shall provide Tenant with the Building's ENERGY STAR score not more than one (1) time per calendar year. Landlord and Tenant shall, upon request, provide a point of contact to discuss issues related to sustainability and energy, including, but not limited to, retrofit projects, billing issues, energy efficiency upgrades and data access. All such notices by Landlord to Tenant shall be addressed to Tenant as set forth in Paragraph 34 of this Lease. All notices by Tenant to Landlord with respect to the matters described in the preceding sentence shall be addressed to the management office of the Building, or to such other place as Landlord may from time to time designate by notice to Tenant hereunder.

j. <u>Janitorial Services</u>. Landlord shall cause Landlord's janitorial contractor for the Building (the "**Building's Janitorial Contractor**") to provide to the Premises, five (5) days per week (excluding holidays), janitorial service for the Premises substantially consistent with the specifications attached hereto as <u>Exhibit E</u>, at no additional cost to Tenant (other than through inclusion in Operating Expenses).

k. <u>Security Services.</u> Landlord shall provide, twenty-four (24) hours per day, seven (7) days per week, every day of the year, on-site Building security equipment, personnel, procedures and systems.

l. <u>Window Washing.</u> Landlord shall furnish as a service for the Building window washing of all windows in the Premises, both inside and out, at such times as shall be required in Landlord's reasonable judgment, consistent with Comparable Buildings. Landlord agrees that the operation of such window washing equipment shall be conducted in a manner (and during times) consistent with the practices of Comparable Buildings.

m. <u>Building Amenities</u>. Tenant shall have the right to use the Building conference facilities, 2nd floor roof deck, fitness center, on-site showers, and bicycle parking on a non-exclusive basis throughout the Lease term, subject to the Rules and Regulations, and any other amenities now or hereafter existing which are not for the exclusive use or benefit of a specific tenant or group of tenants. Tenant and Tenant's employees shall be permitted to use the 2nd floor roof deck, the fitness center, and the on-site showers at no additional cost, on a non-exclusive basis. Tenant shall be permitted to use the conference facilities on a non-exclusive basis at the rates attached hereto as <u>Exhibit E-1</u>.

19. <u>Personal Property and Other Taxes</u>. Tenant shall pay before delinquency, any and all taxes, fees, charges or other governmental impositions levied or assessed against Landlord or Tenant (a) upon Tenant's equipment, furniture, fixtures, improvements and other personal property (including carpeting installed by Tenant) located in the Premises, (b) by virtue of any Alterations made by Tenant to the Premises, (c) upon this transaction or any document to which Tenant is a party creating or transferring an interest or an estate in the Premises, and (d) which are measured by or otherwise calculated with respect to the gross or net rent payable by Tenant under this Lease (rather than by or with respect to the gross rental receipts of Landlord from all leases of space in the Real Property), including, without limitation, any rent tax or sales tax, service tax, transfer tax or value added tax, business tax or any other applicable tax on the rent or services herein or otherwise respecting this Lease, levied by any taxing authority or adopted by any voter initiative or ballot measure. If any such fee, charge or other governmental imposition is paid by Landlord, Tenant shall reimburse Landlord for Landlord's payment within thirty (30) days after demand; provided, however, that at Landlord's election, Landlord may give

to Tenant notice of Landlord's estimate of the amounts payable by Tenant pursuant to this Paragraph 18 for the given calendar year, and thereafter on or before the first day of each month during each such calendar year Tenant shall pay to Landlord one-twelfth (1/12th) of the estimated annual amount, at the same time and manner as Tenant is obligated to make monthly payments of Additional Rent pursuant to Paragraph 7.e. above (and such estimated payments shall be reconciled on an annual basis as set forth in Paragraph 7.f. above). If it shall not be lawful for Tenant to reimburse Landlord for any taxes as described herein, the Monthly Rent payable to Landlord prior to the imposition of such taxes shall be increased to net Landlord the same net Monthly Rent after imposition of such taxes as would have been received by Landlord prior to the imposition of such taxes.

20.    Rules and Regulations. Tenant shall comply with the rules and regulations (including, without limitation, any health and safety rules and regulations imposed by Landlord in response to recommendations or applicable Legal Requirements, such as wearing masks in Common Areas and other amenity areas of the Building) set forth on Exhibit B attached hereto, as such rules and regulations may be modified or amended by Landlord from time to time (the "**Rules and Regulations**"); provided such amendments or modifications shall be reasonable and non-discriminatory and shall not materially increase the burdens or obligations upon Tenant, materially diminish Tenant's rights under this Lease. Landlord shall not be responsible to Tenant for the nonperformance or noncompliance by any other tenant or occupant of the Building of or with any of the Rules and Regulations, but Landlord shall use reasonable efforts to encourage such compliance. In the event of any conflict between the Rules and Regulations and the balance of this Lease, the balance of this Lease shall control. Landlord shall not enforce the Rules and Regulations in an unreasonable manner or in a manner which shall unreasonably interfere with the normal and customary use of the Premises by Tenant for normal and customary business office operations permitted under Paragraph 8.a.

21.    Surrender; Holding Over.

a.    Surrender. Upon the expiration or other termination of this Lease, Tenant shall surrender the Premises to Landlord vacant and broom-clean, with all improvements and Alterations (except as provided below) in good condition, except for reasonable wear and tear, damage from casualty or condemnation; provided, however, that prior to the expiration or termination of this Lease Tenant shall remove from the Premises any Alterations that Tenant is required by Landlord to remove under the provisions of Paragraph 9.b. of this Lease and all of Tenant's personal property (including, without limitation, all voice and data cabling) and unattached trade fixtures. If such removal is not completed at the expiration or other termination of this Lease, Landlord may remove the same at Tenant's reasonable expense. Notwithstanding the foregoing, in lieu of removing certain cabling, Tenant shall, at Landlord's request, abandon and leave in place, without additional payment to Tenant or credit against rent, any cabling (including conduit) designated by Landlord and installed in the Premises or elsewhere in the Building by or on behalf of Tenant (including all connections for such cabling), in a neat and safe condition in accordance with the requirements of all applicable Legal Requirements, including the National Electric Code or any successor statute, and terminated at both ends of a connector, properly labeled at each end and in each electrical closet and junction box. Any damage to the Premises or the Building caused by such removal shall be repaired promptly by Tenant (including the patching or repairing of ceilings and walls) or, if Tenant fails to do so, Landlord may do so at Tenant's reasonable expense. The removal of Alterations from the Premises shall be governed by Paragraph 9.b. above. Any failure by Tenant to timely surrender the Premises as required hereunder shall be deemed a holdover and the provisions of Paragraph 20.b. below shall apply with respect to such holdover. Tenant's obligations under this paragraph shall survive the expiration or other termination of this Lease. Upon expiration or

termination of this Lease or of Tenant's possession, Tenant shall surrender all keys to the Premises or any other part of the Building and shall make known to Landlord the combination of locks on all safes, cabinets and vaults that may be located in the Premises.

b.    Holding Over. If Tenant remains in possession of the Premises after the expiration or earlier termination of this Lease with the express written consent of Landlord, Tenant's occupancy shall be a month-to-month tenancy at a rent agreed upon by Landlord and Tenant. Except as provided in the preceding sentence, the month-to-month tenancy shall be on the terms and conditions of this Lease, except that any renewal options, expansion options, rights of first refusal, rights of first negotiation or any other rights or options pertaining to additional space in the Building contained in this Lease shall be deemed to have terminated and shall be inapplicable thereto except as agreed upon by Landlord and Tenant. Landlord's acceptance of rent after such holding over with Landlord's written consent shall not result in any other tenancy or in a renewal of the original term of this Lease. If Tenant remains in possession of the Premises after the expiration or earlier termination of this Lease without Landlord's consent, Tenant's continued possession shall be on the basis of a tenancy at sufferance and Tenant shall pay as Monthly Rent during the first month of the holdover period an amount equal to one hundred twenty-five percent (125%) of the Monthly Rent payable under this Lease (plus Additional Rent) for the last full month prior to the date of such expiration or termination, and thereafter during such holdover period, Tenant shall pay one hundred fifty percent (150%) of the Monthly Rent payable under this Lease (plus Additional Rent) for the last full month prior to the date of such expiration or termination.

c.    Indemnification. Tenant shall indemnify, defend and hold Landlord harmless from and against all Claims incurred by or asserted against Landlord and arising directly or indirectly from Tenant's failure to timely surrender the Premises, including but not limited to (i) any rent payable by or any loss, cost, or damages, including lost profits, claimed by any prospective tenant of the Premises or any portion thereof, and (ii) Landlord's damages as a result of such prospective tenant rescinding or refusing to enter into the prospective lease of the Premises or any portion thereof by reason of such failure to timely surrender the Premises; provided, however, as a condition to Tenant's obligations under this Paragraph 20.c., Landlord shall give Tenant written notice of the existence of a prospective successor tenant for the Premises or any portion thereof, or the existence of any other matter which might give rise to a claim by Landlord under the foregoing indemnity, at least thirty (30) days prior to the date Landlord shall require Tenant's surrender of the Premises, and Tenant shall not be responsible to Landlord under the foregoing indemnity if Tenant shall surrender the Premises on or prior to the later of (I) the expiration or earlier termination of the Lease, or (II) the expiration of such thirty (30) day period (it being agreed, however, that Landlord need not identify the prospective tenant by name in its notice, and it being further agreed that such notice may be given prior to the scheduled expiration date of this Lease).

22.    Subordination and Attornment. This Lease is expressly made subject and subordinate to any mortgage, deed of trust, ground lease, underlying lease or like encumbrance affecting any part of the Real Property or any interest of Landlord therein which is now existing or hereafter executed or recorded, any present or future modification, amendment or supplement to any of the foregoing, and to any advances made thereunder (any of the foregoing being a "**Superior Interest**") without the necessity of any further documentation evidencing such subordination except as expressly required herein. Notwithstanding the foregoing, Tenant's agreement to subordinate this Lease to any future Superior Interest is on the express condition that Landlord provide Tenant, at Landlord's sole cost and expense, with a commercially reasonable nondisturbance agreement which shall provide that Tenant's rights and interests under this Lease shall not be disturbed so long as Tenant is not in breach of this Lease after notice and an opportunity to cure. Subject to the foregoing, Tenant shall, within thirty (30) days after

Landlord's request, execute and deliver to Landlord a commercially reasonable document evidencing the subordination of this Lease to a particular Superior Interest, provided such document does not materially decrease Tenant's rights under this Lease or materially increase Tenant's obligations under this Lease. If the interest of Landlord in the Real Property or the Building is transferred to any person ("**Purchaser**") pursuant to or in lieu of foreclosure or other proceedings for enforcement of any Superior Interest, then Tenant shall immediately attorn to the Purchaser, and this Lease shall continue in full force and effect as a direct lease between the Purchaser and Tenant on the terms and conditions set forth herein, provided that Purchaser acquires and accepts the Real Property or the Building subject to this Lease. Upon Purchaser's request, including any such request made by reason of the termination of this Lease as a result of such foreclosure or other proceedings, Tenant shall enter in to a new lease with Purchaser on the terms and conditions of this Lease applicable to the remainder of the term hereof. Notwithstanding the subordination of this Lease to Superior Interests as set forth above, the holder of any Superior Interest may at any time (including as part of foreclosure or other proceedings for enforcement of such Superior Interest), upon written notice to Tenant, elect to have this Lease be prior and superior to such Superior Interest.

23.    Notwithstanding the foregoing, Landlord shall cause concurrently with the execution and delivery of this Lease, that the holder of any existing Superior Interest execute a written "non-disturbance agreement" in favor of Tenant in the form of Exhibit F attached hereto (the "**SNDA Contingency**"), and Tenant hereby acknowledges and agrees to execute and deliver the same; provided that if, in order to obtain such non-disturbance agreement Landlord is required to expend any sum on account of (i) itself (including any out-of-pocket legal fees) and (ii) the holder of any existing Superior Interest's out-of-pocket legal fees and standard processing fee (such clauses (i) and (ii), collectively, the "**Landlord/Lender Fees**"), then Landlord shall so notify Tenant and Tenant shall pay such Landlord/Lender Fees up to a cap of $25,000.00. Landlord shall pay any such Landlord/Lender Fees in excess of $25,000.00. Tenant shall be responsible for all of Tenant's fees (including Tenant's legal fees) in connection with the foregoing.

24.    Financing Condition. If any lender or ground lessor that intends to acquire an interest in, or holds a mortgage, ground lease or deed of trust encumbering any portion of the Real Property should require either the execution by Tenant of an agreement requiring Tenant to send such lender written notice of any default by Landlord under this Lease and preventing Tenant from terminating this Lease (to the extent such termination right would otherwise be available) unless such default remains uncured after foreclosure has been completed, then Tenant agrees that it shall, within thirty (30) days after Landlord's request, execute and deliver such agreement; provided, however, that no such modification shall affect the length of the term or increase the rent payable by Tenant under Paragraphs 5 and 7 or otherwise materially increase any obligation of Tenant under this Lease or materially decrease any right of Tenant under this Lease. Tenant acknowledges and agrees that its failure to timely execute any such agreement or modification shall be a default under this Lease.

25.    Entry by Landlord. Landlord may, at any and all reasonable times, enter the Premises upon at least twenty-four hours prior notice (except in the case of an emergency or to supply normal and regular janitorial or security services pursuant to the terms of the Lease, in which case no such notice shall be required) to: (a) inspect the same and to determine whether Tenant is in compliance with its obligations hereunder, (b) supply janitorial and any other service Landlord is required to provide hereunder and perform repairs required under this Lease, (c) show the Premises to prospective lenders, purchasers or, during the last twelve (12) months of the term, to prospective tenants, (d) post notices of nonresponsibility, and alter, improve or repair the Premises (however, no such changes shall be made to

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(36)

the interior portions of the Premises without Tenant's consent) or any other portion of the Real Property. In connection with any such alteration, improvement or repair, Landlord may erect if reasonably required in the Premises or elsewhere in the Real Property scaffolding and other structures reasonably required for the work to be performed. Except as expressly provided in this Lease, and provided Landlord complies with the express requirements set forth in this Lease, in no event shall such entry or work entitle Tenant to an abatement of rent, constitute an eviction of Tenant, constructive or otherwise, or impose upon Landlord any liability whatsoever, including but not limited to liability for consequential damages or loss of business or profits by Tenant. Landlord shall use good faith efforts to cause all such work to be done in such a manner as to cause as little interference to Tenant as reasonably possible. Landlord shall at all times retain a key with which to unlock all of the doors in the Premises, except Tenant's vaults, safes and the Secured Areas (as defined below). If an emergency necessitates immediate access to the Premises, Landlord may use whatever force is necessary to enter the Premises and any such entry to the Premises shall not constitute a forcible or unlawful entry into the Premises, a detainer of the Premises, or an eviction of Tenant from the Premises, or any portion thereof.

a.        Tenant may designate certain areas of the Premises as "Secured Areas" should Tenant require such areas for the purpose of securing certain valuable property or confidential information. Landlord shall have no obligation to provide either janitorial service or cleaning in the Secured Areas. Landlord may not enter such Secured Areas except in the case of emergency or in the event of a Landlord inspection, in which case Landlord shall provide Tenant with ten (10) days' prior written notice of the specific date and time of such Landlord inspection and shall allow an employee of Tenant to accompany Landlord at all times.

26.        <u>Insolvency or Bankruptcy</u>. The occurrence of any of the following shall constitute an Event of Default under Paragraph 25 below:

a.        Tenant ceases doing business as a going concern, makes an assignment for the benefit of creditors, is adjudicated an insolvent, files a petition (or files an answer admitting the material allegations of such petition) seeking for Tenant any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar arrangement under any state or federal bankruptcy or other law, or Tenant consents to or acquiesces in the appointment, pursuant to any state or federal bankruptcy or other law, of a trustee, receiver or liquidator for the Premises, for Tenant or for all or any substantial part of Tenant's assets; or

b.        Tenant fails within sixty (60) days after the commencement of any proceedings against Tenant seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any state or federal bankruptcy or other Legal Requirement, to have such proceedings dismissed, or Tenant fails, within sixty (60) days after an appointment pursuant to any state or federal bankruptcy or other Legal Requirement without Tenant's consent or acquiescence, of any trustee, receiver or liquidator for the Premises, for Tenant or for all or any substantial part of Tenant's assets, to have such appointment vacated; or

c.        Tenant is unable, or admits in writing its inability, to pay its debts as they mature; or

d.        Tenant gives notice to any governmental body of its insolvency or pending insolvency, or of its suspension or pending suspension of operations.

In no event shall this Lease be assigned or assignable by reason of any voluntary or involuntary bankruptcy, insolvency or reorganization proceedings, nor shall any rights or privileges hereunder be an asset of Tenant, the trustee, debtor-in-possession, or the debtor's estate in any bankruptcy, insolvency or reorganization proceedings.

27.    Default and Remedies.

a.    Events of Default. The occurrence of any of the following shall constitute an "**Event of Default**" by Tenant:

(i)    Tenant fails to pay when due Monthly Rent, Additional Rent or any other rent due hereunder and such failure continues for five (5) Business Days after written notice thereof from Landlord, except that Landlord shall only be required to give two (2) such notices in any calendar year, and after two (2) such notices are given any failure by Tenant thereafter in such calendar year to pay Monthly Rent, Additional Rent or any other rent due hereunder when due shall itself constitute an Event of Default, without the requirement of notice from Landlord of such failure; or

(ii)    Tenant abandons the Premises and ceases to pay Rent; or

(iii)    Tenant fails to deliver any estoppel certificate pursuant to Paragraph 29 below, subordination agreement pursuant to Paragraph 21 above, or document required pursuant to Paragraph 22 above, within the applicable periods set forth therein; or

(iv)    Tenant violates the bankruptcy and insolvency provisions of Paragraph 24 above; or

(v)    Tenant makes or has made or furnishes or has furnished any warranty, representation or statement to Landlord in connection with this Lease, or any other agreement made by Tenant for the benefit of Landlord, which is or was intentionally false or misleading in any material respect when made or furnished; or

(vi)    Tenant assigns this Lease or subleases any portion of the Premises in violation of Paragraph 13 above; or

(vii)    The default by any guarantor, if any, of Tenant's obligations under this Lease of any provision of such guarantor's guaranty, or the attempted repudiation or revocation of any such guaranty or any provision thereof, or the application of items (iv) or (v) of this Paragraph 25.a. with the reference to "Tenant" therein being deemed to refer instead to such guarantor; or

(viii)    Intentionally omitted; or

(ix)    Tenant fails to comply with any other provision of this Lease in the manner and within the time required where such failure continues for thirty (30) days after written notice, or such longer period as is reasonable if such failure cannot reasonably be cured within such 30-day period, provided Tenant commences to cure such failure within such 30-day period and thereafter pursues such cure to completion, except that such thirty (30) day period shall be shortened as set forth in Landlord's written notice to Tenant as Landlord reasonably determines is necessary if waiting for such thirty (30) day period to expire would materially jeopardize the health, safety or quiet enjoyment of the

Building by its tenants and occupants or cause further material damage or loss to Landlord or the Real Property or result in any violation (or continuance of any violation) of any Legal Requirement.

b.    <u>Remedies</u>. Upon the occurrence of an Event of Default Landlord shall have the following remedies, which shall not be exclusive but shall be cumulative and shall be in addition to any other remedies now or hereafter allowed by law (including, without limitation, during any eviction moratorium, to the extent not prohibited by applicable Legal Requirements):

(i)    Landlord may terminate Tenant's right to possession of the Premises at any time by written notice to Tenant. Tenant expressly acknowledges that in the absence of such written notice from Landlord, no other act of Landlord, including, but not limited to, its re-entry into the Premises, its efforts to relet the Premises, its reletting of the Premises for Tenant's account, its storage of Tenant's personal property and trade fixtures, its acceptance of keys to the Premises from Tenant, its appointment of a receiver, or its exercise of any other rights and remedies under this Paragraph 25 or otherwise at law, shall constitute an acceptance of Tenant's surrender of the Premises or constitute a termination of this Lease or of Tenant's right to possession of the Premises.

