**LABATON KELLER SUCHAROW LLP**
Michael P. Canty (*pro hac vice*)
James T. Christie (*pro hac vice*)
Nicholas D. Manningham (*pro hac vice*)
Stephen C. Boscolo (*pro hac vice*)

140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: mcanty@labaton.com
        jchristie@labaton.com
        nmanningham@labaton.com
        sboscolo@labaton.com

*Attorneys for Lead Plaintiffs and the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Lucas E. Gilmore (Bar No. 250893)
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: lucasg@hbsslaw.com

*Liaison Counsel for Lead Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE E.L.F. BEAUTY, INC. SECURITIES LITIGATION | Case No. 25-cv-02316-EKL<br><br><u>CLASS ACTION</u><br><br>**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Date: February 11, 2026<br>Time: 10:00 A.M.<br>Courtroom: Courtroom 7 – 4th Floor<br>Judge: Hon. Eumi K. Lee |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

I.      PRELIMINARY STATEMENT ................................................................................... 1

II.     SUMMARY OF ALLEGATIONS ............................................................................... 4

        A.      Background ...................................................................................................... 4

        B.      Defendants Misled Investors About Demand For ELF Products .......................... 5

        C.      The Truth Was Gradually Revealed While Defendants Continued to
                Mislead Investors ............................................................................................. 6

        D.      The Full Truth Was Revealed ........................................................................... 7

III.    ARGUMENT ............................................................................................................. 7

        A.      Legal Standard on a Motion to Dismiss .............................................................. 7

        B.      Defendants' Misstatements Were False and Misleading When Made ................... 8

                1.      Inventory Statements Were False and Misleading When Made ................ 8

                2.      Defendants' Additional Arguments for the Inventory Statements
                        Fail .................................................................................................. 11

                3.      Defendants Made Several Other False and Misleading Statements ......... 13

                4.      Defendants' Independent Falsity Defenses Fail .................................... 15

        C.      The Complaint Alleges a Strong Inference of Scienter ...................................... 17

                1.      The CW Allegations Demonstrate a Strong Inference of Scienter ........... 18

                2.      Defendants' Insider Sales Support Scienter ......................................... 19

                3.      Access To Information Supports Scienter ............................................. 22

                4.      Core Operations Support Scienter ....................................................... 22

        D.      The Complaint Establishes Loss Causation ...................................................... 23

IV.     CONCLUSION ........................................................................................................ 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Azar v. Yelp*,
    2019 WL 285196 (N.D. Cal. Jan. 22, 2019) ...........................................................................24

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ...............................................................................................17

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) ...............................................................................................12

*Born v. Quad/Graphics, Inc.*,
    521 F. Supp. 3d 469 (S.D.N.Y. 2021) ..................................................................................24

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    2013 WL 6441843 (N.D. Cal. Dec. 9, 2013) ........................................................................19

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Techs*,
    856 F.3d 605 (9th Cir. 2017) ...............................................................................................16

*City of Miami Gen. Emps' & Sanitation Emps' Ret. Tr. v. RH, Inc.*,
    302 F. Supp. 3d 1028 (N.D. Cal. 2018) ................................................................................14

*In re Concho Res. Inc. Sec. Litig.*,
    2003 WL 2297425 (S.D. Tex. Feb. 23, 2023) .......................................................................15

*Dolly v. GitLab Inc.*,
    2025 WL 2372965 (N.D. Cal. Aug. 14, 2025) ......................................................................24

*In re Facebook, Inc. Sec. Litig.*,
    405 F. Supp. 3d 809 (N.D. Cal. 2019) ..................................................................................21

*In re Fastly, Inc. Sec. Litig.*,
    2025 WL 2721693 (N.D. Cal. Sept. 24, 2025) ...............................................................19, 25

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
    97 F.4th 1171 (9th Cir. 2024) .................................................................................................7

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ..............................................................................................23

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) .............................................................................................8, 16

*Hable v. Godenzi*,
    2024 WL 5252227 (9th Cir. Dec. 31, 2024) ...........................................................................8

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ....................................................................................................... *passim*

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ..................................................................................7, 21

*Lamartina v. VMware, Inc.*,
   2023 WL 2763541 (N.D. Cal. Mar. 31, 2023)...........................................................19

*Leventhal v. Chegg, Inc.*,
   721 F. Supp. 3d 1003 (N.D. Cal. 2024) ............................................................ *passim*

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ...................................................................................23

*In re Lucid Grp., Inc. Sec. Litig.*,
   2024 WL 3745605 (N.D. Cal. Aug. 8, 2024) .............................................................17

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) .....................................................................................23

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) .........................................................................17

*N.M. State Inv. Council v. Ernst & Young LLP*,
   641 F.3d 1089 (9th Cir. 2011) .....................................................................................7

*No. 84 Emp-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d (9th Cir. 2003) ............................................................................................21

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
   730 F.3d 1111 (9th Cir. 2013) ...................................................................................25

*Omnicare, Inc. v. Laborers Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015).....................................................................................................16

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) .....................................................................................17

*In re Oxford Health Plans, Inc.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ...............................................................................14

*Pardi v. Tricida, Inc.*,
   2022 WL 3018144 (N.D. Cal. July 29, 2022)............................................................12

*Plumbers & Steamfitters Loc. 60 Pension Tr. v. Meta Platforms, Inc.*,
   2024 WL 4251896 (N.D. Cal. Sept. 17, 2024) ..........................................................24

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ........................................................................... *passim*

*In re QuantumScape Sec. Class Action Litig.*,
   580 F. Supp. 3d 714 ...................................................................................................15

*Retail Wholesale & Dep't Store Union Loc. 228 Ret. Fund v. Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) .....................................................................................8

*Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitchfix, Inc.*,
  2025 WL 1900722 (N.D. Cal. July 9, 2025)........................................................................22, 23

*In re Rocket Fuel, Inc. Sec. Litig.*,
  2015 WL 9311921 (N.D. Cal. Dec. 23, 2015)............................................................................13

*Scandlon v. Blue Coat Sys., Inc.*,
  2013 WL 5313168 (N.D. Cal. Sept. 23, 2013) ..........................................................................24

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) .............................................................................10, 12, 14

*In re Seagate Tech. Holdings PLC Sec. Litig.*,
  2025 WL 1744505 (N.D. Cal. May 12, 2025)............................................................................24

*Simon v. Am. Power Conversion Corp.*,
  945 F. Supp. 416 (D.R.I. 1996).................................................................................................9

*In re SolarEdge Techs., Inc. Sec. Litig.*,
  2024 WL 4979296 (S.D.N.Y. Dec. 4, 2024) .......................................................................9, 12

*In re SVB Fin. Grp. Sec. Litig.*,
  2025 WL 1676800 (N.D. Cal. June 13, 2025) ..........................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).............................................................................................7, 18, 19

*Weston v. DocuSign, Inc.*,
  669 F. Supp. 3d 849 (N.D. Cal. 2023) .............................................................17, 20, 21

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) ..........................................................................................15

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ........................................................................12, 13, 18

