LATHAM & WATKINS LLP
 Michele D. Johnson (Bar No. 198298)
  *michele.johnson@lw.com*
 650 Town Center Drive, 20th Floor
 Costa Mesa, California 92626
 Telephone: +1.714.540.1235

 Colleen C. Smith (Bar No. 231216)
  *colleen.smith@lw.com*
 12670 High Bluff Drive
 San Diego, California 92130
 Telephone: +1.858.523.5400

 Eric R. Swibel (*pro hac vice*)
  *eric.swibel@lw.com*
 330 North Wabash Avenue, Suite 2800
 Chicago, Illinois 60611
 Telephone: +1.312.876.7700

 Whitney B. Weber (Bar No. 281160)
  *whitney.weber@lw.com*
 Daniel R. Gherardi (Bar No. 317771)
  *daniel.gherardi@lw.com*
 505 Montgomery Street, Suite 2000
 San Francisco, California 94111
 Telephone: +1.415.391.0600

*Attorneys for Defendants e.l.f. Beauty, Inc.,*
*Tarang P. Amin, and Mandy J. Fields*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE e.l.f. BEAUTY, INC. SECURITIES LITIGATION<br><br>Defendants. | Case No. 5:25-cv-02316-EKL<br><br>**DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Hon. Eumi K. Lee<br><br>**JURY TRIAL DEMANDED** |

Defendants e.l.f. Beauty, Inc. ("e.l.f." or the "Company"), Tarang P. Amin ("Amin"), and Mandy J. Fields ("Fields") (collectively, "Defendants"), by and through their attorneys of record, hereby answer and assert defenses to the claims and allegations made by Lead Plaintiffs Boston Retirement System and Metropolitan Employee Benefit System ("Lead Plaintiffs"), in their Consolidated Complaint for Violation of Federal Securities Laws (the "Complaint") (Dkt. 55). To the extent not expressly admitted, Defendants deny all allegations in the Complaint, including all allegations contained in section headings, footnotes, or other portions of the Complaint that are not contained within the specifically numbered paragraphs of the Complaint. Likewise, to the extent that headings and subheadings in the Complaint are intended to constitute factual allegations, Defendants deny the allegations insofar as they relate to Defendants. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the Complaint's headings or subheadings and therefore deny those allegations on that basis.

Defendants' responses are made upon information and belief and may change subject to further investigation. Defendants expressly reserve the right to amend their Answer, or seek leave to amend their Answer, and to modify and/or assert all claims, defenses, counterclaims, and third-party claims permitted by law. Numbered paragraphs below correspond to the like-numbered paragraphs in the Complaint. In addition, the Complaint included bold and italicized emphases, which are replicated in the quoted paragraphs.

**PLAINTIFFS' PREAMBLE**

Court-appointed Lead Plaintiffs Boston Retirement System ("Boston") and Metropolitan Employee Benefit System ("Nashville" and together with Boston, "Lead Plaintiffs"), individually and on behalf of all persons and entities who or which, during the period from February 7, 2024 to February 6, 2025, inclusive (the "Class Period"), purchased the publicly traded common stock of ELF Beauty, Inc. ("ELF" or the "Company") (NYSE: ELF) and were damaged thereby (the "Class"), bring this Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") against ELF and current Chief Executive Officer ("CEO") Tarang P. Amin and current Chief Financial Officer ("CFO") Mandy Fields (the "Individual Defendants" and together with ELF, "Defendants"). Lead Plaintiffs bring this action seeking to recover

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

Lead Plaintiffs' claims are brought upon personal knowledge as to their own acts and upon information and belief as to all other matters, based upon, among other things, a review and analysis of: (1) reports and documents filed by ELF with the Securities and Exchange Commission ("SEC"); (2) reports issued by analysts covering or concerning ELF and its business; (3) press releases, news articles, transcripts, videos, and other public statements issued by or about ELF, its business, and Defendants; (4) an investigation conducted by Lead Plaintiffs' attorneys, including interviews with confidential witnesses ("CWs"); and (5) other publicly available information concerning ELF, its business, and the allegations contained herein. Lead Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein and will continue to be revealed after Lead Plaintiffs have a reasonable opportunity for discover.[1]

**ANSWER**: Defendants admit that Lead Plaintiffs purport to bring this action seeking to recover damages under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder. Defendants aver that on February 4, 2026, the Court dismissed from the Complaint any statements made between February 7, 2024 and November 20, 2024. Dkt. 65 ("Order"). Accordingly, although the Complaint purported to assert claims on behalf of purchasers of e.l.f. common stock between February 7, 2024 and February 6, 2025, the action is now limited to asserting claims on behalf of purchasers of e.l.f. common stock between November 21, 2024 and February 6, 2025, inclusive (the "Putative Class Period"). Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the preamble and in footnote one, and therefore deny those allegations on that basis. Except as expressly admitted, Defendants deny the remaining allegations in the preamble, and in footnote 1,

---

[1] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, and/or control person of ELF during the Class Period, and members of their immediate families and any trust established by or for such excluded person; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) ELF's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

I.    NATURE OF THE ACTION

1.    This securities fraud class action arises from Defendants' false and misleading statements to investors about the demand for ELF's products. Despite knowing that demand and sales growth had slowed to its lowest levels in years, Defendants falsely told investors that demand was as strong as ever and would lead to continued sales growth, leaving investors holding the bag when ELF unexpectedly disclosed its lowest sales growth in over six years.

**ANSWER**:  Defendants admit that the Lead Plaintiffs purport to bring a securities class action. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

2.    Throughout the Class Period, Defendants falsely assured investors that the sales growth ELF experienced before the Class Period would continue because of strong demand in all the Company's channels. Indeed, Defendants even falsely explained away possible signals of slowing demand—such as rising inventory levels—by falsely telling investors ELF was ordering more inventory to meet the strong demand they were currently seeing

**ANSWER**:  Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

3.    In reality, however, Defendants knew that ELF's sales growth would not continue, as they had observed plummeting demand trends, including (i) rising inventory levels (which they knew were caused by lower sales, not rising demand), (ii) declining sales from large, important retailers, and (iii) the repeated failures of the Company's key "innovation" products that had been critical to ELF's success up to that point.

**ANSWER**:  Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

4.    The truth was partially revealed on August 8, 2024, when the Company disclosed weaker-than-expected guidance.  In response, ELF's stock price declined by more than 14% in a single day, as investors began to be concerned about ELF's sales growth.  However, Defendants continued to mislead investors throughout the rest of the calendar year 2024, reassuring the market

that ELF had continued to see strong demand and that the Company's higher inventory was because of the strong demand that Defendants had observed.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed all statements before November 21, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

5. The full truth was revealed on February 6, 2025, when after more than 17 quarters of double-digit year-over-year sales growth, Defendants were forced to reveal that ELF was not growing like they had falsely told investors and lowered net sales growth in their Q4 FY 2025 to between -1% and 2%, the worst sales growth quarter in six years. Investors were shocked by this news, causing ELF's stock to tumble nearly 20% in a single day.

**ANSWER**: With regard to the first sentence, Defendants admit that on February 6, 2025, e.l.f. released its financial results for its third quarter fiscal year 2025 ("3Q25"), including that the Company's quarterly sales grew year-over-year ("YoY") for the twenty-fourth consecutive quarter. Defendants further aver that on February 6, 2025, e.l.f. provided updated financial guidance for its fiscal year 2025 ("FY25") (April 1, 2024 through March 31, 2025) and its fourth quarter fiscal year 2025 ("4Q25"), projecting 4Q25 YoY sales growth of -1% to 2% (which it achieved). With regard to the second sentence, Defendants aver that the stock price and average trading volume of e.l.f. stock is publicly available. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

### A. ELF's Stock Surged on the Back of Record Sustained Growth

6. ELF is a beauty company that offers low-cost cosmetics and skin care products. Although it started as a direct-to-consumer e-commerce business, it now largely acts as a retail distributor for sales at physical retailer stores. Of those retail stores, Ulta Beauty, Target, and Walmart are by far the most important, collectively accounting for approximately 50-60% of ELF's total net sales during the Class Period.

**ANSWER**: With regard to the first sentence, Defendants aver that e.l.f. is a multi-brand beauty company that offers inclusive, accessible, clean, vegan, and cruelty free cosmetics and skin care products. With regard to the second sentence, Defendants aver that e.l.f. was founded as a digital brand with a direct-to-consumer e-commerce site, and now has an omni-channel distribution strategy to sell its products with retailers in the United States, internationally, and online through its own direct e-commerce channels and other e-commerce websites. With regard to the third sentence, Defendants aver that the phrase "by far the most important" is vague and ambiguous and thus deny the allegations on that basis. Defendants aver that during FY25, Target, Walmart, Ulta, and Amazon were the Company's four largest customers, accounting for 23%, 16%, 12%, and 12% of e.l.f.'s sales, respectively. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

7. Leading into the Class Period, ELF experienced strong sales growth due to steady growth in its retail partners and their ability to develop new, innovative products that drove new sales. Starting in February 2021, ELF experienced double-digit net sales growth for the next 17 quarters (more than four years).

**ANSWER**: Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive. Defendants further aver that through the second quarter fiscal year 2025 ("2Q25") (the quarterly results for which were announced November 6, 2024, prior to the Putative Class Period beginning), e.l.f. reported YoY net sales growth for twenty-three consecutive quarters. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

8. This consistently strong sales growth was critical to the value of ELF for investors because ELF's total sales were significantly lower than its competitors. For example, peer publicly-traded companies such as Estee Lauder, Revlon, and Coty all consistently collected billions more in yearly revenue than ELF. ELF, however, claimed something that none of its competitors could: consistent and sustained net sales growth that outpaced competitors.

Accordingly, throughout the Class Period, investors were narrowly focused on ELF's ability to demonstrate continued growth in net sales.

**ANSWER**:  With regard to the first and second sentences, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.  With regard to the third sentence, Defendants aver that the sentence purports to summarize statements made by Defendants without specifying who made the alleged statements or when or how they were made.  Defendants thus lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.  With regard to the fourth sentence, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

### B. ELF's Demand Fell Throughout the Class Period, Driving Lower Sales and Burdening ELF with Excess Inventory

9.        In Fiscal Year ("FY") 2024,[2] the period directly before the Class Period, ELF reported record net sales growth, with 85% year-over-year sales growth in its Q3 FY2024 (October through December 2023).  This result, announced in February 2024, was the highest sales growth ELF would report in its history.  Unbeknownst to investors, it would also be the zenith of ELF's growth story, as Defendants had already seen indications that sales and demand were plummeting, unable to replicate the success of previous years.

**ANSWER**:  Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive.  With regard to the first and second sentences, Defendants aver that on February 6, 2024, e.l.f. announced its third quarter fiscal year 2024 ("3Q24") financial results, including that its quarterly sales increased 85% YoY, and on May 22, 2024, e.l.f. announced its fiscal year 2024 ("FY24") (April 1, 2023 through March 31, 2024) results, including

---

[2] ELF's fiscal quarters and fiscal years are offset from the calendar year. ELF's fiscal year ends on March 31. Thus, for example, for ELF's Fiscal Year 2021, Q1 ended on June 30, 2020, Q2 ended on September 30, 2020, Q3 ended on December 31, 2020, and Q4 (and the 2021 fiscal year) ended on March 31, 2021 and was reported in May 2021.  For consistency, Lead Plaintiffs will refer to all quarters using ELF's fiscal quarter system unless otherwise noted as "calendar years."

that its net sales increased 77% YoY. With regard to the third sentence, Defendants deny the allegations, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions. With regard to footnote two, Defendants admit that e.l.f.'s fiscal year ends on March 31, that its first fiscal quarter ends on June 30, that its second fiscal quarter ends on September 30, and that its third fiscal quarter ends on December 31. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

10. Specifically, by early calendar year 2024 (the start of the Class Period), ELF began to experience slowing sales for its products, caused by worsening demand trends and the failures of ELF's new products to sell. In particular, ELF's sales at Ulta Beauty, one of its most important retail channels, were declining rapidly. Several former ELF employees detail that Ulta Beauty had a lot of unsold inventory because ELF products were not selling, and thus, Ulta Beauty stopped ordering certain products from ELF in 2024.

**ANSWER**: Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive. With regard to the first and second sentences, Defendants deny the allegations, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions. With regard to the third sentence, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations on that basis. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

11. Worse, investors had no choice but to trust Defendants' statements on demand trends at Ulta Beauty. Although investors could see commercial point of sales data for some retailers (in what is referred to as a "tracked" channel), Ulta Beauty was part of ELF's "untracked" channel, meaning the market had virtually no visibility into what sales at Ulta Beauty looked like.

**ANSWER**: With regard to the first sentence, Defendants deny the allegations, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions. With regard to the second sentence, Defendants aver that Nielsen collects point of sales data for certain skincare and

cosmetic categories at certain retailers, which e.l.f. refers to as sales that occur in a "tracked channel," and which data is publicly available. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

12.    Conversely, the market could see that ELF's inventory was rising. This could mean one of two things: (1) ELF ordered more inventory to meet strong demand (similar to what it had done in the past); or (2) demand was slowing, and retailers were not ordering more product from ELF because they already had existing inventory left at their store.

**ANSWER**:  Defendants aver that every quarter, e.l.f. publicly discloses its inventory levels, and prior to the Putative Class Period, the Company disclosed that it was "build[ing] back [its] inventory."  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

13.    Given this, investors specifically asked Defendants whether the rising inventory levels were a sign of weakening demand. However, rather than tell the truth, Defendants concealed slowing consumer demand by claiming rising inventory was actually a good thing. For example, on both February 6, 2024 and May 22, 2024, Defendant Fields falsely stated that ELF continued to "***build back our inventory levels to support strong consumer demand***."

**ANSWER**:  With regard to the first sentence, Defendants aver that the sentence purports to summarize questions asked by investors to Defendants without specifying who asked the alleged questions or when or how they were made.  With regard to the second sentence, Defendants deny the allegations, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.  With regard to the third sentence, Defendants aver that on the February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on February 6, 2024 and May 22, 2024, and thus, no response to these allegations is required.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

DEFENDANTS' ANS. AND AFF. DEFENSES TO CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

14.    However, this was false. In reality, the Company had high inventory levels because demand was declining. Indeed, according to former ELF employees who attended forecast meetings with Defendant Amin and others, Defendants specifically discussed a significant decline in sales, as well as rising inventory levels and how they could move the excess and obsolete inventory.

**ANSWER**:  With regard to the first and second sentences, Defendants deny the allegations, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.  With regard to the third sentence, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations on that basis.

15.    For example, CW 4 stated that she attended monthly forecast meetings during her most recent tenure, which were attended by CEO Tarang Amin, Global Chief Marketing Officer Kory Marchisotto, heads of channels and heads of sales, among others. CW 4 detailed that the most recent Company sales data from ELF's data visualization platform was presented at these monthly forecast meetings. CW 4 detailed that contemporaneous negative sale trends were also discussed in these forecast meetings. CW 4 also stated that excess inventory was discussed at these forecast meetings.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

16.    CW 4 recalled that beginning in Summer 2024, attendees at the monthly forecast meeting discussed the negative sales trends that they were observing, including plans to turn around negative sales trends. CW 4 stated that the attendees of the monthly forecast meeting also discussed excess and obsolete inventory and how to move excess inventory. CW 4 detailed that during monthly forecast meetings, attendees discussed plans to have retail partners help move ELF's excess inventory.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

17.    As a result of Defendants' false and misleading statements about strong demand in untracked channels, like Ulta Beauty, and the reasons for ELF's rising inventory levels, investors wrongly believed that ELF's consumer demand was strong and would continue its strong track record of double-digit net sales growth.

**ANSWER**:   Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

### C. The Individual Defendants Sold Millions of Dollars' Worth of Their Shares Prior to Revealing the Truth

18.    Meanwhile, armed with this inside knowledge, the Individual Defendants sold off millions of dollars of stock, enriching themselves at the expense of the class. Although the Individual Defendants already had established Rule 10b5-1 trading plans—which allow corporate insiders to sell company stock at predetermined times in accordance with insider trading laws— the Individual Defendants made millions in stock sales between April and June 2024 outside of the parameters of their Rule 10b5-1 plans.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed all statements before November 21, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants aver that several months before the Putative Class Period, on April 18, 2024 and June 5, 2024, Amin sold 117,404 shares solely to satisfy tax or other government withholding obligations in connection with the vesting of performance and restricted stock units, in accordance with the Company's Equity Incentive Award Plan, which provides that "[u]pon vesting of the Shares, the Company, on the Participant's behalf, will instruct the Company's transfer agent . . . to sell that number of Shares . . . as may be necessary to satisfy any resulting withholding tax obligations on the Company."  Defendants further aver that several

months before the Putative Class Period, on April 18, 2024 and June 5, 2024, Fields sold 49,602 shares solely to satisfy tax or other government withholding obligations in connection with the vesting of performance and restricted stock units, likewise in accordance with the Company's Equity Incentive Award Plan, which provides that the "[u]pon vesting of the Shares, the Company, on the Participant's behalf, will instruct the Company's transfer agent . . . to sell that number of Shares . . . as may be necessary to satisfy any resulting withholding tax obligations on the Company."  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

19.    Between April and June 2024, while the Individual Defendants had access to material nonpublic information that ELF's ballooning inventory was caused by lower demand (and not because of strong demand, as they falsely told investors), the Individual Defendants collectively sold more than $28 million of their ELF stock **outside** of their Rule 10b5-1 plans. During that short time span, Defendant Amin sold more than $20 million and Defendant Fields sold more than $8 million of ELF stock. These sales included massive single-day sales of over $12.3 million for Amin and over $4.8 million for Fields—by far the most either had sold in a single day in years. These insider sales, demonstrate the Individual Defendants had knowledge of ELF's slowing demand and took advantage of that knowledge to make millions of dollars before the lower demand caused slowing sales growth and revealed the truth to investors.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed all statements before November 21, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants further aver that several months before the Putative Class Period, on April 18, 2024 and June 5, 2024, Amin sold 117,404 shares solely to satisfy tax or other government withholding obligations in connection with the vesting of performance and restricted stock units, in accordance with the Company's Equity Incentive Award Plan, which provides that "[u]pon vesting of the Shares, the Company, on the Participant's behalf, will instruct the Company's transfer agent . . . to sell that number of Shares . . . as may be necessary to satisfy any resulting withholding tax obligations on the Company."  Defendants further aver that several

months before the Putative Class Period, on April 18, 2024 and June 5, 2024, Fields sold 49,602 shares solely to satisfy tax or other government withholding obligations in connection with the vesting of performance and restricted stock units, in accordance with the Company's Equity Incentive Award Plan, which provides that "[u]pon vesting of the Shares, the Company, on the Participant's behalf, will instruct the Company's transfer agent . . . to sell that number of Shares . . . as may be necessary to satisfy any resulting withholding tax obligations on the Company." Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

### D. Defendants Began to Reveal the Truth While Hiding the Full Extent of ELF's Sales Decline

20.	Shortly after the Individual Defendants made millions in insider sales outside of their 10b5-1 trading plans, investors began to learn the truth about the slowing demand for ELF products when the Company released its fiscal Q1 2025 results (April through June 2024) and provided its outlook for fiscal Q2 2025. On August 8, 2024, ELF issued meaningfully weaker-than-anticipated guidance for fiscal Q2 2025 and acknowledged downward pressure on its adjusted EBITDA guidance, approximately $30 million lower than expected by the street, signaling a sequential slowdown in growth. On this news, **ELF's stock price fell $27.12 per share, or 14.4 percent**, to close at $160.83 per share on August 9, 2024.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed all statements before November 21, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

21.	Despite this revelation, Defendants continued to misrepresent the status of the Company to investors. Over the next six months, Defendants continued to reassure investors that they had observed strong demand for ELF products and that ELF's inventory was only elevated "***to support the demand***" that Defendants were presently seeing.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed all statements before November 21, 2024, and thus, no response to these allegations is required.  To the extent

any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

22.     During the earnings call on August 8, 2024, Defendant Amin responded to analyst questions about whether growth was slowing, and falsely denied any slowdown in growth. For example, one analyst from J.P. Morgan pressed Defendants on the possible slowdown in growth because, according to data from "tracked channels" that investors had access to, it appeared as if growth from the tracked channels was growing faster than ELF's overall growth guidance, signaling a possible slowdown in untracked channels (which investors had virtually no visibility into). However, Defendant Fields flatly denied any slowdown in growth from their untracked channels, like Ulta Beauty, and falsely stated that Defendants "*saw growth across all of our channels, digital, all of our national retailers, and international customers.*"

**ANSWER**:   Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

23.     This was false, as former ELF employees detail ELF was not experiencing growth across all channels. For example, CW 4 recalled that sales of ELF's products began to decline "across the board" in Summer 2024. CW 4 detailed that ELF's overall sales were in the high single digits percent below the Company's internal projections in Summer 2024. Additionally, CW 4 recalled that beginning in Summer 2024, attendees at the monthly forecast meeting discussed the negative sales trends that they were observing, including plans to turn around negative sales trends. Similarly, CW 2 recalled sales of e.l.f. Beauty Inc. (ELF) products at Ulta Beauty significantly declined in June or July 2024 and stayed down throughout the rest of 2024.

**ANSWER**:   Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required.  Further, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements,

and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

24.    Then, as Defendants privately saw that sales continued to decline throughout the rest of 2024, leading to rising inventory, Defendants doubled down on November 6, 2024 and again falsely told investors that they "***feel great about our inventory position***" and that "***higher inventory levels overall, [] allows us to service the demand that we're seeing***."