Upon such termination in writing of Tenant's right to possession of the Premises, this Lease shall terminate and Landlord shall be entitled to recover damages from Tenant as provided in California Civil Code Section 1951.2 or any other applicable existing or future Legal Requirement providing for recovery of damages for such breach, including but not limited to the following:

1.    The reasonable cost of recovering the Premises; plus

2.    The reasonable cost of putting the Premises into the surrender condition required in this Lease; plus

3.    All unpaid rent due or earned hereunder prior to the date of termination, less the proceeds of any reletting or any rental received from subtenants prior to the date of termination applied as provided in Paragraph 25.b (ii) below, together with interest at the Interest Rate, on such sums from the date such rent is due and payable until the date of the award of damages; plus

4.    The amount by which the rent which would be payable by Tenant hereunder, including Additional Rent under Paragraph 7 above, as reasonably estimated by Landlord, from the date of termination until the date of the award of damages, exceeds the amount of such rental loss as Tenant proves could have been reasonably avoided, together with interest at the Interest Rate on such sums from the date such rent is due and payable until the date of the award of damages; plus

5.    The amount by which the rent which would be payable by Tenant hereunder, including Additional Rent under Paragraph 7 above, as reasonably estimated by Landlord, for the remainder of the then term, after the date of the award of damages exceeds the amount such rental loss as Tenant proves could have been reasonably avoided, discounted at the discount rate published by the Federal Reserve Bank of San Francisco for member banks at the time of the award plus one percent (1%); plus

6.    Such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law, including without limitation any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom.

(i)        Landlord has the remedy described in California Civil Code Section 1951.4 (a landlord may continue the lease in effect after the tenant's breach and abandonment and recover rent as it becomes due, if the tenant has the right to sublet and assign subject only to reasonable limitations), and may continue this Lease in full force and effect and may enforce all of its rights and remedies under this Lease, including, but not limited to, the right to recover rent as it becomes due. After the occurrence of an Event of Default, Landlord may enter the Premises without terminating this Lease and sublet all or any part of the Premises for Tenant's account to any person, for such term (which may be a period beyond the remaining term of this Lease), at such rents and on such other terms and conditions as Landlord reasonably deems advisable. In the event of any such subletting, rents received by Landlord from such subletting shall be applied (i) first, to the payment of the costs of maintaining, preserving and repairing the Premises for subletting, the other costs of subletting, including but not limited to reasonable brokers' commissions for the remainder of the Term, reasonable attorneys' fees and expenses of removal of Tenant's personal property, trade fixtures and Alterations (to the extent Tenant was required to remove the same at the expiration or earlier termination of the Lease); (ii) second, to the payment of rent then due and payable hereunder; (iii) third, to the payment of future rent as the same may become due and payable hereunder; (iv) fourth, the balance, if any, shall be paid to Tenant upon (but not before) expiration of the term of this Lease. If the rents received by Landlord from such subletting, after application as provided above, are insufficient in any month to pay the rent due and payable hereunder for such month, Tenant shall pay such deficiency to Landlord monthly upon demand. Notwithstanding any such subletting for Tenant's account without termination, Landlord may at any time thereafter, by written notice to Tenant, elect to terminate this Lease by virtue of a previous Event of Default.

During the continuance of an Event of Default, for so long as Landlord does not terminate Tenant's right to possession of the Premises and subject to Paragraph 13, entitled Assignment and Subletting, and the options granted to Landlord thereunder, Landlord shall not unreasonably withhold its consent to an assignment or sublease of Tenant's interest in the Premises or in this Lease.

(ii)       During the continuance of an Event of Default, Landlord may enter the Premises without terminating this Lease and remove all Tenant's personal property, Alterations and trade fixtures from the Premises and store them at Tenant's risk and expense. If Landlord removes such property from the Premises and stores it at Tenant's risk and expense, and if Tenant fails to pay the cost of such removal and storage after written demand therefor, then after the property has been stored for a period of thirty (30) days or more Landlord may sell such property at public or private sale, in the manner and at such times and places as Landlord deems commercially reasonable following reasonable notice to Tenant of the time and place of such sale. The proceeds of any such sale shall be applied first to the payment of the expenses for removal and storage of the property, the preparation for and the conducting of such sale, and for reasonable attorneys' fees and other legal expenses incurred by Landlord in connection therewith, and the balance shall be applied as provided in Paragraph 25.b.2. above.

Tenant hereby waives all claims for damages that may be caused by Landlord's reentering and taking possession of the Premises or removing and storing Tenant's personal property pursuant to this Paragraph 25, and Tenant shall indemnify, defend and hold Landlord harmless from and against any and all Claims resulting from any such act. No reentry by Landlord shall constitute or be construed as a forcible entry by Landlord.

(iii)      Landlord may require Tenant to remove any and all Alterations from the Premises which Tenant is required to remove at the expiration or earlier termination of this Lease, if any,

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(40)

or, if Tenant fails to do so within ten (10) days after Landlord's request, Landlord may do so at Tenant's expense.

(iv)    Landlord may cure the Event of Default at Tenant's expense, it being understood that such performance shall not waive or cure the subject Event of Default. If Landlord pays any sum or incurs any expense in curing the Event of Default, Tenant shall reimburse Landlord upon demand for the amount of such payment or expense with interest at the Interest Rate from the date the sum is paid or the expense is incurred until Landlord is reimbursed by Tenant. Any amount due Landlord under this subsection shall constitute additional rent hereunder.

c.    <u>Waiver of Redemption</u>. Tenant hereby waives, for itself and all persons claiming by and under Tenant, all rights and privileges which it might have under any present or future Legal Requirement to redeem the Premises or to continue this Lease after being dispossessed or ejected from the Premises.

d.    <u>Waiver of Consequential, Punitive and Special Damages</u>. Notwithstanding any other provision of this Lease, Tenant shall in no event be liable for any consequential damages, loss of business or profits, or any special or punitive damages except for those incurred in connection with a holdover of the Premises by Tenant after the expiration or earlier termination of this Lease pursuant to Paragraph 20.b. above. Tenant acknowledges and agrees that the accelerated rent damages recoverable by Landlord pursuant to California Civil Code Section 1951.2 are not consequential damages.

28.    <u>Damage or Destruction</u>. If all or any part of the Premises or any material portion of the balance of the Real Property is damaged by fire or other casualty, then within sixty (60) days of the date of the damage Landlord shall give Tenant notice of Landlord's reasonable estimate of the time required from the date of the damage to repair the damage (the "**Damage Estimate**"). If the Damage Estimate is two hundred seventy (270) days or less, this Lease shall remain in full force and effect, and if the fire or other casualty damages the Premises and/or areas of the Building and/or any portion of the Common Areas of the Real Property necessary for Tenant's use and occupancy of the Premises, then Landlord shall diligently proceed to repair the damage. If the Damage Estimate is more than two hundred seventy (270) days, Landlord, at its option exercised by written notice to Tenant within seventy-five (75) days of the date of the damage, shall either (i) continue this Lease in full force in effect, and, if the fire or other casualty damages the Premises and/or areas of the Building and/or any portion of the Common Areas of the Real Property necessary for Tenant's use, enjoyment and/or occupancy of the Premises, diligently proceed to repair the damage, or (ii) terminate this Lease as of the date specified by Landlord in the notice, which date shall be not less than thirty (30) days nor more than sixty (60) days after the date such notice is given, and this Lease shall terminate on the date specified in the notice; provided Landlord may only terminate this Lease if Landlord also terminates the leases of all similarly situated tenants whose leases are terminable pursuant to the express terms thereof.

29.    If (i) the Damage Estimate is more than two hundred seventy (270) days, the fire or other casualty damages the Premises and/or areas of the Building necessary for Tenant's use, enjoyment and/or occupancy of the Premises, and/ or the Common Areas of the Real Property that would be reasonably necessary for Tenant's use, enjoyment and/or occupancy of the Premises, or (ii) the fire or other casualty occurs during the last twelve (12) months of the Lease term, and the Damage Estimate indicates that the fire or other casualty damages the Premises and/or areas of the Building necessary for Tenant's use, enjoyment and/or occupancy of the Premises, and/ or the Common Areas of the Real Property that would be reasonably necessary for Tenant's use, enjoyment and/or occupancy of the

Premises cannot be repaired within ninety (90) days of the casualty, then in either event Tenant may give notice to Landlord, within thirty (30) days after Tenant's receipt of the Damage Estimate, terminating this Lease as of the date specified in Tenant's termination notice, which date shall not be before the date of Tenant's termination notice or more than thirty (30) days after the date of Tenant's termination notice. In addition, if Tenant was entitled to but elected not to exercise its right to terminate this Lease pursuant to the preceding sentence and Landlord does not substantially complete the repair and restoration of the Premises within sixty (60) after the expiration of the estimated period of time set forth in the Damage Estimate, which period shall be extended to the extent of any Reconstruction Delays (as defined below), then Tenant may terminate this Lease by written notice to Landlord within fifteen (15) days after the expiration of such period, as the same may be extended. For purposes of this Lease, the term "**Reconstruction Delays**" shall mean: (i) any delays caused by the insurance adjustment process; (ii) any delays caused by Tenant; and (iii) any delays caused by events of Force Majeure.

30.    Notwithstanding the foregoing, (x) Landlord shall not be obligated to repair or replace any of Tenant's movable furniture, equipment, trade fixtures, and other personal property (the performance of such repair to be performed by Tenant at Tenant's cost), and (y) although Landlord's contractor shall repair any above Building standard alterations installed in the Premises by or at the request of Tenant (including those installed by Landlord at Tenant's request, whether prior or subsequent to the commencement of the Lease term), the reasonable cost of the repairs to such above Building standard alterations shall be the responsibility of Tenant and Tenant shall assign to Landlord Tenant's insurance proceeds that are applicable to such costs (with any portion of the cost of the repairs to the above Building standard alterations that is not covered by Tenant's insurance to remain the responsibility of Tenant. Landlord shall not be required to commence repairs to any above Building standard alterations until Landlord has received the funds required for such work or has received reasonable assurance that the cost thereof will be timely paid to Landlord by Tenant's insurance company. No damage to any of Tenant's movable furniture, equipment, trade fixtures, and other personalty shall entitle Tenant to any rent abatement.

If the fire or other casualty damages the Premises or the Common Areas of the Real Property necessary for Tenant's use and occupancy of the Premises, Tenant ceases to use any portion of the Premises as a result of such damage, and the damage does not result from the willful misconduct of Tenant or any other Tenant Parties, then during the period the Premises or portion thereof are rendered unusable by such damage and repair, Tenant's Monthly Rent and Additional Rent under Paragraphs 5 and 7 above shall be proportionately reduced based upon the extent to which the damage and repair prevents Tenant from conducting, and Tenant does not conduct, its business at the Premises. Notwithstanding any contrary provision of this Paragraph 26, the parties hereby agree as follows: (i) the closure of the Building, the Common Areas, or any part thereof to protect public health or safety or to comply with changes in applicable Legal Requirements or applicable law shall not constitute a casualty for purposes of this Lease, (ii) casualty covered by this Paragraph 26 shall require that the physical or structural integrity of the Premises, the Building, or the Common Areas is degraded as a direct result of such occurrence, and (iii) a casualty under this Paragraph 26 shall not be deemed to occur merely because Tenant is unable to productively use the Premises if the events described in clause (i) above have occurred.

A total destruction of the Building shall automatically terminate this Lease. In no event shall Tenant be entitled to any compensation or damages from Landlord for loss of use of the whole or any part of the Premises or for any inconvenience occasioned by any such destruction, rebuilding or restoration of the Premises, the Building or access thereto, except for the rent abatement expressly provided above. Tenant hereby waives California Civil Code Sections 1932(2) and 1933(4), providing

for termination of hiring upon destruction of the thing hired and Sections 1941 and 1942, providing for repairs to and of premises.

31.     <u>Eminent Domain</u>.

a.      If all or any part of the Premises is taken by any public or quasi-public authority under the power of eminent domain, or any agreement in lieu thereof (a "**taking**"), this Lease shall terminate as to the portion of the Premises taken effective as of the date of taking. If only a portion of the Premises is taken, Tenant may terminate this Lease as to the remainder of the Premises upon written notice to the other party within ninety (90) days after the taking; provided, however, that Tenant's right to terminate this Lease is conditioned upon the remaining portion of the Premises being of such size or configuration that such remaining portion of the Premises is unusable or uneconomical for Tenant's business as determined by Tenant in Tenant's reasonable business discretion. Landlord shall be entitled to all compensation, damages, income, rent awards and interest thereon whatsoever which may be paid or made in connection with any taking and Tenant shall have no claim against Landlord or any governmental authority for the value of any unexpired term of this Lease or of any of the improvements or Alterations in the Premises not paid for by Tenant; provided, however, that the foregoing shall not prohibit Tenant from prosecuting a separate claim against the taking authority for an amount separately designated for Tenant's relocation expenses or the interruption of or damage to Tenant's business or as compensation for Tenant's personal property, trade fixtures, Alterations or other improvements paid for by Tenant so long as any award to Tenant will not reduce the award to Landlord.

In the event of a partial taking of the Premises which does not result in a termination of this Lease, the Monthly Rent and Additional Rent under Paragraphs 5 and 7 hereunder shall be equitably reduced and Landlord shall repair the Premises to an architectural whole as similar to the condition existing prior to the taking as is reasonably practicable. If all or any material part of the Real Property other than the Premises is taken, Landlord may terminate this Lease upon written notice to Tenant given within ninety (90) days after the date of taking.

b.      Notwithstanding the foregoing, if all or any portion of the Premises is taken for a period of time of one (1) year or less ending prior to the end of the term of this Lease, this Lease shall remain in full force and effect and Tenant shall continue to pay all rent and to perform all of its obligations under this Lease; provided, however, that Tenant shall be entitled to all compensation, damages, income, rent awards and interest thereon that is paid or made in connection with such temporary taking of the Premises (or portion thereof), except that any such compensation in excess of the rent or other amounts payable to Landlord hereunder shall be promptly paid over to Landlord as received. Landlord and Tenant each hereby waive the provisions of California Code of Civil Procedure Section 1265.130 and any other applicable existing or future Legal Requirement providing for, or allowing either party to petition the courts of the state in which the Real Property is located for, a termination of this Lease upon a partial taking of the Premises and/or the Building. Notwithstanding any contrary provision of this Lease, the following governmental actions shall not constitute a taking or condemnation, either permanent or temporary: (i) a change in applicable Legal Requirements that requires Tenant's business or the Building to close for any period during the Lease term, and (ii) a change in applicable Legal Requirements that is promulgated in whole or in part for the purpose of protecting public health or safety (including, without limitation, to protect against acts of war, the spread of communicable diseases, or an infestation), and no such changes, or actions taken to implement them shall entitle Tenant to any compensation from Landlord or any authority, or to rent abatement or any other remedy under this Lease.

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(43)

32.     Landlord's Liability; Sale of Building. The term "Landlord," as used in this Lease, shall mean only the owner or owners of the Real Property at the time in question. Notwithstanding any other provision of this Lease, the liability of Landlord for its obligations under this Lease is limited solely to Landlord's interest in the Real Property as the same may from time to time be encumbered, including the rents, issues, profits, and proceeds therefrom, and no personal liability shall at any time be asserted or enforceable against any other assets of Landlord or against the constituent shareholders, partners, members, or other owners of Landlord, or the directors, officers, employees and agents of Landlord or such constituent shareholder, partner, member or other owner, on account of any of Landlord's obligations or actions under this Lease. In addition, in the event of any conveyance of title to the Real Property, then the grantor or transferor shall be relieved of all liability with respect to Landlord's obligations to be performed under this Lease after the date of such conveyance, provided the grantee or transferee assumes the obligations of Landlord from the date of such conveyance. In no event shall Landlord be deemed to be in default under this Lease unless Landlord fails to perform its obligations under this Lease, Tenant delivers to Landlord written notice specifying the nature of Landlord's alleged default, and Landlord fails to cure such default within thirty (30) days following receipt of such notice (or, if the default cannot reasonably be cured within such period, to commence action within such thirty (30)-day period and proceed diligently thereafter to cure such default). Except where the provisions of this Lease grant Tenant an express, exclusive remedy, or expressly deny Tenant a remedy, Tenant's exclusive remedy for Landlord's failure to perform its obligations under this Lease shall be limited to actual damages, injunctive relief, or specific performance; in each case, Landlord's liability or obligations with respect to any such remedy shall be limited as provided in this Paragraph 28. Upon any conveyance of title to the Real Property, the grantee or transferee shall be deemed to have assumed Landlord's obligations to be performed under this Lease from and after the date of such conveyance, subject to the limitations on liability set forth above in this Paragraph 28. If Tenant provides Landlord with any security for Tenant's performance of its obligations hereunder, Landlord shall transfer such security to the grantee or transferee of Landlord's interest in the Real Property, and upon such transfer Landlord shall be released from any further responsibility or liability for such security. Notwithstanding any other provision of this Lease, but not in limitation of the provisions of Paragraph 14.a. above, Landlord shall not be liable for any consequential damages or interruption or loss of business, income or profits, or claims of constructive eviction, nor shall Landlord be liable for loss of or damage to artwork, currency, jewelry, bullion, unique or valuable documents, securities or other valuables, or for other property not in the nature of ordinary fixtures, furnishings and equipment used in general administrative and executive office activities and functions (all of the foregoing, collectively, "**Special Claims**"), except to the extent caused by Landlord's gross negligence or willful conduct. Wherever in this Lease Tenant (a) releases Landlord from any claim or liability, (b) waives or limits any right of Tenant to assert any claim against Landlord or to seek recourse against any property of Landlord or (c) agrees to indemnify Landlord against any matters, the relevant release, waiver, limitation or indemnity shall run in favor of and apply to Landlord, the constituent shareholders, partners, members, or other owners of Landlord, and the directors, officers, employees and agents of Landlord and each such constituent shareholder, partner, member or other owner.

33.     Estoppel Certificates. At any time and from time to time, upon not less than fifteen (15) days' prior notice from Landlord, Tenant shall execute, acknowledge and deliver to Landlord a statement certifying the commencement date of this Lease, stating that this Lease is unmodified and in full force and effect (or if there have been modifications, that this Lease is in full force and effect as modified and the date and nature of each such modification), that Landlord is not in default under this Lease (or, if Landlord is in default, specifying the nature of such default), that Tenant is not in default under this Lease (or, if Tenant is in default, specifying the nature of such default), the current amounts of and the dates to

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(44)

which the Monthly Rent and Additional Rent has been paid, and setting forth such other matters as may be reasonably requested by Landlord. The aforesaid fifteen-day period shall not commence until Landlord has provided Tenant with a draft of the requested estoppel statement sent to laverlenden@elfbeauty.com, SMilsten@elfbeauty.com, and lease-admin@r-lg.com. Any such statement may be conclusively relied upon by a prospective purchaser of the Real Property or by a lender obtaining a lien on the Real Property as security. If Tenant fails to deliver such statement within the time required hereunder, and such failure continues for five (5) Business Days after a second written notice from Landlord, then such failure shall be conclusive upon Tenant that (i) this Lease is in full force and effect, without modification except as may be represented by Landlord, (ii) there are no uncured defaults in Landlord's performance of its obligations hereunder except as may be represented by Landlord, (iii) not more than one month's installment of Monthly Rent has been paid in advance, and (iv) any other statements of fact included by Landlord in such statement are correct. Landlord shall provide a similar statement within thirty (30) days of Tenant's written request.

34.    <u>Right of Landlord to Perform</u>. If Tenant fails to make any payment required hereunder (other than Monthly Rent and Additional Rent) or fails to perform any other of its obligations, Landlord may, but shall not be obliged to, and without waiving any default of Tenant or releasing Tenant from any obligations to Landlord hereunder, make any such payment or perform any other such obligation on Tenant's behalf; provided, however, that unless Landlord notifies Tenant in writing that in Landlord's reasonable good faith judgment earlier payment or performance is required by reason of emergency, or to preclude imminent jeopardy to the health, safety or quiet enjoyment of the Building by its tenants or occupants or further damage or loss to Landlord or the Project, then Landlord shall provide Tenant with not less than fifteen (15) days prior written notice (provided, however, if such obligation cannot reasonably be completed within such 15-day period, then Tenant shall have such additional time as is reasonably necessary, provided Tenant commences to perform such obligation within such 15 day period and thereafter diligently pursues the completion of such obligation), that Landlord will make such payment or perform such obligation on Tenant's behalf if the same is not paid or performed by Tenant prior to the expiration of such fifteen (15) day notice period, it being agreed that any notices delivered by Landlord to Tenant pursuant to this Paragraph 30 shall conspicuously state the nature of the issue and timing involved with respect to such matter. Tenant shall pay to Landlord, within thirty (30) days of Landlord's written demand therefor, one hundred ten percent (110%) of all reasonable out-of-pocket sums so paid by Landlord and all necessary incidental costs incurred by Landlord in connection with the performance by Landlord of an obligation of Tenant. If such sum is not paid by Tenant within the required thirty (30) day period, interest shall accrue on such sum at the Interest Rate from the end of such thirty (30) day period until paid by Tenant. Further, Tenant's failure to make such payment within such thirty (30) day period shall entitle Landlord to the same rights and remedies provided Landlord in the event of non-payment of rent.