**Statutes**

15 U.S.C. § 78u-5(c)(1)(A).......................................................................................................16

Court-appointed Lead Plaintiffs Boston Retirement System and Metropolitan Employee Benefit System ("Lead Plaintiffs"), respectfully submit this Memorandum of Law in Opposition to Defendants e.l.f. Beauty, Inc. ("ELF"), Tarang Amin ("Amin"), and Mandy Fields ("Fields," and collectively "Defendants") Motion to Dismiss ("Motion" or "MTD," ECF No. 58) the Consolidated Amended Class Action Complaint ("Complaint," ECF No. 55).[1]

## I.      PRELIMINARY STATEMENT

This is a clear and straightforward case of securities fraud. Despite knowing that demand for ELF products had declined significantly, Defendants publicly stated the opposite, telling investors that demand was robust and as strong as ever. Indeed, Defendants even explained away rising inventory levels (a possible sign of slowing demand) by falsely assuring investors that ELF was simply increasing its inventory to meet that allegedly strong demand (when, in reality, they knew that lower demand had caused the higher inventory). Defendants' false and misleading statements led investors to believe that ELF was presently experiencing high demand that would lead to future sales. At the same time, Defendants dumped millions of dollars' worth of their ELF stock before the truth was revealed, profiting at the expense of investors who were left holding the bag when the truth was revealed.

Unable to refute the Complaint's legal sufficiency, Defendants simply rewrite it to suit their arguments, attempting to dismiss a complaint that does not exist. For example, Defendants argue that a securities fraud complaint alleging that ELF's quarterly projections were false must be dismissed because ELF still (barely) met that guidance. MTD at 1. Unfortunately for Defendants, that is not even remotely what the Complaint alleges. In fact, a cursory review of the Complaint's false and misleading statements section confirms that Lead Plaintiffs do not allege that ELF's guidance was false or misleading (or even that any reported numbers were false). Rather, the Complaint alleges that Defendants falsely stated that they were growing their inventory

---

[1] Unless noted, all emphasis is added, internal citations and quotes are omitted, and all capitalized terms, including Defendants and Individual Defendants, have meanings set forth in the Complaint. Citations to "¶__" are to the Complaint. Citations to "Ex." are to Exhibits to the MTD.

to meet <u>increased</u> demand, when in truth, Defendants knew that the real reason for the increased inventory was <u>decreased</u> demand. ¶¶9-17. This signaled something far worse to investors than the "guidance" case Defendants try to rewrite the Complaint to be.

As alleged in the Complaint, prior to the Class Period (February 7, 2024 – February 6, 2025), ELF experienced strong sales growth due to steady consumer demand at ELF's retail partners (i.e., the stores that sold ELF products) as well as ELF's ability to develop new, innovative products that drove new sales. ¶7. Starting in February 2021, ELF experienced double-digit net sales growth for the next several quarters. *Id*. This sales growth was critical to investors because ELF's total sales were lower than many competitors, like Estée Lauder, and thus investors were focused on ELF's ability to demonstrate continued growth in net sales. ¶8. But by February 2024, the start of the Class Period, Defendants became singularly aware that the steady demand ELF had seen in previous years was plummeting. ¶10. This rapid decline in demand led to increased inventory at ELF (as lowered consumer demand meant ELF's retail partners did not need to order more product from ELF). However, Defendants concealed this fact from investors and falsely stated that demand was as strong as ever and specifically misled investors about the reasons for ELF's increasing inventory. ¶¶13-14. Indeed, when directly asked why inventory was increasing, Defendants falsely stated that the rising inventory was to meet the strong demand they claimed they saw at the time. *Id*.

The Complaint further states that Defendants internally knew the opposite: that demand had plummeted, and ELF could not unload the massive amounts of inventory the Company had previously ordered, which in turn, inevitably resulted in lower sales and growth. ¶¶14, 89. Statements from several, corroborative former ELF employees ("CWs") confirm that at the same time Defendants claimed the inventory rise was caused by increased demand, Defendants knew that the inventory rise was caused by lowered sales and decreased demand. ¶¶15-16. Armed with this material nonpublic information, Defendants unloaded $28 million worth of stock in a two-month period—outside the parameters of their 10b5-1 trading plans—as the stock skyrocketed to its highest levels of all time based on their false and misleading statements. ¶¶270-72.

LEAD PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
Case No. 5:25-cv-02316-EKL                    2

Shortly after the Individual Defendants made millions in insider sales, investors began to learn the truth about ELF's rising inventory levels and low demand when, on August 8, 2024, ELF issued meaningfully weaker-than-anticipated guidance and acknowledged downward pressure on its adjusted EBITDA guidance, approximately $30 million lower than expected by analysts, signaling a sequential slowdown in growth. ¶¶123-25. In response, ELF's stock price declined 14.4%. ¶126. However, Defendants continued to mislead investors, falsely reassuring them that Defendants continued seeing strong growth across all of ELF's channels and that ELF's inventory was elevated only to support the strong demand they purportedly saw. ¶¶127-35. Based on these false and misleading reassurances, investors were shocked when, on February 6, 2025, ELF lowered its revenue and adjusted EBITDA guidance for fiscal year 2025, including guiding that net sales growth would be between negative 1% and 2% for Q4 FY 2025. ¶¶154-56. In response, ELF's stock price tumbled nearly 20% in a single day. ¶157.

Faced with these allegations, Defendants choose to instead attack a strawman, claiming that ELF's ultimate ability to meet its guidance means that any statements about demand could not have been false. The Court should not adjudicate this case based on what Defendants want the Court to believe, but rather, use the allegations set forth in the four corners of the Complaint.

When stripped of their factual recasting, Defendants' remaining legal arguments also fall apart under even minimal scrutiny. For example, Defendants' arguments that the statements of the CWs do not support falsity are wrong. The CW statements plainly demonstrate that inventory rose because of lower demand at the same time Defendants were publicly attributing the growth to higher demand. For example, CW 4 stated that inventory had built up because of lowered demand in Summer 2024, ¶¶99-100, while Defendants told investors in August 2024 that inventory had built up because of heightened demand. ¶¶187-88.

Defendants also cannot rebut scienter. While Defendants claim there is little direct indicia of scienter, contemporaneous CW statements demonstrate that Defendants knew their statements were false, including specific descriptions of meetings that Defendant Amin attended in Summer 2024 and descriptions of databases that the C-suite reviewed, showing that Defendants knew

inventory built up because of lowered demand at the same time they told the market the opposite. *E.g.* ¶¶73, 78, 99-101. Moreover, although Defendants cite misleading stock sales data to suggest that Defendants had no motive to mislead investors, they cannot hide from the fact that the Individual Defendants sold over $28 million worth of stock outside of their Rule 10b5-1 trading plans while knowing that demand had declined significantly. ¶¶270-72. Indeed, the timing of these sales, shortly before the truth was partially revealed, adds a strong inference of scienter.