**<u>ANSWER</u>**:  Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024 , and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

25.    However, Defendants knew the opposite was true. For example, CW 4 recalled that attendees of the weekly and monthly inventory meeting began to express concern beginning in Summer 2024 when ELF sales began to decline. CW 4 stated that ELF was "sitting on a lot of inventory" beginning in Summer 2024 because sales were declining and were not as strong as they were the previous year. CW 4 also stated that attendees of the monthly forecast meeting also discussed excess and obsolete inventory and how to move excess inventory. CW 4 detailed that during monthly forecast meetings, attendees discussed plans to have retail partners help move ELF's excess inventory.

**<u>ANSWER</u>**:  Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required.  Further, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

**E. The Truth is Revealed When Elf Announces its Lowest Growth Quarter in Six Years**

26.    The full truth regarding ELF's demand and sales growth was revealed on February 6, 2025, when ELF released its fiscal Q3 2025 results (October through December 2024) and reduced its financial outlook for the first time since 2020. Specifically, ELF lowered its revenue and adjusted EBITDA guidance for fiscal year 2025, including guiding that net sales growth would be between negative 1% and 2% for Q4 FY 2025. This meant that year-over-year net sales growth would be in the single digits (at best) for the first time since 2020, breaking a streak that had been ongoing for 17 straight quarters.

**ANSWER**:  With regard to the first and second sentences, Defendants aver that on February 6, 2025, e.l.f. released its 3Q25 financial results (October through December 2024) and provided updated financial guidance for FY25 and 4Q25, projecting 4Q25 YoY sales growth of -1% to 2% (which it achieved).  With regard to the third sentence, Defendants admit that e.l.f.'s 4Q25 guidance projected YoY net sales growth in the single digits.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

27.    On this day, management stated that these downward revisions reflected lower demand trends, challenging category conditions, and slower-than-expected new product performance. Moreover, Defendants finally admitted that the rising inventory levels were not caused by strong demand, as they had previously claimed. Instead, for the first time in years, Defendants did not attribute the elevated inventory levels to high demand.

**ANSWER**:  Defendants aver that this paragraph purports to summarize statements made by Defendants without specifying who made the alleged statements or when or how they were made. Defendants thus lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.

28.    On this news, **ELF's stock price fell $17.36 per share, or 19.6 percent**, to close at $71.13 per share on February 7, 2025. This was a loss of over $150 per share from the Class Period intra-day high of $221.83 on March 4, 2024.

**ANSWER**:  Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive.  Defendants further aver that the stock price and average trading volume of e.l.f. stock is publicly available.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

29.    Analysts were shocked that ELF's sales growth had fallen this much, noting that ELF had displayed unexpected weakness in its "untracked channels," which Defendants had repeatedly reassured investors was not happening throughout the Class Period. Piper Sandler expressed surprise that untracked channels were as unproductive as they were, stating "we were hopeful that untracked channels would offset, [but] management is lowering guidance."

**ANSWER**:  With regard to the first sentence, Defendants aver that Lead Plaintiffs purport to summarize statements made by unknown analysts without stating when or how they were made. Defendants thus lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.  With regard to the second sentence, Defendants admit that Piper Sandler issued a report on February 6, 2025, which is publicly available and contains the language quoted in this sentence.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

30.    Following the final corrective disclosure, investors finally understood the relevant truth: (i) Defendants had been concealing declining demand, particularly in its untracked channels like Ulta Beauty; (ii) ELF had ballooned its inventory to more than $200 million worth of product because it was not able to sell its goods at the rates it promised; and (iii) ELF had failed to produce successful innovations in the latter half of 2024, despite reassuring the market during that time frame that their innovations were spurring strong growth.

**ANSWER**:  Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

31.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and Class members have suffered

significant losses and damages. This Action seeks to recover those losses caused by Defendants' fraud.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

## II.    JURISDICTION. VENUE AND DIVISIONAL ASSIGNMENT

32.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

**ANSWER**: Defendants admit that the Complaint purports to assert claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

33.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

**ANSWER**: Defendants admit that this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

34.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because ELF is headquartered in this District, the Company conducts substantial business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

**ANSWER**: Defendants admit that venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §§1391(b)-(c) because e.l.f. maintained its corporate headquarters in this District during the Putative Class Period.

35.    In connection with the acts, conduct and other wrongs alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

## III.    PARTIES

### 1.    Lead Plaintiffs

36.    Lead Plaintiff Boston Retirement System ("Boston"), headquartered in Boston, Massachusetts, is a governmental defined benefit plan, created by General Laws Chapter 32 of Massachusetts, which manages more than nine billion dollars in assets. Boston and its Board serves members, retirees, and qualified beneficiaries of all City of Boston departments, the Boston Planning & Development Agency, the Boston Housing Authority, the Boston Public Health Commission, and the Boston Water and Sewer Commission. As set forth in its Lead Plaintiff Certification (ECF No. 21-1), Boston purchased ELF common stock during the Class Period and suffered damages as a result of Defendants' violations of federal securities laws alleged herein.

**ANSWER**:    With regard to the first and second sentences, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.  With regard to the second sentence, Defendants admit that Lead Plaintiff Boston filed a certification (Dkt. 15-2) that purports to reflect records of purchases of e.l.f. common stock by Boston, but Defendants lack knowledge or information sufficient to form a belief as to the veracity of those records and deny the allegations on that basis.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

37.    Lead Plaintiff Metropolitan Employee Benefit System ("Nashville"), headquartered in Nashville, Tennessee, is a public employee defined benefit plan which manages more than four billion dollars in assets. Nashville serves public employees of the Metropolitan Government of Nashville and Davidson County. As set forth in its Lead Plaintiff Certification (ECF No. 21-1), Nashville purchased ELF common stock during the Class Period and suffered damages as a result of Defendants' violations of federal securities laws alleged herein.

**ANSWER**:    With regard to the first and second sentences, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.  With regard to the second sentence, Defendants admit that Lead Plaintiff Nashville filed a certification (Dkt. 21-1) that purports to reflect records of purchases of e.l.f. common stock

by Nashville, but Defendants lack knowledge or information sufficient to form a belief as to the veracity of those records and deny the allegations on that basis. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

### 2. Defendants

38. Defendant ELF is a multi-brand beauty company that offers cosmetics and skin care products. ELF is a Delaware corporation with principal executive offices located at 570 10th Street, Oakland, California 94607. The Company's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "ELF."

**ANSWER**: With regard to the first sentence, Defendants aver that e.l.f. is a multi-brand beauty company that offers inclusive, accessible, clean, vegan, and cruelty free cosmetics and skin care products. With regard to the second sentence, Defendants aver that e.l.f. is a Delaware corporation with principal executive offices located at 601 12th Street, 14th Floor, Oakland, California 94607. With regard to the third sentence, Defendants admit e.l.f. common stock trades on the NYSE under the ticker symbol "ELF," and aver that the phrase "efficient market" is vague and ambiguous and deny the allegation on that basis. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

39. Defendant Tarang P. Amin ("Amin") is the CEO, Chairman of the Board, and President at ELF and held that role at all relevant times during the Class Period. Prior to his role at ELF, Amin served as President, CEO and Director of Schiff Nutrition and Vice President, General Manager of The Clorox Company's Litter, Food and Charcoal Strategic Business Units. During the Class Period, in his role as CEO of ELF, Defendant Amin participated in various media interviews, earnings calls, and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact, among other things, relating to ELF's ability to sustain growth. In his role as CEO, Amin also signed the Company's annual and quarterly SEC filings. Defendant Amin attended monthly forecast meetings during the Class Period, where

he was informed of current sales reports, inventory levels, and ELF's internal forecasts (which were based on ELF's internal data it received from retailers and its own website).

**ANSWER**:  With regard to the first sentence, Defendants admit that Amin is CEO, Chairman of the Board, and President at e.l.f. and held that role at all relevant times during the Putative Class Period, which Defendants aver is now limited to November 21, 2024 through February 6, 2025, inclusive.  With regard to the second sentence, Defendants admit that prior to his role at e.l.f., Amin served as President, CEO and Director of Schiff Nutrition and Vice President, General Manager of The Clorox Company's Litter, Food and Charcoal Strategic Business Units.  With regard to the third sentence, Defendants admit that in his role as CEO for e.l.f., Amin participated in various media interviews, earnings calls, and conferences with securities analysts during the Putative Class Period (only one of which is at issue following the Court's dismissal order).  With regard to the fourth sentence, Defendants admit that, in his role as CEO for e.l.f., Amin signed the Company's annual and quarterly SEC filings (none of which are at issue following the Court's dismissal order).  With regard to the fifth sentence, Defendants aver that Lead Plaintiffs' allegation is premised upon allegations made by alleged former e.l.f. employees, and that Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations premised upon former e.l.f. employees' allegations or statements, and deny the allegations on that basis. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

40.     Defendant Mandy J. Fields ("Fields") is the Senior Vice President and CFO at ELF and held that role at all relevant times during the Class Period. Prior to her role at ELF, Fields served as the CFO at BevMo!, Vice President of Finance and Analytics at Albertsons Companies, and Director of Consumer Brands Finance at Safeway. During the Class Period, in her role as CFO of ELF, Defendant Fields participated in various media interviews, earnings calls, and conferences with securities analysts, during which she made false and misleading statements and omissions of material fact, among other things, relating to ELF's ability to sustain growth. In her role as CFO, Fields also signed the Company's annual and quarterly SEC filings.

**ANSWER**:  Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive.  With regard to the first sentence, Defendants admit that Fields is the Senior Vice President and CFO at e.l.f. and held that role at all relevant times during the Putative Class Period.  With regard to the second sentence, Defendants admit that prior to her role at e.l.f., Fields, served as the CFO at BevMo! and Vice President of Finance and Analytics at Albertsons Companies, and Director of Consumer Brands Finance at Safeway.  With regard to the third sentence, Defendants admit that, in her role as CFO of e.l.f., Fields participated in various media interviews, earnings calls, and conferences with securities analysts (none of which is at issue following the Court's dismissal order).  With regard to the fourth sentence, Defendants admit that, in her role as CFO of e.l.f., Fields signed the Company's annual and quarterly SEC filings (none of which is at issue following the Court's dismissal order).  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

41.     Defendants Amin and Fields are collectively referred to herein as the "Individual Defendants." The Company and the Individual Defendants are collectively, in whole or in part, referred to herein as the "Defendants."

**ANSWER**:  With regard to the first sentence, Defendants admit that the Complaint uses a defined term of "Individual Defendants" to refer to Amin and Fields.  With regard to the second sentence, Defendants admit that the Complaint uses a defined term of "Defendants" to refer to Amin, Fields, and e.l.f.  Except as expressly admitted, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

42.     ELF is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

**ANSWER**:   Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

43.    The scienter of each of the Individual Defendants and each of the other employees and agents of the Company is similarly imputed to ELF under respondeat superior and agency principles.

**ANSWER**:    Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

44.    The Individual Defendants, because of their high-level positions of control and authority as senior executive officers of ELF, possessed the power and authority to control, and did actually control, the contents of ELF's SEC filings, press releases, investor presentations, and other market communications during the Class Period. The Individual Defendants were provided with copies of ELF's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions within ELF, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

**ANSWER**:    Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

### 3.    **Relevant Third Parties**[3]

45.    CW 1 was employed by ELF from before the Class Period until August 2024. During the Class Period, CW 1 was a senior member of the E-commerce division. During her time at ELF, CW 1 managed digital sales of Keys Soulcare products and managed digital sales for Well People products. CW 1 explained she regularly attended inventory meetings with the Keys Soulcare team, which included current Chief Marketing Officer Kory Marchisotto.

**ANSWER**:  Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive.  Further, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or

---

[3] All CWs are described in the feminine to protect their identities

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

46. CW 2 was employed by ELF from March 2024 to February 2025. In her role, CW 2 tracked sales of Elf Cosmetics, Elf Skin, and Natrium products at Ulta Beauty retail stores throughout the United States. CW 2 also built brand recognition and ran events at Ulta Beauty stores.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

47. CW 3 was employed by ELF as an Account Manager from before the Class Period until September 2024. CW 3 explained that during her tenure, she managed the sales of ELF skin care and cosmetic products at Ulta Beauty, the sales of Keys Soulcare products at Ulta Beauty, and the sales of Well People products at Target.

**ANSWER**: Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive. Further, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

48. CW 4 was employed by ELF as a senior member of ELF's sales team from May 2024 to after the Class Period. CW 4 explained that during this period, she was paid as a third-party consultant. In her role, CW 4 was involved with sales to various retailers, including Target and Ulta Beauty. According to CW 4, she attended monthly forecasting meetings with CEO Tarang Amin and Global Chief Marketing Officer Kory Marchisotto, heads of channels and heads of sales, among others.

**ANSWER**:  Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive.  Further, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

**IV.   SUBSTANTIVE ALLEGATIONS**

**A.  Background**

49.      Founded in 2004, ELF is an Oakland, California based multi-brand beauty company that offers low-cost cosmetics and skincare products. ELF markets itself as a cheaper alternative to more established cosmetic brands. The Company has several different beauty brands, including e.l.f. Cosmetics, e.l.f. SKIN, Naturium, Well People, and Keys Soulcare.

**ANSWER**:  With regard to the first sentence, Defendants admit that e.l.f. is headquartered in Oakland, California was founded in 2004.  Defendants further aver that e.l.f. is a multi-brand beauty company that offers inclusive, accessible, clean, vegan and cruelty free cosmetics and skin care products.  With regard to the second sentence, Defendants aver that the phrases "cheaper" and "established" are vague and ambiguous and thus deny the allegations on that basis.  With regard to the third sentence, Defendants admit that e.l.f.'s family of brands includes e.l.f. Cosmetics, e.l.f. SKIN, Naturium, Well People, and Keys Soulcare.  Except as expressly admitted, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

50.      Although ELF began with an initial focus on direct-to-consumer e-commerce, which allowed it to build a strong customer database and social networking site, the Company now employs a retail distribution strategy aimed at offering ELF products wherever consumers shop for beauty products.

**ANSWER**:  Defendants aver that e.l.f. was founded as a digital brand with a direct-to-consumer e-commerce site, and now has an omni-channel distribution strategy to sell its products with retailers in the United States, internationally, and online through its own direct e-commerce

channels and other e-commerce websites.  Except as expressly admitted, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

51.     However, ELF does not have any brick-and-mortar stores. Instead, it acts as a retail distributor for sales at physical retailer stores. Of those retail stores, Ulta Beauty, Target, and Walmart are the most important, collectively accounting for approximately 50-60% of ELF's total net sales during the Class Period as per the Company's annual reports.

**ANSWER**:  With regard to the first sentence, Defendants aver that e.l.f. does not operate its own physical retail stores, but has an omni-channel distribution strategy to sell its products with retailers in the United States, internationally, and online through its own direct e-commerce channels and other e-commerce websites.  With regard to the second sentence, Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive and that the phrase "the most important" is vague and ambiguous and thus deny the allegations on that basis.  Defendants aver that during FY25, Target, Walmart, Ulta, and Amazon were the Company's four largest customers, accounting for 23%, 16%, 12%, and 12% of e.l.f.'s sales, respectively.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

**B.  ELF Experienced Significant Growth Before the Class Period**

52.     Starting in 2019, ELF began to grow rapidly and exponentially. As it grew, it presented its value to investors as the ability to continuously sustain a high level of growth quarter after quarter. Investors valued ELF for its rapid growth, diverse channels, and consistent ability to push new products that would drive sales growth, and as a result, they closely monitored any trends that provided insight into ELF's demand and sales performance.

**ANSWER**:  With regard to the first sentence, Defendants aver that, through 2Q25 (the quarter that preceded the Putative Class Period), e.l.f. experienced net sales and market share growth for 23 consecutive quarters beginning in its fiscal year 2019.  With regard to the second sentence, Defendants aver that the sentence purports to summarize statements made by Defendants without specifying who made the alleged statements or when or how they were made.  Defendants thus

lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.  With regard to the third sentence, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations in this paragraph on that basis.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

53.    Knowing the importance of net sales growth to its value as a company, ELF touted to investors that it had grown its net sales every year since Q4 FY 2019. As CFO Defendant Mandy Fields explained during an August 24, 2024 podcast, "In our 20 year history, [ELF] only had two quarters where we have not had growth."

**ANSWER**:  With regard to the first sentence, Defendants aver that the sentence purports to summarize statements made by Defendants without specifying who made the alleged statements or when or how they were made.  Defendants thus lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.  With regard to the second sentence, Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive.  Defendants further aver that the sentence purports to summarize statements made by Defendant Fields on a podcast without specifying on which podcast the alleged statements were made.  Defendants thus lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

54.    In the years leading up to the Class Period, the Company's growth continued to accelerate. Starting in Q3 of fiscal year 2021 ("FY21") (October – December 2020), ELF reported year-over-year double-digit net sales growth every quarter. Starting in Q2 FY 2023 (July – September 2022), ELF reported year-over-year sales growth in excess of **forty percent** each quarter.

**ANSWER**:  With regard to the first sentence, Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive.  Defendants further aver

that the word "accelerate" is vague and ambiguous and thus deny the allegations on that basis. With regard to the second sentence, Defendants admit that starting in its third quarter fiscal year 2021, e.l.f. reported YoY double-digit net sales growth every quarter through 3Q25. With regard to the third sentence, Defendants admit that between its third quarter fiscal year 2023 and first quarter fiscal year 2025 ("1Q25"), e.l.f. reported YoY sales growth of between 49 and 85 percent. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

55.    Every quarter, Defendants would publish versions of the chart below, touting that net sales growth had consistently grown 20% or more and had continued to rise each quarter during the Class Period. For example, ELF presented this chart in its Q1 FY2025 (April – June 2024) earnings presentation:



**ANSWER**:  With regard to the first sentence, Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive. Further, Defendants aver that the word "touting" is vague and ambiguous and thus deny the allegations on that basis. With regard to the second sentence, Defendants admit that the chart in this paragraph is in e.l.f.'s 1Q25 Earnings Presentation. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

56.    ELF's stock rose in accordance with its ability to demonstrate sales growth and strong consumer demand. By the time ELF announced its results for Q3 FY 2023 (October – December 2022), ELF stock was trading at roughly $70 a share. By Q4 FY 2023 (January – March 2023) results, ELF stock was trading at roughly $100 a share.

**ANSWER**: Defendants aver that the stock price and average trading volume of e.l.f. stock is publicly available. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

57. To continue to boost its stock, ELF had to convince the market that its sales growth would continue unabated at the same levels. Analysts remarked that ELF's differentiator was "a double digit long term growth story, supported by consistent innovation."[4] In other words, it was not enough that ELF had grown its net sales every quarter; the market needed to believe that it would not stop growing to support its valuation.

**ANSWER**: With regard to the first sentence, Defendants deny the allegations, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions. With regard to the second sentence and footnote 4, Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive. Defendants further admit that on April 17, 2024, an analyst from TD Cowen issued a report that contains the quoted language in this sentence. With regard to the third sentence, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

58. Analysts repeatedly expressed that ELF's ability to continue its sales growth was key to the stock's value. For example, in raising ELF's price target on November 3, 2022, analysts from J.P. Morgan remarked that ELF's ability to "continue growth," driven by its "innovation and ability to attract and engage consumers that continue to propel the company's growth engine" was the driver behind those analysts' decision to raise ELF's target price. Similarly, Bank of America explained on April 16, 2023, that it was raising its price target due to its view of ELF as an "outlier in our Consumer Staples coverage" because of its "high-growth nature in value."

**ANSWER**: With regard to the first sentence, Defendants aver that the sentence purports to summarize statements made by analysts without specifying who made the alleged statements or

---

[4] TD Cowen report dated April 17, 2024.

when or how they were made. Defendants thus lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. With regard to the second sentence, Defendants admit that J.P. Morgan issued a report on November 3, 2022, which is publicly available and contains the language quoted in this sentence. With regard to the third sentence, Defendants aver that Bank of America issued a report on April 17, 2023, which is publicly available and includes the statement, "We continue to view ELF as an outlier in our Consumer Staples coverage given its high-growth nature in volume, price/mix gains, and market share momentum." Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

59.    ELF's stock chart demonstrates the importance of ELF's growth metrics. ELF's stock price remained flat, at around $25 a share, for most of its history as a public company. It was not until ELF was able to consistently demonstrate sales growth in excess of 20%, in mid-2022, that its stock price began to climb. Accordingly, Defendants realized they needed to persuade the market that ELF would sustain sales growth in excess of 20% to continue to boost its stock price. **ANSWER**: Defendants aver that the stock price and average trading volume of e.l.f. stock is publicly available. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

## C. Investors Closely Monitored Sales Growth and Demand Trends

60.    There were several ways investors tracked ELF's demand and sales growth trends, including tracking the Company's sales to retailers and inventory levels. However, as noted below, the information that was publicly available to investors was only part of the story compared to the extensive internal information that Defendants had access to and used to accurately measure demand. **ANSWER**: With regard to the first sentence, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. With regard to the second sentence, Defendants deny the allegations, including Lead Plaintiffs' characterization

of the events at issue and any legal conclusions.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

### 1. ELF's Revenue Depended on Both Sell-through and Sell-in Sales

61.    As a retail distributor, ELF tracks two types of transactions: sell-in and sell-through sales. Sell-in sales occur when ELF sells its products to a retailer such as Ulta Beauty or Target. Sell-in sales are important to ELF because that is when the Company recognizes those sales as revenue. Accordingly, when ELF reports sales to its retailer customers, it is reporting sell-in sales.