35.    <u>Late Charge; Late Payments</u>. Tenant acknowledges that late payment of any installment of Monthly Rent or Additional Rent or any other amount required under this Lease will cause Landlord to incur costs not contemplated by this Lease and that the exact amount of such costs would be extremely difficult and impracticable to fix. Such costs include, without limitation, processing and accounting charges, late charges that may be imposed on Landlord by the terms of any encumbrance or note secured by the Real Property and the loss of the use of the delinquent funds. Therefore, if any installment of Monthly Rent or Additional Rent or any other amount due from Tenant is not received when due, Tenant shall pay to Landlord on demand, on account of the delinquent payment, an additional sum equal to the greater of (i) five percent (5%) of the overdue amount, or (ii) One Hundred Dollars ($100.00), which additional sum represents a fair and reasonable estimate of the costs that Landlord will incur by reason of

late payment by Tenant. Notwithstanding the foregoing, Landlord shall give Tenant notice of non-payment of any Monthly Rent, Additional Rent or other payments required of Tenant under this Lease and five (5) Business Days after delivery of such notice to cure such non-payment twice in each calendar year before assessing the late charge in such calendar year pursuant to this Paragraph 31. Acceptance of any late charge shall not constitute a waiver of Tenant's default with respect to the overdue amount, nor prevent Landlord from exercising its right to collect interest as provided above, rent, or any other damages, or from exercising any of the other rights and remedies available to Landlord.

36.    Attorneys' Fees; Waiver of Jury Trial. In the event of any action or proceeding between Landlord and Tenant (including an action or proceeding between Landlord and the trustee or debtor in possession while Tenant is a debtor in a proceeding under any bankruptcy law) to enforce any provision of this Lease, the losing party shall pay to the prevailing party all costs and expenses, including, without limitation, reasonable attorneys' fees and expenses, incurred in such action and in any appeal in connection therewith by such prevailing party. The "**prevailing party**" will be determined by the court before whom the action was brought based upon an assessment of which party's major arguments or positions taken in the suit or proceeding could fairly be said to have prevailed over the other party's major arguments or positions on major disputed issues in the court's decision. Notwithstanding the foregoing, however, Landlord shall be deemed the prevailing party in any unlawful detainer or other action or proceeding instituted by Landlord based upon any default or alleged default of Tenant hereunder if (i) judgment is entered in favor of Landlord, or (ii) prior to trial or judgment Tenant pays all or any portion of the rent claimed by Landlord, vacates the Premises, or otherwise cures the default claimed by Landlord.

IF ANY ACTION OR PROCEEDING BETWEEN LANDLORD AND TENANT TO ENFORCE THE PROVISIONS OF THIS LEASE (INCLUDING AN ACTION OR PROCEEDING BETWEEN LANDLORD AND THE TRUSTEE OR DEBTOR IN POSSESSION WHILE TENANT IS A DEBTOR IN A PROCEEDING UNDER ANY BANKRUPTCY LAW) PROCEEDS TO TRIAL, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, LANDLORD AND TENANT HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY IN SUCH TRIAL. Landlord and Tenant agree that this paragraph constitutes a written consent to waiver of trial by jury within the meaning of California Code of Civil Procedure Section 631(d)(2), and each party does hereby authorize and empower the other party to file this paragraph and/or this Lease, as required, with the clerk or judge of any court of competent jurisdiction as a written consent to waiver of jury trial.

37.    Waiver. No provisions of this Lease shall be deemed waived by Landlord or Tenant unless such waiver is in a writing signed by the waiving party. The waiver by Landlord or Tenant of any breach of any provision of this Lease shall not be deemed a waiver of any subsequent breach of the same or any other provision of this Lease. No delay or omission in the exercise of any right or remedy of Landlord or Tenant upon any default by Landlord or Tenant, as applicable, shall impair such right or remedy or be construed as a waiver. Landlord's acceptance of any payments of rent due under this Lease shall not be deemed a waiver of any default by Tenant under this Lease (including Tenant's recurrent failure to timely pay rent) other than Tenant's nonpayment of the accepted sums, and no endorsement or statement on any check or accompanying any check or payment shall be deemed an accord and satisfaction. Landlord's consent to or approval of any act by Tenant requiring Landlord's consent or approval shall not be deemed to waive or render unnecessary Landlord's consent to or approval of any subsequent act by Tenant. Tenant's consent to or approval of any act by Landlord requiring Tenant's consent or approval shall not be deemed to waive or render unnecessary Tenant's consent to or approval of any subsequent act by Landlord.

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(46)

38.     Notices. All notices and demands which may or are required to be given by either party to the other hereunder shall be in writing. All notices and demands by Landlord to Tenant shall be delivered personally or sent by United States mail, postage prepaid, or by any reputable overnight or same-day courier, addressed to Tenant at: E.L.F. Cosmetics., Inc., 570 10th Street, Oakland, CA 94607, Attention: Scott Milsten and Lane Verlenden; and a courtesy copy of all default notices applicable to Tenant sent via email at the same time, to Ravid Law Group at lease-admin@r-lg.com, or to such other place as Tenant may from time to time designate by notice to Landlord hereunder. All notices and demands by Tenant to Landlord shall be sent by United States mail, postage prepaid, or by any reputable overnight or same-day courier, addressed to Landlord in care of Shorenstein Company LLC, 235 Montgomery Street, [1]6th floor, San Francisco, California 94104, Attn: Corporate Secretary, with a copy to the management office of the Building, or to such other place as Landlord may from time to time designate by notice to Tenant hereunder. Notices delivered personally or sent same-day courier will be effective immediately upon delivery to the addressee at the designated address; notices sent by overnight courier will be effective one (1) Business Day after acceptance by the service for delivery; notices sent by mail will be effective two (2) Business Days after mailing. In the event Tenant requests multiple notices hereunder, Tenant will be bound by such notice from the earlier of the effective times of the multiple notices.

39.     Independent Covenants. This Lease shall be construed as though the covenants herein between Landlord and Tenant are independent and not dependent and Tenant hereby expressly waives the benefit of any statute to the contrary and agrees that if Landlord fails to perform its obligations set forth herein, Tenant shall not be entitled to make any repairs or perform any acts hereunder at Landlord's expense or to any setoff of the Rent or other amounts owing hereunder against Landlord except as expressly provided in this Lease.

40.     Defined Terms and Marginal Headings. When required by the context of this Lease, the singular includes the plural. If more than one person or entity signs this Lease as Tenant or Landlord, the obligations hereunder imposed upon Tenant or Landlord (as applicable) shall be joint and several, and the act of, written notice to or from, refund to, or signature of, any Tenant or Landlord signatory to this Lease (including, without limitation, modifications of this Lease made by fewer than all such signatories) shall bind every other Tenant or Landlord signatory (as applicable) as though every other signatory had so acted, or received or given the written notice or refund, or signed. The headings and titles to the paragraphs of this Lease are for convenience only and are not to be used to interpret or construe this Lease. Wherever the term "including" or "includes" is used in this Lease it shall be construed as if followed by the phrase "without limitation." Whenever in this Lease a right, option or privilege of Tenant is conditioned upon Tenant (or any affiliate thereof or successor thereto) being in "occupancy" of a specified portion or percentage of the Premises, for such purposes "**occupancy**" shall mean Tenant's (or such affiliate's or successor's) physical occupancy of the space for the conduct of such party's business, and shall not include any space that is subject to a sublease or that has been vacated by such party, other than a vacation of the space as reasonably necessary in connection with the performance of approved Alterations or by reason of a fire or other casualty or a taking. The language in all parts of this Lease shall in all cases be construed as a whole and in accordance with its fair meaning and not construed for or against any party simply because one party was the drafter thereof.

41.     Time and Applicable Law. Time is of the essence of this Lease and of each and all of its provisions. This Lease shall be governed by and construed in accordance with the laws of the State of California, and the venue of any action or proceeding under this Lease shall be the City and County of San Francisco, California.

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(47)

42.    <u>Successors</u>. Subject to the provisions of Paragraphs 13 and 28 above, the covenants and conditions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors, executors, administrators and assigns.

43.    <u>Entire Agreement; Modifications</u>. This Lease (including any exhibit, rider or attachment hereto) constitutes the entire agreement between Landlord and Tenant with respect to Tenant's lease of the Premises. No provision of this Lease may be amended or otherwise modified except by an agreement in writing signed by the parties hereto. Neither Landlord nor Landlord's agents have made any representations or warranties with respect to the Premises, the Building, the Real Property or this Lease except as expressly set forth herein, including without limitation any representations or warranties as to the suitability or fitness of the Premises for the conduct of Tenant's business or for any other purpose, nor has Landlord or its agents agreed to undertake any alterations or construct any improvements to the Premises except those, if any, expressly provided in this Lease, and no rights, easements or licenses shall be acquired by Tenant by implication or otherwise unless expressly set forth herein. Neither this Lease nor any memorandum hereof shall be recorded by Tenant or Landlord without the consent of the other party.

44.    <u>Light and Air</u>. Tenant agrees that no diminution of light, air or view by any structure which may hereafter be erected (whether or not by Landlord) shall entitle Tenant to any reduction of rent hereunder, result in any liability of Landlord to Tenant, or in any other way affect this Lease.

45.    <u>Name of Building; Tenant's Trademarks</u>. Tenant shall not use the name of the Building for any purpose other than as the address of the business conducted by Tenant in the Premises without the written consent of Landlord. Landlord reserves the right to change the name of the Building at any time in its sole discretion by written notice to Tenant and Landlord shall not be liable to Tenant for any loss, cost or expense on account of any such change of name. Landlord shall not have the right to use Tenant's trade name, trademarks or logo ("**Tenant's Trademarks**"), nor shall the Tenant's Trademarks be used by Landlord in advertising nor in any other manner without the prior written consent of Tenant, which shall not be unreasonably withheld or delayed.

46.    <u>Severability</u>. If any provision of this Lease or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Lease and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

47.    <u>Authority</u>. If Tenant is a corporation, partnership, trust, association or other entity, Tenant hereby covenants and warrants that (a) Tenant is duly incorporated or otherwise established or formed and validly existing under the laws of its state of incorporation, establishment or formation, (b) Tenant has and is duly qualified to do business in the state in which the Real Property is located, (c) Tenant has full corporate, partnership, trust, association or other appropriate power and authority to enter into this Lease and to perform all Tenant's obligations hereunder, and (d) each person (and all of the persons if more than one signs) signing this Lease on behalf of Tenant is duly and validly authorized to do so. If Landlord is a corporation, partnership, trust, association or other entity, Landlord hereby covenants and warrants that (a) Landlord is duly incorporated or otherwise established or formed and validly existing under the laws of its state of incorporation, establishment or formation, (b) Landlord has and is duly qualified to do business in the state in which the Real Property is located, (c) Landlord has full corporate, partnership, trust, association or other appropriate power and authority to enter into this Lease and to perform all Landlord's obligations hereunder, and (d) each person (and all of the persons if more

than one signs) signing this Lease on behalf of Landlord is duly and validly authorized to do so. Landlord warrants and represents to Tenant that the Landlord is solely vested with fee simple title to the Premises and the Real Property and has full right and lawful authority to lease the Premises to Tenant.

48.    No Offer. Submission of this instrument for examination and signature by Tenant does not constitute an offer to lease or a reservation of or option for lease, and is not effective as a lease or otherwise until execution and delivery by both Landlord and Tenant.

49.    Real Estate Brokers. Tenant represents and warrants that it has negotiated this Lease directly with the real estate broker(s) identified in Paragraph 2 and has not authorized or employed, or acted by implication to authorize or to employ, any other real estate broker or salesman to act for Tenant in connection with this Lease. Landlord represents and warrants that it has negotiated this Lease directly with the real estate broker(s) identified in Paragraph 2 and has not authorized or employed, or acted by implication to authorize or to employ, any other real estate broker or salesman to act for Landlord in connection with this Lease. Each party shall hold the other harmless from and indemnify and defend the other against any and all Claims by any real estate broker or salesperson other than the Real Estate Broker(s) identified in Paragraph 2 for a commission, finder's fee or other compensation as a result of the inaccuracy of such party's representation above. Landlord shall pay Tenant's Broker a commission (the "**Brokerage Commission**") in connection with this Lease pursuant to a separate written agreement between Landlord and Tenant's Broker (the "**Commission Agreement**"). If Landlord fails to timely pay the Brokerage Commission within the time period specified in the Commission Agreement, which failure continues for twenty (20) days after written demand from Tenant's Broker, then Tenant shall have the right, upon written notice to Landlord, to pay the unpaid Brokerage Commission to Tenant's Broker and offset such amount so paid against Monthly Rent due under this Lease until such amount is exhausted; however, Landlord shall have the option to reimburse Tenant for the amount so paid, in which case, the credit against Monthly Rent shall thereafter be null and void). If Tenant pays the Brokerage Commission as set forth above, Tenant shall promptly notify Landlord of the same and provide evidence of payment to Landlord.

50.    Consents and Approvals. Wherever the consent, approval, judgment or determination of Landlord is required or permitted under this Lease, Landlord shall act reasonably in granting or withholding such consent or approval or in making such judgment or determination, unless the provision providing for such consent, approval, judgment or determination specifies that Landlord's consent or approval may be withheld in Landlord's sole and absolute discretion, or otherwise specifies the standards under which Landlord may withhold its consent. Whenever the Lease grants Landlord or Tenant the right to take action, exercise discretion, establish rules and regulations or make allocations or other determinations (other than decisions to exercise expansion, contraction, cancellation, termination or renewal options), Landlord and Tenant shall act reasonably and in good faith and take no action which might result in the frustration of the reasonable expectations of a sophisticated tenant or landlord concerning the benefits to be enjoyed under the Lease. The review and/or approval by Landlord of any item shall not impose upon Landlord any liability for accuracy or sufficiency of any such item or the quality or suitability of such item for its intended use. Any such review or approval is for the sole purpose of protecting Landlord's interest in the Real Property, and neither Tenant nor any Tenant Party nor any person or entity claiming by, through or under Tenant, nor any other third party shall have any rights hereunder by virtue of such review and/or approval by Landlord.

51.     Reserved Rights. Landlord retains and shall have the rights set forth below, exercisable without notice and without liability to Tenant for damage or injury to property, person or business and without giving rise to any claim for rent abatement, except as expressly provided in this Lease:

a.     To grant to anyone the exclusive right to conduct any business or render any service in or to the Building and its tenants, provided that such exclusive right shall not operate to require Tenant to use or patronize such business or service or to exclude Tenant from its use of the Premises expressly permitted herein.

b.     To reduce, increase, enclose or otherwise change at any time and from time to time the size, number, location, lay-out and nature of the Common Areas and facilities and other tenancies and premises in the Real Property and to create additional rentable areas through use or enclosure of Common Areas; however, such actions shall not materially adversely affect Tenant's access to or use of the Premises for the Permitted Use or Tenant's access to, or use of, the parking facilities or that would materially increase Tenant's obligations under the Lease or materially decrease Tenant's rights under the Lease. Further, subject to the preceding sentence. Further, Landlord may allow tenants of any retail or food establishment at the Building to use portions of the Common Areas to increase display space, take out or ordering areas, or eating areas while complying with applicable Legal Requirements; any such use of the Common Areas by retail tenants shall not modify any tenant's obligations relating to the payment of Operating Expenses.

c.     If portions of the Real Property or property adjacent to the Real Property (collectively, the "**Other Improvements**") are owned by an entity other than Landlord, Landlord, at its option, in its sole and absolute discretion, may enter into an agreement with the owner or owners of any or all of the Other Improvements to provide (i) for reciprocal rights of access and/or use of the Real Property and the Other Improvements, (ii) for the common management, operation, maintenance, improvement and/or repair of all or any portion of the Real Property and the Other Improvements, (iii) for the equitable allocation of a portion of the Operating Expenses to the Other Improvements and the operating expenses and taxes for the Other Improvements to the Real Property, and (iv) for the use or improvement of the Other Improvements and/or the Real Property in connection with the improvement, construction, and/or excavation of the Other Improvements and/or the Real Property. Nothing contained herein shall be deemed or construed to limit or otherwise affect Landlord's right to convey all or any portion of the Real Property or any other of Landlord's rights described in this Lease.

52.     Financial Statements. Note more than once per year, in connection with a sale, financing, or refinancing of the Real Property or an Event of Default, within thirty (30) days after Landlord's request therefor, Tenant shall furnish to Landlord copies of true and accurate financial statements reflecting Tenant's then current financial situation (including without limitation balance sheets, statements of profit and loss, and changes in financial condition), Tenant's most recent audited or certified annual financial statements and in addition shall cause to be furnished to Landlord similar financial statements and tax returns for any guarantor(s) of this Lease, if any. As a condition to providing such financial statements, Tenant may require that Landlord and/or Landlord's lender, prospective lender, purchaser, or prospective purchaser, execute a commercially reasonable confidentiality agreement. Notwithstanding the foregoing, Tenant shall not be required to furnish any such financial statements if (i) Tenant is publicly traded on a nationally recognized stock exchange, or (ii)(A) Tenant's parent company, e.l.f Beauty, Inc. ("**Tenant's Parent**"), is publicly traded on a nationally recognized stock exchange, (B) Tenant's Parent's financial statements are publicly available, and (C) Tenant accounts for at least ninety percent (90%) of the revenue reflected on Tenant's Parent's financial statement.

53.    Intentionally Omitted.

54.    Nondisclosure of Lease Terms. Landlord and Tenant agrees that the terms of this Lease are confidential and constitute proprietary information of Landlord and Tenant, and that disclosure of the terms hereof could adversely affect the ability of Landlord to negotiate with other tenants or the ability of Tenant to negotiate with other landlords. Tenant hereby agrees that Tenant and its partners, officers, directors, employees, agents, real estate brokers and sales persons and attorneys shall not disclose the terms of this Lease to any other person without Landlord's prior written consent, except to any accountants of Tenant in connection with the preparation of Tenant's financial statements or tax returns, to an assignee of this Lease or sublessee of the Premises, or to an entity or person to whom disclosure is required by applicable law or in connection with any action brought to enforce this Lease or as required to comply with reporting requirements for publicly traded companies.

55.    Hazardous Substance Disclosure. California law requires landlords to disclose to tenants the existence of certain hazardous substances. Accordingly, the existence of gasoline and other automotive fluids, maintenance fluids, copying fluids and other office supplies and equipment, certain construction and finish materials, tobacco smoke, cosmetics and other personal items, and asbestos-containing materials ("**ACM**") must be disclosed. Gasoline and other automotive fluids are found in the garage area of the Building. Cleaning, lubricating and hydraulic fluids used in the operation and maintenance of the Real Property are found in the utility areas of the Real Property not generally accessible to Real Property occupants or the public. Many Building occupants use copy machines and printers with associated fluids and toners, and pens, markers, inks, and office equipment that may contain hazardous substances. Certain adhesives, paints and other construction materials and finishes used in portions of the Real Property may contain hazardous substances. Although smoking is prohibited in the public areas of the Real Property, these areas may, from time to time, be exposed to tobacco smoke. Real Property occupants and other persons entering the Real Property from time-to-time may use or carry prescription and non-prescription drugs, perfumes, cosmetics and other toiletries, and foods and beverages, some of which may contain hazardous substances. Landlord has made no special investigation of the Premises with respect to any hazardous substances.