Finally, Defendants' attacks on loss causation ignore both the Complaint's allegations and well-worn case law that loss causation can be demonstrated in an infinite number of ways, including a guidance revision revealing that prior statements touting demand were false. *See, e.g.*, *Leventhal v. Chegg, Inc.*, 721 F. Supp. 3d 1003, 1017–18 (N.D. Cal. 2024).

The Court should deny the Motion to Dismiss.

## II.    SUMMARY OF ALLEGATIONS

### A.    Background

ELF is a cosmetics and beauty company which offers discount products to consumers. ¶6. Approximately 80% of ELF's sales are through retail partners, with most of those sales coming from retailers Ulta Beauty ("Ulta"), Target, and Walmart. ¶¶6, 274. ELF's primary value proposition to investors is its ability to grow its sales. ¶8. ELF's total sales are less than more established competitors, such as Estée Lauder, but the Company consistently reported double-digit sales growth nearly every quarter in the years preceding the Class Period. ¶53. Indeed, ELF experienced significant and record sales growth in 2023, largely fueled by ELF's retail partners like Ulta ordering more products. ¶¶54, 84. However, by the beginning of 2024, Defendants knew that ELF's growth had reached its zenith. ¶9.

Throughout 2024, ELF experienced declining demand for its products. ¶10. ELF records most of its revenue through sales of its products to retailers (sell-in sales), who in turn sell those products to end consumers (sell-through sales). ¶¶61-62. Although sell-in sales to retailers remained strong in the early part of 2024, sell-through sales, which are strong predictors of future sales, plummeted. ¶90. Worse, the inventory the Company had previously ordered from its

suppliers continued to stream in, leading to a massive bloat in inventory in both: (i) retailers, as they could not sell to consumers, and (ii) ELF, as retailers stopped making new orders. ¶89.

### B.    Defendants Misled Investors About Demand For ELF Products

Investors could see reported inventory rising and began to question whether ELF's once-vaunted sales growth was slowing, which would in turn tank the Company's stock price. ¶¶85-95. Rather than admit that the inventory had risen because demand was fading, Defendants instead falsely told investors that the reason for rising inventory was because Defendants observed increased consumer demand to buy all that inventory. ¶87. This allowed ELF to misleadingly disguise the high inventory as a signal of increased demand, not the signal of declining demand it actually was. *Id*. Indeed, in nearly every earnings call and earnings presentation in 2024, ELF claimed that it was stockpiling inventory to "***support the demand that we're seeing***." ¶¶164-65, 173-74, 204. In truth, inventory had bloated due to declining demand. ¶14.

Throughout 2024, Defendants continued to reassure investors that increased demand was the result of ELF's rising inventory even as they knew the opposite. CWs reported that in meetings and internal documents, ELF attributed the rise in inventory to decreased demand. For example, CW 4 explained that in weekly inventory meetings attended by Defendant Amin, the Company discussed how inventory was elevated because sales were declining and were not as strong as the previous year. ¶¶98-100. Similarly, CW 2 noted that Ulta, one of ELF's primary retail partners, also had excess inventory of ELF products because those products were not selling. ¶101.

Defendants observed other signs of decreased demand in 2024. According to CW 4, ELF saw sales decline across the board in Summer 2024 through nonpublic data it received from its retail partners. ¶¶111-12, 248. CW 4 explained that ELF regularly held forecast meetings where signs of decreased demand, including negative sales trends, were discussed. ¶¶110-14. Additionally, sales to Ulta, one of ELF's largest retail partners whose sales were part of ELF's "untracked" channels (which investors had limited visibility into) plummeted in 2024. ¶¶70-71, 102-06. CW 2 explained that sales of ELF products at Ulta significantly declined in June or July 2024 and stayed low for the rest of the year. ¶103. Other CWs, namely CWs 1 and 3, corroborated

this decline. ¶¶104-106. And CWs 2 and 4 reported that new product launches in 2024, which ELF relied on to drive sales growth, flopped, further depressing sales. ¶¶107-09, 143-44.

Worse, as ELF's stock price skyrocketed, the Individual Defendants sold tens of millions worth of stock outside the parameters of pre-set trading plans. In April 2024-June 2024, the months before ELF stock began to fall, Defendants Fields and Amin collectively sold $28 million worth of stock while its price was at its peak. ¶¶270-72.

### C.    The Truth Was Gradually Revealed While Defendants Continued to Mislead Investors

The truth was partially revealed on August 8, 2024, when ELF released its fiscal Q1 2025 results (i.e., April – June 2024) and provided its outlook for fiscal Q2 2025. ¶¶123-24. This earnings report was materially weaker than analysts expected, which signified that demand had fallen even as inventory continued to rise. *Id*. ELF's stock plummeted as a result of this disclosure, falling $27.12 per share, or 14.4%. ¶126.

Nevertheless, Defendants continued to falsely reassure investors that demand was strong and inventory was rising to meet demand. ¶128. Defendants also promised investors that they were seeing growth in all of their channels, including in their national retailers. ¶¶127-30. However, at the same time that Defendants were touting heightened demand as the driver of inventory to the public, they internally continued to attribute their swollen inventory to decreased demand and an inability to move product. ¶¶99-101, 110.

In fact, the issues were so pronounced that attendees of monthly forecast meetings attended by Defendant Amin discussed plans to enlist retail partners to help move ELF's stockpiles of excess and obsolete inventory. ¶100. While externally Defendants professed confidence, internally they were reeling. For example, CW 4 reported that ELF's sales slowed in August 2024 and were roughly 12% below the Company's internal projections in September and October, staying that way throughout 2024. ¶145. Moreover, ELF had internally acknowledged the previous month that it was going to have a bad quarter. ¶146. Accordingly, Defendants knew but continued to conceal from investors that ELF was barreling towards its worst growth quarter in years. ¶5.

### D.    The Full Truth Was Revealed

The full truth was revealed on February 6, 2025, when ELF released its fiscal Q3 2025 results (the period between October – December 2024) and reduced its fiscal year outlook for the first time since 2020. ¶¶26, 154. ELF's guidance was lowered mere months after raising it, as Defendants admitted ELF's revenue would fall and guiding sales growth for Q4 to a paltry -1%-2%. ¶¶154-56. Defendants finally conceded that these revisions reflected lowered demand trends and slower-than-expected new product performance—all of which they knew about since early 2024. *Id*. And for the first time in years, Defendants did not attribute their still-swollen inventory to increased demand. ¶155. On this news, the stock fell 19.6 percent in a single day. ¶157.

## III.    ARGUMENT

### A.    Legal Standard on a Motion to Dismiss

In evaluating a motion to dismiss, the Court must accept all factual allegations in the Complaint as true, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), construing all facts "in the light most favorable to plaintiffs[.]" *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1094-95 (9th Cir. 2011). "To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege: (1) a material misrepresentation or omission ("falsity"), (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation."  *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024).

Moreover, at the pleading stage, Defendants may not create their own version of events by attaching extrinsic documents. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018) ("the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery"). Instead, on a motion to dismiss, the Court must accept the allegations as true, interpret them in the light most favorable to the plaintiff, and determine whether a complaint states a claim. *Id.* at 1014. For this reason, Lead Plaintiffs object to Defendants' Request for Judicial Notice to the extent Defendants offer these exhibits for the truth of the matter asserted therein. *Id.* at 1003

("it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint").