**ANSWER**:  Defendants aver that e.l.f. recognizes revenue when control of promised goods or services is transferred to a customer in an amount that reflects the consideration that the Company expects to receive in exchange for those goods or services.  For the Company's retail-customer transactions, a contract exists when a written purchase order is received, and control transfers at the time of shipment or the time of delivery, depending upon the specific terms of the customer agreement.  Except as expressly admitted, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

62.    Sell-through sales occur when the retailer, like Ulta Beauty or Target, sells ELF products to the end consumer. Sell-through sales are also important to ELF because they are the primary indicator of consumer demand. Although ELF does not book sell-through sales as revenue, they are the strongest indicator that sales growth will be sustained.

**ANSWER**:  Defendants aver that e.l.f. recognizes revenue when control of promised goods or services is transferred to a customer in an amount that reflects the consideration that the Company expects to receive in exchange for those goods or services.  For the Company's retail customer transactions, a contract exists when a written purchase order is received, and control transfers at the time of shipment or the time of delivery, depending upon the specific terms of the customer agreement.  Defendants further aver that e.l.f.'s retail customers then sell e.l.f. products to consumers.  Except as expressly admitted, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

63.    Importantly, consumer demand lags sell-in sales. Therefore, if a retailer experiences lower consumer sales (in other words, lower consumer demand), it will only pass on that lower demand to the distributor (here, ELF) when, in the future, it lowers its orders to meet slowing sell-through sales. In other words, ELF experiences lower sell-in sales (i.e., the sales reported to investors) in some future period after observing lower sell-through sales.

**ANSWER**:    Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

64.    Prior to and during the Class Period, ELF touted that its massive sales and inventory growth were driven by strong consumer demand and cited sell-through sales as evidence of that strong demand. Investors also understood the importance of sell-through sales. For example, one analyst from J.P. Morgan stated in a November 2, 2023 analyst report that ELF's stock rise prior to the Class Period was driven by "sell through trends" indicating "strong demand."

**ANSWER**:  Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive.  With regard to the first sentence, Defendants aver that the words "touted" and "massive" are vague and ambiguous and thus deny the allegations on that basis.  With regard to the second sentence, Defendants admit that J.P. Morgan issued a report on November 2, 2023, which is publicly available and contains the language quoted in this sentence. Except as expressly admitted, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

65.    If sell-in sales to a retailer exceed sell-through sales, that is a strong indicator that demand for products is slowing down because sales to retailers are exceeding what the retailer is able to sell to the end consumer. This will ultimately lead to lower sell-in sales—and thus lower reported sales by the Company—because the retailers stop ordering as much product from the distributor (here ELF) because they already have more than enough product on hand and not enough consumer demand to sell it all. To illustrate, if a retailer such as Ulta Beauty purchases more ELF products than it can sell, it will reduce purchases from ELF moving forward.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and deny the allegations on that basis.  Defendants deny the

remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

66.    Accordingly, whether growth was driven by sell-in sales (i.e. sales to retailers) or sell-through sales (i.e. consumer demand), both were material to ELF's ability to grow its sales revenue in the future.

**ANSWER**:  Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

### 2. ELF Tracked Sales and Inventory Data Closely, in A Manner the Market Could Not

67.    Defendants tracked sell-through trends using internal sales data that ELF received, and used this sell-through sales data to accurately track consumer demand for ELF products. However, the market did not have access to the same sell-through data that Defendants did. Instead, the market could track demand only by using sales to retailers (sell-in data) and commercial point of sale data (which, as explained below, was limited to only certain retailers).

**ANSWER**:  With regard to the first sentence, Defendants aver that e.l.f. utilized publicly available sources to track sales data, as available.  With regard to the second sentence, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.  With regard to the third sentence, Defendants aver that Nielsen collects point of sales data for certain skincare and cosmetic categories at certain retailers, which e.l.f. refers to as sales that occur in a "tracked channel," and which data is publicly available.  Except as expressly admitted, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

68.    Accordingly, Defendants had access to material information about demand that was not available to investors, and as a result, investors had to rely on Defendants to accurately determine the level of demand for ELF products.

**ANSWER**:  Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

69.     Though the market tried to track demand using commercial point of sale data, that was limited to only "tracked" channels. ELF sorts its consumer sales into two primary groups of channels: (1) tracked channels (channels where commercial aggregators such as NielsenIQ collect surveys of point-of-sale data and make that data available to the market for a fee); and (2) untracked channels (channels where the market has virtually no view into sell-through transactions).

**ANSWER**:  Defendants aver that Nielsen collects point of sales data for certain skincare and cosmetic categories at certain retailers, which e.l.f. refers to as sales that occur in a "tracked channel," and which data is publicly available.  Except as expressly admitted, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

70.     Roughly half of ELF's ultimate sales to consumers occur through tracked channels. This includes mass market retailers such as Walmart and Target.  The remaining 50% of consumer sales occur though untracked channels, which ELF explained includes "international, digital, and Ulta [Beauty]."[5]

**ANSWER**:  With regard to the first and second sentences, Defendants aver that data aggregators, including Nielsen, track sales data for certain of e.l.f.'s retail customers, including Target and Walmart, which accounted for 23% and 16% of e.l.f.'s sales in FY25, respectively.  With regard to the third sentence and footnote 5, Defendants aver that e.l.f. held its 2Q24 Earnings Call on November 1, 2023, the transcript of which is publicly available, and includes the statement, "we have international, digital and Ulta that fall into that untracked channels and some of our strongest performance is coming from that side of the house."  Except as expressly admitted, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

71.     Because aggregators like NielsenIQ and Circana collect samplings of point-of-sale sell-through data from tracked channels, analysts can obtain limited insight into ELF's consumer demand from those channels. In comparison, because untracked channels are typically not

---

[5] Earning Call transcript dated November 1, 2023.

available from commercial sources, investors had little to no insight into demand from untracked channels. In other words, at best, investors had access to half the sell-through data that Defendants did.

**ANSWER**:   With regard to the first and second sentences, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.  With regard to the third sentence, Defendants deny the allegations, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

72.     Moreover, regardless of whether a channel was tracked or untracked, Defendants had far greater and more accurate insight into sell-through data than investors. For example, CW 4 recalled that ELF purchased sales data directly from many of its retail clients, including Ulta Beauty and Target, and that this data was maintained in a data visualization platform. CW 4 stated that ELF's internal sales data was 99% accurate and noted that sales data maintained by commercial aggregators, such as Nielsen or Circana, were not as accurate. CW 4 detailed that ELF maintained its own website and retail sales database, which was broken down by retailer and even by each retail store. CW 4 explained that data it purchased from its retail clients demonstrated what consumers were buying from these retailers.

**ANSWER**:   With regard to the first sentence, Defendants deny the allegations, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.  With regard to the second through fifth sentences, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

73.     Moreover, regardless of whether a channel was tracked or untracked, Defendants had far greater and more accurate insight into sell-through data than investors. For example, CW 4 recalled that ELF purchased sales data directly from many of its retail clients, including Ulta

Beauty and Target, and that this data was maintained in a data visualization platform. CW 4 stated that ELF's internal sales data was 99% accurate and noted that sales data maintained by commercial aggregators, such as Nielsen or Circana, were not as accurate. CW 4 detailed that ELF maintained its own website and retail sales database, which was broken down by retailer and even by each retail store. CW 4 explained that data it purchased from its retail clients demonstrated what consumers were buying from these retailers.

**ANSWER**:  With regard to the first sentence, Defendants deny the allegations, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.  With regard to the second through fifth sentences, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

74.    CW 4 stated that she attended monthly forecast meetings during her most recent tenure, which were attended by CEO Tarang Amin, Global Chief Marketing Officer Kory Marchisotto, heads of channels and heads of sales, among others. CW 4 detailed that the most recent Company sales data from ELF's data visualization platform was presented at these monthly forecast meetings.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

75.    Accordingly, ELF had access to accurate and contemporaneous data that the market did not—data that accurately measured consumer demand for ELF products. Specifically, ELF had sole possession of demand signals from their retail partners (i.e., sell-through data) that showed what the consumer demand for ELF products was and how it would affect future ELF sales.

**ANSWER**:  Defendants deny the allegations in this paragraph, including Lead Plaintiffs'

characterization of the events at issue and any legal conclusions.

### 3. ELF's Inventory is a Barometer for Demand

76.    Sales data was not the only way to track demand. ELF's inventory was also seen by the market as a measure of demand and growth. However, for investors inventory offers only limited insight into demand, as high inventory levels could mean demand is dropping in some circumstances, but could also mean demand is rising in other circumstances.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and deny the allegations on that basis.

77.    For example, if inventory levels were high, and ELF could not reduce it, that would be seen as an indicator that demand was slowing (since ELF could not sell-through its inventory to customers). It would also mean that ELF faced the potential for having to offload expired or obsolete product. But high inventory levels could, in certain circumstances such as high growth, mean that demand was increasing. For example, if ELF increased its inventory levels, but was then able to sell that inventory quickly, that would be a strong measure of future demand (since ELF was ordering more product to meet high levels of demand). Accordingly, high inventory was a marker of success if and only if it was accompanied by correspondingly high demand.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and deny the allegations on that basis.

78.    Throughout the Class Period, Defendants closely tracked inventory in internal databases as well. According to CW 4, ELF maintained and tracked inventory data during her tenure. CW 4 stated that she also attended weekly inventory meetings with the Operations and Sales teams. CW 4 added that ELF also held monthly inventory forecasting meetings.

**ANSWER**:  With regard to the first sentence, Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive.  Defendants further aver that "closely tracked" and "internal databases" are vague and ambiguous and deny the allegations on that basis.  With regard to the second, third, and fourth sentences, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.

Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

79.   Therefore, because ELF could accurately track both inventory and demand, it could determine whether it was scaling inventory with demand or if demand could not keep pace with inventory growth.

**ANSWER**:   Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

### D. Defendants Touted Their Ability to Continue to Grow Through New Products and Relationships With Retailers

80.   Defendants embarked on two complimentary strategies to convince the market that ELF would continuously sustain net sales growth at high levels.

**ANSWER**:   Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

81.   First, ELF touted that it had unlocked the ability to consistently innovate and produce new products that would virally drive sales. ELF referred to these products as its "unicorn" or "holy grail" products. In reality, these unicorn products were merely copies of top-shelf products from other brands, such as Dior or Charlotte Tilbury, that ELF could mimic and sell cheaply. Nonetheless, some of these copycat products, such as its Glow Reviver Lip Oil, did achieve viral success prior to the Class Period. After these products drove ELF's growth, Defendants doubled down and claimed ELF possessed the ability to consistently produce a constant pipeline of new viral successes even though Defendants knew from internal documents that it could not.

**ANSWER**:   With regard to the first and second sentences, Defendants aver that the sentences purport to summarize statements made by Defendants without specifying who made the alleged statements or when or how they were made.  Defendants thus lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. With regard to the third sentence, Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive.  Defendants further deny the allegations, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.  With

regard to the fourth, and fifth sentences, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

82. Second, Defendants repeatedly touted ELF's relationship with its retail clients such as Ulta Beauty as evidence of their ability to consistently drive growth. Defendants repeatedly claimed that ELF's growth stemmed from their strong sales and relationships with retail clients. For example, in ELF's 2024 annual report, Defendants stated, "We have strong relationships with our retail customers such as Target, Walmart, Ulta Beauty, and other leading retailers that have enabled us to expand distribution both domestically and internationally."

**ANSWER**: With regard to the first and second sentences, Defendants aver that the allegations purport to summarize statements made by Defendants without specifying who made the alleged statements or when or how they were made. Defendants thus lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. With regard to the third sentence, Defendants aver that on May 23, 2024, e.l.f. filed its Form 10-K for FY24, which is publicly available and contains the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

83. In turn, the market understood that ELF's consistent ability to generate sales to its retail clients was a driver of its sustained growth. For example, Raymond James raised its price target on ELF on October 23, 2023, citing "ELF's white space opportunities across . . . retailers" and ELF's "non-tracked channels," including sales to retailers like Ulta Beauty, which were "growing at a faster rate" and "justifying a premium valuation to peers."

**ANSWER**: With regard to the first sentence, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations in this paragraph on that basis. With regard to the second sentence, Defendants admit that Raymond James issued a report on October 23, 2023, which is publicly available and contains the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph,

including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

84.    Indeed, as ELF continued to grow, it began to increase its reliance on certain retail clients, most notably Ulta Beauty. Prior to FY 2022, Ulta Beauty was responsible for less than 10% of ELF's net sales (less than $32 million in FY 2021). In FY 2022, Ulta Beauty accounted for 12% of ELF's net sales (roughly $47 million). And in FY 2023, Ulta Beauty accounted for 15% of ELF's net sales (roughly $86 million). During ELF's growth phase, its sales to Ulta Beauty consistently grew every year. As the Company grew, so did its sales to Ulta Beauty.

**ANSWER**:  With regard to the first sentence, Defendants aver that the phrase "increase its reliance" is vague and ambiguous and thus deny the allegations on that basis.  With regard to the second and third sentences, Defendants admit that prior to e.l.f.'s fiscal year 2022 ("FY22"), Ulta did not individually account for greater than 10% of the Company's net sales.  Defendants further aver that Ulta Beauty accounted for 12% of e.l.f.'s net sales in FY22 and 15% of e.l.f.'s net sales in its fiscal year 2023 ("FY23").  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

### E.  Defendants Misled Investors About ELF's Demand and Sales Growth

85.    Before the Class Period, between July 2021 (start of Q2 FY 2022) and June 2022 (end of Q1 FY 2023), ELF's net sales growth was drastically higher than its inventory growth. This indicated that demand was strong. However, directly before the Class Period, these numbers would switch, and the growth in inventory began to outstrip the growth in sales, as demand did not keep up with the pace of inventory. By December 2023 (which was the end of Q3 FY 2024), ELF's inventory growth was nearly double its sales growth.

**ANSWER**:  Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive.  With regard to the first sentence, Defendants further aver that the phrase "drastically higher" is vague and ambiguous and thus deny the allegations on that basis.  With regard to the second sentence, Defendants aver that the phrase "strong" is vague and ambiguous and thus deny the allegations on that basis.  With regard to the third sentence, Defendants deny the allegations, including Lead Plaintiffs' characterization of the events at issue

and any legal conclusions.  With regard to the fourth sentence, Defendants aver that the phrase "nearly double" is vague and ambiguous as to the comparator, and thus deny the allegations on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

86.    At the same time, ELF also began to exhibit falling inventory turnover (or turns).[6] Inventory turns fell from 2.41 in Q1 2024 down to 1.54 in Q3 2024, a key indicator that demand of ELF products was waning because sales of its products to end consumers was decelerating. The mounting inventory and slowing inventory turns, taken together with ELFs proprietary and contemporaneous insight into its sales and demand figures, informed Defendants that the Company's sales growth had slowed due to decreasing consumer demand.

**ANSWER**:  With regard to the first and second sentences, Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive.  Defendants further aver that the sentence purports to reference metrics and figures without specifying where or how those metrics or figures were published.  Defendants thus lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph and footnote 6, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

87.    Rather than admit that its rising inventory or falling inventory turns were indicative of lower demand, Defendants did the reverse: they framed the higher inventory as a sign that demand was strong, repeatedly claiming that ELF was building inventory to meet demand. At virtually every earnings call during the Class Period, Defendant Fields and the Company attributed any rise in inventory to the supposed "strong consumer demand" that ELF was presently seeing.

**ANSWER**:  Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive.  Defendants further aver that the paragraph purports to

---

[6] Quarterly inventory turn ("inventory turn") measures how quickly ELF was able to sell its product. For example, an inventory turn of 2 means that ELF was able to sell through roughly two instances of its average inventory on hand every quarter. If, for example, inventory turn declines to 1, that typically denotes lowered sales growth or overstocking, as ELF was able to turn over inventory only once during the quarter.

summarize statements made by Defendants without specifying who made the alleged statements or when or how they were made. Defendants thus lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

88.     The Class Period begins on February 7, 2024, the day after ELF released its financial results for Q3 of FY 2024. After the market closed on February 6, 2024, ELF held its earnings call. During the call, Defendant Fields touted the "*strong consumer demand*" ELF was seeing. Addressing the high levels of inventory—which were 2.5 times that of the year prior—Fields claimed that the inventory levels were being brought up "*to support strong consumer demand*" and asserted that ELF had "the appropriate levels of inventory across the business to service our customers and *support the demand we're seeing."*

**ANSWER**:  With regard to the first sentence, Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive. With regard to the second, third, and fourth sentences, Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on February 6, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

89.     Defendant Fields' statements during the February 6, 2024 earnings call were false and misleading. Although Defendant Fields claimed ELF's inventory had swelled because of "strong consumer demand," in truth, inventory was higher because demand had stagnated and ELF was unable to move its products at the level it predicted. In other words, ELF's inventory was not rising to meet demand, as Defendants falsely represented, but because Defendants had miscalculated the growth and could not unload the massive amounts of inventory they had previously purchased from ELF's suppliers.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on February 6, 2024, and thus, no response to these

allegations is required.  To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

90.    Defendants also knew that ELF's demand was declining because much of their record growth in FY 2024 was caused by sell-in transactions (i.e., sales to retailers). Indeed, although ELF's sales grew massively in FY 2024, exceeding 70% year-over-year growth in every quarter, these sales were largely attributed to sell-in transactions, as opposed to sell-through sales, fueled by increased consumer demand. Accordingly, this growth was not sustainable, as inventory purchased from retailers was not tracking in line with slowing consumer demand. Nevertheless, ELF purchased additional inventory as if the previous sales growth was fueled by consumer demand. Once retailers stopped increasing their purchases of ELF goods at the same rate, ELF was left holding tens of millions of dollars' worth of excess inventory.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on February 6, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

91.    Three interrelated facts make clear that ELF's rising inventory was a sign that demand had slowed and would lead to future declining sales.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on February 6, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

92.    First, between Q2 2024 (July – September 2023) and Q4 2024 (January 2024 – March 2024), ELF's inventory growth massively exceeded sales growth. In other words, demand was not keeping up with ELF's rising inventory—meaning ELF would soon be left with excess

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

inventory and lower sales as retailers stopped buying more product from ELF (since they already had existing inventory they still needed to sell).

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on February 6, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

93. Second, between Q1 2024 (April – June 2023) and Q3 2024 (October – December 2023), inventory turn dropped precipitously, even while sales growth rose. This indicated that ELF's rise in inventory was not scaling with demand, as ELF's inventory increase led to slower turns (since, again, retailers were not seeing enough demand to request more inventory).

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on February 6, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

94. Third, inventory + accounts receivable growth (which measured the total amount of ELF products possessed by both ELF and retailers) exceeded sales growth every quarter between Q3 2024 (October – December 2023) and Q2 2025 (July – September 2024). This shows that by the time the Class Period began, the marketplace was flooded with ELF products that Defendants, but not the public, exceeded consumer demand.

**ANSWER**: Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive, and that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on February 6, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

43

95.    These three factors (paired with detailed, contemporaneous internal point of sale data) revealed to Defendants that ELF's inventory growth was not driven by sustainable demand.[7]

**ANSWER**:  Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive, and that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on February 6, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants admit that the data regarding e.l.f.'s inventory figures was public, and deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

F. **Defendants Knew That Demand Was Slowing and ELF's Days of Exceeding 40% Sales Growth Were Over**

96.    By mid-2024, the evidence that growth had stagnated on multiple levels, and thus ELF's record of consecutive quarters of 20-plus percent sales growth was no longer feasible, continued to mount. As explained below, former employees confirmed that Defendants knew that demand had declined, and sales growth would soon fall in line.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

1. **Inventory Build Up**

97.    High inventory levels were a strong indicator that demand was declining. Inventory continued to build up at ELF beginning in 2024, ballooning to $200 million dollars of inventory

---

[7] Although some of the data underlying these metrics were public, Defendants repeatedly misled investors as to context surrounding the inventory levels and inventory turn. For example, Defendants misled investors about the supposed increased demand they had seen supporting the inventory growth, and because Defendants had access to more accurate data, investors did not know that Defendants had actually seen lower demand signals, particularly from untracked channels.

by the Summer of 2024. Although Defendants repeatedly attributed this buildup to an intentional choice to meet the consumer demand ELF was seeing, this was false.

**ANSWER**:  With regard to the second sentence, Defendants aver that e.l.f.'s net inventory, as reported on its balance sheet, was $199.6 million as of June 30, 2024, as reported in e.l.f.'s 1Q25 Form 10-Q.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

98.    Indeed, ELF's failure to meet internal projections for sales left it with a large inventory buildup. ELF had ordered a great deal of inventory with the expectation that it would sell that inventory to meet demand, but when demand fell in 2024, ELF was left sitting on piles of swelling inventory with no way to move it. In other words, the inventory buildup was a sign of **reduced** demand, not "strong consumer demand" as Defendants falsely claimed.

**ANSWER**:  Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

99.    For example, CW 4 stated that ELF was "sitting on a lot of inventory" beginning in Summer 2024 because sales were declining and were not as strong as they were the previous year.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

100.    CW 4 recalled that attendees of the weekly and monthly inventory meetings began to express concern beginning in Summer 2024 when ELF sales began to decline. CW 4 also stated that attendees of the monthly forecast meeting also discussed excess and obsolete inventory and how to move excess inventory. CW 4 detailed that during monthly forecast meetings, attendees discussed plans to have retail partners help move ELF's excess inventory.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

101. Other former ELF employees similarly stated that Ulta Beauty was not selling all of its inventory of ELF products. For example, CW 2 explained that she saw a lot of unsold excess ELF products at Ulta Beauty Stores. CW 2 stated that Ulta Beauty had excess inventory of ELF products because those products were not selling.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

**2. Sales to Ulta Beauty Were Plummeting**

102. In addition to a sales decline across the board, Defendants began to observe particularly noticeable drops in ELF's sales to Ulta Beauty (which, again, was part of ELF's untracked channel).