56.    Signage Rights.

a.    Except to the extent expressly provided in this Paragraph 52, Tenant shall not (i) place or install (or permit to be placed or installed by any Tenant Party) any signs, advertisements, logos, identifying materials, pictures or names of any type on the roof, exterior areas or Common Areas of the Building or the Real Property or in any area of the Building, Premises or Real Property which is visible from the exterior of the Building or outside of the Premises or (ii) place or install (or permit to be placed or installed by any Tenant Party) in or about any portion of the Premises any window covering (even if behind Building standard window coverings) or any other material visible from outside of the Premises or from the exterior of the Building.

b.    Subject to compliance with applicable Legal Requirements and such Building signage criteria as Landlord shall apply from time to time and subject to receipt of Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed: (i) in the case where Tenant occupies an entire floor in the Building, Tenant may, at Tenant's sole cost and expense, place in any portion of such floor or on the elevator lobby on such floor which is not visible from the exterior of the Building such identification signage as Tenant shall desire, including in the elevator lobby on the floor on which the Premises is located, and (ii) Landlord shall, at Landlord's sole cost and expense,

(A) install Building standard directional signage for the Premises, and (B) install at the entry to the Premises suite identification signage identifying Tenant that is in compliance with Landlord's signage program (as the same may exist from time to time). All signage described in this Paragraph 52 shall be treated as Tenant's personal property under the provisions of Paragraph 20.a. above with respect to Tenant's obligations at the expiration or early termination of this Lease.

57.    Parking.

a.    The Building Parking Garage consists of two (2) levels of underground parking directly beneath the Building. Commencing upon the Commencement Date and continuing throughout the term of this Lease, Landlord shall lease to Tenant, and Tenant shall lease from Landlord, on an unassigned, non-exclusive and un-labeled basis, 0.70 parking spaces for each 1,000 rentable square feet, of which one-half shall be in the Building Parking Garage (the "**Building Parking Spaces**") and one-half of the parking spaces shall be in the parking garage known as "**Garage West**" located across the street from the Building (the "**Garage West Parking Spaces**"). For the avoidance of doubt, as of the Commencement Date, Tenant shall be entitled to twenty (20) total parking spaces (ten (10) Building Parking Spaces and ten (10) Garage West Parking Spaces). Tenant shall pay Landlord or the operator of the Building Parking Garage or Garage West, as applicable, and as directed by Landlord, for the parking spaces leased by Tenant hereunder at the rate or charge in effect from time to time for parking in the Parking Facilities for the type of space leased. As of the date hereof, Landlord's prevailing charge for an unassigned parking space in the Building Parking Garage or Garage West, as applicable, for the type of space leased. The monthly rate for parking spaces in the Building Parking Garage is estimated to be $250.00 per parking space on the Commencement Date. The monthly rate imposed by Landlord for the Garage West Parking Spaces shall be equal to the rate that is charged to Landlord by the City of Oakland for the use of such parking spaces, without mark-up. The parking charges payable by Tenant shall include the taxes, assessments or other impositions imposed by any governmental entity in connection with Tenant's use of the parking spaces. Landlord shall use commercially reasonable efforts, at no additional cost or expense to Landlord, to assist Tenant with increasing the total number of parking spaces in Garage West such that Tenant will achieve a combined parking ratio between the Building Parking Garage and Garage West of 1.0 parking spaces per 1,000 rentable square feet of the Premises; however, Landlord does not guarantee that the same will be achievable and in no event shall Landlord be in default under this Lease or incur any liability if Tenant is unable to secure such additional parking rights. In addition, if additional parking spaces are available in the Building Parking Garage, then Tenant shall have the opportunity to lease the same. Notwithstanding anything to the contrary contained in the Lease (subject to any temporary shutdown for repairs, for security purposes, for compliance with any legal restrictions, or Force Majeure, or other causes beyond the reasonable control of Landlord), Tenant's parking privileges shall be available to Tenant twenty-four (24) hours per day, seven (7) days per week, every day of the year. Should Landlord provide reserved, segregated, preferred, priority, valet or block parking to any other tenant of the Building, the same shall be made available to Tenant. Any time and from time to time during the Lease term, Tenant may decrease or, subject to then current availability at the parking facilities, increase the number of parking spaces up to the maximum permitted under this Paragraph 53 by giving thirty (30) days' written notice to Landlord.

Notwithstanding the above, Tenant shall not be required to lease the parking space provided above, but if Tenant does not accept (and commence payment for) such parking space(s) within sixty (60) days after the Commencement Date, any such parking space(s) shall be permanently forfeited.

If requested by Tenant's employees from time-to-time, Landlord shall cause its Building personnel to escort Tenant's employees from the Building to the Building Parking Garage or Garage West.

b.      Tenant shall provide Landlord with advance written notice of the names of each individual to whom Tenant from time to time distributes Tenant's parking rights hereunder, and shall cause each such individual to execute the standard waiver form for garage users used in the Building Parking Garage or Garage West, as applicable. If the parking charge for a particular parking space is not paid when due, and such failure continues for ten (10) days after written notice to Tenant of such failure, then in addition to any other remedies afforded Landlord under this Lease by reason of nonpayment of rent, Landlord may terminate Tenant's rights under this Paragraph 53 as to such parking space. Further, if at any time after the date which is sixty (60) days after the Commencement Date, Tenant releases to Landlord any parking space provided for in this Paragraph 53, then Tenant's right under this Paragraph 53 to use such released parking space shall automatically forever terminate, unless Landlord then has available parking spaces to provide to Tenant at Tenant's written request, delivered at least thirty (30) days in advance.

c.      The unassigned parking spaces to be made available to Tenant hereunder may contain a reasonable mix of spaces for compact cars. Landlord shall take reasonable actions to ensure the availability of the parking spaces leased by Tenant, but Landlord does not guarantee the availability of those spaces at all times against the actions of other tenants of the Real Property and users of the Building Parking Garage or Garage West. Without limiting the foregoing, in no event shall this Lease be void or voidable, nor shall Landlord be liable to Tenant for any loss or damage, nor shall there be any abatement of rent hereunder (other than the parking charge paid hereunder for any parking space no longer made available), by reason of any reduction in Tenant's parking rights hereunder by Force Majeure or any other cause beyond the reasonable control of Landlord. Access to the parking spaces to be made available to Tenant shall, at Landlord's option, be by card, pass, bumper sticker, decal or other appropriate identification issued by Landlord, and Tenant's right to use the Building Parking Garage and Garage West, as applicable, is conditioned on Tenant's abiding by and shall otherwise be subject to such reasonable rules and regulations as may be promulgated by the operator of the subject facility. If applicable, Tenant's employees and occupants shall only have the right to park in Tenant's designated area(s). Landlord shall have the right to reasonably modify, change, add to or delete the design, configuration, layout, size, ingress, egress, areas, method of operation, and other characteristics of or relating to the Building Parking Garage or Garage West at any time, and/or to provide for nonuse, partial use or restricted use of portions thereof.

d.      The parking rights provided to Tenant pursuant to this Paragraph 53 are provided to Tenant solely for use by officers, directors, agents, contractors and employees of Tenant, and Tenant's permitted subtenants and assignees, and such rights may not otherwise be transferred, assigned, subleased or otherwise alienated by Tenant to any other type of transferee without Landlord's prior written approval, which may be withheld in Landlord's sole discretion.

e.      Tenant's business visitors may park in the visitor parking provided by Landlord for the Building, on a space-available basis, upon payment of the prevailing fee for parking charged to visitors to the Building. Tenant may validate visitor parking by such method or methods as the Landlord may establish, at the validation rate then charged by Landlord to other tenants leasing similarly sized premises from time to time generally applicable to visitor parking.

f.      Tenant's employees shall have the right to utilize Tenant's parking privileges within the Building Parking Garage or Garage West in the ordinary course and to leave their vehicles overnight when Tenant's employees are on business trips or vacations.

58.     Transportation Management. To the extent applicable to Tenant, Tenant shall fully comply with all present or future programs imposed by applicable Legal Requirements intended to manage parking, transportation or traffic in and around the Real Property, and in connection therewith, Tenant shall take responsible action for the transportation planning and management of all employees located at the Premises by working directly with Landlord, any governmental transportation management organization or any other transportation-related committees or entities, as required.

59.     Renovation of the Real Property and Other Improvements. Tenant acknowledges that portions of the Building, Real Property and/or the Other Improvements (as defined in Paragraph 47.d. above) may be under construction following Tenant's occupancy of the Premises, and that such construction may result in levels of noise, dust, obstruction of access, etc. which are in excess of that present in a fully constructed project. It is agreed and acknowledged that no representations respecting the condition of the Premises, the Building or the Real Property have been made by Landlord to Tenant except as specifically set forth in this Lease. Tenant acknowledges and agrees that Landlord may alter, remodel, improve and/or renovate (collectively, the "**Renovation Work**") the Building, Premises, and/or the Real Property, and in connection with any Renovation Work, Landlord may, among other things, erect scaffolding or other necessary structures in the Building or the Real Property, restrict access to portions of the Real Property, including portions of the Common Areas, or perform work in the Building and/or the Real Property. Tenant hereby agrees that, provided Landlord Performs such Renovation Work in accordance with this Lease, such Renovation Work and Landlord's actions in connection with such Renovation Work shall in no way entitle Tenant to any abatement of Rent except as expressly provided in this Lease. Except as expressly provided in this Lease, Landlord shall have no responsibility or liability to Tenant for any injury to or interference with Tenant's business arising from any such Renovation Work, and Tenant shall not be entitled to any damages from Landlord for loss of use of the Premises, in whole or in part, or for loss of Tenant's personal property or improvements, resulting from the Renovation Work or Landlord's actions in connection therewith or for any inconvenience occasioned by such Renovation Work or Landlord's actions in connection therewith. Notwithstanding anything in this Lease to the contrary, Landlord shall perform such Renovation Work in such a manner so as to avoid any material interference with Tenant's use of the Premises for the Permitted Use.

60.     Waiver of Claims. As a material inducement to Landlord to enter into this Lease, except as expressly provided in this Lease, Tenant hereby releases the Indemnitees from, and hereby waives, any and all losses, costs, damages, expenses, liabilities, claims, rights and causes of action (collectively, the "**Released Claims**") arising from or related to any Force Majeure, including, without limitation, any claims for, and/or rights of, termination of this Lease and/or abatement, offset and/or deferral of rent under this Lease, at law and/or in equity, related to the inability of Tenant to conduct operations from the Premises as a result of any "shelter in place" orders or similar governmental directives related thereto. With respect to the Released Claims, Tenant acknowledges that (i) Tenant accepts and assumes that Tenant may be unable to conduct operations from the Premises as a result of any current or future "shelter in place" orders or similar governmental directives related thereto; and (ii) Tenant has been advised by legal counsel, has had the opportunity to be advised by legal counsel, or has otherwise made itself familiar with all Legal Requirements relative thereto.

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt                                        (54)

61.     Force Majeure. Whenever a period of time is prescribed in this Lease for the performance of an action by Landlord or Tenant and such performance is actually delayed for reasons that are beyond the performing party's reasonable control, such as delays due to strikes, lockout, labor disputes, shortages of material or labor, war, riots, fire or other casualty, acts of God, inability to secure governmental approvals or permits, governmental restrictions, actual or threatened public health emergency (including, without limitation, epidemic, pandemic and other significant public health risks), changes in applicable Legal Requirements (including, without limitation, any shelter-in-place orders or any other restrictions on travel or business that preclude Landlord or Tenant, or their respective agents, contractors or employees from accessing or using all or part of the Premises, or Real Property), breaches in cybersecurity, or any other cause whether similar or dissimilar to the foregoing which is beyond a party's reasonable control ("**Force Majeure**"), then the period of time for the performance of the subject action shall be extended by the number of days that the performance is actually delayed by the Force Majeure event(s), provided that the performing party shall use commercially reasonable efforts to minimize the length of the Force Majeure caused delay.  Notwithstanding the foregoing, in no event shall events of Force Majeure (i) extend any period of time for the payment of Monthly Rent, Additional Rent or other sums payable by either party under this Lease, (ii) extend any period of time for the written exercise of an option or right by either party, (iii) be grounds for Tenant to abate any portion of rent due pursuant to this Lease, or entitle either party to terminate this Lease, except as allowed pursuant to Paragraphs 26 and 27 of this Lease, (iv) excuse Tenant's obligations under Paragraph 8 of this Lease or (v) extend the occurrence of the Commencement Date. In the event Tenant is delayed in completing construction of the Improvements as a result of any Force Majeure delays, then Tenant shall promptly notify Landlord of the same in which case the Buildout Period shall be extended for the period(s) of time corresponding to any such delay(s), not to exceed an aggregate of ninety (90) days.

62.     Quiet Enjoyment. If, and so long as, Tenant pays the rent and keeps, observes and performs each and every term, covenant and condition of this Lease on the part or on behalf of Tenant to be kept, observed and performed within applicable notice and cure periods, Tenant shall peaceably and quietly enjoy the Premises throughout the term without hindrance by Landlord or any person lawfully claiming through or under Landlord, subject to the provisions of this Lease.

63.     No Discrimination. Tenant covenants by and for itself and its successors, heirs, personal representatives and assigns and all persons claiming under or through Tenant that there shall be no discrimination against or segregation of any person or of a group of persons on account of race, color, religion, creed, sex or national origin in the leasing, subleasing, transferring, use, occupancy, tenure or enjoyment of the Premises nor shall Tenant or any person claiming under or through Tenant establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, sublessees, subtenants or assignees of the Premises.

64.     OFAC. Each of Landlord and Tenant hereby represents and warrants to the other party that, to the representing party's knowledge, as of the date of this Lease, neither the representing party nor any individual, entity, or organization holding any (or, if a publicly traded entity, a significant) ownership or controlling interest in the representing party, nor any officer or director of such entity, is an individual, entity, or organization with whom any United States law, regulation, or executive order prohibits U.S. companies and individuals from dealing, including, without limitation, names appearing on the U.S. Department of Treasury's Office of Foreign Assets Control's Specially Designated Nationals and Blocked Persons List. If the foregoing representation by a representing party is presently or later becomes untrue, the representing party shall be in material breach of this Lease and the other party shall

have the remedies provided to such party under this Lease for a material breach; provided, however, if the breach is by Tenant, Landlord may immediately terminate this Lease upon written notice to Tenant without application of a notice and cure period. Further, Tenant shall indemnify and hold harmless Landlord from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable attorneys' fees and costs) incurred by Landlord arising from or relating to Tenant's breach of the foregoing representation by Tenant, which indemnity obligation shall survive the expiration or earlier termination of this Lease. Landlord acknowledges that the foregoing representation is inapplicable to shareholders or equity owners who, directly or indirectly, own shares or equity in Tenant or Tenant's affiliates by purchase on a nationally recognized securities exchange.

65.    CASp Inspection. As of the date of this Lease, the Premises and the Common Areas of the Real Property expected to be in Tenant's path of travel during the Lease term, have not undergone an inspection by a Certified Access Specialist (CASp) regarding compliance with construction-related accessibility standards. A CASp can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises. This disclosure is made pursuant to Section 1938 of the California Civil Code.

66.    Sustainability Practices. Tenant acknowledges that Landlord may elect, in Landlord's sole discretion, to implement energy, water, and waste efficiency, and other environmentally sustainable practices (collectively, the "**Sustainability Practices**") and, in furtherance of same, may pursue an environmental sustainability monitoring and certification and/or rating program such as ENERGY STAR, Green Globes-CIEB, LEED, BREEAM, IREM CSP, Fitwel, Fitwel VRM, WELL, WELL Health & Safety or similar programs ("**Green Building Certification and Health & Safety Certification**"). Tenant agrees that, throughout the Lease term (as the same may be extended), Tenant shall reasonably cooperate with Landlord and, to the extent reasonably practicable, comply with Landlord's Sustainability Practices standards for the Building and/or Landlord's efforts to obtain or maintain Green Building Certification and Health & Safety Certification including matters addressing operations and maintenance, including indoor air quality, energy efficiency, water efficiency, water quality, wellness, health safety, recycling programs, exterior maintenance program, transportation and occupant satisfaction surveys, sustainable procurement practices, systems upgrades and recommissioning of Building systems. In the event that Landlord provides a forum for the Tenant to engage with Landlord to improve the environmental performance of the Premises or Building, Tenant shall cooperate. Landlord shall have the right to install on-site power generation (i.e., solar or small wind) and/or storage (batteries) at the Building. Tenant agrees to cooperate with Landlord in connection with the installation and on-going operation of such on-site power and/or storage. Tenant shall have no right to any renewable energy credits or similar resulting from on-site energy generation or storage, even if Tenant uses such energy. Landlord may retain or assign such renewable energy credits in Landlord's sole discretion. Notwithstanding the foregoing or anything in this Lease to the contrary, Tenant's agreement to cooperate with Landlord and comply with the Sustainability Practices and Landlord's efforts to obtain or maintain Green Building Certification and Health & Safety Certification as provided above is on the express condition that such cooperation and compliance is at no material additional cost or material inconvenience

to Tenant. In no event shall Tenant be required to obtain a LEED certification for any of Tenant's Alterations.

67.    Renewal Options.

a.    Option to Renew. The original Tenant executing this Lease (the "**Original Tenant**") or any Affiliate Assignee shall have the option to renew this Lease for two (2) consecutive additional terms of five (5) years each, commencing upon the expiration of the initial term of the Lease or the first renewal term, as the case may be. The renewal options must be exercised, if at all, by written notice given by Tenant to Landlord not earlier than eighteen (18) months nor later than twelve (12) months prior to the expiration of the initial term of this Lease or the first renewal term, as the case may be. Notwithstanding the foregoing, if (i) as of the date immediately preceding the commencement of the renewal period the Original Tenant and/or any Affiliate is not in occupancy of all or a portion of the Premises then demised hereunder, or (ii) on the date Tenant exercises the option or on the date immediately preceding the commencement date of the renewal period Tenant is in default of any of its obligations under this Lease beyond applicable notice and cure periods, then, at Landlord's election, the renewal option shall be null and void and Tenant shall have no right to renew this Lease.

b.    Terms and Conditions. If Tenant exercises a renewal option, then during the respective renewal period all of the terms and conditions set forth in this Lease as applicable to the Premises during the initial term shall apply during the applicable renewal term, except that (i) Tenant shall have no further right to renew this Lease beyond the second renewal term, (ii) Tenant shall take the Premises in its then "as-is" state and condition, except that if fair market terms include an improvement allowance, Tenant shall receive such improvement allowance and the Monthly Rent referred to item (iii) shall take such improvement allowance into account, (iii) the Monthly Rent payable by Tenant for the Premises shall be the then-fair market rent for the Premises based upon the terms of this Lease, as renewed, and (iv) the Base Year and Base Tax Year for the Premises shall be the calendar year and fiscal tax year, as the case may be, in which the renewal term commences. Fair market rent shall include the periodic rental increases, if any, that would be included for space leased for the period of the renewal term. For purposes of this Paragraph 63, the term "**fair market rent**" shall mean the rental rate that would be applicable for a lease term commencing on the commencement date of the renewal term and that would be payable in any arm's length negotiations for the Premises in their then as-is condition, for the renewal term, which rental rate shall be established by reference to rental terms actually negotiated for comparable space under primary lease (and not sublease), taking into consideration all relevant factors, including, without limitation, the location of the Building and such amenities as existing improvements, view, floor on which the Premises are situated and the like, situated in Class A office projects located in the City-Center District of Downtown Oakland ("**Comparable Buildings**"), in similar physical and economic condition as the Building, engaged in then-prevailing ordinary rental market practices with respect to tenant concessions (if any) (e.g. not offering extraordinary rental, promotional deals and other concessions to tenants in an effort to alleviate cash flow problems, difficulties in meeting loan obligations or other financial distress) and taking into account then market concessions (including, but not limited to, any construction allowances and/or rent abatement); provided, however, that notwithstanding anything to the contrary herein, no consideration shall be given to the fact that Landlord is or is not required to pay a real estate brokerage commission in connection with Tenant's exercise of its renewal option or the fact that any comparable transactions do or do not involve the payment of real estate brokerage commissions. The fair market rent shall be mutually agreed upon by Landlord and Tenant in writing within a thirty (30) calendar day period commencing not later than six (6) months prior to commencement of the renewal period. If Landlord and Tenant are unable to agree upon the fair market monthly rent within such thirty