## B.   Defendants' Misstatements Were False and Misleading When Made

The Complaint adequately pleads falsity by specifying each misleading statement or omission and the reason it was misleading. *Hable v. Godenzi,* 2024 WL 5252227, at \*2 (9th Cir. Dec. 31, 2024). A statement is false or misleading if it "directly contradicts what the defendant knew at that time" or "omits material information." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023).

Additionally, a public statement is materially false or misleading if it is "inconsistent with" internal information. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017). Accordingly, a statement is misleading if it would give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Loc. 228 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017).

### 1.   Inventory Statements Were False and Misleading When Made

The Complaint adequately alleges that Defendants misled investors about the cause of ELF's rising inventory levels during the Class Period. Throughout 2024, Defendants repeatedly assured investors that the cause of the rising inventory was to "***build back our inventory levels***" to "***support the demand that we're seeing***." ¶¶164-65, 173-74, 187-88, 203-05, 217.

These misstatements were material because although investors could see that ELF's inventory was rising, they had to rely on Defendants' statements to interpret that rise in inventory and what it meant to ELF's prospects. Indeed, a sustained rise in ELF's inventory could signal one of two things to the market. On the one hand, an inventory rise could signal that ELF saw increased consumer demand from its retail partners, leading ELF to raise its own inventory to meet demand from the end consumer. ¶¶76-77. Conversely, rising inventory could be a sign of lower demand, meaning that ELF was unable to reduce its inventory because its retail partners were unable to sell existing product to the end consumer and stopped ordering more products from ELF. *Id.*

Throughout the Class Period, Defendants told investors it was the former—that rising inventory was a signal of strong consumer demand—when in truth, demand had collapsed.

Courts have found similar statements attributing inventory buildup to heightened demand to be false and misleading when an increase in inventory is not caused by increased demand. *See, e.g., In re SolarEdge Techs., Inc. Sec. Litig.*, 2024 WL 4979296, at *10 (S.D.N.Y. Dec. 4, 2024) (holding it was misleading to attribute rising inventory levels to heightened demand when inventory rose for other reasons); *Simon v. Am. Power Conversion Corp.*, 945 F. Supp. 416, 429 (D.R.I. 1996) (same). Here, Defendants' knowingly false statements disguised the true reason for rising inventory from investors, robbing investors of material information about demand that would have informed their investment decision.

Defendants claim that the Complaint fails to allege that their statements were false at the time they were made, arguing that demand remained strong throughout the Class Period. MTD at 11 ("none of the CWs upon whom they rely alleges demand was not strong at the time"); MTD at 14 (inventory statements in August and November not false "for the reasons described above"). But these arguments simply ignore the allegations in the Complaint, which explain statements about the cause of inventory rise (demand) were contradicted by contemporaneous information demonstrating demand had declined significantly.

To illustrate, on August 8, 2024, Defendants assured investors that ELF was "***build[ing] back [its] inventory levels to support the strong consumer demand***" and falsely claimed the "driver" of inventory growth was heightened demand in the corresponding earnings presentation. ¶¶187-88. Indeed, Defendants continued to tell investors that increased demand was causing the rise in inventory throughout 2024. *See* ¶¶203-05 (Fields's false statements in November 2024 that inventory rise was driven by ***"the demand we're seeing"***); ¶217 (Amin's false statements in November 2024 that ELF "***built up inventory to . . . meet the strong demand we're seeing***").

However, by Summer 2024, Defendants knew and had already discussed internally that inventory buildup was actually attributable to decreased demand. For example, CW 4 stated that ELF was sitting on a lot of inventory beginning in Summer 2024 because sales were declining,

¶99, not because of increased demand. Indeed, CW 4 explained that a regular topic of discussion in monthly forecast meetings that Defendant Amin attended in Summer 2024 was the excess inventory that was piling up at ELF, and its inability to move that inventory. ¶¶99-100, 110-14. Similarly, CW 2 noted that sales to Ulta—critically, one of ELF's largest customers—had plummeted as Ulta stopped ordering products due to a backlog and recalled that sales at Ulta declined in June or July 2024 and stayed down throughout the rest of 2024. ¶¶101, 103.

In other words, at the same time Defendants claimed increased demand was driving increased inventory, contemporaneous internal data demonstrated the opposite: that declining demand and declining sales to ELF's retail partners were the true causes of ELF's raised inventory levels. Therefore, Defendants' statements on August 8, 2024 and November 6, 2024 were false and misleading because they were contradicted by contemporaneous internal data. *See In re Quality Sys.*, 865 F.3d at 1144 (statement is false or misleading if "inconsistent with" internal information"). Furthermore, Defendants' statements also omitted contrary information: once Defendants chose to tout their inventory levels as a sign of increased demand, they were required to disclose all information, including any relevant facts cutting against their representations. *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016). At no point in touting their inventory growth did Defendants mention that lessened demand was a contributor to their rise in inventory.

Defendants' inventory statements prior to then—namely, their statements in February 2024 that they "*continue[d] to build back [ELF's] inventory through fiscal 2024 to support strong consumer demand*" and had "*the appropriate levels on inventory*" to "*support the demand [they]'re seeing*" and their statements on May 22, 2024 that they "*have been increasing that inventory position to support the demand we're seeing*"—were also contemporaneously false. ¶¶164-65, 172-73. In the months prior to February 2024, ELF's inventory and accounts receivable growth (which measured the total stock of ELF products held by both ELF and retail clients) exceeded sales growth, and its inventory turn (which measured the speed ELF was moving through its stock of inventory) fell from 2.41 to 1.54. ¶¶90-95. In other words, ELF's inventory was rising

faster than its ability to move that inventory through sales. The decline in inventory turns served as a red flag to Defendants that inventory growth was outstripping demand and was fueled by an inability to move product, not increased demand.

Although Defendants dismiss these metrics as irrelevant because they were public, *see* MTD at 9, Defendants were the only ones who had access to complete and accurate sales data (especially with respect to one of its most important customers, Ulta)—information that was necessary to understand if the decline in inventory turns was due to lack of demand or something else (which is what Defendants' false statements touting demand led investors to believe). *See* ¶95 n.7. Defendants similarly argue that an inventory turn of 1.54 could not have reflected lower demand because quarterly turns remained above 1. MTD at 9-10, 14. That is both factually incorrect and improperly contrary to the allegations in the Complaint. As the Complaint alleges, an inventory turn ratio declining from 2.4 to 1.5 signifies bloat and lessened demand. ¶¶85-86.

In sum, taken together with Defendants' access to nonpublic demand data and CW allegations that inventory was rising due to lower demand, the only reasonable conclusion is that lowered demand caused the increase in ELF's inventory at the start of the Class Period in February 2024, when Defendants falsely attributed the increased inventory to increased demand.