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

103. Specifically, CW 2 recalled sales of e.l.f. Beauty Inc. (ELF) products at Ulta Beauty significantly declined in June or July 2024 and stayed down throughout the rest of 2024. CW 2 explained that this decline was reflected in sales reports and was also discussed in weekly sales calls she attended in June or July 2024. CW 2 stated that ELF was also not seeing the same level of growth at Ulta in June or July 2024 that it experienced in previous years.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this

paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

104.    This testimony was corroborated by other CWs. For example, CW 3 explained that sales of Elf Cosmetic Products at Ulta Beauty began to decline in August or September 2024. CW 3 explained that ELF's cosmetic products grew stale at this time and the Company did not launch any new cosmetic products in August or September 2024.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

105.    Similarly, CW 1 explained that in 2024, Ulta stopped ordering new Keys Soulcare products for its website from ELF because Keys Soulcare sales were so poor.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

106.    Ultimately, CW 3 noted that Ulta Beauty closed down its Keys Soulcare account in July or August 2024. CW 3 explained that Keys Soulcare did not drive enough volume to warrant Ulta Beauty's shelf space.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

### 3.  ELF's Attempt to Develop New Products to Generate Demand Fails

107. Moreover, former employees acknowledge that some failures of ELF's sales growth leading up to and during the Class Period was due to the fact that ELF's new product launches were unsuccessful. Indeed, the Company's business model of innovative products to sustain strong demand was critical to maintaining its growth levers. However, former employees reveal that ELF's new products in 2024 were failing.

**ANSWER**: Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive. Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. With regard to the second sentence, Defendants aver that the phrases "innovative," "critical to maintaining," and "growth levers" are vague and ambiguous and thus deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

108. For example, CW 2 explained that ELF's new innovation launches had performed below expectations in July 2024. According to CW 2, ELF expected that two new product launches were going to perform well. However, CW 2 recalled that in July 2024, sales reports reflected that the two new launches were not selling well at Ulta. CW 2 added that it was also discussed during weekly sales calls in July 2024 that these two launches were not performing as well as projected at Ulta and that these two products were not "up to par" with previous ELF product launches.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

109. Therefore, CW 2 recalled that in July 2024, ELF shifted its focus from selling skincare and Naturium products to cosmetic products at Ulta. CW 2 stated that she and her colleagues were initially told to focus on selling skincare and Naturium products at Ulta because ELF's cosmetic products "sold themselves." However, CW 2 explained that ELF had its field

salespeople shift their focus to selling cosmetic products at Ulta after the two new launches did not perform well at Ulta.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

4. **Internal Meetings Reveal Demand Trends Significantly Slowed**

110. Finally, CW testimony confirms that the Individual Defendants participated in internal meetings where declining demand was discussed. Indeed, by no later than the Summer of 2024, ELF's declining sales and poor demand outlook were discussed in internal meetings, even as Defendants falsely told the market that they were seeing strong consumer demand and the market should expect continued growth.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

111. For example, CW 4 recalled that sales of ELF's products began to decline "across the board" in Summer 2024. CW 4 detailed that ELF's overall sales were in the high single digits percent below the Company's internal projections in Summer 2024.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

112. CW 4 explained that when sales began to decline at ELF in Summer 2024, the Company could see the decline immediately because it received sales data directly from its retail clients.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

113.    CW 4 recalled that beginning in Summer 2024, attendees at the monthly forecast meeting discussed the negative sales trends that they were observing, including plans to turn around negative sales trends. CW 4 stated that she attended monthly forecast meetings during her most recent tenure, which were attended by CEO Tarang Amin, Global Chief Marketing Officer Kory Marchisotto, heads of channels, and heads of sales, among others. CW 4 detailed that the most recent Company sales data from ELF's data visualization platform was presented at these monthly forecast meetings.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

114.    CW 4 explained that ELF's sales slowed in August 2024 and were roughly 12% below the Company's internal projections in September and October. CW 4 added that sales "stayed that way" through 2024.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

**G. Defendants Continue to Mislead Investors About ELF's Demand and Growth in May and June 2024**

115.    Despite all the evidence of declining demand, Defendants continued to mislead the market on ELF's earnings call for Q4 FY 2024, which ELF held on May 22, 2024. In her opening statement, Defendant Fields stated that ELF "***continue[s] to build back our inventory levels to support strong consumer demand.***"  Similarly, when an analyst asked about ELF's inventory

position, Defendant Fields stated that Defendants "fe[lt] great about our inventory position" because ELF has been "increasing that inventory position *to support the demand that we're seeing[.]*"

**ANSWER**:   Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on May 22, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

116.     Defendant Fields' statements were false and misleading for the same reasons as described supra ¶¶96-114. Specifically, (i) ELF's inventory buildup was caused by lowered demand and an inability to move products, not heightened demand; (ii) ELF's previous sales growth had been fueled in part by unsustainable sell-in transactions; and (iii) retailers had also become overstocked with ELF product and had decreased orders because of the lowered demand.

**ANSWER**:   Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on May 22, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

117.     Similarly, on June 30, 2024, Defendant Amin participated in an interview with Barrons. When asked about ELF's stock performance, Defendant Amin stated "the party's just getting started. There's two things that correlate most to long-term stock performance for ELF— net sales growth and adjusted EBITDA growth," and "*[g]iven the white space we have ahead of us*, given the known strengths that we have, our ability and confidence continue to drive strong net sales and adjusted EBITDA growth. *There's still plenty of growth to be had.*"

**ANSWER**:   Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on June 30, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and

any legal conclusions.

118.    However, Defendant Amin's statement touting ELF's growth was false and misleading because it omitted material facts about the indicators of declining growth that Defendants had observed. Specifically, as explained in detail below, by that point, there were several indicators of slowing demand, including: (i) Defendants had observed sales declining across all of ELF's channels in Summer 2024, signaling that ELF's days of continued and sustained growth at previous levels were at an end; (ii) sales at important retails partners such as Ulta Beauty had significantly declined; (iii) inventory had ballooned, caused by declining consumer demand and an inability to move product; and (iv) ELF's unicorn products, which Defendants had counted on to drive future demand, were performing extremely poorly.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on June 30, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

### H. The Individual Defendants Made Millions in Insider Sales Between April and June 2024

119.    While they misled the market, the Individual Defendants enriched themselves as the Company's stock price soared based on their false and misleading statements. Although the Individual Defendants already had established Rule 10b5-1 trading plans—which allow corporate insiders to sell company stock at predetermined times in accordance with insider trading laws—the Individual Defendants made massive sales between April and June 2024 outside of the parameters of their Rule 10b5-1 plans.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed all statements before November 21, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants aver that several months before the Putative Class Period, on April 18, 2024 and June 5, 2024, Amin sold 117,404 shares solely to satisfy tax or other government withholding obligations in connection with the vesting of performance and restricted

stock units, in accordance with the Company's Equity Incentive Award Plan, which provides that "[u]pon vesting of the Shares, the Company, on the Participant's behalf, will instruct the Company's transfer agent . . . to sell that number of Shares . . . as may be necessary to satisfy any resulting withholding tax obligations on the Company." Defendants further aver that several months before the Putative Class Period, on April 18, 2024 and June 5, 2024, Fields sold 49,602 shares solely to satisfy tax or other government withholding obligations in connection with the vesting of performance and restricted stock units, likewise in accordance with the Company's Equity Incentive Award Plan, which provides that "[u]pon vesting of the Shares, the Company, on the Participant's behalf, will instruct the Company's transfer agent . . . to sell that number of Shares . . . as may be necessary to satisfy any resulting withholding tax obligations on the Company." Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

120. For example, on April 18, 2024, the Individual Defendants collectively sold over 103,000 shares and reaped over **$17 million in a single day**. Specifically, knowing that ELF's demand was declining, and thus ELF would not be able to sustain its historical sales growth numbers, Defendant Amin intentionally deviated from his 10b5-1 trading plan and made his largest open market sale of the Class Period, reaping **$12,388,646.40** in a single day. Similarly, Defendant Fields also made her April 18, 2024 sale outside of her 10b5-1 trading plan, collecting **$4,892,992.00** on April 18, 2024. These massive sales nearly doubled the record for the most shares either person had sold in a single day in years.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed all statements before November 21, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants aver that several months before the Putative Class Period, on April 18, 2024 and June 5, 2024, Amin sold 117,404 shares solely to satisfy tax or other government withholding obligations in connection with the vesting of performance and restricted stock units, in accordance with the Company's Equity Incentive Award Plan, which provides that "[u]pon vesting of the Shares, the Company, on the Participant's behalf, will instruct the Company's transfer agent . . . to sell that number of Shares . . . as may be necessary to satisfy any

resulting withholding tax obligations on the Company." Defendants further aver that several months before the Putative Class Period, on April 18, 2024 and June 5, 2024, Fields sold 49,602 shares solely to satisfy tax or other government withholding obligations in connection with the vesting of performance and restricted stock units, likewise in accordance with the Company's Equity Incentive Award Plan, which provides that "[u]pon vesting of the Shares, the Company, on the Participant's behalf, will instruct the Company's transfer agent . . . to sell that number of Shares . . . as may be necessary to satisfy any resulting withholding tax obligations on the Company." Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

121. The Individual Defendants did not stop there. Between April and June 2024, as they made the statements alleged directly above, see Section IV(G) supra, and while the Individual Defendants had access to material nonpublic information that ELF's ballooning inventory was caused by lower demand (and not because of strong demand, as they falsely told investors), the Individual Defendants collectively sold more than $28 million of their ELF stock outside of their Rule 10b5-1 plans.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed all statements before November 21, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

122. The Individual Defendants' open market sales, made outside of their Rule 10b5-1 trading plans and shortly before the truth was partially revealed, demonstrates that they knew the truth about ELF's slowing growth and the real reason for the Company's declining inventory.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed all statements before November 21, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

**I.    The Truth Begins to Emerge when ELF Disclosed Declining Growth Numbers**

123.    The truth began to emerge on August 8, 2024, when Defendants lowered guidance and guided sales to lower than the market expected. However, investors did not understand the full truth because Defendants presented these issues as limited and unlikely to repeat, rather than indicative of a fundamental change in ELF's business.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed all statements before November 21, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

124.    On August 8, 2024, the Company released its fiscal Q1 2025 results (i.e., April – June 2024) and provided its outlook for fiscal Q2 2025 (July – September 2024). Specifically, ELF issued meaningfully weaker-than-anticipated adjusted EBITDA guidance, which implied ~$40 million EBITDA in Q2—$30 million lower than expected by the street, signaling a sequential slowdown in top line growth. ELF also guided sales growth to 25%-27% for FY 2025, which was significantly lower than what analysts expected.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed all statements before November 21, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

125.    Given Defendants' false and misleading statements touting ELF's demand, analysts were confused and concerned by ELF's guidance cut. For example, UBS stated on August 8, 2024 that it found "the sequential slowdown in top line growth embedded in the outlook **perplexing**," and noted that this slowdown "implies more challenged US non-tracked channel performance." Similarly, Morgan Stanley commented that same day that "ELF's stock was down significantly aftermarket on **weaker than expected guidance** for Q2, with revenue growth only slightly above 25-27% FY growth expectations, which would be a big slowdown from 50% in Q1, and includes ~16% Naturium acquisition contribution."

**ANSWER**:  With regard to the first sentence, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.  With regard to the second and third sentences, Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive, as on February 4, 2026, the Court's Order dismissed all statements before November 21, 2024.  Defendants further admit that UBS issued a report on August 8, 2024, which is publicly available and contains the language quoted in this sentence.  Defendants further admit that Morgan Stanley issued a report on August 8, 2024, which is publicly available and contains the language quoted in this sentence.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

126.    ELF's stock tumbled as a result of this disclosure, falling $27.12 per share, or 14.43 percent, to close at $160.83 per share on August 9, 2024.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed all statements before November 21, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

127.    Despite this disclosure, Defendants issued soothing statements to falsely reassure the market that demand was as strong as ever and sales would continue to grow.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

128.    For example, Defendants downplayed any concerns of slowing growth by continuing to falsely assert that its ballooning inventory was a sign of rising demand, not any failure to meet sales expectations. Although conceding that inventory was $200 million, more than double what it was a year prior, Defendant Fields stated on associated earnings call on August 8, 2024 that the difference was largely because ELF "continue[d] to build back our inventory level *to support strong consumer demand*."

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is

required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

129. Again, this was false. For example, CW 4 recalled that attendees of the weekly and monthly inventory meetings began to express concern beginning in Summer 2024 when ELF sales began to decline. CW 4 stated that ELF was "sitting on a lot of inventory" beginning in Summer 2024 because sales were declining and were not as strong as they were the previous year.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required. Further, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

130. Defendant similarly continued to deny that the inventory growth had any relation to lack of demand that ELF was in truth experiencing. During the same call, Defendant Amin reassured the market that ELF was "particularly well positioned," given that it saw "growth across all of [its] channels, digital, all of our national retailers, and international customers." Accordingly, Amin assured investors ELF "remain[s] quite bullish in our ability to continue to drive market share, both in color as well as skin care, and our continued expansion internationally."

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

131. Although ELF had nominally raised projected sales growth, analysts pressed the company on whether those numbers indicated stagnant growth, as they were significantly less than what was expected based on sales from tracked channels. J.P. Morgan's Andrea Teixiera pointed

out during the earnings call on August 8, 2024 that "tracked channels [are] growing" faster than ELF's guidance. In other words, guidance indicated that untracked channels or other factors may have hindered ELF's growth, because ELF was projected to grow slower than its tracked channels would indicate. Texiera then asked if there were any issues that ELF was seeing that explained the lower guidance. Defendant Fields flatly denied any issues, whether in untracked channels or otherwise, stating "*we are pleased with what we're seeing out of our retailers*, digitally, [and] internationally," and "we have increased confidence on the year."

**ANSWER**:   Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

132.   Defendants' statements were false. As the CWs explained, ELF had seen signs that their retailers and overall sales numbers were slowing and growth would be significantly lower, particularly in large retailers in the untracked channels like Ulta Beauty (which investors did not have access to data on).

**ANSWER**:   Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required.  Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

133.   For example, CW 3 explained that sales of ELF Cosmetic Products at Ulta Beauty began to decline in August or September 2024. CW 4 stated that sales across all channels began declining in Summer 2024. CW 4 detailed that ELF's overall sales were in the high single digits percent below the Company's internal projections in Summer 2024. CW 4 also recalled that beginning in Summer 2024, attendees at the monthly forecast meeting discussed the negative sales

trends that they were observing, including plans to turn around negative sales trends. And CW 2 recalled sales of e.l.f. Beauty Inc. (ELF) products at Ulta Beauty significantly declined in June or July 2024 and stayed down throughout the rest of 2024.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required.  Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

134.    Defendants' statements were also false because the innovative products Defendants were counting on to drive consumer demand were also failing at this time. For example, CW 2 explained that ELF's new innovation launches had performed below expectations in July 2024. According to CW 2, ELF expected that two new product launches were going to perform well. However, CW 2 recalled that in July 2024, sales reports reflected that the two new launches were not selling well at Ulta. CW 2 added that it was also discussed during weekly sales calls in July 2024 that these two launches were not performing as well as projected at Ulta and that these two products were not "up to par" with previous ELF product launches.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required.  Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

135.    Analysts accepted Defendants' false assurances that demand was as strong as ever. For example, UBS stated, "We came away from our callback with the view that the 2Q top-line remarks are more likely management taking a prudent approach given the uncertain operating

backdrop, rather than a reflection on any observed slowing in underlying trends." And J.P. Morgan stated, "Investors are Too Caught Up on FQ2 Guidance 'Above New Annual Range of +25-27%.' Recall that ahead of FQ1, management said the same 'above the annual rate of 20-22%' and ended up delivering +50% growth in FQ1. ELF has been **beating and raising every quarter** since the Pandemic recovery."

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants admit that UBS issued a report on August 8, 2024, which is publicly available and contains the language quoted in this sentence.  With regard to the third sentence, Defendants admit that J.P. Morgan issued a report on August 9, 2024, which is publicly available and contains the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

### J. Defendants Continue to Mislead the Market on November 6, 2024

136.    Defendants continued to issue statements that misled the market into believing that growth would continue and there were no indications of softening demand.

**ANSWER**:    Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

137.    For example, on November 6, 2024, the Company released its Q2 FY 2025 earnings results. In the associated press release, the Company touted its results, claiming they had seen "***strength in both our retailer and e-commerce channels***, in the U.S. and internationally."

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

138.    Worse, rather than inform investors they had observed stagnating demand, declining sales at Ulta Beauty, and ballooning inventory, Defendants instead **raised** guidance.

Specifically, Defendant Amin stated, "We are pleased to be in a position to raise our outlook across both the top and bottom line. For the full year, we now expect net sales growth of approximately 28% to 30%, up from 25% to 27% previously. *Our raised outlook reflects the outperformance in Q2 relative to our expectations[.]*"

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required.    To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

139.    In fact, on the associated earnings call on November 6, 2024, Defendant Amin attempted to draw investors away from any indicia that sales were dropping. For example, although Fields acknowledged that inventory had bloated to $239 million (nearly double of the previously year), she attributed the increase in inventory to "*supporting the demand we're seeing.*" Fields also claimed that ELF "feel[s] great about our inventory position and feel that we have the inventory that we need to continue to *support the demand that we're seeing.*"

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required.    To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

140.    Concerned that sales may be slowing, an analyst queried whether high levels of inventory was indicative of declining demand, asking "[is there] something going on? Is there too much inventory?" Fields again denied that ELF's bloated inventory was a sign that net sales were declining, emphatically (and falsely) reassuring investors that the inventory levels "allows [ELF] to *service the demand that we're seeing.*"

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required.    To the extent any such response is required, Defendants deny the

allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

141.    Defendant Fields' statements were false and misleading because they falsely attributed the buildup in inventory to a conscious decision by ELF to support increased demand. In truth, and as revealed by CWs, ELF's inventory buildup was caused by overstocking and decreased demand leading ELF to be unable to sell products it had manufactured. The statements were additionally false and misleading because, rather than seeing the demand that $239 million worth of inventory would support, ELF had observed drastically declining sales, stagnating retail sales, and lowered demand.

**ANSWER**:   Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required.   To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

142.    Moreover, Defendants knew that demand was slowing. As described supra, ¶¶96-114, Defendants observed a significant slowdown in its macroscopic sales trends and skyrocketing inventory as a result of lower demand. Throughout the remainder of 2024, Defendants continued to see indications that demand had stagnated, sales were performing below expectations, and inventory had bloated due to an inability to move product. There were also further indications that the innovations ELF had counted on to continue to drive sales growth had failed.

**ANSWER**:   Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required.   To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

143.    According to CW 4, it was discussed internally that ELF's new product launches were not performing well in calendar 2024. CW 4 stated that in calendar 2024, ELF's product innovation was not as good as it had been in previous years.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required.  Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

144.    CW 4 recalled that by late September 2024 or early October 2024, it became clear to all Marketing, Finance and Sales Operations employees that its new product launches were not as successful as projected. According to CW 4, ELF had originally projected that its new products were going to be a "big hit." However, CW 4 stated that ELF's new products did not resonate with its customers, which was reflected in sales data. For example, CW 4 recalled that during this time, sales of new setting powder products were significantly lower than projected.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required.  Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

145.    CW 4 explained that ELF's sales slowed in August 2024 and were roughly 12% below the Company's internal projections in September and October. CW 4 added that sales "stayed that way" through 2024. CW 4 noted that ELF's sales during the holiday season in 2024 were also "lower than expected."

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required.  Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

146. CW 4 stated that by mid-October 2024, ELF's Marketing, Finance and Sales Operations teams shifted its focus from marketing new products to marketing the Company's icon products. According to CW 4, by that time, the Company, including the C-Suite, were all "aligned" that the new products did not match the Company's internal forecasts or expectations, and their sales were not comparable to previous years. CW 4 recalled that at this time, ELF acknowledged that it was going to have a "bad" Q3 FY2025.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required. Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

### K. A Muddy Waters Report is Released and Defendants Continue to Mislead Investors in Their Attempts to Refute it

147. On November 20, 2024, Muddy Waters (an activist investor organization) released a report shorting ELF stock (the "Muddy Waters Report"). Drawing on interviews with ELF's Chinese suppliers and ELF's custom import data, Muddy Waters alleged that ELF had been materially overstating its revenue.

**ANSWER**: Defendants admit that on November 20, 2024, Muddy Waters Research issued a short-seller report, which is publicly available. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

148. The Muddy Waters Report reported that ELF had recently ordered significantly less inventory in an attempt to de-stock their overabundance of inventory, quoting interviews from

ELF's suppliers who explained that shipments were down and ELF "continue[s] to cut the inventory holding at their side." In other words, ELF had spent 2024 attempting to destock their inventory because they had overordered in a manner disproportionate to demand, rather than purposefully raising inventory to meet demand. These allegations corroborate the CW allegations that ELF had experienced significant lower demand throughout 2024. See supra ¶¶96-114.