(30)-day period, then the fair market rent shall be established by brokers in accordance with the procedures set forth in Paragraph 63.c. below.

c.    <u>Determination of Fair Market Rent</u>. Within fifteen (15) days after the expiration of the thirty (30)-day period for the mutual agreement of Landlord and Tenant as to the fair market rent, each party hereto, at its cost, shall engage a real estate broker to act on its behalf in determining the fair market rent. The brokers each shall have at least ten (10) years' experience with leases in Comparable Buildings and shall submit to Landlord and Tenant in advance for Landlord's and Tenant's reasonable approval of the methods to be used to determine fair market rent. If a party does not appoint a broker within said fifteen (15)-day period but a broker is appointed by the other respective party, the single broker appointed shall be the sole broker and shall set the fair market rent. If the two brokers are appointed by the parties as stated in this paragraph, such brokers shall meet promptly and attempt to set the fair market rent. If such brokers are unable to agree within thirty (30) days after appointment of the second broker, the brokers shall elect a third broker meeting the qualifications stated in this Paragraph within ten days after the last date the two brokers are given to set the fair market rent. Each of the parties hereto shall bear one-half (1/2) the cost of appointing the third broker and of the third broker's fee. The third broker shall be a person who has not previously acted in any capacity for either party.

d.    The third broker shall conduct his own investigation of the fair market rent, and shall be instructed not to advise either party of his determination of the fair market rent except as follows: When the third broker has made his determination, he shall so advise Landlord and Tenant and shall establish a date, at least five (5) days after the giving of notice by the third broker to Landlord and Tenant, on which he shall disclose his determination of the fair market rent. Such meeting shall take place in the third broker's office unless otherwise agreed by the parties. After having initialed a paper on which his determination of fair market rent is set forth, the third broker shall place his determination of the fair market rent in a sealed envelope. Landlord's broker and Tenant's broker shall each set forth their determination of fair market rent on a paper, initial the same and place them in sealed envelopes. Each of the three envelopes shall be marked with the name of the party whose determination is inside the envelope.

e.    In the presence of the third broker, the determination of the fair market rent by Landlord's broker and Tenant's broker shall be opened and examined. If the higher of the two determinations is 105% or less of the amount set forth in the lower determination, the average of the two determinations shall be the fair market rent, the envelope containing the determination of the fair market rent by the third broker shall be destroyed and the third broker shall be instructed not to disclose his determination. If either party's envelope is blank, or does not set forth a determination of fair market rent, the determination of the other party shall prevail and be treated as the fair market rent. If the higher of the two determinations is more than 105% of the amount of the lower determination, the envelope containing the third broker's determination shall be opened. If the value determined by the third broker is the average of the values proposed by Landlord's broker and Tenant's broker, the third broker's determination of fair market rent shall be the fair market rent. If such is not the case, fair market rent shall be the rent proposed by either Landlord's broker or Tenant's broker which is closest to the determination of fair market rent by the third broker.

f.    <u>Delay in Determination of Monthly Rent</u>. If the fair market rent is not established prior to the commencement of the renewal period, then Tenant shall continue to pay as Monthly Rent and Additional Rent the sums in effect as of the last day of the initial term of the Lease and, as soon as the fair market rent is determined, Tenant shall immediately pay to Landlord any deficiency in

the amount paid by Tenant during such period, or, if Tenant paid excess Monthly Rent during such period, Landlord shall credit such excess payments to the Monthly Rent amounts next due.

68.     Abatement of Rent and Termination Right When Tenant Is Prevented From Using Premises.

a.      Notwithstanding anything in this Lease to the contrary, if (i) Landlord fails to perform the repair and maintenance obligations required of Landlord under the terms of this Lease, or (ii) there is any interruption in, or failure or inability to provide any Basic Services that is within Landlord's reasonable control, and such failure or interruption causes all or a portion of the Premises to be untenantable and unusable for the Permitted Use by Tenant, or (iii) Tenant is unable to access the Premises as a result of Landlord failing to comply with its obligations under this Lease (each of the items set forth in clauses (i), (ii) and (iii) above being referred to herein as a "**Trigger Event**"), then upon the occurrence of such Trigger Event, Tenant shall give Landlord written notice specifying such failure or interruption, as the case may be. If Landlord has not cured the Trigger Event within five (5) Business Days after the receipt of Tenant's written notice (the "**Eligibility Period**"), then Tenant shall be entitled to an abatement of Monthly Rent under Paragraph 5 hereof and Additional Rent under Paragraph 7 hereof, which abatement shall commence as of the first day after the expiration of the Eligibility Period, as the case may be, and shall be based upon the portion of the Premises that Tenant is unable to and does not so use for Tenant's business. If Tenant's right to abatement described in this Paragraph 64.a. occurs during the Abatement Period, then the Abatement Period shall be extended for the number of days that the abatement period pursuant to this Paragraph 64.a. overlapped the Abatement Period ("**Overlap Period**"). Landlord shall have the right to extend the Expiration Date for a period of time equal to the Overlap Period if Landlord sends a notice to Tenant of such election within ten (10) days following the end of the extended Abatement Period. The abatement provisions set forth above shall be inapplicable to any interruption in, or failure or inability to provide any of the services or utilities described in Paragraph 17.a. above or failure to perform repair or maintenance obligations that is caused by (x) damage by fire or other casualty or a taking (it being acknowledged that such situations shall be governed by Paragraphs 26 and 27, respectively), or (y) the negligence or willful misconduct of Tenant or any other Tenant Parties.

b.      In addition, notwithstanding anything in this Lease to the contrary, in the event that Tenant cannot, within six (6) months ("**Non-Use Period**") after the occurrence of the Trigger Event, be given reasonable use of, and access to the Premises and the utilities and services pertaining to the Premises (including the Basic Services), all suitable for the efficient conduct of Tenant's business therefrom, then Tenant may elect to terminate this Lease upon written notice sent to Landlord within thirty (30) days following the expiration of the Non-Use Period.

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(59)

THIS LEASE IS EXECUTED by Landlord and Tenant as of the date set forth at the top of page 1 hereof.

Landlord:                                             Tenant:

601 CITY CENTER LLC,                                 E.L.F. COSMETICS, INC.,
a Delaware limited liability company                 a Delaware corporation

By:    /s/ Paul W. Grafft                            By:    /s/ Scott Milsten
Name:  Paul W. Grafft                                Name:  Scott Milsten
Title: Vice President                                Title: SVP, General Counsel & Chief People Officer

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt                          (1)

## **EXHIBIT A**

Outline of Premises



601 CITY CENTER
FLOOR 14
EXHIBIT A

4885-9329-8068.6
391320.00007/5-29-24/arb/bwt

(1)

**EXHIBIT B**

Rules and Regulations

601 City Center

In the event of a conflict between these Rules and Regulations and the Lease to which they are attached, the terms of the Lease shall control.

1.   Except as provided in Paragraph 52, no sign, placard, picture, advertisement, name or notice shall be inscribed, displayed or printed or affixed on or to any part of the outside or inside of the Building or any part of the Premises visible from the exterior of the Premises without the prior written consent of Landlord, which consent may be withheld in Landlord's reasonable discretion. Landlord shall have the right to remove, at Tenant's expense and without notice to Tenant, any such sign, placard, picture, advertisement, name or notice that has been installed in violation of this Lease.

If Landlord notifies Tenant in writing that Landlord objects to any curtains, blinds, shades or screens attached to or hung in or used in connection with any window or door of the Premises that were installed without Landlord's approval, such use of such curtains, blinds, shades or screens shall be removed immediately by Tenant. No awning shall be permitted on any part of the Premises.

2.   No ice, drinking water, towel, barbering or bootblacking, shoe shining or repair services, or other similar services shall be provided to the Premises, except from persons reasonably authorized by Landlord and at the hours and under regulations reasonably fixed by Landlord.

3.   The bulletin board or directory of the Building will be provided exclusively for the display of the name and location of tenants only and Landlord reserves the right to exclude any other names therefrom.

4.   The sidewalks, halls, passages, exits, entrances, elevators and stairways shall not be obstructed by any of the Tenant Parties or used by Tenant for any purpose other than for ingress to and egress from its Premises. The halls, passages, exits, entrances, elevators, stairways, balconies and roof are not for the use of the general public and Landlord shall in all cases retain the right to control and prevent access thereto by all persons whose presence in the judgment of Landlord shall be prejudicial to the safety, character, reputation and interests of the Building and its tenants. No tenant and no employees or invitees of any tenant shall go upon the roof of the Building.

5.   Except as otherwise expressly set forth in this Lease, Tenant shall not alter any lock or install any new or additional locks or any bolts on any interior or exterior door of the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned, or delayed.

6.   The toilet rooms, toilets, urinals , wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed and no foreign substance of any kind whatsoever shall be thrown therein and the expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the tenant who, or whose employees or invitees, shall have caused it.

7.   Tenant shall not overload the floor of the Premises or mark, drive nails , screw or drill into the partitions, woodwork or plaster or in any way deface the Premises or any part thereof.

8.   No heavy furniture, freight or equipment of any kind shall be brought into the Building without the consent of Landlord (which consent shall not be unreasonably withheld, conditioned, or delayed) and all moving of the same into or out of the Building shall be done at such time and in such manner as Landlord shall reasonably designate. Landlord shall have the right to prescribe the weight, size and position of all safes and other heavy equipment brought into the Building and also the times and manner of moving the same in and out of the Building. Safes or other heavy objects shall, if considered necessary by Landlord, stand on a platform of such thickness as is necessary to properly distribute the weight. Landlord will not be responsible for loss of or damage to any such safe or property from any cause, and all damage done to the Building by moving or maintaining any such safe or other property shall be repaired at the expense of Tenant. The elevator designated for freight by Landlord shall be available for use by all tenants in the Building during the hours and pursuant to such procedures as Landlord may reasonably determine from time to time. The persons employed to move Tenant's equipment, material, furniture or other property in or out of the Building must be reasonably acceptable to Landlord. The moving company must be a locally recognized professional mover , whose primary business is the performing of relocation services, and must be bonded and fully insured. In no event shall Tenant employ any person or company whose presence may give rise to a labor or other disturbance in the Real Property. A certificate or other verification of such insurance must be received and approved by Landlord prior to the start of any moving operations. Insurance must be sufficient in Landlord's reasonable opinion, to cover all personal liability, theft or damage to the Real Property, including, but not limited to, floor coverings, doors, walls, elevators, stairs , foliage and landscaping. Special care must be taken to prevent damage to foliage and landscaping during adverse weather. All moving operations shall be conducted at such times and in such a manner as Landlord shall reasonably direct, and all moving shall take place during non-business hours unless Landlord agrees in writing otherwise.

9.   Tenant shall not employ any person or persons other than the janitor of Landlord for the purpose of cleaning the Premises, unless otherwise reasonably agreed to by Landlord. Except with the written consent of Landlord, no person or persons other than those approved by Landlord shall be permitted to enter the Building for the purpose of cleaning the Building or the Premises. Tenant shall not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness. Notwithstanding the foregoing, Tenant shall be permitted to have Tenant's employees clean the Premises.

10.  Tenant shall not use, keep or permit to be used or kept any foul or noxious gas or substance in the Premises, or permit or suffer the Premises to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Building by reason of noise, odors and/or vibrations, or interfere in any way with other tenants or those having business therein, nor shall any animals or birds be brought in or kept in or about the Premises or the Building, except for guide dogs for the blind and other customary service animals. In no event shall Tenant keep, use, or permit to be used in the Premises or the Building any guns, firearm, explosive devices or ammunition. Subject to Paragraph 64 of the Lease, except in areas designated by Landlord, Tenant may not bring any bicycles or other vehicles onto the Building or the Real Property.

11.  No cooking shall be done or permitted by Tenant in the Premises, nor shall the Premises be used for the storage of merchandise, for washing clothes, for lodging, or for any improper, objectionable or immoral purposes. Notwithstanding the foregoing, however, Tenant may maintain and use microwave ovens and equipment for brewing coffee, tea, hot chocolate and similar beverages,

provided that Tenant shall (i) prevent the emission of any unreasonable food or cooking odor from leaving the Premises, (ii) be solely responsible for cleaning the areas where such equipment is located and removing food-related waste from the Premises and the Building, or shall pay Landlord's standard rate for such service as an addition to cleaning services ordinarily provided, (iii) maintain and use such areas solely for Tenant's employees and business invitees, not as public facilities, and (iv) keep the Premises free of vermin and other pest infestation and shall exterminate, as needed, in a manner and through contractors reasonably approved by Landlord, preventing any emission of odors, due to extermination, from leaving the Premises. Notwithstanding clause (ii) above, Landlord shall, without special charge, empty and remove the contents of one (I) 15-gallon (or smaller) waste container from the food preparation area so long as such container is fully lined with, and the contents can be removed in, a waterproof plastic liner or bag, supplied by Tenant, which will prevent any leakage of food related waste or odors; provided, however, that if at any time Landlord must pay a premium or special charge to Landlord's cleaning or scavenger contractors for the handling of food-related or so-called "wet" refuse, Landlord's obligation to provide such removal, without special charge, shall cease.

12. Tenant shall not use or keep in the Premises or the Building any kerosene, gasoline, or inflammable or combustible fluid or material, or use any method of heating or air conditioning other than that supplied by Landlord except for any supplemental HVAC installed by Tenant and approved by Landlord.

13. Landlord will direct electricians as to where and how telephone and telecommunications wiring is to be introduced into the Premises and the Building. No boring or cutting for wires will be allowed without the prior consent of Landlord. The location of telephones, call boxes and other office equipment affixed to the Premises shall be subject to the prior approval of Landlord.

14. Upon the expiration or earlier termination of the Lease, Tenant shall deliver to Landlord the keys of offices, rooms and toilet rooms which have been furnished by Landlord to Tenant and any copies of such keys which Tenant has made. In the event Tenant has lost any keys furnished by Landlord, Tenant shall pay Landlord for such keys.

15. Tenant shall not lay linoleum, tile, carpet or other similar floor covering so that the same shall be affixed to the floor of the Premises, except to the extent and in the manner approved in advance by Landlord. The expense of repairing any damage resulting from a violation of this rule or removal of any floor covering shall be borne by the tenant by whom, or by whose contractors, employees or invitees, the damage shall have been caused.

16. No furniture, packages, supplies, equipment or merchandise will be received in the Building or carried up or down in the elevators, except between such hours and in such elevators as shall be reasonably designated by Landlord, which elevator usage shall be subject to the Building's customary charge therefor as established from time to time by Landlord.

17. At all times other than Building Hours, access to the Building, or to the halls, corridors, elevators or stairways in the Building, or to the Premises may be refused unless the person seeking access is known to the person or employee of the Building in charge and has a pass or is properly identified. Landlord shall in no case be liable for damages for any error with regard to the admission to or exclusion from the Building of any person. In case of invasion, mob, riot, public excitement, or other commotion, Landlord reserves the right to prevent access to the Building during the continuance of the same by closing the doors or otherwise, for the safety of the tenants and protection of property in the Building.

18.  Tenant shall be responsible for insuring that the doors of the Premises are closed and securely locked before leaving the Building and must observe strict care and caution that all water faucets or water apparatus are entirely shut off before Tenant or Tenant's employees leave the Building, and that all electricity, gas or air shall likewise be carefully shut off, so as to prevent waste or damage, and for any default or carelessness Tenant shall make good all injuries sustained by other tenants or occupants of the Building or Landlord. Except to the extent caused by the gross negligence or willful misconduct of Landlord or Landlord's agents, employees, or contractors, Landlord shall not be responsible to Tenant for loss of property on the Premises, however occurring, or for any damage to the property of Tenant caused by the employees or independent contractors of Landlord or by any other person.

19.  Landlord reserves the right to exclude or expel from the Building any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of the rules and regulations of the Building.

20.  The requirements of any tenant will be attended to only upon application at the office of the Building. Employees of Landlord shall not perform any work or do anything outside of their regular duties unless under special instructions from Landlord, and no employee will admit any person (tenant or otherwise) to any office without specific instructions from Landlord.

21.  Tenant may install a vending machine in any kitchen/pantry area, subject to Landlord's reasonable requirements to protect the floor and walls of the Premises from damage.

22.  Subject to Tenant's right of access to the Premises in accordance with Building security procedures, Landlord reserves the right to close and keep locked all entrance and exit doors of the Building outside of Building Hours, and during such further hours as Landlord may deem advisable for the adequate protection of the Building and the property of its tenants.

23.  Intentionally Omitted.

24.  Tenant, its employees and agents shall not loiter in or on the entrances, corridors, sidewalks, lobbies, courts, halls, stairways, elevators, vestibules or any Common Areas for the purpose of smoking tobacco products, nor in any way obstruct such areas.

25.  Tenants shall comply with the Building's trash and recycling program.

**EXHIBIT C**

Form of Commencement Date Letter

_____, 20__

⎯

⎯

⎯

Re:     Lease dated as of _____ (the "Lease") between 601 CITY CENTER LLC, a Delaware limited liability company ("Landlord") and _____ ("Tenant"), for premises located on the _____ floor of the building located at 601 12th Street, Oakland, California, and known as 601 City Center.

Gentlemen or Ladies:

Pursuant to Paragraph 3.a. of your above-referenced Lease, this letter shall confirm the following dates:

1. The Delivery Date of the Lease (as defined in Paragraph 2.b. of the Lease) is _____, which is the date the Premises were delivered to Tenant in their as-is condition,

2. The Commencement Date (as defined in Paragraph 2.b. of the Lease) is _____, and

3. The Expiration Date of the Lease (as defined in Paragraph 2.b. of the Lease) is _____, which is the last day of the one hundred thirtieth (130th) full calendar month following the Commencement Date.

Please acknowledge Tenant's agreement to the foregoing by executing this letter and returning the same to Landlord. This letter may be executed in electronic (including PDF) counterparts, each of which shall be deemed an original, with the same effect as if both parties had executed the same document.

Very truly yours,

601 CITY CENTER LLC,
a Delaware limited liability company

By:   SHORENSTEIN REALTY SERVICES, LP,
        a Delaware limited partnership

        By: __
        Authorized signatory

The undersigned agrees to the dates set forth above:

E.L.F. COSMETICS, INC.,
a Delaware corporation

By: __
Name __
Title __

## EXHIBIT D

Work Letter

This <u>Exhibit D</u> (the "**Work Letter**") shall set forth the terms and conditions relating to the construction of the tenant improvements in the Premises. This Work Letter is essentially organized chronologically and addresses the issues of the construction of the Premises, in sequence, as such issues will arise during the actual construction of the Premises. All references in this Work Letter to Articles or Paragraphs of "this Lease" shall mean the relevant portion of the Lease to which this Work Letter is attached and of which this Work Letter forms a part, and all references in this Work Letter to Sections of "this Work Letter" shall mean the relevant portion of this Work Letter.

### SECTION 1

### DELIVERY OF THE PREMISES

1.1     **Delivery Condition**. Except as provided in Paragraph 4 of the Lease and <u>Exhibit D-1</u> attached hereto, Landlord shall tender possession of the Premises to Tenant in its existing "as-is" condition and Landlord shall not be obligated to provide or, except as set forth in this Work Letter, pay for any improvement work or services related to the improvement of the Premises, Building or the Real Property and Tenant shall accept the Premises "as is" on the Delivery Date. Landlord and Tenant expressly agree that there are and shall be no implied warranties of merchantability, habitability, fitness for a particular purpose, or any other kind arising out of this Lease and there are and shall be no warranties that extend beyond the warranties, if any, expressly set forth in this Lease.