### 2.    Defendants' Additional Arguments for the Inventory Statements Fail

To the extent Defendants grapple with the Complaint's allegations, their arguments are without merit. *First*, Defendants argue that ELF disclosed its plans to build inventory, so the market could not have been surprised when inventory increased. MTD at 10, 13, 14. But that argument ignores **why** those statements were false and misleading. It was not the mere fact that inventory increased that misled investors; it was Defendants' statements describing what caused ELF's inventory growth.[2] Moreover, once Defendants spoke on the cause of any inventory increases, they assumed a duty to disclose any material facts related to the inventory levels,

---

[2] Defendants incorrectly suggest Lead Plaintiffs "do not dispute" that the rise in inventory was partially caused by an accounting change. MTD at 10. False. Lead Plaintiffs explicitly alleged Defendants' excuse that inventory rise was caused by an accounting change was false. ¶206.

including whether the inventory rise was caused by lowered demand or sales. *See Arena Pharms., Inc.*, 840 F.3d at 705-06; *In re SolarEdge Techs.*, 2024 WL 4979296, at *10 ("In speaking on the causes of rising inventory, Defendants assumed a duty to be both accurate and complete.").

*Second*, Defendants argue that they did not mislead investors because ELF suggested that demand may drop yet still met its guidance. MTD at 12-14. This too misses the mark. Defendants' statements that ELF would grow slower than before did not convey that demand had already cratered. Although Defendants admitted in November 2024 that they had observed some softening demand trends, they continued to maintain those trends did not affect demand or sales, going so far as to <u>raise guidance</u> in November and continuing to insist in both August and November that the inventory rise was in response to observed increased demand. ¶¶187, 200. Disclosing lowered growth while raising guidance and insisting strong demand was still driving inventory growth did not cure Defendants' false inventory statements. *See Pardi v. Tricida, Inc.*, 2022 WL 3018144, at *6 (N.D. Cal. July 29, 2022) (falsity only cured if "information withheld or misrepresented was transmitted to the public with a degree of intensity and credibility to effectively counterbalance the misleading impressions created by insider one-sided representations"). And the fact that ELF still reported positive sales growth and met guidance is similarly unhelpful to Defendants—ultimately, ELF's results were significantly worse than expected by the market, as the corrective disclosure, and the steep stock price decline that resulted, demonstrated.

*Third*, Defendants resort to attacking the CWs' reliability, launching a scattershot assault on their testimony to suggest the Court should disregard the CW's testimony. None of their attacks undermine the probative value of the CWs. Under Ninth Circuit law, CW allegations are deemed credible where the complaint: (1) describes the CWs "with sufficient particularity to establish their reliability and personal knowledge;" and (2) the testimony of the CWs are "indicative of scienter [or falsity]." *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009); *see also In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 787 (9th Cir. 2020) (*Zucco*'s two-prong test applicable to falsity as well as scienter). That is precisely what the Complaint does. Lead Plaintiffs have described each of the four CW's job descriptions, responsibilities, employment timeframes,

and details such as specific meetings both the CWs and Defendants attended—in other words, the basis for the CW's knowledge. ¶¶45-48. That is all that is required under the first prong of *Zucco*.

In attacking the CWs, Defendants mischaracterize the Complaint's allegations, claiming that "it is not even clear [CW 2] was employed by ELF" and arguing that CW 4 was a third-party consultant, not an ELF employee. MTD at 10-11. Defendants are wrong. Both CWs were ELF employees, as the Complaint makes clear. *See* ¶46 ("CW 2 was employed by ELF,"); ¶48 ("CW 4 was employed by ELF as a senior member of ELF's sales team[.]"). Defendants cannot dismiss a complaint by misstating its allegations. Moreover, the CWs' testimony is indicative of falsity because, taken collectively, the CWs explain that ELF experienced flagging demand in Summer 2024 and into the fall and winter, particularly in its untracked channels such as Ulta, causing its inventory to swell. *See, e.g.*, ¶¶175-79.

*Finally*, Defendants misleadingly suggest that Defendant Amin never made false statements concerning inventory before November 2024. *See* Appendix A to MTD (ECF No. 58-1). This argument is wrong on the facts and the law. As CEO of ELF, Amin had ultimate authority over statements the Company made, including statements in investor presentations throughout 2024 claiming the increased demand was a "driver" of inventory. ¶¶44, 165, 174, 188. Accordingly. Amin was the maker of those statements. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011); *In re Rocket Fuel, Inc. Sec. Litig.*, 2015 WL 9311921, at *10 (N.D. Cal. Dec. 23, 2015) (allegations in complaint that defendants possessed the power and authority to control contents of investors presentations sufficient for *Janus* maker liability to attach).

### 3.    Defendants Made Several Other False and Misleading Statements

In addition to the false statements discussed above, Defendants made several additional false and misleading statements. These included statements that: (1) Defendants saw ***"plenty of growth to be had"*** (¶117); (2) "***saw growth across all of our channels***" and "***are pleased with what we're seeing out of our retailers***," (¶¶191-92); (3) were raising guidance from 25-27% to 28-30%, <u>because</u> of an "***outperformance in Q2 relative to [ELF's] expectations***," (¶¶199-200);

(4) ELF had a "*growing market share*" (¶220); and (5) ELF's "*business was strong*" at Ulta, ELF had "*great business with [Ulta]*" (¶221). These statements were all false and misleading at the time they were made.

*First*, statements touting ELF's growth during the Class Period were false when made (¶¶117, 191-92, 220) because Defendants observed, through sales data they compiled and reviewed, that ELF's growth had slowed and demand had dropped. *See* ¶¶72, 111-12, 133-34, 143-46. Defendants' choice to tout growth while observing the opposite misled investors. *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1042 (N.D. Cal. 2018) (statements touting sales growth were misleading when such statements were contradicted by internal data).

*Second*, Defendants' statements in August and November 2024 claiming that their business was strong at retailers such as Ulta were false and misleading when made (¶¶191-92, 221). Defendants bragged to the market that they had "great business at Ulta" when, in reality, Ulta sales had plummeted in June or July of 2024 to the point where Ulta stopped ordering additional inventory from ELF. ¶¶177-78, 182; *see, e.g., In re Quality Sys., Inc.*, 865 F.3d at 1143 (statement that sales pipeline "strong" materially false because, in context, it conveyed that sales pipeline continued to grow).

*Finally*, Defendants' statements raising guidance because of purported "outperformance" were false and misleading when made and omitted material facts. ¶¶199-200. Specifically, Defendants misled investors about the **reason** for the guidance raise, claiming it was because of stronger than expected sales, when in reality, internal data showed sales were 12% below internal expectations. ¶¶201-02. Accordingly, the statements were false and misleading. *See Arena Pharms., Inc*., 840 F.3d at 705-06 ("once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information"); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) (failure to disclose then-existing material facts cutting against guidance raise actionable).

#### 4.    Defendants' Independent Falsity Defenses Fail

Defendants rotely and incorrectly aver that independent falsity defenses—*e.g.*, safe harbor, opinion statements, and puffery—warrant dismissal of the alleged misstatements. *See* MTD at 15-19. For the reasons set forth herein, Defendants' arguments fail as a matter of law.