**ANSWER**: Defendants admit that Muddy Waters Research issued a report shorting e.l.f. stock on November 20, 2024, which is publicly available and contains the language quoted in this sentence. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' and suppliers' allegations or statements, and deny the allegations in this paragraph on that basis. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

149.    Again, rather than come clean, Defendants doubled down and, in attempting to refute the Muddy Waters Report, continued to make false and misleading statements about their inventory and retail sales.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

150.    On November 21, 2024, Defendant Amin went on Mad Money with Jim Cramer to issue a full-throated defense of the company. Without disclosing any of the information undermining ELF's results, Amin claimed that ELF had a "clear line of sight in color cosmetics for market leadership, and it had recently "***built up inventory to be able to meet the strong demand that we're seeing not only in the U.S., but internationally.***"

**ANSWER**: Defendants admit that Defendant Amin participated in an interview on Mad Money with Jim Cramer on November 21, 2024, the recording of which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

151.    However, as explained supra, ¶¶96-114, Amin's statement was false and misleading because in truth ELF's inventory levels were elevated because of slowing demand.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

152.    Then, Jim Cramer pressed Amin about ELF's sales at Ulta Beauty. Pointing out that Target and Ulta Beauty had recently reported difficult sales, Jim Cramer asked Amin directly, "How's your business with Ulta?" Rather than admit that ELF's sales at Ulta Beauty were continuing to decline and were dragging down sales growth, Amin again doubled down on his misrepresentations, claiming "our ***business is strong at both*** customers," and "we're also the most productive brand that Ulta carries, and so ***we have great business with them***." Amin concluded by claiming "what you have to look at is ***the facts of just how strong our growth is***, and how we're winning in the marketplace, and that's really the real news."

**ANSWER**:  Defendants admit that Defendant Amin participated in an interview on Mad Money with Jim Cramer on November 21, 2024, the recording of which is publicly available and contains the excerpted language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

153.    Defendant Amin's statements were false and misleading. As explained supra, ¶¶102-106, ELF's sales at Ulta Beauty had declined significantly by that time. CW 4 also noted that sales to Ulta Beauty were significantly lower than expected during the holiday season in 2024.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

**L.  The Truth is Fully Revealed on February 6, 2025**

154.    On February 6, 2025, ELF announced its Q3 FY2025 results, lowering its full-year fiscal 2025 net sales growth to be in the range of 27 to 28 percent, down from the previous guidance

of 28 to 30 percent. Moreover, net sales in the final quarter of the fiscal year were projected to be between -1% and 2%, which was the lowest net sales growth in six years and the first time since 2Q FY 2021 (i.e., July – September 2020) that ELF did not hit double digit sales growth. Moreover, these results meant that ELF risked negative sales growth in a quarter for only the third time in its **entire history.**

**ANSWER**: With regard to the first sentence, Defendants admit that on February 6, 2025, e.l.f. released its financial results for its 3Q25 and provided updated financial guidance for FY25, projecting FY25 YoY sales growth of 27% to 28%. With regard to the second sentence, Defendants aver that on February 6, 2025, e.l.f. provided updated financial guidance for 4Q25, projecting 4Q25 YoY sales growth of -1% to 2% (which it achieved). Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

155. ELF further guided its adjusted EBITDA downward to $289 to 293 million, from $304 to 308 million, and reported that its inventory was at $215 million worth of product, more than $100 million more than immediately before the Class Period just a year earlier. Tellingly, despite their repeated false and misleading statements about raising inventory being an indicator of strong demand, Defendants finally did not attribute the high inventory levels to the "strong demand" it was ostensibly seeing.

**ANSWER**: With regard to the first sentence, Defendants aver that on February 6, 2025, e.l.f. provided updated adjusted EBITDA guidance of $289 to $293 million and reported a net inventory balance of $215 million. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions

156. Defendants attributed this decline to several factors. First, ELF noted it had seen overall softer consumption of its products. Second, Defendants explained that ELF had released new products that had not produced results, despite Defendants' earlier promise that ELF had a pipeline of innovative products that they could pull forward if they observed weakness. Finally,

despite previous false statements about the strength of sales at Ulta Beauty, Defendants finally conceded that ELF had observed "softness in Ulta" that contributed to the sales decline.

**ANSWER**:  Defendants admit that on February 6, 2025, e.l.f. held its 3Q25 earnings call, the transcript of which is publicly available.  Defendants further aver that during this earnings call, e.l.f. attributed its lowered guidance for FY 2025 to "consumption trends" that were "softer than [e.l.f.] expected," which included some of its "spring new items."  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

157.    On this news, ELF stock plummeted, tumbling $17.36 per share, or 19.6 percent, to close at $71.13 per share on heavy trading on February 7, 2025. All in all, this was a price decline of over $*150* dollars per share since its Class Period high of $221.83 on March 4, 2024— a **67.9 percent** decline in less than a year.

**ANSWER**:  Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive.  Defendants further aver that the stock price and average trading volume of e.l.f. stock is publicly available.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

158.    Analysts were shocked by the news. Oppenheimer commented "We did not anticipate this severe a guide-down and moderation in the business . . . We remain concerned with upcoming difficult comparisons and would stay sidelined." UBS downgraded its price target, noting that the results were attributed to "weaker early reads on '25 innovation" and stating that "the company's 3Q results/updated outlook implies that this deceleration in growth may continue, with the updated outlook implying that growth could move into the + single-digit% range for the first time in four years." And Piper Sandler expressed surprise that untracked channels like Ulta Beauty had been as unproductive as they were, stating "though we were hopeful that untracked channels would offset, management is lowering guidance, calling for sales growth of +27-28% y/y vs. +28-30% y/y previously."

**ANSWER**:  With regard to the first sentence, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations in this paragraph on that basis.  With regard to the second sentence, Defendants admit that UBS issued a report on February 6, 2025, which is publicly available and contains the language quoted in this sentence. With regard to the third sentence, Defendants admit that Piper Sandler issued a report on February 6, 2025, which is publicly available and contains the language quoted in this sentence.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

159.    After this disclosure was made, investors finally understood the truth: although Defendants had promised sales would continue to grow and demand would continue to produce record results, Defendants had been concealing evidence that ELF's demand had been slipping, its innovations had been underperforming, and its inventory had been ballooning due to poor sales.

**ANSWER**:   Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

160.    When it released its annual report for FY2025 in May 2025, ELF confirmed what had been revealed to the market on February 6, 2025: Ulta Beauty sales had stagnated in FY2025, crippling ELF's sales growth. Although ELF's total sales for the quarter had reached $1.3 billion, its sales to Ulta Beauty had limped to roughly $157 million. Not only had sales to Ulta Beauty failed to drive sales growth at the same rate as previous years, when ELF had consistently near-doubled its yearly sales to Ulta Beauty, ELF had actually produced less sales to Ulta Beauty than the previous year.

**ANSWER**:  Defendants aver that on May 29, 2025, e.l.f. filed a Form 10-K for FY25 in which e.l.f. disclosed that Ulta Beauty accounted for 12% of e.l.f.'s FY25 net sales.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

161.    Lead Plaintiffs allege that Defendants' statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements falsely and/or misleadingly inflated and/or maintained the price of ELF's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

**ANSWER**:  With regard to the first sentence, Defendants admit that Lead Plaintiffs allege that certain of Defendants' statements were knowingly and materially false and misleading.  With regard to the second sentence, Defendants deny the allegations, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

162.    Throughout the Class Period, Defendants made a series of misrepresentations concerning: (1) the declining sales in ELF's retail customers such as Ulta Beauty; (2) the cause of ELF's bloated inventory; and (3) ELF's ability to sustain net sales growth.

**ANSWER**:  Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

### A.  February 6, 2024 – Q3 2024 Earnings Call

163.    The Class Period begins on February 7, 2024, the day after ELF released its financial results for Q3 of FY 2024.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on February 6, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

164.    After the market closed on February 6, 2024, ELF released its financial results for Q3 of FY 2024, for the period ended on December 31, 2023. In the related earnings call that was held the same day, Defendant Fields stated, in relevant part:

> Our balance sheet remains strong, and we believe positions us well to execute our long-term growth plans. We ended the quarter with approximately $72 million in cash on hand compared to a cash balance of $87 million a year ago. Our ending inventory balance was $205 million, in-line with our expectations and up from $81 million a year ago. The difference is primarily a combination of three things[.]
>
> [F]irst, as we said last quarter, *we continue to build back our inventory levels through fiscal [20]24 to support strong consumer demand[*.] [S]econd, approximately $28 million of the increase is the result of taking ownership of inventory from China when it ships, versus when it enters our distribution center here in the US; lastly, our consolidated results include Naturium for the first time, which added approximately $25 million of inventory. *We believe we have the appropriate levels of inventory across the business to service our customers and support the demand we're seeing.*

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on February 6, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

165.    Moreover, Defendants made a nearly identical statement in the investor presentation that Defendants released alongside the earnings call. Specifically, in the presentation, Defendants attributed ELF's inventory balance to "*strong consumer demand*."

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on February 6, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

166.    Defendants' statements in ¶¶164-165 were materially false and misleading. Although Defendants claimed ELF's inventory had swelled because of "strong consumer

demand," in truth, ELF's inventory was higher because demand had stagnated and ELF was unable to move its products at the level it had predicted. In other words, ELF's inventory was not rising to meet demand, as Defendants falsely represented, but because Defendants had miscalculated the growth and could not unload the massive amounts of inventory they had previously purchased from ELF's suppliers.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on February 6, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

167.    Defendants also knew that ELF's demand was declining because much of their record sales growth in FY 2024 was caused by sell-in transactions. Indeed, although ELF's sales grew massively in FY 2024 (April 2023 through March 2024), exceeding 70% year-over-year growth in every quarter, these sales were largely attributed to "sell-in transactions," fueled by increased orders from retailers, as opposed to "sell-through" sales, fueled by increased consumer demand. Accordingly, this growth was not sustainable, as inventory purchased to meet that growth was not due to consumer demand. Nevertheless, ELF had purchased additional inventory as if the previous sales growth was fueled by consumer demand. Once retailers stopped increasing their purchases of ELF goods at the same rate, ELF was left holding tens of millions of excess inventory.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on February 6, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

168.    Moreover, three interrelated facts demonstrate that ELF's rising inventory was a sign that demand had slowed and would lead to future declining sales, rather than a sign of rising demand as ELF claimed.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

DEFENDANTS' ANS. AND AFF. DEFENSES TO CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on February 6, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

169.  First, between Q2 2024 (July – September 2023) and Q4 2024 (January 2024 – March 2024), ELF's inventory growth massively exceeded sales growth. In other words, demand was not keeping up with ELF's rising inventory—meaning ELF would soon be left with excess inventory and lower sales as retailers stopped buying more product from ELF (since they already had existing inventory they still needed to sell).

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on February 6, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

170.  Second and relatedly, between Q1 2024 (April – June 2023) and Q3 2024 (October – December 2023), inventory turn dropped precipitously, even while sales growth rose. This indicated that ELF's rise in inventory was not scaling with demand, as ELF's inventory increase led to slower turns (since, again, retailers were not seeing enough demand to request more inventory).

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on February 6, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

171.  Third, inventory + accounts receivable growth (which measured the total amount of ELF products possessed by sellers in the marketplace, including ELF and retailers) exceeded sales growth every quarter between Q3 2024 (October – December 2023) and Q2 2025 (July –

September 2024). This shows that by the time the Class Period began, the marketplace was flooded with ELF products that exceeded consumer demand.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on February 6, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

**B. May 22, 2024 – Q4 2024 Earnings Call**

172. On May 22, 2024, ELF released its financial results for Q4 of 2024, for the period ended on March 31, 2024. Defendant Amin and Defendant Fields appeared on the related earnings call that was held the same day. Defendant Fields, in her opening statement, emphasized that ELF "***continue[s] to build back our inventory levels to support strong consumer demand***."

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on May 22, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

173. During the same earnings call on May 22, 2024, an analyst asked about ELF's inventory position. In response, Defendant Fields stated:

> We feel great about our inventory position. As we talked, ***we have been increasing that inventory position to support the demand that we're seeing*** and certainly have room to support even further demand and upside potential should that come to fruition in our inventory. So, we're feeling great about that

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on May 22, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

174.    Moreover, Defendants made a nearly identical statement in the investor presentation that Defendants released alongside the earnings call. Specifically, in the presentation, Defendants listed a "driver" of ELF's inventory balance as "***strong consumer demand***."

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on May 22, 2024, and thus, no response to these allegations is required.   To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

175.    Defendants' statements in ¶¶173-174 were materially false and misleading because ELF's inventory growth was not fueled by ELF's decision to support demand, but rather by lowered demand and an inability to move products. This lowered demand would result in lagging sell-in sales in Summer 2024.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on May 22, 2024, and thus, no response to these allegations is required.   To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

176.    Specifically, CW 4 stated that ELF was "sitting on a lot of inventory" beginning in Summer 2024 because sales were declining and were not as strong as they were the previous year. CW 4 recalled that attendees of the weekly and monthly inventory meetings began to express concern beginning in Summer 2024 when ELF sales began to decline. CW 4 also stated that attendees of the monthly forecast meeting also discussed excess and obsolete inventory and how to move excess inventory. CW 4 detailed that during monthly forecast meetings, attendees discussed plans to have retail partners help move ELF's excess inventory.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on May 22, 2024, and thus, no response to these allegations is required.   Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements,

and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

177.    Other CWs described that Ulta Beauty stopped purchasing ELF products in 2024, as Ulta Beauty ordered more inventory than it could sell. For example, CW 2 explained that she saw "a lot" of unsold excess ELF products at Ulta Beauty Stores. CW 2 stated that Ulta Beauty had excess inventory of ELF products because those products were not selling. As a result of this, Ulta Beauty cut down on its orders from ELF. Additionally, CW 2 explained that ELF's products were not moving off Ulta's shelves fast enough and therefore there was no shelf space available for any additional product. Similarly, CW 1 explained that in 2024, Ulta stopped ordering new Keys Soulcare products for its website from ELF because Keys Soulcare sales were so poor.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on May 22, 2024, and thus, no response to these allegations is required. Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

178.    Moreover, CW 2 recalled sales of e.l.f. Beauty Inc. (ELF) products at Ulta Beauty significantly declined in June or July 2024 and stayed down throughout the rest of 2024. CW 2 explained that this decline was reflected in sales reports and was also discussed in weekly sales calls she attended in June or July 2024. CW 2 stated that ELF was also not seeing the same level of growth at Ulta in June or July 2024 that it experienced in previous years.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on May 22, 2024, and thus, no response to these allegations is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this

paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

179. Similarly, CW 4 recalled that sales of ELF's products began to decline "across the board" in Summer 2024. CW 4 detailed that ELF's overall sales were in the high single digits percent below the Company's internal projections in Summer 2024. Additionally, CW 4 recalled that beginning in Summer 2024, attendees at the monthly forecast meeting discussed the negative sales trends that they were observing, including plans to turn around negative sales trends.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on May 22, 2024, and thus, no response to these allegations is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

**C. June 30, 2024 – Barrons' Interview with Defendant Amin**

180. On June 30, 2024, Defendant Amin participated in an interview with Barrons. When asked about ELF's stock performance, Defendant Amin stated:

> The line I sometimes get is, "Did I miss the party?" And my answer usually is "no"—the party's just getting started. There's two things that correlate most to long-term stock performance for ELF—net sales growth and adjusted EBITDA growth. So we're focused on consistently building both net sales and adjusted EBITDA, and if you do that, you'll see our stock performance has actually correlated with that. ***Given the white space we have ahead of us, given the known strengths that we have, our ability and confidence continue to drive strong net sales and adjusted Ebitda growth***. ***There's still plenty of growth to be had.***

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on June 30, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

181.     Defendant Amin's statement that "[t]here's still plenty of growth to be had" was false and misleading, for the same reasons outlined in supra, ¶¶96-114. Specifically, statements touting ELF's "growth" and "white space" were misleading because indicated Defendants saw evidence of strong demand and growth opportunities while omitting that (i) Defendants had observed sales declining across all of ELF's channels in Summer 2024, signaling that ELF's days of continued and sustained growth at previous levels were at an end; (ii) sales at important retails partners such as Ulta Beauty had significantly declined; and (iii) inventory had ballooned, caused by declining consumer demand and an inability to move product.

**ANSWER**:     Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on June 30, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

182.     For example, CW 2 recalled sales of e.l.f. Beauty Inc. (ELF) products at Ulta Beauty significantly declined in June or July 2024 and stayed down throughout the rest of 2024. CW 2 explained that this decline was reflected in sales reports and was also discussed in weekly sales calls she attended in June or July 2024. CW 2 stated that ELF was also not seeing the same level of growth at Ulta in June or July 2024 that it experienced in previous years.

**ANSWER**:     Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on June 30, 2024, and thus, no response to these allegations is required.  Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

183.     Similarly, CW 4 recalled that sales of ELF's products began to decline "across the board" in Summer 2024. CW 4 detailed that ELF's overall sales were in the high single digits percent below the Company's internal projections in Summer 2024. Additionally, CW 4 recalled

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

that beginning in Summer 2024, attendees at the monthly forecast meeting discussed the negative sales trends that they were observing, including plans to turn around negative sales trends.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on June 30, 2024, and thus, no response to these allegations is required.  Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

## THE TRUTH BEGINS TO EMERGE WHILE ELF CONTINUED TO MISLEAD INVESTORS

184.    On August 8, 2024, investors began to learn the truth when the Company released its fiscal Q1 2025 results and provided its outlook for fiscal Q2 2025. Specifically, ELF issued weaker-than-anticipated guidance for fiscal Q2 2025 and acknowledged some downward pressure on its adjusted EBITDA guidance, approximately $30 million lower than expected by the street, signaling a sequential slowdown in top line growth.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed all statements before November 21, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

185.    On this news, ELF's stock price fell $27.12 per share, or 14.4 percent, to close at $160.83 per share on August 9, 2024.

**ANSWER**:  Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive.  Defendants aver that the price and average trading volume of e.l.f. stock is publicly available.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

186.    Despite these revelations, investors did not know the truth about ELF's declining demand and sales because Defendants continued to issue misleading statements regarding the strength of consumer demand for its products, the cause of the ballooning inventory levels, and the success of its innovations.

**ANSWER**:    Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

**D.  August 8, 2024 – Q1 2025 Earnings Call**

187.    In connection with the fiscal Q1 2025 results, ELF hosted an earnings call with investors and analysts to discuss the Company's fiscal Q1 2025 results (the "Q1 2025 Call"). During the scripted portion of the Q1 2025 Call, Defendant Fields stated, in relevant part:

> Our balance sheet remains strong and we believe positions us well to execute our long-term growth plans. We ended the quarter with $109 million in cash on hand compared to a cash balance of $143 million a year ago. Our ending inventory balance was $200 million in line with our expectations and up from $98 million a year ago. The difference is primarily a combination of three things. First, as we've said in the past few quarters, ***we continue to build back our inventory levels to support strong consumer demand***. Second, our consolidated results now include Naturium, which added approximately $26 million of inventory. Lastly, an additional $23 million of the increase is the result of taking ownership of inventory from China when it ships versus when it enters our distribution center here in the US.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required.    To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

188.    Moreover, Defendants made a nearly identical statement in the investor presentation that Defendants released alongside the earnings call. Specifically, in the presentation, Defendants listed a "driver" of ELF's inventory balance as "***strong consumer demand***."

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required.    To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and

any legal conclusions.

189.    Defendants' statements in ¶¶187-188 were false and misleading. Specifically, Defendants attributed the rise in inventory to "strong consumer demand." In truth, Defendants had overestimated demand and now possessed an excess of inventory they were unable to unload. Additionally, Defendants failed to disclose that the inventory buildup has been caused by declining sales.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required.    To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

190.    CW 4 stated that ELF was "sitting on a lot of inventory" beginning in Summer 2024 because sales were declining and were not as strong as they were the previous year. CW 4 recalled that attendees of the weekly and monthly inventory meetings began to express concern beginning in Summer 2024 when ELF sales began to decline. CW 4 stated that attendees of the monthly forecast meeting also discussed excess and obsolete inventory and how to move excess inventory. CW 4 detailed that during monthly forecast meetings, attendees discussed plans to have retail partners help move ELF's excess inventory.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required.    Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.    Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

191.    Later on that same call, Defendant Amin attempting to assuage investors' worry about ELF's growth trends, asserting:

I would say that we're particularly well positioned. *We saw growth across all of our channels, digital, all of our national retailers, and international customers. So, we remain quite bullish in our ability to continue to drive market share, both in color as well as skin care, and our continued expansion internationally.*

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

192. Similarly, Defendant Fields responded to analyst questions about growth by pointing to increased "momentum" and good results across all channels, stating:

*[W]e are pleased with what we're seeing out of our retailers, digitally, internationally, all of those that we mentioned on the call. So continue to think that we have momentum there.*

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

193. Defendants' statements in ¶¶191-192 were materially false and misleading because they failed to disclose that Defendants had observed declines in sales trends across all channels and ELF's overall sales were significantly lower than expected. Specifically, CW 4 recalled that sales of ELF's products began to decline "across the board" in Summer 2024. CW 4 detailed that ELF's overall sales were in the high single digits percent below the Company's internal projections in Summer 2024. Further, CW 4 explained that ELF's sales slowed in August 2024 and were roughly 12% below the Company's internal projections in September and October.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required. Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations

in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

194.    Moreover, CW 4 recalled that beginning in Summer 2024, attendees at the monthly forecast meeting discussed the negative sales trends that they were observing, including plans to turn around negative sales trends.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required.  Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

195.    Defendants' statements in ¶¶191-192 were additionally materially false and misleading because they omitted and failed to disclose that ELF had observed lowered demand and declining sales across its retail partners such as Ulta Beauty. Specifically, CW 2 recalled sales of e.l.f. Beauty Inc. (ELF) products at Ulta Beauty significantly declined in June or July 2024 and stayed down throughout the rest of 2024. CW 2 explained that this decline was reflected in sales reports and was also discussed in weekly sales calls she attended in June or July 2024. CW 2 stated that ELF was also not seeing the same level of growth at Ulta in June or July 2024 that it experienced in previous years. Similarly, CW 3 explained that sales of ELF Cosmetic Products at Ulta Beauty began to decline in August or September 2024.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required.  Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

196.    These issues were especially pronounced in the Keys Soulcare account. For example, CW 3 noted that Ulta Beauty closed down its Keys Soulcare account in July or August 2024. CW 3 explained that Keys Soulcare did not drive enough volume to warrant Ulta Beauty's shelf space. Similarly, CW 1 explained that in 2024, Ulta stopped ordering new Keys Soulcare products for its website from ELF because Keys Soulcare sales were so poor.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required.  Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

197.    Defendants' statements in ¶¶191-192 were additionally materially false and misleading because they omitted that innovative products Defendants were counting on to drive consumer demand were also failing at this time. For example, CW 2 explained that ELF's new innovation launches had performed below expectations in July 2024. According to CW 2, ELF expected that two new product launches were going to perform well. However, CW 2 recalled that in July 2024, sales reports reflected that the two new launches were not selling well at Ulta. CW 2 added that it was also discussed during weekly sales calls in July 2024 that these two launches were not performing as well as projected at Ulta and that these two products were not "up to par" with previous ELF product launches.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on August 8, 2024, and thus, no response to these allegations is required.  Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

**E.  November 6, 2024 – Q2 2025 Earnings Call**

198.    On November 6, 2024, ELF issued a press release announcing its financial results for the three months ended September 30, 2024 (the "Q2 2025 Press Release"). In the Q2 2025 Press Release, ELF stated that "Net sales increased 40% to $301.1 million, primarily driven by strength in both our retailer and e-commerce channels, in the U.S. and internationally."