### SECTION 2

### TENANT IMPROVEMENT ALLOWANCE; SPACE PLANNING ALLOWANCE

2.1     **Tenant Improvement Allowance**. Tenant shall be entitled to a one-time tenant improvement allowance (the "**Tenant Improvement Allowance**") in the amount of $5,009,580.00 (i.e., $180.00 per rentable square foot of the Premises) for the initial design and construction of Tenant's improvements which are permanently affixed to the Premises (the "**Tenant Improvements**"). In no event shall Landlord be obligated to make disbursements pursuant to this Work Letter in a total amount which exceeds the Tenant Improvement Allowance and the Space Planning Allowance (as defined below). All Tenant Improvements for which the Tenant Improvement Allowance has been utilized shall be deemed Landlord's property under the terms of the Lease. Tenant acknowledges that the Tenant Improvement Allowance is to be applied to Tenant Improvements covering the entire Premises and if Tenant does not elect to improve the entire Premises, then the Tenant Improvement Allowance shall be adjusted on a pro-rata per rentable square foot basis to reflect the number of square feet actually being improved. In the event that Tenant shall fail to request the entire Tenant Improvement Allowance prior to the expiration of Lease Month 36, such unrequested amounts shall be the sole property of Landlord and Tenant shall have no claim to any such unrequested amounts. Notwithstanding anything contained herein to the contrary, the Tenant Improvement Allowance may be applied to non-construction related costs as further set forth in Paragraph 2.2.

2.2    **Tenant Improvement Allowance Items**. Except as otherwise set forth in this Work Letter, the Tenant Improvement Allowance shall be disbursed by Landlord only for the following items and costs (collectively the "**Tenant Improvement Allowance Items**"):

2.2.1    Payment of the fees of the "Architect/Space Planner" and the "Engineers," as those terms are defined in Paragraph 3.1 of this Work Letter, and payment of the fees incurred by, and the cost of documents and materials supplied by, Landlord and Landlord's consultants in connection with the preparation and review of the "Construction Documents," as that term is defined in Paragraph 3.1 of this Work Letter, not exceed an aggregate amount equal to $10.00 per rentable square foot of the Premises;

2.2.2    The payment of plan check, permit and license fees relating to construction of the Tenant Improvements;

2.2.3    The cost of construction of the Tenant Improvements, including, without limitation, demolition, testing and inspection costs, trash removal costs, parking fees, after-hours utilities usage and contractors' fees and general conditions;

2.2.4    The cost of any changes anywhere in the base building or the floor of the Building on which the Premises is located, when such changes are required by the Construction Documents (including if such changes are due to the fact that such work is prepared on an unoccupied basis) or to comply with applicable governmental regulations or building codes (collectively, the "**Code**"), such cost to include all direct architectural and/or engineering fees and expenses incurred in connection therewith;

2.2.5    The cost of any changes to the Construction Documents or Tenant Improvements required by Code;

2.2.6    Sales and use taxes and Title 24 fees;

2.2.7    The "Landlord Coordination Fee," as that term is defined in Paragraph 4.2.6 of this Work Letter;

2.2.8    The cost of cabling for the Premises; and

1.1.1    The cost of any furniture, fixtures and equipment for the Premises;

1.1.2    The cost of project management;

1.1.3    The cost of special electrical power distribution;

1.1.4    The cost of telephone and security systems; and

2.2.9    Tenant's moving costs.

2.3    **Disbursement of Tenant Improvement Allowance**. During the construction of the Tenant Improvements, Landlord shall make disbursements of the Tenant Improvement Allowance for Tenant Improvement Allowance Items for the benefit of Tenant upon Tenant's request (but not more frequently than monthly) and shall authorize the release of monies for the benefit of Tenant as follows.

2.3.1    **Monthly Disbursements**. On or before the twentieth (20th) day of each calendar month during the construction of the Tenant Improvements (the "**Submittal Date**") (or such other date as Landlord may designate), Tenant may deliver to Landlord: (i) a request for payment of the "Contractor," as that term is defined in Paragraph 4.1 of this Work Letter, approved by Tenant showing the schedule, by trade, of percentage of completion of the Tenant Improvements in the Premises; (ii) invoices from all of "Tenant's Agents," as that term is defined in Paragraph 4.1.2 of this Work Letter, for labor rendered and materials delivered to the Premises (if such invoice is for the Contractor, the Contractor will need to provide an application and certificate for payment [AIA form G702-1992 or equivalent] signed by the Architect/Space Planner, and a breakdown sheet [AIA form G703-1992 or equivalent]); (iii) a letter from the Tenant requesting payment from the Tenant Improvement Allowance; and (iv) executed mechanic's lien releases with respect to contracts in excess of $25,000.00, which lien releases shall be conditional with respect to the then-requested payment amounts and unconditional with respect to payment amounts previously disbursed by Landlord or Tenant, from all of Tenant's Agents which shall comply with the appropriate provisions, as reasonably determined by Landlord, of California Civil Code Sections 8132, 8134, 8136 and 8138. Tenant's request for payment shall be deemed Tenant's acceptance and approval of the work furnished and/or the materials supplied as set forth in Tenant's payment request. On or before the date occurring thirty (30) days after the Submittal Date, and assuming Landlord receives all of the information described in items (i) through (iv), above, and subject to Tenant first delivering any Over-Allowance Payments (as defined below) in accordance with Paragraph 4.2.1, Landlord shall deliver a check to Tenant made to Tenant's Agent (or to Tenant if such invoices were previously paid by the Tenant) in payment of the lesser of: (A) the amounts so requested by Tenant, as set forth in this Paragraph 2.3.1, above, less a ten percent (10%) retention (the aggregate amount of such retentions shall be known as the "**Final TI Allowance Reimbursement**"), and (B) the balance of any remaining available portion of the Tenant Improvement Allowance (not including the Final TI Allowance Reimbursement), provided that Landlord does not dispute any request for payment based on non-compliance of any work with the "Approved Construction Documents", as that term is defined in Paragraph 3.4 below, or due to any substandard work, or for any other reason as provided in this Lease. Landlord's payment of such amounts shall not be deemed Landlord's approval or acceptance of the work furnished or materials supplied as set forth in Tenant's payment request.

2.3.2    **Final TI Allowance Reimbursement**. Subject to the provisions of this Work Letter, a check for the Final TI Allowance Reimbursement payable to Tenant shall be delivered by Landlord to Tenant following the completion of construction of the Premises, provided that (i) Tenant delivers to Landlord (a) properly executed, unconditional final mechanic's lien releases from all of Tenant's Agents with contracts in excess of $25,000.00, showing the amounts paid, in compliance with California Civil Code Sections 8132, 8134, 8136 and 8138, (b) Contractor's last application and certificate for payment (AIA form G702 1992 or equivalent) signed by the Architect/Space Planner, (c) a breakdown sheet (AIA form G703 1992 or equivalent), (d) original or copies of stamped building permit plans, one copy of the building permit, (f) original or copies of the of stamped building permit inspection card with all final sign-offs, (g) full size bond copies and a CD R disk containing electronic files of the "as-designed" drawings of the Tenant Improvements in both "dwg" and "pdf" formats, from the Architect/Space Planner for architectural drawings, and "as-built" drawings from the Contractor for all other trades, (h) air balance reports, (i) intentionally omitted; (j) one year warranty letters from Tenant's Agents, (k) manufacturer's warranties and operating instructions, (l) final punchlist completed and signed off by Tenant and the Architect/Space Planner, (m) letters of compliance from the Engineers stating that the Engineers have inspected the Tenant Improvements and that they comply with the Engineers' drawings and specifications, (n) a copy of the recorded Notice of Completion, and (o) a final list of all contractors/vendors/consultants retained by Tenant in connection with the Tenant Improvements and any other improvements in the Premises pursuant to this Work Letter, including, but not limited to, the

Contractor, other contractors, subcontractors and the remaining Tenant's Agents, the Architect/Space Planner, the Engineers, systems furniture vendors/ installers, data/telephone cabling/equipment vendors/installers, etc., which final list shall set forth the full legal name, address, contact name (with telephone/fax/e mail addresses) and the total price paid by Tenant for goods and services to each of such contractors/vendors/consultants (collectively, the "**Final Close Out Package**"), and (ii) Landlord has determined that no substandard work exists which materially adversely affects the mechanical, electrical, plumbing, heating, ventilating and air conditioning, life-safety or other systems of the Building, the curtain wall of the Building, the structure or exterior appearance of the Building, or any other tenant's use of such other tenant's leased premises in the Building.

▪       Notwithstanding anything to the contrary contained herein, if (i) Tenant has satisfied all of the conditions precedent to the disbursement by Landlord of all or an installment of the Tenant Improvement Allowance, and Landlord is obligated pursuant to the terms of this Lease to disburse same to Tenant, (ii) Landlord fails to timely disburse the Tenant Improvement Allowance or such installment thereof in accordance with the terms of this Lease and, thereafter Tenant delivers notice ("**Allowance Disbursement Failure Notice**") to Landlord of such failure (which Allowance Disbursement Failure Notice must refer to this provision and state in capital bold letters in the Allowance Disbursement Failure Notice the following: "**LANDLORD MUST DISBURSE THE TENANT IMPROVEMENT ALLOWANCE PURSUANT TO TENANT'S REQUEST CONTAINED HEREIN WITHIN THIRTY (30) DAYS AFTER RECEIPT OR TENANT WILL EXERCISE ITS RIGHT OF OFFSET PURSUANT TO THE TERMS OF THE LEASE**"), and (iii) Landlord fails to make such disbursement within thirty (30) days after delivery of the Allowance Disbursement Failure Notice, then, subject to the terms and conditions of this Paragraph 2.3, Tenant shall be entitled to pay such unfunded amount to the applicable party and offset such unfunded amount from Monthly Rent next due and payable by Tenant under this Lease (the "**Offset**"), provided that Tenant will concurrently deliver notice to Landlord of the amount so funded by Tenant. The amount of the Tenant Improvement Allowance that Tenant elects to Offset pursuant to the preceding sentence shall reduce the remaining available balance of the Tenant Improvement Allowance accordingly. If any portion of the Tenant Improvement Allowance is not paid to Tenant when due, such Tenant Improvement Allowance shall first be reduced by any Landlord's Coordination Fee due and owing to Landlord (such reduced amount, the "**Remaining Tenant Improvement Allowance**") and, in the event such Remaining Tenant Improvement Allowance remains unpaid after thirty (30) days written notice to Agent at the notice address set forth in Section 11 of the SNDA, interest shall accrue on such unpaid Remaining Tenant Improvement Allowance at the Interest Rate from the date due until paid to Tenant or fully Offset by Tenant. Notwithstanding the foregoing, Tenant shall not be entitled to Offset against Monthly Rent pursuant to this Paragraph 2.3, any portion of the Tenant Improvement Allowance that is the subject of a good faith dispute between Landlord and Tenant so long as Landlord has provided Tenant with written notice regarding such dispute prior to the expiration of the thirty (30) day period described above in this Paragraph 2.3. If Tenant commences to Offset the unfunded amount of the Tenant Improvement Allowance pursuant to the provisions of this Paragraph 2.3, Landlord shall have the right, at any time, to pay to Tenant all or any portion of the then-unfunded amount, in which event Tenant shall have no further right to continue such Offset with respect to the amount so paid.

2.4       **Construction Rules, Requirements, Specifications, Design Criteria and Building Standards**. Landlord has established construction rules, regulation, requirements and procedures, and specifications, design criteria and Building standards with which Tenant, the "Architect/Space Planner," as that term is defined below, and all Tenant's Agents must comply in designing and constructing the Tenant Improvements in the Premises (the "**Construction Rules, Requirements, Specifications, Design Criteria and Building Standards**").

2.5    **Restoration Obligations**. With respect to the Tenant Improvements, at the expiration or earlier termination of the Lease term, Tenant shall not be required to remove any such Tenant Improvements from the Premises.

2.6    **Space Planning Allowance**. In addition to the Tenant Improvement Allowance, Landlord shall contribute toward the cost of planning of the Tenant Improvements in the Premises an amount not to exceed $4,174.65 (i.e., $0.15 per rentable square foot of the Premises) ("**Space Planning Allowance**"). No portion of the Space Planning Allowance, if any, remaining after payment for the test fit plan prepared by the Architect/Space Planner (as defined below) shall be available for use by Tenant. At such time as the Space Planning Allowance has been entirely disbursed, Tenant shall pay the remaining excess cost, if any, subject to the Tenant Improvement Allowance.

## SECTION 3

## CONSTRUCTION DOCUMENTS

3.1    **Selection of Architect/Space Planner/Construction Documents**. Tenant shall retain a licensed, competent, reputable architect/space planner experienced in mid-rise office space design selected by Tenant and reasonably approved by Landlord, which approval shall not be unreasonably withheld, conditioned, or delayed (the "**Architect/Space Planner**") to prepare the Construction Documents. Landlord hereby approves Forge as Tenant's Architect/Space Planner. Tenant shall retain a licensed, competent, reputable engineering consultants selected by Tenant and reasonably approved by Landlord, which approval shall not be unreasonably withheld, conditioned, or delayed (the "**Engineers**") to prepare all plans and engineering Construction Documents relating to the structural, mechanical, electrical, plumbing, HVAC, life safety, and sprinkler work in the Premises. Landlord approves Glumac, Degenkolb, or AWA as Tenant's potential Engineer for the Basis of Design. Mechanical, electrical, plumbing, HVAC, life safety, and sprinkler will be design-build. The plans and drawings to be prepared by Architect/Space Planner and the Engineers hereunder shall be known collectively as the "**Construction Documents**." All Construction Documents shall comply with Landlord's drawing format and specifications. Landlord's review of the Construction Documents as set forth in this Paragraph 3, shall be for its sole purpose and shall not imply Landlord's review of the same, or obligate Landlord to review the same, for quality, design, Code compliance or other like matters. Accordingly, notwithstanding that any Construction Documents are reviewed by Landlord or its space planner, architect, engineers and consultants, and notwithstanding any advice or assistance which may be rendered to Tenant by Landlord or Landlord's space planner, architect, engineers, and consultants, Landlord shall have no liability whatsoever in connection therewith and shall not be responsible for any omissions or errors contained in the Construction Documents, and Tenant's waiver and indemnity set forth in the Lease shall specifically apply to the Construction Documents. Furthermore, Tenant and Architect/Space Planner shall verify, in the field, the dimensions and conditions as shown on the relevant portions of the base building plans, and Tenant and Architect/Space Planner shall be solely responsible for the same, and Landlord shall have no responsibility in connection therewith.

3.2    **Final Space Plan**. Landlord hereby approves Tenant's final space plan for the Premises, including all details set forth therein, which space plan is attached hereto as Exhibit D-2 (the "**Final Space Plan**").

3.3    **Final Construction Documents**. After the approval of the Final Space Plan by Landlord and Tenant, Tenant shall promptly cause the Architect/Space Planner and the Engineers to complete the architectural and engineering drawings for the Premises, and Architect/Space Planner shall compile a

4885-9329-8068.6/
391320.00007/5-29-24/arb/bwt

EXHIBIT D

-5-

fully coordinated set of architectural, structural, mechanical, electrical and plumbing Construction Documents in a form which is complete to allow subcontractors to bid on the work and to obtain all applicable permits (collectively, the "**Final Construction Documents**") and shall submit the same to Landlord for Landlord's approval. Tenant shall supply Landlord with one (1) electronic copy signed by Tenant of such Final Construction Documents. Landlord shall advise Tenant within five (5) Business Days after Landlord's receipt of the Final Construction Documents for the Premises if the same is unsatisfactory or incomplete in any respect. If Tenant is so advised, Tenant shall immediately revise the Final Construction Documents in accordance with such review and any disapproval of Landlord in connection therewith. Landlord shall have three (3) Business Days to review Tenant's revisions to the Final Construction Documents. If Landlord fails to respond to Tenant's request for approval of the Final Construction Documents within the time periods provided above, Tenant may deliver a written "reminder notice" to Landlord that contains the following statement in bold and capital letters: "**THIS IS A SECOND REQUEST FOR APPROVAL PURSUANT TO THE PROVISIONS OF PARAGRAPH 3.2 OF EXHIBIT D TO THE LEASE. IF LANDLORD FAILS TO RESPOND WITHIN THREE (3) BUSINESS DAYS AFTER RECEIPT OF THIS NOTICE, THEN LANDLORD SHALL BE DEEMED TO HAVE APPROVED THE FINAL CONSTRUCTION DOCUMENTS DESCRIBED HEREIN.**" If Landlord fails to respond to such "reminder notice" within three (3) Business Days, then Landlord shall be deemed to have approved the proposed Final Construction Documents.

3.4     **Approved Construction Documents**. The Final Construction Documents shall be approved (or deemed approved pursuant to Paragraph 3.3. above) by Landlord (the "**Approved Construction Documents**") prior to the commencement of construction of the Premises by Tenant. After approval by Landlord of the Final Construction Documents (or, at Tenant's election, concurrently with Tenant's submission to Landlord) Tenant shall cause the Architect/Space Planner to submit the Approved Construction Documents to the appropriate municipal authorities for all architectural and structural permits (the "**Permits**"), provided that (a) the Architect/Space Planner shall provide Landlord with a copy of the package that it intends to submit prior to such submission, and (b) if there are Base Building modifications required to obtain the Permits, then Tenant shall obtain Landlord's prior written consent to any such Base Building modifications. Tenant hereby agrees that neither Landlord nor Landlord's consultants shall be responsible for obtaining any building permit or certificate of occupancy (or other documentation or approval allowing Tenant to legally occupy the Premises) for the Premises and that obtaining the same shall be Tenant's responsibility; provided, however, that Landlord shall cooperate with Tenant in performing ministerial acts reasonably necessary to enable Tenant to obtain any such permit or certificate of occupancy (or other documentation or approval allowing Tenant to legally occupy the Premises). No material changes, modifications or alterations in the Approved Construction Documents may be made without the prior written consent of Landlord, which consent may not be unreasonably withheld, conditioned, or delayed. To the extent there is any inconsistency between the terms of the Lease or any tenant manual (including the Construction Rules, Requirements, Specifications, Design Criteria and Building Standards) and the Approved Construction Documents, the terms of Approved Construction Documents shall control.

## SECTION 4

## CONSTRUCTION OF THE TENANT IMPROVEMENTS

4.1     **Tenant's Selection of Contractors**.

4.1.1     **The Contractor**. Tenant shall retain a licensed general contractor selected by Tenant and reasonably approved by Landlord, which consent shall not be unreasonably withheld, conditioned, or delayed (the "**Contractor**"), as contractor for the construction of the Tenant Improvements, which Contractor shall be a qualified, reputable, general contractor experienced in class A, mid-rise office building tenant improvement construction in the downtown area of Oakland, California. Landlord hereby approves BCCI, Skyline, Principal Builders, and West Coast Builders as Tenant's potential Contractors.

4.1.2     **Tenant's Agents**. The Architect/Space Planner, Engineers, consultants, Contractor, other contractors, vendors, subcontractors, laborers, and material suppliers retained and/or used by Tenant shall be known collectively as the "**Tenant's Agents**." For the following trades, only those contractors, subcontractors, laborers, and material suppliers listed in the Construction Rules, Requirements, Specifications, Design Criteria and Building Standards may be selected by Tenant: Asbestos, Cable Television, Electrical, Elevators, Fire Sprinklers, Fire / Life Safety, HVAC, HVAC Air Balance, Plumbing, Roofing (as listed for each building comprising the Project), and Waste. Notwithstanding the foregoing, Tenant shall have the right to select other contractors, subcontractors, laborers, and materials suppliers not listed in the Construction Rules, Requirements, Specifications, Design Criteria and Building Standards for such trades, provided the same are approved by Landlord, which approval shall not be unreasonably withheld, conditioned, or delayed. The Electrical, Fire Sprinklers, Fire / Life Safety, HVAC and Plumbing must be engineered by, and any structural engineering must be conducted by, an engineer or engineers approved by Landlord.

4.2     **Construction of Tenant Improvements by Tenant's Agents**.

4.2.1     **Construction Contract; Cost Budget**.

4.2.1.1 Prior to execution of a construction contract, Tenant shall submit a copy of the proposed contract with the Contractor for the construction of the Tenant Improvements, including the general conditions with Contractor (the "**Contract**") to Landlord for its record. Following execution of the Contract and prior to commencement of construction, Tenant shall provide Landlord with a fully executed copy of the Contract for Landlord's records. Prior to the commencement of the construction of the Tenant Improvements, and after Tenant has accepted all bids and proposals for the Tenant Improvements, Tenant shall provide Landlord with a detailed breakdown, by trade, for all of Tenant's Agents, of the final estimated costs to be incurred or which have been incurred in connection with the design and construction of the Tenant Improvements to be performed by or at the direction of Tenant or the Contractor (the "**Construction Budget**"), which costs shall include, but not be limited to, the costs of the Architect's and Engineers' fees and the Landlord Coordination Fee. The amount, if any, by which the total costs set forth in the Construction Budget exceed the amount of the Tenant Improvement Allowance is referred to herein as the "**Over Allowance Amount**".