#### (a)    Defendants' Statements Are Not Protected By The Safe Harbor

Defendants set forth a blanket challenge to "[n]early all" or "fourteen" of the alleged misstatements as protected by the PSLRA safe harbor. MTD at 15-17. However, Defendants fail to explain what portion of these statements are supposedly forward-looking, as they merely refer to their appendix to list the statements and conclude they are inactionable.[3] *Id*. This alone dooms their arguments. *In re Concho Res. Inc. Sec. Litig.*, 2023 WL 2297425, at *13 n.11, (S.D. Tex. Feb. 23, 2023), *adopted in part by,* 2023 WL 4146278 (S.D. Tex. June 23, 2023) (rejecting safe harbor argument where defendants failed to "specify what portion [of each] statement is inactionable").

Even if Defendants had identified the statements with any degree of specificity, their arguments are plainly wrong. The safe harbor protects a statement only if "forward-looking and either is accompanied by [meaningful] cautionary language or is made without actual knowledge that it is false or misleading." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1190 (9th Cir. 2021). The Ninth Circuit has made clear that the "safe harbor is not designed to protect . . . current or past facts." *In re Quality Sys.*, 865 F.3d at 1142. Yet that is precisely what Defendants attempt by challenging present tense statements regarding the purported reasons for ELF's **current** increased inventory levels or decisions to raise guidance. *See, e.g.*, ¶173 ("*we have been increasing that inventory position to support the demand*"), ¶217 ("*we built up inventory to be able to meet the strong demand*"). These statements are simply not forward-looking. *See In re QuantumScape Sec.*

---

[3] Defendants concede that the statements described in ¶173, ¶192, and ¶221 are not forward-looking.

*Class Action Litig.*, 580 F. Supp. 3d 714, 736-37 (N.D. Cal. 2022) (statement regarding present business capabilities and status not forward-looking).

To the extent this Court agrees with Defendants that any statement or portion thereof is forward-looking, the safe harbor remains inapplicable because any such forward-looking statements are not "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ" or were made with actual knowledge of their falsity. 15 U.S.C. § 78u-5(c)(1)(A). The examples cited by Defendants are scarce and fail to specify what risk factor applies to which portion of which statement. The law on this point is clear: "a boilerplate listing of generic risks [that] does not mention the specific risk to which [Defendants] ha[ve] been alerted" is well out of the applicable bounds for the safe harbor. *Glazer Cap. Mgmt.*, 63 F.4th at 778. Moreover, "cautionary language is not 'meaningful' [as] it discusses as a mere possibility a risk that has already materialized." *Id*. at 781. Defendants cannot rely on disclosure of vague risks that demand might, may, or could drop if they observed declining demand at the same time as making such hypothetical contrary statements. And as Lead Plaintiffs have explained, all statements were made with actual knowledge of their falsity, further foreclosing this argument. *See infra* at 19-23.

### (b)    Defendants' Statements Are Not Inactionable Opinions

Defendants challenge four statements as opinions, despite all asserting factual statements outside the segments cherry-picked by Defendants. MTD at 17-18. Even if these statements were opinions, Defendants rely on an incorrect and self-servingly broad interpretation that a statement's phrasing is outcome determinative. *Id*. In fact, only one statement contains phrases such as "we believe," but even that word does not categorically disqualify statements from being actionable. *Omnicare, Inc. v. Laborers Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183–84 (2015). "A statement of opinion, even if literally accurate, may be rendered misleading by the omission of a material fact." *In re SVB Fin. Grp. Sec. Litig.*, 2025 WL 1676800, at *10 (N.D. Cal. June 13, 2025); *see also City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Techs*, 856 F.3d 605, 616 (9th Cir. 2017) (same). For example, a company's statement that it "believe[s]" that

LEAD PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
Case No. 5:25-cv-02316-EKL                    16

demand trends will continue to be strong is actionable if it fails to disclose known facts undermining those demand trends. *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 880-81 (N.D. Cal. 2023). In other words, if a company touts the success of its business while omitting information material to a reasonable investor, it cannot immunize those statements by virtue of the word "believe." Here, like in *DocuSign*, the Complaint alleges that Defendants' misstatements omitted known and contrary facts; specifically, ELF's growing inventory levels were a result of declining demand. ¶¶13-17.

### (c) Defendants' Statements Are Not Puffery

Defendants challenge 11 statements as puffery, again relying on a spreadsheet of conclusions to challenge whole-cloth statements without specificity or context. MTD at 18; *see also Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966-67 (N.D. Cal. 2014) (assessment cannot be "in a vacuum, plucking the statements out of their context to determine whether words, taken per se … constitute puffery"). Defendants' arguments miss the mark. Courts should dismiss statements as "'puffery' only if . . . the statement is so obviously unimportant to a reasonable investor that reasonable minds could not differ on . . . their unimportance." *Id*. at 967. Not the case here. The statements discussed important metrics that analysts covered, and indeed, many were in response to analyst questions. Moreover, statements regarding inventory levels to service consumer demand and statements regarding the cause of past growth are "capable of objective verification," and thus per se not puffery. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014); *see also In re Lucid Grp., Inc. Sec. Litig.*, 2024 WL 3745605, at *20 (N.D. Cal. Aug. 8, 2024) (statements which "convey concrete facts" regarding the "core" business not puffery because such statements would be "expected to induce reliance given the relevant context").

### C. The Complaint Alleges a Strong Inference of Scienter

A complaint sufficiently pleads scienter when it alleges facts supporting a strong inference that defendants intended to deceive or were deliberately reckless "as to the possibility of misleading investors." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).

The key inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter[.]" *Tellabs, Inc.*, 551 U.S. at 310. Moreover, a strong inference of scienter "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id*. at 324.

### 1.    The CW Allegations Demonstrate a Strong Inference of Scienter

As described *supra*, the CW allegations satisfy the Ninth Circuit's two-prong standard. *Zucco*, 552 F.3d at 995. Just as the *Zucco* standard is satisfied for falsity, it is met for scienter.

*First*, the Complaint pleads details about each CW's "job descriptions," including their roles, duties, tenures, and the sources of their knowledge. ¶¶45-48. These allegations easily satisfy the first prong of *Zucco*. *See Zucco*, 552 F.3d at 995-96; *supra* §III.B.2. *Second*, testimony from the CWs strongly evidences Defendants' scienter. In assessing the second prong, courts "look to the level of detail provided by the [CWs], the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Zucco*, 552 F.3d at 995.