**ANSWER**:   Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required.   To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

199.    ELF also announced in the Press Release that they were raising guidance. The Press Release stated, "The Company is providing the following updated outlook for fiscal 2025. The updated outlook for fiscal 2025 reflects *an expected 28-30% year-over-year increase in net sales*, as compared to an expected 25-27% increase previously."

**ANSWER**:   Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required.   To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

200.    That same day, ELF hosted an earnings call with investors and analysts to discuss the Company's fiscal Q2 2025 results (the "Q2 2025 Call"). During the scripted portion of the Q2 2025 Call, Defendant Fields stated, in relevant part:

> Now let's turn to our raised outlook for fiscal 2025. We are pleased to be in position to raise our outlook across both the top and bottom line. For the full year, *we now expect net sales growth of approximately 28% to 30%*, up from 25% to 27% previously. *Our raised outlook reflects the outperformance in Q2 relative to our expectations*, pipeline related to the space gains we talked about with Target, Dollar General, and Walgreens as well as ongoing international momentum

**ANSWER**:   Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these

allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

201. Defendants' statements in ¶¶199-200 were materially false and misleading because Defendants omitted material facts, including the fact that they had observed declining sales and demand that they knew could not support a guidance change. At the same time that ELF raised guidance, Defendants failed to disclose that: (i) ELF had observed declining sales across all of its channels; (ii) retail partners such as Ulta Beauty had experienced massively declining sales; (iii) ELF's overall sales continued to decline for the remainder of 2024 and were roughly 12% below the Company's internal projections in September and October 2024; and (iv) by October 2024, the Company, including the C-Suite, were all "aligned" that the new products did not match the Company's internal forecasts or expectations, and their sales were not comparable to previous years. See ¶¶96-114, 143-146, 153.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

202. Defendants' statements in ¶¶199-200 were materially false and misleading because Defendants omitted material facts, including the fact that they had observed declining sales and demand that they knew could not support a guidance change. At the same time that ELF raised guidance, Defendants failed to disclose that: (i) ELF had observed declining sales across all of its channels; (ii) retail partners such as Ulta Beauty had experienced massively declining sales; (iii) ELF's overall sales continued to decline for the remainder of 2024 and were roughly 12% below the Company's internal projections in September and October 2024; and (iv) by October 2024, the Company, including the C-Suite, were all "aligned" that the new products did not match the Company's internal forecasts or expectations, and their sales were not comparable to previous years. See ¶¶96-114, 143-146, 153.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

DEFENDANTS' ANS. AND AFF. DEFENSES TO CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

203. During the Q2 2025 Call, Defendant Fields also touted the supposed demand ELF was seeing as supporting ELF's continued rise in inventory, stating:

> Moving to the balance sheet and cash flow, our balance sheet remains strong and we believe positions us well to execute our long-term growth plans. We ended the quarter with $97 million in cash on hand, compared to a cash balance of $108 million at the end of fiscal 2024. Our ending inventory balance was $239 million, in line with our expectations and up from $147 million a year ago. Consistent with the last few quarters, the increase was driven by timing of when we take ownership of inventory from China, the addition of NATURIUM, and *supporting the demand we're seeing.*

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

204. Similarly, during the Q2 2025 Call, an analyst asked Defendant Fields about the excess inventory, and Fields responded as follows:

> Q: Nice job on the quarter. I guess, maybe I was wondering a little bit more on the innovation front. You talked about maybe having a little bit less this quarter. I guess, what franchises or categories do you think there's opportunities still to roll out new innovation? And then how long does it take, I guess, from incubation to shelf to get product out there? I guess, when should we expect more newness to come out? And then just really quick on the inventory, it looks like it did come down this quarter, so I'm curious if you're done kind of building up that excess inventory that you needed and how we should think about that [–] the inventory growth as we go forward? Thanks.
> […]
> A: And then, Susan, on your question on inventory, we feel great about our inventory position and feel that we have the inventory that we need to continue to support the demand that we're seeing. In terms of buildup, we haven't given an outlook . . . but I do feel comfortable saying that as we go into kind of this – third quarter, typically there's a buildup as we're kind of looking at our spring innovation and there's pipeline and things like that that need to go out. And then you should see it come down a bit more as we get into Q4 and exit this year.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

205. Later during the Q2 2025 Call, an analyst asked Defendant Fields again about the excess inventory:

Q: Wanted to ask about inventories again. I guess it still seems like it's a bit higher than maybe I would have expected, given your expectations for decelerating growth. And I look at it on a year-on-year basis, it was up more sequentially 1Q '24 to 2Q '24 and year-on-year then, but the growth was also much greater. So, I guess, trying to figure out, is there something going on? Is it too much inventory? Like, what would be the timing of how long it's potentially good for?
[…]
A: Hi, Mark. Yeah, so, let me just maybe take you back a couple quarters on our inventory. So, last year around this time is when we started talking about the change with taking ownership earlier that we're taking ownership when products leave China instead of when it arrives here. So *that had an impact on inventory. That has been for the last couple quarters that we've been talking about that. So that's not a new thing or a new addition to our inventory narrative here*. And I want to address your question on obsolescence as well. There is no risk of obsolescence overall for our portfolio, color cosmetics, anything like that. And what you're seeing in the build on inventory, as we've talked about, is really building for that global footprint.
So we've talked about setting up distribution centers across the world, in Asia, in Germany, in the UK, here with the second DC here in the US, additional nodes on our e-commerce. *So that also leads to higher inventory levels overall, but allows us to service the demand that we're seeing. So we feel quite comfortable with the inventory that we have on hand and believe that it will be enough to help service that demand that we're seeing.*

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

206. Defendant Fields' statements in ¶¶203-05 were materially false and misleading because ELF's inventory rise was not primarily caused by either demand or an accounting change.

Rather, the rise was caused by decreased demand and ELF overstocking its inventory to a level that its declining sales could not meet.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

207. Illustrating this, CW 4 recalled that attendees of the weekly and monthly inventory meeting began to express concern beginning in Summer 2024 when ELF sales began to decline. CW 4 stated that ELF was "sitting on a lot of inventory" beginning in Summer 2024 because sales were declining and were not as strong as they were the previous year. CW 4 also stated that attendees of the monthly forecast meeting also discussed excess and obsolete inventory and how to move excess inventory. CW 4 detailed that during monthly forecast meetings, attendees discussed plans to have retail partners help move ELF's excess inventory.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required. Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

208. Furthermore, Defendants Fields' statements in ¶¶203-05 were additionally materially false and misleading because they omitted and failed to disclose that ELF had observed lowered demand and declining sales across its retail partners such as Ulta Beauty. Specifically, CW 2 recalled sales of e.l.f. Beauty Inc. (ELF) products at Ulta Beauty significantly declined in June or July 2024 and stayed down throughout the rest of 2024. CW 2 explained that this decline was reflected in sales reports and was also discussed in weekly sales calls she attended in June or July 2024. CW 2 stated that ELF was also not seeing the same level of growth at Ulta in June or

July 2024 that it experienced Furthermore, Defendants Fields' statements in ¶¶203-05 were additionally materially false and misleading because they omitted and failed to disclose that ELF had observed lowered demand and declining sales across its retail partners such as Ulta Beauty. Specifically, CW 2 recalled sales of e.l.f. Beauty Inc. (ELF) products at Ulta Beauty significantly declined in June or July 2024 and stayed down throughout the rest of 2024. CW 2 explained that this decline was reflected in sales reports and was also discussed in weekly sales calls she attended in June or July 2024. CW 2 stated that ELF was also not seeing the same level of growth at Ulta in June or July 2024 that it experienced.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required. Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

209. Furthermore, Defendants Fields' statements in ¶¶203-05 were additionally materially false and misleading because they omitted and failed to disclose that ELF had observed lowered demand and declining sales across its retail partners such as Ulta Beauty. Specifically, CW 2 recalled sales of e.l.f. Beauty Inc. (ELF) products at Ulta Beauty significantly declined in June or July 2024 and stayed down throughout the rest of 2024. CW 2 explained that this decline was reflected in sales reports and was also discussed in weekly sales calls she attended in June or July 2024. CW 2 stated that ELF was also not seeing the same level of growth at Ulta in June or July 2024 that it experienced.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required. Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations

in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

210.    Defendants' statements in ¶¶203-05 were additionally materially false and misleading because they omitted that innovative products Defendants were counting on to drive consumer demand were also failing at this time.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required.    To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

211.    For example, CW 2 explained that ELF's new innovation launches had performed below expectations in July 2024. According to CW 2, ELF expected that two new product launches were going to perform well. However, CW 2 recalled that in July 2024, sales reports reflected that the two new launches were not selling well at Ulta. CW 2 added that it was also discussed during weekly sales calls in July 2024 that these two launches were not performing as well as projected at Ulta and that these two products were not "up to par" with previous ELF product launches.

**ANSWER**:    Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required.    Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.    Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

212.    Similarly, CW 4 explained that by late September 2024 or early October 2024, it became clear to all Marketing, Finance and Sales Operations employees that its new product launches were not as successful as projected. According to CW 4, ELF had originally projected that its new products were going to be a "big hit." However, CW 4 stated that ELF's new products

did not resonate with its customers, which was reflected in sales data. For example, CW 4 recalled that during this time, sales of new setting powder products were significantly lower than projected.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required. Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

213. CW 4 explained that ELF's sales slowed in August 2024 and were roughly 12% below the Company's internal projections in September and October. CW 4 added that sales "stayed that way" through 2024. CW 4 noted that ELF's sales during the holiday season in 2024 were also "lower than expected."

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required. Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

214. CW 4 stated that by mid-October 2024, ELF's Marketing, Finance and Sales Operations teams shifted its focus from marketing new products to marketing the Company's icon products. According to CW 4, by that time, the Company, including the C-Suite, were all "aligned" that the new products did not match the Company's internal forecasts or expectations, and their sales were not comparable to previous years. CW 4 recalled that at this time, ELF acknowledged that it was going to have a "bad" Q3 FY2025.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these

allegations is required. Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

215. Additionally, Defendants' statements were false and misleading because ELF had observed outsized declines in its untracked channels such as Ulta Beauty, which would drive lower sales growth.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

216. CW 2 recalled sales of e.l.f. Beauty Inc. (ELF) products at Ulta Beauty significantly declined in June or July 2024 and stayed down throughout the rest of 2024. CW 2 explained that this decline was reflected in sales reports and was also discussed in weekly sales calls she attended in June or July 2024. CW 2 stated that ELF was also not seeing the same level of growth at Ulta in June or July 2024 that it experienced in previous years. Similarly, CW 3 explained that sales of ELF Cosmetic Products at Ulta Beauty began to decline in August or September 2024.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to statements made on November 6, 2024, and thus, no response to these allegations is required. Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

**F.  November 21, 2024 – Defendant Amin's Interview on Mad Money**

217.    On November 21, 2024, Defendant Amin participated in an interview on Mad Money with Jim Cramer regarding the Muddy Waters Report, stating:

> First of all, their report was absolute nonsense. Their claim that they couldn't see import data from us is because we asked the US Customs and Borders Protections back in February to make that confidential for competitive reasons. So our facts basically unravel their entire report, their whole basis was on the import data . . . our company's extremely healthy, has terrific controls on inventory, on revenue recognition and is very well-run… ***In fact, we built up inventory to be able to meet the strong demand that we're seeing*** not only in the U.S., but also internationally, our international business was up 91% last quarter.

**ANSWER**:  Defendants admit that Defendant Amin participated in an interview on Mad Money with Jim Cramer on November 21, 2024, the recording of which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

218.    Defendant Amin's statement in ¶217 was materially false and misleading because ELF's inventory was not built up "to meet the strong demand" ELF was seeing, but rather because sales were declining and ELF was unable to unload the excess inventory it had previously ordered.

**ANSWER**:  Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

219.    Illustrating this, CW 4 recalled that attendees of the weekly and monthly inventory meetings began to express concern beginning in Summer 2024 when ELF sales began to decline. CW 4 stated that ELF was "sitting on a lot of inventory" beginning in Summer 2024 because sales were declining and were not as strong as they were the previous year. CW 4 stated that attendees of the monthly forecast meeting also discussed excess and obsolete inventory and how to move excess inventory. CW 4 detailed that during monthly forecast meetings, attendees discussed plans to have retail partners help move ELF's excess inventory.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this

paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

220.    When Cramer questioned whether ELF was able to withstand the struggles other beauty companies had faced during the latter half of 2024, Amin pushed back, claiming "***This is our 23rd consecutive quarter of growing our market share*** and we are now the number one unit share brand in the U.S., number two in dollars, with a ***clear line of sight in color cosmetics for market leadership.***"

**ANSWER**:  Defendants admit that Defendant Amin participated in an interview on Mad Money with Jim Cramer on November 21, 2024, the recording of which is publicly available and contains the language quoted in this paragraph.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

221.    Cramer then pointed out that Target and Ulta Beauty had experienced recent negative results, asking "How's your business with Ulta?" In response, Amin stated "our ***business is strong at both*** customers," "we're also the most productive brand that Ulta carries, and so ***we have great business with them***" and "what you have to look at is ***the facts of just how strong our growth is***, and how we're winning in the marketplace, and that's really the real news."

**ANSWER**:  Defendants admit that Defendant Amin participated in an interview on Mad Money with Jim Cramer on November 21, 2024, the recording of which is publicly available and contains some of the excerpted language quoted in this paragraph.  Defendants aver that Plaintiffs misquoted Defendant Amin, and that Defendant Amin said: "what you have to look at is the facts of just how strong our growth *has been*."  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

222.    Defendant Amin's statements in ¶¶220-21 were materially false and misleading because Defendants failed to disclose that: (i) ELF had observed declining sales across all of its channels; (ii) retail partners such as Ulta Beauty had experienced massively declining sales in 2024; (iii) ELF's overall sales had declined since Summer 2024 and were roughly 12% below the

Company's internal projections in September and October 2024; and (iv) by October 2024, the Company, including the C-Suite, were all "aligned" that ELF's new innovations for 2024 did not match the Company's internal forecasts or expectations, and their sales were not comparable to previous years. See ¶¶96-114, 143-146, 153.

**ANSWER**:   Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

### THE TRUTH IS FULLY REVEALED

223.   On February 6, 2025, ELF released its fiscal Q3 2025 results and lowered its fiscal outlook for the first time since before the onset of the COVID-19 pandemic. Specifically, ELF lowered its net sales outlook for the final quarter of the fiscal year to between -1 and 2%. ELF further revealed that it expected full-year fiscal 2025 net sales growth to be in the range of 27 to 28 percent, down from the previous guidance of 28 to 30 percent. The Company also revised its adjusted EBITDA guidance downward to $289 to 293 million, from $304 to 308 million. Management explained that this downward revision in guidance reflected lower demand trends, challenging category conditions, and slower-than-expected new product performance.

**ANSWER**:  With regard to the first sentence, Defendants admit that on February 6, 2025, e.l.f. released its financial results for its 3Q25.  With regard to the second sentence, Defendants aver that on February 6, 2025, e.l.f. provided updated financial guidance for 4Q25, projecting 4Q25 YoY sales growth of -1% to 2% (which it achieved).  With regard to the third sentence, Defendants aver that on February 6, 2025, e.l.f. provided updated financial guidance for FY25, projecting FY25 YoY sales growth of 27% to 28% as compared to its prior guidance of 28% to 30%.  With regard to the fourth sentence, Defendants aver that on February 6, 2025, e.l.f. provided updated adjusted EBITDA guidance of $289 to $293 million as compared to its prior guidance of $304 to $308 million.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

224.   On this news, ELF's stock price fell $17.36 per share, or 19.62 percent, to close at $71.13 per share on February 7, 2025.

**ANSWER**:  Defendants aver that the stock price and average trading volume of e.l.f. stock is publicly available.  Except as expressly admitted, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

225.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and other Class members have suffered significant losses and damages.

**ANSWER**:  Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

## VI.    LOSS CAUSATION

226.    Defendants' materially false and misleading statements and omissions alleged above directly and proximately caused the damages suffered by Lead Plaintiffs and other Class members. Defendants' material misstatements and omissions were widely disseminated to the securities markets, investment analysts, and the investing public and had the effect of creating unrealistically positive assessments and characterizations of ELF and its business, prospects, operations, and results which caused the Company's common stock to be overvalued and artificially inflated throughout the Class Period. Lead Plaintiffs and other Class members purchased or otherwise acquired ELF common stock at prices that were artificially inflated by Defendants' misrepresentations and omissions of material fact alleged herein.

**ANSWER**:  Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

227.    As alleged above, during the Class Period, Defendants publicly issued materially false and misleading statements and omissions of material fact regarding: (1) the declining sales in their retail partners; and (2) the cause of their inflated inventory; and (3) ELF's ability to sustain net sales growth. Had Defendants been truthful about these matters during the Class Period, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their shares of ELF common stock at the artificially inflated prices that they were offered at.

**ANSWER**:  Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

228.    As certain relevant and true facts became known and/or the risks previously concealed by Defendants' material misstatements and omissions materialized, the artificial inflation was removed from the price of ELF's common stock, causing the losses of Lead Plaintiffs and other Class members. The timing and magnitude of ELF's common stock price declines negates any inference that the losses suffered by Lead Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomics or industry factors, or over Company-specific facts unrelated to Defendants' fraudulent conduct.

**ANSWER**:  Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

229.    Specifically, on August 8, 2024 and February 6, 2025, the foreseeable risks and relevant truth concealed by Defendants' Class Period misstatements and omissions concerning ELF's net sales growth, its inventory, its demand, and its failure to produce successful new products. Indeed, each of these partial corrective disclosures, discussed above, supra ¶¶123-126, 154-160, and herein, partially revealed the relevant truth and foreseeable risks previously misrepresented and/or concerned by Defendants' materially false and misleading statements and omissions.

**ANSWER**:  Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive.  Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

**A. August 8, 2024 —First Partial Corrective Disclosure/Materialization of the Concealed Risk**

230.    On August 8, 2024, Defendants partially revealed the truth about their declining sales growth and stagnating sales.  Despite Defendants' repeated assurances that the Company would continue to deliver category-leading growth, investors began to learn that ELF's growth was flattening when the Company issued weak guidance for Q2 FY2025.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to all statements made on or before August 8, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

231.   Specifically, ELF issued meaningfully weaker-than-anticipated adjusted EBITDA guidance, which implied ~$40 million EBITDA in Q2—$30 million lower than expected by the street, signaling a sequential slowdown in top line growth. ELF also guided sales growth to 25%-27% for FY 2025, which was significantly lower than what analysts expected.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to all statements made on or before August 8, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions

232.   As a direct and proximate result of this partial corrective and/or materialization of the concealed risk, shares of ELF common stock fell 14.43%, declining from $187.95 per share on August 8, 2024, to close at $160.83 per share on August 9, 2024.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to all statements made on or before August 8, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

233.   Analysts expressed dismay as a result of this weak guidance. UBS stated on August 8, 2024 that "we believe a key driver of shares being down -10% after hours is the meaningfully weaker than anticipated implied F2Q EBITDA guidance (~$30M or so below Str. estimates entering the day) with the sequential slowdown in top line growth embedded in the outlook perplexing," and noted that this slowdown "implies more challenged US non-tracked channel performance." That same day, Morgan Stanley commented that "ELF's stock was down

significantly aftermarket on **weaker than expected guidance** for Q2, with revenue growth only slightly above 25-27% FY growth expectations, which would be a **big slowdown** from 50% in Q1, and includes ~16% Naturium acquisition contribution"

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to all statements made on or before August 8, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

234.   At the same time that it partially disclosed the truth, Defendants continued misleading investors by reassuring the market that the guidance was merely conservatism on their part, and ELF was still seeing signs of elevated demand. For example, in response to an analyst asking Defendant Amin if he expected any slowdown in sales, Amin stated "I would say that we're particularly well positioned. We saw growth across all of our channels, digital, all of our national retailers, and international customers. So, we remain quite bullish in our ability to continue to drive market share[.]" Similarly, Defendant Fields stated again attributed ELF's high levels of inventory to "***strong consumer demand.***"

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to all statements made on or before August 8, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

235.   Therefore, despite the partial disclosure of previously misrepresented and/or concealed material facts, the price of ELF common stock remained artificially inflated due to Defendants' failure to disclose: (1) declining sales, including in their retail partners such as Ulta Beauty; (2) the bloated inventory caused by the lowered demand environment, and (3) ELF's inability to sustain net sales growth.