4.2.1.2 In the event that an Over-Allowance Amount exists, then Tenant shall pay a percentage of each amount requested by the Contractor or otherwise to be disbursed under this Tenant Work Letter, which percentage shall be equal to the Over-Allowance Amount divided by the

amount of the total costs set forth in the Construction Budget (after deducting from the total costs any amounts expended in connection with the preparation of the Construction Documents, and the cost of all other Tenant Improvement Allowance items incurred prior to the commencement of construction of the Tenant Improvements), and such payments by Tenant (the "**Over-Allowance Payments**") shall be a condition to Landlord's obligation to pay any amounts from the Tenant Improvement Allowance. In the event that, after the total costs set forth in the Construction Budget have been delivered by Tenant to Landlord, the costs relating to the design and construction of the Tenant Improvements shall change, any additional costs for such design and construction in excess of the total costs set forth in the Construction Budget shall be added to the Over-Allowance Amount and the total costs set forth in the Construction Budget, and the Over-Allowance Payments shall be recalculated in accordance with the terms of the immediately preceding sentence. Tenant shall make payments for such additional costs out of its own funds, but Tenant shall continue to provide Landlord with the documents described in items (i), (ii), (iii) (iv), and (v) of Paragraph 2.3.2.1 of this Tenant Work Letter, above, for Landlord's approval, prior to Tenant paying such costs. All Tenant Improvements paid for by the Over-Allowance Amount shall be deemed Landlord's property under the terms of the Lease after the expiration or earlier termination of the Lease.

4.2.2   **Tenant's Agents**.

4.2.2.1   **Landlord's General Conditions for Tenant's Agents and Tenant Improvement Work**. Tenant's and Tenant's Agent's construction of the Tenant Improvements shall comply with the following: (i) the Tenant Improvements shall be constructed in accordance with the Approved Construction Documents; (ii) Tenant and Tenant's Agents shall not, in any way, unreasonably interfere with, obstruct, or delay, the work of Landlord's base building contractor and subcontractors with respect to the Base Building or any other work in the Building; (iii) Tenant's Agents shall submit schedules of all work relating to the Tenant's Improvements to Landlord and Landlord shall, within five (5) business days of receipt thereof, inform Tenant's Agents of any changes which are necessary thereto, and Tenant's Agents shall adhere to such corrected schedule; and (iv) Tenant shall abide by all reasonable rules made by Landlord with respect to the use of parking, freight, loading dock and service elevators, storage of materials, coordination of work with the contractors of other tenants, and any other matter in connection with this Work Letter, including, without limitation, the construction of the Tenant Improvements and Tenant shall promptly execute all documents including, but not limited to, Landlord's standard contractor's rules and regulations, as Landlord may deem reasonably necessary to evidence or confirm Tenant's agreement to so abide.

4.2.2.2   **Indemnity**. Tenant's indemnity of Landlord as set forth in the Lease shall also apply with respect to any and all costs, losses, damages, injuries and liabilities related in any way to any act or omission of Tenant or Tenant's Agents, or anyone directly or indirectly employed by any of them, or in connection with Tenant's non-payment of any amount arising out of the Tenant Improvements and/or Tenant's disapproval of all or any portion of any request for payment. Such indemnity by Tenant, as set forth in the Lease, shall also apply with respect to any and all costs, losses, damages, injuries and liabilities related in any way to Landlord's performance of any ministerial acts reasonably necessary (i) to permit Tenant to complete the Tenant Improvements, and (ii) to enable Tenant to obtain any building permit or certificate of occupancy (or other documentation or approval allowing Tenant to legally occupy the Premises) for the Premises.

4.2.2.3   **Requirements of Tenant's Agents**. Each of Tenant's Agents shall guarantee to Tenant and for the benefit of Landlord that the portion of the Tenant Improvements for which it is responsible shall be free from any defects in workmanship and materials for a period of not

4885-9329-8068.6/
391320.00007/5-29-24/arb/bwt

EXHIBIT D
-8-

less than one (1) year from the date of completion thereof. Each of Tenant's Agents shall be responsible for the replacement or repair, without additional charge, of all work done or furnished in accordance with its contract that shall become defective within one (1) year after the later to occur of (i) completion of the work performed by such contractor or subcontractors and (ii) the Commencement Date. The correction of such work shall include, without additional charge, all additional expenses and damages incurred in connection with such removal or replacement of all or any part of the Tenant Improvements, and/or the Building and/or common areas that may be damaged or disturbed thereby. All such warranties or guarantees as to materials or workmanship of or with respect to the Tenant Improvements shall be contained in the Contract or subcontract and shall be written such that such guarantees or warranties shall inure to the benefit of both Landlord and Tenant, as their respective interests may appear, and can be directly enforced by either. Tenant covenants to give to Landlord any assignment or other assurances which may be necessary to effect such right of direct enforcement.

4.2.2.4 **Insurance Requirements**.

4.2.2.4.1 **General Coverages**. All of Tenant's Agents shall carry worker's compensation insurance covering all of their respective employees, and shall also carry commercial general liability insurance, including property damage, all with limits, in form and with companies as are required to be carried by Tenant as set forth in Article 15 of this Lease, and the policies therefor shall insure Landlord and Tenant, as their interests may appear, as well as the Contractor and subcontractors.

4.2.2.4.2 **Special Coverages**. Tenant or Contractor shall carry "Builder's All Risk" insurance in an amount approved by Landlord, which shall in no event be less than the amount actually carried by Tenant or Contractor, covering the construction of the Tenant Improvements, and such other insurance as Landlord may require, it being understood and agreed that the Tenant Improvements shall be insured by Tenant pursuant to Article 15 of this Lease immediately upon completion thereof. Such insurance shall be in amounts and shall include such extended coverage endorsements as may be reasonably required by Landlord.

4.2.2.4.3 **General Terms**. Certificates for all insurance carried pursuant to this Paragraph 4.2.2.4 shall be delivered to Landlord before the commencement of construction of the Tenant Improvements and before the Contractor's equipment is moved onto the site. All such policies of insurance must contain a provision that the company writing said policy will give Landlord thirty (30) days prior written notice of any cancellation or lapse of the effective date or any reduction in the amounts of such insurance. In the event that the Tenant Improvements are damaged by any cause during the course of the construction thereof, Tenant shall immediately repair the same at Tenant's sole cost and expense. Tenant's Agents shall maintain all of the foregoing insurance coverage in force until the Tenant Improvements are fully completed and accepted by Landlord, except for any Products and Completed Operation Coverage insurance required by Landlord, which is to be maintained for ten (10) years following completion of the work and acceptance by Landlord and Tenant and which shall name Landlord, and any other party that Landlord so specifies, as additional insured as to the full limits required hereunder for such entire ten (10) year period. All insurance, except Workers' Compensation, maintained by Tenant's Agents shall preclude subrogation claims by the insurer against anyone insured thereunder. Such insurance shall provide that it is primary insurance as respects the owner and that any other insurance maintained by owner is excess and noncontributing with the insurance required hereunder. The requirements for the foregoing insurance shall not derogate from the provisions for indemnification of Landlord by Tenant under Paragraph 4.2.2.2 of this Work Letter.

4.2.3 **Governmental Compliance**. The Tenant Improvements shall comply in all respects with the following: (i) the Code and other state, federal, city or quasi-governmental laws, codes, ordinances and regulations, as each may apply according to the rulings of the controlling public official, agent or other person; (ii) applicable standards of the American Insurance Association (formerly, the National Board of Fire Underwriters) and the National Electrical Code; and (iii) building material manufacturer's specifications.

4.2.4 **Inspection by Landlord**. Landlord shall have the right to inspect the Tenant Improvements at all times, provided however, that Landlord's failure to inspect the Tenant Improvements shall in no event constitute a waiver of any of Landlord's rights hereunder nor shall Landlord's inspection of the Tenant Improvements constitute Landlord's approval of the same. Should Landlord disapprove any portion of the Tenant Improvements which are not constructed in accordance with the Approved Construction Documents, Landlord shall notify Tenant in writing of such disapproval and shall specify the items disapproved. Any defects or deviations in, and/or disapproval by Landlord of, the Tenant Improvements shall be rectified by Tenant at no expense to Landlord, provided however, that in the event Landlord determines that a defect or deviation exists or disapproves of any matter in connection with any portion of the Tenant Improvements, Landlord may, take such action as Landlord deems necessary, at Tenant's expense and without incurring any liability on Landlord's part, to correct any such defect, deviation and/or matter, including, without limitation, causing the cessation of performance of the construction of the Tenant Improvements until such time as the defect, deviation and/or matter is corrected to Landlord's satisfaction.

4.2.5 **Meetings**. Tenant shall hold regular meetings with the Architect/Space Planner and the Contractor regarding the progress of the preparation of Construction Documents and the construction of the Tenant Improvements, as reasonably required, at a time mutually agreed upon by Landlord and Tenant, and, upon Landlord's request, certain of Tenant's Agents shall attend such meetings. In addition, minutes shall be taken at all such meetings, a copy of which minutes shall be promptly delivered to Landlord. One such meeting each month shall include the review of Contractor's current request for payment.

4.2.6 **Landlord Coordination Fee**. Tenant shall pay a construction supervision and management fee (the "**Landlord Coordination Fee**") to Landlord in an amount equal to one percent (1%) of the hard and soft costs incurred in constructing the Tenant Improvements (which Landlord Coordination Fee is in lieu of, and not in addition to, the Alteration Operations Fee). At the time Landlord makes any disbursement of the Tenant Improvement Allowance, Landlord shall retain from Tenant Improvement Allowance, as a partial payment of the Landlord Coordination Fee, a proportionate amount of the Landlord Coordination Fee based upon Landlord's reasonable estimation of the amount required to be withheld from each disbursement in order to ensure that the entire Landlord Coordination Fee is retained over the course of construction on a prorata basis. At such time as the Tenant Improvement Allowance has been entirely disbursed, Tenant shall, within thirty (30) days of written demand, pay to Landlord the remainder, if any, of the Landlord Coordination Fee not yet paid to Landlord.

4.3 **Notice of Completion**. Within fifteen (15) days after the final completion of construction of the Tenant Improvements, including, without limitation, the completion of any punch list items, Tenant shall cause a Notice of Completion to be recorded in the office of the Recorder of the County of Alameda in accordance with Section 8182 of the Civil Code of the State of California or any successor statute, and shall furnish a copy thereof to Landlord upon such recordation. If Tenant fails to do so, Landlord may execute and file the same on behalf of Tenant as Tenant's agent for such purpose, at

4885-9329-8068.6/
391320.00007/5-29-24/arb/bwt

EXHIBIT D

-10-

Tenant's sole cost and expense. At the conclusion of construction and prior to Landlord's payment of the Final TI Allowance Reimbursement, (i) Tenant shall cause the Contractor and the Architect/Space Planner (A) to update the Approved Construction Documents through annotated changes, as necessary, to reflect all changes made to the Approved Construction Documents during the course of construction, (B) to certify to the best of the Architect/Space Planner's and Contractor's knowledge that such updated Approved Construction Documents are true and correct, which certification shall survive the expiration or termination of this Lease, as hereby amended, and (ii) Tenant shall deliver to Landlord the Final Close Out Package. Landlord shall, at Tenant's reasonable expense, update Landlord's "as-built" master plans, for the floor(s) on which the Premises are located, if any, including updated vellums and electronic CAD files, all of which may be modified by Landlord from time to time, and the current version of which shall be made available to Tenant upon Tenant's request.

## SECTION 5

## MISCELLANEOUS

5.1 **Time of the Essence in This Work Letter**. Unless otherwise indicated, all references in this Work Letter to a "number of days" shall mean and refer to calendar days. If any item requiring approval is timely disapproved by Landlord, the procedure for preparation of the document and approval thereof shall be repeated until the document is approved by Landlord.

5.2 **Freight Elevator Access**. During Building Hours, Tenant shall not be charged for, and Landlord shall provide, freight elevator service during the design and construction of the Tenant Improvements and any subsequent Alterations; provided, however, that Tenant shall be charged for Landlord's actual reasonable cost of any additional security guard that is reasonably necessary to monitor Tenant's after-hours use of the freight elevator. Tenant shall pay Landlord any amounts due under this Paragraph 5.2 within thirty (30) days after Landlord's written demand therefor.

5.3 **Tenant's Lease Default**. Notwithstanding any provision to the contrary contained in this Lease, if Tenant is in monetary or material non-monetary default of any of Tenant's covenants, representations or warranties under the Lease or this Work Letter beyond applicable notice and cure periods at any time on or before the substantial completion of the Premises, then (i) in addition to all other rights and remedies granted to Landlord pursuant to this Lease, Landlord shall have the right to withhold payment of all or any portion of the Tenant Improvement Allowance and/or Landlord may cause cessation of the construction of the Premises (in which case, Tenant shall be responsible for any delay in the substantial completion of the Premises caused by such work stoppage), and (ii) all other obligations of Landlord under the terms of this Work Letter shall be forgiven until such time as such default is cured pursuant to the terms of this Lease (in which case, Tenant shall be responsible for any delay in the substantial completion of the Premises caused by such inaction by Landlord).

## EXHIBIT D-1

Delivery Condition

Premises to be provided in broom-swept, as-is condition, which consists of the following:

1.  Floor Design Loads

    •   80 psf live load with an additional 20 psf partition load on each premises floor.

2.  Core

    •   ADA compliant men's and women's restrooms on each premises floor.

    •   One janitorial closet on each premises floor.

    •   Two tele-data riser closets on each premises floor. Additionally, Tenant to be provided space within the telco riser. Pathways exist to support connections from the floors to the MPOE. Tenant shall be provided with an appropriate amount of space consistent with square footage within pathways/sleeves, subject to Tenant's engineer confirmation, the proposed pathways are sufficient to support Tenant's intended use LV Gyp.

3.  All base building graphics shall be removed.

    •   Perimeter exterior walls: unpainted thermal insulation.

    •   Floors: unsealed concrete.

    •   Ceiling: exposed with spray fireproofing.

    •   Columns: exposed with spray fireproofing.

    •   Metal floor closures at perimeter walls except locations with full-height or sill-height thermal insulation.

    LL to prep all elevator lobby, and stair doors to allow for Tenant's installation of card readers/access controls, to be further defined Tenant shall be responsible for running conduit/cable to allow for card access readers at their entry points.

4.  HVAC System

    •   Supply and return ducts on each premises floor. Two supply taps per floor that are each approximately 10,400 cfm.

    •   Main duct loop on each premises floor.

    •   One condenser water riser, sized to support approximately 21 tons of supplemental cooling on each premises floor provided with stub-outs and shut-off valves.

    •   One HVAC hot water riser with stub-outs on each premises floor.

5. Plumbing

- Two domestic cold water risers with stub-outs on each premises floor.

6. Fire & Life Safety

- Siemens life safety systems installed throughout the premises as required by code for core and shell condition.

- Sprinkler main with distribution and turned up heads as required by code for core and shell condition.

- Emergency egress exit and lighting as required by code for core and shell condition.

7. Electrical

- One 100-amp bus disconnect, one 100-amp 24-circuit high voltage distribution panel, one 45-kVA-transformer and two 150-amp 42-circuit low voltage panels provided in each electrical room.

- Design capacities:
  - 1.0 watts per GSF for lighting.
  - 3.0 watts per GSF for plug loads.
  - 2.0 watts per GSF of spare capacity.

**EXHIBIT D-2**

Final Space Plan


*[See Attached]*


4885-9329-8068.6/
391320.00007/5-29-24/arb/bwt

EXHIBIT D
-1-



4885-9329-8068.6/
391320.00007/5-29-24/arb/bwt

**EXHIBIT E**

Janitorial Specifications

I.    TENANT AREAS

A.    NIGHTLY

1.    CARPETED FLOORS

All carpeted floors will be spot vacuumed nightly. Particular attention will be given to vacuuming under desks. Spot clean as necessary.

2.    UNCARPETED FLOORS

All hard-surfaced floors will be spot cleaned where necessary to remove spill and smudges.

3.    TRASH REMOVAL, RECYCLING PROGRAM, AND TRASH LINERS

All trash and recycling from "Central Collection" locations (1 for every ~5,000sf) wastebaskets will be removed from the premises and deposited in the buildings designated areas for trash and recycling. Trash liners will be replaced as necessary but in no event less than weekly. Clean and sanitize trash and recycling containers as required. Owner's recycling program shall be adhered to and supported at all times.

4.    COMPOSTING

Remove all composting in kitchen area and replace with bio degradable bags provided by the tenant nightly.

B.    WEEKLY

1.    FURNITURE AND ACCESSORIES

Wipe file cabinets, telephones, furniture and accessories to remove spills, smudges and streaks. Sanitize all telephone receivers. Polish desk and furniture tops with appropriate polishing materials. Return chairs and waste baskets to their proper positions.

Wipe with dust cloth all sides of furniture and legs on furniture. Wipe all horizontal surfaces, including window sills, which are not dusted during the nightly dusting. Dust all vinyl base. Spot cleaning for the interior windows.

2.    THRESHOLDS

Clean and polish all metal door thresholds.

3.    DOORS, JAMBS AND WALLS

All doors, jambs, walls and window mullions and glass partitions will be spot-cleaned to remove streaks, smudges, hand marks and spills. Give particular attention to areas such as doors, jambs

and windows where it is reasonable to expect hand marks will be present. Dust and remove debris from all metal door thresholds.

C.    MONTHLY

1.    FURNITURE

Vacuum all upholstered furniture.

2.    CARPETED FLOORS

All carpeted floor areas that are not accessible, but are easily visible will be vacuumed with portable vacuums. For example, desk wells, areas around planters and spaces between furniture. Thoroughly vacuum under and around all desks and office furniture.

3.    UNCARPETED FLOORS

Sweep, dust mop, wet mop, and spray buff all resilient and/or composite floorings with mild detergent solution. Spot clean streaks, smudges and stains as required. Floor should dry free of any streaks or smudges. Dust all vinyl base.

D.    QUARTERLY

1.    HIGH DUSTING

All horizontal surfaces on furniture, ledges, wainscot, picture frames, wall hangings, etc., that are beyond the reach of normal nightly dusting, will be dusted.

2.    UNCARPETED FLOORS

Shower-scrub or otherwise recondition all resilient or composition flooring to provide a level of appearance equivalent to a completely refinished floor.

E.    SEMI-ANNUALLY

1.    HIGH DUSTING

All ceiling vents, vents located high on the walls or in ceilings, and light fixtures will be dusted. Dust ceiling surfaces other than acoustical ceiling material.

2.    BUILDING EXTERIOR WINDOWS

Wash the Building exterior windows in a manner consistent with Comparable Buildings, but not less than twice per year.

## EXHIBIT E-1

Conference Room Rates

As of the date hereof, the Building conference facility offers the following conference rooms: (1) Conference Rooms A and B (individually – 60 people maximum); and (2) Conference Room C (10 person board room).

As of the date hereof, pricing for Conference facility as follows (such rates are subject to change from time to time):

Conference Rooms A or B (individually – 60 people maximum):
½ Day: $300
Full Day: $500

Conference Rooms A & B (combined – 120 people maximum):
½ Day: $400
Full Day: $700

Conference Room C (10 person board room)
$75/hr
½ Day: $250
Full Day: $400

**EXHIBIT F**

Form of SNDA

*[See Attached]*

GDC DRAFT 5/29/24

**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

This **SUBORDINATION, NON-DISTURBANCE, AND ATTORNMENT AGREEMENT** (the "*Agreement*") is dated as of ___, 2024 and is by and among **DEUTSCHE BANK AG, NEW YORK BRANCH**, having an address at 1 Columbus Circle, 15th Floor, New York, New York 10019 (together with its successors and assigns, "*Agent*"), for itself and on behalf of any other lenders (together with their respective successors and assigns, collectively, "*Lenders*" and each individually, a "*Lender*"), 601 CITY CENTER LLC, a Delaware limited liability company, having an office at 235 Montgomery Street, 16th floor, San Francisco, California 94104, Attn: Corporate Secretary ("*Landlord*"), and E.L.F. COSMETICS, INC., a Delaware corporation, having an office at 570 10th Street, Oakland, California 94607 ("*Tenant*").