Here, CWs specifically describe meetings where Defendants were made aware that the statements they disseminated to the marketplace were false and misleading. For example, CW 4 stated that she attended monthly forecast meetings during her tenure, which were attended by Defendant Amin and heads of channels and heads of sales, among others. ¶252. CW 4 recalled that beginning in Summer 2024, attendees at the monthly forecast meeting, including Defendant Amin, discussed the negative sales trends they observed. ¶253. CW 4 also explained that attendees discussed excess inventory and how to move it, noting that ELF was "sitting on a lot of inventory" beginning in Summer 2024 because sales declined from the previous year. ¶190. CW 4 detailed that the buildup of inventory was so acute, attendees of the monthly forecast meetings discussed plans to have retail partners help move ELF's excess inventory. *Id.* And by mid-October 2024, CW 4 recalled that the Company, including the C-Suite, were all "aligned" that the new products did not match the Company's internal forecasts or expectations, and their sales were not comparable to previous years. ¶256. This was corroborated by other CWs, such as CWs 2 and 3,

who described how sales to Ulta fell and inventory built up in Summer 2024. ¶¶102-104. Taken collectively with other indicia of scienter, these allegations strongly support scienter. *See In re Fastly, Inc. Sec. Litig.*, 2025 WL 2721693, at *20 (N.D. Cal. Sept. 24, 2025) (CW allegations that contrary information discussed during meetings supported scienter).

### 2. Defendants' Insider Sales Support Scienter

Defendant Amin's and Defendant Fields's suspicious insider sales also "weigh heavily in favor of [] scienter." *Tellabs*, 551 U.S. at 325. When analyzing insider trading, courts look to "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 2013 WL 6441843, at *13 (N.D. Cal. Dec. 9, 2013).

### (a) <u>Amount and Percentage of Defendants' Sales Are Suspicious</u>

The amount and percentage of Defendants' total sales outside of their Rule 10b5-1 plans— collectively over $28 million in a two-month period directly before the truth was partially revealed—support scienter. ¶271. Indeed, on April 18, 2024, the Individual Defendants collectively sold over 103,000 shares and reaped over $17 million **in a single day**. ¶270. These massive sales—made outside of their 10b5-1 plans—nearly doubled the record for the most shares either person had sold in a single day in years. *Id.* Other courts within this district have found similar amounts contribute to an inference of scienter when they are also disproportionate with previous trading practices. *See, e.g., Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *15 (N.D. Cal. Mar. 31, 2023) (finding Defendants' stock sales of $17.8 million and $23.4 million were indicative of scienter, particularly when compared to previous trading history).

Defendants attempt to rebut this by claiming that Amin and Fields increased their total ELF holdings during the Class Period which "undercuts any inference of scienter." MTD at 20. In doing so, Defendants cite misleading documents and omit relevant information. Moreover, their arguments—which are based on cherry-picked Form 4s they apparently use for their calculations—are flawed in various ways.

*First*, in claiming that Amin and Fields increased their holdings during the Class Period, Defendants misleadingly include acquisitions which the Individual Defendants received **months after** the Class Period. For example, in suggesting that Fields possessed 113,961 shares at the end of the Class Period, Defendants conveniently omit that this number includes 94,027 shares that Fields received in April 2025—two months after the Class Period. In reality, however, both Amin and Fields drastically **decreased** their stock holdings during the Class Period. *See* Ex. 14 at 11 (Amin's stock ownership went from 252,792 units at the start of the Class Period to 99,699 units at the end the Class Period, a decline of more than 60% prior to his post-Class Period purchase of 179,505 units of stock); Ex. 15 at 2, 4 (Fields' stock ownership went from to 77,146 units at the start of the Class Period to 68,147 units at the end of the Class Period).[4]

*Second*, Defendants' mischaracterization of Defendant Amin's holdings suffers an additional deficiency—Defendants ask the court to use 478,254 units of stock as the endpoint to measure his increase/decrease in stock ownership, compared to the 252,792 units he directly possessed before the Class Period. MTD at 20. However, this comparison is apples to oranges; not only do Defendants point to a Form 4 which describes purchases made **after** the Class Period, but the particular number they cite refers to Amin's **indirect** ownership of shares in his family partnerships; wholly distinct holdings from his direct holdings. Ex. 14 at 4, 11. As such, this argument should be discarded.

*Third*, Defendants' argument that some of Amin's and Fields' sales were "nondiscretionary transactions to cover taxes on equity compensation" does not negate the inference of scienter, particularly given Defendants still derived substantial benefit from such sales. *See Docusign, Inc.*, 669 F. Supp. 3d 849, 885 (N.D. Cal. 2023) (sales suspicious despite a significant portion of sales being "Code F" sales allegedly made to pay personal taxes). Moreover, regardless of the purpose

---

[4] Defendants' arguments based on Exhibits 14 and 15 are additionally flawed because those Exhibits omit numerous Form 4s where Defendants sold shares sales during the Class Period—including Form 4s for both Individual Defendants describing $8 million in stock sales between April 2024 and June 2024, and all Form 4s for Defendant Amin dated between June 2024 and April 2025. ¶271, Ex. 14 at 6-11, Ex. 15 at 3-4.

of the stock sale, concealing negative information before those sales but after Defendants knew demand was waning was a discretionary choice that contributes to an inference of scienter. *Id*. at 885-86.

*Finally*, Defendants' attempt to use extrinsic documents as evidence of "non-discretionary" transactions runs afoul of Ninth Circuit precedent.  In *Khoja*, the Ninth Circuit cited "a concerning pattern" of abuse of judicial notice and incorporation by reference in securities cases, holding that neither doctrine permits consideration of disputed facts for their truth. *Khoja*, 899 F.3d at 999. Under *Khoja*, while Form 4s are appropriate for judicial notice, "judicial notice is confined to recognizing *only* that [certain transactions] existed," not that these transactions "confined Defendants' trading discretion." *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 829 (N.D. Cal. 2019) (emphasis in original) (reversed on other grounds). In other words, the truth of the assertion Defendants are making—that the Form 4s rebut scienter because the transactions were made to cover tax expenses—is a disputed fact not appropriate for judicial notice (or incorporation by reference).

### (b)      Defendants' Insider Sales Are Suspiciously Timed

The timing of the Individual Defendants' stock sales further supports scienter. *See No. 84 Emp-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d at 920, 939 (9th Cir. 2003) (sales suspicious when made "near the stock's peak . . . and just prior to the stock's decline"). Amin and Fields collectively unloaded over $17 million of stock on April 18, 2024, near the zenith of ELF's stock price, while ELF's inventory was skyrocketing due to decreased demand (which only Defendants knew about). ¶¶270-72. Over the next two months, the Individual Defendants continued to sell massive amounts of stock, collectively selling $28 million of their ELF stock outside of their Rule 10b5-1 plans between April and June 2024. *Id*. At the same time the Individual Defendants sold their stock, they continued to make misleading statements to the marketplace that fraudulently inflated the stock price. For example, in May 2024, both Individual Defendants told the market that ELF's inventory rise was caused by increased demand, and in June 2024, Defendant Amin falsely stated to investors that "***there's still plenty of growth to be had***."

¶¶172-74, 180. Shortly after the Individual Defendants both made these statements and sold tens of millions worth of shares, ELF's stock price began to fall, as Defendants' fraud was revealed.