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to all statements made on or before August 8, 2024, and thus, no response to

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

236. Analysts accepted Defendants' misrepresentations and indicated they believed ELF's long-term growth prospects were still intact and they expected ELF to beat its guidance and continue to grow. For example, on August 9, 2024, J.P. Morgan stated, "Investors are Too Caught Up on FQ2 Guidance 'Above New Annual Range of +25-27%.' Recall that ahead of FQ1, management said the same 'above the annual rate of 20-22%' and ended up delivering +50% growth in FQ1. ELF has been **beating and raising every quarter** since the Pandemic recovery." Similarly, Truist stated that although "the company remained conservative with guidance" and "[s]hares have worked down," it "continue[d] to believe ELF is well positioned to outperform – thanks to its Holy Grail products and international expansion – in a category more stable than some might fear." And UBS stated, "We came away from our callback with the view that the 2Q top-line remarks are more likely management taking a prudent approach given the uncertain operating backdrop, rather than a **reflection on any observed slowing in underlying trends."**

**ANSWER**: Defendants aver that on February 4, 2026, the Court's Order dismissed Lead Plaintiffs' challenge to all statements made on or before August 8, 2024, and thus, no response to these allegations is required. To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

**B. February 6, 2025 —Final Corrective Disclosure/Materialization of the Concealed Risk**

237. On February 6, 2025, the full truth and foreseeable risks regarding ELF's stagnant sales growth and weak demand environment were revealed and materialized. On this date, ELF released its results for Q3 FY 2025 and **lowered** its fiscal outlook—something it had not done in six years. Notably, ELF also guided its net sales growth for Q4 2025 to between -1% and 2%. This result would be the lowest quarterly year-over-year sales growth since at least FY19, and would risk negative sales growth for only the third time in ELF's 20+ year history.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

101

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

**ANSWER**: With regard to the second sentence, Defendants admit that on February 6, 2025, e.l.f. released its financial results for its 3Q25 and provided updated financial guidance. With regard to the third sentence, Defendants aver that on February 6, 2025, e.l.f. projected 4Q25 YoY sales growth of -1% to 2% (which it achieved). Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

238. Defendants attributed this decline to several factors. First, Defendants noted ELF had seen overall softer consumption of its products. Second, Defendants explained that ELF had released new products that had not produced results, despite Defendants' earlier promise that ELF had a pipeline of innovative products that they could pull forward if they observed weakness. Finally, Defendants conceded that ELF had observed "a little bit of softness in Ulta" that contributed to the sales decline.

**ANSWER**: With regard to the fourth sentence, Defendants admit that e.l.f. held an earnings call on February 6, 2025, the transcript of which is publicly available and contains the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

239. ELF also announced that it had an inventory balance of $215 million; and for the first time in years, did not attribute that inventory balance to "strong consumer demand."

**ANSWER**: Defendants admit that on February 6, 2025, e.l.f. reported an inventory balance of $215 million. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

240. As explained supra ¶¶52-59, net sales growth (and ELF's ability to sustain high growth every quarter) was absolutely vital to investors. At virtually every opportunity, Defendants bragged ELF was one of the only publicly traded consumer companies to both demonstrate net sales growth in 23 consecutive quarters, and to average over 20% net sales growth every quarter. Jeopardizing that growth risked crippling ELF's value to investors.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

241.    As a direct and proximate result of this corrective disclosure and/or risk materialization, shares of ELF common stock declined another $17.36 per share, or 19.62 percent, from $88.49 on February 6, 2025, to a closing price of $71.13 per share on February 7, 2025, thereby removing the artificial inflation from ELF stock.

**ANSWER**: Defendants aver that the stock price and average trading volume of e.l.f. stock is publicly available.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

242.    Analyst coverage of this shocking news confirms that the market was reacting to new information on ELF's stagnant sales growth, as caused by its failure to produce new innovations and produce results in its retail channels. Oppenheimer commented "We did not ***anticipate this severe a guide-down and moderation in the business*** . . . We remain concerned with upcoming difficult comparisons and would stay sidelined." UBS downgraded its price target, noting that the results were attributed to "***weaker early reads on '25 innovation***" and stating that "the company's 3Q results/updated outlook implies that this deceleration in growth may continue, with the updated outlook implying that growth could move into the + single-digit% range for the first time in four years." D.A. Davidson noted that ELF was shipping in far more inventory than it was offloading, calculating that ELF had overshipped the previous quarter by as much as 37%. And Piper Sandler expressed surprise that untracked channels like Ulta Beauty had been as unproductive as they were, stating "***though we were hopeful that untracked channels would offset***, management is lowering guidance, calling for sales growth of +27-28% y/y vs. +28-30% y/y previously."

**ANSWER**:  With regard to the first sentence, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.  Defendants further aver that the phrase "produce results in its retail channels" is vague and ambiguous and deny the allegations on that basis.  With regard to the second sentence, Defendants admit that

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

103

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

Oppenheimer issued a report on February 6, 2025, the contents of which are publicly available and contain the language quoted in this sentence. With regard to the third sentence, Defendants admit that UBS issued a report on February 6, 2025, the contents of which are publicly available and contain the language quoted in this sentence. With regard to the fourth sentence, Defendants admit that D.A. Davidson issued a report on February 6, 2025, the contents of which are publicly available. With regard to the fifth sentence, Defendants admit that Piper Sandler issued a report on February 6, 2025, the contents of which are publicly available and contain the excerpted language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

243. Accordingly, investors finally learned that Defendants had been concealing evidence that ELF's demand had been slipping, its innovations had been underperforming, and its inventory had been ballooning due to poor sales.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

## VII.    ADDITIONAL INDICIA OF SCIENTER

244. Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over ELF's and their materially false or misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section V, supra, were materially false or misleading when made, and knowingly or recklessly participated in or acquiesced in the issuance or dissemination such statements as primary violators of the federal securities laws. In addition to the specific facts alleged above, Defendants' scienter is furthered by the following facts.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

**A. Defendants Closely Monitored the Company's Topline Metrics**

245.     At all relevant times, Defendants closely monitored the company's topline metrics, the relevant inputs, contemporaneous sales data, inventory levels, and other indicators of demand. Both CW testimony and Defendants' own statements reveal that Defendants were aware of information which contradicted their public statements.

**ANSWER**:  With regard to the first sentence in this paragraph, Defendants aver that the phrases "closely monitored," "topline metrics," "relevant inputs," and "contemporaneous sales data," "inventory levels," and "other indicators of demand" are vague and ambiguous and deny the allegations on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

**1.  CW Testimony Reveals Defendants Had Access to and Were Informed of Information Contrary to Their Public Statements**

246.     CW testimony establishes that Defendants had access to real time sales data which contradicted their public statements.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

247.     CW 4 detailed that ELF maintained its own website and retail sales database, which was broken down by retailer and even by each retail store. According to CW 4, ELF maintained and tracked sales data in a data visualization platform.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants also aver that the phrases "tracked sales data" and "data visualization platform" in the second sentence in this paragraph are vague and ambiguous and deny the allegations on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

105

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

conclusions.

248.   CW 4 recalled that ELF also purchased sales data directly from many of its customers, including Ulta Beauty and Target, and that this data was maintained in the data visualization platform. CW 4 stated that ELF's internal sales data was 99% accurate and noted that sales data maintained by commercial aggregators, such as Nielsen or Circana, were not as accurate. CW 4 added that ELF's sales data was updated weekly on Monday evenings with the prior week's sales figures.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants also aver that the phrases "sales data," "data," and "data visualization platform" in this paragraph are vague and ambiguous and deny the allegations on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

249.   CW 4 recalled that all ELF employees had access to the data visualization platform, including the C-Suite. According to CW 4, the Company's C-suite reviewed sales data in the data visualization platform "all the time" because ELF is a very "data-driven" Company.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants also aver that the phrases "sales data," "data," "C-Suite," and "data visualization platform," and "data-driven" in this paragraph are vague and ambiguous and deny the allegations on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

250.   Defendants also closely tracked inventory data. According to CW 4, ELF maintained and tracked inventory data during her tenure. CW 4 stated that she also attended weekly inventory meetings with the Operations and Sales teams and that attendees of that meeting reviewed and discussed inventory during these meetings. CW 4 noted that current Senior Director

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

106

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

of Sales and Operations Planning George Barros led these weekly meetings. CW 4 added that ELF also held monthly inventory forecasting meetings.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants also aver that the phrase "inventory data" in this paragraph is vague and ambiguous and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

251.    Moreover, CW testimony establishes that the Individual Defendants were informed of information that contradicted their public statements, including sales and inventory data presented during internal meetings.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants also aver that the phrase "sales and inventory data" in this paragraph is vague and ambiguous and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

252.    For example, CW 4 stated that she attended monthly forecast meetings during her most recent tenure, which were attended by CEO Tarang Amin, Global Chief Marketing Officer Kory Marchisotto, heads of channels and heads of sales, among others. CW 4 detailed that the most recent Company sales data from ELF's data visualization platform was presented at these monthly forecast meetings. CW 4 detailed that contemporaneous negative sale trends were also discussed in these forecast meetings. CW 4 also stated that excess inventory was discussed at these forecast meetings.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants also aver that the phrases "sales data," "data visualization platform," "sale trends," and "excess inventory" in this paragraph are vague and

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

107

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

ambiguous and deny the allegations on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

253.    CW 4 recalled that beginning in Summer 2024, attendees at the monthly forecast meeting discussed the negative sales trends that they were observing, including plans to turn around negative sales trends. CW 4 stated that the attendees of the monthly forecast meeting also discussed excess and obsolete inventory and how to move excess inventory. CW 4 detailed that during monthly forecast meetings, attendees discussed plans to have retail partners help move ELF's excess inventory.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants also aver that the phrases "sale trends," "excess and obsolete inventory," and "excess inventory" in this paragraph are vague and ambiguous and deny the allegations on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

254.    Similarly, CW 4 recalled that attendees of the weekly and monthly inventory meetings began to express concern beginning in Summer 2024 when ELF sales began to decline.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis.  Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

255.    CW 4 also stated that it was discussed internally that ELF's new product launches were not performing well in calendar 2024. CW 4 recalled that by late September 2024 or early October 2024, it became clear to all Marketing, Finance and Sales Operations employees that its new product launches were not as successful as projected.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW

108

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants also aver that the phrases "not performing well," "not as successful as projected" in this paragraph are vague and ambiguous and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

256. Therefore, CW 4 stated that by mid-October 2024, ELF's Marketing, Finance and Sales Operations teams shifted its focus from marketing new products to marketing the Company's icon products. According to CW 4, by that time, the Company, including the C-Suite, were all "aligned" that the new products did not match the Company's internal forecasts or expectations, and their sales were not comparable to previous years. CW 4 recalled that at this time, ELF acknowledged that it was going to have a "bad" Q3 FY2025.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

### 2. Defendants' Own Statements Make Clear They Closely Monitored Relevant Information

257. Defendants' knowledge of relevant and contrary information was evident not only from CW testimony, but from Defendants' own public statements to the market.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

258. Throughout the Class Period, Defendants also made clear they closely monitored the success of their innovations. For example, on February 23, 2024, Defendant Fields described their productivity model and stated, "**We are proactively looking at our SKUs each year**. We rotate out about 25% of those annually. **We don't let our retailers tell us when something is dying at shelf**, we are proactively doing that. And it's really driven by the insights that we get

from our Beauty Squad, our digital, elfcosmentics.com, we're able to leverage those insights to really understand what consumers are going to be most attractive to."

**ANSWER**: Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive. Defendants aver that this paragraph purports to quote statements made by Defendant Fields without specifying where the statement was made. Defendants thus lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

259. This practice continued throughout the Class Period. On an earnings call on November 6, 2024, Defendant Amin stated, "We leverage insights from our site and Beauty Squad loyalty program to **proactively change out up to 20% of our retail assortment each year**. This approach has led us to be the most productive brand on a dollar per foot basis with our largest retail customers globally."

**ANSWER**: Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive. With regard to the second sentence, Defendants admit that e.l.f. held an earnings call on November 6, 2024, the transcript of which is publicly available and contains the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

260. Similarly, Defendants' own statements make clear that ELF is a very "data-driven' company. Indeed, Defendant Amin believed data to be essential to the DNA of the company. For example, on July 17, 2024 during an interview with After Earnings, a financial podcast, Defendant Amin was asked how ELF actually "connect[s] and contextualize[s]" data across many different channels and "[h]ow is data part of the DNA of the company?" Defendant Amin replied:

> **No, it's essential to the DNA of the company. And I would say we certainly have a data team part of both our digital team as well as our insights teams. And they're constantly going through from everything from creating the data lake to how we mine that to now starting to use AI to also help uncover some of those insights.** But one of the best tools we have is one of the simplest we have as part of our overall program, we have a loyalty program

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW

110

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

called Beauty Squad and we have almost 5 million Beauty squad members. And not only are they great fans of the brand, they buy way more than anyone else on our website. They certainly purchase more frequently. They're the big driver of elfcosmetics.com. But the other great thing about Beauty Squad is the rich source of first party data, data that we can use to better target in our marketing activities, but also data and insights we can use to the business.

**ANSWER**: With regard to the third and fourth sentences, Defendants admit that Defendant Amin participated in an interview on After Earnings on July 17, 2024, the recording of which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

261.    During the same interview, Defendant Amin commented that ELF "ha[d] data off of [its] e-commerce site" allowing it to know "what's going to sell.[]"

**ANSWER**: Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive. Defendants further, and admit that Defendant Amin participated in an interview on After Earnings on July 17, 2024, the recording of which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

262.    Additionally, Defendants repeatedly told investors that they closely monitored the Company's key top line metrics, like e-commerce site data, net sales growth, adjusted EBITDA growth, and market share.

**ANSWER**: Defendants aver that this paragraph purports to summarize statements made by Defendants without specifying where or when the statements were made. Defendants thus lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.

263.    For example, on November 6, 2024 during an earnings call, Defendant Amin was asked about "defining a long-term growth algorithm that helps investors understand how rapidly you can expand into these various areas that you're expanding internationally, new brands, et cetera." Defendant Amin replied, "Periodically, we will go and refresh what correlates most closely with our long-term share performance. **And for us, there's three measures: net sales**

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

111

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

**growth, adjusted EBITDA growth, and market share. And those are the three things we're absolutely focused on**."

**ANSWER**: Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive. Defendants admit that e.l.f. held an earnings call on November 6, 2024, the transcript of which is publicly available and contains the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

264. Critically, Defendants closely monitored data at Ulta Beauty and their other retailers. During the Morgan Stanley Global Consumer & Retail Conference on December 4, 2024, Defendant Amin stated:

> We're quite bullish on our prospects on digital. If you just take a look at our growth not only in the last couple of years, but even this last quarter, digital is growing faster than our retail business and it's really being driven by two different things. One is our investments over time in our Beauty Squad loyalty program, we have 5.3 million Beauty Squad loyalty members. We're still the only major mass brand with its own direct-to-consumer site, and that loyalty program not only drive[s] better results on our own e-com business driving that, **but we get a rich source of first-party data to really improve our marketing and get insights from our consumers in that community of Beauty Squad.**

**ANSWER**: Defendants admit that Defendant Amin participated in the Morgan Stanley Global Consumer & Retail Conference on December 4, 2024, the transcript of which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

265. Again, on December 4, 2024, Defendants touted their access and review of data crucial to demand and consumer growth received from the Beauty Squad loyalty program. During the Morgan Stanley Global Consumer & Retail Conference on December 4, 2024, Defendant Amin replied to a question regarding business trends from a digital standpoint for ELF and e-commerce sales over the next few years relative to retail store sales:

> We're quite bullish on our prospects on digital. If you just take a look at our growth not only in the last couple of years, but even this last quarter, digital is growing faster than our retail business and it's really being driven by two different things. One is our investments over time in our Beauty Squad loyalty program, we have 5.3 million Beauty Squad loyalty

members. We're still the only major mass brand with its own direct-to-consumer site, and that loyalty program not only drive[s] better results on our own e-com business driving that, **but we get a rich source of first-party data to really improve our marketing and get insights from our consumers in that community of Beauty Squad.**

**ANSWER**: Defendants admit that Defendant Amin participated in the Morgan Stanley Global Consumer & Retail Conference on December 4, 2024, the transcript of which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

266. Analyst firm D.A. Davidson explained in a December 19, 2024 report that ELF "gets consumption data from their retail partners all over the world" and receives "weekly POS data from all their retail partners across both tracked and untracked channels."

**ANSWER**: Defendants admit that D.A. Davidson issued a report on December 19, 2024, which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

267. These and other similar statements, corroborated by CW accounts, demonstrate that Defendants were familiar with all relevant data, including weekly sales data, inventory data, and demand trends. Defendants had access to critical sales data indicating ELF was aware of poor sales performance during the Class Period, interacted with this data, and therefore had firsthand access to declining demand. Defendants' monitoring of such data made them aware inventory had swelled and demand was down, and are directly relevant to the scienter of the Defendants.

**ANSWER**: Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive. Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Defendants also aver that the phrases "sales data," "inventory data," "demand trends," "poor sales performance," "interacted" and "monitoring" in this paragraph are vague and ambiguous and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs'

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

113

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

characterization of the events at issue and any legal conclusions.

**B. The Individual Defendants Offload $28 Million in ELF Stock to Capitalize on ELF's Artificially Inflated Stock Price Before the Truth is Revealed**

268.    Based on their knowledge of material nonpublic information that ELF's inventory was expanding because of lower demand, and as a result, ELF's high rate of sales growth would soon decelerate as retailers stopped ordering more product, Defendants Amin and Fields enriched themselves at the expense of ELF investors.

**ANSWER**:    Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

269.    Although the Individual Defendants already had established Rule 10b5-1 trading plans—which allow corporate insiders to sell company stock at predetermined times in accordance with insider trading laws—the Individual Defendants made massive sales between April and June 2024 outside of the parameters of their Rule 10b5-1 plans.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed all statements before November 21, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants aver that several months before the Putative Class Period, on April 18, 2024 and June 5, 2024, Amin sold 117,404 shares solely to satisfy tax or other government withholding obligations in connection with the vesting of performance and restricted stock units, in accordance with the Company's Equity Incentive Award Plan, which provides that "[u]pon vesting of the Shares, the Company, on the Participant's behalf, will instruct the Company's transfer agent . . . to sell that number of Shares . . . as may be necessary to satisfy any resulting withholding tax obligations on the Company."  Defendants further aver that several months before the Putative Class Period, on April 18, 2024 and June 5, 2024, Fields sold 49,602 shares solely to satisfy tax or other government withholding obligations in connection with the vesting of performance and restricted stock units, likewise in accordance with the Company's Equity Incentive Award Plan, which provides that "[u]pon vesting of the Shares, the Company, on the Participant's behalf, will instruct the Company's transfer agent . . . to sell that number of Shares . . . as may be necessary to satisfy any resulting withholding tax obligations on the Company."

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

114

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

270.    For example, on April 18, 2024, the Individual Defendants collectively sold over 103,000 shares and reaped over $17 million **in a single day**. Specifically, knowing that ELF's demand and net sales were declining, and thus ELF would not be able to sustain its historical growth numbers, Defendant Amin intentionally deviated from his 10b5-1 trading plan and made his largest open market sale of the Class Period, reaping **$12,388,646.40** in a single day. Similarly, Defendant Fields also made her April 18, 2024 sale outside of her 10b5-1 trading plan, collecting **$4,892,992** on April 18, 2024. These massive sales nearly doubled the record for the most shares either person had sold in a single day in years.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed all statements before November 21, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants aver that on April 18, 2024, Defendant Amin sold 74,451 shares solely to satisfy tax or other government withholding obligations in connection with the vesting of performance-based restricted stock units, in accordance with the Company's Equity Incentive Award Plan, which provides that "[u]pon vesting of the Shares, the Company, on the Participant's behalf, will instruct the Company's transfer agent . . . to sell that number of Shares . . . as may be necessary to satisfy any resulting withholding tax obligations on the Company." Defendants further aver that on April 18, 2024, Defendant Fields sold 29,405 shares solely to satisfy tax or other government withholding obligations in connection with the vesting of performance-based restricted stock units, in accordance with the Company's Equity Incentive Award Plan, which provides that "[u]pon vesting of the Shares, the Company, on the Participant's behalf, will instruct the Company's transfer agent . . . to sell that number of Shares . . . as may be necessary to satisfy any resulting withholding tax obligations on the Company."  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

271.    The Individual Defendants did not stop there. Between April and June 2024, while the Individual Defendants had access to material nonpublic information that ELF's ballooning

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

115

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

inventory was caused by lower demand (and not because of strong demand, as they falsely told investors), the Individual Defendants collectively sold more than $28 million of their ELF stock outside of their Rule 10b5-1 plans.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed all statements before November 21, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants aver that between April and June 2024, Defendant Amin sold 117,404 shares solely to satisfy tax or other government withholding obligations in connection with the vesting of performance and restricted stock units, in accordance with the Company's Equity Incentive Award Plan, which provides that "[u]pon vesting of the Shares, the Company, on the Participant's behalf, will instruct the Company's transfer agent . . . to sell that number of Shares . . . as may be necessary to satisfy any resulting withholding tax obligations on the Company." Defendants further aver that on April and June 2024, Defendant Fields sold 49,602 shares solely to satisfy tax or other government withholding obligations in connection with the vesting of performance and restricted stock units, in accordance with the Company's Equity Incentive Award Plan, which provides that "[u]pon vesting of the Shares, the Company, on the Participant's behalf, will instruct the Company's transfer agent . . . to sell that number of Shares . . . as may be necessary to satisfy any resulting withholding tax obligations on the Company."  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

272.   The Individual Defendants' open market sales, made outside of their Rule 10b5-1 trading plans and shortly before the truth was partially revealed, demonstrates a strong showing of scienter.