WHEREAS, Agent has administered or intends to administer, and the Lenders have made or intend to make, a loan to Landlord (the "*Loan*"), which Loan shall be evidenced by one or more promissory notes (as the same may be amended, modified, restated, severed, consolidated, renewed, replaced, or supplemented from time to time, the "*Promissory Note*") and secured by, among other things, that certain Mortgage or Deed of Trust, Assignment of Leases and Rents and Security Agreement (as the same may be amended, restated, replaced, severed, split, supplemented or otherwise modified from time to time, the "*Mortgage*") encumbering the real property located at 601 12th Street, Oakland, California, as more particularly described on **Exhibit A** annexed hereto and made a part hereof (the "*Property*");

WHEREAS, by a lease agreement (the "*Lease*") dated __, , between Landlord (or Landlord's predecessor in title) and Tenant, Landlord leased to Tenant a portion of the Property, as said portion is more particularly described in the Lease (such portion of the Property hereinafter referred to as the "*Premises*");

WHEREAS, Tenant acknowledges that Agent will rely on this Agreement in making the Loan to Landlord; and

WHEREAS, Agent and Tenant desire to evidence their understanding with respect to the Mortgage and the Lease as hereinafter provided.

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, the parties hereto hereby agree as follows:

1.    Tenant covenants, stipulates and agrees that the Lease and all of Tenant's right, title and interest in and to the Property thereunder (including but not limited to any option to purchase, right of first refusal to purchase or right of first offer to purchase the Property or any portion thereof) is hereby, and shall at all times continue to be, subordinated and made secondary and inferior in each and every respect to the Mortgage and the lien thereof, to all of the terms, conditions and provisions thereof and to any and all advances made or to be made thereunder, so that at all times the Mortgage shall be and remain a lien on the Property prior to and superior to the Lease for all purposes, subject to the provisions set forth herein. Subordination is to have the same force and effect as if the Mortgage and such renewals, modifications, consolidations, replacements and extensions had been executed, acknowledged, delivered and recorded prior to the Lease, any amendments or modifications thereof and any notice thereof.

103131734.4

2.    Agent agrees that if Agent exercises any of its rights under the Mortgage, including entry or foreclosure of the Mortgage or exercise of a power of sale under the Mortgage, Agent will not disturb Tenant's right to use, occupy and possess the Premises under the terms of the Lease so long as Tenant is not in default beyond any applicable grace period under any term, covenant or condition of the Lease.

3.    If, at any time Agent, any Lender or their respective designee (or any person, or such person's successors or assigns, or designee who acquires the interest of Landlord under the Lease through foreclosure of the Mortgage or otherwise) shall succeed to the rights of Landlord under the Lease as a result of a default or event of default under the Mortgage (the date upon which such succession occurs, the "***Date of Attornment***"), Tenant shall attorn to and recognize such person so succeeding to the rights of Landlord under the Lease (herein sometimes called "***Successor Landlord***") as Tenant's landlord under the Lease, said attornment to be effective and self-operative without the execution of any further instruments, subject to Section 2 of this Agreement. Although said attornment shall be self-operative, Tenant agrees to execute and deliver to Agent or to any Successor Landlord, such other instrument or instruments as Agent or such other person shall from time to time reasonably request in order to confirm said attornment.

4.    Landlord authorizes and directs Tenant to honor any written demand or notice from Agent instructing Tenant to pay rent or other sums to Agent rather than Landlord (a "***Payment Demand***"), regardless of any other or contrary notice or instruction which Tenant may receive from Landlord before or after Tenant's receipt of such Payment Demand. Tenant may rely upon any notice, instruction, Payment Demand, certificate, consent or other document from, and signed by, Agent and shall have no duty to Landlord to investigate the same or the circumstances under which the same was given. Any payment made by Tenant to Agent or in response to a Payment Demand shall be deemed proper payment by Tenant of such sum pursuant to the Lease.

5.    If Agent, any Lender or any Successor Landlord shall become the owner of the Property or the Property shall be sold by reason of foreclosure or other proceedings brought to enforce the Mortgage or if the Property shall be transferred by deed in lieu of foreclosure, Agent, Lenders or any Successor Landlord shall not be:

(a)    liable for any act or omission of any prior landlord (including, without limitation, the then defaulting Landlord), provided, however, that nothing in this Agreement shall relieve Agent (or such Successor Landlord) from the obligation to (X) pay to Tenant the outstanding balance (if any) of the Remaining Tenant Improvement Allowance (as defined in the Lease) set forth in Exhibit D to the Lease in effect as of the date hereof, or (Y) pay the outstanding balance (if any) solely of the Commission (as defined in that certain letter agreement, dated as of January 30, 2024, by and between Landlord and Cushman & Wakefield U.S., Inc. ("***Cushman***")) (the "***CW Agreement***"), or
(Z) cure any ongoing maintenance, replacement or repair default under the Lease with respect to the Premises by any prior landlord under the Lease, which default is continuing on the Attornment Date (a "***Continuing Default***"), provided that (i) Agent is provided written notice of such Continuing Default within the time period set forth in Section 7 of this Agreement prior to the Attornment Date, (ii) Agent (or such Successor Landlord) had

2

(and is/was given) the opportunity to cure such Continuing Default within the time period set forth in Section 7 of this Agreement and (iii) Agent's (or such Successor Landlord's)

3

obligation to cure such Continuing Default shall be limited solely to performing the ongoing maintenance and repair obligations as required pursuant to the terms of the Lease (and in no event shall Agent, Lender or such Successor Landlord have any other liability or obligation with respect to such Continuing Default or be liable for any damages in connection therewith); or

(b)  subject to clauses (X) and (Y) of Section 4(a) above, bound by any obligation to make any payment to Tenant which was required to be made prior to the Date of Attornment; or

(c)  obligated to perform any construction obligations of any prior landlord (including Landlord) under the Lease or liable for any defects (latent, patent or otherwise) in the design, workmanship, materials, construction or otherwise with respect to improvements and buildings constructed on the Property; or

(d)  subject to clauses (X) and (Y) of Section 4(a) above, subject to any offsets, defenses or counterclaims which Tenant may be entitled to assert against any prior landlord (including Landlord); provided that the foregoing shall not affect any right of offset expressly provided in the Lease; or

(e)  bound by any payment of rent or additional rent by Tenant to any prior landlord (including Landlord) for more than one month in advance, except to the extent any such payment of rent or additional rent is actually received by Lender or such Successor Landlord (as applicable) or is required pursuant to the express terms of Section 5(a) of the Lease; or

(f)  bound by any surrender, termination, amendment or modification of the Lease made without the consent of Agent or such Successor Landlord; provided, however, that with respect to amendments or modifications of the Lease (and not any surrender or termination of the Lease), (i) Agent's consent shall not be unreasonably withheld, conditioned or delayed if, pursuant to the express terms of the Lease, Landlord's consent to the matter giving rise to such amendment or modification is also subject to the same standard and (ii) (y) the exercise by Tenant of any unilateral right of Tenant to terminate the Lease without the consent of approval of Landlord pursuant to the express terms of Sections 3b, 26, 27, or 64 of the Lease or (z) the execution of ministerial amendments that confirm or memorialize Tenant's exercise of any right or option expressly set forth in the Lease, if any, shall not, in either case, require Agent's consent so long as (i) such right or option is exercised by Tenant in accordance with the express terms of the Lease and (ii) Agent's or Lender's notice and cure rights under Section 7 below will remain applicable to any Landlord default; or

(g)  liable or responsible for or with respect to the retention, application and/or return to Tenant of any security deposit paid to any prior landlord (including Landlord), whether or not still held by such prior landlord, unless and until Agent or any Successor Landlord has actually received said deposit for its own account as the landlord under the Lease as security for the performance of Tenant's obligation under the Lease (which deposit shall, nonetheless, be held subject to the provisions of the Lease).

4

6.    Notwithstanding anything to the contrary set forth in this Agreement, and without limiting the generality of Section 5(a) above, Agent agrees that, in each instance subject to Landlord qualifying for the applicable Advance under the Loan Agreement (a) solely to the extent Tenant is expressly entitled to the same under the Lease in effect as of the date hereof, Lender shall fund such amounts to Landlord (as further described below) for Landlord to pay to Tenant the applicable Remaining Tenant Improvement Allowance set forth in Exhibit D to the Lease in effect as of the date hereof within ten (10) Business Days of (i) Landlord's and/or Tenant's written request to Agent for the same and (ii) Tenant's delivery to Agent of all of the deliverables required to be sent to Landlord set forth in Section 2.3 of the Lease in effect as of the date hereof and (b) solely to the extent Cushman is expressly entitled to the same under the CW Agreement in effect as of the date hereof, Lender shall fund to Landlord such amounts for Landlord to pay to Cushman the applicable Commission (as defined in the CW Agreement in effect as of the date hereof) within ten (10) Business Days of Landlord's and/or Cushman's written request to Agent for the same. For the avoidance of doubt, (I) Lender's obligation to fund such amounts to Landlord is not contingent on Agent (or Lender) becoming the Successor Landlord and (II) (i) the maximum amount of the Remaining Tenant Improvement Allowance shall not exceed $5,009,580.00 and (ii) the maximum amount of the Commission shall not exceed $626,197.50. Landlord hereby irrevocably requests that, if requested by Landlord or Tenant or Cushman, Lender make certain Advances or disbursements of any Reserve Funds of amounts that are due and payable under the Lease and/or CW Agreement directly to Tenant and/or Cushman (as applicable) or through a title company to disburse directly to Tenant and/or Cushman (as applicable), which may be (but does not have to be) pursuant to an escrow agreement acceptable to Agent. The execution of this Agreement by Landlord shall, and hereby does, constitute an irrevocable direction and authorization to so disburse the Advances or disbursements as stated above, and Landlord acknowledges that any amounts Advanced or disbursed as such shall be deemed to have been Advanced under the Loan to Landlord and thereafter paid to Tenant and/or Cushman, and the same shall be added to the Outstanding Principal Balance and shall for all purposes constitute Debt under and secured by the Loan Documents in the same manner as if the same were paid directly to Landlord.

7.    Tenant hereby represents, warrants, covenants and agrees to and with the Agent

(a) to deliver to Agent, by nationally recognized overnight courier or certified mail, return receipt requested, a duplicate of each notice of default delivered by Tenant to Landlord at the same time as such notice is given to Landlord and no such notice of default shall be deemed given by Tenant under the Lease unless and until a copy of such notice shall have been so delivered to Agent. Agent and/or any Lender (and/or Successor Landlord) shall have the right (but shall not be obligated) to cure such default. Tenant shall accept performance by Agent and/or any Lender (and/or any Successor Landlord) of any term, covenant, condition or agreement to be performed by Landlord under the Lease with the same force and effect as though performed by Landlord. Tenant further agrees to afford Agent and Lenders (and/or Successor Landlord) (x) with respect to monetary defaults, the later of (i) a period of thirty (30) days commencing on the date Agent receives written notice from Tenant of such monetary default by Landlord under the Lease and (ii) a period of thirty (30) days beyond any period afforded to Landlord in the Lease for the curing of such monetary default and (y) with respect to non-monetary defaults, the later of (i) a period of thirty (30) days commencing on the date Agent receives written notice from Tenant of such non-monetary default by Landlord under the Lease and (ii) a period of thirty (30) days beyond any period afforded to Landlord in the Lease for the curing of such non-monetary default (provided, however, if such non-monetary default cannot be

5

cured within that time, and Agent and/or Lender (and/or Successor Landlord) delivers written notice to Tenant within such later thirty (30) day period that Agent and/or Lender (and/or Successor Landlord) is electing to cure such default, then such additional period of time as may be reasonable to enable Agent and/or Lender (and/or Successor Landlord) to remedy, or cause to be remedied, any such non-monetary default in addition to the period given to Landlord for remedying, or causing to be remedied, any such default, so long as Agent or Lender (or such Successor Landlord) is diligently pursuing the cure of any such non-monetary default (which may include the commencement of remedies under the Mortgage)) prior to taking any action to terminate the Lease;

(b) that Tenant is the sole owner of the leasehold estate created by the Lease; and

(c) to promptly certify in writing to Agent, in connection with any proposed assignment of the Mortgage, whether or not any default on the part of Landlord then exists under the Lease and to deliver to Agent any tenant estoppel certificates required under the Lease.

8.  Tenant acknowledges that the interest of Landlord under the Lease is assigned to Agent solely as security for the Promissory Note, and Agent shall have no duty, liability or obligation under the Lease or any extension or renewal thereof, unless Agent shall specifically undertake such liability in writing or Agent becomes the fee owner of the Property and then only with respect to periods in which Agent becomes, the fee owner of the Property.

9.  This Agreement shall be governed by and construed in accordance with the laws of the State in which the Premises is located (excluding the choice of law rules thereof).

10. This Agreement and each and every covenant, agreement and other provisions hereof shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns (including, without limitation, any successor holder of the Promissory Note) and may be amended, supplemented, waived or modified only by an instrument in writing executed by the party against which enforcement of the termination, amendment, supplement, waiver or modification is sought.

11. All notices to be given under this Agreement shall be in writing and shall be deemed served upon receipt by the addressee if served personally or, if mailed, upon the first to occur of receipt or the refusal of delivery as shown on a return receipt, after deposit in the United States Postal Service certified mail, postage prepaid, addressed to the address of Landlord, Tenant or Agent appearing below. Such addresses may be changed by notice given in the same manner. If any party consists of multiple individuals or entities, then notice to any one of same shall be deemed notice to such party.

Agent's Address:    Deutsche Bank AG, New York Branch
                    1 Columbus Circle, 15th Floor New York, New York 10019 Attention: [ ]

With a copy to:    Gibson, Dunn & Crutcher LLP
                   200 Park Avenue
                   New York, New York 10166-0193 Attention: Noam Haberman, Esq.
                   Email: NHaberman@gibsondunn.com

6

with a copy to:    Hanover Street Capital, LLC
156 West 56th Street, Suite 1104 New York, New York
10019 Attention: [ ]
Email: [ ]

Tenant's Address**:**    E.L.F. Cosmetics., Inc.
570 10th Street
Oakland, California 94607
Attention:    Scott    Milsten    and    Lane    Verlenden
Email:    Smilsten@elfbeauty.com and laverlenden@elfbeauty.com

With a copy to:    Ravid Law Group
lease-admin@r-lg.com

Landlord's Address**:** 601 CITY CENTER LLC
c/o: Shorenstein Company LLC 235 Montgomery Street
16th floor
San    Francisco,    California    94104    Attn:    Corporate
Secretary

With a copy to:    [ ]

12.  If this Agreement conflicts with the Lease, then this Agreement shall govern as between the parties and any Successor Landlord, including upon any attornment pursuant to this Agreement. This Agreement supersedes, and constitutes full compliance with, any provisions in the Lease that provide for subordination of the Lease to, or for delivery of non-disturbance agreements by the holder of, the Mortgage.

13.  Tenant shall look only to the estate and interest, if any, of Agent, such Lender or such Successor Landlord in the Loan and/or the Property (including the rents, incomes and proceeds derived therefrom at the time owned by Agent (or such Successor Landlord)) for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money in the event of any default by Agent, any Lender or any Successor

Landlord as a Successor Landlord under the Lease or under this Agreement, and no other property or assets of Agent, any Lender or any Successor Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to the Lease, the relationship of the landlord and tenant under the Lease or Tenant's use or occupancy of the Premises or any claim arising under this Agreement.

14.  If any provision of this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be deemed modified to the extent necessary to be enforceable, or if such modification is not practicable, such provision shall be deemed

7

deleted from this Agreement, and the other provisions of this Agreement shall remain in full force and effect, and shall be liberally construed in favor of Agent.

15.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

16.  (y) Tenant shall be responsible for (i) any Landlord/Lender Fees up to a cap of $25,000.00 pursuant to Section 21 of the Lease (ii) any fees and expenses of Tenant in connection with the Lease and this Agreement and (z) Landlord shall be responsible for the remainder of any Landlord/Lender Fees.

[*Remainder of Page Intentionally Left Blank*]

8

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date first above written.

**TENANT:**

**E.L.F. COSMETICS, INC.**,
a Delaware corporation

By:  ___ Name:
        Title:

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
|---|

State of California   ) County of _____   )

On ___, 2024, before me, ___, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature ___(Seal)

[Signature Page to SNDA]

**LANDLORD:**

**601 CITY CENTER LLC**,
a Delaware limited liability company


By: __ Name:
        Title:


A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.


State of California    ) County of _____    )

On __, 2024, before me, __, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature __(Seal)

[Signature Page to SNDA]

**AGENT:**

**DEUTSCHE BANK AG, NEW YORK BRANCH**


By: __ Name:
   Title:


By: __ Name:
   Title:

[Signature Page to SNDA]

**<u>ACKNOWLEDGMENT</u>**

STATE OF __    )
                           )   ss.:
COUNTY OF __ )

On the day of __ in the year 2024 before me, the undersigned, a Notary Public in and for said State, personally appeared ___, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument. Witness my hand and official seal.

_____

Notary Public

**<u>ACKNOWLEDGMENT</u>**

STATE OF __    )
                           )   ss.:
COUNTY OF __ )

On the day of __ in the year 2024 before me, the undersigned, a Notary Public in and for said State, personally appeared ___, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument. Witness my hand and official seal.

_____

Notary Public

**EXHIBIT G**

Existing Exclusives

Blue Shield: During the initial term of [the Blue Shield] Lease and, if so exercised, the Renewal Option provided for in Paragraph 64 [of the Blue Shield Lease], (i) Landlord shall not lease space in any portion of the Building (or allow an assignment or sublease of space in the Building) to Kaiser Permanente, Anthem/Blue Cross, Sutter Health, Healthnet/Centene or United Healthcare (each a "**Prohibited Competitor**") and (ii) Landlord may only lease space (or allow an assignment or sublease of space) to Aetna, Cigna or Humana ( each a "**Restricted Competitor**") if the space is located in the lower elevator bank of the Building, the space leased to the Restricted Competitor does not exceed a total of one (1) full floor, and the Restricted Competitor is not permitted signage outside of the Restricted Competitor's floor (other than standard signage on Building directories). The leasing restrictions in clauses (i) and (ii) in the immediately preceding sentence are referred to herein individually as a "**Leasing Restriction**" and collectively as the "**Leasing Restrictions**". The Leasing Restriction as to the Prohibited Competitors and the Leasing Restriction as to the Restricted Competitors shall also apply to the wholly owned subsidiaries of the respective entities.

4885-9329-8068.6/
391320.00007/5-29-24/arb/bwt

EXHIBIT G
-1-

**Exhibit 31.1**

**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER**
**PURSUANT TO**
**SECURITIES EXCHANGE ACT RULES 13A-14(A) AND 15D-14(A)**
**AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Tarang P. Amin, certify that:

1.      I have reviewed this Quarterly Report on Form 10-Q of e.l.f. Beauty, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 8, 2024

/s/ Tarang P. Amin
_____
Tarang P. Amin
Chief Executive Officer
*(Principal Executive Officer)*

**Exhibit 31.2**

**CERTIFICATION OF THE CHIEF FINANCIAL OFFICER**
**PURSUANT TO**
**SECURITIES EXCHANGE ACT RULES 13A-14(A) AND 15D-14(A)**
**AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Mandy Fields, certify that:

1.      I have reviewed this Quarterly Report on Form 10-Q of e.l.f. Beauty, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 8, 2024

/s/ Mandy Fields
Mandy Fields
Chief Financial Officer
*(Principal Financial Officer and Principal Accounting Officer)*

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of e.l.f. Beauty, Inc. (the "Company") on Form 10-Q for the quarterly period ended June 30, 2024, as filed with the Securities and Exchange Commission (the "Report"), Tarang P. Amin, Chief Executive Officer of the Company, and Mandy Fields, Chief Financial Officer of the Company, do each hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

•   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

•   The information in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Date: August 8, 2024


/s/ Tarang P. Amin
_____
Tarang P. Amin
Chief Executive Officer
*(Principal Executive Officer)*


/s/ Mandy Fields
_____
Mandy Fields
Chief Financial Officer
*(Principal Financial Officer and Principal Accounting Officer)*