**(c)      Defendants' Sales Are Inconsistent with Their Trading Patterns**

Third, the Complaint adequately alleges that the sales were not consistent with Defendant Amin's and Fields' prior trading history. The massive sales by both Defendant Amin and Fields on April 18, 2024 nearly doubled the record for the most shares either person sold in any single day in years. ¶270. This demonstrates a strong departure from the historic trading patterns of Defendants Amin and Fields. Taken together, Defendants' insider sales support scienter.

**3.      Access To Information Supports Scienter**

"Particularized allegations that defendants had actual access to the disputed information raise a strong inference of scienter." *In re Quality Sys., Inc.*, 865 F.3d at 1145. For example, the Ninth Circuit has found allegations that defendants had "real-time access" to contrary sales information strongly indicative of scienter. *Id*. Lead Plaintiffs have alleged similar circumstances exist here. For example, CW 4 stated that all ELF employees had access to ELF's data visualization platform containing real-time sales data, and the Company's C-suite reviewed sales data in the data visualization platform "all the time" because ELF is a very "data-driven" company. ¶¶248-49. Defendants also bragged about their close monitoring of inventory and sales data, including claiming that ELF had a data team that is "constantly going through everything from creating the data lake to how we mine that." ¶¶258-66.

**4.      Core Operations Support Scienter**

Core operations theory further evidences scienter. Core operations allegations can support scienter in three ways: "(1) when they, along with other allegations, support a cogent and compelling inference of scienter," (2) when presented along allegations of actual access; and (3) when the subject of the relevant fact is of such prominence it would be "absurd" to suggest management lacked knowledge. *See Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitchfix, Inc.¸* 2025 WL 1900722 at *9 (N.D. Cal. July 9, 2025). All three circumstances are

present here. ¶¶273-84. *First*, as described herein, there are multiple other indicia of scienter, which combined with core operations theory support a cogent and compelling inference of scienter. *Second*, Defendants had actual access to contrary information, as described *supra* at 22, making core operations particularly indicative of scienter. *Third*, sales growth, ELF's sales at its retail partners, and the reasons for growth in inventory were critical to ELF's core operations. *Id*. It therefore would be "absurd to suggest" that Defendants did not have knowledge of problems associated with the Company's primary revenue drivers.

### D.    The Complaint Establishes Loss Causation

The crux of loss causation is "whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). "To prove loss causation, plaintiffs need only show a causal connection between the fraud and the loss, by tracing the loss back to the very facts about which the defendant lied[.]" *Id*. The Ninth Circuit has explained that "loss causation is a 'context-dependent' inquiry as there are an 'infinite variety' of ways for a tort to cause a loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).  Indeed, "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings[.]" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

Here, Defendants' materially false and misleading statements directly and proximately caused the damages suffered by Lead Plaintiffs. Throughout the Class Period, Defendants misled investors about the demand for ELF's products, leading investors to believe ELF's purportedly strong demand would lead to commensurate earnings growth. The truth was first partially revealed on August 8, 2024, when Defendants signaled a slowdown in topline growth and EBITDA pressure, sending ELF shares down by 14.4% in a single day. ¶¶184-85. The misstatements were fully corrected on February 6, 2025, when Defendants finally attributed poor financial outlook to lower demand trends (which Defendants internally knew about since the start of the Class Period) and poor new product performance, causing ELF shares to fall by 19.62% in a single day. ¶224.

Therefore, these disclosures of poor financial results caused by lower demand trace back to the false and misleading statements about demand for ELF's products. Indeed, allegations such as these are routinely sufficient in this District. *Leventhal v. Chegg, Inc.*, 721 F. Supp. 3d 1003, 1017–18 (N.D. Cal. 2024) (loss causation satisfied based on allegations that lowered revenue projections revealed previous demand statements were false and misleading); *In re Seagate Tech. Holdings PLC Sec. Litig.*, 2025 WL 1744505, at *10 (N.D. Cal. May 12, 2025) (same); *Azar v. Yelp*, Inc., 2019 WL 285196, at *5 (N.D. Cal. Jan. 22, 2019) (same).

Defendants argue that the Complaint does not sufficiently allege loss causation, but in so doing, Defendants skew the Complaint's theory as solely related to guidance revisions. MTD at 25. This is simply wrong. The Complaint alleges that statements touting inventory had been built up to "support strong consumer demand" artificially inflated the price of ELF shares. ¶164. As a result, investors believed that purportedly strong demand would lead to continued strong earnings. However, following the final corrective disclosure, investors finally learned that Defendants had been concealing evidence that ELF's demand had been slipping, its innovations had been underperforming, and its inventory had been ballooning due to poor sales. ¶243.

Indeed, analyst coverage of this shocking news confirms that the market was reacting to new information on ELF's stagnant sales growth. For example, Oppenheimer commented "[w]e did not ***anticipate this severe a guide-down and moderation in the business***." ¶242. Therefore, the cases relied upon by Defendants are also inapposite. *See Dolly v. GitLab Inc.*, 2025 WL 2372965, at *16 (N.D. Cal. Aug. 14, 2025) (failure to plead with particularity how the "market understood" suboptimal financial performance was "a revelation of fraud"); *Scandlon v. Blue Coat Sys., Inc.*, 2013 WL 5313168, at *4 (N.D. Cal. Sept. 23, 2013) (pure guidance case); *Plumbers & Steamfitters Loc. 60 Pension Tr. v. Meta Platforms, Inc.*, 2024 WL 4251896, at *11 (N.D. Cal. Sept. 17, 2024) (purely forward-looking disclosure was not new news); *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 494 (S.D.N.Y. 2021) (out of circuit case where alleged corrective disclosures had no relation back to misstatements).

Defendants also argue that courts in this District are forbidden from recognizing a materialization of the risk theory of loss causation absent express endorsement by the Ninth Circuit. MTD at 25. Yet, courts in this District have both long and recently upheld such a theory on substantially identical facts to the present case. *See, e.g.*, *In re Fastly.*, 2025 WL 2721693, at *22–23 (loss causation satisfied under materialization of risk theory based on allegations guidance miss revealed declining demand); *see also Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 n.5 (9th Cir. 2013) (Ninth Circuit decision noting that district courts within the Circuit have applied this theory). Accordingly, Defendants' arguments should be rejected.

## IV.    CONCLUSION

For all these reasons, Defendants' Motion should be denied in its entirety. If the Court grants any part of the Motion, Lead Plaintiffs respectfully request leave to amend.

DATED: October 22, 2025

/s/ *James T. Christie*
**LABATON KELLER SUCHAROW LLP**
Michael P. Canty (*pro hac vice*)
James T. Christie (*pro hac vice*)
Nicholas D. Manningham (*pro hac vice*)
Stephen C. Boscolo (*pro hac vice*)

140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-047
mcanty@labaton.com
jchristie@labaton.com
nmanningham@labaton.com
sboscolo@labaton.com

*Counsel for Lead Plaintiffs*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Lucas E. Gilmore (Bar No. 250893)
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001

lucasg@hbsslaw.com

*Liaison Counsel for Lead Plaintiffs*