**ANSWER**:  Defendants aver that on February 4, 2026, the Court's Order dismissed all statements before November 21, 2024, and thus, no response to these allegations is required.  To the extent any such response is required, Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW

116

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

## C. Continued Elevated Net Sales Growth in the Company's Retail Sales Were Critical to ELF's Core Operations

273. The Individual Defendant's knowledge, or reckless disregard, of ELF's plummeting retailer sales, declining net sales growth, and underperformance of new products can be inferred because these facts were critical to ELF's core operations.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

274. First, continued customer demand and growth for ELF's retail sales were critical to ELF's business. Indeed, according to the Company's 2022, 2023, 2024, and 2025 10-Ks, the majority of ELF's net sales came from relationships with retail partners such as Walmart, Target, and Ulta Beauty. Each year, retail partners accounted for approximately 80% of the Company's overall net sales. In its 2024 10-K, the Company stated that, "We expect that Target, Walmart and Ulta Beauty, along with a small number of other customers will, in the aggregate, continue to account for a large portion of our net sales in the future."

**ANSWER**: With regard to the second sentence, Defendants admit that e.l.f.'s FY22, FY23, FY24, and FY25 Forms 10-K reported that over 50% of the Company's net sales were derived from retail partners, including Walmart, Target, and Ulta Beauty. With regard to the third sentence, Defendants admit that e.l.f.'s FY22, FY23, FY24, and FY25 Forms 10-K report that over 80% of the Company's net sales were derived from international and national retail partners. With regard to the fourth sentence, Defendants admit that e.l.f.'s FY24 Form 10-K, which is publicly available, contains the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

275. Critically, the Company was conscientious of how dependent it was on a small number of retailers. In its 2024 Q3 10-Q, the Company noted, "We depend on a limited number of retailers for a large portion of our net sales, and the loss of one or more of these retailers, or business challenges at one or more of these retailers, could adversely affect our results of operations."

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

117

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

**ANSWER**: With regard to the second sentence, Defendants admit that e.l.f.'s 3Q24 Form 10-Q, which is publicly available and was filed on February 7, 2024, contains the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

276. Further, the Company regularly touted the impact of retail on ELF's growth and bottom line. For example, in the Q4 2023 Press Release, ELF stated that "Net sales increased 78% to $187.4 million, *primarily driven by strength across our retailer and e-commerce channels*." ELF echoed this attribution in virtually every press release and every earnings call announcing its results.

**ANSWER**: With regard to the second sentence, Defendants admit that e.l.f.'s fourth quarter fiscal year 2023 press release, which is publicly available and was published on May 24, 2023, contains the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

277. Second, ELF's entire value to investors was attached to its ability to grow. ELF is a growth company, meaning its stock is attractive to investors because it has the potential to consistently and continuously grow its revenue.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

278. Reflecting this, Defendants constantly touted ELF's streak of continued sales growth as its key differentiator. For example, ELF would start every sales call listing how many quarters in a row it has achieved net sales growth. On February 6, 2024, at the start of the Q3 2024 Earnings Call, Defendant Amin stated, "Q3 marked our 20th consecutive quarter of net sales growth, putting e.l.f. Beauty in a rarefied group of consistent, high growth consumer companies."

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

Defendant Amin would go on to deliver an update of this statement at the beginning of each earnings call during the Class Period.

**ANSWER**: Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive. With regard to the first and second sentences, Defendants aver that they purport to summarize statements made by Defendants without specifying where or when the statements were made. Defendants thus lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. With regard to the third sentence, Defendants admit that on February 6, 2024, e.l.f. held an earnings call, the transcript of which is publicly available and contains the language quoted in this paragraph. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

279. Analyst coverage confirms that ELF's growth of net sales was key to its value as a public company. For example, in raising ELF's price target on November 3, 2022, analysts from J.P. Morgan remarked that ELF's ability to "continue growth," driven by its "innovation and ability to attract and engage consumers that continue to propel the company's growth engine" was the driver behind the target raise. Similarly, Bank of America explained on April 16, 2023 that it was raising its price target due to its view of ELF as an "outlier in our Consumer Staples coverage" because of its "high-growth nature in value."

**ANSWER**: With regard to the first sentence, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. With regard to the second sentence, Defendants admit that J.P. Morgan issued a report on November 3, 2022, the contents of which are publicly available and contain the language quoted in this paragraph. With regard to the third sentence, Defendants admit that Bank of America issued a report on April 17, 2023, the contents of which are publicly available and contain the language quoted in this sentence. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

119

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

280. Third, innovations, or periodic new products developed by ELF, were a major part of ELF's business. CW 4 detailed that sales of new products typically made up to 20% of overall Company sales.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding former e.l.f. employees' allegations or statements, and deny the allegations in this paragraph on that basis. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

281. Defendants touted the importance of innovation to their performance throughout the Class Period. On February 6, 2024, during the Q3 FY 2024 earnings call, Defendant Amin stated, "The second driver of our performance is our powerhouse innovation. **Our innovation engine has built category leadership over time.**" Similarly on February 23, 2024, while presenting at the Consumer Analyst Group of New York Conference on behalf of ELF, Defendant Amin stated, "[o]ur third strategic imperative and perhaps the linchpin of our entire strategy is to lead innovation."

**ANSWER**: Defendants aver that the Putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive. With regard to the first sentence, Defendants aver that it purports to summarize statements made by Defendants without specifying where or when the statements were made. Defendants thus lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. With regard to the second sentence, Defendants admit that on February 6, 2024, e.l.f. held an earnings call, the transcript of which is publicly available and contains the language quoted in this paragraph. With regard to the third sentence, Defendants admit that on February 23, 2024, Defendant Amin participated in the Consumer Analyst Group of New York Conference. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

282. Given the critical importance of ELF's retail sales, which represented the majority of the Company's sales, to ELF's business, Defendants' knowledge or reckless disregard of the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

120

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

problems associated with the declining sales in the Company's core business and Defendants' undisclosed scheme to cover up the lack of demand and growth can be inferred.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

283. Similarly, given the importance of demonstrating continuous growth in net sales to the Company's business model and value to investors, Defendants' knowledge, or their reckless disregard, of the stagnating net sales the Company would ultimately be forced to report and Defendants' undisclosed scheme to cover up the lack of demand and growth can be inferred.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

284. Finally, given the importance of new innovative products, which represented 20-30% of a company's net sales in a given year, to ELF's business, Defendants' knowledge, or their reckless disregard, of new products underperforming strongly supports an inference of scienter.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

## VIII.    CONTROL PERSON ALLEGATIONS

285. The Individual Defendants, by virtue of their high-level and controlling positions at ELF, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

**ANSWER**: Defendants aver that the phrases "high-level," and "controlling positions" in this paragraph are vague and ambiguous and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

286.    Defendants Amin and Fields, as senior executive officers of ELF—a publicly-held company whose common stock was, and is, traded on the NYSE, and governed by the federal securities laws—had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of ELF publicly traded common stock would be based on accurate information. Each of the Individual Defendants violated these requirements and obligations during the Class Period.

**ANSWER**:    Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

287.    Defendants Amin and Fields, because of their positions of control and authority as senior executive officers of ELF, were able to and did control the content of ELF's SEC filings, press releases, and other public statements issued by or on behalf of ELF during the Class Period. Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected.

**ANSWER**:    Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

288.    Accordingly, the Individual Defendants were responsible for the accuracy of the public statements alleged herein.

**ANSWER**:    Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

289.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of ELF common stock by disseminating materially false and misleading information and concealing and omitting material adverse facts. The scheme deceived the investing public regarding ELF's business, operations, and management, and the intrinsic value of ELF common stock, and caused Lead Plaintiffs and members of the Class to purchase ELF common stock at artificially inflated prices.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW

122

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

## IX. THE STATUTORY SAFE HARBOR IS INAPPLICABLE

290. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading. First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because, among other reasons, the risks that Defendants warned of had already come to pass.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

291. To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

**ANSWER**: Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

292. In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

**ANSWER**: Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

293.    Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected. To the extent Defendants included any cautionary language, that language was not meaningful because, among other reasons, any potential risks identified by Defendants had already passed or manifested.

**ANSWER**:    Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

294.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of ELF who knew that the statement was false when made.

**ANSWER**:    Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

295.    Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Lead Plaintiffs and other members of the Class purchased ELF's publicly traded common stock between the time Defendants misrepresented or failed to disclose

material facts and the time the facts were disclosed, without knowledge of the misrepresented or omitted facts

**ANSWER**:　Defendants admit that Lead Plaintiffs purport to rely upon the presumption of reliance.　Defendants aver that the phrase "efficient market" is vague and ambiguous and deny the allegations on that basis.　Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

296.　At all relevant times, the market for ELF shares was efficient for the following reasons, among others:

(a) ELF's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, ELF filed periodic public reports with the SEC and the NYSE;

(c) ELF regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

(d) ELF was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of those reports was publicly available and entered the public marketplace.

**ANSWER**:　Defendants aver that the phrases "met the requirements for listing," "highly efficient and automated market," "established market communication mechanisms," "major newswire services," "wide-ranging public disclosures," "major brokerage firms," and "sales force and certain customers" are vague and ambiguous and deny the allegations on that basis.　Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

125

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

297. As a result of the foregoing, the market for ELF securities promptly digested current information regarding ELF from publicly available sources and reflected such information in ELF's securities price(s). Under these circumstances, all persons and entities who or which purchased or otherwise acquired ELF's common stock during the Class Period suffered similar injuries through their purchase of ELF common stock at artificially inflated prices and thus, the presumption of reliance applies.

**ANSWER**: With regard to the first sentence in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations in this paragraph on that basis. Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

298. The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of ELF common stock.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

299. Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased shares of ELF common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

300. To the extent that Defendants concealed or improperly failed to disclose material facts with respect to ELF's business, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

126

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

## XI.   CLASS ACTION ALLEGATIONS

301.   Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons and entities who or which, during the period from February 7, 2024 through February 6, 2025, inclusive, purchased the publicly traded common stock of ELF, and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, and/or control person of ELF. during the Class Period, and members of their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) ELF's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

**ANSWER**:  Defendants admit that Lead Plaintiffs purport to bring a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons and entities who or which purchased the publicly traded e.l.f. common stock.  Defendants aver that the putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive.  Defendants further admit that the proposed class excludes Defendants, members of their immediate families, any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest, e.l.f.'s employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s), and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.  Except as expressly admitted, Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

302.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, there were over 56 million shares of ELF common stock outstanding, and the average daily trading volume was over 1.9 million shares. While the exact number of Class members is unknown to Lead Plaintiffs at this time, Lead Plaintiffs believe that there are at least thousands of members of the proposed Class. Record owners and other

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

127

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

members of the Class may be identified from records maintained by ELF or its transfer agent and can be notified of the pendency of this action by mail and publication using forms of notice similar to those customarily used in securities class actions.

**ANSWER**: Defendants aver that the putative Class Period is now limited to November 21, 2024 through February 6, 2025, inclusive. Defendants further lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

303.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' wrongful conduct as complained of herein.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

304.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and deny the allegations on that basis. Defendants deny the remaining allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

305.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW

128

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

(c) Whether, and to what extent, the market price of ELF common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(d) Whether Defendants acted with the requisite level of scienter;

(e) Whether the Individual Defendants were controlling persons of ELF;

(f) Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages

**ANSWER**:   Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

306.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expenses and burden of individual litigation make it practically impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**ANSWER**:   Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

307.   Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, as discussed in Section X, supra.

**ANSWER**:  Defendants admit that Lead Plaintiffs purport to rely, in part, upon the presumption of reliance.  Defendants deny that the presumption of reliance applies here.

308.   Based upon the foregoing, Lead Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

**ANSWER**:   Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

129

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

## XII.   COUNTS AGAINST DEFENDANTS

### Count I

### (For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

309.   Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

**ANSWER**:  Defendants incorporate their answers to the foregoing paragraphs.

310.   This Count is asserted against Defendants based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

**ANSWER**:  Defendants admit that Lead Plaintiffs purport to bring claims against Defendants under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5.

311.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**ANSWER**:  Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

312.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

130

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

313. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

314. Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other ELF personnel to members of the investing public, including Lead Plaintiffs and the Class.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

315. As a result of the foregoing, the market price of ELF securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Lead Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of ELF securities during the Class Period in purchasing ELF securities at prices that were artificially inflated as a result of Defendants' false and misleading statement.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

131

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

**ANSWER**:  Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

316.  Had Lead Plaintiffs and the other members of the Class been aware that the market price of ELF securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Company securities at the artificially inflated prices that they did, or at all.

**ANSWER**:  Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

317.  As a result of the wrongful conduct alleged herein, Lead Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

**ANSWER**:  Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

318.  As a result of the wrongful conduct alleged herein, Lead Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

**ANSWER**:  Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

**COUNT II**

**(Violations of Section 20(a) of The Exchange Act Against the Individual Defendants)**

319.  Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

**ANSWER**:  Defendants incorporate their answers to the foregoing paragraphs.

320.  During the Class Period, the Individual Defendants participated in the operation and management of the Company. The Individual Defendants conducted and participated, directly and indirectly, in the conduct of ELF's business affairs. Because of their senior positions, they knew the material information regarding the Company's operations, including key metrics like sales growth, inventory, and demand.

**ANSWER**:  Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

132

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

321. As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

322. Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

323. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**ANSWER**: Defendants deny the allegations in this paragraph, including Lead Plaintiffs' characterization of the events at issue and any legal conclusions.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for relief and judgment on behalf of themselves and the Class, as follows:

(a) Determining that this action is a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Lead Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

133

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest, as allowed by law;

(c) Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Awarding such further relief, including any equitable/injunctive relief, as the Court may deem just and proper

**ANSWER**:  To the extent any response is required to Lead Plaintiffs' prayer for relief, Defendants deny each and every allegation contained herein.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

**ANSWER**:  Defendants demand a trial by jury on all triable issues.  Defendants reserve the right to amend their Answer as necessary once the precise nature of the relevant circumstances or events is determined through discovery.

## AFFIRMATIVE DEFENSES

Without admitting or acknowledging that Defendants bear any burden of proof as to any of them, Defendants assert the following affirmative defenses:

## FIRST AFFIRMATIVE DEFENSE

### (No Standing)

Plaintiffs' claims against Defendants are barred, in whole or in part, because Plaintiffs lack standing to assert their claims against Defendants.

## SECOND AFFIRMATIVE DEFENSE

### (Action Cannot Be Maintained as a Class Action)

Defendants contend that this lawsuit should not proceed as a class action on the grounds that, *inter alia*, Plaintiffs lack standing to represent the purported class, Plaintiffs are not typical of, and do not and cannot fairly and adequately represent the putative class, Plaintiffs cannot establish that questions of law or fact common to class members predominate over individualized issues, and because a class action will not be superior to other methods available for the adjudication of this controversy.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

134

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

## THIRD AFFIRMATIVE DEFENSE

### (No Reliance)

Plaintiffs and members of the putative class would have acquired e.l.f. stock even if, when acquired, they had known of the allegedly untrue statements of material fact, omissions of material fact, or misleading statements or other wrongful conduct upon which Defendants' purported liability rests.

## FOURTH AFFIRMATIVE DEFENSE

### (Truth on the Market Defense)

Certain matters alleged to be the subject of misrepresentations and omissions were publicly disclosed or were in the public domain, and as such were available to Plaintiffs, members of the putative class, and/or the securities markets.

## FIFTH AFFIRMATIVE DEFENSE

### (Safe Harbor Defense)

Plaintiffs' claims are not actionable to the extent that the alleged statements of material fact, omissions of material fact, misleading statements, and/or other challenged statements made by Defendants fall within the Safe Harbor provisions of the Reform Act, as codified at 15 U.S.C. § 78u-5.

## SIXTH AFFIRMATIVE DEFENSE

### (Contribution)

Under principles of contribution and indemnity, persons or entities other than Defendants are wholly or partially responsible for the purported damages, if any, Plaintiffs and putative class members have sustained.

## SEVENTH AFFIRMATIVE DEFENSE

### (Comparative Fault and Equitable Allocation)

Any damages sustained by Plaintiffs or any member of the putative class must be rendered and/or barred in proportion to the wrongful or negligent conduct of persons or entities other than Defendants under the principles of equitable allocation, recoupment, set-off, and comparative fault.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

135

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

## EIGHTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate Damages)

Plaintiffs and members of the putative class have failed to mitigate any damages they may have suffered.  Any damages attributed to a purported loss in value of e.l.f. securities is a result of the failure of Plaintiffs and members of the putative class to take reasonable steps to reduce their damages when they first learned or should have learned of any alleged misstatement or omission.

## NINTH AFFIRMATIVE DEFENSE

### (Intervening and Superseding Cause)

Any recovery for damages allegedly incurred by Plaintiffs and members of the putative class, if any, is limited to the percentage of responsibility of Defendants in proportion to the total fault of all persons, whether or not named as parties to this action, who caused or contributed to Plaintiffs' alleged damages, if any, pursuant to the proportionate liability provisions of the Private Securities Litigation Reform Act of 1995, as codified at 15 U.S.C. § 78u-4(f)(3)(A). The acts and practices of persons or entities not associated with Defendants and ongoing economic events constitute independent intervening and superseding causes of the alleged harm, if any, suffered by Plaintiffs or members of the putative class, relieving Defendants of any liability.

## TENTH AFFIRMATIVE DEFENSE

### (Good Faith and Reasonable Care)

Defendants exercised reasonable care and acted in good faith, including good faith conformity with applicable Securities and Exchange Commission rules, regulations, and orders, and also did not directly or indirectly induce the act or acts constituting the alleged violations or causes of action. Defendants are therefore not subject to liability under the federal securities laws.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Assumption of the Risk)

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs and/or other members of the putative class had actual or constructive knowledge of the risks involved and thus assumed the risk that the value of e.l.f. stock would decline if such risks materialized.

## TWELFTH AFFIRMATIVE DEFENSE

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

136

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

(Good Faith for Control Persons)

Each and every one of the Defendants alleged to be a control person under Section 20(a) of the Securities Exchange Act of 1934 acted in good faith and did not directly or indirectly induce any acts constituting the alleged violations and causes of action.

## THIRTEENTH AFFIRMATIVE DEFENSE

(No Price Impact)

Plaintiffs' claims against Defendants are barred, in whole or in part, because the purported misstatements or omissions alleged in the Complaint did not affect the market price of e.l.f. securities owned by Plaintiffs or other members of the putative class.

## FOURTEENTH AFFIRMATIVE DEFENSE

(Failure to State a Claim)

The Complaint fails to state a claim upon which relief may be granted.

## PRAYER FOR RELIEF

Defendants have insufficient knowledge or information upon which to form a belief as to whether there may be additional affirmative defenses available to them. Defendants expressly reserve the right to plead additional affirmative and other defenses that may become available or apparent during this litigation and/or required by any amendments to the Complaint.

WHEREFORE, Defendants pray that this Court enter judgment as follows:

1. That judgment be entered in favor of Defendants;

2. That Plaintiffs and the purported plaintiff class take nothing from Defendants by their Complaint, and that the same be dismissed with prejudice;

3. For costs, attorneys' fees, expert witness fees, and court hearing fees incurred herein; and

4. For such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Defendants hereby demand a jury trial on all issues so triable in this action.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL

Respectfully Submitted,

Dated: April 3, 2026                     LATHAM & WATKINS LLP

By */s/ Whitney B. Weber*
    Michele D. Johnson (Bar No. 198298)
    *michele.johnson@lw.com*
    650 Town Center Drive, 20th Floor
    Costa Mesa, California 92626
    Telephone: +1.714.540.1235

    Colleen C. Smith (Bar No. 231216)
    *colleen.smith@lw.com*
    12670 High Bluff Drive
    San Diego, California 92130
    Telephone: +1.858.523.5400

    Eric R. Swibel (*pro hac vice*)
    *eric.swibel@lw.com*
    330 North Wabash Avenue, Suite 2800
    Chicago, Illinois 60611
    Telephone: +1.312.876.7700

    Whitney B. Weber (Bar No. 281160)
    *whitney.weber@lw.com*
    Daniel R. Gherardi (Bar No. 317771)
    *daniel.gherardi@lw.com*
    505 Montgomery Street, Suite 2000
    San Francisco, California 94111
    Telephone: +1.415.391.0600

    *Attorneys for Defendants e.l.f. Beauty, Inc.,*
    *Tarang P. Amin, and Mandy J. Fields*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

138

DEFENDANTS' ANS. AND AFF. DEFENSES TO
CONSOLDIATED COMPLAINT
CASE NO. 5:25-cv-02316-EKL